WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Kelly DiBlasi, Esq.
Debora Hoehne, Esq.
Furqaan Siddiqui, Esq.

*Attorneys for the Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
---------------------------------------------------------- x
```
|  |  |  |
|---|---|---|
| *In re*: | : | |
| | : | **Chapter 15** |
| | : | |
| **NORWEGIAN AIR SHUTTLE ASA,** *et al.,*[1] | : | **Case No. 21–10478 (MEW)** |
| | : | |
| **Debtors in foreign proceedings.** | : | |
| | : | **(Joint Administration Requested)** |

```
---------------------------------------------------------- x
```

## DECLARATION OF GEIR KARLSEN IN SUPPORT OF
## THE MOTION FOR RECOGNITION OF FOREIGN MAIN AND
## NONMAIN PROCEEDINGS AND CERTAIN RELATED RELIEF

I, Geir Karlsen, hereby submit this declaration (the "**Declaration**") and state as follows:

1.    I am the Chief Financial Officer of Norwegian Air Shuttle ASA ("**Norwegian**") and a board member of Arctic Aviation Assets DAC ("**AAA**" and, together with Norwegian, the "**Debtors**").  In my capacity as the authorized foreign representative (the "**Foreign Representative**") of the Debtors, I have commenced these chapter 15 cases (the "**Chapter 15**

---

[1] The Debtors in the foreign proceedings and the last four digits of each Debtor's local tax identification number are as follows: Norwegian Shuttle ASA (0358) and Arctic Aviation Assets DAC (1191).  The location of Norwegian Air Shuttle ASA's corporate headquarters is Oksenøyveien 3, 1336 Lysaker, Norway.  The location of Arctic Aviation Assets DAC's corporate headquarters is Ground Floor, Imbus House, Dublin Airport, Ireland.

Cases") on behalf of Norwegian, which has commenced a foreign proceeding in Norway (the "**Reconstruction Proceeding**") under Norway's Temporary Reconstruction Act (2020) (the "**Norwegian Reconstruction Act**") before the District Court of Oslo (the "**Norwegian Court**"), and AAA, which together with Norwegian and certain non-debtor affiliates has commenced a foreign proceeding in Ireland (the "**Irish Examinership Proceeding**" and, together with the Reconstruction Proceeding, the "**Foreign Proceedings**") under Part 10 of Ireland's Companies Act 2014 (the "**Companies Act**") before the High Court of Ireland (the "**Irish Court**").

2.      On February 26, 2021, the Norwegian Court entered an order, which, among other things, appointed me as the Foreign Representative of Norwegian in relation to the Reconstruction Proceeding. Subsequently, on March 5, 2021, the Irish Court entered an order, which, among other things, appointed me as the Foreign Representative of the Debtors in relation to the Irish Examinership Proceeding.

3.      I submit this Declaration in support of the following motions and other documents filed concurrently herewith (collectively, the "**Chapter 15 Pleadings**"): (a) the voluntary chapter 15 petitions of the Debtors (the "**Chapter 15 Petitions**"); (b) the *Motion for Recognition of Foreign Main and Nonmain Proceedings and Request for Certain Related Relief under Chapter 15 of the Bankruptcy Code* (the "**Recognition Motion**"); (c) the *Motion of Foreign Representative For Entry Of Order Authorizing Joint Administration Of Debtors' Chapter 15 Cases Pursuant To Bankruptcy Rule 1015* (the "**Joint Administration Motion**"); and (d) the *Motion Pursuant To Fed. R. Bankr. P. 2002 and 9007 Requesting Entry of Order Scheduling Recognition Hearing and Specifying Form and Manner of Service of Notice* (the "**Scheduling Motion**").  I am authorized by the Debtors to submit this Declaration on their behalf in support of the Chapter 15 Pleadings.

4.      In my role as Chief Financial Officer of Norwegian and board member of AAA, I have become familiar with the Debtors' businesses, day-to-day operations, and financial affairs, and I have been closely involved in the Debtors' financing and restructuring efforts to date. I am an individual over the age of 18 and, if called upon, could and would testify to the facts set forth in this Declaration.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, information supplied to me by other members of the Debtors' management and professionals, learned from my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtors' industry, operations, and financial condition.

## **BACKGROUND**

### I.    **Overview**

5.      Norwegian was one of the largest airline carriers in Europe and among the ten largest in the world, with a route network connecting North America, South America, Europe, North Africa, the Middle East, and Southeast Asia.

6.      The commencement of the Foreign Proceedings were a result of, among other things, mounting financial indebtedness, which was severely exacerbated by the COVID-19 pandemic as global air travel came to a complete standstill and shut down nearly all of the Debtors' operations.  Although the Debtors took various measures to manage their debt obligations and liquidity in light of the unprecedented financial and operating conditions they faced prior to their commencement of the Foreign Proceedings, a long-term holistic operational and financial restructuring is necessary to secure the future of their business.

7.      The Foreign Proceedings provide the Debtors with the flexibility and tools they need to implement such a holistic restructuring.  To be most effective, it is imperative that the

Debtors are protected from parties taking actions against them and their assets in the United States. Ultimately, the Debtors expect both the Irish Court and the Norwegian Court will approve a scheme of arrangement for each Debtor and similar reconstruction plan (as described in more detail in the Recognition Motion) that substantially restructure the Debtors' liabilities, and the effectiveness of the Debtors' overall restructuring will be maximized if the schemes and the plan are enforceable in the United States. Granting the relief sought herein will help accomplish these objectives, while at the same time ensuring the fair and efficient administration of the Foreign Proceedings, maximization of the value of the Debtors' business for the benefit of creditors, and fair and equitable treatment of all stakeholders.

## II.    The Debtors' Business

8.    Norwegian and its subsidiary companies (the "**Norwegian Group**" or the "**Group**") were founded in 1993. Until recently, the Norwegian Group's route network stretched across Europe into North Africa, the Middle East, North America, South America, and Southeast Asia. The Norwegian Group is a leader in the European short-haul point-to-point market and holds a dominant market position in Scandinavia.

9.    From its establishment in 1993 to the spring of 2003, the Norwegian Group primarily operated flights in Norway and was granted an exclusive license to operate these routes for the duration of its contract with the Norwegian government.

10.    In 2003, Norwegian became a listed company on Oslo Børs (the "**Oslo Stock Exchange**").

11.    Between 2004 and 2005, the Norwegian Group continued to run low-fare operations. In April 2007, the Norwegian Group announced the acquisition of the Swedish low-cost airline FlyNordic from Finnair plc, which resulted in it becoming the largest low-cost airline

in Scandinavia.

12.     Between 2001 and 2013, the Norwegian Group increased the size of its operations through the opening of a number of new bases across Europe including Helsinki and London Gatwick (with the latter intended to be the European base of its long-haul operations). During this time, the Norwegian Group also grew its fleet through various contracts with aircraft lessors and aircraft manufacturers.

13.     In 2012, the Norwegian Group announced the largest aircraft order in European history.  At a cost of $13.8 billion, Norwegian contracted to purchase a total of one hundred and twenty-two (122) aircraft (with an option for an additional one hundred (100) aircraft) from The Boeing Company ("**Boeing**") and one hundred (100) aircraft (with an option for an additional fifty (50) aircraft) from Airbus S.A.S. (now trading as Airbus SE) ("**Airbus**").  In 2015, AAA contracted with Boeing to acquire nineteen (19) Boeing 787-9 Dreamliners.

14.     The Norwegian Group liquidated certain investments to finance this ambitious growth strategy that involved the opening of many new routes, along with the associated investment in increased employee numbers, training, and new aircraft deliveries.  The company also entered into a number of sale and leaseback arrangements in respect of its aircraft.

15.     In July 2014, the Norwegian Group began its long haul-operations and became the first airline to offer low cost flights between Europe and the United States.

16.     By 2019, the Norwegian Group employed over 9,388 staff at twenty operational bases in eleven countries across four continents.  However, 2019 was ultimately a difficult year for the Norwegian Group, as it faced a number of significant challenges, including those caused by grounding and operational issues with certain Boeing aircraft.  In response to these challenges, the Group devised and implemented a number of cost reduction measures that included

the closure of several crew bases.  The Group also undertook a re-evaluation of its entire network as part of a strategy to return the company to profitability.  These measures resulted in cost savings of approximately $250 million.

17.    Unfortunately, in March 2020 the COVID-19 pandemic dealt another blow that severely impacted the Norwegian Group.  As discussed below, as a result of this hit to passenger demand and revenue, the Group was forced to enter into "hibernation mode".

18.    As of the commencement of the Foreign Proceedings, the Debtors employed just six hundred (600) employees and were only operating six (6) of their twenty-one (21) operational aircraft.  Despite having taken these and additional steps (discussed further below) to mitigate the financial strain on the Group, after the Norwegian government announced that it would be withdrawing its support of the Norwegian Group, the Debtors were left with no feasible option but to commence the Irish Examinership Proceeding on November 18, 2020, and the Reconstruction Proceeding on December 8, 2020.

## III.    Norwegian Group's Corporate Structure

19.    Norwegian, the ultimate shareholder of the Group, is a publicly listed company in Norway and its shares trade on the Oslo Stock Exchange.  AAA is a wholly-owned subsidiary of Norwegian, and it has thirty-six (36) Irish incorporated subsidiary companies (the "**Leasing Subsidiaries**").  The Leasing Subsidiaries facilitate the financing, trading, and leasing of aircraft by the Norwegian Group.  The three largest Leasing Subsidiaries are Drammensfjorden Leasing Limited ("**DLL**"), Torskefjorden Leasing Limited ("**TLL**"), and Lysakerfjorden Leasing Limited ("**LLL**").  DLL, TLL and LLL, together with one of the Group's airline operators, Norwegian Air International Limited ("**NAI**"), sought the protection of the Irish Examinership

Proceeding with Norwegian and AAA.[2]  Thereafter, Norwegian sought additional protection of the Reconstruction Proceeding.  An abridged corporate organizational chart showing the entities of the Norwegian Group that are part of the Irish Examinership Proceeding, Reconstruction Proceeding, and these Chapter 15 Cases is set forth below.



i.    **Norwegian**

20.    Norwegian is incorporated in Norway.  It is the sole shareholder of AAA and its wholly owned Irish corporate platform, which consists primarily of the Leasing Subsidiaries (which, together with AAA, are collectively referred to as the "**Irish Asset Management Platform**").[3]  As of the commencement of the Foreign Proceedings, the Irish Asset

---

[2] DLL, TLL, LLL and NAI are not Debtors in these Chapter 15 Cases.  TLL was subsequently removed from the Irish Examinership Proceeding in January 2021 when the decision was made to eliminate long haul flying in its entirety, as all aircraft leased through this entity were no longer needed for the successful restructuring of the Group.

[3] Other than on account of a limited relationship between AAA and Norwegian's former Argentinian airline in respect of three (3) aircraft and AAA's joint venture, SkyHawk (as defined herein), Norwegian and its wholly owned group are the sole airline customers of the Irish Asset Management Platform.

Management Platform possessed one hundred and forty (140) aircraft with associated debt and leasing liabilities of approximately $5.19 billion.

21.     As of the commencement of the Foreign Proceedings, Norwegian held Airline Operating Certificate ("**AOC**") issued by Norway (which it intends to maintain post-restructuring) and leased its fleet of thirty-seven (37) aircraft from certain of the Leasing Subsidiaries.

22.     In addition to being an operational airline, Norwegian houses the Group's management and corporate functions, which include an internal treasury function for the Group. Norwegian collects and holds all income generated from ticket sales.  When required, Norwegian transfers cash to other Norwegian Group companies, including those companies that form part of the Irish Asset Management Platform, to fund their ongoing obligations.

23.     Norwegian guaranteed the obligations of the Irish Asset Management Platform to third party aircraft lessors and financiers.

24.     Norwegian was a customer under an aircraft purchase contract with Boeing for the purchase of certain Boeing 787-8 aircraft (the "**787-8 Aircraft Contract**").  As set forth in more detail below, on June 29, 2020, Norwegian terminated the 787-8 Aircraft Contract.

**ii.     AAA**

25.     AAA is the Irish holding company for the Group's Irish aircraft Asset Management Platform.

26.     AAA was incorporated to act as an asset management company for the Norwegian Group, centralizing aircraft leases and financings in a dedicated corporate structure, which is a common commercial practice for aircraft owners, lessors, and financiers.  As mentioned above, AAA has thirty-six (36) Leasing Subsidiaries.  AAA and its Leasing Subsidiaries predominantly act as a "captive lessor" by leasing or subleasing all of their owned and financed

aircraft to the Norwegian Group's airlines, including to Norwegian and NAI.  AAA also manages

new aircraft orders for Norwegian, sources aircraft financing, manages aircraft leased from

external lessors to the Irish Asset Management Platform, and markets and trades aircraft to third

parties.  As a separate business line, AAA acquires and leases aircraft to unrelated airlines via its

Irish incorporated subsidiary companies, most recently through a joint venture called SkyHawk

Aviation Limited ("**SkyHawk**").[4]

27.    AAA actively manages the aircraft leasing and financing arrangements of

the Leasing Subsidiaries from its leased office at Dublin Airport, Ireland where AAA employs

seven full time employees.  AAA's activities include the management of day-to-day contractual

matters and communications with aircraft financiers and lessors.  AAA charges a management fee

to each of the Leasing Subsidiaries for the management services it provides.

28.    AAA receives and holds funds from Norwegian for distribution to the other

members of the Irish Asset Management Platform, as and when required.  AAA has also acted as

an intra-group lender to the Leasing Subsidiaries in connection with the aircraft leasing and

financing activities of those companies and acts as a guarantor of certain financing and aircraft

leasing arrangements of both its subsidiaries and its parent, Norwegian.

29.    AAA was the customer under an aircraft purchase contract entered into on

October 21, 2015 with Boeing for the purchase of nineteen Boeing 787-9 aircraft, of which five

(5) are undelivered (the "**787-9 Aircraft Contract**").  AAA was also the assignee by way of

novation of an aircraft purchase contract with Boeing for the purchase of one hundred and ten

---

[4] AAA is a 30% shareholder in SkyHawk, which is a joint-venture aircraft financing and leasing platform established in October 2019 between AAA and CCB Leasing (International) Corporation DAC ("**CCBLI**"), whose ultimate parent is China Construction Bank Corporation ("**CCB**").  CCBLI holds the remaining 70% of the shares in SkyHawk.  SkyHawk, through its wholly owned Irish incorporated subsidiary, engages in the leasing of aircraft to Hong Kong Express Airways Limited, an airline based in Hong Kong (and part of the Cathay Pacific group of airlines), which is unrelated to Norwegian, CCBLI and CCB.

(110) Boeing 737-8 MAX aircraft, ninety-two (92) of which remain undelivered.  This contract was originally entered into by and among Norwegian and Boeing on January 24, 2012, and was novated to AAA on November 27, 2014 (the "**737-8 Max Aircraft Contract**").  As set forth in more detail below, on June 29, 2020, AAA terminated the 787-9 Aircraft Contract and the 737-8 Max Aircraft Contract.

30.    AAA was the assignee by way of novation of an aircraft purchase contract with Airbus for the purchase of one hundred (100) Airbus aircraft (the "**Airbus Contract**").[5]  This contract was originally entered into by Norwegian and Airbus on June 8, 2012, and was novated to AAA on December 1, 2014.

31.    Norwegian guaranteed AAA's obligations under both the Airbus Contract and the 737-8 Max Aircraft Contract.

## IV.    Norwegian Group's Capital Structure

32.    As of the commencement of the Foreign Proceedings, the Debtors were liable for approximately $5.9 billion in aggregate debt obligations, as summarized below:

| Obligor | Obligation | Approximate Amount Outstanding (NOK) (thousands) | Approximate Amount Outstanding (USD) (thousands) | Maturity |
|---|---|---|---|---|
| **Norwegian/AAA** | **Aircraft Leasing & Financing** | **46,308,000** | **5,130,796** | |
| Norwegian | NAS 09 Secured Notes | 250,000 | 27,699 | Nov. 23, 2021 |
| Norwegian | NAS 07 Secured Notes | 1,356,960 | 150,347 | Nov. 11, 2022 |
| Norwegian | NAS 08 Secured Notes | 530,522 | 58,780 | Feb. 7, 2023 |
| **Norwegian** | **Total Secured Debt** | **2,137,482** | **236,826** | |
| Norwegian | 2019 Convertible Bonds | 58,009 | 6,427 | Nov. 15, 2024 |

---

[5] The 787-8 Aircraft Contract, 787-9 Aircraft Contract, 737-8 Max Aircraft Contract, and Airbus Contract have also been repudiated subject to the terms of the Repudiation Order issued by the Irish Court.

| Obligor | Obligation | Approximate Amount Outstanding (NOK) (thousands) | Approximate Amount Outstanding (USD) (thousands) | Maturity |
|---|---|---|---|---|
| Norwegian | NOK 2.99 billion State-Backed Term Facility | 2,989,000 | 331,173 | Mar. 31, 2022 |
| Norwegian | Facility agreement: NOK 333 million State-Backed Term Facility | 333,000 | 36,895 | Mar. 31, 2022 |
| Norwegian | Standard Convertible Perpetual Bonds | 1,652,905 | 183,137 | N/A |
| Norwegian | VWAP Convertible Perpetual Bonds | 264,382 | 29,293 | N/A |
| **Norwegian** | **Total Unsecured Debt** | **5,297,296** | **586,925** | |
| | **Total Debt** | **53,742,778** | **5,954,547** | |

33.     As of the commencement of the Foreign Proceedings, the Debtors had outstanding aircraft leasing and financing obligations of approximately NOK 46.3 billion (approximately $5.1 billion USD) on account of the Norwegian Group's aircraft fleet, whether in the form of lease obligations, aircraft financing, or NAS's guarantees thereof (the "**Aircraft Leasing & Financing Obligations**").  A portion of the Aircraft Leasing & Financing Obligation is secured.

34.     As of the commencement of the Foreign Proceedings, there was approximately NOK 250 million (approximately $27.7 million USD) in principal outstanding pursuant to the NOK 250,000,000 FRN Norwegian Air Shuttle ASA Senior Secured Bond Issue 2017/2020 with ISIN NO 001 0809940 due November 23, 2021 (the "**NAS09 Secured Notes**") issued pursuant to that certain bond agreement, dated as of November 16, 2017, and amended and restated as of May 19, 2020, among Norwegian Air Shuttle ASA, as issuer and Nordic Trustee AS, as Bond Trustee.  Obligations under the NAS09 Secured Notes are secured with a first priority lien over an aircraft hangar located on property with registration number 229, property number 1, and

ground lease number 83 in Ullensaker municipality, Norway, including a charge over the ground lease and rights of co-insurance under related insurance policies.

35.    As of the commencement of the Foreign Proceedings, there was approximately NOK 1.36 billion (approximately $150 million USD) in principal outstanding under the EUR 250,000,000 7.25% Norwegian Air Shuttle ASA Senior Unsecured Bond Issue 2015/2019 with ISIN NO 001 0753437 due November 11, 2022 (the "**NAS07 Secured Notes**") issued pursuant to that certain bond agreement, dated as of December 9, 2015, and amended and restated as of May 19, 2020, among Norwegian Air Shuttle ASA, as issuer and Nordic Trustee AS, as Bond Trustee.  Obligations under the NAS07 Secured Notes are secured indirectly by slot rights at Gatwick Airport.

36.    As of the commencement of the Foreign Proceedings, there was approximately NOK 531 million (approximately $59 million USD) in principal outstanding under the SEK 963,500,000 7.25% Norwegian Air Shuttle ASA Senior Unsecured Bond Issue 2017/2020 with ISIN NO 001 0783459 due February 7, 2023 (the "**NAS08 Secured Notes**") issued pursuant to that certain bond agreement, dated as of February 7, 2017, and amended and restated as of May 19, 2020, among Norwegian Air Shuttle ASA, as issuer and Nordic Trustee AS, as Bond Trustee. Obligations under the NAS08 Secured Notes are secured indirectly by slot rights at Gatwick Airport.

37.    As of the commencement of the Foreign Proceedings, there was approximately NOK 58 million (approximately $6.4 million USD) in principal outstanding under the Norwegian Air Shuttle ASA 6.375% Senior Unsecured Convertible Bonds due November 15, 2024 (the "**2019 Convertible Bonds**") issued pursuant to Bond Terms dated as of November 13, 2019, and amended and restated as of May 19, 2020, among Norwegian Air Shuttle ASA, as issuer

and Nordic Trustee AS, as Bond Trustee. Obligations under the 2019 Convertible Bonds are unsecured.

38.     On May 16, 2020, Norwegian, as borrower entered into that certain Facility Agreement ("**Facility Agreement**") maturing March 31, 2022, in the amount of approximately NOK 2.99 billion (approximately $331 million USD) (the "**NOK 2.99 Billion State-Backed Term Facility**"). 90% of Norwegian's payment obligations under the NOK 2.99 Billion State-Backed Term Facility are guaranteed by Garantinstituttet for eksportkreditt ("**GIEK**"), the export credit agency of Norway. Obligations under the NOK 2.99 Billion State-Backed Term Facility are unsecured.

39.     On March 31, 2020, Norwegian, as borrower entered into that certain Facility Agreement maturing March 31, 2022, in the amount of NOK 333 million (approximately $37 million USD) (the "**NOK 333 Million State-Backed Term Facility**"). Obligations under the NOK 333 Million State-Backed Term Facility are unsecured.

40.     As of the commencement of the Foreign Proceedings, there was NOK 1.65 billion (approximately $183 million USD) in principal outstanding under the zero coupon perpetual subordinated convertible bonds issued pursuant to the Bond Terms dated May 22, 2020 (as amended and restated from time to time) in connection with (1) the Norwegian Air Shuttle ASA perpetual 0% USD subordinated convertible bond loan with ISIN NO 0010883515; (2) the Norwegian Air Shuttle ASA perpetual 0% EUR subordinated convertible bond loan with ISIN NO 0010883416; and (3) the Norwegian Air Shuttle ASA perpetual 0% SEK subordinated convertible bond loan with ISIN NO 0010883473 (collectively, the "**Standard Convertible Perpetual Bonds**"). The Standard Convertible Perpetual Bonds were issued in connection with the Out-of-Court Restructuring Plan and are convertible into equity at the conversion price specified in the

Bond Terms. Any remaining obligations under the Standard Convertible Perpetual Bonds are unsecured.

41.     As of the commencement of the Foreign Proceedings, there was NOK 264 million (approximately $29 million USD) in principal outstanding under the Norwegian Air Shuttle ASA perpetual 0% USD convertible bond loan with ISIN NO 0010884646 pursuant to the Bond Terms dated June 4, 2020 (as amended and restated from time to time) (the "**VWAP Convertible Perpetual Bonds**"). The VWAP Convertible Perpetual Bonds were issued on substantially the same terms as the Standard Convertible Perpetual Bonds, except for amendments to the conversion price mechanism in respect of a two-week period from June 4, 2023 as described in the Group's stock exchange announcement to the Oslo Stock Exchange dated September 30, 2020. The VWAP Convertible Perpetual Bonds were also issued in connection with the Out-of-Court Restructuring Plan and are convertible into equity at the conversion price specified in the Bond Terms. Any remaining obligations under the VWAP Convertible Perpetual Bonds are unsecured.

## V.    Assets and Operations in the United States

42.     The Debtors have widespread assets and contacts in the United States. Prior to the COVID-19 pandemic, Norwegian operated flights to and from fifteen (15) U.S. international airports located in eleven (11) different states. In connection therewith, Norwegian held slots at these airports, and still holds a valuable airport slot at John F. Kennedy International Airport in New York ("**JFK**"). Norwegian also held related operational contracts with various U.S. airport authorities and vendors. To assist with U.S. operations, Norwegian also leased a crew room at

JFK and a storage space in New York.[6]  Norwegian also leased office space in Ft. Lauderdale, Florida and owns an apartment in Seattle, Washington.

43.    Norwegian also has significant financial interests in the United States. Specifically, Norwegian has approximately $1.5 million on account at DNB Bank in New York, New York.  Norwegian is owed a refund from the Internal Revenue Service in an amount exceeding $16 million.  Norwegian is also owed accounts receivable in excess of $1 million from fifty (50) vendors located across fourteen (14) different states.  Norwegian and AAA also have an interest in remaining fee advance funds on account with Weil, Gotshal & Manges LLP ("**Weil**"), counsel to the Foreign Representative, which funds are held in an account in New York.

44.    Norwegian and AAA have significant contacts in the United States through various aircraft and engine purchase, maintenance, and lease agreements.  Norwegian and AAA are both plaintiffs in a lawsuit (the "**Boeing Complaint**") commenced against Boeing and Boeing Commercial Aviation Services Europe Limited ("**BCASEL**") in the Circuit Court of Cook County, Illinois on June 29, 2020 in connection with the faulty and undelivered aircraft purchased pursuant to the (now terminated and repudiated) 737-8 Max Aircraft Contract, 787-8 Aircraft Contract, and 787-9 Aircraft Contract, as described in more detail below.  Both contracts are governed by laws of the State of Washington, and performance thereunder took place in Washington, South Carolina, Illinois, and a variety of U.S. airports (among other non-U.S. locations).  Norwegian owns Boeing 787 parts inventory located in eight (8) different airports across the United States.  Norwegian was also party to certain maintenance contracts with Boeing and BCASEL in connection with the

---

[6] Shortly before January 24, 2021, Norwegian decided to terminate long-haul operations to the United States. Moreover, the Debtors and their affiliates have proposed a downsizing of their fleet.  As a result, most of the Debtors' U.S. contracts and leases are subject to repudiation, effective as of implementation of the Schemes (as defined herein).

servicing of Norwegian Group's 737 MAX and 787 aircraft (the "**GoldCare Contracts**"). Norwegian terminated the GoldCare Contracts on June 29, 2020.  On the same date, the Debtors terminated the 787-8 Aircraft Contract, the 787-9 Aircraft Contract, and the 737-8 Max Aircraft Contract.

45.    AAA is also party to a contract to purchase aircraft engines from Pratt & Whitney (the "**PW Contract**").  Norwegian originally entered into the PW Contract to purchase aircraft engines and later novated and assigned the contract to AAA.  The PW Contract is governed by laws of the State of Connecticut, and the engines are manufactured in Connecticut.[7]

46.    Norwegian is also party to certain engine leases governed by laws of the State of New York and has provided guarantees of other aircraft operating lease contracts entered into by TLL and DLL which are governed by laws of the States of New York and California.

47.    Finally, Norwegian is a defendant in a customer refund lawsuit in New York and is also a defendant in various small claim personal injury and customer damages lawsuits across state courts in California.[8]

## VI.    Events Leading to the Foreign Proceedings

48.    The global grounding and operational defects of the Norwegian Group's Boeing aircraft, the COVID-19 pandemic, and the Norwegian government's withdrawal of

---

[7] The PW Contract has been repudiated, subject to the terms of the Repudiation Order issued by the Irish Court and subject to the effective date of the Scheme.

[8] As of the commencement of the Foreign Proceedings, Norwegian was also involved in a litigation matter regarding its sales tax liability before the New York State Department of Taxation and Finance, which was settled on January 8, 2021.  New York State has since submitted its claim representing the settlement amount in the Irish Examinership Proceeding.

financial support are the primary catalysts that propelled the Debtors into commencing the Foreign

Proceedings. Each of these catalysts is discussed below.

### i.    Impact of Global Grounding of Boeing 737 MAX and Boeing 787 Dreamliner Operational Issues

49.    In March, 2019, global aviation regulators grounded all Boeing 737 MAX

aircraft after two fatal accidents involving this aircraft type (operated by other airlines) resulted in

total casualties of 346 people. As a consequence, the Norwegian Group had to ground eighteen

(18) of its aircraft of this type and Boeing was unable to deliver twenty-one (21) new aircraft that

were scheduled to have been delivered in 2019.

50.    Furthermore, the thirty-seven (37) 787 Dreamliners that Boeing delivered

to the Debtors experienced severe and persistent operational problems, causing the Debtors to

ground the aircraft for heavy maintenance well in advance of normal expected intervals. These

issues caused substantial harm to the Debtors, negatively impacting on the Group's ability to plan

its route network and flight schedules with any certainty. Accordingly, on June 29, 2020,

Norwegian and AAA filed the Boeing Complaint against Boeing and BCASEL asserting causes

of action for breach of contract, breach of duty of good faith and fair dealing, and fraudulent

inducement, alleging damages in excess of $1 billion.

51.    The grounding of the Boeing 737 MAX aircraft and the technical difficulties

encountered with the Boeing 787 Dreamliner fleet required the Norwegian Group to rapidly adapt

its network in an effort to minimize the disruption to its customers, and incur substantial additional

expenses and losses as a result. Specifically, the 737 MAX catastrophes resulted in the Norwegian

Group having to leave $1 billion worth of 737 MAX aircraft sitting on the tarmac and in storage;

required the Norwegian Group to expend significant additional costs, including having to train

pilots to operate different models, leasing and operating substitute aircraft, incurring additional

fuel costs, cancelling flights and routes, refunding tickets, managing additional call center volume, and other expenses.  In addition, the 787s Boeing delivered to the Norwegian Group had such severe issues that for years the Group was repeatedly forced to take the planes out of service for months for heavy maintenance and to lease substitute aircraft.  As a result, the Norwegian Group suffered significant losses in 2019 directly attributable to the fleet disruption.

ii.    **Impact of COVID-19 Pandemic**

52.    Despite the issues with its Boeing aircraft and the resulting losses that Norwegian Group incurred, the Group's 2019 financial results were still promising, with an increase of 8% in total revenue compared to 2018.  The Group took significant actions in 2019 to optimize the route network, cut costs, and create financial headroom.   In February 2020 (immediately prior to the COVID-19 pandemic hitting Europe), the Group was targeting a net profit for 2020.  In a matter of weeks, however, like all other operators in the aviation sector, the Group's focus shifted from one of growth to survival.

53.    The Group's business has been significantly and adversely affected by the ongoing COVID-19 pandemic, which has caused an unprecedented near-shutdown of the global passenger aviation industry.  As a result of the pandemic, global airlines have announced large scale cost-cutting and cash preservation initiatives, sought extensive government support and subsidies, and/or have commenced chapter 11 cases, entered administration, or accessed other court-backed restructuring processes.

54.    Since last year, the Group's revenue has declined 91% to $144.5 million.  This deterioration comes amidst a 91% decline in passenger volumes from 2019 levels.

55.    Faced with these challenges, the Group undertook a comprehensive approach to manage its liquidity and operations, including making the difficult decision to furlough

8,000 employees between March and June of 2020 and limiting aircraft operations to a few domestic routes in Norway during this period.

56.    Despite introducing these decisive cost-reducing measures, the scale of the unprecedented and prolonged disruption has had a severe impact on the Group's financial position, with the Norwegian Group suffering a net loss of NOK 5.24 billion (approximately $596 million) in the first half of 2020.  Although the Norwegian Group was able to reintroduce more aircraft into service in the third quarter of 2020, peaking at twenty-five (25) aircraft, a second wave of COVID-19 and renewed travel restrictions forced the Group in the fourth quarter to return to hibernation mode, ground all but six (6) aircraft, and furlough additional staff.

### iii.    The 2020 Out-of-Court Restructuring

57.    Shortly after the initial decision to put the Group into hibernation mode, it became readily apparent that the Group required additional external working capital in order to stave off a potential bankruptcy.  The Group obtained this relief through state aid in the form of loan guarantees from the Norwegian government.  However, it was necessary for the Norwegian Group to restructure its debt before it would qualify for the Norwegian government's financial assistance program for the aviation industry (the "**State Aid Package**").

58.    On April 27, 2020, the Norwegian Group outlined its plan to qualify for the State Aid Package (the "**Out-of-Court Restructuring Plan**").  The Out-of-Court Restructuring Plan included the conversion of a certain portion of the Norwegian Group's debt and leasing obligations to equity, the mark to market of certain aircraft lease rates, entry into a power-by-the-hour arrangement to support the Group's need to reduce the payment terms on its limited active fleet, and a postponement of operations outside of Norway (including to the rest of Europe and intercontinental long-haul flights) until the COVID-19 pandemic eased.  The Norwegian Group presented the Out-of-Court Restructuring Plan as the blueprint for a "New Norwegian" with future

plans to reinstate routes that had been abandoned in response to the COVID-19 pandemic as consumer demand returned. The ultimate goal of the Out-of-Court Restructuring Plan was to return the Group to a position where it would be operating between 110 and 120 aircraft.

59.    To implement the Out-of-Court Restructuring Plan, the Group was required to engage, and secure agreements with, certain of its creditors, including aircraft lessors and holders of secured and unsecured bonds issued by the Norwegian Group. Negotiations with aircraft lessors took place between April and May 2020. While many lessors were willing to discuss the restructuring of the Group's obligations, there were a number who were not prepared to entertain any such discussions. By May of 2020, the Norwegian Group's negotiations concluded with certain of its lessors agreeing to provide for a temporary reduction in aircraft lease payments through a power-by-the-hour arrangement, a permanent reduction of certain aircraft lease rates, and a conversion of certain outstanding lease obligations to equity. The revised terms were expected to reduce lease payments by approximately $250-285 million until March 2021.

60.    During this same timeframe, the Group engaged in negotiations with certain funded debt creditors. On May 20, 2020, Norwegian announced that it had, as part of the Out-of-Court Restructuring Plan, successfully converted approximately $1.45 billion debt held on account of certain bonds and lease obligations to equity (through agreements with certain of its creditors) by, among other things, the issuance of the Standard Convertible Perpetual Bonds and the VWAP

Convertible Perpetual Bonds, and raised approximately $44 million in new cash and equity through a public offering.

61.    With the Out-of-Court Restructuring Plan completed, the Norwegian Group fulfilled the conditions to enable it to access the State Aid Package, which consisted of a state loan package of NOK 2.99 billion (approximately $331 million USD) that GIEK guaranteed.

62.    The State Aid Package was made available to the Norwegian Group for the purpose of financing short-term liquidity needs caused by the COVID-19 pandemic to ensure the continued operation of the company (but not to refinance other financial indebtedness of the Norwegian Group or to decrease any negative balance on overdraft facilities).

63.    Even though the Debtors successfully restructured a large portion of their leasing and bond debt, and in so doing qualified for the State Aid Package, the restructuring process in respect of the aircraft financings and other creditors, such as vendors and hedge counterparties continued.  The Group hoped to reach a more comprehensive consensual out of court restructuring with these and other creditors, backed by additional financial support from the Norwegian government.

64.    However, on November 9, 2020, the Norwegian government announced that it would not be providing any further financial support to the Group, and certain creditors began taking steps to commence actions against the Group.  Following the announcement by the Norwegian government, the Group's management furloughed additional employees and reduced

its already skeletal operations, and the relevant governing boards authorized the commencement of the Irish Examinership Proceeding to protect the company and facilitate a holistic restructuring.

## VII.   The Irish Examinership Proceeding

65.   On November 17, 2020, the respective boards of directors of the Debtors and certain of their subsidiaries (collectively, the "**Irish Petitioners**") authorized by written resolution the commencement of the Irish Examinership Proceeding and proposed that Kieran Wallace of KPMG be appointed as examiner (the "**Examiner**") of each of the Irish Petitioners to investigate the business of each of the Irish Petitioners and to determine whether proposals for a compromise or scheme of arrangement could be formulated in respect of each of the Irish Petitioners for the benefit of their employees and creditors.

66.   On November 18, 2020, the Irish Petitioners commenced the Irish Examinership Proceeding by filing the petition (the "**Irish Petition**") with the Irish Court seeking protection under Part 10 of the Companies Act and seeking appointment of the Examiner on an interim basis.  The Irish Petition was accompanied by a Verifying Affidavit containing information regarding the Group and an Independent Expert Report issued by Deloitte Ireland estimating the statement of affairs for the Group on both a "going concern" and a "winding up" basis.

67.   Notice of the Irish Examinership Proceeding was (i) served on the parties entitled to notice as required by the Irish Court, and (ii) published once in each of the *Iris Oifigiúil* (the official gazette of the Government of Ireland), the *Irish Independent* newspaper, and the *Financial Times (International Edition)*.

68.   Through the Irish Examinership Proceeding, the Irish Petitioners were able to enter a 150-day maximum protection period pursuant to which the Irish Petitioners, with the assistance of the Examiner, could determine the Group's go-forward operational needs, negotiate

revised aircraft lease and financing terms, repudiate certain burdensome contracts and leases, and develop scheme proposals to restructure liabilities, and obtain new capital to allow the Group to continue operating as a going concern.

69.     On November 18, 2020, the Irish Court issued an interim order that, among other things, appointed Kieran Wallace as the Examiner, on an interim basis, pursuant to sections 512(7) and 517(1) of the Companies Act.  On December 7, 2020, the Irish Court issued a final order that confirmed the appointment of the Examiner and granted certain relief in connection with the Irish Examinership Proceeding (the "**Examiner Appointment Order**").

70.     With the assistance of the Examiner, the Group began negotiations with creditors and formulated a new business plan.  This plan included terminating the Group's long-haul operations and focusing on its core Nordics business, with a significant reduction in the number of aircraft deployed, routes flown, and headcount.  It is with the scaled down business plan that the Examiner and Group management believe sufficient fresh capital can be obtained to fund future operations and secure the Group as a going concern.

71.     On January 28, 2021, February 4, 2021, and February 15, 2021, the Irish Petitioners filed motions (the "**Repudiation Motions**") seeking an order approving the repudiation of certain contracts, leases, subleases, and guarantees entered into by the Irish Petitioners with certain airport facilities, leasing entities, and other service providers, as listed in the affidavit of Tore Jenssen filed with the Irish Court on January 22, 2021, January 29, 2021, February 1, 2021, and February 9, 2021.  The Irish Petitioners concluded it was necessary to repudiate the above-mentioned contracts, leases, subleases, and guarantees to effectively implement the Irish Petitioners' business plan.  On March 5, 2021, the Irish Court issued an order approving the Repudiation Motions (the "**Repudiation Order**" and, collectively with the Examiner

Appointment Order, the Irish Foreign Representative Order, and any other order that may be entered by the Irish Court, the "**Irish Orders**"), effective as of the effective date of the Schemes (as defined below).

72.    On February 25, 2021, the respective boards of directors of the Debtors authorized by written resolution my appointment to act as the Foreign Representative of the Foreign Proceedings with authority to file the Chapter 15 Petitions in the United States for purposes of achieving recognition and enforcement of the Schemes (as defined below), the Reconstruction Plan (as defined below), the Irish Orders, and the Reconstruction Orders (as defined below) in the United States.

73.    On March 11, 2021, the Examiner launched two schemes of arrangement – one for Norwegian (the "**Norwegian Scheme**"), and a related scheme on substantially similar terms for the other Irish Petitioners, including AAA (the "**AAA Scheme**" and, together with the Norwegian Scheme, the "**Schemes**").    The Examiner has scheduled meetings (the "**Scheme Meetings**") of the relevant classes of creditors (the "**Scheme Creditors**") of each Debtor.    The Scheme Meetings will be held on March 18, 2021, March 19, 2021, and March 20, 2021.

74.    On March 11, 2021, the Examiner sent notice of the Scheme Meetings (the "**Scheme Meetings Notice**") to the Scheme Creditors. The Scheme Meetings Notice was made available to the creditors for which the Debtors did not have email contact details on Norwegian's website (www.norwegian.com), and also was announced via the Oslo Stock Exchange.    Where relevant, intermediaries for customer bookings were notified.    Where the Debtors had email contact details for creditors, the Schemes Meeting Notice was sent by the Examiner via email containing individual log-on codes for the online portal operated by Lumi Global.    A comprehensive overview of the Irish Examinership Proceeding is described more fully within the

*Declaration of Tony O'Grady as Irish Counsel in Support of the Motion for Recognition of Foreign Main and Nonmain Proceedings and Certain Related Relief* (the "**O'Grady Declaration**"), filed concurrently herewith.

## VIII.    The Reconstruction Proceeding

75.    As some creditors continued to pursue their claims against Norwegian after the commencement of the Irish Examinership Proceeding, the board of directors of Norwegian determined it was necessary to also commence the Reconstruction Proceeding to obtain the necessary protection for the Norwegian Group in Norway.  On December 8, 2020, Norwegian entered into a supplemental restructuring process in Norway by commencing the Reconstruction Proceeding through the filing of a petition.

76.    On December 8, 2020, the Norwegian Court issued an order (i) appointing a creditors committee (the "**Debt Restructuring Committee**") and Håvard Wiker of the law firm Ro Sommernes as Reconstructor and Chairman of the Debt Restructuring Committee to oversee the operations of Norwegian and (ii) granting certain additional relief in connection with the Reconstruction Proceeding (the "**Reconstructor Appointment Order**").  On January 27, 2021, Norwegian proposed an initial Reconstruction plan to creditors.

77.    Notice of the Reconstructor Appointment Order was made publicly available on the Norwegian Court's website and notice of the Reconstruction Proceeding was publicly announced on the Group's website.  A separate announcement was also made on the Oslo Stock Exchange.  Later on, all known creditors (i.e. the same creditors that were included in the Irish Examinership Proceeding) were notified of the Reconstruction Proceeding by letter whereby they were urged to file their claims in both Ireland and Norway.  Accordingly, all creditors that

were notified of the Irish Examinership Proceeding were also notified of the Reconstruction Proceeding.

78.     On March 11, 2021, the Reconstructor sent a final Reconstruction plan (the "**Reconstruction Plan**") to creditors in the Reconstruction Proceeding.  Immediately after the Irish Court sanctions the Schemes, the Reconstructor will commence a two-week long voting period on the Reconstruction Plan.   It is anticipated that the Norwegian Court will sanction the Reconstruction Plan on or about April 15, 2021 and issue an order confirming the Reconstruction Plan (the "**Reconstruction Confirmation Order**" and, together with the Reconstructor Appointment Order and the Norwegian Foreign Representative Order, the "**Reconstruction Orders**").

79.     A comprehensive overview of the Reconstruction Proceeding and its coordination with the Irish Examinership Proceeding is described more fully within the *Declaration of Christopher Thue Jerving as Norwegian Counsel in Support of the Motion for Recognition of Foreign Main and Nonmain Proceedings and Certain Related Relief*, filed concurrently herewith.

## IX.     The Schemes

80.     On March 11, 2021, the Examiner proposed the Schemes, the effect of which will be to substantially reduce the reorganized Norwegian Group's total debt and to raise

new capital through a combination of a public offering and a private placement to certain investors and existing creditors.

81.    A summary of the key terms and provisions of the transactions contemplated by the Schemes is set forth below, which key terms and provisions are in accordance with and subject to the Operative Scheme Documents:[9]

| Schemes – Summary | |
|---|---|
| **Overview of Proposed Restructuring** | • Norwegian will focus on its core Nordics business and cease operating its long-haul network, resulting in significant fleet, route, and headcount reductions across the Group;<br><br>• The Group plans to raise gross proceeds of at least NOK 4.5 billion (approximately $535 million USD) in new capital through the Investment (defined below);<br><br>• The Norwegian Government has indicated that it intends to participate in the New Capital Perpetual Bonds offering (described below) up to an amount not exceeding NOK 1.5 billion;<br><br>• The Group's liabilities will be satisfied and restructured through distributions to creditors, depending on the nature of their claims, of cash, written down secured debt instruments, and/or a revised claim with a new equity conversion feature, as described further below;<br><br>• Creditors, subject to meeting certain debt criteria, will be entitled to subscribe to new equity through the New Capital Perpetual Bonds or through the Private Placement (each as described below);<br><br>• The company aims to have a total debt of a maximum of approximately NOK 20 billion (approximately $2.3 billion USD) and have a free cash position of NOK 4 - 5 billion (approximately $460 - 570 million USD) following the restructuring; |

---

[9] The following summary is provided for illustrative purposes only and is qualified in its entirety by reference to the "**Operative Scheme Documents**."  The term "**Operative Scheme Documents**" refers collectively to the Norwegian Scheme and the AAA Scheme, both of which are annexed to the O'Grady Declaration (as defined herein) as **Exhibit B**.  In the event of any inconsistency between the summary table and the Operative Scheme Documents, the Operative Scheme Documents will control in all respects.  Capitalized terms used in this summary table and the corresponding footnotes but not otherwise defined in this Recognition Motion will have the meanings ascribed to such terms in the Operative Scheme Documents.

| | |
|---|---|
| | • Parallel implementation through the Reconstruction Proceeding and Reconstruction Plan (with the assistance of recognition and enforcement in the U.S. through these Chapter 15 Cases); and<br><br>• Liquidation (outside of the Foreign Proceedings) of approximately 14-16 of the Debtors' subsidiaries. |

| **Proposals to Raise Capital (Debt & Equity Offering)** | |
|---|---|
| **The Investment** | At least NOK 4.5 billion (approximately $535 million USD) (the "**Minimum Gross Proceeds Threshold**") in new capital will be raised through a combination of:<br><br>• a rights offering to current shareholders through the issuance of tradeable subscription rights (the "**Rights Offering**");<br><br>• a private share placement to certain investors and creditors (the "**Private Placement**"); and<br><br>• issuance of new capital perpetual bonds to certain investors and creditors (the "**New Capital Perpetual Bonds**" and, together with the Rights Offering and the Private Placement, the "**Investment**"). |
| **Use of Proceeds** | The Investment proceeds will be used to provide working capital for the Norwegian Group's general corporate purposes, including to facilitate the ongoing survival of the Irish Petitioners as going concerns. |

| **Treatment of Existing Shareholders** | |
|---|---|
| **Proposed Post-Restructuring Ownership** | Norwegian has estimated that if the proceeds of the Investment equal the Minimum Gross Proceeds Threshold, and each relevant party exercises its right to acquire shares, Norwegian's post-examinership capital structure will be as follows:<br><br>• 4.6% held by existing (pre-examinership) shareholders in Norwegian;<br><br>• 25.4% held by creditors receiving and converting Dividend Claims; and<br><br>• 70% held by new investors (in the Rights Offering, Private Placement, and New Capital Perpetual Bonds). |
| **Existing Shareholders** | Holders of the existing shares will continue to hold such shares, subject to dilution on account of (i) the issuance of new shares pursuant to the Rights Offering and the Private Placement, and (ii) the conversion of New Capital |

| | |
|---|---|
| | Perpetual Bonds and Dividend Claims, in accordance with the terms thereof, into new shares. |
| **Proposed Consideration** | |
| **Cash Entitlement** | The Schemes provide for certain creditors to receive a pro rata cash dividend from a fixed amount of NOK 500,000,000 (approximately $59 million USD) in cash to be made available by Norwegian (the "**Cash Pool**"), based on the net agreed debt of each creditor's claim. |
| **Dividend Claims** | The Schemes provide that certain creditors will receive, in addition to a cash dividend from the Cash Pool, 5% of the net agreed debt of their claims (after deducting the amount of cash dividend and excluding any amount the creditor may recover through participation in the proposed Investment) converted into a Dividend Claim in full and final satisfaction of such claims. |
| | The Dividend Claims will constitute unsecured debt obligations of Norwegian in accordance with the Dividend Claims Terms, and will, subject to the Opt-Out Election (defined below), be deemed to convert into shares in Norwegian (the "**Conversion Shares**") sixty (60) days after the Schemes are effective and will then be sold in the Structured Sale Process (described below), with the net proceeds shared proportionately among participating creditors. |
| | On the date that falls five (5) business days prior to the Structured Sale Conversion Date (defined below), Norwegian will, in conjunction with the Overseer (Mr. Helge Østvold of BHL DA), fix the conversion price under the Dividend Claims such that all of the Dividend Claims arising under the Schemes would in aggregate convert into a number of shares that would represent 25.4% of the Company's issued share capital on a fully diluted basis (or 233,548,229 shares). |
| | Subject to the Op-Out Election described below, the Dividend Claims will be converted into Shares on the date that falls 60 days after the Effective Date (the "**Structured Sale Conversion Date**") and the resulting shares will be issued within five (5) business days after the Structured Sale Conversion Date to a VPS investor escrow account in the name of Norwegian on behalf of the creditors that held the corresponding Dividend Claims immediately prior to such conversion (each a "**Structured Sale Creditor**"). |
| | The shares will be sold in the market by DNB Markets through a structured sale process, to be determined by DNB Markets in its discretion, with the objective of maximizing the average sale price of the shares within a |

commercially reasonable time period, based on liquidity and other market factors (the "**Structured Sale Process**").

The cash proceeds from the Structured Sale Process will be deposited in a blocked escrow account of Norwegian held with DNB and the proceeds (net of fees) will be distributed pro rata to the Structured Sale Creditors, in each case promptly following the later of:

- the completion of the Structured Sale Process; and

- the date on which such Structured Sale Creditor provides payment details (and, if applicable, satisfactory KYC information) to Norwegian and/or DNB.

A holder of a Dividend Claim may, subject to the Dividend Claims Terms and securities laws applicable to that creditor, irrevocably elect to opt out no later than two (2) business days prior to the Structured Sale Conversion Date (the "**Opt-Out Deadline**") for either:

- such Dividend Claim (in whole but not in part) not to be converted to shares, in which case such Dividend Claim will continue on the terms of the Dividend Claims Terms, with no conversion right thereafter; or

- such Dividend Claim (in whole but not in part) to be converted to shares but not be sold pursuant to the Structured Sale Process, and in such event the Dividend Claims in respect of which such electronic notification is given will, promptly following completion of the Structured Sale Process, be converted into Non-Sale Conversion Shares and delivered to the specified VPS account on or before the Opt-Out Deadline;

  (collectively, the "**Opt-Out Election**")

In accordance with the Dividend Claims Terms, a creditor will only be permitted to exercise an Opt-Out Election where:

- the creditor provides Norwegian with details of a valid VPS account on or prior to the Opt-Out Deadline; and

- the creditor notifies that it is either: not located in the United States (as defined in Regulation S under the U.S. Securities Act); or it is either (i) a "qualified institutional buyer" (as defined in Rule 144A under the U.S. Securities Act) or (ii) an "institutional" accredited investor (within the meaning of Rule 501(a)(1), (3), (5) or (7) under the U.S. Securities Act).

| | Any Dividend Claim that is not converted to shares due to the Opt-Out Election will continue as an unsecured claim on the terms of the Dividend Claims Terms, with no conversion rights. |
|---|---|
| **Retained Claims Bonds** | Each Eligible New Capital Perpetual Bonds Creditor that participates in the New Capital Perpetual Bonds Offering or each Eligible Private Placement Creditor that participates in the Private Placement will receive Retained Claims Bonds issued by Norwegian in an amount equal to 200% of the aggregate nominal value of such bonds or the total amount paid in respect of such subscription for shares, as applicable.<br><br>No creditor will have any part of its net agreed debt converted into a Dividend Claim or receive any Cash Entitlement in respect of the part of its claim that is satisfied by the issuance of Retained Claims Bonds. |
| **Proposed Classes and Treatment[10]** | |
| **Secured Cash Deposit Claims** | Secured Cash Deposit Claims consist of claims of holders of a security over certain bank accounts, the value of which exceeds the amount of the Secured Cash Deposit Claims.<br><br>Secured Cash Deposit Claims will be unaffected by the Schemes and the existing security will remain in force. |
| **AAA Secured Claims** | To the extent that AAA Secured Claims exceed or are equal to the relevant secured amount of such claims, the AAA Secured Claims will be unaffected by the Schemes and the existing security will remain in force.<br><br>To the extent the relevant secured amount is less than the amount of the AAA Secured Claims, such claims will be impaired and written down to the value of the relevant secured amount and each holder of an AAA Secured Claim will receive a cash dividend in the amount of 1% of its net agreed debt in full and final satisfaction of its AAA Secured Claim. |
| **NAS09 Secured Bond Claims** | The NAS09 Secured Bond Claims consist of claims of holders of the NAS09 Secured Notes.  To the extent that NAS09 Secured Bond Claims exceed or are equal to the relevant secured amount of such claims, the NAS09 Secured Bond Claims will be unaffected by the Schemes and the existing security will remain in force.<br><br>To the extent the relevant secured amount is less than the amount of the NAS09 Secured Bond Claims, such claims will be impaired and written down to the value of the relevant secured amount and each holder of a NAS09 Secured Bond Claim will receive a dividend in the amount of 5% |

---

[10]     While certain classes are relevant either solely to the Norwegian Scheme or the AAA Scheme, certain classes are relevant to both Schemes.

| | |
|---|---|
| | of its net agreed debt, which will be satisfied by (i) the payment of a specified cash dividend from the Cash Pool as set forth in the Schemes, and (ii) conversion of the remaining balance into Dividend Claims in full and final satisfaction of its NAS09 Secured Bond Claim. |
| **NAS 07/08 Secured Bond Claims** | The NAS07/08 Secured Bond Claims consist of claims of holders of the NAS07 Secured Notes and NAS08 Secured Notes.  To the extent that NAS07/08 Secured Bond Claims exceed or are equal to the relevant secured amount of such claims, the NAS07/08 Secured Bond Claims will be unaffected by the Schemes and the existing security will remain in force.<br><br>To the extent the relevant secured amount is less than the amount of the NAS07/08 Secured Bond Claims, such claims will be impaired and written down to the value of the relevant secured amount and each holder of a NAS07/08 Secured Bond Claim will receive a dividend in the amount of 5% of its net agreed debt, which will be satisfied by (i) the payment of a specified cash dividend from the Cash Pool as set forth in the Schemes, and (ii) conversion of the remaining balance into Dividend Claims in full and final satisfaction of its NAS07/08 Secured Bond Claim. |
| **2019 Convertible Bond Claims** | The 2019 Convertible Bond Claims consist of claims of holders of the 2019 Convertible Bonds.<br><br>Each holder of a 2019 Convertible Bond Claim will receive a dividend in the amount of 5% of its net agreed debt, which will be satisfied by (i) the payment of a specified cash dividend from the Cash Pool as set forth in the Schemes, and (ii) conversion of the remaining balance into Dividend Claims in full and final satisfaction of its 2019 Convertible Bond Claim. |
| **Norwegian Unsecured Claims** | Each holder of a Norwegian Unsecured Claim will receive a dividend in the amount of 5% of its net agreed debt, which will be satisfied by (i) the payment of a specified cash dividend from the Cash Pool as set forth in the Schemes, and (ii) conversion of the remaining balance into Dividend Claims in full and final satisfaction of its Norwegian Unsecured Claim. |
| **AAA Unsecured Claims** | Each holder of an AAA Unsecured Claim will receive a cash dividend in the amount of 1% of its net agreed debt in full and final satisfaction of its AAA Unsecured Claim. |
| **GIEK Guaranteed Loan Facilities Claims** | GIEK Guaranteed Loan Facilities Claims consist of claims of lenders under the GIEK Guaranteed Loan Facilities.  To the extent that GIEK Guaranteed Loan Facilities Claims exceed or are equal to the relevant secured amount (if any) of such claims, the GIEK Guaranteed Loan Facilities Claims will be unaffected by the Schemes and the existing security (if any) will remain in force. |

|  | To the extent the relevant secured amount (if any) is less than the amount of the GIEK Guaranteed Loan Facilities Claims, such claims will be impaired and written down to the value of the relevant secured amount and each holder of a GIEK Guaranteed Loan Facilities Claim will receive a dividend in the amount of 5% of its net agreed debt, which will be satisfied by (i) the payment of a specified cash dividend from the Cash Pool as set forth in the Schemes, and (ii) conversion of the remaining balance into Dividend Claims in full and final satisfaction of its GIEK Guaranteed Loan Facilities Claim. |
|---|---|
| **Retained Guarantee Claims** | Retained Guarantee Claims consist of guaranteed claims where the underlying primary obligation is continuing.  Unless agreed prior to the date that the Irish Confirmation Order is issued by the Irish Court, Retained Guarantee Claims will be treated as disputed claims and such Claims will be determined under the expert determination process as set forth in the Norwegian Scheme (the "**Expert Determination Process**").<br><br>Each holder of a Retained Guarantee Claim will receive a dividend in the amount of 5% of its net agreed debt, which will be satisfied by (i) the payment of a specified cash dividend from the Cash Pool as set forth in the Schemes, and (ii) conversion of the remaining balance into Dividend Claims in full and final satisfaction of its Retained Guarantee Claim. |
| **Non-Retained Guarantee Claims** | Non-Retained Guarantee Claims consist of guaranteed claims where the underlying primary obligation is not continuing. Unless agreed prior to the date that the Irish Confirmation Order is issued by the Irish Court, Non-Retained Guarantee Claims will be treated as disputed claims and such claims (including, for the avoidance of doubt, any pre-repudiation post-petition liabilities) will be determined under the Expert Determination Process.<br><br>Each holder of a Non-Retained Guarantee Claim will receive a dividend in the amount of 5% of its net agreed debt, which will be satisfied by (i) the payment of a specified cash dividend from the Cash Pool as set forth in the Schemes, and (ii) conversion of the remaining balance into Dividend Claims in full and final satisfaction of its Non-Retained Guarantee Claim. |

| Terminated Contract Claims | Unless agreed prior to the date that the Irish Confirmation Order is issued by the Irish Court, Terminated Contract Claims will be treated as disputed claims and will be determined under the Expert Determination Process.

All Terminated Contract Claims are unsecured claims and will be subject to the same treatment as Unsecured Claims. |
|---|---|
| Retained Sub-Lease Claims | Retained Sub-Lease Claims will be written down in full and the holders thereof will not receive any dividend in respect of such claims. |
| Terminated Guaranteed Sub-Lease Claims | Terminated Guaranteed Sub-Lease Claims will be written down in full and the holders thereof will not receive any dividend in respect of such claims.

The Schemes are without prejudice to, and will not prevent a holder of a Terminated Guaranteed Sub-Lease Claim from enforcing its security on account of such claim, provided that any recourse will be limited to secured assets. |
| Retained Lease Claims | Unless agreed prior to the date that the Irish Confirmation Order is issued by the Irish Court, Retained Lease Claims will be treated as disputed claims and such claims will be determined under the Expert Determination Process.

Each holder of a Retained Lease Claim will receive a dividend in the amount of 5% of its net agreed debt, which will be satisfied by (i) the payment of a specified cash dividend from the Cash Pool as set forth in the Schemes, and (ii) conversion of the remaining balance into Dividend Claims in full and final satisfaction of its Retained Lease Claim. |
| Terminated Lease Claims | Unless agreed prior to the date that the Irish Confirmation Order is issued by the Irish Court, Terminated Lease Claims will be treated as disputed and such claims will be determined under the Expert Determination Process.

Each holder of a Terminated Lease Claim will receive a dividend in the amount of 5% of its net agreed debt, which will be satisfied by (i) the payment of a specified cash dividend from the Cash Pool as set forth in the Schemes, and (ii) conversion of the remaining balance into Dividend Claims in full and final satisfaction of its Terminated Lease Claim. |
| Customer Claims | Each holder of a Customer Claim will, upon agreement or determination of its Claim in accordance with the Norwegian Scheme, receive a dividend in the amount of 5% of its net agreed debt, which will be satisfied by (i) the payment of a specified cash dividend from the Cash Pool as set forth in the Schemes, and (ii) conversion of the remaining balance into Dividend Claims in full and final satisfaction of its Customer Claim. |

| | |
|---|---|
| | To the extent the Customer Claim concerns a ticket refund and is disputed, or has not been submitted to Norwegian and agreed prior to the Irish Confirmation Date, it will be subject to the Expert Determination Process.<br><br>To the extent the Customer Claim concerns a damages claim and is disputed, or has not been submitted to Norwegian and agreed prior to the Irish Confirmation Date, it will be subject to determination by the relevant decision-making or judicial authority with jurisdiction over the dispute. |
| **2020 Convertible Perpetual Bond Claims** | The amount of the 2020 Convertible Perpetual Bond Claims will be the market value of the number of shares that the 2020 Convertible Perpetual Bonds held by the 2020 Convertible Perpetual Bond Creditor at the Petition Date (except for any 2020 Convertible Perpetual Bonds converted to shares after the Petition Date) would have converted into at to the conversion price in effect on the Petition Date.<br><br>Each holder of a 2020 Convertible Perpetual Bond Claim will receive a dividend in the amount of 5% of its net agreed debt, which will be satisfied by (i) the payment of a specified cash dividend from the Cash Pool as set forth in the Schemes, and (ii) conversion of the remaining balance into Dividend Claims in full and final satisfaction of its 2020 Convertible Perpetual Bond Claim. |
| **Connected and Intercompany Claims** | Connected and Intercompany Claims are unsecured claims, which will be set off against any mutual claims as between Norwegian or AAA and the holder of such Connected and Intercompany Claim as of the Petition Date (excluding any claims in respect of any aircraft sub-leases) and, subject to the terms of the Schemes, will be subject to the same treatment as Unsecured Claims.<br><br>Any entitlement to a dividend (by way of cash and Dividend Claims) on account of a Connected and Intercompany Claim will be offset against the Counter Indemnity Obligations and, in the case of any affiliate company, the amount of funding provided in the form of cash by Norwegian to fund dividends payable by that affiliate company.<br><br>With respect to the Connected and Intercompany Claims against Norwegian, if there is any residual balance due (following a set off) on account of such claim, such balance will be written down in full and the holders thereof will not receive any dividend in respect of such claims.<br><br>With respect to the Connected and Intercompany Claims against AAA, if there is any residual balance due (following a set off) on account of such claim, the holder thereof will be paid a cash dividend of 0.5% of such residual balance in full and final satisfaction of the Connected and Intercompany Claim against AAA. |

| | |
|---|---|
| **Co-Obligor Liability Claims** | The Co-Obligor Liability Claims will be discharged and released in full pursuant to the terms of the Schemes.<br><br>The holder of a Co-Obligor Liability Claim will not receive any dividend in respect of such claim. To the extent necessary, the Co-Obligor Liability Claims will be written down in full by the Schemes. |
| **AAA Counter-Indemnity Claims** | Each holder of an AAA Counter-Indemnity Claim will provide dividends to the holders of Co-Obligor Liability Claims and Continent Litigation Claims as set forth in the AAA Scheme.<br><br>Any residual balance after accounting for any set off of the AAA Counter-Indemnity Claims pursuant to the Norwegian Scheme will be written down in full and the holders thereof will not receive any dividend in respect of such claims. |
| **Contingent Unagreed Claims** | As of the date the Schemes launched: (i) the liability, if any, of Norwegian or AAA on account of the Contingent Litigation Claims; and (ii) the amount, if any, due on account of the Contingent Unagreed Claims, have not been determined or agreed upon.<br><br>Unless agreed upon prior to the Effective Time, such claims will, unless otherwise agreed by the holders thereof and Norwegian or AAA, be determined:<br><br>• to the extent proceedings have been issued by any holder of Contingent Unagreed Claim before the date that the Irish Confirmation Order is issued by the Irish Court (each such claim being, a "**Contingent Litigation Claim**"), by the courts of competent jurisdiction; and<br><br>• in all other cases, by the Expert Determination Process.<br><br>All Contingent Unagreed Claims are unsecured claims and any amounts due or found to be due to any Contingent Unagreed Claim will be subject to the same treatment as the Unsecured Claims. |
| **Additional Provisions** | |
| **Determination of Disputed Claims** | The Schemes set forth a dispute resolution process, pursuant to which disputed claims will be determined as follows:<br><br>• the holder of an a disputed claim must send its proof of claim to creditorclaims@norwegian.com within 14 days after the Irish Confirmation Order is issued by the Irish Court; |

| | |
|---|---|
| | • Norwegian or AAA will notify the holder of the disputed claim within 7 days after receipt of the proof of claim indicating whether it accepts or disputes the amount or liability of such claim; |
| | • If Norwegian or AAA disputes such claim, the holder of the disputed claim may submit such claim for determination to the assigned expert as set forth in the Schemes; |
| | • Norwegian or AAA and the holder of a disputed claim may negotiate a settlement of the claim at any time; |
| | • The relevant expert will, upon receipt of the disputed claim, furnish Norwegian or AAA with a copy of the claim.  Norwegian or AAA may submit a response to the relevant expert within 14 days after receipt of such copy claim; |
| | • The relevant expert will, no later than 60 days after the Irish Confirmation Order is issued by the Irish Court, notify both the holder of the disputed claim and Norwegian or AAA of his determination of the amount, if any, for which the disputed claim will be admitted. |
| **Conditionality of the Schemes** | The Schemes and the Investment contemplated thereby, are subject to the following conditions:<br><br>• approval by the Irish Court of the Schemes and approval by the Norwegian Court of the Reconstruction Plan; and<br><br>• raising the Minimum Gross Proceeds Threshold through the Investment. |

## REQUESTS FOR RECOGNITION AND RELATED RELIEF

82.     In connection with the filing of these Chapter 15 Cases, I have submitted the Recognition Motion, the Joint Administration Motion, and the Scheduling Motion.  In addition to the facts set forth above, factual bases for relief under each of these motions is set forth below. I believe, after consultation with counsel, that the relief requested by each of the motions is necessary to (i) ensure that all of the creditors affected by the Schemes and the Reconstruction Plan are treated consistently, regardless of whether they are located in Ireland, Norway, or the

United States; (ii) protect the Debtors from any lawsuits in the United States from those who are bound by, and benefit from, the terms of the Schemes and the Reconstruction Plan; and (iii) minimize the risk of other potential residual claims that might exist outside of the terms of the Schemes and the Reconstruction Plan.

## I.    Recognition Motion

83.    Contemporaneously herewith, I filed the Recognition Motion seeking entry of the proposed order (the "**Proposed Order**") (i) granting recognition of the Reconstruction Proceeding of Norwegian as a foreign main proceeding pursuant to chapter 15 of the Bankruptcy Code; (ii) granting recognition of the Irish Examinership Proceeding of AAA as a foreign main proceeding pursuant to chapter 15 of the Bankruptcy Code; (iii) granting recognition of the Irish Examinership Proceeding of Norwegian as a foreign nonmain proceeding pursuant to chapter 15 of the Bankruptcy Code; (iv) granting recognition of me as the "foreign representative," as defined in section 101(24) of the Bankruptcy Code, in respect of the Foreign Proceedings; (v) recognizing, granting comity to, and giving full force and effect in the United States to the Foreign Proceedings, the Schemes, the Reconstruction Plan, the Irish Orders, and the Reconstruction Orders; (vi) enjoining parties from taking any action in the United States that is otherwise inconsistent with the Schemes, the Reconstruction Plan, the Irish Orders, and the Reconstruction Orders; and (vii) granting such other relief as the Court deems just and proper.

84.    As detailed more fully in the Recognition Motion, there is a compelling case for both the Irish Examinership Proceeding and the Reconstruction Proceeding to each be recognized as a "foreign proceeding," and I am a "foreign representative," as I understand those terms to be defined in the Bankruptcy Code.  I have been further advised that these Chapter 15 Cases were duly and properly commenced by filing the Chapter 15 Petitions accompanied by all

fees, documents, and information required by the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, including (a) corporate ownership statements; (b) a list containing (i) the names and addresses of all persons or bodies authorized to administer foreign proceedings of the Debtors and (ii) all parties to litigation pending in the United States in which the Debtors are a party at the time of the filing of the Chapter 15 Petitions; (c) a statement identifying all known foreign proceedings with respect to the Debtors; and (d) copies of the orders commencing the Foreign Proceedings.

85.    The Debtors have property in the United States and in this jurisdiction.  The Debtors' property in the United States consists of, among other things, (i) approximately $1.5 million held on account at DNB Bank in New York, (ii) a refund of approximately $16 million owed by the IRS, (iii) accounts receivable in excess of $1 million from fifty (50) vendors located across fourteen (14) different states, (iv) litigation claims pending in the Circuit Court of Cook County, Illinois against Boeing and BCASEL, (v) Boeing 787 inventory in California, Florida, Washington, Rhode Island, and Washington, D.C., (vi) an apartment in Seattle, Washington, and (vii) numerous contracts and leases governed by U.S. law with parties across the United States (which are subject to the Repudiation Order).  In addition, Weil, as counsel to the Foreign Representative, holds a fee advance balance on behalf of the Debtors in an account in New York.

86.    The Irish Examinership Proceeding is pending in Ireland.  Ireland is the center of AAA's main interests.  As set forth above, (i) AAA is incorporated in Ireland and its registered office is located in Ireland, (ii) AAA owns thirty six (36) Irish-incorporated subsidiaries through which it carries out its primary operations from Ireland, and (iii) AAA's principal place of business is in Ireland.

87.    Norwegian has an "establishment" in Ireland, as I understand the term is

defined in the Bankruptcy Code.  As set forth above, Norwegian is the sole shareholder of AAA

and NAI (both Irish incorporated companies that are managed and operated from Ireland) and the

indirect shareholder of several subsidiaries incorporated and operating in Ireland.  Furthermore,

Norwegian itself has on-going commercial relations with third party Irish lessors of aircraft owned,

financed or registered in Ireland.  Norwegian also operates and manages its entire fleet through

Irish-incorporated subsidiaries.  The Norwegian Group also employed a crew of 1,960 through

Irish-incorporated subsidiaries.  Though COVID has since forced the suspension of this service as

of the time of filing, Norwegian also operated flights to and from Ireland.

88.     The Reconstruction Proceeding is pending in Norway.  Norway is the center

of Norwegian's main interests.  As set forth above, Norwegian is incorporated in Norway and its

registered office is located in Norway.

89.     As described in more detail in the Recognition Motion, permanent

injunctive relief is necessary to protect the Norwegian Group from irreparable harm.  I have been

advised that the orderly and equitable determination of claims and distribution of the Norwegian

Group's assets would be disrupted absent such relief.  I understand that allowing creditors to re-

litigate issues already determined in the Foreign Proceedings and effectively evade the terms of

the Schemes and the Reconstruction Plan would threaten the success of the Norwegian Group's

restructuring efforts by depleting the Group's resources.  I have been further advised that the

granting of the permanent injunctive relief would protect the interests of creditors in the Foreign

Proceedings by maximizing the total value available for distribution and ensuring that claims are

determined and paid on a consistent, nondiscriminatory basis.

90.     Finally, as discussed with counsel, I understand that recognizing the Irish

Examinership Proceeding as a foreign main proceeding (with respect to AAA) and a foreign

nonmain proceeding (with respect to Norwegian), recognizing the Reconstruction Proceeding as a foreign main proceeding (with respect to Norwegian), and granting additional relief requested in the Recognition Motion is consistent with the purposes of chapter 15 of the Bankruptcy Code and U.S. public policy.  The relief requested in the Recognition Motion is necessary and appropriate and is in the best interests of the Debtors, their creditors, and other parties in interest.

## II.    Joint Administration Motion

91.    I have also filed, contemporaneously herewith, the Joint Administration Motion seeking entry of an order directing joint administration of these Chapter 15 Cases for procedural purposes only, and providing that parties in interest shall use a consolidated caption to indicate that any pleading filed relates to the jointly administered Chapter 15 Cases.

92.    Joint administration of these Chapter 15 Cases is warranted because the Debtors' financial affairs and business operations are closely related.  I confirm that Norwegian is the same company seeking recognition of a foreign main proceeding in Norway, and a foreign nonmain proceeding in Ireland.  Further, I confirm that the Debtors are affiliates as Norwegian directly owns and controls one hundred (100) percent of the outstanding voting securities of AAA.

93.    Joint administration of these Chapter 15 Cases will allow for the efficient and convenient administration of the Debtors' interrelated Chapter 15 Cases and will yield significant cost savings.  I anticipate that joint administration will save substantial time and expense for the Debtors by removing the need to prepare, replicate, file, and serve duplicative notices, pleadings, and orders.  Moreover, I have been advised that joint administration will relieve the Court of entering duplicative orders and maintaining duplicative dockets, pleadings, and papers, as joint administration will permit the Clerk of the Court to use a single docket for all of the Debtors' cases and to combine notices to creditors and other parties in interest.  I have been

further advised that the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") and other parties in interest will similarly benefit from joint administration of these Chapter 15 Cases by sparing them the time and effort of reviewing duplicative dockets, pleadings, and other filings.

94.     Joint administration of these Chapter 15 Cases will not prejudice the rights of any party in interest.  As discussed with counsel, I understand that joint administration will protect parties in interest by ensuring that they will be apprised of the various matters before the Court.  I have also been advised that the relief sought in the Joint Administration Motion is purely procedural and not intended to affect substantive rights. As such, each creditor and party in interest will maintain whatever rights it has against the particular Debtor against which it allegedly has a claim or right.

95.     Therefore, the relief requested in the Joint Administration Motion is necessary and appropriate and is in the best interests of the Court, the Debtors, their creditors, and other parties in interest.

## III.    Scheduling Motion

96.     I have also filed the Scheduling Motion seeking the entry of an order (i) setting the date for the hearing (the "**Recognition Hearing**") on the relief sought in the Recognition Motion on April 27, 2021 or as soon thereafter as this Court's calendar permits, (ii) setting 4:00 p.m. (prevailing Eastern Time) on April 16, 2021 or a date no less than seven (7) days prior to Recognition Hearing as the deadline by which any responses to the Recognition Motion must be filed and received (the "**Objection Deadline**"), (iii) approving the form of notice of the Recognition Hearing and Objection Deadline (the "**Hearing Notice**"), (iv) approving the manner of service of the Hearing Notice, and (v) granting such other relief as the Court deems just and

proper.

97.     Under the facts and circumstances of the Debtors' Chapter 15 Cases, I submit that service of the documents identified as the Notice Documents in the manner proposed in the Scheduling Motion will provide those parties listed as the Notice Parties in the Scheduling Motion (the "**Notice Parties**") with due and sufficient notice of the commencement of these Chapter 15 Cases, the relief requested in the Recognition Motion, and the associated Objection Deadline and hearing date.

98.     I have been advised that the proposed form of notice procedures outlined in the Scheduling Motion provides sufficient notice and ample opportunity for any Notice Parties with foreign addresses to participate in these Chapter 15 Cases, and, as such, no supplemental notice is necessary.

99.     Therefore, I believe the relief requested in the Scheduling Motion is necessary and appropriate and is in the best interests of the Court, the Debtors, their creditors, and other parties in interest.

## STATEMENT PURSUANT TO SECTION 1515(C) OF THE BANKRUPTCY CODE

100.    I submit the following statement identifying each country in which a foreign proceeding by, regarding, or against the debtor is pending:

101.    The Debtors have together commenced the Irish Examinership Proceeding in Ireland.  This proceeding is a foreign nonmain proceeding for Norwegian and a foreign main proceeding for AAA.  The Irish Examinership Proceeding is continuing in coordination with the Reconstruction Proceeding and it is intended that any Schemes proposed in the Irish Examinership Proceeding will be implemented in Norway through the Reconstruction Proceeding.

102.    Norwegian has commenced the Reconstruction Proceeding in Norway.

This proceeding is a foreign main proceeding for Norwegian. The Reconstruction Proceeding was commenced in coordination with the Irish Examinership Proceeding and to implement in Norway any Schemes proposed in the Irish Examinership Proceeding.

## **CONCLUSION**

103.    Based on the foregoing, the relief being requested at the outset of these Chapter 15 Cases is well justified, necessary under the circumstances, in the best interests of the Debtors and their creditors, and should be granted.

[*Remainder of page intentionally left blank*]

I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct to the best of my knowledge, information, and belief.


Executed on this 11th day of March, 2021
in Oslo, Norway

By:       _____
Name:     Geir Karlsen
Title:    Chief Financial Officer of Norwegian Air
          Shuttle ASA