**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------- x

*In re*:

NORWEGIAN AIR SHUTTLE ASA, *et al.,* [1]

Debtors in foreign proceedings.

------------------------------------------------------------- x

Chapter 15

Case No. 21–10478 (MEW)

(Joint Administration Requested)

### DECLARATION OF TONY O'GRADY AS IRISH COUNSEL IN SUPPORT OF THE MOTION FOR RECOGNITION OF FOREIGN MAIN AND NONMAIN PROCEEDINGS AND CERTAIN RELATED RELIEF

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

I, Tony O'Grady, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury as follows:

### INTRODUCTION

1.      I am a Partner in Matheson, an Irish corporate law firm whose principal place of business is 70 Sir John Rogerson's Quay, Dublin 2, Ireland.  I am a solicitor and hold a practicing certificate from the Law Society of Ireland, having qualified in 1993.  I have been engaged in law practice, specializing in insolvency and restructuring law in Ireland, for approximately 25 years.  I, together with other Partners and Associates at Matheson, are the Irish solicitors to Norwegian Air Shuttle ASA ("**Norwegian**") and certain related companies (together with Norwegian, the "**Debtors**") in connection with the Irish Examinership Proceeding (as defined below).  I am over the age of 18 and, except as otherwise indicated, all facts set forth in this

---

[1] The Debtors in the foreign proceeding and the last four digits of each Debtor's local tax identification number are as follows: Norwegian Air Shuttle ASA (0358) and Arctic Aviation Assets DAC (1191).  The location of Norwegian Air Shuttle ASA's corporate headquarters is Oksenøyveien 3, 1336 Lysaker, Norway.  The location of Arctic Aviation Assets DAC's corporate headquarters is Ground Floor, Imbus House, Dublin Airport, Ireland.

declaration (the "**Declaration**") are based upon my personal knowledge, my opinion based upon my experience and knowledge of the operations and financial condition of the Debtors, and my review of relevant documents or information supplied to me.  In preparing this Declaration, I reviewed the Chapter 15 Petitions (as defined below), the Recognition Motion (as defined below), and relevant provisions of the Companies Act (as defined below), other provisions of Irish law as they relate to chapter 15 of title 11 of the United States Code (the "**Bankruptcy Code**"), and other aspects of U.S. bankruptcy law.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.

2.      As of the date hereof, the Debtors are the subject of a proposed restructuring pursuant to Part 10 of Ireland's Companies Act 2014 (the "**Companies Act**") before the Irish High Court (the "**Irish Court**"), concerning rescue schemes between the Debtors and their creditors (the "**Irish Examinership Proceeding**"), which has been commenced through proceedings entitled *In the Matter of Arctic Aviation Assets Designated Activity Company and In the Matter of Norwegian Air International Limited and In the Matter of Drammensfjorden Leasing Limited and In the Matter of Torskefjorden Leasing Limited and In the Matter of Lysakerfjorden Leasing Limited and In the Matter of Part 10 of the Companies Act 2014 and In the Matter of Norwegian Air Shuttle ASA as a Related Company Within the Meaning of Section 517 and Section 2(10) of the Companies Act 2014*.  Absent the Irish Court's approval, the Debtors cannot implement the rescue schemes. Matheson is advising the Debtors in connection with the Irish Examinership Proceeding.

3.      I submit this Declaration in support of the (i) *Voluntary Chapter 15 Petitions for Recognition of Foreign Proceedings* (the "**Chapter 15 Petitions**") and (ii) *Motion for Recognition of Foreign Main and Nonmain Proceedings and Request for Certain Related Relief*

*under Chapter 15 of the Bankruptcy Code* (the "**Recognition Motion**"), each of which were filed contemporaneously herewith.

4.       This Declaration is comprised of matters that are statements of my view of Irish law or statements of fact.  Where the matters stated in this Declaration are statements of Irish law, such statements represent my view of Irish law as a solicitor admitted and authorized to practice in Ireland.  Where the matters stated in this Declaration are statements of fact that are within my personal knowledge, they are true.  Where the matters stated in this Declaration are statements of fact that are not within my personal knowledge, they are derived, as appropriate, from documents on the Register of Companies maintained by the Registrar of Companies in Ireland, from the records maintained by Matheson as a result of advising the Debtors in connection with the Irish Examinership Proceeding, and/or from information supplied to me by or on behalf of the Debtors, and in each case are true to the best of my knowledge, information, and belief.

### PERSONAL BACKGROUND AND QUALIFICATIONS

5.       I am a Partner in Matheson's Commercial Litigation and Dispute Resolution Department and head of the Corporate Restructuring and Insolvency Group with expertise in all aspects of corporate restructuring and insolvency law matters.  I frequently advise clients on large-scale transactions and reorganizations that are implemented with the sanction of the Irish Court.  I completed a Bachelor of Civil Law (BCL) degree at University College Cork in 1988.  I qualified as a Solicitor in 1993, was a trainee solicitor in Eugene F. Collins solicitors in Dublin between 1990 and 1993, was an assistant solicitor in the Chief State Solicitor's Office between 1993 and 1995, joined Matheson in 1995, and became a Partner at Matheson in 2001.  I am a member of INSOL, R3 and the Insolvency Lawyers Association.

## STATEMENTS OF IRISH LAW AND PRACTICE

**I.    Examinership under the Laws of Ireland**

6.    An examinership in Ireland is a statutory process under Part 10 of the Companies Act.  Examinerships were introduced into Irish law under the Companies Act as a mechanism for the rescue of ailing companies that still have a reasonable prospect of survival. Sections 539 through 544 of the Companies Act govern the process for proposing, obtaining sanction of, and implementing rescue schemes.  I understand and have been advised by the Debtors' counsel in the United States that this process is similar in many respects to chapter 11 of the Bankruptcy Code, incorporating the concepts of a debtor-in-possession where directors and management continue to run the business, a stay against creditor actions, and cross-class cramdown.

**II.    Filing a Petition**

7.    An examinership is commenced by filing a petition in the court office, at which point a stay against creditor actions becomes effective and currently has a maximum duration of 150 days,[2] plus any additional time required by the Court to consider the rescue scheme or plan.  A company incorporated in Ireland may commence an examinership, and a company that is a related group company to the company in examinership may be put into examinership as well. The stay in respect of a related company, however, only becomes effective from the date of appointment of the examiner, as opposed to the date of the filing of the petition in the court office.

---

[2] Under section 534 of the Companies Act, Court protection extends over a period of 70 days starting on the filing date of the petition.  Before the expiration of the protection period, the examiner may apply to extend the period to 100 days.  Due to the COVID-19 pandemic, the Court may now extend the period to 150 days if exceptional circumstances exist.

8.      Although it is possible to put groups of companies into examinership (by way of the principal company and related company applications), the tests for admission and approval of a scheme must be met and each step of the process must be taken in respect of each company separately.  The separate schemes in respect of each company can be interdependent.  In the interests of reducing the volume of documentation, all of the documentation (e.g., petition, verifying affidavit, and scheme) can, at each stage, be consolidated  as long as the necessary statutory requirements are met separately and clearly in relation to each company.

9.      If a company to be included in the examinership is registered in a jurisdiction that is not a party to the European Insolvency Regulation,[3] such related company must have a sufficient connection with Ireland.  This concept is one developed in case law and its parameters are not precisely defined.  However, if a company has substantial assets in the form of its subsidiaries, as well as its other connections to Ireland, this is generally sufficient to allow participation in the examinership.

## III.    Appointment of an Examiner

10.      When a petition is filed, the Court may appoint an examiner on an interim basis.  Usually, within seven to ten days after the filing of the petition, there is a hearing on notice to creditors to consider whether it is appropriate to appoint a new examiner or, as is almost invariably the case, continue the appointment of the examiner appointed on an interim basis on the day of filing.

11.      Section 509 of the Companies Act sets out certain prerequisites for the appointment of an examiner, including the requirement that the company be insolvent at the time of filing or in the imminent future and that the company and all or part of its business has a

---

[3] Regulation (EU) No. 2015/848.

reasonable prospect of survival if an examiner is appointed.  Once these statutory prerequisites are

met, the Court has the discretion under the Companies Act to appoint an examiner, and typically

does so unless it concludes that the application is being made in bad faith or the petitioner is guilty

of material non-disclosure.

## IV.    Formulating a Scheme Proposal

12.    The examiner's primary function is to formulate a proposal for a scheme,

which usually entails writing down the company's debt and obtaining new investment.  Once

appointed, the examiner usually carries out a review of the company's finances and its business,

generally with a view to understanding how a proposal for a scheme might be formulated.  In some

instances the company will have filed a draft proposal with the petition, in which case the examiner

will review and consider whether to adopt such proposal in whole or part.  The examiner will

usually also need to consider, in conjunction with the company, the level and likely source of any

investment required as part of the restructuring.

13.    The examiner has a variety of powers designed to protect the company from

actions which he considers detrimental to the survival of the company.  In extreme cases, the

examiner may assume full executive control of the company with court approval.

## V.    Voting on a Scheme Proposal

14.    After the examiner formulates the proposal for a scheme, the examiner is

required to convene separate scheme meetings for each class of creditors and shareholders to vote

either in favor of or against the proposal.  Under section 534(2) of the Companies Act, the examiner

must conclude all scheme meetings and report the voting results to the Court within 35 days of

appointment, or such longer period as the Court may allow.  In addition, the examiner must report

the voting outcome to the Court before the expiration of the maximum protection period mentioned in paragraph 7 above.

15.     Creditors and shareholders are entitled to attend the relevant scheme meeting in person, by authorized representative (if a corporate entity), or by proxy.  Each scheme meeting is chaired by the examiner, who oversees voting, adjudicates disputes, tabulates votes, and reports the result to the Court.  Creditors and shareholders have the opportunity to raise questions and objections to the proposal at the scheme meetings.

16.     Under section 534 of the Companies Act, order 74A, and rule 18 of the Rules of the Superior Courts, the examiner must provide written notice of the scheme meetings to all creditors, including those residing in the United States, at least three days in advance of the scheme meetings.  Section 540 of the Companies Act requires each such notice to contain, among others, (i) a statement explaining the effect of the proposal and (ii) a statement explaining any material interests of the directors of the company and the effect of the scheme on such interests insofar as different to the effect on like interests of other persons.  It is the invariable practice to comply with this requirement by sending the entire proposal with the notice to creditors and shareholders convening the meetings.  Under section 539 of the Companies Act, the proposal is required to include (i) a statement of the company's assets and liabilities as of the date of the proposal and (ii) a description of the financial outcome of a winding up of the company for each class of creditors or shareholders.

17.     A class approves the proposal if a majority in number representing at least 75% in value of that class votes in favor of the proposal.  At least one class of impaired creditors must approve the proposal.  As mentioned in paragraph 8 herein, each company and subsidiary is the subject of a separate examinership and, hence, at least one class of creditors at each company

must vote in favor of the scheme proposal.  For example, an inter-company loan would constitute

a relevant claim and intercompany loans could constitute a class on their own, separate from other

unsecured creditors.  The fact that intercompany loans may be subordinated to other unsecured

claims would not affect the ability to use a vote in favor by such class to meet the statutory test.

Although there are no statutory rules in relation to class composition, the Court tends to follow the

decision of the courts of England and Wales in *Re Sovereign Life Assurance v Dodd*,[4] which held

that creditors may be classified together unless their interests diverge such that it would not be

possible for them to confer on the proposal.

## VI.    Confirmation of a Scheme Proposal

18.    Following the meetings of creditors and shareholders, the examiner is

obliged to report the outcome of the meetings to the Court.  The Court then holds a hearing to

consider confirmation of a scheme proposal, and may require the examiner to notify certain

creditors and interested parties of the hearing date as it sees fit.

19.    Under section 541(4)(b) of the Companies Act, the Court can only confirm

a scheme proposal if it is (i) "fair and equitable" to those classes of creditors who have rejected

the proposal and whose interests would be impaired by the implementation of the scheme

proposed, and (ii) not unfairly prejudicial to the interests of any interested party.  In determining

whether the proposal meets this test, the Court compares the treatment of affected creditors under

the scheme to what such creditors would receive under available alternatives.[5]  A creditor cannot

---

[4] *Re Sovereign Life Assurance v Dodd* [1892] 2 QB 573.

[5] *See Re Antigen Holdings Ltd* [2001] 4 IR 600; *Re Traffic Group Ltd* [2008] 3 IR 253; *McInerney Homes Ltd. v. Cos Acts 1990* [2011] IESC 31.

be treated materially worse than it would be if the examinership were to fail and the company were to be placed into liquidation or receivership.[6]

20.    In broad terms, the following claims have priority in the following order: (i) an examiner's claim for fees and direct expenses; (ii) claims of secured creditors with fixed security; (iii) a liquidator's claim for fees and expenses; (iv) claims of preferential creditors; (v) claims of secured creditors with floating security; (vi) claims of unsecured creditors; and (vii) claims of subordinated unsecured creditors.

21.    The Court can make any necessary modifications to a scheme proposal that are not material.  Once the proposal is confirmed by the Court, with or without modification, it is binding on all creditors, shareholders, and any other party liable for all or any part of the debts of the company.  Creditors or shareholders of the company may challenge the proposal if they are in a position to establish that they would be unfairly prejudiced.  The scheme will come into effect at a date fixed by the Court but no later than twenty-one (21) days from the date of confirmation (which period can be extended by the Court if appropriate).

## THE DEBTORS' IRISH EXAMINERSHIP PROCEEDING

22.    On November 17, 2020, the respective boards of directors of the Debtors authorized by written resolution the commencement of the Irish Examinership Proceeding and proposed that Kieran Wallace of KPMG be appointed as examiner of each of the Debtors (the "**Examiner**") to investigate the business of each of the Debtors and to determine whether proposals for a compromise or scheme of arrangement could be formulated in respect of each of the Debtors for the benefit of their employees and creditors.

23.    On November 18, 2020, the Debtors commenced the Irish Examinership

---

[6] *See McInerney Homes Ltd. v. Cos Acts 1990* [2011] IESC 31.

Proceeding by filing the petition (the "**Irish Petition**") with the Irish Court seeking protection under Part 10 of the Companies Act and seeking appointment of the Examiner on an interim basis. The Irish Petition was accompanied by a Verifying Affidavit containing information regarding the Debtors and an Independent Expert Report issued by Deloitte & Touche LLP estimating the statement of affairs for the Group on both a "going concern" and a "winding up" basis.

24.     Notice of the Irish Examinership Proceeding was (i) served on the parties entitled to notice as required by the Irish Court, and (ii) published once in each of the *Iris Oifigiúil* (the official gazette of the Government of Ireland), the *Irish Independent* newspaper, and the *Financial Times (International Edition)*.

25.     The Irish Petition sought protection for Norwegian as a related company of the other Ireland-based petitioners pursuant to section 517 of the Companies Act on the basis that, although Norwegian's center of main interests is located in Norway, there is a sufficient connection between Norwegian and Ireland such that it is capable of being afforded protection in the Irish Examinership Proceeding.

26.     On November 18, 2020, the Irish Court issued an interim order that, among other things, appointed Kieran Wallace as the Examiner, on an interim basis, pursuant to sections 512(7) and 517(1) of the Companies Act.  On December 7, 2020, the Irish Court issued a final order that confirmed the appointment of the Examiner and granted certain relief in connection with the Irish Examinership Proceeding (the "**Examiner Appointment Order**").  A copy of the Examiner Appointment Order is attached hereto as **Exhibit A**.

27.     With the assistance of the Examiner, the Debtors began negotiations with creditors and formulated a new business plan terminating long-haul operations and focusing on the company's core Nordics business with a significant fleet, route, and headcount reduction across

the Debtors.

28.     During the period between November 27, 2020 and January 12, 2021, the Examiner sent creditors instructions as to how to participate in the Schemes' claims submission process.  The Schemes will also include a dispute resolution process for those creditors whose claims are disputed with respect to either amount or liability.

29.     On January 28, 2021, February 4, 2021, and February 15, 2021, the Debtors filed motions (the "**Repudiation Motions**") seeking an order approving the repudiation of certain contracts, leases, subleases, and guarantees entered into by the Debtors with certain airport facilities, leasing entities, and other service providers, as listed in the affidavit of Tore Jenssen filed with the Irish Court on January 22, 2021, January 29, 2021, February 1, 2021, and February 9, 2021.  The Debtors concluded it was necessary to repudiate the above-mentioned contracts, leases, subleases, and guarantees to effectively implement the Debtors' business plan.  The Debtors provided notice to contract counterparties of their intent to repudiate such contracts under the Repudiation Motions, and proposed to address the liabilities arising from such repudiation in the Schemes (as defined below).  The Debtors also negotiated with contract counterparties to consensually resolve disputes regarding the Repudiation Motion.  I understand that the chapter 11 rejection process is similar to the repudiation process in the Irish Examinership Proceeding, where the Irish Court allowed contract counterparties to submit affidavits in opposition of the Repudiation Motion and held several hearings in connection with the Debtors' proposed repudiations.  On March 5, 2021, the Irish Court issued an order approving the Repudiation Motion, effective as of the effective date of the Schemes (as defined below).

30.     On February 25, 2021, the respective boards of directors of the Debtors authorized by written resolution the appointment of Geir Karlsen, the Chief Financial Officer of

Norwegian, to act as the foreign representative of the Irish Examinership Proceeding (the "**Foreign Representative**") with authority to file the Chapter 15 Petitions in the United States for purposes of achieving recognition and enforcement of the Schemes and the Irish Orders (as defined below) in the United States. The Irish Court issued an order confirming the appointment of Geir Karlsen as the Foreign Representative on March 5, 2021.

31.     On March 11, 2021, the Examiner launched two schemes of arrangement – one for Norwegian (the "**Norwegian Scheme**"), and a related scheme on substantially similar terms for certain subsidiaries of Norwegian in the Irish Examinership Proceeding, including AAA (the "**AAA Scheme**" and, together with the Norwegian Scheme, the "**Schemes**"). Copies of the Schemes are attached to this Declaration as **Exhibit B**. The Examiner has scheduled meetings (the "**Scheme Meetings**") of the relevant classes of creditors (the "**Scheme Creditors**") of each Debtor. The Scheme Meetings will be held on March 18, 2021, March 19, 2021, and March 20, 2021.

32.     On March 11, 2021, the Examiner sent notice of the Scheme Meetings (the "**Scheme Meetings Notice**") to the Scheme Creditors. The Scheme Meetings Notice was made available on Norwegian's website (www.norwegian.com) to creditors for which the Debtors did not have email contact details, and also was announced via the Oslo Stock Exchange (the "**Oslo Stock Exchange Announcement**").[7] Where relevant, intermediaries for customer bookings were notified. Where the Debtors had email contact details for creditors, the Schemes Meeting Notice was sent by the Examiner via email containing individual log-on codes for the online portal operated by Lumi Global. The Scheme Meetings Notice contained, among other things, (i) a copy of the relevant Scheme, including (a) a statement of the relevant Debtor's assets and liabilities as

---

[7] A copy of the Oslo Stock Exchange Announcement is attached to this Declaration as **Exhibit C**.

of March 11, 2021 and (b) a description of the financial outcome of a winding up of the relevant Debtor for each class of creditors or shareholders; (ii) a statement explaining the effect of the relevant Scheme (each, a "**Explanatory Memorandum**" and, collectively, the "**Explanatory Memoranda**");[8] (iii) proxy forms; and (iv) a dedicated email address to contact in the event a creditor wants to dispute the Schemes.

33.     If each Scheme is approved by at least one class of impaired Scheme Creditors, a hearing before the Irish Court seeking sanction and approval of that Scheme is expected to be held on or about March 26, 2021 (the "**Sanction Hearing**").  The Scheme Creditors and other creditors of the Debtors will have an opportunity to be heard and raise objections at the Sanction Hearing.

34.     Assuming the Irish Court deems it appropriate to enter an order at the Sanction Hearing (the "**Irish Confirmation Order**," and, collectively with the Examiner Appointment Order, and any other order that may be entered by the Irish Court, the "**Irish Orders**"), the Irish Confirmation Order is expected, among other things, to (i) sanction and approve consummation of the Schemes, (ii) bind all creditors in accordance with the terms of the Schemes, and (iii) authorize the Examiner and the Debtors on behalf of the Scheme Creditors to execute all agreements and documentation necessary to consummate the Schemes and the investment transactions contemplated therein.  The Schemes will be consummated shortly after the expiration of the time for any appeal of (i) the Irish Confirmation Order, (ii) an order of the Norwegian Court confirming the Reconstruction Plan, and (iii) receipt by the Debtors of the necessary funding.  The Debtors hope that an order of this Court recognizing and enforcing the Schemes under chapter 15 of the Bankruptcy Code will have been obtained by that time also.

---

[8] Copies of the Explanatory Memoranda are attached to this Declaration as **Exhibit D**.

## COORDINATION OF THE IRISH EXAMINERSHIP PROCEEDING
## AND THE RECONSTRUCTION PROCEEDING

35.　　As some creditors continued to pursue their claims towards Norwegian after the Irish Examinership Proceeding was commenced, Norwegian considered it necessary to also commence the Reconstruction Proceeding to obtain court protection in Norway.  As described more fully in the *Declaration of Christopher Thue Jerving as Norwegian Counsel in Support of the Motion for Recognition of Foreign Main and Nonmain Proceedings and Certain Related Relief*, on December 8, 2020, Norwegian commenced a foreign proceeding in Norway (the "**Reconstruction Proceeding**") under the Temporary Reconstruction Act (the "**Reconstruction Act**") before the District Court of Oslo (the "**Norwegian Court**").  On the same date, the Norwegian Court issued an order (i) commencing reconstruction negotiations for Norwegian under the Reconstruction Act and (ii) appointing Håvard Wiker, a Norwegian lawyer in the law firm Ro Sommernes Advokatfirma DA as Reconstructor (the "**Reconstructor**"). On March 11, the Reconstructor proposed a Reconstruction plan (the "**Reconstruction Plan**") to creditors in the Reconstruction Proceeding, a copy of which was also annexed to the Norwegian Scheme.

36.　　The Reconstruction Proceeding was designed to progress in parallel with, and effectively implement, the Irish Examinership Proceeding.  I understand that the Examiner and the Reconstructor have worked together to ensure that the Reconstruction Plan in Norway reflects the terms and substance of the Norwegian Scheme and the vote will track the vote solicited on the Norwegian Scheme.  Specifically, the Norwegian Scheme includes a provision (the "**Power of Attorney Provision**") that requires each creditor subject to the Irish Examinership Proceeding to irrevocably appoint the Examiner as its agent with full power and authority to vote on the Reconstruction Plan on its behalf once the Norwegian Scheme is confirmed by the Irish Court. The Power of Attorney Provision compels the Examiner to vote in favor of the Reconstruction

Plan if it is not materially different from the Scheme.  Thus, it is practically certain that the Reconstruction Plan will obtain the requisite majority vote as long as the Norwegian Scheme is confirmed by the Irish Court.  I have no reason to believe that the Irish Court will not approve the Norwegian Scheme due to the Power of Attorney Provision, or that the Power of Attorney Provision is unenforceable under Irish law.

37.    Accordingly, it is advantageous for the Debtors that the Irish Examinership Proceeding and the Reconstruction Proceeding run in parallel, as such coordination is expected to achieve the same result: a confirmed scheme of arrangement that will bind creditors in both jurisdictions while providing sufficient protection for the Debtors against creditors during its cross-border restructuring and after implementation thereof.

## **CONCLUSION**

38.    The relief requested by the Foreign Representative under chapter 15 of the Bankruptcy Code is necessary to both implement the Schemes and give effect to the Schemes in the United States and will best assure an economical, expeditious, fair, and efficient administration of the Schemes that protects the interests of the Debtors and its creditors.  Based on the foregoing, I believe that the relief requested in the Debtors' Chapter 15 Petitions should be granted in full.

*[Remainder of page intentionally left blank]*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on this ___11th___ day of March, 2021

in Dublin, Ireland


Tony O'Grady
Matheson
70 Sir John Rogerson's Quay
Dublin 2, D02 R296 Ireland

## Exhibit A

**Examiner Appointment Order**

THE HIGH COURT

2020 No. 366 COS

Monday the 7th day of December 2020

BEFORE MR JUSTICE QUINN

## IN THE MATTER OF ARCTIC AVIATION ASSETS DESIGNATED ACTIVITY COMPANY

## AND IN THE MATTER OF NORWEGIAN AIR INTERNATIONAL LIMITED

## AND IN THE MATTER OF DRAMMENSFJORDEN LEASING LIMITED

## AND IN THE MATTER OF TORSKEFJORDEN LEASING LIMITED

## AND IN THE MATTER OF LYSAKERFJORDEN LEASING LIMITED

## AND IN THE MATTER OF NORWEGIAN AIR SHUTTLE ASA AS A RELATED COMPANY WITHIN THE MEANING OF SECTION 517 AND SECTION 2(10) OF THE COMPANIES ACT 2014

## AND IN THE MATTER OF THE COMPANIES ACT 2014

The petition herein (the "**Petition**") coming on for hearing this day having been presented to the Court on the 18th day of November 2020 by Arctic Aviation Assets Designated Activity Company, Norwegian Air International Limited, Drammensfjorden Leasing Limited, Torskefjorden Leasing Limited and Lysakerfjorden Leasing Limited (the "**Petitioners**") (together with Norwegian Air Shuttle ASA hereinafter called the "**Companies**")

And on reading the said Petition, the affidavit of Tore Jenssen filed on the 18th day of November 2020 and the documents and exhibits referred therein, the supplemental affidavit of Tore Jenssen filed on the 23rd day of November 2020 and the documents and exhibits referred therein, the affidavit of Gavin Smith filed on the 18th day of November 2020 as to the fitness of Kieran Wallace of KPMG of 1 Stokes Place, St. Stephen's Green, Dublin 2 to act as examiner (if appointed) to the

**THE HIGH COURT**

Companies, the letter of consent dated the 17th day of November 2020 of Kieran Wallace to act as examiner (if appointed) to the Companies and the affidavit of Kieran Wallace filed on the 18th day of November 2020 as to his qualifications to act as examiner (if appointed) to the Companies

And on reading the Order made herein on the 18th day of November 2020 appointing Kieran Wallace as examiner of the Companies on an interim basis (the "**Order**")

And on hearing counsel for the Petitioners

And on hearing counsel for the Interim Examiner

And on hearing counsel for the Revenue Commissioner

And on hearing the solicitor for Jorgen Andersen Bondholder Trustee

And on hearing counsel for Airbus SAS

And on hearing counsel for Aercap

And on hearing counsel for Boca Aviation

And on hearing counsel for EXIM Bank

And on hearing counsel for Otra Aviation Leasing Limited

And on hearing counsel for Itochu Corporation / IC Airlease One Limited

And on hearing counsel for Engine Lease Finance Corporation

And on hearing the solicitor for Mitsui

And on hearing counsel for SMBC Aviation Capital Group

And on hearing the solicitor for FPG Amentum

And on hearing the solicitor for Rolls Royce

And on hearing the solicitor for Aviation Capital Group

And on hearing the solicitor for KDAC Aircraft Trading 2 Limited

And on hearing the solicitor for Avolon

THE HIGH COURT

And on hearing the solicitor for Jackson Square Aviation

And on hearing the solicitor for Mabanaft Limited and Mabanaft Energy Scandanavia A.S.

And on reading the second affidavit of Kieran Wallace sworn on the 4th day of December 2020 and the report of the Interim Examiner exhibited thereto

And on reading the affidavit of Benoit De Saint Exupery (unsworn) and the affidavit of Brendan Colgan sworn on the 7th day of December 2020 vouching advertisement and service of the Petition and the exhibits thereto including the Irish Independent newspaper on the 20th day of November 2020, the Financial Times (International Edition) newspaper on the 20th day of November 2020 and the Official Gazette (Iris Oifigiuil) on the 20th day of November 2020 each containing an advertisement of the presentation of the Petition, the date fixed for the hearing thereof and the appointment of the interim examiner to the Companies

And the Court being satisfied as to service on the notice parties set out in the Order

And the Court being satisfied that the directions contained in the Order with regard to advertising having been complied with and being satisfied to continue the protection of the Court to the Companies

**IT IS ORDERED** that:

1.    Kieran Wallace of KPMG, 1 Stokes Place, St. Stephen's Green, Dublin 2 be appointed as examiner pursuant to Sections 509 of the Companies Act 2014 (as amended) (the "**Act**") in respect of Arctic Aviation Assets Designated Activity Company, Norwegian Air International Limited, Drammensfjorden Leasing Limited, Torskefjorden Leasing Limited and Lysakerfjorden Leasing Limited and pursuant to 517 of the Act in respect of Norwegian Air Shuttle ASA for the purpose of examining the state of each of the Companies' affairs

THE HIGH COURT

and performing such duties in relation to the Companies as may be imposed by or under the Act.

2.     All returns of the Companies be brought up to date and filed and that all current taxes be paid during the currency of the examinership.

3.     The parties listed in the schedule hereto be put on notice of any future applications and that 24 hours' notice be given to the notice parties in advance of any applications to be made in this matter and that service of the notice parties by email be deemed good service for the purposes of the Order

4.     The Companies be authorised to discharge a pre-petition liability to Vodafone in the sum of €15,062.53.

5.     The examiner be entitled to his costs of the interim examinership as part of his costs in the examinership.

Liberty to apply

**AND IT IS ORDERED** that these proceedings be adjourned to 10.30 a.m. on Friday the 18th day of December 2020

**ALISON KING**
**REGISTRAR**
**Perfected the 10th day of December 2020**

Matheson
Solicitors for the Companies

William Fry
Solicitors for the interim examiner

A COPY WHICH I ATTEST

*Rachel May*

FOR REGISTRAR

**THE HIGH COURT**

## Schedule

1.    The Companies

2.    Revenue Commissioner

3.    Jorgen Andersen Bondholder Trustee

4.    Aercap

5.    Boca Aviation

6.    EXIM Bank

7.    Otra Aviation Leasing Limited

8.    Itochu Corporation / IC Airlease One Limited

9.    Engine Lease Finance Corporation

10.    M&T Aviation Limited

11.    Mitsui

12.    SMBC Aviation Capital

13.    FPG Amentum

14.    Rolls Royce

15.    Aviation Capital Group

16.    Airbus SAS

17.    KDAC Trading 2 Limited

18.    Mabanaft Energy Scandinavia A.S / Mabanaft Limited

19.    Commission for Aviation Regulation

20.    Avolon

21.    Jackson Square Aviation

22.    AFIC

23.    Willis Lease Finance Corporation

**<u>Exhibit B</u>**

**Norwegian Scheme**

## THE HIGH COURT

**2020 No. 366 COS**

IN THE MATTER OF

**ARCTIC AVIATION ASSETS DESIGNATED ACTIVITY COMPANY**

AND IN THE MATTER OF

**NORWEGIAN AIR INTERNATIONAL LIMITED**

AND IN THE MATTER OF

**DRAMMENSFJORDEN LEASING LIMITED**

AND IN THE MATTER OF

**TORSKEFJORDEN LEASING LIMITED**

AND IN THE MATTER OF

**LYSAKERFJORDEN LEASING LIMITED**

AND IN THE MATTER OF

**PART 10 OF THE COMPANIES ACT 2014**

AND IN THE MATTER OF

**NORWEGIAN AIR SHUTTLE ASA**
**AS A RELATED COMPANY WITHIN THE MEANING OF SECTION 517 AND SECTION**
**2(10) OF THE COMPANIES ACT 2014**

**PROPOSALS FOR A SCHEME OF ARRANGEMENT**

**BETWEEN**

**NORWEGIAN AIR SHUTTLE ASA (IN EXAMINATION**
**UNDER PART 10 OF THE COMPANIES ACT 2014)**

**AND**

**ITS MEMBERS AND CREDITORS**

Kieran Wallace
Examiner
KPMG
1 Stokes Place
St Stephen's Green
Dublin 2
Ireland

**CONTENTS**

| | | |
|---|---|---|
| 1. | DEFINITIONS | 3 |
| 2. | INTERPRETATION | 16 |
| 3. | BACKGROUND AND RECITALS | 17 |
| 4. | THE REPORT AND FORMULATION OF PROPOSALS | 21 |
| 5. | EFFECTIVE DATE AND EFFECTIVE TIME | 22 |
| 6. | EXAMINER'S AUTHORITY REGARDING THE NORWEGIAN RESTRUCTURING PLAN | 23 |
| 7. | THE INVESTMENT | 24 |
| 8. | SUMMARY OF PROPOSALS | 27 |
| 9. | TREATMENT OF MEMBERS | 28 |
| 10. | TREATMENT OF CREDITORS | 28 |
| 11. | DETERMINING THE CLAIMS OF UNAGREED CREDITORS | 42 |
| 12. | WAIVING OF CREDITOR RIGHTS | 45 |
| 13. | IMPLEMENTATION OF PROPOSALS | 46 |
| 14. | GENERAL DATA PROTECTION REGULATION | 47 |
| 15. | MISCELLANEOUS PROVISIONS | 47 |
| SCHEDULE 1 | | 49 |
| SCHEDULE 2 | | 50 |
| SCHEDULE 3 | | 51 |
| SCHEDULE 4 | | 53 |
| SCHEDULE 5 | | 54 |
| SCHEDULE 6 | | 120 |
| SCHEDULE 7 | | 121 |
| SCHEDULE 8 | | 122 |
| SCHEDULE 9 | | 123 |
| SCHEDULE 10 | | 124 |

1.      **Definitions**

In these Proposals, unless inconsistent with the subject or context, the following expressions bear the following meanings:

"**2019 Convertible Bonds**", Norwegian Air Shuttle ASA 6.375 per cent. Senior Unsecured Convertible USD 34,500,000 Bonds 2019/2024 with ISIN NO 001 0868284 issued in November 2019 pursuant to bond terms dated 13 November 2019 (as amended and restated from time to time);

"**2019 Convertible Bond Creditor**", the trustee of the 2019 Convertible Bonds identified in the Creditor Schedule;

"**2020 Convertible Perpetual Bonds**", all outstanding bonds issued pursuant to the following zero coupon perpetual subordinated convertible bond issues pursuant to bond terms dated 22 May 2020 (as amended and restated from time to time):

(a)     Norwegian Air Shuttle ASA perpetual 0% USD subordinated convertible bond loan with ISIN NO 0010883515;

(b)     Norwegian Air Shuttle ASA perpetual 0% EUR subordinated convertible bond loan with ISIN NO 0010883416; and

(c)     Norwegian Air Shuttle ASA perpetual 0% SEK subordinated convertible bond loan with ISIN NO 0010883473;

"**2020 Convertible Perpetual Bond Creditors**", the trustees of the 2020 Convertible Perpetual Bonds identified in the Creditor Schedule (and each a "**2020 Convertible Perpetual Bond Creditor**");

"**2020 Restructuring**", the restructuring of the Group referenced in Clause 3.14;

"**2020 Restructuring Plan**", the plan referenced in Clause 3.15;

"**AAA Proposals**", the Related Proposals in respect of AAA;

"**Act**", the Irish Companies Act 2014 (as amended);

"**Affiliate**", with respect to a person:

(a)     any other person who, directly or indirectly is in control of, or controlled by, or is under common control with, such person; or

(b)     any other person who is a director, officer or employee:

(i)      of such person;

(ii)     of any subsidiary or parent company of such person; or

(iii)    of any person described in paragraph (a) above,

and for the purposes of this definition, control of a person shall mean the power, direct or indirect, (A) to vote on more than 50% of the securities having ordinary voting power for the election of directors of such person, or (B) to direct or cause the direction of the management and policies of such person whether by contract or otherwise;

"**Agreed Creditor**", those Creditors whose Claims are accepted by the Company both in terms of liability and quantum and beside whose name in the Creditor Schedule there is the word "Yes";

3

"**Agreed Debt**":

(a)    the amount due to a Creditor as appears beside its name and marked as agreed in the Creditor Schedule;

(b)    the amount due to a Creditor which has otherwise been agreed by the Company and the Creditor prior to the Irish Confirmation Date, determined by the Irish High Court under Section 537(3) of the Act or determined in accordance with the Expert Determination Process;

(c)    in the case of any Contingent Litigation Creditor, the amount which is found to be due to it as determined by the courts of competent jurisdiction (subject to any appeal) or the amount settled or agreed by the Company; or

(d)    in the case of any Customer Damages Claims Creditor, the amount which is found to be due to it by the Customer Claim Forum (subject to any appeal) or the amount settled or agreed by the Company;

"**Aircraft Experts**":

(a)    Richard G. Spaulding of Spaulding Aviation Services LLC, 17971 Tobermory Place, Leesburg, VA 20175, United States of America; and

(b)    Robert Palmer, Malvern Consulting Limited of 17 Park Avenue, Solihull, West Midlands, B91 3EJ, United Kingdom,

(and each an "**Aircraft Expert**");

"**Aircraft Lease**", any lease agreement between a non-Group company, Group company or other entity, as lessor, and the Company, as lessee, in respect of aircraft and/or aircraft engine(s) (excluding any Aircraft Sub-Lease);

"**Aircraft Sub-Lease**", any sub-lease agreement between a Group company, as sub-lessor, and the Company or NAI, as sub-lessee, in respect of aircraft and/or aircraft engine(s);

"**Allocation Factors**", has the meaning given to such term in Clause 7.13;

"**Allocation Principles**", has the meaning given to such term in Clause 7.13;

"**AOC**", an air operator's certificate;

"**Auditor**", the Company's auditor, PricewaterhouseCoopers AS;

"**Board**", the board of Directors of the Company;

"**Broker**", DNB Markets, a part of DNB;

"**Business Day**", any day other than a Saturday, Sunday or public holiday in either of Ireland or Norway;

"**Capital Increase Registration**", has the meaning given to such term in Clause 5.1.4;

"**Cash Creditors**", has the meaning given to such term in Clause 10.5;

"**Cash Pot**", has the meaning given to such term in Clause 10.5;

"**Cash Pot Entitlement**", has the meaning given to such term in Clause 10.6;

"**Claim**", any claim or right of action which a Creditor may have against the Company as at the Petition Date, including, but not limited to, any right to payment whether or not such right is

reduced to judgment, liquidated, unliquidated, fixed, contingent, prospective, matured, unmatured, disputed, undisputed, ascertained, unascertained, legal, equitable, secured, or unsecured (and including, for the avoidance of doubt and without limitation: (1) the right to payment of any Pre-Repudiation Post-Petition Liabilities; and (2) any claim from a Contingent Unagreed Creditor that has not crystallised);

"**Closing Date**", has the meaning given to such term in Clause 7.2;

"**Companies**", collectively:

(a)     the Company;

(b)     Arctic Aviation Assets Designated Activity Company, a designated activity company incorporated under the laws of Ireland with company number 531191, having its registered office at Ground Floor, Imbus House, Dublin Airport, Co Dublin ("**AAA**");

(c)     Norwegian Air International Limited, a private company limited by shares incorporated under the laws of Ireland with company number 525771, having its registered office at Ground Floor, Imbus House, Dublin Airport, Co Dublin ("**NAI**");

(d)     Drammensfjorden Leasing Limited, a private company limited by shares incorporated under the laws of Ireland with company number 533167, having its registered office at Ground Floor, Imbus House, Dublin Airport, Co Dublin ("**DLL**"); and

(e)     Lysakerfjorden Leasing Limited, a private company limited by shares incorporated under the laws of Ireland with company number 585570, having its registered office at Ground Floor, Imbus House, Dublin Airport, Co Dublin ("**LLL**");

"**Company**", Norwegian Air Shuttle ASA, a company incorporated under the laws of Norway with company number 965920358 MVA, having its headquarters at Oksenøyveien 3, 1336 Lysaker, Norway (also referred to as "**NAS**");

"**Company's Proposal**", has the meaning given to such term in Clause 3.31;

"**Connected and Intercompany Creditors**", any Creditor which is or was a member of the Group, including but not limited to those identified in the Creditor Schedule (and each a "**Connected and Intercompany Creditor**");

"**Connected Person**", a person who would be connected with another person for the purposes of Section 220 of the Act if that other person was a director of a company;

"**Constitution**", the Company's articles of association (*Nw. vedtekter*) as at the date of these Proposals;

"**Contingent Litigation Creditor**", has the meaning given to such term in Clause 10.27.17(b)(i);

"**Contingent Unagreed Creditors**", any persons with Claims against the Company which are contingent, including, without limitation, upon the outcome of litigation or any other binding dispute resolution procedure which is in being or has been intimated against the Company (excluding Customer Damages Claims Creditors), and not accepted by the Company including (but not limited to) those identified in the Creditor Schedule (and each a "**Contingent Unagreed Creditor**");

"**Conversion Price**", has the meaning given to such term in Clause 10.16;

"**Conversion Price Determination Date**", has the meaning given to such term in Clause 10.16;

"**Conversion Shares**", has the meaning given to such term in Clause 10.19.2;

5

"**Converting Creditors**", has the meaning given to such term in Clause 10.19.2;

"**Counter Indemnity Obligations**", has the meaning given to such term in Clause 10.27.16(b)(i);

"**Creditor Schedule**", Schedule 5;

"**Creditors**", all creditors of the Company, known or unknown, whether or not the liabilities have been acknowledged or recognised, qualified or unqualified, actual or contingent, ascertained or unascertained, including (but not limited to) the creditors and classes of creditors listed in the Creditor Schedule and each a "**Creditor**";

"**Customer Claim Forum**", has the meaning given to such term in Clause 10.27.14(c);

"**Customer Creditors**", the customers or other Creditors (including any travel agent, agent, claims handler or legal owner of such Claim) with Ticket Refund Claims and/or Customer Damages Claims including but not limited to the Customer Creditors identified in a confidential creditor schedule maintained by the Company and the Examiner but not included with these Proposals in accordance with the directions of the Irish High Court made on 19 February 2021 (each a "**Customer Creditor**");

"**Customer Damages Claims**", any Claim for losses, damages, penalties, standard compensation, interest or costs, whether arising under Regulation 261/2004/EC or otherwise, in respect of flights which were cancelled or other matters which occurred prior to the Petition Date excluding, for the avoidance of doubt, any Ticket Refund Claims;

"**Customer Damages Claims Creditors**", any Customer Creditor with a Customer Damages Claim against the Company (and each a "**Customer Damages Claims Creditor**");

"**Data Protection Laws**", has the meaning given to such term in Clause 14.1;

"**Determination Date**", the date of final agreement, settlement, crystallisation or determination of a Claim;

"**Directors**", the directors of the Company from time to time and each a "**Director**";

"**Dispute Notice**", a notice served by the Company on an Unagreed Creditor, under which the Company disputes the liability claimed to be owed by the Company to such Creditor;

"**Dividend Amount**", in respect of a Creditor, 5% of its Net Agreed Debt;

"**Dividend Balance**", in respect of any Creditor, its Dividend Amount less its Cash Pot Entitlement;

"**Dividend Claims**", the Claims of the Creditors reduced and converted as set out in these Proposals on the Dividend Claims Terms;

"**Dividend Claims Creditors**", has the meaning given to such term in Clause 10.10;

"**Dividend Claims Terms**", the terms governing the Dividend Claims dated 11 March 2021, an executed copy of which is set forth in Schedule 7;

"**Dividend Creditor VPS Account**", has the meaning given to such term in Clause 10.19.2;

"**DNB**", DNB Bank ASA;

"**DOT Approval**", has the meaning given to such term in Clause 3.9;

"**Effective Date**", the date fixed by the Irish Court for the purposes of Section 542(3) of the Act or any alteration thereof on application by the Examiner pursuant to Clause 5.3 of these Proposals;

"**Effective Time**", the time on the Effective Date by which the last of the NRBE Registrations occurs;

"**Eligible New Capital Perpetual Bonds Creditor**", an Initial New Capital Perpetual Bonds Creditor or a Subsequent Eligible New Capital Perpetual Bonds Creditor, provided that any such Examinership Companies Creditor, when aggregated with its Affiliates' and/or Connected Persons' Relevant Portions, has a Relevant Portion of more than NOK 2,500,000 (or an equivalent amount in another currency);

"**Eligible Private Placement Creditor**", any Examinership Companies Creditor that is permitted to participate in the Private Placement pursuant to applicable securities law and regulation that may apply to such Examinership Companies Creditor from time to time and that, when aggregated with its Affiliates' and/or Connected Persons' Relevant Portions, has a Relevant Portion not exceeding NOK 2,500,000 (or an equivalent amount in another currency);

"**Equivalent Expert Determination Process**", in respect of any of the Related Companies, the process set out in its Related Proposals which is substantially the same as the Expert Determination Process;

"**Estimated Net Agreed Debt**", has the meaning given to such term in Clause 10.7;

"**EU**", the European Union;

"**euro**" or "**€**", the lawful currency for the time being of Ireland;

"**Examiner**", Kieran Wallace of KPMG, 1 Stokes Place, St. Stephen's Green, Dublin 2;

"**Examinership Companies Creditors**", the Creditors and the Related Company Creditors;

"**Existing Shares**", all Shares in issue immediately prior to the Effective Time;

"**Experts**", the Aircraft Expert and the General Expert (and each an "**Expert**");

"**Expert Determination End Date**", 60 days after the Irish Confirmation Date;

"**Expert Determination Process**", the expert determination process set out in Clause 11.1 of these Proposals;

"**Explanatory Memorandum**", the explanatory statement explaining the effect of these Proposals, as required by the Act;

"**FSAN**", Financial Supervisory Authority of Norway (*Finanstilsynet*);

"**Fully Diluted Basis**", the Company's issued share capital on a fully diluted basis at the Effective Time: (1) assuming that an amount exactly equal to the Minimum Gross Proceeds Threshold  is raised under the Investment; (2) calculated as if all conversion rights under the New Capital Perpetual Bonds and the Dividend Claims were immediately exercised on issue on such date (notwithstanding that conversion on such date will not be permitted under either the New Capital Perpetual Bonds Instrument or the Dividend Claims Terms); (3) assuming all 2020 Convertible Perpetual Bonds are voluntarily converted by the holders thereof in accordance with their terms prior to the Effective Time (other than any 2020 Convertible Perpetual Bonds beneficially owned by the Company as of the Petition Date); and (4) assuming that there are no changes to the Company's share capital other than as contemplated in these Proposals and the Related Proposals;

"**General Expert**", Damien Murran of RSM Ireland, Trinity House, Charleston Road, Ranelagh, Dublin, D06 C8X4, Ireland;

"**General Payment Date**", the date which falls four weeks from the later of:

(a)     the Expert Determination End Date; and

7

(b)     the Effective Date;

"**GIEK Guaranteed Loan Facilities Creditors**", the lenders in respect of any of the facilities provided to the Company under the Term Facility Agreement dated 31 March 2020 and the Term Facility Agreement dated 16 May 2020 identified in the Creditor Schedule (and each a "**GIEK Guaranteed Loan Facilities Creditor**");

"**Group**", the group of companies of which the Companies form part;

"**Guaranteed Creditors**", any persons to which the Company and/or any Related Company has any obligation to make a payment on foot of a guarantee given by the Company and/or any Related Company in respect of the obligations of any of the Related Companies, any other entity within the Group or any other person whatsoever (and each a "**Guaranteed Creditor**");

"**Guaranteed Obligations**", all monies, obligations and liabilities owed, payable or otherwise, including any damages arising from a repudiation of any guarantee pursuant to the Repudiation Orders, due to any Guaranteed Creditor by any of the Related Companies, any other entity within the Group or any other person whatsoever which are subject to a guarantee, indemnity or other form of surety provided by the Company;

"**Independent Expert**", Ken Fennell of Deloitte LLP, 29 Earlsfort Terrace, Dublin 2;

"**Independent Verification Statement**", has the meaning given to such term in Clause 10.22;

"**Initial Eligible New Capital Perpetual Bonds Creditor**", any Examinership Companies Creditor that is permitted to participate in the New Capital Perpetual Bonds Offering pursuant to applicable securities law and regulation that may apply to such Examinership Companies Creditor from time to time, provided that:

(a)     with respect to any application for New Capital Perpetual Bonds (an "**Application**") by such Examinership Companies Creditor:

    (i)     the debt on which basis such Examinership Companies Creditor's Investment Allowance is calculated (the "**Eligible Debt**") was owned by such Examinership Companies Creditor as at the Petition Date; and

    (ii)    such Examinership Companies Creditor has not:

        (A)     entered into or permitted to be entered into any agreement to transfer all or part of its Eligible Debt to any person (or any arrangement of similar effect); and/or

        (B)     made or permitted to be made such Application in contemplation of any such agreement or arrangement;

it being noted that the above provisos will be set out in the application form or similar documentation provided by the Company pursuant to which any such Application shall be made and will be represented by such Examinership Companies Creditor by its execution of the same; and

(b)     such Examinership Companies Creditor has delivered by email to the Company at nasperpetual@bahr.no, a non-binding expression of interest in participating in the New Capital Perpetual Bond Offering on or before the business day following the Norwegian Confirmation Date.

"**Investment**", has the meaning given to such term in Clause 7.1;

"**Investment Allowance**", with respect to a Creditor, 50% of such Creditor's Relevant Portion;

"**Investment Proceeds**", the total proceeds raised by the Company in connection with the Investment;

"**Irish Confirmation Date**", the date on which the Irish High Court makes an order confirming these Proposals and the Related Proposals pursuant to Section 541 of the Act;

"**Irish Confirmation Order**", the Irish Court order(s) confirming these Proposals and the Related Proposals pursuant to Section 541 of the Act;

"**Irish Court**", the Irish High Court, or where any decision of the Irish High Court is appealed, the Court of Appeal of Ireland and/or Supreme Court of Ireland;

"**Irish High Court**", the High Court of Ireland;

"**KYC**", 'Know Your Customer' anti-money laundering requirements under Norwegian law;

"**Litigation Escrow Account**", has the meaning given to such term in Clause 10.8;

"**Litigation Payment Date**", the date which falls four weeks from the latest of:

(a)     the Effective Date;

(b)     the Expert Determination End Date;

(c)     the date of any final decision (the period in respect of all rights of appeal having expired) of:

    (i)     the relevant Customer Claim Forum in favour of any Customer Damages Claims Creditor; and

    (ii)     the relevant court of competent jurisdiction in favour of any Contingent Litigation Creditor in respect of its Claim; and

(d)     the date on which the Company and the relevant Customer Damages Claims Creditor or Contingent Litigation Creditor (as applicable) settle or agree the amount of the relevant Claim;

"**Litigation Reserve**", has the meaning given to such term in Clause 10.8;

"**Locked Accounts**", has the meaning given to such term in Clause 5.1.5;

"**Locked Bonds Proceeds Account**", has the meaning given to such term in Clause 5.1.5;

"**Locked Share Proceeds Account**", has the meaning given to such term in Clause 5.1.4;

"**Long Stop Date**", 30 June 2021;

"**Members**", the holders of the Existing Shares and each a "**Member**";

"**Minimum Gross Proceeds Threshold**", with respect to the Investment, gross proceeds (prior to the deduction of any costs or fees associated with the capital raising process) of NOK 4,500,000,000 in aggregate;

"**NAS07 Secured Bonds**", all outstanding bonds constituted pursuant to the EUR 250,000,000 7.25% Norwegian Air Shuttle ASA Senior Unsecured Bond Issue 2015/2019 with ISIN NO 001 0753437, originally entered into on 9 December 2015 as amended and restated on 26 May 2020;

"**NAS07/08 Secured Bonds**",  the NAS07 Secured Bonds and the NAS08 Secured Bonds;

"**NAS07/08 Secured Bond Creditor**",  the trustee of the NAS07/08 Secured Bonds identified in the Creditor Schedule;

"**NAS08 Secured Bonds**", all outstanding bonds constituted pursuant to the SEK 963,500,000 7.25% Norwegian Air Shuttle ASA Senior Unsecured Bond Issue 2017/2020 with ISIN NO 001 0783459, originally entered into on 7 February 2017 and amended and restated on 4 December 2019 and further amended and restated on 26 May 2020;

"**NAS09 Secured Bonds**", all outstanding bonds constituted pursuant to the NOK 250,000,000 FRN Norwegian Air Shuttle ASA Senior Secured Bond Issue 2017/2020 with ISIN NO 001 0809940, originally entered into on 16 November 2017 as amended and restated on 26 May 2020;

"**NAS09 Secured Bond Creditor**", the trustee of the NAS09 Secured Bonds identified in the Creditor Schedule;

"**Net Agreed Debt**", in respect of any Creditor, the amount of its Agreed Debt less:

(a)     the aggregate amount of Retained Claims Bonds (if any) issued or to be issued to such Creditor, provided that where a Creditor has more than one Agreed Debt, the aggregate amount of Retained Claims Bonds issued or to be issued to such Creditor shall be apportioned equally across each of its Agreed Debts; and

(b)     in the case of the NAS07/08 Secured Bond Creditor and the NAS09 Secured Bond Creditor, that Creditor's relevant Secured Amount,

(such amount being an unsecured debt for the purposes of the Norwegian Restructuring Act);

"**New Capital Perpetual Bonds**", the bonds contemplated under the New Capital Perpetual Bond Instrument;

"**New Capital Perpetual Bond Instrument**", the instrument constituting the New Capital Perpetual Bonds, which shall reflect the terms of the near final term sheet set forth in Schedule 6, subject to such amendments as the Company may effect on the basis of discussions with potential investors in the New Capital Perpetual Bonds save that they shall not adversely impact the value or operation of the Dividend Claims;

"**New Capital Perpetual Bonds Offering**", the offering to Eligible New Capital Perpetual Bonds Creditors to subscribe for New Capital Perpetual Bonds as more particularly described in Clause 7.16 to 7.22;

"**New Capital Perpetual Bonds Subscription Period**", has the meaning given to such term in Clause 7.17;

"**NOK**", the lawful currency for the time being of Norway;

"**No-Sale Creditor**", has the meaning given to such term in Clause 10.19.2;

"**No-Sale Conversion Date**", has the meaning given to such term in Clause 10.19.2;

"**No-Sale Conversion Shares**", has the meaning given to such term in Clause 10.19.2;

"**Non-Retained Guaranteed Creditors**", any Guaranteed Creditors of the Company which are not Retained Guarantee Creditors (including, but not limited to, those persons identified in the Creditor Schedule) (and each a "**Non-Retained Guaranteed Creditor**");

"**Norway**", the Kingdom of Norway;

"**Norwegian Administrator**", Håvard Wiker of Ro Sommernes advokatfirma DA, Fridtjof Nansens pl. 7, 0160 Oslo, Norway;

"**Norwegian Confirmation Date**", the date on which the Oslo City Registrar (*Nw. Oslo Byfogdembete*) makes the Norwegian Confirmation Order;

10

"**Norwegian Confirmation Order**", the order of the Oslo City Registrar (*Nw. Oslo Byfogdembete*) sanctioning the Norwegian Restructuring Plan;

"**Norwegian Court**", the Oslo City Registrar (*nw. Oslo Byfogdembete*) or, where any decision of the Oslo City Registrar is appealed, the Court of Appeal of Norway and/or Supreme Court of Norway;

"**Norwegian Creditors Committee**", collectively:

(a)     Rolf Tjugum (attorney at law);

(b)     Øyvind Dehli (attorney at law);

(c)     Jørgen Andersen (attorney at law); and

(d)     Stig Patey (employee representative);

"**Norwegian Public Limited Liability Companies Act**", *lov om aksjeselskaper (aksjeloven) 1997*;

"**Norwegian Restructuring Act**", *Rekonstruksjonsloven 2020*;

"**Norwegian Restructuring Committee**", collectively, the Norwegian Administrator, the Norwegian Creditors Committee and the auditor appointed by the Norwegian Court, Helge Østvold of BHL DA, Elias Smiths vei 24, 1337 Sandvika, Norway;

"**Norwegian Restructuring Plan**", the restructuring plan proposed under the Norwegian Restructuring Process, a copy of which plan is set forth in Schedule 8 (excluding Appendix 1 thereto, which is a copy of these Proposals);

"**Norwegian Restructuring Process**", the process in respect of the Company referenced in Clause 3.22 to 3.28;

"**Norwegian Restructuring Report**", the report dated 11 March 2021 prepared by the Norwegian Restructuring Committee and including, among other things, its recommendation to Creditors in respect of voting on the Norwegian Restructuring Plan, a copy of which report is set forth in Schedule 9 (excluding Annexes 1 to 5 thereto, which are included within these Proposals, but including Annex 6 thereto);

"**Norwegian State Aid Package**", the Norwegian government's guarantee scheme for the aviation industry referenced in Clause 3.14;

"**NRBE**", Norwegian Register of Business Enterprises (*Nw. Foretaksregisteret*);

"**NRBE Registrations**", has the meaning given to such term in Clause 5.1.5;

"**Obligor VPS Account**", has the meaning given to such term in Clause 10.15;

"**Opt-Out Deadline**", has the meaning given to such term in Clause 10.19;

"**Opt-Out Election**", has the meaning given to such term in Clause 10.19;

"**Opt-Out Notice**", has the meaning given to such term in Clause 10.19;

"**Oslo Stock Exchange**", the Oslo Børs, a stock exchange operated by Oslo Børs ASA;

"**Overseer**", Mr Helge Østvold of BHL DA, Elias Smiths vei 24, 1337 Sandvika, Norway;

"**Perpetual Bond Issue Registration**", has the meaning given to such term in Clause 5.1.5;

"**Petition Date**", the date of the presentation of the petition, being 18 November 2020;

"**Post-Conversion Report**", has the meaning given to such term in Clause 10.24;

"**Private Placement**", the private placing of new Shares and the listing of such Shares on the Oslo Stock Exchange as more particularly described in Clause 7.11 to 7.15;

"**Private Placement Subscription Period**", has the meaning given to such term in Clause 7.12;

"**Pre-Repudiation Post-Petition Liabilities**", any liability of any kind of the Company which has arisen under any contract which has been terminated or will be terminated upon these Proposals taking effect either:

(a)     pursuant to a formal agreement with the Company entered into either on or before the date of these Proposals or before the Irish Confirmation Date;

(b)     under the Repudiation Orders; or

(c)     otherwise,

during the period commencing on and including the Petition Date and ending on and including the date of termination of such contract;

"**Pro Rata Proportion**", has the meaning given to such term in Clause 7.18;

"**Proposals**", these proposals and any modifications in respect of these proposals made pursuant to the Act;

"**Prospectus**", has the meaning given to such term in Clause 7.8;

"**Protection Period**", the period during which the Company is under the protection of the Irish Court in accordance with the Act;

"**Record Date**", has the meaning given to such term in Clause 7.7;

"**Related Companies**", the Companies, other than NAS (and each a "**Related Company**");

"**Related Company Creditors**", the creditors of any of the Related Companies, known or unknown, whether or not the liabilities have been acknowledged or recognised, qualified or unqualified, actual or contingent, ascertained or unascertained, including (but not limited to) the creditors and classes of creditors listed in the Creditor Schedule to each of the Related Proposals and each a "**Related Company Creditor**";

"**Related Proposals**", in respect of any of the Related Companies, the Examiner's proposals for a scheme of arrangement in relation to such Related Company to be issued on or around the date of these Proposals;

"**Relevant Portion**", with respect to any Examinership Companies Creditor, such Examinership Companies Creditor's Agreed Debt (as such term is defined in these Proposals or the relevant Related Proposals (as applicable) and without double counting) or in the event that such Examinership Companies Creditor's Claim is an Unagreed Debt the amount as identified in the Creditor Schedule to these Proposals or to any of the relevant Related Proposals (as applicable and without double counting) less:

(a)     in the case of any Secured Examinership Companies Creditor, its relevant Secured Amount (as such term is defined in these Proposals or the relevant Related Proposals (as applicable)); and

(b)     in the case of any such debt against the Company or a Related Company that is subordinated to the unsecured liabilities of such Company or Related Company, the

amount of such subordinated debt (including for the avoidance of doubt, in respect of the 2020 Convertible Perpetual Bond Creditors, any debt in respect of the 2020 Convertible Perpetual Bonds);

"**Report**", the report of the Independent Expert;

"**Repudiation Orders**", the Order(s) of the Irish High Court made under Section 537 of the Act pursuant to any of: (i) the Notice of Motion dated 22 January 2021; (ii) the Notice of Motion dated 29 January 2021; (iii) the Notice of Motion dated 1 February 2021; and (iv) the Notice of Motion dated 9 February 2021;

"**Retained Claims Bonds Amount**":

(a)     with respect to any Eligible New Capital Perpetual Bonds Creditor that participates in the New Capital Perpetual Bonds Offering, 200% of the aggregate nominal value of New Capital Perpetual Bonds subscribed for by such Eligible New Capital Perpetual Bonds Creditor; and

(b)     with respect to any Eligible Private Placement Creditor that participates in the Private Placement, 200% of the total amount paid by such Eligible Private Placement Creditor in respect of its subscription for Shares under the Private Placement;

"**Retained Claims Bonds**", the retained claims bonds contemplated under the Retained Claims Bond Instrument, which will be issued to each Creditor which participates in:

(a)     the New Capital Perpetual Bonds Offering; and/or

(b)     the Private Placement;

"**Retained Claims Bonds Instrument**", the instrument constituting the Retained Claims Bonds, which shall reflect the terms of the near final term sheet set forth in Schedule 6, subject to such amendments as the Company may effect on the basis of discussions with potential recipients of the Retained Claims Bonds, save that they shall not adversely impact the value or operation of the Dividend Claims and/or the Retained Claims Bonds;

"**Retained Guaranteed Creditors**", any Guaranteed Creditors of the Company where one or more of the Companies has entered into an agreement with the applicable Guaranteed Creditor to continue a contractual arrangement which is the subject of the guarantee following the conclusion of the Irish examinership process, being the retained guaranteed creditors identified in the Creditor Schedule (and each a "**Retained Guaranteed Creditor**");

"**Retained Lease Creditors**", Creditors under Aircraft Leases that have been retained by the Company and are identified in the Creditor Schedule (and each a "**Retained Lease Creditor**");

"**Retained Sub-Lease Creditors**", Creditors under Aircraft Sub-Leases that have been retained by the Company and are identified in the Creditor Schedule (and each a "**Retained Sub-Lease Creditor**");

"**Rights Offering**", the rights offering more particularly described in Clause 7.7 to 7.10;

"**Rights Offering Subscription Period**", has the meaning given to such term in Clause 7.8;

"**Secured Amount**", the value of the Secured Assets, being:

(a)     where any Creditor enforces its security over the Secured Assets on and from the Effective Date, the amount realised by that Creditor as a result of the enforcement of such security; or

(b)     in any other case, the Secured Asset Valuation,

13

provided always that where the Company and the relevant Creditor have agreed an amount, the value shall be the amount agreed in writing;

"**Secured Assets**", with respect to any Creditor, the relevant asset(s) over which any of the Companies or any other company within the Group has granted security to such Creditor including, in respect of any GIEK Guaranteed Loan Facilities Creditor, any cash balance of any company within the Group to which such GIEK Guaranteed Loan Facilities Creditor has recourse by way of any lawful set-off arrangement;

"**Secured Asset Valuation**", the value of the relevant Secured Assets as determined by the Norwegian Restructuring Committee, save that where the relevant Creditor disputes the value determined by the Norwegian Restructuring Committee the value shall be determined by the Norwegian Court;

"**Secured Cash Deposit Creditors**", the secured cash deposit creditors identified in the Creditor Schedule;

"**Secured Examinership Companies Creditors**", any Examinership Companies Creditors which are treated as being within a class of secured creditors under these Proposals or any of the Related Proposals (and including, but not limited to, the Secured Cash Deposit Creditors, the NAS07/08 Secured Bond Creditor or the NAS09 Secured Bond Creditor) (and each a "**Secured Examinership Companies Creditor**");

"**Shares**", the ordinary shares in the Company;

"**Structured Sale Conversion Date**", has the meaning given to such term in Clause 10.15;

"**Structured Sale Conversion Shares**", has the meaning given to such term in Clause 10.15;

"**Structured Sale Creditor**", has the meaning given to such term in Clause 10.15;

"**Structured Sale Proceeds**", has the meaning given to such term in Clause 10.18;

"**Structured Sale Proceeds Account**", has the meaning given to such term in Clause 10.18;

"**Structured Sale Process**", has the meaning given to such term in Clause 10.17;

"**Subscription Price**", the price determined for the subscription of Shares in the Private Placement and Rights Offering and which shall be determined by the Board;

"**Subscription Rights**", has the meaning given to such term in Clause 7.9;

"**Subsequent Eligible New Capital Perpetual Bonds Creditor**", any Examinership Companies Creditor that is permitted to participate in the New Capital Perpetual Bonds Offering pursuant to applicable securities law and regulation that may apply to such Examinership Companies Creditor from time to time;

"**Terminated Contract Creditors**", Creditors identified in the Creditor Schedule with Claims arising from the termination of their contracts with the Company either:

(a)     pursuant to a formal agreement with the Company entered into either on or before the date of these Proposals or before the Irish Confirmation Date;

(b)     under the Repudiation Orders; or

(c)     otherwise;

including (but not limited to) those persons identified in the Creditor Schedule (and each a "**Terminated Contract Creditor**");

"**Terminated Guaranteed Obligations**", any Guaranteed Obligations arising from or related to a primary agreement which has been terminated, either

(a)    pursuant to a formal agreement with the Company entered into either on or before the date of these Proposals or before the Irish Confirmation Date;

(b)    under the Repudiation Orders; or

(c)    otherwise;

"**Terminated Guaranteed Sub-Lease Creditors**", Creditors with Claims arising from the termination of Aircraft Sub-Leases, either:

(a)    pursuant to a formal agreement with the Company and/or any Related Company entered into either on or before the date of these Proposals or before the Irish Confirmation Date;

(b)    under the Repudiation Orders; or

(c)    otherwise;

and whose obligations as lessees under the underlying Aircraft Leases have been guaranteed by any one or more of the Companies including (but not limited to) those persons identified in the Creditor Schedule (and each a "**Terminated Guaranteed Sub-Lease Creditor**");

"**Terminated Lease Creditors**", Creditors identified in the Creditor Schedule with Claims arising from the termination of Aircraft Leases, either:

(a)    pursuant to a formal agreement with the Company entered into either on or before the date of these Proposals or before the Irish Confirmation Date;

(b)    under the Repudiation Orders; or

(c)    otherwise;

including (but not limited to) those persons identified in the Creditor Schedule (and each a "**Terminated Lease Creditor**");

"**Ticket Refund Claims**", any Claims arising prior to the Petition Date in respect of any entitlement to a refund for amounts paid to the Company, irrespective of whether any such Claim has been notified to the Company, as a result of:

(a)    the cancellation of flights; or

(b)    customers not using flight tickets;

"**TLL**", Torskefjorden Leasing Limited (In Liquidation), a private company limited by shares incorporated under the laws of Ireland with company number 560938, having its registered office at Ground Floor, Imbus House, Dublin Airport, Co Dublin;

"**Trading Period**", has the meaning given to such term in Clause 7.9;

"**Unagreed Creditor**", any Creditor:

(a)    which is not an Agreed Creditor;

(b)    whose Claim is not included in the Creditor Schedule; or

(c)    which disputes the amount of its Claim, whether or not designated as an Agreed Creditor by the Company, as it appears in the Creditor Schedule;

"**Unagreed Customer Damages Claims**", has the meaning given to such term in Clause 10.27.14(d);

"**Unagreed Debt**", any Claim against the Company which is not an Agreed Debt;

"**Unagreed Non-Submitted Customer Damages Claim**", has the meaning given to such term in Clause 10.27.14(d);

"**Unagreed Submitted Customer Damages Claim**", has the meaning given to such term in Clause 10.27.14(c);

"**Unsecured Claim Amount**", the total amount by which any Creditor's Claim exceeds any Secured Amount that is relevant to that Creditor;

"**Unsecured Creditors**", the unsecured creditors including (but not limited to) those persons identified in the Creditor Schedule (and each an "**Unsecured Creditor**");

"**US Dollar**" or "**$**", the lawful currency for the time being of the United States of America

"**US Securities Act**", the U.S. Securities Act of 1933 (as amended); and

"**VPS**", the Norwegian Central Securities Depository, being Euronext VPS, officially Verdipapirsentralen ASA.

2.  **Interpretation**

In these Proposals, unless the context otherwise requires or these Proposals expressly provide otherwise:

2.1  references to sections, Clauses, sub-paragraphs and Schedules are references to the sections, Clauses, sub-paragraphs and Schedules respectively of these Proposals;

2.2  references to a "person" include an individual, firm, partnership, company, corporation, unincorporated body of persons or any state or state agency;

2.3  references to a statute or a statutory provision or to a statutory instrument or provision of a statutory instrument include the same as subsequently modified, amended or re-enacted from time to time and all statutory instruments, regulations and orders from time to time made hereunder or deriving validity therefrom;

2.4  the singular includes the plural and vice versa and words importing one gender shall include all genders;

2.5  headings to sections, Clauses, sub-paragraphs and Schedules are for ease of reference only and shall not affect the interpretation of these Proposals;

2.6  words such as hereunder, hereto, hereof and herein and other words commencing with "here" shall, unless the context clearly indicates to the contrary, refer to the whole of these Proposals and not to any particular paragraph hereof;

2.7  in construing these Proposals, general words introduced by the word "other" shall not be given a restrictive meaning by reason of the fact that they are preceded by words indicating a particular class of acts, matters or things, and general words shall not be given a restrictive meaning by reason of the fact that they are followed by particular examples intended to be embraced by the general words, and any references to the word "include" or "including" is to be construed without limitation;

2.8  any reference to "these Proposals" or any other document, or to any specified provision of these Proposals or any other document, is to these Proposals, that document or that provision as in force for the time being and as amended from time to time in accordance with the terms of these Proposals or that document; and

2.9    any reference to a person includes his successors, personal representatives and permitted assigns.

**3.    Background and Recitals**

*A.  Overview in relation to the business of the Group*

*History of the Group*

3.1    The Group was founded in 1993 and was at the Petition Date one of the largest low-cost airline carriers in Europe and among the ten largest in the world. In addition to being a global airline with a route network across Europe into North Africa, the Middle East, North America, South America, and South-East Asia, the Group is one of the leaders in the European short-haul point-to-point market and has a particularly strong market position in Scandinavia.

3.2    By 2019, the Group employed more than 9,388 staff at 20 operational bases in 11 countries across four continents. However, as outlined in further detail below, 2019 was a difficult year for the Group as it was faced with a number of significant challenges. In response to these challenges, the Group devised and implemented a number of cost reduction measures which incuded the closure of several crew bases. A re-evaluation of the Group's entire network was also undertaken as part of a strategy that was intended to return the Group to profitability.

3.3    In March 2020, the Group was severely impacted by the coronavirus pandemic. In early 2020, the Group's total employee headcount had been significantly reduced as part of the Group's response to the pandemic's effect on passenger demand.

*The Companies in Examinership*

*(a) NAS*

3.4    NAS is the holding company for the Group.  The Group management and corporate functions (which include an internal treasury function which NAS performs for the entire Group) are carried out within NAS.  In addition, NAS provides other Group airlines and other business areas with shared services, including ticket sales.  All income generated from ticket sales by the Group is collected and held by NAS which operates a cash pooling arrangement with the rest of the Group.

3.5    NAS (as a holder of an AOC) also leases its fleet of aircraft from certain of the Related Companies and other companies in the Group.

3.6    Further particulars of NAS are included in Schedule 1.

*(b) AAA*

3.7    AAA is the Irish holding company for NAS's Irish aircraft management, trading, leasing and financing platform, through which NAS finances and, at the Petition Date, continued to lease its entire fleet of aircraft.

3.8    AAA was incorporated to act as an asset management company for the Group and to centralise aircraft leases and financing arrangements in a dedicated corporate structure. It manages the Group's new aircraft orders, sources aircraft financing, manages aircraft leased from external lessors and markets and trades aircraft to third parties.

*(c) NAI*

3.9    NAI was established to serve intercontinental routes.  However, due to delays obtaining United States Department of Transportation approval ("**DOT Approval**"), NAI started to operate routes within Europe, becoming the Group's first EU-licensed airline.  After DOT Approval was obtained, NAI operated intercontinental routes as originally planned.  At the end of 2019, NAI operated out of bases in Denmark, Finland, Spain, Ireland and the United Kingdom.

### (d) DLL

3.10    DLL was incorporated to centralise all third-party Boeing 737-800 aircraft leased into the Group. DLL does not own any aircraft but was the head lessee in respect of 20 Boeing 737-800 aircraft on an operating lease basis as at the Petition Date. As at the Petition Date, each of these aircraft was in turn sub-leased by DLL to, and operated by, airlines within the Group.

### (e) LLL

3.11    LLL was also incorporated for the purpose of centralising certain Boeing 737-800 and Boeing 737-8 aircraft leases held by the Group. LLL does not own any aircraft but was the head lessee in respect of 24 Boeing 737-800 aircraft and four Boeing 737-8 Max aircraft on an operating lease basis as the Petition Date.  As at the Petition Date, each of these aircraft was in turn sub-leased by LLL to, and operated by, airlines within the Group.

### Historical trading performance of the Group

3.12    The trading performance of NAS and the wider Group was under pressure before the onset of the coronavirus pandemic.  The Group suffered significant losses during each of the 2017, 2018 and 2019 financial years.  This was, in part, a result of fleet disruptions caused by the grounding of Boeing 737 MAX aircraft and continued engine issues on Boeing 787 Dreamliners which impacted negatively on the Group's operating profit in 2019.

3.13    However, the pandemic significantly and adversely affected the Group's operating results for 2020. Traffic figures were severely affected, with travel restrictions and decreasing demand forcing the Group to significantly reduce operations as outlined further below.

### 2020 Restructuring

3.14    With the sudden collapse of the Group's revenue due to the pandemic, the Group required additional external working capital in order to stave off a potential bankruptcy (the "**2020 Restructuring**"). It obtained this working capital through urgent liquidity that was provided by the Norwegian government to the Company. It was necessary, however, for the Group to restructure its debt before it would qualify for the Norwegian government's guarantee scheme for the aviation industry (the "**Norwegian State Aid Package**").

3.15    On 27 April 2020, the Group outlined its plan to qualify for the Norwegian State Aid Package (the "**2020 Restructuring Plan**"). The 2020 Restructuring Plan included the conversion of a certain proportion of the Group's debt and leasing commitments to equity, the mark to market of certain aircraft lease rentals and a 'power-by-the-hour' arrangement.  The Group reduced its active fleet to seven Boeing 737-800 aircraft operating solely on domestic routes within Norway, and postponed operations outside Norway (including to the rest of Europe and intercontinental long-haul flights) until the pandemic eased.

3.16    On 20 May 2020, NAS announced that it had, as part of the 2020 Restructuring, successfully converted approximately NOK 12.7 billion (approximately €1.2 billion) of debt to equity (through agreement with certain of its creditors) and raised approximately NOK 400 million (approximately €37 million) in new cash and equity through a public offering. With the 2020 Restructuring completed, the Group fulfilled the conditions to enable it to access the Norwegian State Aid Package. The Norwegian State Aid Package consisted of a state loan guarantee package of NOK 3 billion (approximately €278 million) whereby loans would be supported by guarantees issued by *Garantinstituttet for eksportkreditt*, the export credit agency of Norway.

### Current insolvency of the Group

3.17    The 2020 Restructuring generally, the power-by-the-hour agreements concluded with certain lessors and the access to the Norwegian State Aid Package provided the Group with sufficient liquidity to enable it to continue to trade until the end of the first quarter of 2021.

3.18    However, on 9 November 2020, the Norwegian government announced that it would not, at that point in time, be providing any further financial support to the Group. Following that announcement, the Group's management took the decision to furlough additional employees and reduce its already skeletal operations.

3.19    As it became clearer that the travel restrictions introduced in response to the pandemic would continue well into 2021, the Companies forecasted that without a further restructuring they would no longer have sufficient working capital after the first quarter of 2021. This resulted in the Companies petitioning for examinership.

### B.  Appointment of the Examiner

3.20    By Order of the Irish High Court dated 18 November 2020, the Examiner was appointed examiner of the Companies and TLL on an interim basis.

3.21    By further Order of the Irish High Court dated 7 December 2020, the Examiner was appointed as examiner of the Companies and TLL.

### C.  Norwegian Restructuring Process

3.22    The Board applied to the Norwegian Court to have NAS placed into a Norwegian Restructuring Process, entitled *Rekonstruksjonsforhandling* under the Norwegian Restructuring Act.  The application was approved on 8 December 2020 by the Norwegian Court and the Norwegian Restructuring Process has continued in parallel with the examinership process since that date, although the examinership process is the primary restructuring process.

3.23    The Norwegian Restructuring Process had the effect of putting in place a stay in relation to creditor actions against NAS as a matter of Norwegian law pending the presentation and potential approval of a Norwegian Restructuring Plan implementing restructuring proposals for NAS. The Norwegian Restructuring Process is a court-monitored process whose objective is to seek a restructuring of a company's debt within the framework of the relevant Norwegian law which is facilitated by the Norwegian Court's appointment of: (1) an administrator (in this case the Norwegian Administrator); and (2) a creditors' committee (in this case the Norwegian Creditors Committee) consisting of four members that represent the different groups of creditors.

3.24    Under the Norwegian Restructuring Process, the Directors retained control and authority over the Company's affairs under the supervision of the Norwegian Administrator, alongside the Examiner.  The Norwegian Administrator worked as part of the Norwegian Restructuring Committee, and separately with the Examiner, to develop the Norwegian Restructuring Plan, a copy of which is included at Schedule 8, which will adopt and implement the terms and substance of these Proposals in full under Norwegian law.

3.25    These Proposals, and consequently the Norwegian Restructuring Plan, reflect the key principles and requirements of Irish examinership law and the Norwegian Restructuring Process.  These Proposals are governed by Irish law as set out in Clause 15 of these Proposals and in the event of any inconsistencies between these Proposals and the Norwegian Restructuring Plan, which will summarise and implement these Proposals, these Proposals shall take precedence.

3.26    Should the Irish High Court confirm these Proposals, the Norwegian Restructuring Plan will be issued by the Norwegian Administrator immediately following the Irish Confirmation Date which will commence a two-week voting period on the Norwegian Restructuring Plan.  In order to ensure the implementation of these Proposals through the Norwegian Restructuring Plan, the Creditors will authorise the Examiner pursuant to Clause 6.1 of these Proposals to vote in favour of the Norwegian Restructuring Plan on each Creditor's behalf.

3.27    Pursuant to the Norwegian Restructuring Process, the Norwegian Restructuring Committee is required to issue the Norwegian Restructuring Report, a copy of which is included at Schedule 9.  The Norwegian Restructuring Report includes the Norwegian Restructuring Committee's

recommendation in respect of voting on the restructuring provided for in these Proposals and the Norwegian Restructuring Plan.

3.28    The implementation of these Proposals is conditional on, among other things, the approval of the Norwegian Restructuring Plan by the Norwegian Court as set out in Clause 5 of these Proposals.  The Norwegian Restructuring Plan shall, pursuant to its terms, take immediate effect as and from the Effective Time.

### D.  Liquidation of TLL

3.29    Following the Board's decision to cease offering long-haul flights, the Examiner concluded that TLL no longer had a reasonable prospect of survival as a going concern.  By Order of the Irish High Court dated 15 January 2021, the Examiner was discharged as examiner of TLL and Kieran Wallace and Andrew O'Leary were appointed to act as joint liquidators of TLL.

### E.  Company's Proposal

3.30    The Board proposed a high-level restructuring plan to its shareholders on 3 December 2020 setting out its aim to adjust the size of its operations to a level of proven profitability.  The plan proposed, *inter alia*, that the shareholders would give the Company's management wide authorisations for the implementation of the restructuring plan and expressed an intention that shareholders would retain a meaningful minority stake in the Company.  The extraordinary general meeting of the Company held on 17 December 2020 approved a number of resolutions that provided the Board with broad authorities to take steps that may ultimately facilitate the restructuring of NAS and the wider Group, including the Companies, in conjunction with and/or as part of the examinerships and the Norwegian Restructuring Process. This included the ability, but not the obligation, of the Board to pursue a rights offering to raise new capital of up to NOK 4 billion, seek the conversion of certain liabilities of the Company and the wider Group, including the Companies into Shares, a reverse split of the Shares in the ratio 100:1, a subsequent reduction of nominal value of each Share from NOK 10 to NOK 0.01 and general authorisations to the Board to issue Shares and convertible loans.

3.31    Subsequently, the Board approved a business plan and proposed term sheet as a potential basis for the restructuring of the Company (and consequently the Companies) through the Irish examinership process and the Norwegian Restructuring Process (the "**Company's Proposal**") as announced by stock exchange announcement made to the Oslo Stock Exchange on 14 January 2021.

3.32    The proposed term sheet contained details of the Company's proposals in relation to the Rights Offering, the Private Placement, the New Capital Perpetual Bonds Offering and the possible terms of the Dividend Claims (then referred to as Old Capital Hybrid Loans) (each as explained further in these Proposals).   In addition, the Company stated in the stock exchange announcement referred to in Clause 3.31 above that, among other things, it intended to:

3.32.1    focus on its core Nordics business, operating a European short-haul network with narrow body aircraft (the Group expects to initially hold up to 50 Boeing 737 aircraft (owned and leased));

3.32.2    cease operating the Group's long-haul network; and

3.32.3    subject to the restructuring contemplated by these Proposals and the Related Proposals being successful:

(a)    reduce total debt to around NOK 20,000,000,000 and emerge from the restructuring with a free cash position of approximately NOK 4,000,000,000 to 5,000,000,000; and

(b)    achieve positive EBITDA following the restructuring in 2021 based on conservative assumptions as to the length of the pandemic and as to revenue, costs and load factors.

3.33    The Company's Proposal also envisages cost savings where possible, implemented by procuring the most competitive terms available from suppliers and, in some instances, replacing suppliers with in-house resources.

3.34    The Examiner considered and evaluated the Company's Proposal as a potential basis for the restructuring of NAS (and the Related Companies) and ultimately determined that the Company's Proposal was an appropriate basis upon which to prepare these Proposals in conjunction with the Company and the Norwegian Administrator.

### F.  Repudiation of Contracts and Termination of Guarantees

3.35    The Company's decision to pivot away from its long-haul operations necessitated a significant fleet, route and headcount reduction across the Group.  In this regard, the Company and the Related Companies obtained the Repudiation Orders from the Irish High Court and consensually terminated certain contracts which were no longer required.  For the most part, such contracts related to:

3.35.1    aircraft and aircraft engine leases which are surplus to the Group's future requirements in light of its scaled back operations;

3.35.2    ground handling and fuel line services provided to the Company and NAI at a number of US international airports; and

3.35.3    supply or service contracts where the Group will require, in order, to achieve the required economies, to enter into less expensive contracts or substitute third party contract counterparties with in-house resources.

3.36    The Repudiation Orders provide for the repudiation of the relevant contracts as and from the Effective Date of these Proposals and the Related Proposals as relevant (save for the Repudiation Order made in respect of the agreements with Airbus SAS which Repudiation Order provides for the repudiation of the said agreements with Airbus SAS as and from the date of the Repudiation Order).

3.37    The Repudiation Orders also give effect to the termination of any continuing non-monetary obligations under guarantees granted by the Company and the Related Companies (where relevant) in respect of the obligations of the Related Companies and other Group companies.

3.38    Save where the relevant Claims have been agreed between the relevant Companies and the respective Creditor under these Proposals or the Related Proposals (as applicable) or where the Irish High Court has made an Order pursuant to Section 537(3) of the Act determining the amount of the relevant Claims, any Creditors' Claims arising from the repudiation or consensual termination of their contracts shall be determined under the Expert Determination Process as further described below.

### 4.    The Report and Formulation of Proposals

4.1    In the Report which accompanied the petition, the Independent Expert expressed the opinion that the Companies and TLL had a reasonable prospect of survival as a going concern, provided that, among other things, the creditors accepted and the Irish Court approved schemes of arrangement in respect of the Companies.

4.2    Having carefully analysed and evaluated the Company's Proposal and the projections underlying the Company's Proposal, the Examiner has formulated these Proposals in accordance with Section 534 of the Act.

4.3    Save for the liquidation of TLL as referred to in Clause 3.29 above (and which factors only apply to TLL), nothing has arisen since the appointment of the Examiner to cause the Examiner to disagree with the opinion of the Independent Expert set out above.

**5.      Effective Date and Effective Time**

Save for the provisions of Clause 6 and 11, these Proposals will take effect as and from the Effective Time provided that all of the following conditions shall have been satisfied on or before the Effective Time:

5.1.1      these Proposals and the Related Proposals have been confirmed by the Irish Court;

5.1.2      the Norwegian Restructuring Plan, which shall implement these Proposals without modification save for any modification to these Proposals made in accordance with the Act, has been sanctioned by the Norwegian Court in accordance with applicable law;

5.1.3      the Company has raised Investment Proceeds of no less than the Minimum Gross Proceeds Threshold in connection with the Rights Offering, the Private Placement and the New Capital Perpetual Bonds Offering;

5.1.4      with respect to the Rights Offering and the Private Placement, the Company has received the corresponding portion of the Investment Proceeds into a separate bank account in DNB specified for share contributions (*Nw. emisjonskonto*) (the "**Locked Share Proceeds Account**"), which shall, in accordance with the Norwegian Public Limited Liability Companies Act section 10-13, be blocked for the Company until (i) the share capital increase pertaining to the Rights Offering and the Private Placement has been registered with the NRBE (the "**Capital Increase Registration**") and (ii) the Examiner has given the instruction to DNB under Clause 5.1.7 below;

5.1.5      with respect to the New Capital Perpetual Bonds Offering, the Company has received the corresponding portion of the Investment Proceeds into a separate bank account in DNB pledged in favour of the Bond Trustee (as defined in the New Capital Perpetual Bond Instrument) on behalf of the subscribers for New Capital Perpetual Bonds (the "**Locked Bonds Proceeds Account**") (together with the Locked Share Proceeds Account, the "**Locked Accounts**") which shall, in accordance with the Norwegian Public Limited Liability Companies Act section 11-6(3), be blocked for the Company until (i) the issuance of convertible loans pertaining to the New Capital Perpetual Bonds Offering has been registered with the NRBE (the "**Perpetual Bond Issue Registration**") (together with the Capital Increase Registration, the "**NRBE Registrations**") and (ii) the Examiner has given the instruction to DNB under Clause 5.1.7 below;

5.1.6      the Auditor has confirmed in writing to the Examiner that the Investment Proceeds (which, for the avoidance of doubt, shall comprise no less than the Minimum Gross Proceeds Threshold) have been received in the Locked Accounts; and

5.1.7      subject to and conditional upon the satisfaction of the conditions set forth in Clause 5.1.1 to 5.1.6 (inclusive), the Examiner has confirmed to DNB in writing that the only remaining condition to the occurrence of the Effective Time hereunder is the occurrence of the NRBE Registrations and has instructed that the Investment Proceeds (which, for the avoidance of doubt, shall comprise no less than the Minimum Gross Proceeds Threshold) shall be released to the Company at the Effective Time.

5.2      The Company shall take all actions required to be taken by it to procure that the NRBE Registrations occur (and consequently the Effective Time occurs) on the Effective Date, which registrations shall, by operation of Norwegian law, result in the Company becoming entitled to the Investment Proceeds.

5.3      The Examiner shall be entitled at his absolute discretion to apply to the Irish Court (on one or more than one occasion) at any time and on such notice (if any) as may be required by the Irish Court to change or amend the Effective Date that has been fixed by the Irish Court,

provided that the Effective Date shall not be changed or amended to a date after the Long Stop Date.

5.4    In the event that the Effective Time does not occur on or before the Long Stop Date these Proposals (and the Related Proposals) shall terminate (and shall, save in respect of Clause 6, be construed as if they had never become effective and the rights and obligations of the Members and Creditors shall not be affected by these Proposals and shall continue in full force and effect) and the terms of, and the rights and obligations of any person under or pursuant to, these Proposals shall lapse and all the compromises and arrangements provided by these Proposals and any releases granted pursuant to these Proposals shall be of no effect.

5.5    The Company shall, as soon as reasonably practicable, announce the occurrence of the Effective Time by stock exchange announcement to the Oslo Stock Exchange and in any event no later than one Business Day after the Effective Date.

## 6.    Examiner's Authority regarding the Norwegian Restructuring Plan

6.1    On and from the Irish Confirmation Date, each Creditor irrevocably appoints the Examiner as its agent, nominee, proxy and representative with full power and authority and otherwise instructs the Examiner in such Creditor's name and on such Creditor's behalf to exercise all rights in relation to its Claim to vote in favour of and to otherwise consent to the Norwegian Restructuring Plan. The Examiner shall do so and with effect from the Irish Confirmation Date the Examiner shall be entitled and empowered to take all such associated steps, including (but not limited to):

6.1.1    receiving notice of, attending and/or voting at any vote upon the Norwegian Restructuring Plan whether held by way of electronic, postal or other means;

6.1.2    receiving notice of, attending and/or voting at any meeting of the Creditors held in connection with the Norwegian Restructuring Process and all or any adjournments of such meetings or signing any resolution, poll card or written reply on each Creditor's behalf and otherwise voting in favour of the Norwegian Restructuring Plan;

6.1.3    completing and returning proxy cards, polling cards, forms of appointment of authorised representatives and any other documents required to be signed or completed by any Creditor desirable or necessary to exercise any and all voting rights related to such Creditor's Claims;

6.1.4    dealing with and giving directions as to any documents, notices or other communications (in whatever form) arising by right of the Claims or received in connection with the Claims from the Company, the Norwegian Administrator or any other person; and/or

6.1.5    otherwise executing, delivering and doing all documents, instruments and acts in each Creditor's name insofar as may be done in the Creditor's capacity for the purpose of approving, accepting or implementing the Norwegian Restructuring Plan.

6.2    The Examiner shall be entitled to delegate one or more of the powers conferred on or granted to him under Clause 6.1 to any person he deems necessary or desirable.

6.3    For the avoidance of doubt, and notwithstanding any other provision of this Clause 6, each Creditor agrees to and shall be bound by and shall comply with the Norwegian Restructuring Plan as and from the Effective Time, being the time from which the Norwegian Restructuring Plan shall become effective.

6.4    The Examiner may seek an Order from the Irish High Court under Section 542(2) of the Act to ensure the effectiveness of this Clause as and from the Irish Confirmation Date.

## 7.    The Investment

7.1    The investment in the Company shall comprise the proceeds of the Rights Offering, the Private Placement and the New Capital Perpetual Bonds Offering (together, the "**Investment**"). Pursuant to Clause 5, these Proposals (and consequently the Related Proposals) are conditional upon the Company raising Investment Proceeds of no less than the Minimum Gross Proceeds Threshold in connection with the Investment. In the event that:

7.1.1    Investment Proceeds of an amount exactly equal to the Minimum Gross Proceeds Threshold are raised, the investors in the Investment will be entitled to hold approximately 70% in aggregate of the Company's issued share capital on a Fully Diluted Basis;

7.1.2    more Investment Proceeds than the Minimum Gross Proceeds Threshold are raised, the investors' aggregate entitlement will represent a larger proportion of the Company's issued share capital and the Existing Shares and the Conversion Shares shall correspondingly be diluted below 4.6% and 25.4% respectively, as set out in more detail in Clauses 9.3 and 10.16 below; or

7.1.3    the Investment Proceeds are less than the Minimum Gross Proceeds Threshold, the Proposals shall not become effective and the proceeds shall be returned to investors in accordance with the terms of the individual Norwegian law subscription processes governing the Investment.

7.2    The completion of the Rights Offering, the Private Placement and the New Capital Perpetual Bonds Offering are conditional upon the occurrence of the Effective Time.   Each element of the Investment will be launched on a date to be determined by the Board (and, in the case of the Rights Offering and the Private Placement, no earlier than the business day following the date on which the Prospectus has been approved by the FSAN as further described in Clause 7.8 below) and will close (the "**Closing Date**") no earlier than the latest of:

7.2.1    the expiration of the time for any appeal of the Irish Confirmation Order and the Norwegian Confirmation Order;

7.2.2    the final determination of any appeal of the Irish Confirmation Order and/or the Norwegian Confirmation Order; and

7.2.3    in the case of the Rights Offering, the date that falls two weeks after the opening of the Rights Offering Subscription Period,

provided that each relevant Closing Date, and consequently the Effective Time, shall occur by no later than the Long Stop Date in accordance with Clause 5.

7.3    The Investment Proceeds will be used to provide working capital for the Company, the Related Companies and the wider Group for general corporate purposes including to facilitate the ongoing survival of the Companies as going concerns.

7.4    The dividends to be made under these Proposals and/or the Related Proposals shall be funded from cash available to the Company and the Related Companies at the Effective Time.

7.5    Under the New Capital Perpetual Bonds Instrument and the Retained Claims Bonds Instrument, the Company will be subject to restrictions on, *inter alia*, the declaration or making of dividend payments until the Company has complied with certain of its repayment obligations thereunder.  Members and Creditors should therefore note this in the context of any application for Shares under the Rights Offering and Private Placement or the exercise of conversion rights under the Dividend Claims Terms or the New Capital Perpetual Bonds Instrument.

7.6    Further information regarding each of the Rights Offering, the Private Placement and the New Capital Perpetual Bonds Offering (including the Record Date, Subscription Period and Trading Period prior to the occurrence or commencement of the same) will be published by the Company in accordance with the rules of the Oslo Stock Exchange.  Participation in each

24

element of the Investment will be subject to certain terms and conditions, including the provision of satisfactory KYC information to the Company.

**A. Rights Offering**

7.7    Under the Rights Offering, each holder of Shares registered as such in the VPS on a date to be determined by the Board (the "**Record Date**") will, subject to applicable law, be granted preferential rights to subscribe for and be allocated new Shares at the Subscription Price in proportion to his/its shareholding in the Company. The Rights Offering will be limited to raising maximum total gross proceeds for the Company in the amount of NOK 400,000,000.

7.8    The Company will prepare a prospectus for the Rights Offering and the Private Placement (the "**Prospectus**"), to be approved by the FSAN. The subscription period in respect of the Rights Offering will commence on a date to be determined by the Board, being no earlier than the business day after the FSAN has approved the Prospectus, and expire no earlier than the Closing Date (the "**Rights Offering Subscription Period**").

7.9    Each holder of Shares as of the Record Date will be granted tradeable subscription rights (the "**Subscription Rights**") for each Share registered as held by such holder as of the Record Date. The aggregate amount of Subscription Rights received by such holders shall be an amount that ensures up to NOK 400,000,000 in aggregate gross proceeds at the Subscription Price. The Subscription Rights will be listed and tradeable on the Oslo Stock Exchange from the commencement of the Rights Offering Subscription Period until no earlier than 4.30 p.m. (Oslo time) two trading days prior to the end of the Rights Offering Subscription Period (the "**Trading Period**"). Over-subscription and subscription without Subscription Rights will be permitted. Each Subscription Right will, subject to applicable law and the conditions set out in Clause 7.2 above, give the right to subscribe for, and be allocated, one new Share. Subscription Rights acquired during the Trading Period will carry the same right to subscription as the Subscription Rights granted to holders of Shares as of the Record Date and all such Subscription Rights (whether received and retained by holders of Shares or acquired during the Trading Period) shall, for the avoidance of doubt, remain conditional until such time as the conditions of the Rights Offering are satisfied as set out in Clause 7.2 above.

7.10    Subscription Rights that are not used to subscribe for new Shares before the expiry of the Rights Offering Subscription Period will have no value and will lapse without compensation to the holder.

**B. Private Placement**

7.11    Under the Private Placement, certain investors and, as described in Clause 7.14 below, certain Examinership Companies Creditors will be invited to apply for new Shares at the Subscription Price. The new Shares will be listed on the Oslo Stock Exchange.

7.12    The subscription period in the Private Placement will commence on a date to be determined by the Board, being no earlier than on the business day after the FSAN has approved the Prospectus, and expire no earlier than the Closing Date (the "**Private Placement Subscription Period**").

7.13    The Company will, in consultation with DNB Markets (a part of DNB), as global coordinator, determine the allocation of Shares. The allocation principles will, in accordance with customary practice for institutional placements, include factors such as perceived investor quality, investment horizon and history, sector knowledge, size and timeliness of the application, each of which the Company may in its discretion consider ("**Allocation Factors**"), and the Company will reserve the right to reduce or reject any application for shares in the Private Placement and also to set a maximum allocation per applicant, a maximum number of applicants or decide to make no allocation to any applicant (the "**Allocation Principles**"), provided that the Allocation Principles shall not be used to reduce or reject any application from an Eligible Private Placement Creditor in respect of its entitlement (whether in whole or in part) under Clause 7.14 below.

7.14   Each Eligible Private Placement Creditor shall be entitled to apply to participate in the Private Placement up to a maximum amount equal to such Eligible Private Placement Creditor's Investment Allowance during the Private Placement Subscription Period and such Eligible Private Placement Creditors shall be given a preferential allocation in the Private Placement up to the amount of their respective Investment Allowances.

7.15   Where an Eligible Private Placement Creditor participates in the Private Placement, it will also be issued Retained Claims Bonds by the Company in an amount equal to its Retained Claims Bonds Amount.  Such Retained Claims Bonds will be issued by the Company in full and final satisfaction of the portion of each relevant Eligible Private Placement Creditor's Relevant Portion that is equal to the aggregate face value of the Retained Claims Bonds issued to such Eligible Private Placement Creditor.  The Retained Claims Bonds will be constituted pursuant to the Retained Claims Bonds Instrument.

### C.  New Capital Perpetual Bonds Offering

7.16   Under the New Capital Perpetual Bonds Offering, each Eligible New Capital Perpetual Bonds Creditor shall be entitled to apply for New Capital Perpetual Bonds up to a maximum amount equal to such Eligible New Capital Perpetual Bonds Creditor's Investment Allowance during the New Capital Perpetual Bonds Subscription Period.  The New Capital Perpetual Bonds will be constituted pursuant to the New Capital Perpetual Bond Instrument.

7.17   The subscription period in the New Capital Perpetual Bonds Offering will commence on a date to be determined by the Board and expire no earlier than the Closing Date (the "**New Capital Perpetual Bonds Subscription Period**").

7.18   The New Capital Perpetual Bonds will be allocated to each applying Initial Eligible New Capital Perpetual Bonds Creditor on a *pro rata* basis, based on the proportion that its Relevant Portion bears to the aggregate Relevant Portions of all applying Initial Eligible New Capital Perpetual Bonds Creditors (such proportion being, with respect to each such Initial Eligible New Capital Perpetual Bonds Creditor, its "**Pro Rata Proportion**").  To the extent that any Initial Eligible New Capital Perpetual Bonds Creditor subscribes for less than its Pro Rata Proportion, resulting in unsubscribed New Capital Perpetual Bonds, such unsubscribed New Capital Perpetual Bonds shall be reallocated among Initial Eligible New Capital Perpetual Bonds Creditors which have not been allocated the full subscription applied for, in accordance with their respective Pro Rata Proportions, until each Initial Eligible New Capital Perpetual Bonds Creditor has been allocated the full subscription it applied for or, if earlier, the New Capital Perpetual Bonds Offering is fully subscribed.  In the event that the New Capital Perpetual Bonds Offering is not fully subscribed following allocation to Initial Eligible New Capital Perpetual Bonds Creditors as aforesaid, the Company may allocate any remaining unallocated New Capital Perpetual Bonds to applying Subsequent Eligible New Capital Perpetual Bonds Creditors in its discretion, with regard to the Allocation Factors.

7.19   The maximum amount of the New Capital Perpetual Bonds Offering shall be determined by the Company in parallel with determining the amount of the Rights Offering and the Private Placement and shall be no greater than NOK 1,875,000,000.

7.20   Each Eligible New Capital Perpetual Bonds Creditor that participates in the New Capital Perpetual Bonds Offering will also be issued Retained Claims Bonds by the Company in an amount equal to its Retained Claims Bonds Amount.  Such Retained Claims Bonds will be issued by the Company in full and final satisfaction of the portion of each relevant Eligible New Capital Perpetual Bonds Creditor's Relevant Portion that is equal to the aggregate face value of the Retained Claims Bonds issued to such Eligible New Capital Perpetual Bonds Creditor. The Retained Claims Bonds will be constituted pursuant to the Retained Claims Bonds Instrument and are further detailed in Clause 7.23 to 7.25 below.

7.21   Participation in the New Capital Perpetual Bonds Offering shall be subject to certain terms and conditions set forth in the New Capital Perpetual Bond Instrument, including a minimum subscription of at least the NOK equivalent of EUR 100,000.

7.22    The New Capital Perpetual Bonds shall be convertible into Shares at a price equal to 150% of the Subscription Price subject to and in accordance with the terms of the New Capital Perpetual Bond Instrument.

### D.  Retained Claims Bonds

7.23    Each Eligible New Capital Perpetual Bonds Creditor that participates in the New Capital Perpetual Bonds Offering and each Eligible Private Placement Creditor that participates in the Private Placement will be issued Retained Claims Bonds by the Company in an amount equal to its Retained Claims Bonds Amount.  Such Retained Claims Bonds will be issued by the Company in full and final satisfaction of the portion of each relevant Eligible New Capital Perpetual Bonds Creditor and/or Eligible Private Placement Creditor that is equal to the aggregate face value of the Retained Claims Bonds issued to such Eligible New Capital Perpetual Bonds Creditor and/or Eligible Private Placement Creditor.

7.24    To the extent a Creditor has more than one Agreed Debt, the aggregate amount of Retained Claims Bonds issued or to be issued to such Creditor shall be apportioned equally across each of its Agreed Debts when determining its Net Agreed Debt for the purposes of ascertaining the amount of its entitlement (if any) to a dividend under these Proposals.  For the avoidance of doubt, no Creditor shall have any part of its Net Agreed Debt converted into a Dividend Claim (as described in Clause 10.10 to 10.26 below) or be paid any Cash Pot Entitlement (as described in Clause 10.5 to 10.9 below) in respect of such part of its Claim as shall be satisfied by the issuance of Retained Claims Bonds.

7.25    The Retained Claims Bonds will be constituted pursuant to the Retained Claims Bonds Instrument.

### E.  Norwegian Government

7.26    The Norwegian Government proposed (*Prop. 79 S (2020 – 2021) [Post 91 and 92]*), and the Parliament of Norway (*Nw. Stortinget*) has approved, the Norwegian Government's intention to participate in the New Capital Perpetual Bonds Offering up to an amount not exceeding NOK 1,500,000,000.

## 8.    Summary of Proposals

### A.  Members

8.1    There is only one class of Members.

8.2    For the purpose of these Proposals, the interests of a Member are impaired if:

8.2.1    the nominal value of their shareholding in the Company is reduced;

8.2.2    where they are entitled to a fixed dividend in respect of their shareholding in the Company, the amount of that dividend is reduced;

8.2.3    they are deprived of all or any part of the rights accruing to them by virtue of their shareholding in the Company; or

8.2.4    their percentage interest in the total issued share capital in the Company is reduced.

8.3    The interests of the Members are being impaired pursuant to the terms of the Proposals.

### B.  Creditors

8.4    The classes of Creditors of the Company are specified at Clause 10 below.

8.5    For the purpose of these Proposals, a Creditor's Claim against the Company is impaired if it receives less in payment of its Claim than the full amount due in respect of its Claim at the Petition Date.

8.6      The interests or Claims of certain classes of Creditors are being impaired pursuant to the terms of these Proposals, as explained in detail at Clause 10 below.

**C.  General**

8.7      These Proposals will become binding on the Creditors, the Members, the Company and their respective successors and assigns as and from the Irish Confirmation Date and shall separately take effect in accordance with the terms of these Proposals as set out in Clause 5.

8.8      These Proposals provide in Clause 13 for implementation.

8.9      The Examiner does not propose any changes to the Constitution under these Proposals.

8.10     The Examiner does not propose any changes in relation to the management of the Company or the Directors to facilitate the survival of the Company, as a whole or any part of its undertaking, as a going concern.

8.11     A statement of assets and liabilities (including contingent and prospective liabilities) of the Company as at the date of these Proposals is attached at Schedule 2.

8.12     The estimated financial outcome of a winding-up of the Company for the Members and the classes of Creditors, applying Norwegian law as it would apply to the liquidation of the Company, is also attached at Schedule 3.

8.13     The Irish High Court has not directed that any specific provisions be included in these Proposals.

8.14     The Examiner has ensured that these Proposals include all such other matters as he deems appropriate.

8.15     The following sets out in detail what these Proposals provide insofar as the Members and Creditors are concerned.

**9.      Treatment of Members**

9.1      A list of the top 20 largest holders of Shares in value as of 2 March 2021 is set in Schedule 4.

9.2      Where the Irish High Court confirms these Proposals (with or without modification), these Proposals shall notwithstanding any enactment, rule of law or otherwise be binding on all the Members in accordance with the terms of these Proposals as set out in Clause 5.

9.3      On and from the Effective Time, the Existing Shares will be diluted on account of (i) the issue of new Shares pursuant to the Rights Offering and the Private Placement and (ii) the conversion of New Capital Perpetual Bonds and Dividend Claims, in accordance with the terms thereof, into Shares.  The Company has estimated that the Existing Shares will represent approximately 4.6% of the total issued share capital of the Company on a Fully Diluted Basis. Consequently, the rights of Members are impaired by these Proposals.

9.4      Members are, however, entitled to participate in the Rights Offering as described in Clause 7.7 to 7.10 if they hold Shares as of the Record Date.  To the extent that such Members elect to subscribe for their allocated number of new Share(s) then this may mitigate the extent to which their total interest in the Company's share capital will be diluted by virtue of these Proposals and the Related Proposals.

**10.     Treatment of Creditors**

**A.  General**

10.1     The classes of Creditors are dealt with below.

10.2    The Creditor Schedule sets out the amount of each individual Creditor's Claims as set out in the Company's books and records as at the Petition Date (and includes any Pre-Repudiation Post-Petition Liabilities, on the basis that these were contingent or prospective liabilities of the Company as at the Petition Date).

10.3    The treatment proposed in these Proposals with respect to each class of Creditor is set out below. Where the Irish High Court confirms these Proposals (with or without modification), these Proposals shall notwithstanding any enactment, rule of law or otherwise be binding on all the Creditors in accordance with Clause 5 of these Proposals and the class or classes of Creditors affected by these Proposals.

10.4    The claims of Creditors can be categorised into the following classes:

    10.4.1    Secured Cash Deposit Creditors;

    10.4.2    NAS09 Secured Bond Creditor;

    10.4.3    NAS07/08 Secured Bond Creditor;

    10.4.4    2019 Convertible Bond Creditor;

    10.4.5    Unsecured Creditors;

    10.4.6    GIEK Guaranteed Loan Facilities Creditors;

    10.4.7    Retained Guaranteed Creditors;

    10.4.8    Non-Retained Guaranteed Creditors;

    10.4.9    Terminated Contract Creditors;

    10.4.10   Retained Sub-Lease Creditors;

    10.4.11   Terminated Guaranteed Sub-Lease Creditors;

    10.4.12   Retained Lease Creditors;

    10.4.13   Terminated Lease Creditors;

    10.4.14   Customer Creditors;

    10.4.15   2020 Convertible Perpetual Bond Creditors;

    10.4.16   Connected and Intercompany Creditors; and

    10.4.17   Contingent Unagreed Creditors.

**B.  Cash Pot Entitlement**

10.5    As described in detail in Clause 10.27, certain classes of Creditors will receive a cash dividend under these Proposals (such creditors being, the "**Cash Creditors**") from a fixed amount of NOK 500,000,000 in cash to be made available by the Company (the "**Cash Pot**").

10.6    Each Cash Creditor will be entitled to be paid a cash dividend from the Cash Pot on a *pro rata* basis, based on the proportion that its Net Agreed Debt bears to the aggregate of (i) the Net Agreed Debts of all Cash Creditors as of the day immediately following the Expert Determination End Date and (ii) the Estimated Net Agreed Debts (as defined below) as of such date (each Cash Creditor's proportionate entitlement to payment from the Cash Pot being its "**Cash Pot Entitlement**").

10.7    In order to facilitate the payment of cash dividends to any Contingent Litigation Creditors and/or Customer Damages Claims Creditors whose Claims become Agreed Debts after the Expert Determination End Date, the Company shall use all reasonable efforts to determine its best estimate of each such Creditor's likely Net Agreed Debt, if any, subject to the non-binding assumption that the relevant court of competent jurisdiction or Customer Claims Forum rules in that Creditor's favour (in respect of each such Creditor, its "**Estimated Net Agreed Debt**").

10.8    The Company shall place an amount of the Cash Pot equal to the aggregate Estimated Net Agreed Debts (the "**Litigation Reserve**") into a blocked escrow account (the "**Litigation Escrow Account**") from which any Contingent Litigation Creditors and Customer Damages Claims Creditors shall, to the extent due, be paid any Cash Pot Entitlements in accordance with Clause 13.4.

10.9    To the extent that:

10.9.1    the Litigation Reserve contains insufficient cash to cover the Cash Pot Entitlements of Contingent Litigation Creditors and Customer Damages Claims Creditors, the Company shall promptly transfer additional cash amount(s) to the Litigation Escrow Account to ensure that, to the extent due, Contingent Litigation Creditors and Customer Damages Claims Creditors are paid their full Cash Pot Entitlements in accordance with Clause 13.4; and

10.9.2    any amount of the Litigation Reserve (including any interest accrued thereon) remains in the Litigation Escrow Account following the determination, settlement, agreement or withdrawal of all Customer Creditors' Unagreed Customer Damages Claims and Contingent Litigation Creditors' Claims, the Company shall be entitled to all such amounts.

### C. Dividend Claims

10.10    As described in detail in Clause 10.27, certain classes of Creditors will, in addition to receiving their Cash Pot Entitlement, have their respective Dividend Balance converted into a Dividend Claim in full and final satisfaction of the total amount of the Creditors' Claims (the holders of such Dividend Claims from time to time being the "**Dividend Claims Creditors**").

10.11    Dividend Claims shall be dematerialised/uncertificated unsecured debt obligations of the Company and shall be governed by the Dividend Claims Terms from and including the Effective Time.  Each Dividend Claim shall be:

10.11.1    convertible into Shares in the Company; and

10.11.2    assignable to another person (in each case, in respect of the whole of such Dividend Claim only, together with any related PIK Interest Tranche (as defined in the Dividend Claims Terms)) in accordance with, and subject to, the Dividend Claims Terms.

10.12    The full terms and conditions of the Dividend Claims are set out in the Dividend Claims Terms and the following is a summary of the key terms.  In the event of any inconsistencies between this section of the Proposals and the Dividend Claims Terms, the Dividend Claims Terms shall take precedence.

10.13    These Proposals do not constitute or contain taxation advice on any matter, including (without limitation) the taxation consequences for Creditors which participate in any element of the Investment or which are entitled to Dividend Claims or cash payments hereunder.  All Creditors should consult their own taxation advisers about the Irish and Norwegian taxation consequences (and the taxation consequences under the laws of other relevant jurisdictions) which may arise as a result of these Proposals and the matters contemplated hereby (including pursuant to the Dividend Claims Terms).

10.14    The Dividend Claims Terms provide for a number of steps to be taken in relation to the potential conversion of the Dividend Claims and the structured sale of the Conversion Shares as

summarised below. The Company shall appoint the Overseer with effect from the Effective Time to perform the duties summarised below and specified in the Dividend Claims Terms.

10.15    Subject to the option of Dividend Claims Creditors to opt out of the conversion process and/or the Structured Sale Process as described below, the Dividend Claims shall be deemed converted into Shares on the date that falls 60 days after the Effective Date (the "**Structured Sale Conversion Date**") and the resulting Shares (excluding any No-Sale Conversion Shares, the "**Structured Sale Conversion Shares**") shall be issued within 5 business days after the Structured Sale Conversion Date to a VPS investor escrow account (the "**Obligor VPS Account**") in the name of the Company on behalf of the Dividend Claims Creditors that held the corresponding Dividend Claims immediately prior to such conversion (each a "**Structured Sale Creditor**").

10.16    On the date that falls 5 business days prior to the Structured Sale Conversion Date (the "**Conversion Price Determination Date**"), the Company shall, in conjunction with the Overseer, fix the conversion price under the Dividend Claims (the "**Conversion Price**") such that all of the Dividend Claims arising under these Proposals would in aggregate convert into a number of Shares that would represent 25.4% of the Company's issued share capital on a Fully Diluted Basis (or 233,548,229 Shares).   In the event that the amount of Investment Proceeds raised exceeds the Minimum Gross Proceeds Threshold, such 233,548,229 Conversion Shares shall correspondingly represent less than 25.4% of the Company's issued share capital.   Should there be any dispute between the Overseer and the Company regarding the Conversion Price, the decision of the Overseer shall be final.

10.17    The Structured Sale Conversion Shares shall subsequently be sold in the market by the Broker by way of a structured sale process, the structure of which (including timing and sale price) shall be determined by the Broker in its discretion, with the objective of maximising the average sale price of the Structured Sale Conversion Shares within a commercially reasonable time period, based on liquidity and other market factors (the "**Structured Sale Process**").   The instruction from the Company to the Broker to commence the Structured Sale Process, once given, shall be irrevocable. The Broker shall use all reasonable efforts to complete the Structured Sale Process within three months from the Structured Sale Conversion Date, provided that it shall have discretion to extend such period where it considers in its professional judgment that it would be in the best interests of the Structured Sale Creditors to do so. The mandate letter of the Broker with respect to the Structured Sale Process is attached to the Dividend Claims Terms.

10.18    The cash proceeds from the Structured Sale Process, net of 0.35% provision fee that shall be deducted from the Structured Sale Proceeds (and consequently shall be borne pro rata by each Structured Sale Creditor), (the "**Structured Sale Proceeds**") shall be deposited in a blocked escrow account of the Company held with DNB (the "**Structured Sale Proceeds Account**") and shall be distributed *pro rata* to the Structured Sale Creditors, in each case as soon as reasonably practicable following the later of:

10.18.1    the completion of the Structured Sale Process; and

10.18.2    the date on which such Structured Sale Creditor provides payment details (and, if applicable, satisfactory KYC information) to the Company and/or DNB.

10.19    Notwithstanding Clauses 10.14 to 10.18 above, a Dividend Claims Creditor may subject to the Dividend Claims Terms and securities laws applicable to that Dividend Claims Creditor, irrevocably elect no later than 2 business days prior to the Structured Sale Conversion Date (the "**Opt-Out Deadline**"), by delivery to the Company of a notice in the form set out in the Dividend Claims Terms (an "**Opt-Out Notice**") for either:

10.19.1    such Dividend Claim (in whole but not in part) not to be converted to Shares; such Dividend Claim shall in such event continue on the terms of the Dividend Claims Terms, with no conversion right thereafter; or

10.19.2    such Dividend Claim (in whole but not in part) to be converted to Shares but not be sold pursuant to the Structured Sale Process ("**No-Sale Conversion Shares**", and,

31

together with the Structured Sale Conversion Shares, **"Conversion Shares"**), provided that such Dividend Claims Creditor (each a **"No-Sale Creditor"** and, together with the Structured Sale Creditors, the **"Converting Creditors"**) shall provide to the Company details of a valid VPS account (either in its own name or in the name of its custodian) (**"Dividend Creditor VPS Account"**) on or before the Opt-Out Deadline; in such event the Dividend Claims in respect of which such notice is given shall, promptly following completion of the Structured Sale Process (and in any event no later than three months after commencement of the Structured Sale Process) (the **"No-Sale Conversion Date"**), be deemed converted into No-Sale Conversion Shares and delivered to the specified Dividend Creditor VPS Account within 5 business days after the No-Sale Conversion Date;

(collectively, the **"Opt-Out Election"**).

10.20    In accordance with the Dividend Claims Terms, a Dividend Claims Creditor shall only be permitted to exercise its Opt-Out Election where:

10.20.1    the Dividend Claims Creditor provides the Company with details of a valid Dividend Creditor VPS Account on or prior to the Opt-Out Deadline; and

10.20.2    it represents in the Opt-Out Notice that it is either:

(a)    not located in the United States (as defined in Regulation S under the US Securities Act); or

(b)    it is either (i) a "qualified institutional buyer" (as defined in Rule 144A under the US Securities Act) or (ii) an "institutional" accredited investor (within the meaning of Rule 501(a)(1), (3), (5) or (7) under the US Securities Act).

For the avoidance of doubt, the Opt-Out Election of a Dividend Claims Creditor shall not be effective unless the foregoing representation is provided by such Dividend Claims Creditor.

10.21    The Company may in its discretion implement an electronic platform for the purpose of the provision of information and the administration of transactions relating to the Dividend Claims, including:

10.21.1    the Obligor informing each Dividend Claims Creditor of the outstanding amount of its Dividend Claim;

10.21.2    a Dividend Claims Creditor notifying the Company of an assignment of its Dividend Claim;

10.21.3    the delivery by Dividend Claims Creditors of an Opt-out Notice as described in Clauses 10.19 and 10.20 above; and

10.21.4    the provision by Dividend Claims Creditors of payment details and KYC information for the purposes of disbursement of Structured Sale Proceeds and/or payment of principal and interest.

10.22    The Company shall obtain written confirmation from the Overseer that he considers that (the **"Independent Verification Statement"**):

10.22.1    the Conversion Price will in fact enable the Dividend Claims in aggregate to be convertible into a number of Conversion Shares that would represent 25.4% of the Company's issued share capital on a Fully Diluted Basis; and

10.22.2    the number of Conversion Shares to be issued to each Converting Creditor has been calculated in accordance with the Dividend Claims Terms.

10.23    The Company shall announce the Conversion Price, the fact that the Independent Verification Statement has been obtained in respect thereof and the supporting calculations behind the Conversion Price, by stock exchange announcement to the Oslo Stock Exchange and/or on its website on the Conversion Price Determination Date.

10.24    The Company shall procure and provide evidence to the Overseer, promptly after the occurrence of each of the following events:

10.24.1    that the Structured Sale Conversion Shares to be issued to each Structured Sale Creditor have been issued to the Obligor VPS Account;

10.24.2    that the Company has provided an instruction to the Broker to perform the Structured Sale Process in accordance with the Dividend Claims Terms;

10.24.3    from the Broker, of the average sale price that was obtained in respect of the Structured Sale Conversion Shares in the Structured Sale Process, and the calculation of the corresponding *pro rata* entitlement of each Structured Sale Creditor to the Structured Sale Proceeds;

10.24.4    that the Structured Sale Proceeds have been delivered to the Structured Sale Proceeds Account; and

10.24.5    that any No-Sale Conversion Shares to be issued to No-Sale Creditors have been issued to such No-Sale Creditors no later than 5 business days following the No-Sale Conversion Date,

and the Company shall procure from the Overseer, following the conclusion of the Structured Sale Process and the issuance of any No-Sale Conversion Shares, a report based on the aforementioned evidence (the "**Post-Conversion Report**").

10.25    The Company shall make the Post-Conversion Report available on its website as soon as practicable after receipt of the same.

10.26    Any Dividend Claim that is not converted to Shares on the Structured Sale Conversion Date or the No-Sale Conversion Date due to an opt-out as described in Clause 10.19.1 above (and any Dividend Claim in respect of which the Litigation Payment Date falls after the Conversion Price Determination Date) shall continue as an unsecured claim on the terms of the Dividend Claims Terms, with no conversion rights.  Such continuing Dividend Claims shall have a maturity date 7 years after the Effective Date, and shall accrue interest at a rate of six-month NIBOR +1% from the business day following the No-Sale Conversion Date, payable in kind until 1 June 2023 and in cash thereafter.

**D.    *Specific Creditor Classes***

10.27    The specific classes of Creditors of the Company as at the Petition Date and the manner in which it is proposed that they will be treated under the terms of these Proposals with effect on and from the Effective Time are as follows:

10.27.1    **Secured Cash Deposit Creditors**

The Company acknowledges that the security held by the Secured Cash Deposit Creditors over certain bank accounts exceeds the amount of the Secured Cash Deposit Creditors' Claims.  Consequently, the Secured Cash Deposit Creditors' Claims shall be unaffected by these Proposals and the existing security held by the Secured Cash Deposit Creditors shall remain in force notwithstanding Clause 12.2 and 12.4.4.

### 10.27.2  NAS09 Secured Bond Creditor

(a)  The NAS09 Secured Bond Creditor's Claims shall be treated as follows:

  (i)  to the extent that the relevant Secured Amount is equal to or exceeds the amount of the NAS09 Secured Bond Creditor's Claim, the NAS09 Secured Bond Creditor's Claim shall be unaffected by these Proposals and the existing security held by the NAS09 Secured Bond Creditor shall remain in force notwithstanding Clause 12.2 and 12.4.4; and

  (ii)  to the extent that the relevant Secured Amount is less than the amount of the NAS09 Secured Bond Creditor's Claim:

   (A)  the NAS09 Secured Bond Creditor's Claim shall be written down to the value of the relevant Secured Amount.  Notwithstanding Clause 12.4.4, the existing security held by the NAS09 Secured Bond Creditor shall remain in force only in respect of the relevant Secured Amount and shall otherwise be released in accordance with these Proposals; and

   (B)  the NAS09 Secured Bond Creditor shall receive a dividend of the Dividend Amount which shall be satisfied by (i) the payment of its Cash Pot Entitlement and (ii) the conversion of its Dividend Balance into a Dividend Claim in full and final satisfaction of the total amount of the NAS09 Secured Bond Creditor's Unsecured Claim Amount.

(b)  For the avoidance of doubt, these Proposals shall not prevent the NAS09 Secured Bond Creditor from enforcing its security over the Secured Assets on and from the Effective Time.

(c)  In the event that either:

  (i)  the NAS09 Secured Bond Creditor applies to the Norwegian Court to determine its Secured Asset Valuation; or

  (ii)  the NAS09 Secured Bond Creditor enforces its security over the Secured Assets;

  and the Secured Amount is uncertain and/or unascertainable pending the determination of the Norwegian Court or realisation of the Secured Assets, the NAS09 Secured Bond Creditor shall not be entitled to any dividend under Clause 10.27.2(a)(ii)(B) above unless and until the date of the Norwegian Court's final decision in relation to the Secured Asset Valuation or the realisation of the Secured Assets (as applicable) in accordance with the applicable rules for such realisation, save where otherwise agreed in writing between the Company and the NAS09 Secured Bond Creditor.

(d)  Consequently, the NAS09 Secured Bond Creditor is impaired by these Proposals only to the extent its Claims are treated under Clause 10.27.2(a)(ii) above.

### 10.27.3  NAS07/08 Secured Bond Creditor

(a)  The NAS07/08 Secured Bond Creditor's Claims shall be treated as follows:

  (i)  to the extent that the relevant Secured Amount is equal to or exceeds the amount of the NAS07/08 Secured Bond Creditor's

Claim, the NAS07/08 Secured Bond Creditor's Claim shall be unaffected by these Proposals and the existing security held by the NAS07/08 Secured Bond Creditor shall remain in force notwithstanding Clause 12.2 and 12.4.4; and

(ii)    to the extent that the relevant Secured Amount is less than the amount of the NAS07/08 Secured Bond Creditor's Claim:

(A)    the NAS07/08 Secured Bond Creditor's Claim shall be written down to the value of the relevant Secured Amount.  Notwithstanding Clause 12.4.4, the existing security held by the NAS07/08 Secured Bond Creditor shall remain in force only in respect of the relevant Secured Amount and shall otherwise be released in accordance with these Proposals; and

(B)    the NAS07/08 Secured Bond Creditor shall receive a dividend of the Dividend Amount which shall be satisfied by (i) the payment of its Cash Pot Entitlement and (ii) the conversion of its Dividend Balance into a Dividend Claim in full and final satisfaction of the total amount of the NAS07/08 Secured Bond Creditor's Unsecured Claim Amount.

(b)    For the avoidance of doubt, these Proposals shall not prevent the NAS07/08 Secured Bond Creditor from enforcing its security over the Secured Assets on and from the Effective Time.

(c)    In the event that either:

(i)    the NAS07/08 Secured Bond Creditor applies to the Norwegian Court to determine its Secured Asset Valuation; or

(ii)    the NAS07/08 Secured Bond Creditor enforces its security over the Secured Assets;

and the Secured Amount is uncertain and/or unascertainable pending the determination of the Norwegian Court or realisation of the Secured Assets, the NAS07/08 Secured Bond Creditor shall not be entitled to any dividend under Clause 10.27.3(a)(ii)(B) above unless and until the date of the Norwegian Court's final decision in relation to the Secured Asset Valuation or the realisation of the Secured Assets (as applicable) in accordance with the applicable rules for such realisation, save where otherwise agreed in writing between the Company and the NAS07/08 Secured Bond Creditor.

(d)    Consequently, the NAS07/08 Secured Bond Creditor is impaired by these Proposals only to the extent its Claims are treated under Clause 10.27.3(a)(ii) above.

10.27.4  **2019 Convertible Bond Creditor**

(a)    The amount of the 2019 Convertible Bond Creditor's Claim shall be the aggregate principal amount of the 2019 Convertible Bonds held by the 2019 Convertible Bond Creditor at the Petition Date.

(b)    The 2019 Convertible Bond Creditor shall receive a dividend of the Dividend Amount which shall be satisfied by (i) the payment of its Cash Pot Entitlement and (ii) the conversion of its Dividend Balance into a Dividend Claim in full and final satisfaction of the total amount of its Claim. Consequently, the 2019 Convertible Bond Creditor is impaired by these Proposals.

(c) The 2019 Convertible Bond Creditor shall be deemed to have absolutely, irrevocably and unconditionally discharged and released AAA in respect of any liability in respect of the 2019 Convertible Bonds and AAA shall be treated as so discharged and released by operation of these Proposals without any further action on the part of AAA under the AAA Proposals or otherwise.

10.27.5 **Unsecured Creditors**

Each Unsecured Creditor shall receive a dividend of the Dividend Amount which shall be satisfied by (i) the payment of its Cash Pot Entitlement and (ii) the conversion of its Dividend Balance into a Dividend Claim in full and final satisfaction of the total amount of such Unsecured Creditor's Claim. Consequently, the Unsecured Creditors are impaired by these Proposals.

10.27.6 **GIEK Guaranteed Loan Facilities Creditors**

(a) Each GIEK Guaranteed Loan Facilities Creditor's Claims shall be treated as follows:

 (i) to the extent that the relevant Secured Amount (if any) is equal to the amount of such GIEK Guaranteed Loan Facilities Creditor's Claims, such GIEK Guaranteed Loan Facilities Creditor's Claims shall be unaffected by these Proposals and any existing lawful set-off right held by such GIEK Guaranteed Loan Facilities Creditor (if any) shall (for the avoidance of doubt) remain in force notwithstanding Clause 12.2 and 12.4.4; and

 (ii) to the extent that the relevant Secured Amount (if any) is less than the amount of such GIEK Guaranteed Loan Facilities Creditor's Claims:

  (A) such GIEK Guaranteed Loan Facilities Creditor's Claims shall be written down to the value of the relevant Secured Amount; and

  (B) such GIEK Guaranteed Loan Facilities Creditor shall receive a dividend of the Dividend Amount which shall be satisfied by (i) the payment of its Cash Pot Entitlement and (ii) the conversion of its Dividend Balance into a Dividend Claim in full and final satisfaction of such GIEK Guaranteed Loan Facilities Creditor's Unsecured Claim Amount.

(b) For the avoidance of doubt, these Proposals shall not in themselves prevent any GIEK Guaranteed Loan Facilities Creditor from enforcing any lawful right of set-off it may have (if any) over the Secured Assets on and from the Effective Time.

(c) In the event that either:

 (i) a GIEK Guaranteed Loan Facilities Creditor applies to the Norwegian Court to determine the existence of any lawful set-off right and/or its Secured Asset Valuation in respect thereof; or

 (ii) a GIEK Guaranteed Loan Facilities Creditor enforces any lawful right of set-off in respect of the Secured Assets;

and the Secured Amount is uncertain and/or unascertainable pending the determination of the Norwegian Court or realisation of the Secured Assets, such GIEK Guaranteed Loan Facilities Creditor shall not be entitled to any

dividend under Clause 10.27.6(a)(ii)(B) above unless and until the date of the Norwegian Court's final decision in relation to the existence of such lawful set-off right, Secured Asset Valuation or the realisation of the Secured Assets (as applicable) in accordance with the applicable rules for such realisation, save where otherwise agreed in writing between the Company and such GIEK Guaranteed Loan Facilities Creditor.

(d)    Consequently, each GIEK Guaranteed Loan Facilities Creditor is impaired by these Proposals only to the extent its Claims are treated under Clause 10.23.6(a)(ii) above.

### 10.27.7    Retained Guaranteed Creditors

(a)    Unless agreed prior to the Irish Confirmation Date, the Claims of Retained Guaranteed Creditors shall be treated as Unagreed Creditors and their Claims shall be determined under the Expert Determination Process.

(b)    Each Retained Guaranteed Creditor shall receive a dividend of the Dividend Amount which shall be satisfied by (i) the payment of its Cash Pot Entitlement and (ii) the conversion of its Dividend Balance into a Dividend Claim in full and final satisfaction of the total amount of such Retained Guaranteed Creditor's Claim. Consequently, the Retained Guaranteed Creditors are impaired by these Proposals.

(c)    Each Retained Guaranteed Creditor shall be deemed to have absolutely, irrevocably and unconditionally discharged and released the Company and/or any Related Company in respect of any monetary liabilities, whether direct or indirect and whether secured or otherwise, associated or related to such Retained Guaranteed Creditor's Claim as at the date of these Proposals, including (but not limited to) any obligations under any Aircraft Sub-Lease which are secured in favour of any Retained Guaranteed Creditor. Each such Related Company shall be treated as so discharged and released by operation of these Proposals without any further action on the part of the Related Companies under the Related Proposals or otherwise.

(d)    These Proposals do not affect the terms of any agreements with any Retained Guaranteed Creditor (including any related security, related guarantee or liabilities arising from the Effective Time) to continue the primary agreement which is the subject of the guarantee or the said guarantee following the conclusion of the Irish examinership process.

### 10.27.8    Non-Retained Guaranteed Creditors

(a)    Unless agreed prior to the Irish Confirmation Date, the Claims of Non-Retained Guaranteed Creditors shall be treated as Unagreed Creditors and their Claims (including, for the avoidance of doubt, any Pre-Repudiation Post-Petition Liabilities) shall be determined under the Expert Determination Process.

(b)    Each Non-Retained Guaranteed Creditor shall receive a dividend of the Dividend Amount which shall be satisfied by (i) the payment of its Cash Pot Entitlement and (ii) the conversion of its Dividend Balance into a Dividend Claim in full and final satisfaction of the total amount of such Non-Retained Guaranteed Creditor's Claim. Consequently, the Non-Retained Guaranteed Creditors are impaired by these Proposals.

(c)    Each Non-Retained Guaranteed Creditor shall be deemed to have absolutely, irrevocably and unconditionally discharged and released:

(i)      each relevant Related Company in respect of that Related Company's Guaranteed Obligations and each such Related Company shall be treated as so discharged and released by operation of these Proposals without any further action on the part of the Related Companies under the Related Proposals or otherwise;

(ii)     the Company and/or any Related Company in respect of any obligations and/or liabilities, whether direct or indirect, whether secured or otherwise and whether monetary or non-monetary payable to such Non-Retained Guaranteed Creditor including (but not limited to) any obligations under any Aircraft Sub-Lease which are secured in favour of any Non-Retained Guaranteed Creditor; and

(iii)    the obligations of the Company and/or any Related Company under the guarantees provided by the Company and/or any Related Company to the Non-Retained Guaranteed Creditors in respect of any Related Companies' Guaranteed Obligations and such guarantees shall be terminated.

(d)     These Proposals are without prejudice to, and shall not prevent, a Non-Retained Guaranteed Creditor from maintaining a Claim against any Related Company to the extent necessary to enforce its security over the Secured Assets, provided that recourse under any such Claim shall be limited to the Secured Assets.

## 10.27.9   Terminated Contract Creditors

(a)     Unless agreed prior to the Irish Confirmation Date, the Claims of Terminated Contract Creditors shall be treated as Unagreed Creditors and their Claims (including, for the avoidance of doubt, any Pre-Repudiation Post-Petition Liabilities) shall be determined under the Expert Determination Process.

(b)     All Terminated Contract Creditors' Claims are unsecured claims and shall be subject to the same treatment as Unsecured Creditors whether agreed or upon the determination of their claim in accordance with the Expert Determination Process. Consequently, the Terminated Contract Creditors are impaired by these Proposals.

(c)     Each Terminated Contract Creditor shall be deemed to have absolutely, irrevocably and unconditionally discharged and released each relevant Related Company from any joint, equivalent or other liability associated or related to such Terminated Contract Creditor's Claim. Each such Related Company shall be treated as so discharged and released by operation of these Proposals without any further action on the part of the Related Companies under the Related Proposals or otherwise.

## 10.27.10  Retained Sub-Lease Creditors

(a)     The Claims of the Retained Sub-Lease Creditors shall be written down in full and the Retained Sub-Lease Creditors shall not receive any dividend in respect of these Claims.

(b)     Any obligations of the Company or Related Companies to Non-Retained Guaranteed Creditors under any Aircraft Sub-Lease, including any obligations which are secured in favour of any Retained Guaranteed Creditor, have been discharged and released under Clause 10.27.7 above.

(c)     Consequently, the Retained Sub-Lease Creditors are impaired by these Proposals.

(d)     These Proposals do not affect the terms of any agreements with a Retained Sub-Lease Creditor (including any related security, related guarantee or liabilities arising from the Effective Time) to continue the underlying Aircraft Sub-Lease from the Retained Sub-Lease Creditor, as sub-lessor, to the Company, as sub-lessee, following the conclusion of the examinership process.

### 10.27.11 Terminated Guaranteed Sub-Lease Creditors

(a)     The Claims of the Terminated Guaranteed Sub-Lease Creditors (including, for the avoidance of doubt, any Pre-Repudiation Post-Petition Liabilities) shall be written down in full and the Terminated Guaranteed Sub-Lease Creditors shall not receive any dividend in respect of their Claims.

(b)     Any obligations, direct or indirect, of the Company or Related Companies to Non-Retained Guaranteed Creditors, including any obligations to Terminated Guaranteed Sub-Lease Creditors under any Aircraft Sub-Lease which is secured in favour of any Non-Retained Guaranteed Creditor, have been discharged and released under Clause 10.27.8 above.

(c)     These Proposals are without prejudice to, and shall not prevent a Terminated Guaranteed Sub-Lease Creditor from enforcing its security over any Secured Assets, unless such security is otherwise released and/or discharged, save that the Terminated Guaranteed Sub-Lease Creditor shall not be entitled to maintain any Claim against the Company or any Related Company that is otherwise discharged and/or released in these Proposals or the Related Proposals other than that the Terminated Guaranteed Sub-Lease Creditor shall retain such Claim to the extent necessary to enforce such security, provided that recourse under any such Claim shall be limited to the Secured Assets.

(d)     Consequently, the Terminated Guaranteed Sub-Lease Creditors are impaired by these Proposals.

### 10.27.12 Retained Lease Creditors

(a)     Unless agreed prior to the Irish Confirmation Date, the Claims of Retained Lease Creditors shall be treated as Unagreed Creditors and their Claims shall be determined under the Expert Determination Process.

(b)     Each Retained Lease Creditor shall receive a dividend of the Dividend Amount which shall be satisfied by (i) the payment of its Cash Pot Entitlement and (ii) the conversion of its Dividend Balance into a Dividend Claim in full and final satisfaction of the total amount of such Retained Lease Creditor's Claim.

(c)     Consequently, the Retained Lease Creditors are impaired by these Proposals.

### 10.27.13 Terminated Lease Creditors

(a)     Unless agreed prior to the Irish Confirmation Date, the Claims of Terminated Lease Creditors shall be treated as Unagreed Creditors and their Claims (including, for the avoidance of doubt, any Pre-Repudiation

Post-Petition Liabilities) shall be determined under the Expert Determination Process.

(b)    Each Terminated Lease Creditor shall receive a dividend of the Dividend Amount which shall be satisfied by (i) the payment of its Cash Pot Entitlement and (ii) the conversion of its Dividend Balance into a Dividend Claim in full and final satisfaction of the total amount of such Terminated Lease Creditor's Claim.

(c)    These Proposals are without prejudice to, and shall not prevent a Terminated Lease Creditor from enforcing its security over any Secured Assets, unless such security is otherwise released and/or discharged, save that the Terminated Lease Creditor shall not be entitled to maintain any Claim against the Company or any Related Company that is otherwise discharged and/or released in these Proposals or the Related Proposals other than that the Terminated Lease Creditor shall retain such Claim to the extent necessary to enforce such security which Claim shall be limited in terms of recourse to the Secured Assets.

(d)    Consequently, the Claims of Terminated Lease Creditors are impaired by these Proposals.

### 10.27.14  Customer Creditors

(a)    Each Customer Creditor shall, upon agreement or determination of its Claim in accordance with sub-paragraph (b), (c) or (d) below (as applicable), receive a dividend of the Dividend Amount which shall be satisfied by (i) the payment of its Cash Pot Entitlement and (ii) the conversion of its Dividend Balance into a Dividend Claim in full and final satisfaction of the total amount of such Customer Creditor's Claim.

(b)    To the extent that the Company disputes a Customer Creditor's Ticket Refund Claim, or that Ticket Refund Claim has not been submitted by a Customer Creditor to the Company and agreed by the Company prior to the Irish Confirmation Date, it shall be subject to the Expert Determination Process.  Any Ticket Refund Claim submitted by a Customer Creditor and which has not been agreed by the Company prior to the Irish Confirmation Date shall be taken as submitted to the Company in accordance with Clause 11.1.1.

(c)    To the extent that the Company disputes a Customer Creditor's Customer Damages Claim that has been submitted by a Customer Creditor to the Company but not agreed by the Company prior to the Irish Confirmation Date (an "**Unagreed Submitted Customer Damages Claim**"), it shall be subject to the determination by the relevant decision making or judicial authority with jurisdiction over the dispute (a "**Customer Claim Forum**").

(d)    Any Customer Damages Claim that has not been submitted by a Customer Creditor to the Company and agreed by the Company prior to the Irish Confirmation Date ("**Unagreed Non-Submitted Customer Damages Claim**", such Claims being together with the Unagreed Submitted Customer Damages Claims, the "**Unagreed Customer Damages Claims**"), shall, unless otherwise agreed by the Company, be subject to the jurisdiction of the relevant Customer Claim Forum.

(e)    For the avoidance of doubt, the Expert Determination Process shall not apply to determine any Unagreed Customer Damages Claims under either sub-paragraph (c) or (d) above.

(f)    Each Customer Creditor shall be deemed to have absolutely, irrevocably and unconditionally discharged and released NAI in respect of any direct,

joint or equivalent liability for the Customer Creditor's Claims and NAI shall be so discharged and released by these Proposals without any further action on the part of NAI under its Related Proposals or otherwise.

(g)    Consequently, the Customer Creditors are impaired by these Proposals.

### 10.27.15 2020 Convertible Perpetual Bond Creditors

(a)    The amount of the 2020 Convertible Perpetual Bond Creditors' Claims shall be the market value of the number of Shares that the 2020 Convertible Perpetual Bonds held by the 2020 Convertible Perpetual Bond Creditors at the Petition Date (save for any 2020 Convertible Perpetual Bonds converted to Shares after the Petition Date) would have converted into at to the conversion price in effect on the Petition Date.

(b)    Each 2020 Convertible Perpetual Bond Creditor shall receive a dividend of the Dividend Amount which shall be satisfied by (i) the payment of its Cash Pot Entitlement and (ii) the conversion of its Dividend Balance into a Dividend Claim in full and final satisfaction of the total amount of its Claim. Consequently, the 2020 Convertible Perpetual Bond Creditors are impaired by these Proposals.

### 10.27.16 Connected and Intercompany Creditors

(a)    Each Connected and Intercompany Creditor's Claims are unsecured claims which shall be off set against any mutual claims as between the Company and the Connected and Intercompany Creditor as at the Petition Date (excluding any Claims against the Company in respect of any Aircraft Sub-Leases) and, subject to sub-paragraphs (b) and (c) below, shall be subject to the same treatment as Unsecured Creditors whether agreed or upon the determination of their claim in accordance with the Expert Determination Process. Consequently, the Connected and Intercompany Creditors are impaired by these Proposals.

(b)    The amount of any Connected and Intercompany Creditor's entitlement to a dividend (by way of cash and Dividend Claims) under sub-paragraph (a) above shall be offset against:

(i)    any counterindemnity obligations owed by such Connected and Intercompany Creditor to the Company on foot of the Company's discharge of that Connected and Intercompany Creditor's Terminated Guaranteed Obligations under these Proposals ("**Counter Indemnity Obligations**"); and

(ii)    in the case of any Related Company, the amount of funding provided in the form of cash by the Company to fund dividends payable by that Related Company under the Related Proposals.

(c)    Should any balance remain due by the Company to any Related Company following the set off under sub-paragraph (b) above, such balance shall be written down in full and the Related Company shall not receive any dividend in respect of its Claim.

(d)    Should any Connected and Intercompany Creditors dispute the amount of their Counter Indemnity Obligations under sub-paragraph (b) above, such Connected and Intercompany Creditors shall be treated as Unagreed Creditors and their Claims shall be determined under the Expert Determination Process.

10.27.17 **Contingent Unagreed Creditors**

(a)    As at the date of these Proposals:

(i)    the liability, if any, of the Company to each of the Contingent Unagreed Creditors; and

(ii)    the quantum, if any, due to the Contingent Unagreed Creditors,

have not been determined, agreed and/or crystallised.

(b)    Unless agreed and crystallised prior to the Effective Time, the Claims of the Contingent Unagreed Creditors shall, unless otherwise agreed by the Contingent Unagreed Creditor and the Company, be determined:

(i)    to the extent proceedings have been issued by any Contingent Unagreed Creditor before the Irish Confirmation Date (each such Creditor being, a "**Contingent Litigation Creditor**"), by the courts of competent jurisdiction and, for the avoidance of doubt, the Expert Determination Process shall not apply; and

(ii)    in all other cases, by the Expert Determination Process.

(c)    All Contingent Unagreed Creditors' Claims whether quantified by agreement or upon the determination of their Claim under the Expert Determination Process or, in the case of any Contingent Litigation Creditor, by a court of competent jurisdiction (which, for the avoidance of doubt, shall include any existing or future liability of the Company for any such Contingent Litigation Creditor's costs in connection with any litigation or binding dispute resolution procedure) are unsecured claims and any amounts due or found to be due to any Contingent Unagreed Creditor shall be subject to the same treatment as Unsecured Creditors. Consequently, the Contingent Unagreed Creditors are impaired by these Proposals.

(d)    Contingent Unagreed Creditors shall be deemed to have absolutely, irrevocably and unconditionally discharged and released each relevant Related Company from any liability associated or related to the Contingent Unagreed Creditor's Claim. Each such Related Company shall be treated as so discharged and released by operation of these Proposals without any further action on the part of the Related Companies under the Related Proposals or otherwise.

## 11.    Determining the Claims of Unagreed Creditors

11.1    In order to implement these Proposals and in the interests of the Company and its Creditors, taken as a whole, it is proposed to resolve the Claims of Unagreed Creditors (including, for the avoidance of doubt, any Pre-Repudiation Post-Petition Liabilities) as set out in this Clause 11.1, provided that: (i) no determination hereunder shall bind the Company and any Unagreed Creditor before the occurrence of the Effective Time whereupon any determination made or deemed made before such time shall become immediately effective and binding upon such parties; and (ii) the Expert Determination Process shall not be used to determine the claims of (a) any Customer Damages Claims Creditor or (b) any Contingent Litigation Creditor:

11.1.1    An Unagreed Creditor shall forward to the Company, by email to creditorclaims@norwegian.com, within 14 days after the Irish Confirmation Date a proof of claim setting forth the amount which it believes should be included as its claim for the purposes of these Proposals and the basis for the claim, together with:

(a)    in the case of a Customer Creditor, supporting documents sufficient to identify and assess the claim, including (but not limited to) the "Norwegian"

booking reference (6 characters), details of the relevant flight(s) and the reason for the claim; and

(b)        in all other cases, supporting documents as applicable.

11.1.2    In the event that an Unagreed Creditor listed in the Creditor Schedule does not notify the Company of its claim, in accordance with the provisions set out above, that Unagreed Creditor shall be deemed to have submitted a claim for the amount stated in the Company's records and as set out in the Creditor Schedule and the Effective Date shall be deemed to be the Determination Date for such claim.

11.1.3    In the event that an Unagreed Creditor is not listed in the Creditor Schedule and that Unagreed Creditor does not notify the Company of its claim in accordance with the provisions as set out above, such Unagreed Creditor shall have no valid claim whatsoever against the Company.

11.1.4    The Company shall notify the Unagreed Creditor, by return email, within 7 days after receipt of its claim whether the Company accepts the claim or not. In the event that the Company disputes the claim the Company's notice shall be deemed to be a Dispute Notice and it shall specify the quantum of the claim that the Company, acting in good faith, considers should be admitted. If the Company, acting in good faith, considers that the Unagreed Creditor is not a Creditor of the Company the Dispute Notice will specify that this quantum is "zero".

11.1.5    An Unagreed Creditor may, within 14 days of the issue of a Dispute Notice, submit the said claim for determination to:

(a)        one of the Aircraft Experts, by email to either:

(i)        Mr Richard G. Spaulding at richard.spaulding@spauldingaviation.com; or

(ii)       Mr Robert Palmer at robert.palmer@malvernconsulting.net,

to the extent such Unagreed Creditor considers that its Claim arises from contracts relating to the leasing, financing, acquisition, manufacture or maintenance of aircraft (or any part thereof, including, without limitation, any engine(s)); or

(b)        the General Expert by email to NorwegianAirClaims@rsmireland.ie, in all other cases.

To the extent the Company believes that the claim whether submitted to an Aircraft Expert or the General Expert has not been submitted by the Unagreed Creditor to the correct Expert the dispute with regard to whether the claim has been submitted to the correct Expert shall be determined by reference to the criteria identified in this Clause by the Expert to which the claim has been submitted.

11.1.6    In the event that an Unagreed Creditor does not submit its claim to either Expert within 14 days after the issue of the Dispute Notice, that Unagreed Creditor shall be deemed to have submitted a claim for the amount, if any, included in the Dispute Notice and will be admitted as a creditor in that amount (or no amount if no amount is included in the Dispute Notice), and the deemed Determination Date shall be 15 days after the issue of the Dispute Notice.

11.1.7    The Company and the Unagreed Creditor may negotiate a settlement of the claim at any time. In such case, the date of settlement shall be the Determination Date.

11.1.8    The relevant Expert shall, upon receipt of the Unagreed Creditor's claim, furnish the Company with a copy of the claim. The Company may submit a response to the

relevant Expert within 14 days after receipt of such copy claim. The relevant Expert shall not deliver his determination before the expiry of that period of 14 days.

11.1.9    The relevant Expert shall be entitled, but shall not be obliged, to seek further information as he at his sole discretion deems necessary prior to making his determination and the relevant Expert shall be entitled to stipulate the necessary time deadlines for the provision of such information.

11.1.10   The relevant Expert shall, not later than the Expert Determination End Date, notify both the Unagreed Creditor and the Company of his determination of the amount, if any, for which the Unagreed Creditor's claim shall be admitted. The date of the relevant Expert's determination shall be deemed to be the Determination Date.

11.1.11   When determining the Terminated Contract Creditors' Claims, Terminated Guaranteed Sub-Lease Creditors' Claims, Non-Retained Guaranteed Creditors' Claims and/or any other Unagreed Debt arising from the termination or repudiation of an underlying contract, each Expert shall apply the same legal principles that would be applied by the Irish High Court in a hearing under Section 537(3) of the Act to determine the amount of any loss or damage.  Without prejudice to the generality of the foregoing, each Expert shall have full regard to and take account of the value (including the value of future attributable income) of any assets (in any form) in respect of which the relevant Creditor has in connection with its Claim the benefit of any security (whether legal or otherwise), recourse to, and/or any right to (re)take possession. Any dispute regarding the value of such assets shall be determined by the relevant Expert.

11.1.12   The Aircraft Experts shall confer as they deem fit regarding the determination of claims submitted to them.

11.1.13   Where any Creditor with an Unagreed Debt also has a claim against any Related Company, and that claim against a Related Company has been referred for determination under any applicable Equivalent Expert Determination Process, the relevant Expert shall determine that Creditor's Unagreed Debt in parallel to the determination under the Equivalent Expert Determination Process and shall ensure that both determinations are consistent.

11.1.14   The relevant Expert's determination shall be final and binding on the parties.

11.1.15   Upon determination by the relevant Expert in respect of the quantum of a liability, payment in respect of the liability will be made in accordance with the provisions contained herein for payment to the class of Creditor to which the said Unagreed Creditor belongs.

11.1.16   The Company and the Unagreed Creditor shall each be liable for 50% of the costs and expenses of the relevant Expert in connection with his determination.  For illustrative purposes only, the hourly rates of each Expert are set out below:

(a)       the Aircraft Experts: EUR 250 plus VAT; and

(b)       the General Expert: EUR 250 plus VAT.

11.1.17   The General Expert has estimated that it would take at least one hour of his chargeable time to determine the Unagreed Debt of a Customer Creditor with a single Ticket Refund Claim. Accordingly, for illustrative purposes only, such a Creditor may expect to be liable for a minimum of EUR 125 plus VAT per Ticket Refund Claim should it refer a Ticket Refund Claim to the General Expert under Clause 11.1.5.

11.1.18   Each Expert shall act as an expert and not as an arbitrator and his determination shall be final, binding and conclusive in all respects and no dispute in relation to the rights or claims of such Unagreed Creditors, submitted for decision to either Expert,

shall be litigated or arbitrated, nor shall the provisions of the Arbitration Act 2010 be applicable.

11.2     The Examiner may seek an Order from the Irish High Court under Section 542(2) of the Act to ensure the effectiveness of Clause 11.1 as and from the Irish Confirmation Date.

## 12.    Waiving of Creditor Rights

12.1     These Proposals apply to all of the Company's liabilities, including contingent and prospective liabilities, as at the Petition Date (and including, for the avoidance of doubt, any Pre-Repudiation Post-Petition Liabilities) whether or not the liabilities have been acknowledged or recognised or are unknown including for the avoidance of doubt any liabilities arising from or in connection with guarantees or indemnities to any party.

12.2     With effect from the Effective Time, without prejudice to the right of the Company to perform and seek performance of a Creditor's contractual rights and entitlements existing at the Petition Date, no Creditor or any other party shall have any debt, right or claim of any description whatsoever (including, but not limited to, contingent or prospective claims arising out of any guarantee or indemnity granted in respect of any liability of the Company and claims of which the Company and/or the Examiner are unaware but excluding any Secured Amount) against the Company howsoever arising whether out of or connected with any contract, engagement, circumstance, event, act or omission of the Company prior to the Petition Date, or arising as a consequence of the appointment of the Examiner, save as provided in these Proposals (including under Clauses 10.27.1 to 10.27.3 (inclusive) and 10.27.6).

12.3     Without prejudice to the generality of Clause 12.2 above, no Creditor shall be permitted to set off a debt which it owes to the Company (where such debt has been incurred during the examinership period) against a debt which was owing to it by the Company on or before the Petition Date.

12.4     Save as otherwise expressly provided in these Proposals, the following shall apply:

12.4.1     Failure through inadvertence on the part of the Examiner or the Company to notify any Creditor of the class meeting of creditors to which the Creditor should have received notice will not prevent that Creditor from being bound by these Proposals, if and when these Proposals are confirmed by the Irish High Court.

12.4.2     Nothing in these Proposals shall prejudice or affect the rights of the Company to seek full payment or contribution from any person or to pursue or enforce any claim or liability of any person or to seek performance of any such person's contractual rights and entitlements existing at the Petition Date.

12.4.3     To the extent that any Creditor claim is insured, these Proposals shall not affect the liability of the insurer or any right of the Creditor under applicable law or related security to the proceeds of the Company's claim against the insurer.

12.4.4     Unless otherwise provided in these Proposals (including pursuant to Clauses 10.27.1, 10.27.2, 10.27.3, 10.27.6, 10.27.8, 10.27.11 and 10.27.13), where a Creditor's Claim is supported by security from the Company (whether legal or otherwise), that Creditor shall: (a) upon receipt of any dividend paid to it pursuant to these Proposals; or (b) where it is to receive no dividend pursuant to these Proposals as and from the Effective Time, be deemed to have irrevocably and unconditionally released the Company from all of its obligations and/or liabilities arising out of or in connection with or relating to the said security and furthermore, that Creditor shall within seven days of receipt of its dividend (or the Effective Time in the case of those Creditors that will receive no dividend under these Proposals), take all such acts and execute all such documents as may be reasonably necessary in order to remove the security from any public register. Every such Creditor hereby appoints Per Christoffer Kise, the Company's Head of Legal or such other person having such title as the case may be, as its lawfully appointed attorney or, failing that, its agent, nominee

45

and representative for the limited purpose of doing all such acts and executing such documentation as is necessary in order to effect the release of its security.

12.4.5    Unless otherwise provided in these Proposals, with respect to the Company, no interest, damages, penalties, or costs (over and above the sum specified in the Creditor Schedule), notwithstanding whether such liabilities were prospective or contingent as at the Petition Date, shall be payable by the Company to any Creditor.

12.4.6    With respect to the Company, the payments provided for in these Proposals pursuant to an order of the Irish High Court confirming these Proposals shall be in full and final settlement of all claims and entitlements of each Creditor to which a payment is made as determined in accordance with these Proposals.

12.4.7    To the extent not otherwise provided in these Proposals, where the Company has joint or equivalent liability with any Related Company to any Creditor each such Creditor shall be deemed to have absolutely, irrevocably and unconditionally discharged and released the Related Company in respect of any obligations and/or liabilities, whether direct or indirect, whether secured or otherwise and whether monetary or non-monetary.

## 13.    Implementation of Proposals

13.1    In formulating these Proposals, the Examiner has treated each separate class of Creditors on a fair and equitable basis having regard to the current trading position of the Company and the amounts which those Creditors might receive on a winding up. The Examiner is satisfied that the acceptance and implementation of these Proposals is in the best interests of the Creditors of the Company.

13.2    At the confirmation hearing in respect of the Company under Section 541 of the Act, the Examiner proposes to seek an order approving these Proposals in respect of the Company and fixing the Effective Date in accordance with Clause 5 and these Proposals will otherwise become effective in accordance with Clause 5.

13.3    In addition, the Examiner may seek one or more Orders from the Irish High Court under Section 542(2) of the Act to ensure the effectiveness of Clause 6 and Clause 11.1 as and from the Irish Confirmation Date.

13.4    Where required under these Proposals, the Company shall take all steps necessary (including without limitation recording the relevant Dividend Claims Creditors and the amount of their Dividend Claims within the Dividend Claim Schedule to the Dividend Claims Terms) to document the conversion of Dividend Balances into Dividend Claims and pay all Cash Pot Entitlements to relevant Cash Creditors on or before the later of:

13.4.1    either:

(a)    in the case of all Creditors (other than Contingent Litigation Creditors and Customer Damages Claims Creditors), the General Payment Date; or

(b)    in the case of Contingent Litigation Creditors and Customer Damages Claims Creditors, the Litigation Payment Date; and

13.4.2    10 Business Days following the date on which such Creditor provides its account payment details to the Company.

13.5    To the extent a Creditor is entitled to have its Dividend Balance converted into a Dividend Claim and be paid a Cash Pot Entitlement under these Proposals and with effect on and from the Effective Time, every such Creditor hereby appoints Per Christoffer Kise, the Company's Head of Legal or such other person having such title as the case may be, as its lawfully appointed attorney or, failing that, its agent, nominee and representative for the limited purpose of doing all such acts and executing such documentation (including signing any subscription form (*Nw. tegningsformular)* as is necessary for the purpose of enabling such Creditor to have

its Dividend Balance converted into a Dividend Claim and be paid its Cash Pot Entitlement hereunder and to give any instruction (including by delivering notices of exercise of conversion rights on behalf of Converting Creditor) to convert Dividend Claims to Conversion Shares with effect from the Structured Sale Conversion Date or the No-Sale Conversion Date (as applicable) (other than Dividend Claims in respect of which notice has been given in accordance with Clauses 10.19 and 10.20).

13.6    On and from the Effective Time, the Company shall maintain, and where necessary update, the Dividend Claim Schedule to the Dividend Claims Terms in accordance with the Dividend Claims Terms in order to reflect the entitlement of Creditors and/or any other persons to such Dividend Claims.

## 14.    General Data Protection Regulation

14.1    The Examiner shall comply at all times with his obligations as a controller, as provided under Regulation (EU) 2016/679 of the European Parliament and the Council of 27 April 2016 on the protection of natural persons with regard to the processing of personal data and on the free movement of such data and the Data Protection Acts 1988 – 2018 (the "**Data Protection Laws**").

14.2    To the extent that the Examiner acts as a processor (as defined in the Data Protection Laws) on behalf of another party acting as controller, the relevant parties shall enter into a data processing agreement in respect of such processing activities, in accordance with the requirements of the Data Protection Laws.

## 15.    Miscellaneous Provisions

### 15.1    Priorities

15.1.1    These Proposals and the Norwegian Restructuring Plan assume that Norwegian law would apply in respect of the priorities of payment upon the liquidation of NAS.  A summary of the liquidation priorities under Norwegian law is included at Schedule 10.

15.1.1    The remuneration costs and expenses of the Examiner shall be afforded the priority given to them in Section 554 of the Act and shall be paid in priority to all other debts or payments under these Proposals and the Norwegian Restructuring Plan.

15.1.2    Except as provided herein, all amounts due to Creditors by the Company in respect of goods or services used by the Company during the Protection Period shall be paid by the Company in full in the normal course of business.  For the avoidance of doubt, any Pre-Repudiation Post-Petition Liabilities shall not be considered to be amounts due to Creditors by the Company in respect of goods or services used by the Company during the Protection Period.

15.1.3    No certificates pursuant to Section 529 of the Act have been issued by the Examiner at the date of these Proposals in relation to the Company during the Protection Period.

### 15.2    Foreign Currency Conversion

15.2.1    Creditors' claims denominated in currency other than NOK amounts as at the Petition Date will be converted at the daily exchange rates maintained by Norges Bank as at the Petition Date, save that where Norges Bank does not maintain a daily exchange rate in respect of a particular currency on such date then the corresponding daily exchange rate published on the DN Investor website (https://investor.dn.no/#!/Kurser/Valuta/) shall be used.

15.2.2    All Dividend Claims shall be denominated in NOK and Cash Pot Entitlements shall be paid in the currency of the Creditor's underlying Claim as converted on the date of payment.

47

15.3     **Non-Admission of Claims**

Nothing contained in these Proposals shall constitute an admission or acknowledgement of liability in respect of any claim which has not otherwise been admitted by the Company.

15.4     **Explanatory Memorandum**

15.4.1     Accompanying these Proposals is an Explanatory Memorandum, which provides a summary of these Proposals and their effect. It should be read in conjunction with these Proposals.

15.4.2     Terms defined in these Proposals in respect of the Company shall have the same meaning in the Explanatory Memorandum. In the event of any inconsistency between the terms of the Explanatory Memorandum and these Proposals, the terms of these Proposals shall apply.

15.5     **Governing Law and Jurisdiction**

15.5.1     These Proposals and any dispute hereunder (contractual or otherwise) shall, save in respect of the Dividend Claims, be governed by and construed in accordance with the laws of Ireland and the courts of Ireland shall have exclusive jurisdiction to hear and determine any suit, action or proceeding or to settle any dispute which may arise in relation to these Proposals.

15.5.2     For the avoidance of doubt, Clause 15.5.1 shall not affect the governing law and choice of jurisdiction specified in the Dividend Claims Terms insofar as such relates to the Dividend Claims as constituted on and from the Effective Time under the Dividend Claims Terms.

WF-28491351-exv

## SCHEDULE 1

Particulars of the Company

| Norwegian Air Shuttle ASA | Particulars |
|---|---|
| Registered Number | NO 965 920 358 MVA |
| Date of Incorporation | 22 January 1993 |
| Place of Incorporation | Norway |
| Registered Office | Oksenøyveien 3<br>1366 Lysaker<br>Bærum<br>Norway |
| Issued Share Capital | NOK 4,023,442 divided into 40,234,420 ordinary shares, each with a nominal value of NOK 0.10 |
| Members and respective shareholdings | See Schedule 4 for details of members and respective shareholdings as at 2 March 2021 |
| Directors | Niels Smedegaard<br>Margaret Christine Browne<br>Jaan Albrecht<br>Vibeke Hammer Madsen<br>Geir Olav Oien<br>Eric Holm<br>Katrine Gundersen<br>Ingrid Elvira Leisner<br>Sondre Gravir |

**SCHEDULE 2**

Statement of Assets and Liabilities for the Company

| Norwegian Air Shuttle ASA - Statement of Affairs @ 31 December 2020 | | | |
|---|---|---|---|
| | **Notes** | **MNOK** | **MNOK** |
| **Fixed Assets** | | | |
| Intangible assets | | 3,348 | |
| Tangible fixed assets | | 1,200 | |
| Fixed Asset investments | | 20,763 | |
| Intercompany Receivables | | 3,296 | |
| Intercompany Lease Receivables | | 499 | **29,106** |
| | | | |
| **Current Assets** | | | |
| Inventory | | 63 | |
| Trade Receivables | | 1,982 | |
| Internal Trade Receivables | | 3,694 | |
| Other Receivables | | 1,938 | |
| Other Trade Receivables | | 4,114 | |
| Cash and cash equivalents | | 2,443 | **14,234** |
| **Total Assets** | | | **43,340** |
| | | | |
| **Liabilities** | | | |
| Creditors (Including Long Term Liabilities) | | (80,950) | |
| **Total Liabilities** | | | **(80,950)** |
| **Net Assets / (Liabilities) at 31 December 2020** | | | **(37,610)** |

**Source:** Unaudited Management Accounts at 31 December 2020

## SCHEDULE 3

### Estimated Financial Outcome of a Winding-Up for the Company

| Norwegian Air Shuttle ASA  - Liquidation Statement of Affairs at 28 February 2020 | Notes | Net Book Value NOK 000,000 | Projected Realisable Value NOK 000,000 |
|---|---|---|---|
| **Asset Realisations** | | | |
| Intangible assets | | 3,348 | - |
| Investment in Subsidiaries | | 20,740 | - |
| Intercompany Receivables | 1 | 11,043 | 100 |
| External Receivables | 2 | 3,052 | 360 |
| Property - Apartments | 3 | 11 | 5 |
| Property - Oslo Hanger | 4 | 241 | 192 |
| Less Secured Liabilities | | - | (192) |
| Stock / Inventory / Spares & Equipment / Fittings | 5 | 237 | 40 |
| Cash | 6 | 1,366 | 965 |
| Other Assets | 7 | 3,301 | - |
| **Projected Total Liquidation Realisations for Assets** | | | **1,470** |
| | | | |
| **Examinership Costs** | | | |
| Examiner Fees | 8 | (12) | |
| Examinership Professional Fees / Outlay | 8 | (17) | **(29)** |
| | | | |
| **Projected Liquidation Costs** | | | |
| Projected Liquidation Fees, Costs and Outlay | 9 | | **(80)** |
| **Projected total funds available to the First Priority Preferential Creditors** | | | **1,361** |
| | | | |
| **First Priority Preferential Creditors** | | | |
| Total Project First Priority Preferential Creditors | 10 | | **(115)** |
| *Projected Dividend available for First Priority Preferential Creditors* | | | *100%* |
| **Projected Total Funds available to the Second Priority Preferential Creditors** | | | *1,246* |
| | | | |
| **Second Priority Preferential Creditors** | | | |
| Total Projected Second Priority Preferential Creditors | 11 | | **-** |
| *Projected Dividend available for First Priority Preferential Creditors* | | | *100%* |
| **Projected Total Funds Available to the Unsecured Creditors** | | | **1,246** |
| | | | |
| **Unsecured Creditors** | | | |
| Total Unsecured Creditors | 12 | | **81,218** |
| *Projected Dividend available for the Unsecured Creditors* | 13 | | *1.53%* |
| **Projected Total Funds Available to the Subordinated Creditors** | | | **-** |
| | | | |
| *Subordinated Creditors* | | | |
| *Total Subordinated Creditors* | | | **90** |
| *Projected Dividend available for the Unsecured Creditors* | | | *0%* |
| **Projected Overall Liquidation Deficit** | 13 | | **(80,062)** |

**Norwegian Air Shuttle ASA  - Liquidation Statement of Affairs at 28 February 2020 - NOTES**

**Note 1. Intercompany Receivables**
It is projected that in a liquidation scenario the realisable intercompany receivables would be NOK100m

**Note 2. External Receivables**
It is projected that in a liquidation scenario the realisable external receivables would be NOK360m

**Note 3. Property Apartments**
It is projected that in a liquidation scenario the realisable value of the property would be NOK5m as one of the two properties has already been realised

**Note 4. Company Hanger**
It is projected that in a liquidation scenario any proceeds realised from the Hanger would be for the benefit of the Secured Creditor that has a fixed charge over it

**Note 5: Stock / Inventory / Spares & Equipment / Fittings**
It is projected that in a liquidation scenario these assets would have a realisable value of NOK40m

**Note 6: Cash**
It is projected that in a liquidation scenario there would be cash funds of NOK965m available to the unsecured creditors following the Irish Examinership, Norwegian Reconstruction and exercise of bank liens.

**Note 7: Other Assets**
It is projected that in a liquidation scenario, there would be no realisable value in these assets for a Liquidator

**Note 8: Examiners Costs**
The Examiners Fees, Legal fees/costs and outlay for the Examinership period from 18 November 2020 is NOK29m

**Note 9: Liquidation Costs**
The projected Liquidators fees and costs for dealing with the completion of the Liquidation of Norwegian Air Shuttle AS in projected at NOK80m.

**Note 10: First Priority Creditors**
The projected First Priority Creditor claims in a Liquidation scenario are estimated at NOK115m

**Note 11: Second Priority Creditors**
The projected Second Priority Creditor claims in a Liquidation scenario are estimated at zero

**Note 12: Unsecured Creditors**
The projected Unsecured Creditors in a Liquidation Scenario is estimated at NOK81,218m

**Note 12: Subordinated  Creditors**
The projected Subordinated Creditors in a Liquidation Scenario is estimated at NOK90m

**Note 13: Projected Liquidation Deficit:**
The projected overall deficit for liquidation of Norwegian Air Shuttle AS is NOK80,062m. It is projected that the Liquidation of the company would take 3-4 years to complete with the payment of the unsecured dividend being one of the final matters which would project to be in year 3/4 of the overall liquidation process

**SCHEDULE 4**

Members (as at 2 March 2021)

| Rank | Name | Number of Shares Held | % of Shares Held |
|------|------|-----------------------|------------------|
| 1. | Avanza Bank AB | 5,479,945 | 13.62 |
| 2. | Nordnet Bank AB | 3,982,183 | 9.90 |
| 3. | Saxo Bank A/S | 3,688,100 | 9.17 |
| 4. | CLEARSTREAM BANKING S.A. | 2,378,852 | 5.91 |
| 5. | Euroclear Bank S.A./N.V. | 2,321,620 | 5.77 |
| 6. | Swedbank AB | 1,750,005 | 4.35 |
| 7. | Danske Bank A/S | 1,620,872 | 4.03 |
| 8. | Nordea Bank Abp | 1,482,461 | 3.68 |
| 9. | DP Aircraft Ireland Ltd | 1,016,897 | 2.53 |
| 10. | SVENSKA HANDELSBANKEN AB | 800,661 | 1.99 |
| 11. | Interactive Brokers LLC | 761,374 | 1.89 |
| 12. | Morgan Stanley & Co. Int. Plc. | 564,098 | 1.40 |
| 13. | The Bank of New York Mellon SA/NV | 534,170 | 1.33 |
| 14. | Bluesky 3 Leasing Company Limited | 485,054 | 1.21 |
| 15. | Skandinaviska Enskilda Banken AB | 477,058 | 1.19 |
| 16. | UBS Switzerland AG | 458,372 | 1.14 |
| 17. | Nordea Bank Abp | 418,972 | 1.04 |
| 18. | Bank of America, N.A. | 410,832 | 1.02 |
| 19. | The Bank of New York Mellon SA/NV | 383,442 | 0.95 |
| 20. | Nordea Bank Abp | 342,872 | 0.85 |

## SCHEDULE 5

Creditors

| Secured Cash Deposit Creditors | | | | | |
|---|---|---|---|---|---|
| No of Creditor | Creditor Name | Amount at 18 November 2020 | NOK Amount at 18 November 2020 | Claim Received (Yes/No) | Claim Agreed in Quantum & Liability |
| 1 | DNB Bank | NOK 211,680,841 | NOK 211,680,841 | Yes | Yes |
| 2 | Danske Bank | NOK 80,946,964 | NOK 80,946,964 | Yes | Yes |
| | **Total** | **NOK 292,627,805.68** | **NOK 292,627,805.68** | | |

| NAS 09 Secured Bond Creditors | | | | | |
|---|---|---|---|---|---|
| No of Creditor | Creditor Name | Amount at 18 November 2020 | NOK Amount at 18 November 2020 | Claim Received (Yes/No) | Claim Agreed in Quantum & Liability |
| 1 | Nordic Trustee AS - NAS09 Bond | NOK 252,500,000 | NOK 252,500,000 | Yes | Yes |
| 2 | Nordic Trustee AS | NOK 1,148,830 | NOK 1,148,830 | Yes | Yes |
| | **Total** | **NOK 253,648,830** | **NOK 253,648,830** | | |

| NAS 07 / 08 Secured Bond Creditors | | | | | |
|---|---|---|---|---|---|
| No of Creditor | Creditor Name | Amount at 18 November 2020 | NOK Amount at 18 November 2020 | Claim Received (Yes/No) | Claim Agreed in Quantum & Liability |
| 1 | Nordic Trustee AS - NAS07 Bond | € 126,250,000 | NOK 1,352,326,875 | Yes | No |
| 2 | Nordic Trustee AS - NAS08 Bond | SEK 486,567,500 | NOK 510,311,994 | Yes | No |
| | **Total** | - | **NOK 1,862,638,869** | | |

| 2019 Convertible Bond Creditor | | | | | |
|---|---|---|---|---|---|
| No of Creditor | Creditor Name | Amount at 18 November 2020 | NOK Amount at 18 November 2020 | Claim Received (Yes/No) | Claim Agreed in Quantum & Liability |
| 1 | Nordic Trustee AS - 2019 Convertible Bonds | $ 6,256,000 | NOK 56,463,528 | Yes | Yes |
| | **Total** | **-** | **NOK 56,463,528** | | |

| Unsecured Creditors | | | | | |
|---|---|---|---|---|---|
| No of Credi tor | Creditor Name | NOK Amount at 18 November 2020 | Claim Submitted to the Reconstructor | Claim Receiv ed (Yes/N o) | Claim Agreed in Quantu m & Liability |
| 1 | AB Previa | NOK - | NOK - | No | No |
| 2 | Accelya US Inc | NOK 2,837,015.47 | NOK - | Yes | Yes |
| 3 | Accelya World, S.L.U. | NOK 22,782.29 | NOK - | Yes | Yes |
| 4 | Aeroground Inc DBA Menzies Aviation | NOK 945,257.31 | NOK - | Yes | Yes |
| 5 | Agencia Tributaria - Fines | NOK 22,494.15 | NOK - | No | No |
| 6 | Airlines Operation Committee | NOK 2,142.30 | NOK - | No | No |
| 7 | Airports of Montenegro | NOK - | NOK - | No | No |
| 8 | Airway Cleaners, LLC | NOK 1,784,909.87 | NOK - | No | No |
| 9 | ALLKOPI NETPRINT AS | NOK 1,901.22 | NOK - | Yes | Yes |
| 10 | Alstate Maintenance | NOK 305,563.81 | NOK - | No | No |
| 11 | Arvato Finance AS | NOK 125,000.00 | NOK - | Yes | Yes |
| 12 | ASSA ABLOY Entrance Systems Norway | NOK 5,548.56 | NOK - | Yes | Yes |
| 13 | Avarn Security AB | NOK 3,183.11 | NOK - | No | No |
| 14 | AVINOR AS | NOK 120,002,996.00 | NOK - | Yes | Yes |
| 15 | Bama Storkjøkken Oslo AS | NOK 29,669.05 | NOK - | Yes | Yes |
| 16 | Berendsen Tekstil Service AS | NOK 5,143.37 | NOK - | Yes | Yes |
| 17 | Bjørndal Legesenter | NOK 43,200.00 | NOK - | No | No |
| 18 | BRØDRENE RINGSTAD AS | NOK 5,468.70 | NOK - | Yes | Yes |
| 19 | Bundespolizaidirektion Hannover | NOK 394,623.66 | NOK - | Yes | Yes |
| 20 | Bundespolizeiamt Berlin | NOK 5,599,498.75 | NOK - | Yes | Yes |
| 21 | Butikkdrift Iman Aslany AS | NOK 15,895.50 | NOK - | No | No |

| 22 | CAE Centre Oslo AS | NOK 1,803,741.08 | NOK - | No | No |
|----|---------------------|------------------|-------|----|----|
| 23 | CAE Centre Stockholm AB | NOK 1,136,356.26 | NOK - | No | No |
| 24 | Cargo Center Sweden AB | NOK 3,441.11 | NOK - | Yes | Yes |
| 25 | Chevron Aircraft Maintenance Ltd | NOK 1,100,336.40 | NOK - | Yes | Yes |
| 26 | Chevron Technical Services Ltd | NOK 191,115.04 | NOK - | Yes | Yes |
| 27 | Chicago Airlines Terminal Consortium | NOK 4,153,215.42 | NOK - | Yes | Yes |
| 28 | Coca-Cola European Partners Norge A | NOK 1,978.14 | NOK - | Yes | Yes |
| 29 | Dacon AS | NOK 385,976.15 | NOK - | Yes | Yes |
| 30 | Deloitte AS (Assa Abloy Entrance Systems) | NOK 1,727,813.00 | NOK - | Yes | Yes |
| 31 | Equity Finans AS | NOK 2,405.84 | NOK - | No | No |
| 32 | Eurocontrol | NOK 172,268,588.08 | NOK - | Yes | Yes |
| 33 | Eurocontrol Croatia | NOK - | NOK - | No | No |
| 34 | Eurocontrol Denmark | NOK - | NOK - | No | No |
| 35 | Eurocontrol France | NOK - | NOK - | No | No |
| 36 | Eurocontrol Hungary | NOK - | NOK - | No | No |
| 37 | Eurocontrol Ireland | NOK - | NOK - | No | No |
| 38 | Eurocontrol Italy | NOK - | NOK - | No | No |
| 39 | Eurocontrol Lithuania | NOK - | NOK - | No | No |
| 40 | Eurocontrol Netherlands | NOK - | NOK - | No | No |
| 41 | Eurocontrol Sweden | NOK - | NOK - | No | No |
| 42 | Experian AS | NOK 7,050.10 | NOK - | Yes | Yes |
| 43 | Facebook Ireland Ltd. | NOK 574,310.62 | NOK - | No | No |
| 44 | Facebook Norway AS | NOK 7,990,352.11 | NOK - | Yes | Yes |
| 45 | Farelogix Inc. | NOK 64,035.92 | NOK - | Yes | Yes |
| 46 | G2 Secure staff | NOK - | NOK - | No | No |

| 47 | Gardermoen Airport Hotel AS | NOK 379,670.00 | NOK - | Yes | Yes |
|----|----|----|----|----|----|
| 48 | Hotell og Selskapsreiser Ltd | NOK 72,047.56 | NOK - | Yes | Yes |
| 49 | Hotelldrift CI Bjørvika AS | NOK 3,500.00 | NOK - | Yes | Yes |
| 50 | Huntleigh USA Corp | NOK - | NOK - | No | No |
| 51 | Iberostar Bouganville Playa (Hoteadeje, S.L.U | NOK 274,899.94 | NOK - | Yes | Yes |
| 52 | Iberostar Heritage Grand Mencey (Iberstar Management, S.A.U) | NOK 66,475.57 | NOK - | Yes | Yes |
| 53 | Jeppesen GmbH | NOK 5,057,290.23 | NOK - | No | No |
| 54 | Jeppesen Systems AB | NOK 184,822.65 | NOK - | No | No |
| 55 | Kapco Global Warranty and Repair Se | NOK 143,922.88 | NOK - | Yes | Yes |
| 56 | Kreditorforeningen Øst Sa | NOK 47.46 | NOK - | No | No |
| 57 | Lars Tjensvoll | NOK 150.00 | NOK - | No | No |
| 58 | Lindorff AS | NOK 78,141.44 | NOK - | No | No |
| 59 | Lowell Norge AS | NOK 9,500.09 | NOK - | No | No |
| 60 | Menon Economics AS | NOK 197,314.75 | NOK - | Yes | Yes |
| 61 | Menzies Aviation (Denmark) A/S | NOK 6,870,901.29 | NOK - | Yes | Yes |
| 62 | Menzies Aviation (USA) Inc. | NOK 1,000,457.99 | NOK - | Yes | Yes |
| 63 | Menzies Aviation Netherlands BV | NOK 229,459.93 | NOK - | Yes | Yes |
| 64 | Menzies Aviation Oslo AS | NOK 29,595,724.29 | NOK - | Yes | Yes |
| 65 | Morris Accent AS | NOK 615,223.00 | NOK - | Yes | Yes |
| 66 | NAS - INTERFACTURERING | NOK - | NOK - | No | No |
| 67 | Nationwide Hospitality Pty Ltd | NOK 206,795.58 | NOK - | Yes | Yes |
| 68 | NATS (En Route) plc, GBP | NOK 25,851.60 | NOK - | Yes | Yes |
| 69 | NATS (Services) Limited | NOK 56,579.13 | NOK - | Yes | Yes |
| 70 | Nets Branch Norway | NOK 2,093.29 | NOK - | Yes | Yes |
| 71 | NOKAS Aviation Security AS | NOK 1,338,215.00 | NOK - | Yes | Yes |

| 72 | Nordås Legekontor AS | NOK 35.00 | NOK - | No | No |
|----|----|----|----|----|----|
| 73 | Norwegian Air Resources Asia Pte | NOK 552,076.80 | NOK - | No | No |
| 74 | Olje-og EnergiSenteret AS | NOK 70,094.79 | NOK - | Yes | Yes |
| 75 | OSM Aviation Inc. | NOK 1,258,304.88 | NOK - | No | No |
| 76 | Østlandske Bedriftsservice AS | NOK 33,672.34 | NOK - | Yes | Yes |
| 77 | Park Inn by Radisson Oslo Airport | NOK 43,939.99 | NOK - | Yes | Yes |
| 78 | Park Inn Haugesund Airport | NOK 136,822.49 | NOK - | Yes | Yes |
| 79 | Proponent | NOK 716,337.24 | NOK - | Yes | Yes |
| 80 | Quality Airport Hotel Stavanger AS | NOK 644,040.00 | NOK - | Yes | Yes |
| 81 | Quality Hotel Waterfront | NOK 116,410.00 | NOK - | Yes | Yes |
| 82 | Radisson Blu Arlandia Hotel | NOK 736,719.07 | NOK - | Yes | Yes |
| 83 | Radisson Blu Scandinavia Hotel | NOK 1,940.00 | NOK - | Yes | Yes |
| 84 | REGISTERENHETEN I BRØNNØYSUND | NOK 2,221.00 | NOK - | Yes | Yes |
| 85 | Rizzo International AB | NOK 26,466.47 | NOK - | Yes | Yes |
| 86 | SAS Ground Handling Norway AS | NOK 507,157.50 | NOK - | Yes | Yes |
| 87 | Scandic Havet | NOK 360,470.00 | NOK - | No | No |
| 88 | Scandic Hotels AB | NOK 45,399.41 | NOK - | Yes | Yes |
| 89 | Scandic Seilet | NOK 146,880.00 | NOK - | No | No |
| 90 | Scandic Stavanger Airport | NOK 15,260.00 | NOK - | No | No |
| 91 | Scandinavian Airlines System Denmar | NOK 507,157.50 | NOK - | Yes | Yes |
| 92 | Scandinavian House AS | NOK 644,125.00 | NOK - | Yes | Yes |
| 93 | SKAT Centralregistret for motorkør. | NOK 19,770.66 | NOK - | No | No |
| 94 | Skattecenter København | NOK 16,113.51 | NOK - | No | No |
| 95 | Sparebank 1 Factoring AS | NOK 50,252.69 | NOK - | Yes | Yes |
| 96 | SSP Scandinavian Service Partner AB | NOK 212,155.71 | NOK - | Yes | Yes |

| 97 | Stephenson Harwood | NOK 379,530.31 | NOK - | Yes | Yes |
|----|--------------------|----------------|--------|-----|-----|
| 98 | Sure Hotel by Best Western | NOK 491,256.38 | NOK - | Yes | Yes |
| 99 | Svalbard Lufthavn AS | NOK 869,104.00 | NOK - | Yes | Yes |
| 100 | Sverigeråd i Umeå AB | NOK 36,152.14 | NOK - | Yes | Yes |
| 101 | Swedavia AB | NOK 46,094,380.20 | NOK - | Yes | Yes |
| 102 | Swedavia Airport Telecom AB | NOK 633,478.11 | NOK - | Yes | Yes |
| 103 | Swedish Transport Agency | NOK 998.60 | NOK - | No | No |
| 104 | T.A.QN. ANS | NOK 2,502.00 | NOK - | No | No |
| 105 | TAB Transportsentralen Asker og Bær | NOK 10,750.96 | NOK - | Yes | Yes |
| 106 | TCR Denmark ApS | NOK 6,739.89 | NOK - | Yes | Yes |
| 107 | TCR Sweden AB | NOK 68,405.89 | NOK - | Yes | Yes |
| 108 | Tine SA | NOK 15,719.44 | NOK - | Yes | Yes |
| 109 | Torben Mertz | NOK 6,857.00 | NOK - | No | No |
| 110 | Transportstyrelsen | NOK 18,478,279.65 | NOK - | Yes | Yes |
| 111 | Travelliance Global Ltd (GBP) | NOK 175,366.01 | NOK - | Yes | Yes |
| 112 | UAB Baltic Ground Services | NOK 256,123.10 | NOK - | Yes | Yes |
| 113 | UAB Ground Handling Palanga | NOK 256,123.10 | NOK - | Yes | Yes |
| 114 | Unical Aviation, INC | NOK 145,733.76 | NOK - | No | No |
| 115 | Venue Retail Group AB (Rizzo Group AB) | NOK 841,844.49 | NOK - | Yes | Yes |
| 116 | Verifone Norway AS | NOK 175.00 | NOK - | No | No |
| 117 | Vero Skatt, Skatteförvaltningen | NOK 4,663,969.41 | NOK - | No | No |
| 118 | Vidda AS, v/ Thon Hotel Ålesund | NOK 75,174.03 | NOK - | Yes | Yes |
| 119 | Waterlogic Norge AS | NOK 83.40 | NOK - | No | No |
| 120 | Welcome Airport Services Sp.z.o.EUR | NOK 1,047,273.30 | NOK - | Yes | Yes |
| 121 | Welcome Airport Services Sp.z.o.PLN | NOK 8,945.31 | NOK - | Yes | Yes |

| 122 | Wesco Aircraft Hardware Corp. | NOK 722.04 | NOK - | No | No |
|---|---|---|---|---|---|
| 123 | Airports of Montenegro | NOK - | NOK - | No | No |
| 124 | 02-Hotel Axor Barajas 4* | NOK 1,355,452.49 | NOK - | Yes | Yes |
| 125 | 15below Limited | NOK 102,615.13 | NOK - | Yes | Yes |
| 126 | 7N Norge AS | NOK 2,672,990.63 | NOK - | Yes | Yes |
| 127 | A til B AS | NOK 276,738.03 | NOK - | Yes | Yes |
| 128 | A.J. Walter Aviation Ltd. | NOK 2,602.95 | NOK - | No | No |
| 129 | A/S N.P. Trucks | NOK 2,287.66 | NOK - | Yes | Yes |
| 130 | A3 Företag AB | NOK 12,867.73 | NOK - | No | No |
| 131 | Aagaard Engros AS | NOK 34,515.88 | NOK - | No | No |
| 132 | Aalborg Airport Hotel | NOK 725,811.45 | NOK - | Yes | Yes |
| 133 | Aalborg Lufthavn a.m.b.a. | NOK 3,016,387.83 | NOK - | Yes | Yes |
| 134 | AC Bella Sky Hotel Copenhagen A/S | NOK 568,258.13 | NOK - | Yes | Yes |
| 135 | AC Hotel Miami Aventura | NOK 644,330.45 | NOK - | Yes | Yes |
| 136 | ACAVE | NOK 23,422.09 | NOK - | No | No |
| 137 | Actair | NOK 5,063.43 | NOK - | No | No |
| 138 | AddSecure AS | NOK 11,885.00 | NOK - | No | No |
| 139 | Adest GmbH | NOK 6,852.68 | NOK - | No | No |
| 140 | Aditro Enterprise AS | NOK 91,014.94 | NOK - | Yes | Yes |
| 141 | Admincontrol AS | NOK 10,082.24 | NOK - | No | No |
| 142 | ADR Tel S.p.A. | NOK 197,142.91 | NOK - | No | No |
| 143 | Adra Software AS | NOK 189,197.61 | NOK - | Yes | Yes |
| 144 | Advantage Turbine Services | NOK 1,156.17 | NOK - | No | No |
| 145 | Advenio AS | NOK 207,625.00 | NOK - | Yes | Yes |
| 146 | Advokat Edvard Brække | NOK 63,956.25 | NOK - | No | No |

| 147 | Advokatfirmaet BAHR AS | NOK 1,672,021.96 | NOK - | No | No |
|-----|------------------------|------------------|--------|-----|-----|
| 148 | Advokatfirmaet Poul Schmith | NOK 85,378.52 | NOK - | No | No |
| 149 | Advokatfirmaet Simonsen Vogt Wiig | NOK 181,081.00 | NOK - | Yes | Yes |
| 150 | Advokatfirmaet Wiersholm AS | NOK 766,830.14 | NOK - | Yes | Yes |
| 151 | Aena S.M.E.  S.A. | NOK 1,874,717.63 | NOK - | Yes | Yes |
| 152 | Aerodrom Nikola Tesla Beograd | NOK 79,921.50 | NOK - | Yes | Yes |
| 153 | Aerodynamics | NOK 3,458,620.17 | NOK - | Yes | Yes |
| 154 | Aeroforge Inc. | NOK 26,986.25 | NOK - | Yes | Yes |
| 155 | Aeroport de Bordeaux | NOK 45,427.36 | NOK - | No | No |
| 156 | Aeroport International De Bastia-Po | NOK 27,034.97 | NOK - | No | No |
| 157 | Aeroport International de Geneve | NOK 2,234,563.48 | NOK - | Yes | Yes |
| 158 | Aeroporti di Roma S.p.A. | NOK 111,951.78 | NOK - | No | No |
| 159 | Aéroports de Lyon | NOK 294,184.39 | NOK - | Yes | Yes |
| 160 | Aeroports de Paris | NOK 13,798,898.25 | NOK - | Yes | Yes |
| 161 | Aerospace Support Associates LTD | NOK 1,389.93 | NOK - | No | No |
| 162 | Aerospheres (UK) Ltd. | NOK 470,296.24 | NOK - | Yes | Yes |
| 163 | Aerotech | NOK 185,084.01 | NOK - | Yes | Yes |
| 164 | Aerotron Ltd (velg riktig bankkto) | NOK 531,091.29 | NOK - | Yes | Yes |
| 165 | Aeroxchange Ltd. | NOK 125,950.85 | NOK - | No | No |
| 166 | AFS Aviation Fuel Services | NOK - | NOK - | No | No |
| 167 | Agder Taxi AS | NOK 25,578.67 | NOK - | No | No |
| 168 | AGO Security and Service, Inc. | NOK 86,151.47 | NOK - | No | No |
| 169 | AgriKjøp AS | NOK 263,555.00 | NOK - | Yes | Yes |
| 170 | AHS Hamburg Aviation Handl Services | NOK 27,896.28 | NOK - | No | No |
| 171 | Air France (FR) | NOK 2,447,462.71 | NOK - | Yes | Yes |

| 172 | Air General Inc. | NOK 456,906.55 | NOK - | Yes | Yes |
|-----|------------------|----------------|-------|-----|-----|
| 173 | Air Liquide Danmark A/S | NOK 66,372.78 | NOK - | No | No |
| 174 | Air Liquide Gas AB | NOK 39,599.54 | NOK - | No | No |
| 175 | Air Navigation Services (only EUR) | NOK 350,698.79 | NOK - | Yes | Yes |
| 176 | AirCashBack Poland Sp. z.o.o. | NOK 5,355.75 | NOK - | Yes | Yes |
| 177 | Airhoster Alguaire Lleida Airport | NOK 867,655.07 | NOK - | Yes | Yes |
| 178 | Airinmar | NOK 41,236.88 | NOK - | Yes | Yes |
| 179 | Airline Tariff Publishing Company | NOK 392,076.11 | NOK - | Yes | Yes |
| 180 | AIRMAGINE | NOK 282,747.27 | NOK - | Yes | Yes |
| 181 | Airport Cafe AS | NOK 24,744.01 | NOK - | No | No |
| 182 | Airport Facilities Co.Ltd. | NOK 137,731.68 | NOK - | Yes | Yes |
| 183 | Airport Maintenance CO. | NOK 3,610.20 | NOK - | No | No |
| 184 | Airport Service Budapest Zrt | NOK 3,124.54 | NOK - | No | No |
| 185 | Airport Services, Airline Transport | NOK 14,804.15 | NOK - | No | No |
| 186 | Airports of Thailand Public CoLtd. | NOK 1,782,713.79 | NOK - | Yes | Yes |
| 187 | AirRefund SA | NOK 19,280.70 | NOK - | No | No |
| 188 | Airsafe Sweden AB | NOK 92,525.19 | NOK - | No | No |
| 189 | Airside Assist ApS | NOK 102,127.19 | NOK - | No | No |
| 190 | AKA Transport AS | NOK 51,673.00 | NOK - | Yes | Yes |
| 191 | Alektum AS | NOK 275.72 | NOK - | No | No |
| 192 | Ålesund Turvogn Service AS | NOK 46,502.00 | NOK - | Yes | Yes |
| 193 | Alfa Solution AS | NOK 521,514.84 | NOK - | Yes | Yes |
| 194 | ALHA Airport FCO S.p.A. | NOK 746,189.87 | NOK - | No | No |
| 195 | Alha Airport MXP S.p.A. | NOK 41,509.63 | NOK - | No | No |
| 196 | All The Way AS | NOK 1,250.00 | NOK - | Yes | Yes |

| 197 | Alliance Ground International | NOK 2,108,681.54 | NOK - | Yes | Yes |
|-----|------------------------------|-------------------|-------|-----|-----|
| 198 | Allied Universal Security Services | NOK 374,407.16 | NOK - | No | No |
| 199 | All-In Facility Services B.V. | NOK 1,372.68 | NOK - | No | No |
| 200 | Allt för kontor i Väsby AB | NOK 15,747.73 | NOK - | Yes | Yes |
| 201 | Alpha Delivery Service Inc. | NOK 12,202.48 | NOK - | No | No |
| 202 | Alta Taxi AS | NOK 67,825.00 | NOK - | No | No |
| 203 | Alyzia | NOK 1,052,943.45 | NOK - | Yes | Yes |
| 204 | Amadeus IT Group SA | NOK 7,666,541.90 | NOK - | Yes | Yes |
| 205 | Amazon Web Services EMEA SARL | NOK 48,480.29 | NOK - | No | No |
| 206 | Anfo annonsørforeningen | NOK 63,125.00 | NOK - | Yes | Yes |
| 207 | Annerledes Brød & Sirkus AS | NOK 5,130.81 | NOK - | Yes | Yes |
| 208 | Annerledes Personalrestauranter AS | NOK 234,603.27 | NOK - | Yes | Yes |
| 209 | ANSETT AIRCRAFT SPARES&SERVICE | NOK 40,586.86 | NOK - | No | No |
| 210 | APCOA Parking Danmark A/S | NOK 943.36 | NOK - | No | No |
| 211 | APCOA PARKING Norway AS | NOK 73,592.95 | NOK - | Yes | Yes |
| 212 | APM Transportation Inc | NOK 34,107.36 | NOK - | No | No |
| 213 | Apotek 1 Gruppen AS | NOK 199,671.27 | NOK - | Yes | Yes |
| 214 | Arctic Trucks Norge AS | NOK 127.78 | NOK - | No | No |
| 215 | Ariport Dimensions | NOK 124,551.90 | NOK - | Yes | Yes |
| 216 | Arlanda Hotellby | NOK 14,976.86 | NOK - | No | No |
| 217 | Arnestad Storkjøkken AS | NOK 8,008.00 | NOK - | No | No |
| 218 | Arntzen de Besche | NOK 63,750.00 | NOK - | Yes | Yes |
| 219 | Arthur J Gallagher (UK) Ltd | NOK 15,212,272.66 | NOK - | No | No |
| 220 | ASD Aerospace Software Developments | NOK 135,982.92 | NOK - | No | No |
| 221 | Asecna | NOK 4,672,840.46 | NOK - | Yes | Yes |

| 222 | Ased Jaferi Butikkdrift | NOK 13,732.00 | NOK - | Yes | Yes |
|-----|------------------------|---------------|-------|-----|-----|
| 223 | Åsensenteret Bilverksted AS | NOK 13,989.00 | NOK - | Yes | Yes |
| 224 | Asker & Bærum Skiltverksted | NOK 7,993.00 | NOK - | Yes | Yes |
| 225 | Asker og Bærum Brannvesen | NOK 5,440.00 | NOK - | Yes | Yes |
| 226 | Asplunds Väskservice | NOK 19,717.44 | NOK - | No | No |
| 227 | Astronics Advanced Electronics Syst | NOK 419,581.96 | NOK - | Yes | Yes |
| 228 | Atea AS | NOK 1,007.50 | NOK - | Yes | Yes |
| 229 | Athens AeroServices S.A. | NOK 4,713.06 | NOK - | Yes | Yes |
| 230 | Aton Oy | NOK 22,006.13 | NOK - | Yes | Yes |
| 231 | ATPL Consultant (Kirk Laursen) | NOK 44,988.30 | NOK - | Yes | Yes |
| 232 | Augusta Abogados, S.L.P. | NOK 409,393.53 | NOK - | Yes | Yes |
| 233 | Austin Bergstrom Transfer, LLC | NOK 1,651.67 | NOK - | No | No |
| 234 | Austro Control GmbH | NOK 420,027.37 | NOK - | No | No |
| 235 | Auxitrol S.A.S | NOK 40,163.48 | NOK - | No | No |
| 236 | AVIALL | NOK 590,960.77 | NOK - | No | No |
| 237 | Aviapartner Handling S.p.A. | NOK 9,972.83 | NOK - | No | No |
| 238 | Aviation Fuelling Services Norway A | NOK 183,270.92 | NOK - | No | No |
| 239 | Aviation iSolutions AB | NOK 28,652.17 | NOK - | No | No |
| 240 | Aviation Parts and Tools ApS | NOK 1,949.49 | NOK - | No | No |
| 241 | Aviation Port Services LLC | NOK 685,578.42 | NOK - | No | No |
| 242 | Aviation Services S.p.A | NOK 3,712,866.51 | NOK - | Yes | Yes |
| 243 | Aviation Support SA DE CV | NOK 24,453.24 | NOK - | No | No |
| 244 | Aviator Airport Alliance AS | NOK 10,920,935.64 | NOK - | Yes | Yes |
| 245 | Aviator Airport Services Sweden AB | NOK 3,048,517.30 | NOK - | Yes | Yes |
| 246 | AvioAssist doo I. Sarajevo | NOK 29,629.72 | NOK - | No | No |

| 247 | AvioSign BV | NOK 1,151.49 | NOK - | No | No |
|---|---|---|---|---|---|
| 248 | Aviosupport Inc | NOK 77,808.84 | NOK - | Yes | Yes |
| 249 | AvJet Routing FZC | NOK 3,261,896.50 | NOK - | Yes | Yes |
| 250 | Avtech Sweden AB | NOK 108,423.33 | NOK - | Yes | Yes |
| 251 | Avtrade | NOK 64,270.39 | NOK - | Yes | Yes |
| 252 | B/E Aerospace Inc | NOK 359,193.78 | NOK - | Yes | Yes |
| 253 | B/E Aerospace Netherlands | NOK 1,150,789.79 | NOK - | Yes | Yes |
| 254 | BABYSHOP AS | NOK 8,485.00 | NOK - | Yes | Yes |
| 255 | Bach advokater | NOK 99,059.95 | NOK - | Yes | Yes |
| 256 | BAE Systems (Operations) Ltd | NOK 27,049.42 | NOK - | No | No |
| 257 | BÆRUM BLOMSTERDESIGN AS | NOK 485.00 | NOK - | No | No |
| 258 | Baggage Airline Guest Services | NOK 35,049.09 | NOK - | No | No |
| 259 | Bagport Sweden AB | NOK 53,488.80 | NOK - | No | No |
| 260 | BAHS Kapital AS | NOK 2,533,070.27 | NOK - | Yes | Yes |
| 261 | Baines Simmons Ltd | NOK 93,658.35 | NOK - | Yes | Yes |
| 262 | Ballonger & Sånt AB | NOK 12,931.70 | NOK - | Yes | Yes |
| 263 | Bank of America | NOK 113,909,021.37 | NOK - | Yes | Yes |
| 264 | Barents Buss AS | NOK 5,300.00 | NOK - | No | No |
| 265 | Barnas Hus Norge AS | NOK 16,007.00 | NOK - | Yes | Yes |
| 266 | Bekk Consulting AS | NOK 325,750.00 | NOK - | Yes | Yes |
| 267 | BELGRADE AIRPORT d.o.o. Beograd (EU | NOK 44,440.30 | NOK - | Yes | Yes |
| 268 | Belgraver Aircraft Interiors | NOK 1,792,991.56 | NOK - | Yes | Yes |
| 269 | Berg-Hansen Reisebureau AS | NOK 113,038.80 | NOK - | Yes | Yes |
| 270 | Best Western Plus Airport Hotel CPH | NOK 346,551.06 | NOK - | No | No |
| 271 | Best Western Solhem Hotel | NOK 14,540.56 | NOK - | No | No |

| 272 | Bex LLC | NOK 227,552.53 | NOK - | No | No |
|-----|---------|----------------|-------|-----|-----|
| 273 | Bhansa | NOK 270,986.81 | NOK - | No | No |
| 274 | Bilextra (Røn-Rek AS) | NOK 4,234.00 | NOK - | Yes | Yes |
| 275 | Billund Lufthavn A/S | NOK 122,158.77 | NOK - | Yes | Yes |
| 276 | Biltema Norge AS | NOK 29,781.97 | NOK - | Yes | Yes |
| 277 | Birmingham Airport | NOK 566,946.46 | NOK - | No | No |
| 278 | Bisnode D&B Norway AS | NOK 92.50 | NOK - | No | No |
| 279 | Bisnode Norge AS | NOK 38,811.25 | NOK - | No | No |
| 280 | BIT AS | NOK 1,370.12 | NOK - | No | No |
| 281 | Bjørg AS | NOK 3,678.00 | NOK - | No | No |
| 282 | Blake Emergency Services/Airline Tr | NOK 16,779.28 | NOK - | Yes | Yes |
| 283 | Blåkläder AS | NOK 38,258.00 | NOK - | Yes | Yes |
| 284 | Blomsterstua | NOK 1,315.00 | NOK - | No | No |
| 285 | Blue Business Solutions Ltd. | NOK 95,552.07 | NOK - | Yes | Yes |
| 286 | BNP Paribas Leasing Solutions AS | NOK 131,526.00 | NOK - | No | No |
| 287 | BNS Container AS | NOK 3,050.00 | NOK - | Yes | Yes |
| 288 | Boomerang Kurérservice Aps | NOK 21,761.06 | NOK - | Yes | Yes |
| 289 | Boston Consulting Group AB | NOK 62,879,054.34 | NOK - | Yes | Yes |
| 290 | Braathens Technical AB | NOK 425,938.66 | NOK - | No | No |
| 291 | Bring Courier & Express AB | NOK 30,490.08 | NOK - | Yes | Yes |
| 292 | British Airways Plc | NOK 485,160.90 | NOK - | No | No |
| 293 | Brødrene Hedegaard A/S | NOK 53,762.50 | NOK - | Yes | Yes |
| 294 | Brokair Consulting | NOK 28,393.72 | NOK - | Yes | Yes |
| 295 | Broward County Aviation Dep. Fort L | NOK 3,134,377.45 | NOK - | No | No |
| 296 | Brown Aviation Tool Supply Co. | NOK 3,207.21 | NOK - | No | No |

| 297 | Brubakken AS | NOK 10,621.63 | NOK - | Yes | Yes |
|-----|--------------|---------------|-------|-----|-----|
| 298 | Burbank Security Services INC | NOK 237,061.26 | NOK - | No | No |
| 299 | Business Intelligence Consulting Se | NOK 13,580.74 | NOK - | Yes | Yes |
| 300 | Bussring AS | NOK 152,454.26 | NOK - | No | No |
| 301 | Butikk Vu Wergeland AS | NOK 366.00 | NOK - | No | No |
| 302 | Butikkdrift Hashani AS | NOK 3,554.00 | NOK - | Yes | Yes |
| 303 | Butikkdrift Martin Persson | NOK 4,177.49 | NOK - | Yes | Yes |
| 304 | Butterworths Solicitors | NOK 26,367.44 | NOK - | Yes | Yes |
| 305 | BW Consulting | NOK 775,998.60 | NOK - | Yes | Yes |
| 306 | ByTaxi AS | NOK 1,832.95 | NOK - | Yes | Yes |
| 307 | C.A. Shea & Company, Inc. | NOK 455,750.75 | NOK - | No | No |
| 308 | CAE Centre Copenhagen A/S | NOK 1,028,625.35 | NOK - | No | No |
| 309 | CAE Services Italia S.r.l | NOK 18,209.55 | NOK - | No | No |
| 310 | CAE Servicios Globales de Instrucci | NOK 1,861,544.09 | NOK - | No | No |
| 311 | CAE Training & Services UK Ltd | NOK 366,172.63 | NOK - | No | No |
| 312 | Callidus Software INC | NOK 18,926.47 | NOK - | Yes | Yes |
| 313 | Canon España S.A.U. | NOK 112,607.43 | NOK - | Yes | Yes |
| 314 | Canon France SAS | NOK 3,365.77 | NOK - | No | No |
| 315 | Canon Hungaria Kft. | NOK 5,369.67 | NOK - | No | No |
| 316 | Canon Norge AS | NOK 44,094.65 | NOK - | Yes | Yes |
| 317 | Canon Oy | NOK 539.32 | NOK - | No | No |
| 318 | Canon Solution Italia | NOK 5,001.84 | NOK - | No | No |
| 319 | Canon Svenska AB | NOK 16,752.24 | NOK - | No | No |
| 320 | Canon UK Ltd | NOK 11,011.85 | NOK - | Yes | Yes |
| 321 | Cap Gemini | NOK 612,342.50 | NOK - | No | No |

| 322 | Capio Närsjukvård AB | NOK 0.00 | NOK - | No | No |
|-----|----------------------|----------|-------|----|----|
| 323 | Capitum AB | NOK 34,915.22 | NOK - | No | No |
| 324 | Capman OYJ | NOK 9,791.60 | NOK - | No | No |
| 325 | Carl Evensen Eftf AS | NOK 116,219.78 | NOK - | Yes | Yes |
| 326 | CCRA | NOK 54,369.61 | NOK - | Yes | Yes |
| 327 | CCS Maintenance APS | NOK 110,891.87 | NOK - | No | No |
| 328 | Celebi Ground Handling Ltd | NOK 4,928.15 | NOK - | Yes | Yes |
| 329 | Central Collection Unit | NOK 1,484,846.43 | NOK - | No | No |
| 330 | Chambers Almelöv Hjelmqvist | NOK 658,542.60 | NOK - | Yes | Yes |
| 331 | Chambre de Commerce - Ajaccio | NOK 266,154.21 | NOK - | No | No |
| 332 | CHOOOSE AS | NOK 71,684.15 | NOK - | No | No |
| 333 | Christian Nielsen Clientaccount | NOK 336,674.00 | NOK - | No | No |
| 334 | Chronos AS | NOK 75,000.00 | NOK - | Yes | Yes |
| 335 | Cision US Inc. | NOK 227,935.84 | NOK - | Yes | Yes |
| 336 | Citybag | NOK 17,654.75 | NOK - | No | No |
| 337 | Civil Aviation Authority - Finance | NOK 59,446.59 | NOK - | Yes | Yes |
| 338 | Civil Aviation Directorate | NOK 20,385.70 | NOK - | Yes | Yes |
| 339 | Clarion Hotel & Congress OSL | NOK 146,355.72 | NOK - | Yes | Yes |
| 340 | Clarion Hotel Arlanda Airport | NOK 102,389.10 | NOK - | No | No |
| 341 | Clarion Hotel Copenhagen Airport (Nordic Choice Hotels) | NOK 493,900.00 | NOK - | Yes | Yes |
| 342 | Clarksons Platou Securities AS | NOK 22,547.21 | NOK - | Yes | Yes |
| 343 | Close Air Support Ltd. | NOK 187,120.37 | NOK - | Yes | Yes |
| 344 | Cloudflare Inc | NOK 796,049.10 | NOK - | Yes | Yes |
| 345 | CMS Grau | NOK 48,946.19 | NOK - | No | No |
| 346 | CO PLUS AS | NOK 1,606,725.00 | NOK - | Yes | Yes |

| 347 | Coffee Center AB | NOK 31,662.22 | NOK - | Yes | Yes |
|-----|------------------|---------------|-------|-----|-----|
| 348 | Colitel | NOK 36,174.98 | NOK - | Yes | Yes |
| 349 | Collectia Kredithanterarna AB | NOK 1,721.08 | NOK - | No | No |
| 350 | Collector Bank AB | NOK 62.93 | NOK - | No | No |
| 351 | Colligent Inkasso AB | NOK 1,039.04 | NOK - | No | No |
| 352 | Colligent Norge AS | NOK 13,495.63 | NOK - | No | No |
| 353 | Comarch S.A. | NOK 2,102,877.40 | NOK - | Yes | Yes |
| 354 | Comfort Hotel Arlanda Airport | NOK 515,380.32 | NOK - | No | No |
| 355 | Comfort Hotel Bergen Airport | NOK 165,630.00 | NOK - | No | No |
| 356 | Conocilio & Co | NOK 179,447.80 | NOK - | No | No |
| 357 | Coop Nordland SA | NOK 921.00 | NOK - | No | No |
| 358 | Coor Service Management A/S | NOK 118,349.45 | NOK - | Yes | Yes |
| 359 | Coor Service Management AS | NOK 1,653,077.97 | NOK - | Yes | Yes |
| 360 | Copenhagen Airports A/S | NOK 6,984,234.98 | NOK - | Yes | Yes |
| 361 | Copthorne Hotel London Gatwick | NOK 329,615.65 | NOK - | No | No |
| 362 | Courtyard by Marriott Austin Airport | NOK 192,865.73 | NOK - | Yes | Yes |
| 363 | Crawley Borough Council | NOK 306,551.21 | NOK - | No | No |
| 364 | Crayon AS | NOK 184,309.69 | NOK - | Yes | Yes |
| 365 | Creditreform Pinneberg Wall KG | NOK 28,272.58 | NOK - | No | No |
| 366 | Croatian Civil Aviation Agency(EUR) | NOK 74,914.62 | NOK - | No | No |
| 367 | Cross Application Consulting AS | NOK 2,309,200.01 | NOK - | Yes | Yes |
| 368 | CrossConsense GmbH & Co KG | NOK 20,084.06 | NOK - | Yes | Yes |
| 369 | Crowne Plaza Paris-Charles de Gaull | NOK 716,281.43 | NOK - | No | No |
| 370 | CSC Digital Brand Services AS | NOK 529.38 | NOK - | No | No |
| 371 | CSI Aerospace, Inc. | NOK 298,518.41 | NOK - | Yes | Yes |

| 372 | CSI Business Consulting Cvba | NOK 524,863.50 | NOK - | Yes | Yes |
|-----|------------------------------|----------------|-------|-----|-----|
| 373 | CT Corporation, NY Customer Service | NOK 17,083.92 | NOK - | No | No |
| 374 | CTRIP Air Ticketing UK | NOK 28,764.48 | NOK - | No | No |
| 375 | CTSN Consultants on targeted Securi | NOK 227,269.75 | NOK - | Yes | Yes |
| 376 | Dagens Næringsliv | NOK 805.47 | NOK - | No | No |
| 377 | Dangerous Goods Management Oslo AS | NOK 65,825.00 | NOK - | No | No |
| 378 | Danish Aircraft Wash ApS | NOK 77,558.33 | NOK - | No | No |
| 379 | Dasi LLC | NOK 25,280.15 | NOK - | No | No |
| 380 | Datarekvisita Norge as | NOK 110,300.00 | NOK - | No | No |
| 381 | Datek Installasjon AS | NOK 18,025.00 | NOK - | No | No |
| 382 | DEFA AS Cloudcharge | NOK 115.21 | NOK - | No | No |
| 383 | DekkTeam AS | NOK 17,958.55 | NOK - | Yes | Yes |
| 384 | Demand Norge AS | NOK 287.75 | NOK - | No | No |
| 385 | Den Norske Advokatforening | NOK 946.00 | NOK - | No | No |
| 386 | Den Norske Dataforening Østlandet | NOK 1,700.00 | NOK - | No | No |
| 387 | Dentsu Aegis Network Ireland | NOK - | NOK - | No | No |
| 388 | Dentsu Aegis Network Ireland (Dentsu Danmark A/S) | NOK - | NOK - | No | No |
| 389 | Denver International Airport | NOK 3,302,440.92 | NOK - | No | No |
| 390 | DFS Deutsche Flugsicherung GmbH | NOK 270,686.03 | NOK - | No | No |
| 391 | DHL Express (Norway) AS | NOK 28,098.19 | NOK - | Yes | Yes |
| 392 | DHL Global Forwarding (Norway) AS | NOK 428.46 | NOK - | Yes | Yes |
| 393 | DIBkunnskap AS | NOK 91,090.00 | NOK - | Yes | Yes |
| 394 | Direct Maintenance | NOK 722,185.40 | NOK - | Yes | Yes |
| 395 | Direction générale de l´Aviation ci (Agence comptable de l'aviation) | NOK 13,485,853.48 | NOK - | Yes | Yes |
| 396 | Direction Générale Des Finances Pub | NOK 2,784,990.00 | NOK - | No | No |

73

| 397 | Discover America Denmark | NOK 14,170.04 | NOK - | No | No |
|-----|--------------------------|---------------|-------|----|----|
| 398 | Discover America Sweden | NOK 13,718.76 | NOK - | No | No |
| 399 | Discover Momentum, LLC | NOK 335,184.69 | NOK - | Yes | Yes |
| 400 | dnata | NOK 360,656.48 | NOK - | Yes | Yes |
| 401 | DNB Finans | NOK 49,548.59 | NOK - | No | No |
| 402 | DNC Travel Hospitality Svcs | NOK 47,542.90 | NOK - | No | No |
| 403 | DocuSign, Inc. | NOK 59,345.99 | NOK - | Yes | Yes |
| 404 | Doubletree by Hilton Seattle Airport | NOK 407,932.83 | NOK - | Yes | Yes |
| 405 | DSV Air & Sea | NOK - | NOK - | No | No |
| 406 | DSV Air & Sea A/S (DKK) | NOK 812.19 | NOK - | No | No |
| 407 | DSV Air & Sea AS (EUR/USD) | NOK 7,858.68 | NOK - | No | No |
| 408 | DSV Air & Sea AS (GBP,HUF,NOK,SEK) | NOK 5,909,568.16 | NOK - | Yes | Yes |
| 409 | DSV Road AS | NOK 2,340.97 | NOK - | No | No |
| 410 | DTI Software Inc | NOK 292,426.20 | NOK - | No | No |
| 411 | DUBAI AIRPORTS | NOK 409,017.64 | NOK - | Yes | Yes |
| 412 | Due Hospitality | NOK 334,648.56 | NOK - | Yes | Yes |
| 413 | Dustin Norway AS | NOK 60,363.83 | NOK - | No | No |
| 414 | Dvergsdal Consulting AS | NOK 22,331.00 | NOK - | No | No |
| 415 | Dyers (London) Ltd | NOK 172,846.00 | NOK - | Yes | Yes |
| 416 | E.N.N.A. | NOK 1,597.73 | NOK - | No | No |
| 417 | EarthLink Business | NOK 55,938.06 | NOK - | No | No |
| 418 | Easyjet Airline Company Ltd | NOK 2,876.45 | NOK - | No | No |
| 419 | EcoOnline AS | NOK 34,313.00 | NOK - | Yes | Yes |
| 420 | Edinburgh Airport Limited | NOK 28,060.83 | NOK - | Yes | Yes |
| 421 | Edströmska Skolan M | NOK 232,414.08 | NOK - | No | No |

| 422 | Efficient Outcomes legal societa a | NOK 312,097.12 | NOK - | Yes | Yes |
|-----|-----------------------------------|----------------|-------|-----|-----|
| 423 | Egon Zehnder AS | NOK 3,386,721.90 | NOK - | Yes | Yes |
| 424 | Egyptair Maitenance & Engineering | NOK 18,051.00 | NOK - | No | No |
| 425 | Eides Flyfag | NOK 16,400.00 | NOK - | Yes | Yes |
| 426 | ELAL Israel Airlines Ltd | NOK 32,897.95 | NOK - | No | No |
| 427 | Elcon Leasing | NOK 14,151.53 | NOK - | No | No |
| 428 | Element Metech A/S | NOK 111,203.20 | NOK - | Yes | Yes |
| 429 | Element Metech AB | NOK 81,412.05 | NOK - | No | No |
| 430 | Elite Service Partner AS | NOK 26,842.51 | NOK - | No | No |
| 431 | Elvia AS | NOK 98,147.20 | NOK - | No | No |
| 432 | Emirates Group Headquarter | NOK 171,628.73 | NOK - | Yes | Yes |
| 433 | EmpowerMX | NOK 103,225.28 | NOK - | No | No |
| 434 | Enplore AB | NOK 115,000.00 | NOK - | No | No |
| 435 | Entelios AS | NOK 54,947.36 | NOK - | Yes | Yes |
| 436 | Entrillo AS | NOK 790,155.22 | NOK - | Yes | Yes |
| 437 | Epinova AS | NOK 32,223.75 | NOK - | Yes | Yes |
| 438 | Equatex Norway AS | NOK 145,801.26 | NOK - | Yes | Yes |
| 439 | Ernst & Young Advokatfirma AS | NOK 5,081,276.50 | NOK - | Yes | Yes |
| 440 | Ernst & Young AS | NOK 536,591.25 | NOK - | No | No |
| 441 | Ernst & Young Business Advisors | NOK 1,703,927.47 | NOK - | Yes | Yes |
| 442 | ES Health Care | NOK 10,062.50 | NOK - | No | No |
| 443 | Esacon AS | NOK 448,945.63 | NOK - | No | No |
| 444 | Estonian Air Navigation Services | NOK 171,698.38 | NOK - | Yes | Yes |
| 445 | Etihad Airways Engineering L.L.C. | NOK 157,088.83 | NOK - | No | No |
| 446 | Euro Cargo Aviation ApS | NOK 205,747.95 | NOK - | Yes | Yes |

75

| 447 | Eurocontrol Canary Islands | NOK - | NOK - | No | No |
|-----|----------------------------|-------|-------|-----|-----|
| 448 | Eurocontrol Morocco | NOK - | NOK - | No | No |
| 449 | Eurocontrol Spain | NOK - | NOK - | No | No |
| 450 | Eurofacts Oy | NOK 85,692.00 | NOK - | Yes | Yes |
| 451 | Europeiske Reiseforsikring | NOK 13,621.91 | NOK - | No | No |
| 452 | Eversheds | NOK 46,595.03 | NOK - | Yes | Yes |
| 453 | Expedia Group | NOK 412,943.88 | NOK - | Yes | Yes |
| 454 | EY ACS Limited | NOK 53,943.60 | NOK - | Yes | Yes |
| 455 | Federal Ministry of Finance | NOK 712,628.38 | NOK - | No | No |
| 456 | Fekco AS | NOK 3,905.00 | NOK - | No | No |
| 457 | Ferde AS | NOK 1,197.60 | NOK - | No | No |
| 458 | Finexa Norge AS | NOK 760.14 | NOK - | No | No |
| 459 | Finnair Technical Services Ltd | NOK 668,397.60 | NOK - | Yes | Yes |
| 460 | First House AS | NOK 365,625.00 | NOK - | Yes | Yes |
| 461 | FIS AvantGard LLC | NOK 558,864.37 | NOK - | No | No |
| 462 | Fitch Ratings Ltd.-London | NOK 856,920.00 | NOK - | Yes | Yes |
| 463 | Fjellinjen AS | NOK 188.00 | NOK - | Yes | Yes |
| 464 | FL Technics | NOK 602,224.63 | NOK - | Yes | Yes |
| 465 | Flight Data Services Limited GBP (L3 Harris Technologies) | NOK 289,297.56 | NOK - | Yes | Yes |
| 466 | FlightDeck Software AB | NOK 226,344.71 | NOK - | Yes | Yes |
| 467 | Flightright GmbH | NOK 867,774.00 | NOK - | Yes | Yes |
| 468 | Flughafen Berlin Brandenburg GmbH | NOK 1,613,783.24 | NOK - | No | No |
| 469 | Flydocs -Gen2 Systems Ltd | NOK 7,133,859.00 | NOK - | Yes | Yes |
| 470 | Flyforsinkelse.dk | NOK 182,069.49 | NOK - | No | No |
| 471 | Flyhjælp APS | NOK 568,724.74 | NOK - | No | No |

| 472 | Flyvemedicin CPH | NOK 8,406.25 | NOK - | No | No |
|-----|------------------|--------------|-------|----|----|
| 473 | Focus Security AS | NOK 19,047.50 | NOK - | No | No |
| 474 | Food Republic AS | NOK 42,900.00 | NOK - | Yes | Yes |
| 475 | Forbundet for Ledelse og Teknikk | NOK 22,425.00 | NOK - | Yes | Yes |
| 476 | Force Kiwa Aerospace Testing AB | NOK 271,380.15 | NOK - | No | No |
| 477 | Företagsväxter i Knivsta | NOK 52.44 | NOK - | No | No |
| 478 | Fornebu Næringseiendom 1 AS | NOK 11,048,783.71 | NOK - | Yes | Yes |
| 479 | Forse.Net AS | NOK 488,250.00 | NOK - | Yes | Yes |
| 480 | Forsvaret | NOK 7,425.00 | NOK - | No | No |
| 481 | Forter Ltd | NOK 535,553.58 | NOK - | No | No |
| 482 | Forward Air Inc | NOK 163,291.06 | NOK - | Yes | Yes |
| 483 | Framtidsmedia i Skandinavien AB | NOK 335.96 | NOK - | No | No |
| 484 | Frank Brown & Son (Luton) Ltd | NOK 4,188.20 | NOK - | Yes | Yes |
| 485 | FRAPORT TWIN STAR AIRPORT BULGARIA | NOK 342,768.75 | NOK - | No | No |
| 486 | Freshfields Bruckhaus Deringer LLP | NOK 2,416,829.21 | NOK - | No | No |
| 487 | Frugt.dk | NOK 8,196.98 | NOK - | Yes | Yes |
| 488 | Functional software Inc | NOK 2,815.96 | NOK - | No | No |
| 489 | Furuly Turbuss AS | NOK 11,270.00 | NOK - | No | No |
| 490 | Future Metals, LLC | NOK 17,748.42 | NOK - | Yes | Yes |
| 491 | Fyns Kran Udstyr AS | NOK 6,231.56 | NOK - | Yes | Yes |
| 492 | G. Arnon Law Company | NOK 8,574.23 | NOK - | No | No |
| 493 | Gældsstyrelsen | NOK 3,223,207.47 | NOK - | Yes | Yes |
| 494 | Garda National Immigration Bureau | NOK 64,269.00 | NOK - | No | No |
| 495 | Gardermoen Bilservice AS | NOK 69,291.00 | NOK - | No | No |
| 496 | GECAS Asset Management Services | NOK 0.00 | NOK - | No | No |

| 497 | General Civil Aviation Authority | NOK 242,605.44 | NOK - | Yes | Yes |
|-----|--------------------------------|----------------|-------|-----|-----|
| 498 | Georg Martinsen AS | NOK 2,475.75 | NOK - | No | No |
| 499 | Gestione Aeroporti Sardi S.p.A. | NOK 235,067.94 | NOK - | No | No |
| 500 | GigSky ApS | NOK 77,658.38 | NOK - | No | No |
| 501 | GK Inneklima AS | NOK 62,704.50 | NOK - | No | No |
| 502 | Global Air Training | NOK 4,194.82 | NOK - | No | No |
| 503 | Global Aviation Company | NOK 11,845.97 | NOK - | No | No |
| 504 | Global Collect Services B.V | NOK 400,646.84 | NOK - | No | No |
| 505 | Global Risk Management | NOK 181,100,753.45 | NOK - | Yes | Yes |
| 506 | Global VoiceLink GVL Oy | NOK 1,788.50 | NOK - | No | No |
| 507 | GlobalConnect AS | NOK 171,210.04 | NOK - | Yes | Yes |
| 508 | GMT Ground Maintenance Technics | NOK 16,067.25 | NOK - | Yes | Yes |
| 509 | Google Ireland Limited | NOK 968,254.37 | NOK - | Yes | Yes |
| 510 | Gornoslaskie  Towarzystwo Lotnicze | NOK 121,079.80 | NOK - | Yes | Yes |
| 511 | Gorrissen Federspiel | NOK 226,274.86 | NOK - | Yes | Yes |
| 512 | Gothia AS | NOK 5,603.74 | NOK - | No | No |
| 513 | Gözen Air Service | NOK 386,430.75 | NOK - | Yes | Yes |
| 514 | Gözen Air Service | NOK 165,618.46 | NOK - | No | No |
| 515 | GRAND EASY LIVING SOUTH AS | NOK 1,908.00 | NOK - | No | No |
| 516 | Grand Nordic Hotel | NOK 1,530.00 | NOK - | Yes | Yes |
| 517 | Green light events | NOK 18,051.00 | NOK - | No | No |
| 518 | Grenoble Isere Aeroport | NOK 469,604.16 | NOK - | Yes | Yes |
| 519 | Ground Services International Incorporated | NOK 1,194,321.22 | NOK - | Yes | Yes |
| 520 | Groundforce Cargo SLU | NOK 211,977.05 | NOK - | No | No |
| 521 | Groundforce FUE 2015 UTE | NOK 605,809.77 | NOK - | No | No |

| 522 | GroundLink España S.L.U. | NOK 23,834.27 | NOK - | Yes | Yes |
|-----|--------------------------|---------------|-------|-----|-----|
| 523 | GT Service AS | NOK 130,475.55 | NOK - | Yes | Yes |
| 524 | Gurobi Optimalization LLC | NOK 126,357.00 | NOK - | Yes | Yes |
| 525 | Gyldendal ASA | NOK 17,591.79 | NOK - | Yes | Yes |
| 526 | Gyro AS | NOK 569,571.00 | NOK - | No | No |
| 527 | HAECO Cabin Solutions, LLC | NOK 3,531,724.09 | NOK - | Yes | Yes |
| 528 | Haltija Group Oy | NOK 11,429.17 | NOK - | No | No |
| 529 | HAM Ground Handling GmbH & Co. KG | NOK 216,332.88 | NOK - | No | No |
| 530 | Hamaor LLC, Atlantic Crew Transport | NOK 23,412.15 | NOK - | Yes | Yes |
| 531 | Hamar Reiseeffekter AS | NOK 10,013.00 | NOK - | No | No |
| 532 | Handberg Engros | NOK 63,635.00 | NOK - | No | No |
| 533 | Hansel Oy Ltd | NOK 377.37 | NOK - | No | No |
| 534 | Hauptzollamt Giessen | NOK 397,666.58 | NOK - | No | No |
| 535 | HCAA Section B (CHQ) | NOK 454,381.83 | NOK - | No | No |
| 536 | Hedan Aps | NOK 1,581.25 | NOK - | No | No |
| 537 | Heimstaden Norge AS | NOK 120,000.00 | NOK - | No | No |
| 538 | Heinke.Skribe+Partner Rechtsanwälte | NOK 2,584.90 | NOK - | No | No |
| 539 | Hispano-Lusitana de Aviación | NOK 646,551.20 | NOK - | No | No |
| 540 | HMSHost | NOK 24,062.74 | NOK - | Yes | Yes |
| 541 | HMSHost-Umoe F&B Company | NOK 22,890.00 | NOK - | No | No |
| 542 | Hogan Lovells International | NOK - | NOK - | No | No |
| 543 | Hogan Lovells International LLP | NOK 93,632.94 | NOK - | No | No |
| 544 | HØINES Marking AS | NOK 108.71 | NOK - | No | No |
| 545 | Holiday Inn Manhattan Finacial Dist | NOK 144,868.39 | NOK - | Yes | Yes |
| 546 | Honeywell Grimes Aerospace Company | NOK 39,235.83 | NOK - | No | No |

| 547 | Honeywell International Inc | NOK 185,925.30 | NOK - | No | No |
| 548 | Honeywell International Sarl AeroSp | NOK 2,469,058.92 | NOK - | No | No |
| 549 | Honeywell Life Safety AS | NOK 136,853.04 | NOK - | No | No |
| 550 | Hopper (USA), Inc. | NOK 66,337.43 | NOK - | No | No |
| 551 | Hornskov Vindberg A/S | NOK 23,098.58 | NOK - | No | No |
| 552 | Hørselslaben AS | NOK 74.37 | NOK - | No | No |
| 553 | Horten Advokatpartnerselskab | NOK 1,180.60 | NOK - | No | No |
| 554 | Hoteles Sheraton de Argentina S.A.C | NOK - | NOK - | No | No |
| 555 | HR RØR AS | NOK 273,664.50 | NOK - | No | No |
| 556 | Httpool AB | NOK 4,405.44 | NOK - | Yes | Yes |
| 557 | Hub One | NOK 51,025.73 | NOK - | Yes | Yes |
| 558 | HURTIGRUTEN SVALBARD AS | NOK 47,660.00 | NOK - | Yes | Yes |
| 559 | Hyatt House Fihkill/Poughkeepsie | NOK 3,228,621.13 | NOK - | Yes | Yes |
| 560 | Iberia Lae Sa Operadora Sociedad Un | NOK 1,726,256.24 | NOK - | No | No |
| 561 | Ice Norge AS | NOK 2,363.75 | NOK - | No | No |
| 562 | ICTS Europe Systems Ltd | NOK 1,017,592.50 | NOK - | Yes | Yes |
| 563 | ICTS Hispania S.A. | NOK 1,100,012.35 | NOK - | Yes | Yes |
| 564 | ICTS Italia S.r.l | NOK 281,557.13 | NOK - | Yes | Yes |
| 565 | IEC Telecom Norway AS | NOK 12,029.01 | NOK - | Yes | Yes |
| 566 | IF Forsikring DK | NOK 100,314.16 | NOK - | No | No |
| 567 | IKANO Bank AB | NOK 267.79 | NOK - | No | No |
| 568 | Immigration Bureau | NOK 1,076.32 | NOK - | No | No |
| 569 | Ince Gordon Dadds LLP | NOK 122,704.96 | NOK - | No | No |
| 570 | Incendium AB | NOK 23,734.34 | NOK - | Yes | Yes |
| 571 | Indem Advokatfirma | NOK 2,858,609.91 | NOK - | No | No |

| 572 | Indikat AB | NOK 9,019.68 | NOK - | No | No |
|-----|-----------|--------------|-------|-----|-----|
| 573 | Infare Solutions A/S | NOK 182,095.50 | NOK - | Yes | Yes |
| 574 | Inflight service Europe AB | NOK 191,081.74 | NOK - | Yes | Yes |
| 575 | Ingenico e-Commerce Solutions BVBA | NOK 940.26 | NOK - | No | No |
| 576 | Ingenieria Semasa S.A. | NOK 65,781.04 | NOK - | No | No |
| 577 | INGTRENDSAR S.A | NOK 2,919.73 | NOK - | Yes | Yes |
| 578 | Innovacx Tech Labs Pvt Ltd | NOK 45,127.50 | NOK - | No | No |
| 579 | Innovasjon Norge | NOK 14,996.10 | NOK - | Yes | Yes |
| 580 | InsiderLog AB | NOK 49,500.00 | NOK - | Yes | Yes |
| 581 | Instituto Nacional de Aviacao civil | NOK 88,891.74 | NOK - | No | No |
| 582 | interiorsDIRECT GmbH | NOK 334,340.19 | NOK - | Yes | Yes |
| 583 | Intrum A/S | NOK 588.41 | NOK - | No | No |
| 584 | Intrum Justitia Oy | NOK 1,156.84 | NOK - | No | No |
| 585 | Intrum Justitia Sverige AB | NOK 7,387.16 | NOK - | No | No |
| 586 | Ipeco Holdings Ltd. | NOK 9,258.18 | NOK - | Yes | Yes |
| 587 | IPS-GROUP A/S | NOK 2,892.11 | NOK - | Yes | Yes |
| 588 | Isavia EUR | NOK 211,335.32 | NOK - | No | No |
| 589 | ISCO Group AS | NOK 901,301.00 | NOK - | Yes | Yes |
| 590 | Itelligence AS | NOK 111,260.00 | NOK - | Yes | Yes |
| 591 | Itera Norge AS | NOK 334,764.69 | NOK - | Yes | Yes |
| 592 | ITO PallPack AS | NOK 13,139.75 | NOK - | No | No |
| 593 | ITS Infinity Trading Europe | NOK 103,793.25 | NOK - | Yes | Yes |
| 594 | Jackson Lewis P.C. | NOK 528,828.68 | NOK - | No | No |
| 595 | Jæger Automobil AS | NOK 22,354.90 | NOK - | Yes | Yes |
| 596 | Jalo IT Oy | NOK 14,350.20 | NOK - | Yes | Yes |

| 597 | Jat Tehnika | NOK 17,385.51 | NOK - | No | No |
|-----|------------|---------------|-------|----|----|
| 598 | JCM Commercial Business Solutions | NOK 26,750.68 | NOK - | Yes | Yes |
| 599 | Jet Airways Of the US | NOK 153,708.87 | NOK - | Yes | Yes |
| 600 | Jet International Co LLC | NOK 106,703.97 | NOK - | Yes | Yes |
| 601 | Jetpak Norge AS | NOK 5,389.00 | NOK - | No | No |
| 602 | Jetpak Sverige AB (Norge) | NOK 113,567.21 | NOK - | No | No |
| 603 | JFK International Air Terminal | NOK 612,176.47 | NOK - | No | No |
| 604 | Johs Olsen AS | NOK 5,753.22 | NOK - | Yes | Yes |
| 605 | José M. Carzolio | NOK 403,053.04 | NOK - | No | No |
| 606 | JP Aerodromi CRNE GORE | NOK 18,696.92 | NOK - | No | No |
| 607 | JP Associates | NOK 250,447.65 | NOK - | No | No |
| 608 | Jula Norge AS | NOK 9,396.66 | NOK - | Yes | Yes |
| 609 | Juristenes Utdanningssenter | NOK 11,407.75 | NOK - | Yes | Yes |
| 610 | JV Aeroservices Oy | NOK 86,201.87 | NOK - | Yes | Yes |
| 611 | KaffeImperiet | NOK 80,336.25 | NOK - | Yes | Yes |
| 612 | Kammarkollegiet | NOK 4,962.14 | NOK - | Yes | Yes |
| 613 | KAPCO (Kirkhill Aircraft Parts & Co | NOK 477,746.34 | NOK - | No | No |
| 614 | KAPCO (Kirkhill Aircraft Parts & Co) | NOK - | NOK - | No | No |
| 615 | Kardex Norge AS | NOK 1,592.50 | NOK - | No | No |
| 616 | Karlstad Airport AB | NOK 560,629.20 | NOK - | Yes | Yes |
| 617 | Katowice Airport | NOK 27,090.50 | NOK - | Yes | Yes |
| 618 | Kayak | NOK 740,415.51 | NOK - | No | No |
| 619 | Kemneren i Asker og Bærum | NOK 26,805.00 | NOK - | No | No |
| 620 | KGH Customs Services AB | NOK 7,820.28 | NOK - | No | No |
| 621 | KiiltoClean AS | NOK 20,858.10 | NOK - | No | No |

| 622 | Kioskdrift Monica Brommeland | NOK 2,436.87 | NOK - | Yes | Yes |
|-----|------------------------------|--------------|-------|-----|-----|
| 623 | Kirkenes Taxi AS | NOK 6,842.00 | NOK - | Yes | Yes |
| 624 | Kiwa Teknologisk Institutt AS | NOK 282,036.65 | NOK - | Yes | Yes |
| 625 | Kjosavik AS | NOK 84,205.55 | NOK - | No | No |
| 626 | KLM Engineering & Maintenance | NOK 70,048.50 | NOK - | No | No |
| 627 | Knowit Experience Oslo AS | NOK 53,373.75 | NOK - | Yes | Yes |
| 628 | Knowit Insight AS | NOK 1,301,310.37 | NOK - | Yes | Yes |
| 629 | Knut A Høyer AS | NOK 1,699.00 | NOK - | No | No |
| 630 | Københavns Politi | NOK 31,661.69 | NOK - | Yes | Yes |
| 631 | Kongsberg Aviation Maintenance Serv | NOK 8,812.50 | NOK - | Yes | Yes |
| 632 | Kontorcompaniet AS | NOK 4,181.25 | NOK - | No | No |
| 633 | Kontorpartner Midt-Norge as | NOK 674.92 | NOK - | No | No |
| 634 | Krabi International Airport | NOK 5,962.67 | NOK - | No | No |
| 635 | Kravia AS | NOK 74,896.24 | NOK - | Yes | Yes |
| 636 | Kredinor SA | NOK 3,217.97 | NOK - | No | No |
| 637 | Kreditorforeningen M-Norge SA | NOK 89.71 | NOK - | No | No |
| 638 | Kristiania Gourmet AS | NOK 27,564.17 | NOK - | No | No |
| 639 | Kunnskapsformidlerne AS | NOK 13,303.00 | NOK - | No | No |
| 640 | Kvalitetstransport AS | NOK 53,255.00 | NOK - | No | No |
| 641 | KWC AS | NOK 41,484.00 | NOK - | No | No |
| 642 | L.C.A. Delivery Inc | NOK 852.91 | NOK - | No | No |
| 643 | La Factoria del Vinilo | NOK 11,114.04 | NOK - | No | No |
| 644 | Lagardere Travel Retail Austria Gmb | NOK 6,569.36 | NOK - | Yes | Yes |
| 645 | Landesjustizkasse Bamberg | NOK 1,326.51 | NOK - | No | No |
| 646 | Lantal Textiles | NOK 1,852,418.75 | NOK - | Yes | Yes |

| 647 | Latin American Travel Association | NOK 9,779.92 | NOK - | No | No |
|-----|----------------------------------|--------------|-------|-----|-----|
| 648 | Latvijas Gaisa Satiksme | NOK 970,725.94 | NOK - | Yes | Yes |
| 649 | Law Firm LLP | NOK 4,512.75 | NOK - | No | No |
| 650 | Lawrence Enterprises Partnership | NOK 160.67 | NOK - | Yes | Yes |
| 651 | LB Forsikring | NOK 1,056.56 | NOK - | No | No |
| 652 | Le Ganz Jessheim AS | NOK 999.00 | NOK - | Yes | Yes |
| 653 | LeasePlan Norge AS | NOK 35,506.82 | NOK - | Yes | Yes |
| 654 | Legekontoret Inge Nessiøy AS | NOK 87,600.00 | NOK - | No | No |
| 655 | Letisko M.R.Stefanika | NOK 11,664.82 | NOK - | No | No |
| 656 | Lexium Service Management AB | NOK 191,403.79 | NOK - | Yes | Yes |
| 657 | LHL, Landsforeningen for hjerte- og | NOK 519,166.00 | NOK - | Yes | Yes |
| 658 | Lindberg & Lund AS | NOK 2,352.76 | NOK - | Yes | Yes |
| 659 | Linde Gas AS | NOK 28,873.94 | NOK - | Yes | Yes |
| 660 | Linetech S.A. | NOK 70,695.90 | NOK - | No | No |
| 661 | Link Mobility AS | NOK 503,379.00 | NOK - | Yes | Yes |
| 662 | Lomax A/S | NOK 5,714.34 | NOK - | No | No |
| 663 | London Gatwick Airport | NOK 4,165,351.75 | NOK - | Yes | Yes |
| 664 | Loomis Norge AS | NOK 4,808.00 | NOK - | Yes | Yes |
| 665 | Lovetts | NOK 47,097.70 | NOK - | No | No |
| 666 | Lowell Finans AS | NOK 9,027.85 | NOK - | No | No |
| 667 | Lowell Sverige AB | NOK 1,916.12 | NOK - | No | No |
| 668 | LRF Samköp | NOK 20,744.22 | NOK - | Yes | Yes |
| 669 | LS Kontor AB | NOK 189.83 | NOK - | No | No |
| 670 | LSG Sky Chefs, Inc. | NOK 4,727.92 | NOK - | No | No |
| 671 | Luftfartstilsynet | NOK 4,723,783.62 | NOK - | Yes | Yes |

| 672 | Lufthansa Systems GmbH & Co.KG | NOK 1,932,938.70 | NOK - | Yes | Yes |
|-----|-------------------------------|------------------|--------|-----|-----|
| 673 | Lufthansa Technic Budapest | NOK - | NOK - | No | No |
| 674 | Lufthavndrift AS | NOK 4,273,299.38 | NOK - | Yes | Yes |
| 675 | Luleå Taxi AB | NOK 261,574.83 | NOK - | Yes | Yes |
| 676 | Mabanaft Energy Scandinavia AS | NOK - | NOK - | No | No |
| 677 | Macquarie Bank International Limited | NOK 46,534,097.10 | NOK - | Yes | Yes |
| 678 | Magasin Nord AS | NOK 5,771.00 | NOK - | No | No |
| 679 | Magellan Aviation Service Ltd. | NOK 17,599.73 | NOK - | No | No |
| 680 | Magellan Expendables | NOK 22,563.75 | NOK - | No | No |
| 681 | Mail Boxes Etc. | NOK 4,487.05 | NOK - | No | No |
| 682 | Mammoet Denmark Brande A/S | NOK 20,664.06 | NOK - | Yes | Yes |
| 683 | MAP Aircraft Part 21 AS | NOK 335,031.00 | NOK - | Yes | Yes |
| 684 | Marbella Property Care S.L. | NOK 8,554.20 | NOK - | No | No |
| 685 | Marfo BV | NOK 246,681.56 | NOK - | No | No |
| 686 | Märkas AB | NOK 16,169.00 | NOK - | Yes | Yes |
| 687 | Martela Oyj | NOK 9,422.50 | NOK - | No | No |
| 688 | Marthes Renseri AS | NOK 4,339.00 | NOK - | Yes | Yes |
| 689 | Mary-Ann's Polarrigg AS | NOK 16,460.00 | NOK - | No | No |
| 690 | MBH Maskinuthyrning AB | NOK 162,914.30 | NOK - | Yes | Yes |
| 691 | McCann Dublin Ltd | NOK 5,376.04 | NOK - | No | No |
| 692 | Medco Bedriftshelsetjeneste AS | NOK 90,860.00 | NOK - | No | No |
| 693 | Mediation Tourisme Voyage | NOK 107,971.92 | NOK - | Yes | Yes |
| 694 | MediJus AB (SEK) | NOK 285,929.10 | NOK - | Yes | Yes |
| 695 | Meggitt Aerospace Ltd. | NOK 153,364.91 | NOK - | No | No |
| 696 | Menzies World cargo B.V | NOK 4,520.68 | NOK - | Yes | Yes |

| 697 | Mercer (Norge) AS | NOK 120,206.25 | NOK - | No | No |
|---|---|---|---|---|---|
| 698 | Metalco S.A. | NOK 6,937.52 | NOK - | No | No |
| 699 | Microsoft Norge AS | NOK 10,390.87 | NOK - | No | No |
| 700 | Miedzynarodowy Port Lotniczy im. (John Paul II International Airport) | NOK 676,265.30 | NOK - | No | No |
| 701 | Milbank, Tweed, Hadley & McCloy LLP | NOK 27,076.50 | NOK - | No | No |
| 702 | Military Pilot Supply of Texas, Inc | NOK 268,959.90 | NOK - | No | No |
| 703 | Miljødirektoratet (CO2 Emissions) | NOK 148,686,026.00 | NOK - | Yes | Yes |
| 704 | Miller Thomson LLP | NOK 14,440.80 | NOK - | No | No |
| 705 | Ministry of Communication and Trans | NOK 37,660.99 | NOK - | No | No |
| 706 | Moll Wenden | NOK 26,500.00 | NOK - | Yes | Yes |
| 707 | Monarch Aircraft Engineering Ltd | NOK 6,873.51 | NOK - | No | No |
| 708 | Mónica Tarín Román | NOK 1,682.99 | NOK - | No | No |
| 709 | Moog Aircraft Group | NOK 55,202.49 | NOK - | Yes | Yes |
| 710 | Møre og Romsdal Taxitjenester AS | NOK 24,127.50 | NOK - | Yes | Yes |
| 711 | Morris James LLP | NOK 263,019.14 | NOK - | Yes | Yes |
| 712 | Move A Jet Aps | NOK 431.25 | NOK - | No | No |
| 713 | Movinn A/S | NOK 6,445.03 | NOK - | No | No |
| 714 | MUFG Bank | NOK 2,058,870.71 | NOK - | Yes | Yes |
| 715 | Multi Pilot Simulations B.V. | NOK 74,980.50 | NOK - | Yes | Yes |
| 716 | Muuttohaukat Oy | NOK 27,979.08 | NOK - | Yes | Yes |
| 717 | N&K Air Solutions AS | NOK 7,360.00 | NOK - | Yes | Yes |
| 718 | N.C. Nielsen A/S | NOK 10,933.52 | NOK - | No | No |
| 719 | Naboen Utleie AS | NOK 143,578.00 | NOK - | Yes | Yes |
| 720 | Naboen Utleie Oslo AS | NOK 25,939.00 | NOK - | Yes | Yes |
| 721 | Naboen Utleie Trondheim AS | NOK 58,926.00 | NOK - | Yes | Yes |

| 722 | NÆRINGSFORENINGEN                    I TRONDHEIMSREGIO | NOK 295.34 | NOK - | No | No |
|-----|---------------------------------------|-------------|-------|----|----|
| 723 | Næringslivets Hovedorganisasjon | NOK 1,229,384.99 | NOK - | Yes | Yes |
| 724 | Næringslivets NOx-fond (FORENING) | NOK 691,320.21 | NOK - | Yes | Yes |
| 725 | Nagarro AS | NOK 92,556.26 | NOK - | Yes | Yes |
| 726 | Närstads Väskor AB | NOK 1,572.15 | NOK - | No | No |
| 727 | Nasdaq Corporate Solutions Internat | NOK 75,616.55 | NOK - | Yes | Yes |
| 728 | NAV Canada | NOK 1,407,619.71 | NOK - | No | No |
| 729 | NAV Portugal, E.P.E. | NOK 325,122.62 | NOK - | Yes | Yes |
| 730 | Nava Sport Verdal AS | NOK 1,498.50 | NOK - | No | No |
| 731 | navAero Avionics AB | NOK 93,684.69 | NOK - | No | No |
| 732 | Navblue Inc | NOK - | NOK - | No | No |
| 733 | Navigator Aviation & Tourism Manage | NOK 124,016.42 | NOK - | Yes | Yes |
| 734 | Nayak Aircraft Service Italy S.r.l. | NOK 117,023.14 | NOK - | Yes | Yes |
| 735 | Nayak Aircraft Services Italy S.r.l | NOK 13,442.93 | NOK - | No | No |
| 736 | Neste Markkinointi Oy | NOK 472.38 | NOK - | No | No |
| 737 | Netlife Design AS | NOK 2,294,831.76 | NOK - | Yes | Yes |
| 738 | Newrest España S.L. | NOK 62,279.34 | NOK - | No | No |
| 739 | Newrest France SA | NOK 70,509.41 | NOK - | No | No |
| 740 | Newrest Greece | NOK 59,757.10 | NOK - | No | No |
| 741 | NEXTOPS (Openairlines) | NOK 689,305.81 | NOK - | Yes | Yes |
| 742 | NHI-2, LLC (Travelliance) | NOK 532,860.71 | NOK - | No | No |
| 743 | Nippon Gases Norge AS | NOK 13,503.00 | NOK - | No | No |
| 744 | Nishimura & Asahi | NOK 40,441,097.95 | NOK - | No | No |
| 745 | Nor Tekstil AS | NOK 26,910.53 | NOK - | Yes | Yes |
| 746 | Norbrann | NOK 12,401.00 | NOK - | Yes | Yes |

| 747 | Nordania Finans A/S | NOK 170,098.76 | NOK - | No | No |
|---|---|---|---|---|---|
| 748 | Nordea Bank Norge Securities Servic | NOK 100.00 | NOK - | No | No |
| 749 | Nordea Finance Equipment AS | NOK 155,087.00 | NOK - | Yes | Yes |
| 750 | Nordea Finans Norge AS | NOK 805.00 | NOK - | No | No |
| 751 | Nordengen | NOK 75,704.50 | NOK - | Yes | Yes |
| 752 | Nordic Flight Service AS | NOK 308,126.00 | NOK - | Yes | Yes |
| 753 | Nordic Leisure Travel Group AB | NOK 681,139.46 | NOK - | Yes | Yes |
| 754 | Nordic x-Press Logistics AS | NOK 278,432.00 | NOK - | Yes | Yes |
| 755 | Nordland Taxi | NOK 82,520.00 | NOK - | No | No |
| 756 | NorgesGruppen Finans AS | NOK 300.50 | NOK - | No | No |
| 757 | Norsk Gjenvinning AS | NOK 43,897.39 | NOK - | Yes | Yes |
| 758 | Norsk Investor Relations Forening N | NOK 2,000.00 | NOK - | No | No |
| 759 | Norsk telegrambyrå AS | NOK 14,299.00 | NOK - | No | No |
| 760 | NORWEGIAN AIR RESOURCES S.A.U. | NOK 17,254,950.90 | NOK - | No | No |
| 761 | Nova Gratia d.o.o. | NOK 23,101.71 | NOK - | No | No |
| 762 | Novatek AS | NOK 90,588.75 | NOK - | Yes | Yes |
| 763 | Nunavut Airport Services Ltd CAD | NOK 11,091.92 | NOK - | No | No |
| 764 | Nya Västerås Flygplats AB | NOK 45,000.86 | NOK - | No | No |
| 765 | O J Hanssen AS | NOK 1,349.10 | NOK - | No | No |
| 766 | Oakenhurst Aircraft Services Ltd. | NOK 1,986,844.87 | NOK - | Yes | Yes |
| 767 | OCS Group UK Limited | NOK 629,022.37 | NOK - | Yes | Yes |
| 768 | Office du Tourisme  - USA | NOK 10,711.50 | NOK - | Yes | Yes |
| 769 | Office Jungle | NOK 21,907.03 | NOK - | Yes | Yes |
| 770 | Office National des Aeroports | NOK 4,345.71 | NOK - | Yes | Yes |
| 771 | OFJ Airlinks Ltd (& ABM Aviation UK Ltd) | NOK 13,107.73 | NOK - | Yes | Yes |

| 772 | ONC Express SRL | NOK 62,030.30 | NOK - | Yes | Yes |
|-----|-----------------|---------------|-------|-----|-----|
| 773 | One Resourcing Ltd | NOK 5,045.77 | NOK - | Yes | Yes |
| 774 | Onepark AS | NOK 784,537.25 | NOK - | Yes | Yes |
| 775 | ONEXP | NOK 1,218.44 | NOK - | No | No |
| 776 | Opro AS | NOK 30.00 | NOK - | No | No |
| 777 | Optimizely, Inc | NOK 725,704.13 | NOK - | Yes | Yes |
| 778 | OpusCapita Solutions AS | NOK 128,406.32 | NOK - | No | No |
| 779 | Oracle Norge AS | NOK 6,255,916.33 | NOK - | Yes | Yes |
| 780 | Oracle Solicitors & Consultants Ltd | NOK 470,837.38 | NOK - | Yes | Yes |
| 781 | OrbitArena AS | NOK 68.12 | NOK - | No | No |
| 782 | Øresundsbro Konsortiet | NOK 1,043.63 | NOK - | No | No |
| 783 | Oslo Børs ASA | NOK 298,500.80 | NOK - | Yes | Yes |
| 784 | Oslo Digitaltrykk AS | NOK 3,619.00 | NOK - | No | No |
| 785 | Oslo Seafood & Cargo Center AS | NOK 52,618.32 | NOK - | No | No |
| 786 | OSLO TAXI AS | NOK 293.75 | NOK - | Yes | Yes |
| 787 | Oslofjord Varme AS | NOK 311,287.65 | NOK - | Yes | Yes |
| 788 | Ospentos International OU | NOK 228.15 | NOK - | No | No |
| 789 | Østergaard Biler A/S | NOK 20,238.20 | NOK - | Yes | Yes |
| 790 | Otiga Stockholm AB | NOK 140,985.72 | NOK - | No | No |
| 791 | Otis AS | NOK 8,410.67 | NOK - | Yes | Yes |
| 792 | ØVRE ROMERIKE AVFALLSSELSKAP (ØRAS) | NOK 562.50 | NOK - | No | No |
| 793 | P.C. Sarajevo International Airport | NOK 10,483.77 | NOK - | Yes | Yes |
| 794 | Pacific Atlantic Handling | NOK 0.00 | NOK - | No | No |
| 795 | Pacta Inversiones S.A (Hotel Frontair Congress) | NOK 73,055.00 | NOK - | Yes | Yes |
| 796 | Pagero Norway AS | NOK 4,059.00 | NOK - | Yes | Yes |

| 797 | Pan Am International Flight Academy | NOK 436,569.48 | NOK - | No | No |
|-----|-----|-----|-----|-----|-----|
| 798 | Park Inn Copenhagen Airport | NOK 1,138,410.16 | NOK - | Yes | Yes |
| 799 | Park Plaza Amsterdam Airport | NOK 414,334.21 | NOK - | No | No |
| 800 | ParkTrade Europe AB | NOK 491.50 | NOK - | No | No |
| 801 | Parveen Butikkdrift AS | NOK 1,038.00 | NOK - | Yes | Yes |
| 802 | PATA Finland Chapter | NOK 428.46 | NOK - | No | No |
| 803 | Patria Helicopters AB | NOK 450,984.00 | NOK - | Yes | Yes |
| 804 | Paysafe Financial Services Limited | NOK 13,662,101.89 | NOK - | No | No |
| 805 | Pearl Group AS | NOK 219,228.20 | NOK - | Yes | Yes |
| 806 | Pelesys | NOK 411,996.02 | NOK - | Yes | Yes |
| 807 | Pelican Rouge Coffee Solutions | NOK 160.67 | NOK - | No | No |
| 808 | Pequod Associates | NOK 39,249.64 | NOK - | Yes | Yes |
| 809 | Percival Aviation Ltd | NOK 23,676.76 | NOK - | Yes | Yes |
| 810 | Pervaco AS | NOK 865.00 | NOK - | No | No |
| 811 | Pillsbury Winthrop Shaw Pittman | NOK 1,520,056.93 | NOK - | Yes | Yes |
| 812 | Pilotech AS | NOK 19,312.50 | NOK - | Yes | Yes |
| 813 | Pioneer Aero Supply | NOK 618,450.00 | NOK - | Yes | Yes |
| 814 | PKN ORLEN | NOK 57,724.12 | NOK - | Yes | Yes |
| 815 | Platinum Transportation, Inc. | NOK 301,541.96 | NOK - | Yes | Yes |
| 816 | Plusgrade L.P | NOK 8,284,955.89 | NOK - | No | No |
| 817 | Point of Americas II | NOK 32,275.19 | NOK - | No | No |
| 818 | Polish Air Navigation Service Agen | NOK 443,267.68 | NOK - | Yes | Yes |
| 819 | Port Lotniczy Gdansk Sp Zo.o. | NOK 122,136.25 | NOK - | Yes | Yes |
| 820 | Portway | NOK 97,889.51 | NOK - | No | No |
| 821 | Posten Norge AS | NOK 1,063.83 | NOK - | No | No |

| 822 | PPF Plåt & Plast Form AB | NOK 231.40 | NOK - | No | No |
| 823 | PPG Industries (U.K.) Ltd | NOK 29,072.50 | NOK - | No | No |
| 824 | Pret A Manger (Europe) Ltd. | NOK 4,951.81 | NOK - | Yes | Yes |
| 825 | PricewaterhouseCoopers AS | NOK 4,482,559.23 | NOK - | Yes | Yes |
| 826 | PRIME CONTABILIDADE S/S LTDA. | NOK 114,688.03 | NOK - | No | No |
| 827 | PrimeFlight Aviation Services Inc | NOK 392,988.05 | NOK - | No | No |
| 828 | PrintCheck | NOK 3,676,583.13 | NOK - | Yes | Yes |
| 829 | Prioritet Inkasso | NOK 4,252.35 | NOK - | No | No |
| 830 | Prisma Solutions srl | NOK 10.28 | NOK - | No | No |
| 831 | Prodefis GMBH | NOK 615,911.25 | NOK - | Yes | Yes |
| 832 | Prosegur Services Group, Inc. | NOK 903,643.71 | NOK - | Yes | Yes |
| 833 | Protegrity USA Inc | NOK 154,345.62 | NOK - | No | No |
| 834 | Pryor Insurance Corretora de Seguro | NOK 23,276.22 | NOK - | No | No |
| 835 | PwC Tax Services AS | NOK 9,395,247.99 | NOK - | No | No |
| 836 | QAS Quality Airport Services | NOK 1,041,423.65 | NOK - | No | No |
| 837 | Qbrick AS | NOK 128,375.00 | NOK - | No | No |
| 838 | Quadient Finance Norge AS | NOK 3,037.13 | NOK - | No | No |
| 839 | Quality Hotel Expo AS | NOK 10,880.00 | NOK - | Yes | Yes |
| 840 | Quiz DIA LLC | NOK 732.33 | NOK - | No | No |
| 841 | Qvalia AS | NOK 413,260.38 | NOK - | Yes | Yes |
| 842 | Ragnsells AB | NOK 41,088.84 | NOK - | Yes | Yes |
| 843 | Rav Norge AS | NOK 119,737.50 | NOK - | No | No |
| 844 | RDC Aviation | NOK 204,946.92 | NOK - | Yes | Yes |
| 845 | REAL MARINE AS | NOK 86,430.00 | NOK - | Yes | Yes |
| 846 | Realia AS | NOK 32,156.25 | NOK - | Yes | Yes |

| | | | | | |
|---|---|---|---|---|---|
| 847 | Reason AS | NOK 401,681.25 | NOK - | Yes | Yes |
| 848 | Reclamador S.L | NOK 128,688.60 | NOK - | Yes | Yes |
| 849 | Redashe Ltd. | NOK 3,775.34 | NOK - | Yes | Yes |
| 850 | Redcide AS | NOK 466,968.75 | NOK - | Yes | Yes |
| 851 | Reed and Mackay Travel Ltd | NOK 28,934.79 | NOK - | No | No |
| 852 | Reed Business Information Ltd | NOK 32,014.87 | NOK - | No | No |
| 853 | Reed Expositions France | NOK 11,277.07 | NOK - | No | No |
| 854 | Refinitiv Norge AS | NOK 110,933.76 | NOK - | No | No |
| 855 | Refundor SIA | NOK 704,816.70 | NOK - | Yes | Yes |
| 856 | Regus Express | NOK 18,580.85 | NOK - | No | No |
| 857 | Reisebutikken Bryne AS | NOK 2,495.00 | NOK - | No | No |
| 858 | Reisemagasinet AS | NOK 2,639.00 | NOK - | Yes | Yes |
| 859 | Reklamombudsmannen | NOK 39,632.55 | NOK - | Yes | Yes |
| 860 | Renab | NOK 93,181.68 | NOK - | Yes | Yes |
| 861 | Renas AS | NOK 2,876.00 | NOK - | Yes | Yes |
| 862 | Renholdsgruppen Invest AS | NOK 12,762.24 | NOK - | No | No |
| 863 | Renseriet Sandnes AS | NOK 5,575.69 | NOK - | No | No |
| 864 | Rent hus Transport AS | NOK 1,593.11 | NOK - | No | No |
| 865 | Reolteknikk AS | NOK 2,125.00 | NOK - | No | No |
| 866 | Repsol Portuguesa S.A. | NOK 1,518,462.35 | NOK - | No | No |
| 867 | Rescue Money | NOK 30,966.95 | NOK - | Yes | Yes |
| 868 | Retriever Sverige AB | NOK 265,346.40 | NOK - | Yes | Yes |
| 869 | Ricoh Danmark A/S | NOK 19,674.59 | NOK - | No | No |
| 870 | Ricoh España S.L.U. | NOK 24,580.11 | NOK - | No | No |
| 871 | RICOH Financial Services | NOK 3,953.13 | NOK - | No | No |

| 872 | Ricoh Services (Thailand) Limited | NOK 19.11 | NOK - | No | No |
|-----|-----|-----|-----|-----|-----|
| 873 | Ricoh USA Inc. | NOK 20,015.58 | NOK - | No | No |
| 874 | Riga International Airport | NOK 3,398,442.10 | NOK - | Yes | Yes |
| 875 | Riise & GG Storkjøkken AS | NOK 473.00 | NOK - | No | No |
| 876 | RIXJET | NOK 118,804.89 | NOK - | Yes | Yes |
| 877 | Rodahl Consulting AS | NOK 3,398.66 | NOK - | No | No |
| 878 | ROGER BORGE | NOK 3,914.50 | NOK - | No | No |
| 879 | SA Technologies AB | NOK 247,397.98 | NOK - | Yes | Yes |
| 880 | Sabre GLBL Inc | NOK 5,415.30 | NOK - | No | No |
| 881 | SAFRAN AEROSYSTEMS SERVICES EUROPE | NOK 379,138.69 | NOK - | Yes | Yes |
| 882 | Safran Cabin Galleys US, Inc. | NOK 18,920.07 | NOK - | Yes | Yes |
| 883 | Sagat S.p.A. Aeroporto Torino | NOK 658,084.35 | NOK - | No | No |
| 884 | SAGEM DEFENSE SECURITE | NOK 46,806.24 | NOK - | No | No |
| 885 | Salmosped AS | NOK 53,092.17 | NOK - | Yes | Yes |
| 886 | San Francisco Airport Comission | NOK 2,484.09 | NOK - | No | No |
| 887 | Sandnes Pro-service AS | NOK 50.00 | NOK - | No | No |
| 888 | SAS (Sverige, EUR) | NOK 14,800.51 | NOK - | No | No |
| 889 | SAS Ground Handling Denmark AS | NOK 43,783.59 | NOK - | No | No |
| 890 | SAS Services Group Inc | NOK 11,013.73 | NOK - | No | No |
| 891 | Satair AS | NOK 1,058,813.27 | NOK - | Yes | Yes |
| 892 | Saywell International - Aviation Ho | NOK 3,275.35 | NOK - | Yes | Yes |
| 893 | Scan GSE AS | NOK 20,007.08 | NOK - | No | No |
| 894 | Scandanavian House AS | NOK - | NOK - | No | No |
| 895 | Scandic Hell | NOK 754.00 | NOK - | No | No |
| 896 | Scandic Hotels Oy | NOK - | NOK - | No | No |

93

| 897 | Scandinavian Avionics A/S | NOK 13,953.00 | NOK - | No | No |
|---|---|---|---|---|---|
| 898 | Scandinavian Avionics Norway Div. | NOK 335,650.13 | NOK - | Yes | Yes |
| 899 | Scandinavian Photo AS | NOK 54,547.87 | NOK - | No | No |
| 900 | Scelto AS | NOK 388,196.88 | NOK - | Yes | Yes |
| 901 | Schibsted Norge AS | NOK 125,531.47 | NOK - | No | No |
| 902 | Schneider Electric | NOK 140.00 | NOK - | No | No |
| 903 | Scis Air Security | NOK 41,918.03 | NOK - | No | No |
| 904 | SDA SRL | NOK 7,870.60 | NOK - | Yes | Yes |
| 905 | SEA S.p.A. | NOK 1,598,016.66 | NOK - | No | No |
| 906 | Seal Dynamics LLC | NOK 424,408.61 | NOK - | Yes | Yes |
| 907 | Seal Weld Pro | NOK 140.00 | NOK - | No | No |
| 908 | Seatac Fuel Facilities LLC | NOK 16,411.88 | NOK - | No | No |
| 909 | SEB Kort Bank AB, Oslofilialen Nors | NOK 470,382.83 | NOK - | Yes | Yes |
| 910 | Secure by Design | NOK 37,582.18 | NOK - | No | No |
| 911 | Securitas AS | NOK 7,143.75 | NOK - | No | No |
| 912 | Segufoc S.L. | NOK 3,933.37 | NOK - | No | No |
| 913 | Select Service Partner AS | NOK 880,120.25 | NOK - | Yes | Yes |
| 914 | Selecta A/S | NOK 32,132.88 | NOK - | No | No |
| 915 | Semler Retail AS - Amager | NOK 11,092.73 | NOK - | No | No |
| 916 | Sentrum Taxi | NOK 522.00 | NOK - | No | No |
| 917 | Serbia and Montenegro Air Trafic | NOK 294,683.22 | NOK - | No | No |
| 918 | Sergel Norge AS | NOK 71.98 | NOK - | No | No |
| 919 | Servei D'Apats S.L | NOK 601,005.88 | NOK - | Yes | Yes |
| 920 | Servicebedriften Myhre AS | NOK 199,179.37 | NOK - | No | No |
| 921 | SETFA Aeroport de Francazal | NOK 18,133.71 | NOK - | Yes | Yes |

| 922 | SFS (WFS) | NOK 2,203.36 | NOK - | No | No |
|---|---|---|---|---|---|
| 923 | SGS Tecnos SA | NOK 103,493.01 | NOK - | No | No |
| 924 | Shannon Engine Support Ltd | NOK 22,177.82 | NOK - | No | No |
| 925 | SIA Zemgales sparni | NOK 10,174.32 | NOK - | Yes | Yes |
| 926 | Sicra AS | NOK 25,414.54 | NOK - | Yes | Yes |
| 927 | Siemens Financial Services | NOK 71,588.00 | NOK - | Yes | Yes |
| 928 | Siemens Financial Services AB | NOK 51,413.22 | NOK - | Yes | Yes |
| 929 | Sigtuna kommun | NOK 12,995.68 | NOK - | Yes | Yes |
| 930 | Skandia bank & försäkring | NOK 72,838.20 | NOK - | Yes | Yes |
| 931 | Skandikon Dokumenthantering | NOK 168,445.67 | NOK - | No | No |
| 932 | Skandinavisk Fastighetsrenting AB | NOK 4,983,997.24 | NOK - | Yes | Yes |
| 933 | Skandinavisk Motor Co AS (DKK) | NOK 7,443.23 | NOK - | No | No |
| 934 | Skatteverket | NOK 5,599,820.08 | NOK - | Yes | Yes |
| 935 | Ski Renseri AS | NOK 3,657.00 | NOK - | Yes | Yes |
| 936 | Sky City Kemtvätt & Skrädderi | NOK 41,763.22 | NOK - | Yes | Yes |
| 937 | Sky Handling Partner (SHP) Dublin | NOK 1,162.20 | NOK - | No | No |
| 938 | Sky Handling Partner USA | NOK 156,815.45 | NOK - | Yes | Yes |
| 939 | Skybreak- Airborne Representation | NOK 766,515.18 | NOK - | No | No |
| 940 | Skyscanner Ltd | NOK 35,858.65 | NOK - | Yes | Yes |
| 941 | Skytraild Ltd. | NOK 182,450.70 | NOK - | Yes | Yes |
| 942 | Slack Technologies | NOK 64,877.73 | NOK - | No | No |
| 943 | Slangservice i Uppsala AB | NOK 352.40 | NOK - | No | No |
| 944 | Sluttvederlagsordningen | NOK 4,630,030.15 | NOK - | Yes | Yes |
| 945 | Smith, Gambrell & Russell LLP | NOK 366,816.63 | NOK - | No | No |
| 946 | Smiths Interconnect Inc | NOK 1,057,364.40 | NOK - | No | No |

| 947 | Societa Aeroporto Toscana Galileo | NOK 45,610.96 | NOK - | No | No |
|-----|-----------------------------------|---------------|-------|----|----|
| 948 | SOCIETE AEROPORTUAIRE GUADELOUPE | NOK - | NOK - | No | No |
| 949 | SOCIETE AEROPORTUAIRE GUADELOUPE PO | NOK 54,791.77 | NOK - | No | No |
| 950 | Sodexo | NOK 717,175.00 | NOK - | No | No |
| 951 | Sodexo AB | NOK 259,490.67 | NOK - | Yes | Yes |
| 952 | Sodexo AS | NOK 1,493,615.19 | NOK - | Yes | Yes |
| 953 | Sojern Limited | NOK 459,372.37 | NOK - | Yes | Yes |
| 954 | Solia AS, dets konkursbo | NOK 964,977.00 | NOK - | Yes | Yes |
| 955 | Sollentuna Cabin Interiors (SEK) | NOK 11,578.75 | NOK - | Yes | Yes |
| 956 | Solrik AS | NOK 7,626.20 | NOK - | No | No |
| 957 | Solvang's Dekorbyrå AS | NOK 185,536.78 | NOK - | Yes | Yes |
| 958 | Solvencia AS | NOK 5,099.97 | NOK - | No | No |
| 959 | Sønderup Revisorer | NOK 11,216.01 | NOK - | Yes | Yes |
| 960 | Sopra Steria AS | NOK 1,140,141.25 | NOK - | Yes | Yes |
| 961 | SOS International AS | NOK 3,378.13 | NOK - | No | No |
| 962 | South American Airways | NOK 741,992.49 | NOK - | Yes | Yes |
| 963 | SpareBank 1 Finans Østlandet AS | NOK 248,054.47 | NOK - | Yes | Yes |
| 964 | Spectro Jet-Care NB BANK! (Palace International Ltd) | NOK 3,427.68 | NOK - | Yes | Yes |
| 965 | Spesialrekvisita AS | NOK 1,186.25 | NOK - | Yes | Yes |
| 966 | Split Airport Ltd (EUR) | NOK 0.00 | NOK - | No | No |
| 967 | Sprint Consulting AS | NOK 3,109,356.41 | NOK - | Yes | Yes |
| 968 | ST Aerospace Solutions (Europe) | NOK 1,434,926.89 | NOK - | No | No |
| 969 | St. John's University | NOK 32,491.80 | NOK - | Yes | Yes |
| 970 | St. Magleby Autoværksted | NOK 10,706.04 | NOK - | No | No |
| 971 | Stanley Security Sverige AB | NOK 1,319.39 | NOK - | No | No |

| | | | | | |
|---|---|---|---|---|---|
| 972 | Statens og Kommunernes Inkøbs Servi | NOK 6,647.66 | NOK - | Yes | Yes |
| 973 | Stationen AS | NOK 21,115.00 | NOK - | No | No |
| 974 | Statkraft Varme AS | NOK 194,206.55 | NOK - | Yes | Yes |
| 975 | Stavanger Oilers AS | NOK 140.00 | NOK - | No | No |
| 976 | Stavdal AB | NOK 70,161.57 | NOK - | No | No |
| 977 | Stea Norge AS | NOK 14,314.00 | NOK - | No | No |
| 978 | Steakers Svalbard AS | NOK 18,654.00 | NOK - | Yes | Yes |
| 979 | Stein Sørensen Persontransport Din | NOK 5,019.19 | NOK - | Yes | Yes |
| 980 | Stena Recycling A/S | NOK 56,586.63 | NOK - | No | No |
| 981 | Stena Recycling AS | NOK 77,192.69 | NOK - | No | No |
| 982 | Stenger LLP | NOK 1,718,533.78 | NOK - | Yes | Yes |
| 983 | Step Transport ApS | NOK 732.33 | NOK - | No | No |
| 984 | Stiftelsen Statsraad Lehmkul | NOK 520,000.00 | NOK - | No | No |
| 985 | Stjørdal Taxi AS | NOK 1,670.11 | NOK - | No | No |
| 986 | Stobart Aviation Services Ltd MAN | NOK 50,895.00 | NOK - | Yes | Yes |
| 987 | Stokvis Tapes Norge AS | NOK 6,120.00 | NOK - | Yes | Yes |
| 988 | Storadio Aero AB | NOK 108,799.38 | NOK - | Yes | Yes |
| 989 | STS Aviation Services UK Limited | NOK 350,459.23 | NOK - | Yes | Yes |
| 990 | STS Component Sollutions LLC | NOK 83,523.46 | NOK - | Yes | Yes |
| 991 | Sullivan & Cromwell LLP | NOK 1,627,933.77 | NOK - | No | No |
| 992 | Superior Aircraft services, Inc | NOK 169,742.58 | NOK - | Yes | Yes |
| 993 | Suvarnabhumi Airport Hotel Co., Ltd | NOK 3,843.19 | NOK - | No | No |
| 994 | Svalbard Adventures AS | NOK 75,280.00 | NOK - | No | No |
| 995 | Svalbard Buss og Taxi AS | NOK 4,400.00 | NOK - | Yes | Yes |
| 996 | SVALBARD WILDLIFE EIENDOM AS | NOK 176.79 | NOK - | No | No |

| 997 | Svea Finans AS | NOK 909.89 | NOK - | No | No |
|------|----------------|-----------|-------|-----|-----|
| 998 | Svea Inkasso AB | NOK 8,616.11 | NOK - | No | No |
| 999 | Svea Taxi Norrbotten | NOK 4,951.38 | NOK - | No | No |
| 1000 | Svenska Cee Norm AB | NOK 12,506.94 | NOK - | No | No |
| 1001 | Sveriges Affärsreseförening AB | NOK 13,882.10 | NOK - | Yes | Yes |
| 1002 | Sveriges Annonsörer AB | NOK 56,766.30 | NOK - | Yes | Yes |
| 1003 | Swedma Service AB | NOK 19,402.80 | NOK - | Yes | Yes |
| 1004 | Swiss AviationSoftware Ltd. | NOK 122,539.56 | NOK - | Yes | Yes |
| 1005 | Swissport Argentina SA | NOK 2,716,778.66 | NOK - | Yes | Yes |
| 1006 | Swissport Cargo Services | NOK 6,421.12 | NOK - | No | No |
| 1007 | Swissport Cargo Services Belgium nv | NOK 22,886.51 | NOK - | No | No |
| 1008 | Swissport Cargo Services L.P | NOK 5,418.52 | NOK - | Yes | Yes |
| 1009 | Swissport Cargo Services Madrid | NOK 1,555,390.03 | NOK - | Yes | Yes |
| 1010 | Swissport Cargo Services Nice | NOK 31.60 | NOK - | No | No |
| 1011 | Swissport Cyprus | NOK 63,845.90 | NOK - | Yes | Yes |
| 1012 | Swissport Greece S.A. (ATH) | NOK 100,059.44 | NOK - | No | No |
| 1013 | Swissport Handling S.A. | NOK 2,560,639.67 | NOK - | Yes | Yes |
| 1014 | Swissport International AG | NOK 698.77 | NOK - | No | No |
| 1015 | Swissport Maroc SA - NB EUR | NOK 21,434.35 | NOK - | No | No |
| 1016 | Swissport USA/SAUSA LLC | NOK 1,237,091.62 | NOK - | No | No |
| 1017 | Synchrony Bank | NOK 8,122,950.00 | NOK - | Yes | Yes |
| 1018 | T. Myhrvold AS | NOK 6,828.00 | NOK - | No | No |
| 1019 | Talleres Autolica S.A | NOK 3,213.45 | NOK - | No | No |
| 1020 | Tallinn Airport GH AS | NOK 29,121.25 | NOK - | Yes | Yes |
| 1021 | Tarmac Aerosave | NOK 1,058,922.39 | NOK - | Yes | Yes |

| 1022 | Tårnby Kommune Plan/bygg/miljø | NOK 1,576.94 | NOK - | No | No |
|------|-------------------------------|--------------|-------|-----|-----|
| 1023 | Tastes on the Fly Boston LLC | NOK 4,538.11 | NOK - | No | No |
| 1024 | Tata Consultancy Services Limited | NOK 131,278.13 | NOK - | No | No |
| 1025 | Tata Consultansy Services Ltd | NOK 241,317.35 | NOK - | Yes | Yes |
| 1026 | TAXI 2 AS | NOK 1,349.00 | NOK - | No | No |
| 1027 | Taxi Romerike SA | NOK 13,774.00 | NOK - | No | No |
| 1028 | TCR Norway AS | NOK 135,511.08 | NOK - | Yes | Yes |
| 1029 | TDA Touchdown Aviation | NOK 6,185.90 | NOK - | No | No |
| 1030 | TDC A/S | NOK 5,651.55 | NOK - | No | No |
| 1031 | Team Group Consultors Turistics,S.L | NOK 21,423.00 | NOK - | No | No |
| 1032 | TeamViewer GmbH | NOK 21,989.75 | NOK - | No | No |
| 1033 | Techstep Finance AS | NOK 251,877.50 | NOK - | No | No |
| 1034 | Techstep Norway AS | NOK 46,570.00 | NOK - | No | No |
| 1035 | Telair International AB | NOK 745,086.80 | NOK - | Yes | Yes |
| 1036 | Telenor A/S (DKK!!!) | NOK 2,006.19 | NOK - | No | No |
| 1037 | Telenor Norge AS | NOK 345,235.19 | NOK - | Yes | Yes |
| 1038 | Telia Danmark | NOK 24,781.16 | NOK - | Yes | Yes |
| 1039 | Telia Norge AS | NOK 1,030.89 | NOK - | No | No |
| 1040 | Telia Norge AS (Phonero) | NOK 36,558.23 | NOK - | Yes | Yes |
| 1041 | TESS Nord AS | NOK 234.00 | NOK - | No | No |
| 1042 | TGS Yer Hizmetieri A.S | NOK 1,336,622.00 | NOK - | Yes | Yes |
| 1043 | Thai Airways International | NOK 396.46 | NOK - | No | No |
| 1044 | Thales Avionics S.A. | NOK 2,120,225.33 | NOK - | Yes | Yes |
| 1045 | Thanex A/S | NOK 3,670.12 | NOK - | No | No |
| 1046 | The BTA/GTMC | NOK 143,822.40 | NOK - | No | No |

| 1047 | The Port Authority of NY & NJ | NOK 13,508,312.06 | NOK - | Yes | Yes |
|------|-------------------------------|-------------------|-------|-----|-----|
| 1048 | The Westin Los Angeles Airport Hote | NOK 2,300,819.09 | NOK - | Yes | Yes |
| 1049 | Thon Hotel Gardermoen | NOK 2,083,440.31 | NOK - | Yes | Yes |
| 1050 | Thon Hotel Harstad | NOK 35,100.00 | NOK - | Yes | Yes |
| 1051 | Thon Hotel Kirkenes | NOK 39,205.00 | NOK - | Yes | Yes |
| 1052 | Thon Hotel Kristiansand | NOK 84,350.00 | NOK - | No | No |
| 1053 | Thon Hotel Nordlys | NOK 39,205.00 | NOK - | No | No |
| 1054 | Thon Hotel Oslo Airport | NOK 235,034.52 | NOK - | Yes | Yes |
| 1055 | Thon Hotel Tromsø | NOK 235,034.52 | NOK - | Yes | Yes |
| 1056 | Thor Xpress Transport, LLC | NOK 240,584.72 | NOK - | No | No |
| 1057 | THS Couriers Ltd | NOK 1,642.21 | NOK - | No | No |
| 1058 | TNT Sverige AB | NOK 1,001.34 | NOK - | No | No |
| 1059 | Tools AS | NOK 47,551.09 | NOK - | Yes | Yes |
| 1060 | Tools Sverige AB | NOK 4,525.57 | NOK - | No | No |
| 1061 | Totalkapital AS (Boersma Hielke (Sekundi)) | NOK 7,431.16 | NOK - | Yes | Yes |
| 1062 | Tourism Ireland | NOK 107,115.00 | NOK - | Yes | Yes |
| 1063 | Toyota Bilia AS | NOK 2,089.35 | NOK - | No | No |
| 1064 | Toyota Material Handling Denmark | NOK 16,190.36 | NOK - | No | No |
| 1065 | Toyota Material Handling Norway AS | NOK 29,929.00 | NOK - | No | No |
| 1066 | Toyota Material Handling Sweden Ren | NOK 6,298.04 | NOK - | Yes | Yes |
| 1067 | Toyota Romerike AS Jessheim | NOK 2,486.00 | NOK - | No | No |
| 1068 | Trading Aviation Services MB | NOK 4,047.03 | NOK - | No | No |
| 1069 | Trafikstyrelsen (Danish Transport A | NOK 1,675,436.41 | NOK - | Yes | Yes |
| 1070 | Travelmarket  AS | NOK 22,983.14 | NOK - | No | No |
| 1071 | Travelport International Ltd. | NOK 4,158,388.11 | NOK - | Yes | Yes |

100

| 1072 | Tristar Aircraft Spares | NOK 18,350.65 | NOK - | No | No |
|------|------------------------|---------------|--------|-----|-----|
| 1073 | Tromsø Asvo AS | NOK 446.00 | NOK - | No | No |
| 1074 | Tromsø Taxi AS | NOK 204,304.83 | NOK - | Yes | Yes |
| 1075 | Tryg Forsikring | NOK 117,652.45 | NOK - | No | No |
| 1076 | Tui Airlines Belgium | NOK 33,473.44 | NOK - | Yes | Yes |
| 1077 | TUI Sverige AB | NOK 716,855.85 | NOK - | Yes | Yes |
| 1078 | TUIFly Nordic AB | NOK 17,673.98 | NOK - | No | No |
| 1079 | Tullverket | NOK 33,552.16 | NOK - | No | No |
| 1080 | Turbo Resources Int'l | NOK 15,794.63 | NOK - | No | No |
| 1081 | Turismo City | NOK 112,917.60 | NOK - | No | No |
| 1082 | Turk Hava Yollari Teknik A.S. EUR (Turkish Airline Technic Inc) | NOK 53,557.50 | NOK - | Yes | Yes |
| 1083 | Turner Aviation Ltd | NOK 113,766.43 | NOK - | No | No |
| 1084 | Tur-Retur Reiser AS | NOK 4,549.00 | NOK - | Yes | Yes |
| 1085 | U.S Travel Association | NOK 117,602.27 | NOK - | No | No |
| 1086 | UAB Litcargus | NOK 214,987.30 | NOK - | Yes | Yes |
| 1087 | Ukrainian State Air Traffic Service | NOK 28,208.52 | NOK - | Yes | Yes |
| 1088 | Ullensaker Kommune | NOK 24,205.00 | NOK - | Yes | Yes |
| 1089 | Ultra Rapit S.L. | NOK 1,162.20 | NOK - | No | No |
| 1090 | Umeå Business Group AB | NOK 192,712.94 | NOK - | Yes | Yes |
| 1091 | Unicef-komiteen i Norge | NOK 51,320.29 | NOK - | No | No |
| 1092 | Uniconsult AS | NOK - | NOK - | No | No |
| 1093 | UniformPartner AS | NOK 103,200.86 | NOK - | Yes | Yes |
| 1094 | UPS Norway AS | NOK 41.61 | NOK - | No | No |
| 1095 | URBAN SOLUTION S.R.L. | NOK 242.91 | NOK - | No | No |
| 1096 | USDA,Animal and Planet Health Insp | NOK 1,321,168.76 | NOK - | No | No |

| 1097 | UTC Aerospace Systems | NOK 13,239,218.40 | NOK - | Yes | Yes |
|------|----------------------|-------------------|-------|-----|-----|
| 1098 | Utleiemegler Krogsveen AS | NOK 21,591.00 | NOK - | No | No |
| 1099 | Utleiesenteret AS | NOK 39,527.00 | NOK - | Yes | Yes |
| 1100 | Vacaciones eDreams S.L.U. | NOK 2,975,291.69 | NOK - | Yes | Yes |
| 1101 | Valitor A/S | NOK 148,165.97 | NOK - | Yes | Yes |
| 1102 | Vardia Insurance Group ASA | NOK 1,500.00 | NOK - | No | No |
| 1103 | VEGAMOT AS | NOK 270.00 | NOK - | Yes | Yes |
| 1104 | Vegfinans AS | NOK 183.00 | NOK - | No | No |
| 1105 | Veljekset Roininen Oy | NOK 111,346.04 | NOK - | Yes | Yes |
| 1106 | Verdal Kabel TV AS | NOK 1,096.00 | NOK - | No | No |
| 1107 | Vianor as | NOK 6,733.00 | NOK - | Yes | Yes |
| 1108 | Vidar Skaug Lege | NOK 875,700.00 | NOK - | Yes | Yes |
| 1109 | Vika project Finance | NOK 1,401,120.00 | NOK - | No | No |
| 1110 | Villa Newark B, LLC | NOK 120.13 | NOK - | Yes | Yes |
| 1111 | Vipps AS | NOK 4,156.12 | NOK - | No | No |
| 1112 | Visma Advantage AS | NOK 16,073,729.54 | NOK - | Yes | Yes |
| 1113 | Visma bWise AS | NOK 295,656.25 | NOK - | No | No |
| 1114 | Visma Enterprise AS | NOK 18,360.00 | NOK - | No | No |
| 1115 | Visma Financial Solutions AB | NOK 3,937.12 | NOK - | Yes | Yes |
| 1116 | Visma Financial Solutions AS | NOK 96,834.87 | NOK - | No | No |
| 1117 | Visma PPG Oy | NOK 668.72 | NOK - | No | No |
| 1118 | Vizeum Oy | NOK 81.41 | NOK - | No | No |
| 1119 | Vizeum UK | NOK 2,950,600.54 | NOK - | No | No |
| 1120 | Wagamama | NOK 767.05 | NOK - | Yes | Yes |
| 1121 | Wahl-Larsen Advokatfirma | NOK 66,970.10 | NOK - | No | No |

| 1122 | Watson Farley Williams LLP | NOK 155,807.60 | NOK - | Yes | Yes |
|------|-----------------------------|----------------|-------|-----|-----|
| 1123 | Webstep AS | NOK 3,026,808.76 | NOK - | Yes | Yes |
| 1124 | Wencor LLC | NOK 1,508,763.86 | NOK - | Yes | Yes |
| 1125 | Wergelandapenes AS | NOK 393,329.71 | NOK - | No | No |
| 1126 | Wesco Aircraft Germany GmbH | NOK 10,942,706.34 | NOK - | No | No |
| 1127 | Westend Rens AS | NOK 6,455.00 | NOK - | Yes | Yes |
| 1128 | Western Delivery Solutions | NOK 39,257.31 | NOK - | No | No |
| 1129 | WFS Worldwide Flight Services Ire | NOK 4,762.44 | NOK - | No | No |
| 1130 | Whispr Group Norge AS | NOK 352,500.00 | NOK - | Yes | Yes |
| 1131 | Widerøe Ground Handling AS | NOK 27,616.92 | NOK - | No | No |
| 1132 | Widerøe's Flyveselskap AS | NOK 26,084.81 | NOK - | No | No |
| 1133 | Wikborg Rein &b Co | NOK 629,405.81 | NOK - | Yes | Yes |
| 1134 | William Frick Company | NOK 30,946.18 | NOK - | Yes | Yes |
| 1135 | WJ Business Partner AS | NOK 25,449.18 | NOK - | Yes | Yes |
| 1136 | Wolfgang Steubing AG# | NOK 50,879.63 | NOK - | Yes | Yes |
| 1137 | Words & Pictures Ltd. | NOK 7.19 | NOK - | No | No |
| 1138 | World Fuel Services | NOK 534,890.48 | NOK - | Yes | Yes |
| 1139 | Worldwide Flight Services | NOK 20,245.16 | NOK - | No | No |
| 1140 | WOW Air ehf. | NOK 25,815.49 | NOK - | No | No |
| 1141 | Würth Danmark A/S | NOK 13,231.43 | NOK - | No | No |
| 1142 | Würth Norge AS | NOK 514,331.56 | NOK - | Yes | Yes |
| 1143 | Würth Svenska AB | NOK 74,550.00 | NOK - | No | No |
| 1144 | Yabba Island Foods | NOK 27,076.50 | NOK - | No | No |
| 1145 | Yokohama Aerospace America, Inc. | NOK 117,118.90 | NOK - | Yes | Yes |
| 1146 | Yource B.V. | NOK 559,675.88 | NOK - | Yes | Yes |

| | | | | | |
|---|---|---|---|---|---|
| 1147 | Zacco Innovation Technology Norway | NOK 1,969,593.75 | NOK - | Yes | Yes |
| 1148 | ZAS Z-Aviation Services | NOK 262,342.85 | NOK - | No | No |
| 1149 | Zisson AS | NOK 244,400.19 | NOK - | No | No |
| 1150 | Zodiac Galley Inserts (SELL GmbH) | NOK 100,450.20 | NOK - | Yes | Yes |
| 1151 | DNB | NOK 867,774.00 | NOK - | Yes | Yes |
| 1152 | Dankse | NOK 406,875.29 | NOK - | Yes | Yes |
| 1153 | Finland VAT Authority | NOK 3,980,188.92 | NOK - | No | No |
| 1154 | Menzies Aviation Spain S.L. | NOK 1,386,114.80 | NOK - | Yes | Yes |
| 1155 | Lufthansa Technik Landing Gear Serv | NOK 1,145,668.99 | NOK - | Yes | Yes |
| 1156 | Geirangerfjorden | NOK 76,516,692.09 | NOK 198,212,384.20 | No | No |
| | **Total** | **NOK 1,662,780,981.61** | | | |

| GIEK Guaranteed Loan Facilities Creditors | | | | | |
|---|---|---|---|---|---|
| No of Credi tor | Creditor Name | Amount at 18 November 2020 | NOK Amount at 18 November 2020 | Claim Received (Yes/No) | Claim Agreed in Quantum & Liability |
| 1 | Garantiinstituttet Eksportkreditt / Norwegian Export Credit Guarantee Agency | NOK 2,989,000,000 | NOK 2,989,000,000 | Yes | No |
| 2 | Danske Bank | NOK 16,500,000 | NOK 16,500,000 | Yes | No |
| 3 | DNB Bank | NOK 285,500,000 | NOK 285,500,000 | Yes | No |
| | **Total** | **NOK 3,291,000,000** | **NOK 3,291,000,000** | | |

| Retained Guaranteed Creditors | | | | | | |
|---|---|---|---|---|---|---|
| No of Creditor | Creditor Name | Amount at 18 November 2020 | NOK Amount at 18 November 2020 | Claim Submitted to the Reconstructor | Claim Received (Yes/No) | Claim Agreed in Quantum & Liability |
| 1 | Accipiter | $ 19,338,449 | NOK 174,539,171 | NOK - | Yes | Yes |
| 2 | Aercap | $ 1,826,866 | NOK 16,488,379 | NOK - | Yes | Yes |
| 3 | Avolon | $ 9,806,058 | NOK 88,504,577 | NOK - | Yes | Yes |
| 4 | BBAM | $ 11,896,745 | NOK 107,374,070 | NOK - | Yes | Yes |
| 5 | Clover - ex FPG | $ 46,963,375 | NOK 423,867,937 | NOK - | No | No |
| 6 | DVB | $ 37,018,476 | NOK 334,110,252 | NOK - | Yes | Yes |
| 7 | FPG | $ 124,027,213 | NOK 1,119,407,608 | NOK - | No | No |
| 8 | Goshawk | $ 16,632,966 | NOK 150,120,834 | NOK - | Yes | Yes |
| 9 | ICBC | $ 38,437,234 | NOK 346,915,255 | NOK - | No | No |
| 10 | Itochu | $ 12,922,416 | NOK 116,631,261 | NOK - | Yes | Yes |
| 11 | Investec | $ - | NOK - | NOK - | Yes | Yes |
| 12 | Macquarie | $ 17,590,799 | NOK 158,765,758 | NOK - | Yes | Yes |
| 13 | Minsheng | $ 1,937,246 | NOK 17,484,618 | NOK - | Yes | Yes |
| 14 | Mitsui | $ 26,400,967 | NOK 238,281,931 | NOK - | Yes | Yes |
| 15 | SMBC | $ 75,268,927 | NOK 679,339,697 | NOK - | Yes | Yes |
| 16 | USPP | $ 769,000 | NOK 6,940,610 | NOK - | Yes | Yes |
| 17 | Wings Capital | $ 37,131,096 | NOK 335,126,704 | NOK - | Yes | Yes |
| | | | NOK 4,313,898,662 | | | |

| Non-Retained Guaranteed Creditors | | | | | | |
|---|---|---|---|---|---|---|
| No of Creditor | Creditor Name | Amount at 18 November 2020 | NOK Amount at 18 November 2020 | Claim Submitted to the Reconstructor | Claim Received (Yes/No) | Claim Agreed in Quantum & Liability |
| 1 | ACG | $ 54,912,434 | NOK 495,612,176 | NOK 20,508,103 | No | No |
| 2 | Aercap | $ 675,000,000 | NOK 6,092,212,500 | NOK 8,263,044,849 | No | No |
| 3 | AFIC | $ 325,571,581 | NOK 2,938,446,303 | NOK 6,426,643,615 | No | No |
| 4 | Avolon | $ 180,660,994 | NOK 1,630,555,801 | NOK - | Yes | Yes |
| 5 | BOCA | $ 378,000,000 | NOK 3,411,639,000 | NOK - | No | No |
| 6 | CCB | $ 19,425,000 | NOK 175,320,338 | NOK - | No | No |
| 7 | Dr Peters | $ 108,622,782 | NOK 980,374,915 | NOK - | No | No |
| 8 | EETC | $ 50,000,000 | NOK 451,275,000 | NOK - | No | No |
| 9 | EXIM | $ 80,000,000 | NOK 722,040,000 | NOK 7,162,769,223 | No | No |
| 10 | ICBC | $ 101,416,566 | NOK 915,335,214 | NOK - | No | No |
| 11 | Jackson Square Aviation | $ 155,368,684 | NOK 1,402,280,060 | NOK - | Yes | Yes |
| 12 | Merx | $ 60,206,639 | NOK 543,395,024 | NOK - | No | No |
| 13 | MG Aviation ltd | $ 240,000,000 | NOK 2,166,120,000 | NOK - | No | No |
| 14 | Mitsui | $ 20,963,380 | NOK 189,204,987 | NOK - | No | No |
| 15 | Nord LB/ Floreat | $ 75,000,000 | NOK 676,912,500 | NOK 895,280,402 | No | No |
| 16 | Orix | $ 14,448,853 | NOK 130,408,123 | NOK - | Yes | Yes |
| 17 | SKK | $ 636,333 | NOK 5,743,226 | NOK - | Yes | Yes |
| 18 | SMBC | $ 23,824,970 | NOK 215,032,263 | NOK - | Yes | YES |
| 19 | UKEF | $ 356,626,893 | NOK 3,218,736,022 | NOK - | No | No |
| 20 | USPP | $ 4,050,000 | NOK 36,553,275 | NOK - | Yes | Yes |
| | Total | | NOK 26,397,196,729 | | | |

| Terminated Contract Creditors | | | | | | |
|---|---|---|---|---|---|---|
| No of Creditor | Creditor Name | Amount at 18 November 2020 | NOK Amount at 18 November 2020 | Claim Submitted to the Reconstructor | Claim Received (Yes/No) | Claim Agreed in Quantum & Liability |
| 1 | Ambius/Rentokil | NOK 10,392.00 | NOK 10,392 | NOK - | No | No |
| 2 | Airbus | £ 600,000.00 | NOK 7,191,120 | NOK - | No | No |
| 3 | Airinc/ Collins | $ 8,247,648 | NOK 74,439,147 | NOK - | Yes | Yes |
| 4 | AUS Fuel | $ 1,709 | NOK 15,425 | NOK - | No | No |
| 5 | BOSFUEL Corporation | $ - | NOK - | NOK - | No | No |
| 6 | Concur Holdings (Netherlands) B.V | NOK 503,000.00 | NOK 503,000 | NOK - | No | No |
| 7 | Fornebuveien AS | NOK 12,333,207.00 | NOK 12,333,207 | NOK 12,333,207 | No | No |
| 8 | Fornebuveien Eiendomsinvest AS/ FBV 38-40 AS | NOK 34,835.00 | NOK 34,835 | NOK - | No | No |
| 9 | FSM Group LLC | $ 68,719 | NOK 620,223 | NOK - | No | No |
| 10 | Gate Group | NOK 60,973,878.56 | NOK 60,973,879 | NOK - | No | No |
| 11 | Inflight Audio | $ 1,015,000 | NOK 9,160,883 | NOK - | Yes | Yes |
| 12 | International Aero Engines | $ 79,000,000 | NOK 713,014,500 | NOK - | No | No |
| 13 | Kaffeknappen Sverige AB | SEK 15,629.00 | NOK 16,392 | NOK - | No | No |
| 14 | Københavns Lufthavne A/S | DKK 323,087.00 | NOK 464,438 | NOK - | No | No |
| 15 | LAWTFC | $ 138,732 | NOK 1,252,125 | NOK - | No | No |
| 16 | Laxfuel Corporation | $ 113,452 | NOK 1,023,961 | NOK - | No | No |
| 17 | Lufthansa Technik - EUR | NOK 175,425,756.71 | NOK 175,425,757 | NOK 77,461,756 | No | No |
| 18 | Massachusetts Port Authority | $ 245,258.00 | NOK 2,213,576 | NOK - | No | No |
| 19 | No. 1 Lounges LGW | £ 75,176.00 | NOK 900,999 | NOK - | No | No |
| 20 | Orlando Fuel Facilities/ Ft. Lauderdale Fuel Facilities | $ 18,639 | NOK 168,226 | NOK - | Yes | Yes |

| 21 | Panasonic Avionics Corporation | $ 3,850,000 | NOK 34,748,175 | NOK - | Yes | Yes |
|----|--------------------------------|-------------|----------------|-------|-----|-----|
| 22 | Rolls-Royce PLC (USD) | $ 455,548,617 | NOK 4,111,554,044 | NOK - | Yes | Yes |
| 23 | ROW 44 Inc. (Global Eagle) | $ 22,431,117 | NOK 202,452,047 | NOK - | Yes | Yes |
| 24 | SFO Fuel Company LLC | $ 114,322 | NOK 1,031,813 | NOK - | No | No |
| 25 | TBITEC Service | $ 1,160,553 | NOK 10,474,571 | NOK - | Yes | Yes |
| 26 | Terminal One Group Association L.P. (Toga) | $ 40,690,304 | NOK 367,250,339 | NOK - | No | No |
| 27 | TreDoffice AB | NOK 3,633,086.00 | NOK 3,633,086 | NOK 5,354,699 | No | No |
| 28 | UTC (Airbus Financing) | $ 43,300,000.00 | NOK 390,804,150 | NOK - | No | No |
| | **Total** | - | **NOK 6,181,710,309** | | | |

| Retained Sub-Lease Creditors | | | | | |
|---|---|---|---|---|---|
| No of Credi tor | Creditor Name | Amount at 18 November 2020 | NOK Amount at 18 November 2020 | Claim Received (Yes/No) | Claim Agreed in Quantum & Liability |
| 1 | Drammensfjorden Leasing Ltd (ICBC) | $ 38,437,233.99 | NOK 346,915,255.35 | No | No |
| 2 | Lysakerfjorden (Avolon) | $ - | NOK - | No | No |
| 3 | Oslofjorden (Investec) | $ - | NOK - | No | No |
| | | **$ 38,437,233.99** | **NOK 346,915,255.35** | | |

| Terminated Guaranteed Sub-Lease Creditors | | | | | | |
|---|---|---|---|---|---|---|
| No of Credit or | Creditor Name | Amount at 18 November 2020 | NOK Amount at 18 November 2020 | Claim Submitted to the Reconstructor | Claim Receive d (Yes/No) | Claim Agreed in Quantu m & Liability |
| 1 | Drammensfjorden Leasing Ltd (ACG) | $ 54,912,434.28 | NOK 495,612,175.55 | NOK 20,508,103.29 | No | No |
| 2 | DY7 (EXIM) | $ 30,000,000.00 | NOK 270,765,000.00 | NOK 3,035,233,648.75 | No | No |
| 3 | DY9 (EXIM) | $ 30,000,000.00 | NOK 270,765,000.00 | NOK 2,819,821,449.35 | No | No |
| 4 | Lysakerfjorden (Mitsui) | $ 5,260,303.85 | NOK 47,476,872.37 | NOK - | No | No |
| 5 | Ofotfjorden (UKEF) | $ 74,412,165.60 | NOK 671,607,000.64 | NOK - | No | No |
| 6 | Sognefjorden (UKEF) | $ 125,560,173.62 | NOK 1,133,243,347.01 | NOK - | No | No |
| 7 | Torskefjorden (Aercap) | $ 360,000,000.00 | NOK 3,249,180,000.00 | NOK 4,272,580,984.70 | No | No |
| 8 | Torskefjorden (Dr. Peters) | $ 108,622,781.60 | NOK 980,374,915.29 | | No | No |
| 10 | Torskefjorden (MG Aviation ) | $ 180,000,000.00 | NOK 1,624,590,000.00 | | No | No |
| 11 | Ullsfjorden (AFIC) | $ 38,548,187.28 | NOK 347,916,664.30 | NOK 746,859,755.38 | No | No |
| | Total | | NOK 9,091,530,975.17 | | | |

111

| Retained Lease Creditor | | | | | |
|---|---|---|---|---|---|
| No of Credi tor | Creditor Name | Amount at 18 November 2020 | NOK Amount at 18 November 2020 | Claim Received (Yes/No) | Claim Agreed in Quantum & Liability |
| 1 | Engine Lease Finance Corporation | $ 8,094,772.00 | NOK 73,059,365 | Yes | Yes |
| | **Total** | **$ 8,094,772.00** | **NOK 73,059,365** | | |

| Terminated Lease Creditors | | | | | |
|---|---|---|---|---|---|
| No of Credi tor | Creditor Name | Amount at 18 November 2020 | NOK Amount at 18 November 2020 | Claim Received (Yes/No) | Claim Agreed in Quantum & Liability |
| 1 | EXIM | $ 50,000,000.00 | NOK 451,275,000 | No | No |
| 2 | RRPF | $ 30,768,238.24 | NOK 277,698,734 | Yes | Yes |
| 3 | Willis | $ 615,000.00 | NOK 5,550,683 | No | No |
| | **Total** | | **NOK 734,524,417** | | |

| Customer Creditors | | | | | |
|---|---|---|---|---|---|
| No of Credi tor | Creditor Name | Amount at 18 November 2020 | NOK Amount at 18 November 2020 | Claim Received (Yes/No) | Claim Agreed in Quantum & Liability |
| | Total Customer Refunds & Damages | | NOK 521,622,802 | No | No |
| | **Total** | | **NOK 521,622,802** | | |

| 2020 Convertible Perpetual Bond Creditors | | | | | |
|---|---|---|---|---|---|
| No of Credit or | Creditor Name | Amount at 18 November 2020 | NOK Amount at 18 November 2020 | Claim Received (Yes/No) | Claim Agreed in Quantum & Liability |
| | **NO0010883416** | | | | |
| 1 | Nordic Trustee AS - NAS10 Bond | € 850,144 | NOK 9,106,316 | Yes | Yes |
| | **NO0010883473** | | | | |
| 2 | Nordic Trustee AS - NAS11 Bond | SEK 1,517,010 | NOK 1,591,040 | Yes | Yes |
| | **NO0010883515** | | | | |
| 3 | Nordic Trustee AS - NAS12 Bond | $ 8,824,914 | NOK 79,649,263 | Yes | Yes |
| | **NO0010884646** | | | | |
| 4 | Nordic Trustee AS | $ - | NOK - | Yes | Yes |
| | **Total** | | **NOK 90,346,620** | | |

| Connected and Intercompany Creditors | | | | | |
|---|---|---|---|---|---|
| No of Creditor | Creditor Name | Amount at 18 November 2020 | NOK Amount at 18 November 2020 | Claim Received (Yes/No) | Claim Agreed in Quantum & Liability |
| 1 | Norwegian Air Sweden AB | NOK 491,168,468 | NOK 491,168,468 | No | No |
| 2 | Norwegian Air Res US Inc | NOK 26,871,249 | NOK 26,871,249 | No | No |
| 3 | Norwegian Ground Handling | NOK 75,383,090 | NOK 75,383,090 | No | No |
| 4 | Norwegian Cargo AS | NOK 65,839,095 | NOK 65,839,095 | No | No |
| 5 | Oslofjorden Ltd | NOK 116,979,196 | NOK 116,979,196 | No | No |
| 6 | Drammensfjorden Ltd | NOK - | NOK - | No | No |
| 7 | Norwegian Air R. Ireland | NOK 8,960,348 | NOK 8,960,348 | No | No |
| 8 | Norwegian Training Academ | NOK 21,383,175 | NOK 21,383,175 | No | No |
| 9 | Norwegian Air Resources S | NOK 23,122,212 | NOK 23,122,212 | No | No |
| 10 | DY1 Aviation Ireland Ltd | NOK 851,983,512 | NOK 851,983,512 | No | No |
| 11 | DY2 Aviation Ireland Ltd | NOK 874,769,176 | NOK 874,769,176 | No | No |
| 12 | DY3 Aviation Ireland Ltd | NOK - | NOK - | No | No |
| 13 | DY4 Aviation Ireland Ltd | NOK 523,260,572 | NOK 523,260,572 | No | No |
| 14 | DY5 Aviation Ireland Ltd | NOK 367,957,005 | NOK 367,957,005 | No | No |
| 15 | DY6 Aviation Ireland Ltd | NOK 38,553,806 | NOK 38,553,806 | No | No |
| 16 | Geirangerfjorden Ltd | NOK 616,174,014 | NOK 616,174,014 | No | No |
| 17 | Norwegian Brand Ltd. | NOK 304,818,817 | NOK 304,818,817 | No | No |
| 18 | Norwegian Air Int. Ltd | NOK 1,599,363,298 | NOK 1,599,363,298 | No | No |
| 19 | Boknafjorden Ltd | NOK 395,353,601 | NOK 395,353,601 | No | No |
| 20 | Norwegian Air UK Ltd | NOK 853,410,534 | NOK 853,410,534 | No | No |
| 21 | Torskefjorden Ltd | NOK - | NOK - | No | No |
| 22 | Lysakerfjorden Leasing Lt | NOK - | NOK - | No | No |

116

| 23 | Fiskefjorden Ltd | NOK 268,828,921 | NOK 268,828,921 | No | No |
|----|------------------|-----------------|-----------------|-----|-----|
| 24 | Red Maintenance Spain S.L | NOK 18,162,806 | NOK 18,162,806 | No | No |
| 25 | Red Handling Spain S.L. | NOK 8,636,142 | NOK 8,636,142 | No | No |
| 26 | Norwegian Air Resources Spain | NOK 27,999,613 | NOK 27,999,613 | No | No |
|    | **Total** | **NOK 7,578,978,648** | **NOK 7,578,978,648** | | |

| Contingent Unagreed Creditors | | | | | |
|---|---|---|---|---|---|
| No of Credi tor | Creditor Name | Amount at 18 November 2020 | NOK Amount at 18 November 2020 | Claim Received (Yes/No) | Claim Agreed in Quantum & Liability |
| 1 | The Boeing Company | $ - | NOK | No | No |
| 2 | IRS - New York State Division of Tax Appeals | $ 147,125 | NOK 1,327,873 | No | No |
| 3 | John Martini, PLTF vs. Norwegian Air Shuttle ASA, DFT | $ 6,401 | NOK 57,777 | No | No |
| 4 | Norwegian Tax Authority | NOK - | NOK 673,288,069 | No | No |
| 5 | Norwegain Air Resources DK LH ApS, in bankruptcy | NOK - | NOK - | No | No |
| 6 | Norwegain Pilot Services Denmark ApS, in bankruptcy | NOK - | NOK - | No | No |
| 7 | Norwegian Cabin Services DK ApS, in Bankruptcy | NOK - | NOK - | No | No |
| 8 | Danish Transport, Transport and Housing Authority | NOK - | NOK - | No | No |
| 9 | Norwegian Holidays AS | NOK - | NOK - | No | No |
| 10 | Norwegian Air International Limited | NOK - | NOK - | No | No |
| 11 | Arctic Aviation Assets DAC | NOK - | NOK - | No | No |
| 12 | Arctic Aviation Assets DAC | NOK - | NOK - | No | No |
| 13 | Norwegian Air Norway AS | NOK - | NOK - | No | No |
| 14 | Norwegian Air Resources Ireland Ltd | NOK - | NOK - | No | No |
| 15 | Norwegian Air Resources Shared Service Center AS | NOK - | NOK - | No | No |
| 16 | Norwegian Air UK Limited | NOK - | NOK - | No | No |
| 17 | RED Handling UK Ltd | NOK - | NOK - | No | No |
| 18 | Norwegian Air Norway AS | NOK - | NOK - | No | No |
| 19 | Norwegian Air Resources Shared Service Center AS | NOK - | NOK - | No | No |
| 20 | Norwegian Air Norway AS | NOK - | NOK - | No | No |
| 21 | Norwegian Air UK Limited | NOK - | NOK - | No | No |
| 22 | Norwegian Air International Limited | NOK - | NOK - | No | No |
| 23 | Norwegian Air Sweden AB | NOK - | NOK - | No | No |
| 24 | Norwegian Air Argentina Holding S.A | NOK - | NOK - | No | No |
| 25 | Norwegian Air Norway AS | NOK - | NOK - | No | No |

| 26 | Norwegian Air UK Limited | NOK - | NOK - | No | No |
|----|---------------------------|-------|-------|-----|-----|
| 27 | Norwegian Air International Limited | NOK - | NOK - | No | No |
| 28 | Norwegian Air Sweden AB | NOK - | NOK - | No | No |
| 29 | Norwegian Air Norway AS | NOK - | NOK - | No | No |
| 30 | Norwegian Air UK Limited | NOK - | NOK - | No | No |
| 31 | Norwegian Air International Limited | NOK - | NOK - | No | No |
| 32 | Norwegian Air Sweden AB | NOK - | NOK - | No | No |
| 33 | Norwegian Air Norway AS | NOK - | NOK - | No | No |
| 34 | Norwegian Air UK Limited | NOK - | NOK - | No | No |
| 35 | Norwegian Air International Limited | NOK - | NOK - | No | No |
| 36 | Norwegian Air Sweden AB | NOK - | NOK - | No | No |
| 37 | Norwegian Air Norway AS | NOK - | NOK - | No | No |
| 38 | Norwegian Air UK Limited | NOK - | NOK - | No | No |
| 39 | Norwegian Air International Limited | NOK - | NOK - | No | No |
| 40 | Norwegian Air Sweden AB | NOK - | NOK - | No | No |
| 41 | Norwegian Air Argentina Holding S.A | NOK - | NOK - | No | No |
|    | **Total** | **-** | **NOK 674,673,718** | | |

**SCHEDULE 6**

New Capital Perpetual Bonds and Retained Claims Bonds – Term Sheet

# TERM SHEET



### NORWEGIAN AIR SHUTTLE ASA FRN PERPETUAL SUBORDINATED CONVERTIBLE BONDS
### ISIN [●]

| | |
|---|---|
| **Issuer:** | Norwegian Air Shuttle ASA, incorporated under the laws of Norway with business registration number 965 920 358 and LEI-code 549300IEUH2FEM2Y6B51 |
| **Bond Trustee:** | Nordic Trustee AS, a company existing under the laws of Norway with registration number 963 342 624 and LEI-code 549300XAKTM2BMKIPT85 |
| **Currency:** | NOK |
| **Issue Amount:** | Up to NOK 1,875,000,000 (excluding any PIK Bonds) |
| **Issue Date:** | Expected to be [●][1] |
| **Maturity Date:** | The Bonds shall be perpetual with no scheduled maturity date. |
| **Interest Rate:** | The percentage rate per annum which is the aggregate of the Reference Rate plus the Margin. |

**Margin:**

| Year 1 | Years 2 - 3 | Years 4 - 5 | Years 6 - 7 | Year 8+ |
|---|---|---|---|---|
| 250 bps | 350 bps | 500 bps | 700 bps | 950bps |

| | |
|---|---|
| **Reference Rate:** | 6-month NIBOR |
| **Interest:** | Interest to be settled in cash on each relevant Interest Payment Date, unless the Issuer elects to pay interest through issuance of additional Bonds (**PIK Bonds**). |
| **PIK Bonds:** | PIK Bonds shall have Conversion Rights and shall bear interest at a rate equal to the Interest Rate from time to time, however will be treated as a separate claim in the CSD and will be provided with a separate ISIN in accordance with the procedures of the CSD. Any ISIN for PIK Bonds shall not have any voting rights in accordance with the Bond Terms and will be subject to Bondholders' decisions made in any Bondholders Meeting. |

---

[1] To be the Effective Date in respect of the schemes of arrangement under the Examinerships and/or the reconstruction plan under the Reconstruction

| | |
|---|---|
| **Interest Payment Date:** | The last day of each Interest Period, the first Interest Payment Date being [●] |
| **Interest Periods:** | Subject to adjustment in accordance with the Business Day Convention, the period between [●] and [●] each year, and between the end of any such period and the commencement of the corresponding period in the following year. |
| **Business Day:** | A day on which both the relevant CSD settlement system is open and the relevant Bond currency settlement system is open. |
| **Business Day Convention:** | If the last day of any Interest Period originally falls on a day that is not a Business Day, the Interest Period will be extended to include the first following Business Day unless that day falls in the next calendar month, in which case the Interest Period will be shortened to the first preceding Business Day. |
| **Default Interest:** | Interest Rate plus 2 percentage points p.a. |
| **Conversion Rights:** | Each Bond (including any PIK Bonds) shall entitle the holder, at any time during the Conversion Period, to convert such Bond into ordinary shares of the Issuer (**Shares**), credited as fully paid, at the Conversion Price. |
| **Conversion Price:** | NOK [●][2], subject to adjustment as set out in *Anti-Dilution Protection* below<br><br>Upon conversion of Bonds to Shares, a consideration equal to the Conversion Price shall be paid for each Share. Payment shall be carried out by set-off against the Bonds. The number of new Shares to be issued upon conversion shall equal the aggregate nominal value of the Bonds that are to be converted, divided by the Conversion Price. If this does not result in a whole number of Shares, the number shall be rounded down to the nearest number of whole Shares. |
| **Conversion Period:** | The Conversion Period shall commence on the second anniversary of the Issue Date and shall end on (and include) the tenth Business Day prior to (i) the Conversion Right Expiry Date or (ii) any earlier date fixed for redemption of the Bonds.<br><br>Any Bondholder that is also a shareholder of the Issuer on the date on which an Extension Resolution is proposed at a General Meeting of the Issuer shall vote in favour of the Extension Resolution.<br><br>**Conversion Right Expiry Date** means the date that is (i) five years from the date on which the issue of the Bonds was approved by the Issuer or, if later (ii) the latest date on which the Conversion Rights may be exercised pursuant to an Extension Resolution. |

---

[2] Conversion Price to be 150% of the share price in respect of the Rights Offering / Private Placement.

**Extension Resolution** means a valid resolution by the Issuer, to be made prior to the Conversion Right Expiry Date, to extend the conversion period for the Conversion Rights.[3]

**Conversion Notice Period**: 10 Business Days

| | |
|---|---|
| **Interest following Conversion Right Expiry Date** | If the Conversion Right Expiry Date occurs, the provisions with respect to Default Interest shall apply, save that the rate of such Default Interest shall be the Interest Rate plus 20 percentage points p.a., until such time as the Conversion Right Expiry Date is extended. |
| **Anti-Dilution Protection:** | Euro-market standard anti-dilution provisions dealing with, *inter alia*, share consolidations, share splits, spin-off events, rights issues and reorganisations (provided that no adjustment shall occur as a consequence of any event or circumstance provided for by any scheme of arrangement in relation to the Examinerships and/or Reconstruction (as defined below)). |
| **Subscription Price:** | 100% of the Initial Nominal Amount |
| **Initial Nominal Amount:** | NOK 1 |
| **Minimum Investment:** | The minimum permissible investment in the Bonds is the NOK equivalent of EUR 100,000. |
| **Use of proceeds:** | The Issuer will use the net proceeds from the Bond Issue for the general corporate purposes of the Issuer and its subsidiaries. |
| **Status of the Bonds:** | The Bonds, including any accrued interest any other amounts due in respect of the Bonds, shall constitute direct, unsecured obligations of the Issuer and shall rank: |

(a) *pari passu* without any preference among themselves;

(b) senior in right and priority of payment to the ordinary share capital of the Issuer (**Junior Obligations**); and

(c) junior in right and priority of payment, and shall be postponed and subordinated to, all present and future claims of all (i) unsubordinated creditors of the Issuer, and (ii) subordinated creditors whose rights are expressed to rank senior to the Bonds.

| | |
|---|---|
| **Dividend Restriction:** | No declaration or making of dividend, interest or other distributions or payments (including by way of repurchase) in respect of Junior Obligations at any time while any PIK Bonds remain outstanding. |
| **No set-off:** | Subject to applicable law, no Bondholder may exercise, claim or plead any right of set-off, compensation or retention in respect of any amount owed to it by the |

---

[3] Pursuant to Norwegian law, conversion rights may not be granted in excess of five years without a subsequent resolution extending such period

Issuer in respect of, or arising under or in connection with the Bonds and each Bondholder shall, by virtue of its holding of any Bond, be deemed to have waived all such rights of set-off, compensation or retention.

**Listing:** The Issuer shall use its reasonable endeavours to ensure that the Bonds are listed on the Exchange within 6 months after the Issue Date and thereafter remain listed on the Exchange until the Bonds have been redeemed in full.

**Exchange:** Oslo Børs

**Transaction Security:** Unsecured

**Finance Documents** The Bond Terms, the Bond Trustee Agreement, the Calculation Agency Agreement and any other document designated by the Issuer and the Bond Trustee as a Finance Document.

**Conditions Precedent:** Disbursement of proceeds from the Bonds to the Issuer shall be conditional upon the events set out in Schedule 1 to this Term Sheet being fulfilled.

**Issuer Call Option:** The Issuer shall at any time after the fourth anniversary of the Issue Date (the **First Call Date**) have the right to redeem all or part of the Outstanding Bonds (including, if any, PIK Bonds), together with accrued and unpaid interest, at a price equal to:

(a)    from the First Call Date to the fifth anniversary of the Issue Date, 103% of Nominal Amount; and

(b)    after the fifth anniversary of the Issue Date, 100% of the Nominal Amount,

such right to be exercised by prior written notice to the Bond Trustee not more than 60 nor less than 30 calendar days prior to the settlement date for redemption.

**Listing Failure Event:** means that:

(a)    the Bonds have not been admitted to listing on the Exchange on or before the date that is 6 months after the Issue Date, or

(b)    in the case of a successful admission to listing, that a period of 6 months has elapsed since the Bonds ceased to be admitted to listing on the Exchange.

Upon a Listing Failure Event and for so long as such Listing Failure Event is continuing, the interest on any principal amount outstanding under the Bonds Terms shall accrue at the Interest Rate plus 1 percentage point p.a.

**Sustainability:** The Issuer will aim within 2030 to reduce carbon emissions with 45% per passenger per kilometer compared to the levels in 2010 and seek to be one of the leaders within the European airline industry in respect of emissions and sustainability.

| | |
|---|---|
| **Information Undertakings:** | Customary information undertakings, to include making financial reports available on the website of the Issuer, and informing the Bond Trustee and the Bondholders of a Listing Failure Event or the occurrence of the Conversion Right Expiry Date |
| **No Events of Default:** | The Bond Terms will not contain any event of default provisions. Neither the Bond Trustee nor the Bondholders may declare any event of default by the Issuer of any of its obligations under the Bond Terms or accelerate, demand or enforce payment of any such obligations (neither on a contractual basis nor on the basis of general principles of Norwegian law). |
| | Notwithstanding the foregoing, the Bond Trustee may demand that the Bonds shall become due and payable, together with accrued and unpaid interest, on or after the date on which any order is made or resolution is passed for the final and irrevocable liquidation, final and irrevocable winding-up or final and irrevocable dissolution (or an analogous insolvency process in any jurisdiction) of the Issuer (other than for the purposes of reconstruction, amalgamation or merger where the Issuer is still solvent). |
| **Bond Terms:** | The standard Nordic Bond Terms for corporate high yield bonds related to each Relevant Jurisdiction will regulate the rights and obligations with respect to the Bonds. In the event of any discrepancy between this term sheet and the Bond Terms, the provisions of the Bond Terms shall prevail. |
| | By filing an application to subscribe for Bonds, each investor accepts to become a Bondholder (as defined in the Bond Terms) and to be bound by the provisions of the Bond Terms. Further, by filing such application, each investor accepts that certain adjustments to the structure and terms described in this term sheet may occur in the final Bond Terms. |
| | The Bond Terms shall include provisions on the Bond Trustee's right to represent the Bondholders, including a "no action" clause, meaning that no individual Bondholder may take any legal action against the Issuer individually (as further described in the Bond Terms). The Bond Terms will further contain provisions regulating the duties of the Bond Trustee, procedures for Bondholders' Meetings/Written Resolutions and applicable quorum and majority requirements for Bondholders' consent, whereby a sufficient majority of Bondholders may materially amend the provisions of the Bond Terms or discharge the Bonds in part or in full without the consent of all Bondholders, as well as other provisions customary for a bond offering as described herein. |
| **Defined terms:** | Capitalised terms used but not defined herein shall have the meaning ascribed to such terms in the standard Nordic Bond Terms for high yield bonds. |
| **Calculation Agent:** | [•] |
| **Paying and Conversion Agent:** | DNB Bank ASA |

| | |
|---|---|
| **Securities Depository:** | The Bonds will be registered in book entry form in Verdipapirsentralen ASA, the Norwegian central securities depository (the **CSD**). |
| **Examinerships and Reconstruction:** | References to the **Examinerships** and **Reconstruction** herein shall be references to (i) the examinerships of the Issuer and certain of its subsidiaries which commenced on an interim basis pursuant to an order of the High Court of Ireland made on 18 November 2020 and were subsequently confirmed by an order made on 7 December 2020 and (ii) the reconstruction of the Issuer granted by the Oslo Probate Court on 8 December 2020, respectively. |
| **Eligible Investors:** | Eligibility to be determined in accordance with the allocation principles as set out in Schedule 3 (*Principles for Allocation of New Capital Perpetual Bonds and Retained Claims Bonds*). |
| **Allocation:** | To be allocated in accordance with the allocation principles set out in Schedule 3 (*Principles for Allocation of New Capital Perpetual Bonds and Retained Claims Bonds*). |
| **Continuation of existing debt:** | An amount of each subscriber's Agreed Claim equal to 200% of the aggregate Nominal Amount of Bonds subscribed for will be converted into bonds substantially on the terms set out in Schedule 2 (*Retained Claims Bonds*) (the **Retained Claims Bonds**), subject to adjustments as may be permitted under the schemes of arrangement proposed under the Examinerships and the reconstruction plan proposed under the Reconstruction. |
| **Manager:** | DNB Bank ASA, DNB Markets |
| **Repurchase of Bonds:** | The Issuer may purchase and hold Bonds and such Bonds may be retained, sold or cancelled in the Issuer's sole discretion. |
| **Terms of subscription:** | Any subscriber of the Bonds specifically authorises the Bond Trustee to execute and deliver the Bond Terms on behalf of the prospective Bondholder, who will execute and deliver relevant application forms prior to receiving Bond allotments. On this basis, the Issuer and the Bond Trustee will execute and deliver the Bond Terms and the latter's execution and delivery shall be on behalf of all of the subscribers, such that they thereby become bound by the Bond Terms. The Bond Terms specify that by virtue of being registered as a Bondholder (directly or indirectly) with the CSD, the Bondholders are bound by the terms of the Bond Terms and any other Finance Document, without any further action required to be taken or formalities to be complied with. |
| | The Bond Terms shall be made available to the general public for inspection purposes and may, until redemption in full of the Bonds, be obtained on request to the Bond Trustee or the Issuer. |
| **Subscription Restrictions:** | The Bonds will only be offered or sold within the United States to Qualified Institutional Buyers ("QIBs") as defined in Rule 144A under the U.S. Securities Act. |
| | The Bonds have not and will not be registered under the U.S. Securities Act, or any state securities law except pursuant to an exemption from the registration requirements of the U.S. Securities Act and appropriate exemptions under the |

laws of any other jurisdiction. The Bonds may not be offered or sold within the United States to, or for the account or benefit of, any U.S. Person (as such terms are defined in regulations), except pursuant to an exemption from the registration requirements of the U.S. Securities Act. Failure to comply with these restrictions may constitute a violation of applicable securities legislation.

**Transfer Restrictions:**    The Bonds will be freely transferable in accordance with the rules and regulations governing securities registered in the CSD, and may be pledged, subject to the following:

(a)    Bondholders may be subject to purchase or transfer restrictions with regard to the Bonds, as applicable from time to time under local laws to which a Bondholder may be subject (due e.g. to its nationality, its residency, its registered address or its place(s) for doing business). Each Bondholder must ensure compliance with local laws and regulations at its own cost and expense.

(b)    Notwithstanding the above, a Bondholder that has purchased the Bonds in contradiction to mandatory restrictions may nevertheless utilize its voting rights under the Bond Terms provided that the Issuer shall not incur any additional liability by complying with its obligations to such Bondholder.

**Governing Law:**    The Bond Terms will be governed by Norwegian law with Oslo District Court (*tingrett*) as agreed legal venue.

## SCHEDULE 1
## CONDITIONS PRECEDENT

1. **Conditions precedent for disbursement to the Issuer**

   (a) Payment of the net proceeds from the issuance of the Bonds to the Issuer shall be conditional on the Bond Trustee having received in due time (as determined by the Bond Trustee) prior to the Issue Date each of the following documents, in form and substance satisfactory to the Bond Trustee:

   (i) these Bond Terms duly executed by all parties hereto;

   (ii) certified copies of all necessary corporate resolutions of the Issuer to issue the Bonds and execute the Finance Documents to which it is a party;

   (iii) a certified copy of a power of attorney (unless included in the corporate resolutions) from the Issuer to relevant individuals for their execution of the Finance Documents to which it is a party, or extracts from the relevant register or similar documentation evidencing such individuals' authorisation to execute such Finance Documents on behalf of the Issuer;

   (iv) certified copies of the Issuer's articles of association and of a full extract from the relevant company register in respect of the Issuer evidencing that the Issuer is validly existing;

   (v) copies of the Issuer's latest Financial Reports (if any);

   (vi) confirmation that the applicable prospectus requirements (ref the EU prospectus directive (2003/71 EC)) concerning the issuance of the Bonds have been fulfilled;

   (vii) confirmation that the Bonds are registered in the CSD;

   (viii) copies of any written documentation used in marketing the Bonds or made public by the Issuer or any Manager in connection with the issuance of the Bonds;

   (ix) the Bond Trustee Fee Agreement duly executed by the parties thereto;

   (x) legal opinions or other statements as may be required by the Bond Trustee (including in respect of corporate matters relating to the Issuer and the legality, validity and enforceability of these Bond Terms and the Finance Documents); and

   (xi) evidence that the Retained Claims Bonds shall be issued on or about the Issue Date.

The Bond Trustee, acting in its reasonable discretion, may, regarding this Clause (*Conditions precedent for disbursement to the Issuer*), waive the requirements for documentation, or decide in its discretion that delivery of certain documents shall be made subject to an agreed closing procedure between the Bond Trustee and the Issuer.

## SCHEDULE 2
### RETAINED CLAIMS  BONDS

# TERM SHEET



## NORWEGIAN AIR SHUTTLE ASA RETAINED CLAIMS BONDS 2021/2026
## ISIN [●]

| | |
|---|---|
| **Issuer:** | Norwegian Air Shuttle ASA, incorporated under the laws of Norway with business registration number 965 920 358 and LEI-code 549300IEUH2FEM2Y6B51 |
| **Group:** | The Issuer with all its subsidiaries from time to time |
| **Bond Trustee:** | Nordic Trustee AS, a company existing under the laws of Norway with registration number 963 342 624 and LEI-code 549300XAKTM2BMKIPT85 |
| **Examinerships and Reconstruction:** | References to the **Examinerships** and **Reconstruction** herein shall be references to (i) the examinerships of the Issuer and certain of its subsidiaries which commenced on an interim basis pursuant to an interim order of the High Court of Ireland made on 18 November 2020 and subsequently confirmed by an order made on 7 December 2020 and (ii) the reconstruction of the Issuer granted by the Oslo Probate Court on 8 December 2020, respectively. |
| **Eligibility and allocation:** | Eligibility and allocation to be determined in accordance with the allocation principles set out in Schedule 3 (*Principles for Allocation of New Capital Perpetual Bonds and Retained Claims Bonds*). |
| **Currency:** | NOK |
| **Issue Date:** | Expected to be [●][4] |
| **Maturity Date:** | [In respect of 50% of the Bonds issued to each Bondholder on the Issue Date, 30 September 2025, and in respect of the remaining 50% of the Bonds issued to each Bondholder on the Issue date, 30 September 2026.][5] |
| **Interest:** | [0]% p.a.[6] |
| **Subscription Price:** | 100% of the Nominal Amount |
| **Status of the Bonds:** | The Bonds will constitute senior unsecured debt obligations of the Issuer. The Bonds will rank at least *pari passu* with each other and with all other obligations |

---

[4] To be the Effective Date in respect of the schemes of arrangement under the Examinerships and/or the reconstruction plan under the Reconstruction
[5] TBC
[6] TBC

<table>
<tr><td></td><td>of the Issuer (save for such claims which are preferred by bankruptcy, insolvency, liquidation or other similar laws of general application).</td></tr>
<tr><td>**Listing:**</td><td>The Issuer shall use its reasonable endeavours to ensure that the Bonds are listed on the Exchange on or before the date falling 12 months after the Issue Date and thereafter remain listed on the Exchange until the Bonds have been redeemed in full.</td></tr>
<tr><td>**Exchange:**</td><td>Oslo Børs</td></tr>
<tr><td>**Transaction Security:**</td><td>Unsecured</td></tr>
<tr><td>**Finance Documents**</td><td>The Bond Terms, the Bond Trustee Agreement and any other document designated by the Issuer and the Bond Trustee as a Finance Document</td></tr>
<tr><td>**Information Undertakings:**</td><td>Standard information undertakings pursuant to the Bond Terms</td></tr>
<tr><td>**General Undertakings:**</td><td>Standard general undertakings pursuant to the Bond Terms, addressing authorisations, compliance with laws, continuation of business, corporate status, mergers and de-mergers, disposals and related party transactions</td></tr>
<tr><td>**Negative Pledge:**</td><td>The Issuer shall not, and shall procure that no other Group company will, create or allow to subsist, retain, provide, prolong or renew any security over any of its/their assets (whether present or future), other than any Permitted Security,</td></tr>
</table>

where **Permitted Security** means any security:

(a)     granted by Arctic Aviation Assets Limited, a company existing under the laws of Ireland with business registration number 531191, or its subsidiaries;

(b)     expressly contemplated in the schemes of arrangement proposed under the Examinerships and the reconstruction plan proposed under the Reconstruction to continue following the effectiveness of the Examinerships and the Reconstruction;

(c)     securing any Financial Indebtedness incurred by the Group which is:

(i)     wholly or partially guaranteed or provided by any government (including any governmental institution) to the Group or forms part of a financing arrangement involving any such Financial Indebtedness; or

(ii)     incurred to enable the Group to cover corporate expenses during the restrictions on commercial air traffic as a result of the Covid-19 pandemic; or

(d)     securing any trade instrument issued in respect of the obligations of any member of the Group arising in the ordinary course of trading of that member of the Group.

| | |
|---|---|
| **Sustainability:** | The Issuer will aim within 2030 to reduce carbon emissions with 45% per passenger per kilometer compared to the levels in 2010 and seek to be one of the leaders within the European airline industry in respect of emissions and sustainability. |
| **Events of Default:** | Standard Event of Default provisions applicable to the Issuer pursuant to the Bond Terms, with a cross acceleration threshold of NOK [•][7] (or equivalent thereof in any other currency) and an equal threshold amount for insolvency or insolvency proceedings, creditor's process and material litigation. |
| **Dividend Restriction:** | No declaration or making of dividend payments, repurchase of shares or other distributions or loans to shareholders of the Issuer at any time while the Bonds remain outstanding. |
| **Bond Terms:** | The standard Nordic Bond Terms for corporate high yield bonds related to each Relevant Jurisdiction will regulate the rights and obligations with respect to the Bonds. In the event of any discrepancy between this term sheet and the Bond Terms, the provisions of the Bond Terms shall prevail. |
| | By filing an application to subscribe for Bonds, each investor accepts to become a Bondholder (as defined in the Bond Terms) and to be bound by the provisions of the Bond Terms. Further, by filing such application, each investor accepts that certain adjustments to the structure and terms described in this term sheet may occur in the final Bond Terms. |
| | The Bond Terms shall include provisions on the Bond Trustee's right to represent the Bondholders, including a "no action" clause, meaning that no individual Bondholder may take any legal action against the Issuer individually (as further described in the Bond Terms). The Bond Terms will further contain provisions regulating the duties of the Bond Trustee, procedures for Bondholders' Meetings/Written Resolutions and applicable quorum and majority requirements for Bondholders' consent, whereby a sufficient majority of Bondholders may materially amend the provisions of the Bond Terms or discharge the Bonds in part or in full without the consent of all Bondholders, as well as other provisions customary for a bond offering as described herein. |
| **Defined terms:** | Capitalised terms used but not defined herein shall have the meaning ascribed to such terms in the Bond Terms. |
| **Securities Depository:** | The Bonds will be registered in book entry form in Verdipapirsentralen ASA, the Norwegian central securities depository (the **CSD**). |
| **Repurchase of Bonds:** | The Issuer may purchase and hold Bonds and such Bonds may be retained, sold or cancelled in the Issuer's sole discretion. |
| **Terms of subscription:** | Any subscriber of the Bonds specifically authorises the Bond Trustee to execute and deliver the Bond Terms on behalf of the prospective Bondholder, who will execute and deliver relevant application forms prior to receiving Bond allotments. On this basis, the Issuer and the Bond Trustee will execute and deliver the Bond |

---

[7] TBC

Terms and the latter's execution and delivery shall be on behalf of all of the subscribers, such that they thereby become bound by the Bond Terms. The Bond Terms specify that by virtue of being registered as a Bondholder (directly or indirectly) with the CSD, the Bondholders are bound by the terms of the Bond Terms and any other Finance Document, without any further action required to be taken or formalities to be complied with.

The Bond Terms shall be made available to the general public for inspection purposes and may, until redemption in full of the Bonds, be obtained on request to the Bond Trustee or the Issuer.

**Subscription Restrictions:** The Bonds will only be offered or sold within the United States to Qualified Institutional Buyers ("QIBs") as defined in Rule 144A under the U.S. Securities Act.

The Bonds have not and will not be registered under the U.S. Securities Act, or any state securities law except pursuant to an exemption from the registration requirements of the U.S. Securities Act and appropriate exemptions under the laws of any other jurisdiction. The Bonds may not be offered or sold within the United States to, or for the account or benefit of, any U.S. Person (as such terms are defined in regulations), except pursuant to an exemption from the registration requirements of the U.S. Securities Act. Failure to comply with these restrictions may constitute a violation of applicable securities legislation.

**Paying Agent:** DNB Bank ASA

**Transfer Restrictions:** The Bonds will only become freely transferable from the date that is 12 months following the Issue Date (or such earlier date as determined by the Issuer in its discretion), in accordance with the rules and regulations governing securities registered in the CSD, and may be pledged, subject to the following:

(a) Bondholders may be subject to purchase or transfer restrictions with regard to the Bonds, as applicable from time to time under local laws to which a Bondholder may be subject (due e.g. to its nationality, its residency, its registered address or its place(s) for doing business). Each Bondholder must ensure compliance with local laws and regulations at its own cost and expense.

(b) Notwithstanding the above, a Bondholder that has purchased the Bonds in contradiction to mandatory restrictions may nevertheless utilize its voting rights under the Bond Terms provided that the Issuer shall not incur any additional liability by complying with its obligations to such Bondholder.

**Governing Law:** The Bond Terms will be governed by Norwegian law with Oslo District Court (*tingrett*) as agreed legal venue.

SCHEDULE 1
CONDITIONS PRECEDENT

1.      **Conditions precedent for issuance of the Bonds**

(a)     Issuance of the Bonds shall be conditional on the Bond Trustee having received in due time (as determined by the Bond Trustee) prior to the Issue Date each of the following documents, in form and substance satisfactory to the Bond Trustee:

(i)     these Bond Terms duly executed by all parties hereto;

(ii)    certified copies of all necessary corporate resolutions of the Issuer to issue the Bonds and execute the Finance Documents to which it is a party;

(iii)   a certified copy of a power of attorney (unless included in the corporate resolutions) from the Issuer to relevant individuals for their execution of the Finance Documents to which it is a party, or extracts from the relevant register or similar documentation evidencing such individuals' authorisation to execute such Finance Documents on behalf of the Issuer;

(iv)    certified copies of the Issuer's articles of association and of a full extract from the relevant company register in respect of the Issuer evidencing that the Issuer is validly existing;

(v)     copies of the Issuer's latest Financial Reports (if any);

(vi)    confirmation that the applicable prospectus requirements (ref the EU prospectus directive (2003/71 EC)) concerning the issuance of the Bonds have been fulfilled;

(vii)   confirmation that the Bonds are registered in the CSD;

(viii)  copies of any written documentation used in marketing the Bonds or made public by the Issuer or any Manager in connection with the issuance of the Bonds;

(ix)    the Bond Trustee Fee Agreement duly executed by the parties thereto; and

(x)     legal opinions or other statements as may be required by the Bond Trustee (including in respect of corporate matters relating to the Issuer and the legality, validity and enforceability of these Bond Terms and the Finance Documents).

The Bond Trustee, acting in its reasonable discretion, may, regarding this Clause (*Conditions precedent for issuance of the Bonds*), waive the requirements for documentation, or decide in its discretion that delivery of certain documents shall be made subject to an agreed closing procedure between the Bond Trustee and the Issuer.

## SCHEDULE 3

### PRINCIPLES FOR ALLOCATION OF NEW CAPITAL PERPETUAL BONDS AND RETAINED CLAIMS BONDS

## 1.    DEFINITIONS

Capitalised terms used but not defined in this Schedule shall have the same meaning ascribed to them in the NAS Scheme unless the context otherwise requires.

"**Affiliates**" means with respect to a person:

(a)    any other person who, directly or indirectly is in control of, or controlled by, or is under common control with, such person; or

(b)    any other person who is a director, officer or employee:

(i)    of such person;

(ii)    of any subsidiary or parent company of such person; or

(iii)    of any person described in paragraph (a) above,

and for the purposes of this definition, control of a person shall mean the power, direct or indirect, (A) to vote on more than 50% of the securities having ordinary voting power for the election of directors of such person, or (B) to direct or cause the direction of the management and policies of such person whether by contract or otherwise.

"**Agreed Debt**" means:

(a)    the amount due to a Creditor as appears beside its name and marked as agreed in the Creditor Schedule;

(b)    the amount due to a Creditor which has otherwise been agreed by the Issuer and the Creditor prior to the Irish Confirmation Date, determined by the Irish High Court under Section 537(3) of the Act or determined in accordance with the Expert Determination Process;

(c)    in the case of any Contingent Litigation Creditor, the amount which is found to be due to it as determined by the courts of competent jurisdiction (subject to any appeal) or the amount settled or agreed by the Issuer; or

(d)    in the case of any Customer Damages Claims Creditor, the amount which is found to be due to it by the Customer Claim Forum (subject to any appeal) or the amount settled or agreed by the Issuer.

"**Allocation Factors**" includes factors such as perceived investor quality, investment horizon and history, sector knowledge, size and timeliness of the application, each of which the Issuer may in its discretion consider.

"**Connected Person**" means a person who would be connected with another person for the purposes of Section 220 of the Irish Companies Act 2014 (as amended) if that other person was a director of a company;

"**Creditors**" means all creditors of the Issuer, known or unknown, whether or not the liabilities have been acknowledged or recognised, qualified or unqualified, actual or contingent, ascertained or unascertained, including (but not limited to) the creditors and classes of creditors listed in the Creditor Schedule (under and as defined in the NAS Scheme) and each a "**Creditor**".

"**Eligible New Capital Perpetual Bonds Creditor**" means an Initial New Capital Perpetual Bonds Creditor or a Subsequent Eligible New Capital Perpetual Bonds Creditor, provided that any such Examinership Companies Creditor, when aggregated with its Affiliates' and/or Connected Persons' Relevant Portions, has a Relevant Portion of more than NOK 2,500,000 (or an equivalent amount in another currency).

"**Examiner**" means Kieran Wallace of KPMG, 1 Stokes Place, St; Stephen's Green, Dublin 2.

"**Examinership Companies Creditors**" means the Creditors and the Related Company Creditors.

"**Initial Eligible New Capital Perpetual Bonds Creditor**" means any Examinership Companies Creditor that is permitted to participate in the New Capital Perpetual Bonds Offering pursuant to applicable securities law and regulation that may apply to such Examinership Companies Creditor from time to time, provided that:

    (a)    with respect to any application for New Capital Perpetual Bonds (an "**Application**") by such Examinership Companies Creditor:

        (i)    the debt on which basis such Examinership Companies Creditor's Investment Allowance is calculated (the "**Eligible Debt**") was owned by such Examinership Companies Creditor as at the Petition Date; and

        (ii)    such Examinership Companies Creditor has not:

            (A)    entered into or permitted to be entered into any agreement to transfer all or part of its Eligible Debt to any person (or any arrangement of similar effect); and/or

            (B)    made or permitted to be made such Application in contemplation of any such agreement or arrangement;

        it being noted that the above provisos will be set out in the application form or similar documentation provided by the Issuer pursuant to which any such Application shall be made and will be represented by such Examinership Companies Creditor by its execution of the same; and

(b)     such Examinership Companies Creditor has delivered by email to the Issuer at nasperpetual@bahr.no, a non-binding expression of interest in participating in the New Capital Perpetual Bond Offering on or before the business day following the date on which the restructuring plan proposed under the Norwegian restructuring process under the Norwegian Restructuring Act is sanctioned by the Norwegian court.

"**Investment Allowance**" means, with respect to a Creditor, 50% of such Creditor's Relevant Portion.

"**NAS Scheme**" means the Scheme of Arrangement in relation to the Issuer.

"**New Capital Perpetual Bonds Offering**" means the offering to Eligible New Capital Perpetual Bonds Creditors to subscribe for New Capital Perpetual Bonds as more particularly described in the Schemes of Arrangement.

"**Petition Date**" means the date of the presentation of the petition, being 18 November 2020.

"**Private Placement**" means the private placing of new shares and the listing of such shares on the Oslo Stock Exchange as more particularly described in the Schemes of Arrangement.

"**Reconstruction**" means the reconstruction negotiations (Nw. rekonstruksjonsforhandling) in respect of the Issuer pursuant to section 23 of the Norwegian Temporary Reconstruction Act (Nw. rekonstruksjonsloven) commenced by service of a petition dated 8 December 2020.

"**Related Companies**" means:

(a)     Arctic Aviation Assets Designated Activity Company, a designated activity company incorporated under the laws of Ireland with company number 531191, having its registered office at Ground Floor, Imbus House, Dublin Airport, Co Dublin;

(b)     Norwegian Air International Limited, a private company limited by shares incorporated under the laws of Ireland with company number 525771, having its registered office at Ground Floor, Imbus House, Dublin Airport, Co Dublin;

(c)     Drammensfjorden Leasing Limited, a private company limited by shares incorporated under the laws of Ireland with company number 533167, having its registered office at Ground Floor, Imbus House, Dublin Airport, Co Dublin; and

(d)     Lysakerfjorden Leasing Limited, a private company limited by shares incorporated under the laws of Ireland with company number 585570, having its registered office at Ground Floor, Imbus House, Dublin Airport, Co Dublin.

"**Related Company Creditors**" means the creditors of any of the Related Companies, known or unknown, whether or not the liabilities have been acknowledged or recognised, qualified or unqualified, actual or contingent, ascertained or unascertained.

"**Relevant Portion**" means with respect to any Examinership Companies Creditor, such Examinership Companies Creditor's Agreed Debt (as such term is defined in the applicable Scheme of Arrangement) and without double counting) or in the event that such Examinership Companies Creditor's Claim is an Unagreed Debt the amount as identified in the Creditor Schedule to the applicable Scheme of Arrangement (and without double counting) less:

(a) in the case of any Secured Examinership Companies Creditor, its relevant Secured Amount (as such term is defined in the applicable Scheme of Arrangement)); and

(b) in the case of any such debt against the Issuer or a Related Company that is subordinated to the unsecured liabilities of such Issuer or Related Company, the amount of such subordinated debt (including for the avoidance of doubt, in respect of the 2020 Convertible Perpetual Bond Creditor, any debt in respect of the 2020 Convertible Perpetual Bonds).

"**Retained Claims Bonds**" means the retained claims bonds contemplated under the Retained Claims Bond Instrument, which will be issued to each Creditor that participates in:

(a) the New Capital Perpetual Bonds Offering; and/or

(b) the Private Placement.

"**Retained Claims Bonds Amount**" means,

(a) with respect to any Eligible New Capital Perpetual Bonds Creditor that participates in the New Capital Perpetual Bonds Offering, 200% of the aggregate nominal value of New Capital Perpetual Bonds subscribed for by such Eligible New Capital Perpetual Bonds Creditor; and

(b) with respect to any Eligible Private Placement Creditor that participates in the Private Placement, 200% of the total amount paid by such Eligible Private Placement Creditor in respect of its subscription for Shares under the Private Placement.

"**Rights Offering**" means the rights offering described in the Schemes of Arrangement.

"**Schemes of Arrangement**" means the schemes of arrangement relating to the Issuer and the Related Companies (together the "**Examinership Companies**") between, in each case, the relevant Examinership Company and its members and creditors as formulated by the examiner of such Examinership Company pursuant to section 534 of the Irish Companies Act 2014.

"**Schemes**" means the Schemes of Arrangement and the reconstruction plan under the Reconstruction.

"**Secured Examinership Companies Creditors**" means any Examinership Companies Creditors which are treated as being within a class of secured creditors under the Schemes or Arrangement (and including, but not limited to, the Secured Cash Deposit Creditors, the NAS07/08 Secured Bond Creditor or the NAS09 Secured Bond Creditor (each as defined in the NAS Scheme)) (and each a "**Secured Examinership Companies Creditor**").

"**Shares**" means the ordinary shares of the Issuer.

"**Subsequent Eligible New Capital Perpetual Bonds Creditor**" means any Examinership Companies Creditor that is permitted to participate in the New Capital Perpetual Bonds Offering pursuant to applicable securities law and regulation that may apply to such Examinership Companies Creditor from time to time.

"**Unagreed Debt**" means any Claim against the Issuer which is not an Agreed Debt.

## 2.    PRINCIPLES FOR ALLOCATION

### 2.1    New Capital Perpetual Bonds Offering

(a)    Under the New Capital Perpetual Bonds Offering, each Eligible New Capital Perpetual Bonds Creditor shall be entitled to apply for New Capital Perpetual Bonds up to a maximum amount equal to such Eligible New Capital Perpetual Bonds Creditor's Investment Allowance.

(b)    The New Capital Perpetual Bonds will be allocated to each applying Initial Eligible New Capital Perpetual Bonds Creditor on a *pro rata* basis, based on the proportion that its Relevant Portion bears to the aggregate Relevant Portions of all applying Initial Eligible New Capital Perpetual Bonds Creditors (such proportion being, with respect to each such Initial Eligible New Capital Perpetual Bonds Creditor, its "**Pro Rata Proportion**"). To the extent that any Initial Eligible New Capital Perpetual Bonds Creditor subscribes for less than its Pro Rata Proportion, resulting in unsubscribed New Capital Perpetual Bonds, such unsubscribed New Capital Perpetual Bonds shall be reallocated among Initial Eligible New Capital Perpetual Bonds Creditors which have not been allocated the full subscription applied for, in accordance with their respective Pro Rata Proportions, until each Initial Eligible New Capital Perpetual Bonds Creditor has been allocated the full subscription it applied for or, if earlier, the New Capital Perpetual Bonds Offering is fully subscribed.  In the event that the New Capital Perpetual Bonds Offering is not fully subscribed following allocation to Initial Eligible New Capital Perpetual Bonds Creditors as aforesaid, the Issuer may allocate any remaining unallocated New Capital Perpetual Bonds to applying Subsequent Eligible New Capital Perpetual Bonds Creditors in its discretion, with regard to the Allocation Factors.

### 2.2    Retained Claims Bonds

(a)    Each Eligible New Capital Perpetual Bonds Creditor that participates in the New Capital Perpetual Bonds Offering and each Eligible Private Placement Creditor that participates in the Private Placement will be issued Retained Claims Bonds by the Issuer in an amount equal to its Retained Claims Bonds Amount.  Such Retained Claims Bonds will be issued by the Issuer in full and final satisfaction of the portion of the Relevant Portion of each relevant Eligible New Capital Perpetual Bonds Creditor and/or Eligible Private Placement Creditor that is equal to the aggregate face value of the Retained Claims

Bonds issued to such Eligible New Capital Perpetual Bonds Creditor and/or Eligible Private Placement Creditor.

**SCHEDULE 7**

Dividend Claims Terms

**EXECUTION VERSION**

**TERMS OF DIVIDEND CLAIMS**

dated 11 March 2021

for

Norwegian Air Shuttle ASA

*www.bahr.no*

## CONTENTS

**Clause**                                                                                          **Page**

1.    INTERPRETATION ................................................................................. 3
2.    THE DIVIDEND CLAIMS .......................................................................... 9
3.    INTEREST ........................................................................................... 11
4.    REPAYMENT ........................................................................................ 12
5.    CHANGES TO THE CREDITORS ................................................................ 12
6.    CONVERSION TERMS, OPT-OUT AND STRUCTURED SALE ................................. 13
7.    MERGER ............................................................................................. 19
8.    EVENTS OF DEFAULT AND ACCELERATION .................................................. 19
9.    AMENDMENTS AND WAIVERS .................................................................. 20
10.   MISCELLANEOUS .................................................................................. 21
11.   GOVERNING LAW AND JURISDICTION ....................................................... 22

Attachments

Schedule 1 (*Notice of assignment*)

Schedule 2 (*Conversion Opt-out Notice*)

Schedule 3 (*Structured Sale Opt-out Notice)*

Schedule 4 (*Structured Sale Mandate Letter*)

These Dividend Claim Terms are dated 11 March 2021 and are approved by **Norwegian Air Shuttle ASA**, incorporated under the laws of Norway with organisation no. 965 920 358 with its registered office at Oksenøyveien 3, 1366 Lysaker, Bærum, Norway (the "**Obligor**"), and are granted in favour of the Creditors. The Dividend Claims represent part of the dividends approved by the Schemes and to be made by the Obligor on its behalf in accordance therewith. These Dividend Claim Terms shall take effect on and with immediate effect from the Effective Time (as defined below).

**THE OBLIGOR COVENANTS** as follows:

1.      **INTERPRETATION**

1.1     **Definitions**

The following terms shall have the following meanings:

"**Additional Dividend Claim**" shall have the meaning ascribed to such term in Clause 2.5 (*Additional Dividend Claims*).

"**Alternative Platform**" shall have the meaning ascribed to such term in Clause 2.7 (*Alternative Platform*).

"**Alternative Platform Implementation Date**" shall have the meaning ascribed to such term in Clause 2.7 (*Alternative Platform*).

"**Assigning Creditor**" shall have the meaning ascribed to such term in paragraph (a) of Clause 5.1 (*Assignments by the Creditors*).

"**Attachment**" means any schedule, appendix or other attachment to these Dividend Claim Terms.

"**Business Day**" means any day on which banks are open for general business in Oslo, Norway.

"**Business Day Convention**" means that if the last day of any Interest Period originally falls on a day that is not a Business Day, the Interest Period shall be extended to include the first following Business Day, unless that day falls in the next calendar month, in which case the Interest Period shall be shortened to the first preceding Business Day.

"**Change of Control Event**" means a person or group of persons acting in concert, directly or indirectly gaining Decisive Influence over the Obligor.

"**Conversion Agent**" means the party expressly appointed in the Scheme of Arrangement to exercise Conversion Rights on behalf of Creditors that receive Dividend Claims thereunder (whether, in respect of a Creditor, such party is appointed pursuant to the Scheme of Arrangement or pursuant to paragraph (b) of Clause 5.1 (*Assignments by the Creditors*)).

"**Conversion Date**" means the Structured Sale Conversion Date or the No-Sale Conversion Date (as applicable).

"**Conversion Notice**" shall have the meaning ascribed to such term in paragraph (a) of Clause 6.2 (*Procedure for exercise of Conversion Rights*).

"**Conversion Price**" shall have the meaning ascribed to such term in paragraph (d) of Clause 6.1 (*Conversion Date and Conversion Price*).

**"Conversion Price Determination Date"** means the date that falls five (5) Business Days prior to the Structured Sale Conversion Date.

**"Conversion Right"** shall have the meaning ascribed to such term in paragraph (a) of Clause 6.1 (*Conversion Date and Conversion Price*).

**"Conversion Shares"** shall have the meaning ascribed to such term in 6.5 (*Structured Sale Opt-out*).

**"Converting Creditor"** means a No-Sale Creditor or a Structured Sale Creditor.

**"Creditor"** means the holder of a Dividend Claim from time to time, as evidenced by the inclusion of such holder in the Dividend Claim Schedule.

**"Creditor VPS Account"** shall have the meaning ascribed to such term in Clause 6.5 (*Structured Sale Opt-out*)

**"Creditors' Meeting"** shall have the meaning ascribed to such term in paragraph (a) of Clause 9.1 (*Creditors' Meeting*).

**"CSD"** shall mean the Norwegian central securities depository (*Nw. Verdipapirsentralen*).

**"Decisive Influence"** means a person having, as a result of an agreement or through the ownership of shares or interests in another person (directly or indirectly):

(a)    a majority of the voting rights in that other person; or

(b)    a right to elect or remove a majority of the members of the board of directors of that other person.

**"Dividend Claim"** shall have the meaning ascribed to such term in Clause 2.2 (*The Dividend Claims*), or the principal amount for the time being of any such Dividend Claim.

**"Dividend Claim Schedule"** shall have the meaning ascribed to such term in Clause 2.1 (*Dividend Claim Schedule*).

**"Dividend Claim Statement"** shall have the meaning ascribed to such term in Clause 2.3 (*Dividend Claim Statement*).

**"Dividend Claim Terms"** means these dividend claim terms, including all Attachments which shall form an integrated part of these dividend claim terms, in each case as amended and/or supplemented from time to time.

**"Effective Time"** shall have the meaning ascribed to such term in the Scheme of Arrangement.

**"Examinership"** means the examinership of the Obligor pursuant to Part 10 of the Irish Companies Act 2014 which was commenced by the presentation of a petition on 18 November 2020.

**"Independent Verification Statement"** means a written confirmation from the Overseer that he considers that:

DocuSign Envelope ID: DB818F8C-2EE5-4ED7-BDBE-15B374B9032D

(a)     the Conversion Price will in fact enable the Dividend Claims in aggregate to be convertible into a number of Conversion Shares that would represent twenty-five percent (25%) of the Obligor's issued share capital on a Fully Diluted Basis (as defined in the Scheme of Arrangement); and

(b)     the number of Conversion Shares to be issued to each Converting Creditor has been calculated in accordance with the Dividend Claim Terms.

"**Interest Payment Date**" means the last day of each Interest Period, the first Interest Payment Date being the date that falls six (6) months after the Business Day immediately following the No-Sale Conversion Date and the last Interest Payment Date being the Maturity Date.

"**Interest Period**" means, subject to adjustment in accordance with the Business Day Convention:

(a)     the period between the Business Day immediately following the No-Sale Conversion Date and the date falling six (6) months thereafter, and

(b)     each subsequent six (6) month period thereafter.

"**Interest Quotation Date**" means, in relation to any period for which the Interest Rate is to be determined, two Quotation Business Days before the first day of the relevant Interest Period.

"**Interest Rate**" means the percentage rate per annum that is the aggregate of the Reference Rate for the relevant Interest Period plus the Margin.

"**Margin**" means 1 per cent.

"**Maturity Date**" means the date falling 7 years after the Effective Time.

"**Net Cash Proceeds**" means the cash proceeds from the Structured Sale Process net of the Broker's provision fee equal to 0.35% of the gross cash proceeds.

"**New Creditor**" shall have the meaning ascribed to such term in paragraph (a) of Clause 5.1 (*Assignments by the Creditors*).

"**No-Sale Conversion Date**" means the earlier of:

(a)     a date to be determined by the Obligor and communicated to the Conversion Agent no later than five (5) Business Days prior to its occurrence, such date to fall promptly following the completion of the Structured Sale Process; and

(b)     the date falling three (3) months after the commencement of the Structured Sale Process pursuant to Clause 6.4(b).

"**No-Sale Creditor**" shall have the meaning ascribed to such term in Clause 6.5 (*Structured Sale Opt-out*).

"**No-Sale Conversion Shares**" shall have the meaning ascribed to such term in Clause 6.5 (*Structured Sale Opt-out*).

"**No-Sale Dividend Claim**" means any Dividend Claim pertaining to No-Sale Conversion Shares.

"**NOK**" means Norwegian kroner, being the legal currency of Norway.

"**Obligor VPS Account**" has the meaning ascribed to such term in Clause 6.4 (*Structured Sale Process*).

"**Opt-out Deadline**" shall have the meaning ascribed to such term in Clause 6.3 (*Conversion Opt-out*).

"**Overdue Amount**" means any amount required to be paid by the Obligor under these Dividend Claim Terms but not made available to the Creditors on the Maturity Date or otherwise not paid on its applicable due date.

"**Overseer**" means Mr Helge Østvold of BHL DA, Elias Smiths vei 24, 1337 Sandvika, Norway.

"**Par Value**" means, at any time, the par value of the Shares.

"**Parity Obligations**" means any payment obligations of the Obligor that as a matter of contract or law rank *pari passu* in right and priority of payments with the Dividend Claims.

"**PIK Interest Tranche**" means a separate tranche relating to each Dividend Claim to which any paid-in-kind interest shall be allocated in accordance with Clause 3.2(b).

"**Post-Conversion Report**" means a report from the Overseer confirming that the Structured Sale Process (including the distribution of proceeds thereof) and the distribution of No-Sale Conversion Shares to the relevant Creditors have been completed in accordance with the terms set out in these Dividend Claim Terms.

"**Quotation Business Day**" means a day on which Norges Bank's settlement system is open.

"**Reconstruction**" means the reconstruction negotiations (*Nw. rekonstruksjonsforhandling*) in respect of the Obligor pursuant to section 23 of the Norwegian Temporary Reconstruction Act (*Nw. rekonstruksjonsloven*) commenced by service of a petition dated 8 December 2020.

"**Reference Rate**" shall mean NIBOR (Norwegian Interbank Offered Rate), being:

(a)    the interest rate fixed for a period comparable to the relevant Interest Period published by Global Rate Set Systems (GRSS) at approximately 12.00 (Oslo time) on the Interest Quotation Date; or

(b)    if no screen rate is available for the relevant Interest Period:

(i)    the linear interpolation between the two closest relevant interest periods, and with the same number of decimals, quoted under paragraph (a) above; or

(ii)    a rate for deposits in the currency of the Dividend Claims for the relevant Interest Period as supplied to the Obligor at its request quoted by a sufficient number of commercial banks reasonably selected by the Obligor; or

(c) if the interest rate under paragraph (a) above is no longer available, an interest rate set by the Obligor, being:

(i) any relevant replacement reference rate generally accepted in the market; or

(ii) such interest rate that best reflects the interest rate for deposits in the currency of the Dividend Claims offered for the relevant Interest Period;

in each case provided that, if any such rate is below zero, the Reference Rate shall be deemed to be zero.

"**Reference Shares**" means, in respect of the exercise of Conversion Rights on behalf of a Creditor, the number of Shares (rounded down, if necessary, to the nearest whole number) determined in good faith by dividing the amount of such Creditor's Dividend Claim which is the subject of the relevant exercise of Conversion Rights by the Conversion Price in effect on the relevant Conversion Date.

"**Scheme of Arrangement**" means the scheme of arrangement under the Examinership between the Obligor and its members and creditors as formulated by the examiner of the Obligor pursuant to section 534 of the Irish Companies Act 2014.

"**Schemes**" means the Scheme of Arrangement and the reconstruction plan under the Reconstruction.

"**Securities**" means any securities including, without limitation, Shares and other shares in the capital of the Obligor, restricted stock units, or options, warrants or other rights to subscribe for or purchase or acquire Shares or any other shares in the capital of the Obligor.

"**Securities Trading Act**" means the Securities Trading Act of 2007 no. 75 of Norway.

"**Senior Obligations**" means any payment obligations of the Obligor that are neither the payment obligations under the Dividend Claims nor Parity Obligations.

"**Shareholder**" means a holder of a Share.

"**Shares**" means fully paid ordinary shares of the Obligor, at the date of these Dividend Claim Terms listed on the Oslo Stock Exchange and with a Par Value of NOK 0.10 each, including such ordinary shares of the Obligor which, pursuant to the terms and conditions of these Dividend Claim Terms, shall be issued following any exercise of Conversion Rights on behalf of a Creditor.

"**Specified Taxes**" shall have the meaning ascribed to such term in paragraph (g) of Clause 6.2 (*Procedure for exercise of Conversion Rights*).

"**Stock Exchange**" means Oslo Stock Exchange or, if at the relevant time, the Shares are not at that time listed and admitted to trading on the Oslo Stock Exchange, the principal stock exchange or securities market on which the Shares are then listed or quoted or dealt in and any other stock exchange on which the Shares may then be listed or quoted or dealt in.

"**Structured Sale Creditor**" shall have the meaning ascribed to such term in Clause 6.4 (*Structured Sale Process*).

"**Structured Sale Conversion Date**" means the date falling 60 calendar days after the Effective Time.

"**Structured Sale Conversion Shares**" shall have the meaning ascribed to such term in Clause 6.4 (*Structured Sale Process*).

"**Structured Sale Dividend Claim**" shall have the meaning ascribed to such term in Clause 6.4 (*Structured Sale Process*).

"**Structured Sale Opt-out Notice**" shall have the meaning ascribed to such term in Clause 6.5 (*Structured Sale Opt-out*).

"**Structured Sale Proceeds Account**" shall have the meaning ascribed to such term in Clause 6.4 (*Structured Sale Process*).

"**Structured Sale Process**" shall have the meaning ascribed to such term in Clause 6.4 (*Structured Sale Process*).

"**Subsidiary**" means a company over which another company has Decisive Influence.

"**US Securities Act**" means the U.S. Securities Act of 1933 (as amended).

"**Voting Period**" shall have the meaning ascribed to such term in paragraph (b) of Clause 9.3 (*Written Resolution*).

"**Written Resolution**" shall have the meaning ascribed to such term in paragraph (a) of Clause 9.3 (*Written Resolution*).

1.2    **Construction**

(a)    In these Dividend Claim Terms, unless the context otherwise requires:

(i)    headings are for ease of reference only;

(ii)    words denoting the singular shall include the plural and vice versa;

(iii)    references to Clauses are references to the Clauses of these Dividend Claim Terms;

(iv)    references to a time are references to Central European Time unless otherwise stated;

(v)    a reference to a provision of "**law**" is a reference to that provision as amended or re-enacted, and to any regulations made by the appropriate authority pursuant to such law;

(vi)    references to a "**regulation**" include any regulation, rule, official directive, request or guideline by any official body;

(vii)    references to a "**person**" mean any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, unincorporated organisation, government, or any agency or political subdivision

DocuSign Envelope ID: DB818F8C-2EE5-4ED7-BDBE-15B374B0032D

thereof or any other entity, whether or not having a separate legal personality; and

(viii)  references to persons **"acting in concert"** shall be interpreted pursuant to the relevant provisions of the Securities Trading Act.

(b)  In the event of any inconsistency between the provisions of these Dividend Claim Terms and the Schemes, the provisions of these Dividend Claim Terms shall prevail.

## 2.    THE DIVIDEND CLAIMS

### 2.1    Dividend Claim Schedule

(a)  The Obligor shall maintain or procure the maintenance of a schedule to these Dividend Claim Terms, containing information relating to the Dividend Claims outstanding hereunder from time to time, including:

(i)  the amount of each Dividend Claim and related PIK Interest Tranche (if any); and

(ii)  the name of the corresponding Creditor in respect thereof

(the **"Dividend Claim Schedule"**).

(b)  Subject to paragraph (a) above, the Obligor may in its commercially reasonable discretion determine the form of the Dividend Claim Schedule.

(c)  The Dividend Claim Schedule shall, save in the case of manifest error, be conclusive as to the matters set out therein.

(d)  The Dividend Claim Schedule shall constitute an Attachment to these Dividend Claim Terms.

### 2.2    The Dividend Claims

From the Effective Time, the Obligor acknowledges that it owes each Creditor (as of the Effective Time) a claim in the NOK amount set out in respect of such Creditor in the Dividend Claim Schedule on the terms set out in these Dividend Claim Terms (each such claim, a **"Dividend Claim"**).

### 2.3    Dividend Claim Statement

The Obligor shall, promptly following receipt of a written request from any Creditor, inform such Creditor of the outstanding amount of such Creditor's Dividend Claim (a **"Dividend Claim Statement"**).

### 2.4    Eligible Creditors

No provision of these Dividend Claim Terms or the Schemes shall be construed to mean that any person shall be included in the Dividend Claim Schedule where such person cannot lawfully be included therein pursuant to any law to which such person may be subject, or where the inclusion of such person therein would necessitate the satisfaction of any requirement or the making of any accommodation other than as expressly provided for in the Schemes.

DocuSign Envelope ID: DB818F8C-2EE5-4ED7-BDBE-15B374B90325

2.5 **Additional Dividend Claims**

(a) The Obligor may, on one or more occasions after the Effective Time, acknowledge additional Dividend Claims on the terms set out in these Dividend Claim Terms (each an "**Additional Dividend Claim**"), provided that each such Additional Dividend Claim represents a dividend approved by the Schemes.

(b) Any Additional Dividend Claim acknowledged after the Conversion Price Determination Date will, for the avoidance of doubt, not have a Conversion Right attached to it.

(c) The Obligor shall promptly procure that the Dividend Claim Schedule is duly updated to include such Additional Dividend Claim.

2.6 **Status**

(a) The obligations of the Obligor under these Dividend Claim Terms shall constitute direct, unsecured and unsubordinated debt obligations of the Obligor. The Dividend Claims and any related PIK Interest Tranche shall rank *pari passu* between themselves and shall rank at least *pari passu* with all other unsecured obligations of the Obligor (save for such claims which are preferred by bankruptcy, insolvency, liquidation or other similar laws of general application).

2.7 **Alternative Platform**

(a) The Obligor, acting reasonably, may in its discretion implement an electronic platform (an "**Alternative Platform**"), in each case to be made accessible to each Creditor, for the purpose of the provision of information and administration of transactions relating to the Dividend Claims, such as:

(i) maintenance of the Dividend Claim Schedule for the purposes of Clause 2.1 (*Dividend Claim Schedule*) above;

(ii) the Obligor providing to any Creditor a Dividend Claim Statement pursuant to Clause 2.3 (*Dividend Claim Statement*) above;

(iii) the assignment by any Creditor of its Dividend Claims and any related PIK Interest Tranche pursuant to Clause 5.1 (*Assignments by the Creditors*) below;

(iv) the exercise by any Creditor of its Opt-Out Election pursuant to Clause 6.3 (*Conversion Opt-out*) or 6.5 (*Structured Sale Opt-out*) below;

(v) any Creditor providing to the Obligor, and/or its account bank, payment details (and, if applicable, necessary information in respect of "know your customer" or similar checks under applicable laws and regulations) pursuant to Clauses 3.2(c)(ii), 4.1(a)(ii) or 6.4(c) below; and

(vi) the making of communications in accordance with Clause 10.3(a) below.

(b) The Obligor shall, promptly following implementation of an Alternative Platform, announce the same on its official website, together with all information reasonably necessary for a Creditor to make use of the functions thereof (the date of any such announcement being the "**Alternative Platform Implementation Date**") whereafter any proper use of a purported function of the Alternative Platform by the Obligor or

DocuSign Envelope ID: DB818F8C-2EE5-4FD7-BDBE-15B374B0332E

any Creditor to satisfy an obligation and/or exercise a right pursuant to these Dividend Claims shall be deemed to be valid for the purposes thereof.

## 3.    INTEREST

### 3.1    Calculation of interest

(a)    Each Dividend Claim and any related PIK Interest Tranche shall, to the extent not converted to Shares pursuant to Clause 6 (*Conversion terms, opt-out and structured sale*), accrue interest at the Interest Rate from the Business Day immediately following the No-Sale Conversion Date and ending on but excluding the date falling six (6) months thereafter and for each subsequent Interest Period, commencing on and including the first date of the Interest Period, and ending on but excluding the last date of the Interest Period.

(b)    Any Dividend Claim representing part of an Additional Dividend Claim shall accrue interest at the Interest Rate for each Interest Period, commencing on and including the later of: (i) the commencement of the first Interest Period hereunder and (ii) the date on which such Additional Dividend Claim is effective hereunder pursuant to Clause 2.5 (*Additional Dividend Claims*), and thereafter in accordance with paragraph (a) above.

(c)    Interest shall be calculated on the basis of the actual number of days in the Interest Period in respect of which payment is being made divided by 360. The Interest Rate shall be reset on each Interest Quotation Day by the Obligor.

### 3.2    Payment of interest

(a)    Interest shall fall due on each Interest Payment Date for the corresponding preceding Interest Period.

(b)    On each Interest Payment Date falling on or before 1 June 2023, the accrued and unpaid interest payable pursuant to paragraph (a) above shall be paid in kind and deemed fully settled, by way of adding such interest to the PIK Interest Tranche relating to the corresponding Dividend Claim.

(c)    With respect to each Interest Payment Date falling after 1 June 2023, the accrued and unpaid interest pursuant to paragraph (a) above shall be paid in cash, on the later of:

(i)    such Interest Payment Date; and

(ii)    a date falling no later than ten (10) Business Days after the date on which the applicable Creditor has provided the Obligor and/or its account bank with payment details (and, if applicable, all necessary information in respect of "know your customer" or similar checks under applicable laws and regulations).

(d)    For the avoidance of doubt, any amount that is not paid by the Borrower on an Interest Payment Date due to the operation of paragraph (c)(ii) above shall not accrue interest and shall not represent an Overdue Amount or entitle the applicable Creditor to demand or enforce payment of the same in accordance with Clause 8.1(b)(ii) below.

4.    **REPAYMENT**

4.1    **Repayment of Dividend Claims**

(a)    Each Dividend Claim and any related PIK Interest Tranche shall, to the extent not converted to Shares prior to such date pursuant to Clause 6 (*Conversion terms, opt-out and structured sale*) below, mature in full on the Maturity Date, however subject to that it shall be repaid by the Obligor on the later of:

(i)    the Maturity Date; and

(ii)    a date falling no later than ten (10) Business Days after the date on which the applicable Creditor has provided the Obligor and/or its account bank with payment details (and, if applicable, all necessary information in respect of "know your customer" or similar checks under applicable laws and regulations),

in each case at a price equal to 100% of the amount of such Dividend Claim and any related PIK Interest Tranche.

(b)    For the avoidance of doubt, any amount that is not repaid by the Borrower on the Maturity Date due to the operation of paragraph (a)(ii) above shall cease to accrue interest from and including the Maturity Date, and shall not represent an Overdue Amount.

4.2    **Default interest**

(a)    Default interest shall accrue on any Overdue Amount from and including the date on which it was first due and payable to and excluding the date on which the payment is made at the Interest Rate plus 2 percentage points per annum.

(b)    Default interest accrued on any Overdue Amount pursuant to this Clause 4.2 shall be added to the Overdue Amount on each Interest Payment Date until the Overdue Amount and default interest accrued thereon have been repaid in full.

4.3    **Taxation**

(a)    The Obligor shall be responsible for withholding any withholding tax imposed by applicable law on any payments to be made by it under the Dividend Claims or in relation to these Dividend Claim Terms without any obligation to gross up such amount or deliver any document to any authority other than any tax authority to which the Obligor is subject.

(b)    Any public fees levied on the trade of Dividend Claims in the secondary market shall be paid by the Creditors, unless otherwise provided by law or regulation, and the Obligor shall not be responsible for reimbursing any such fees.

5.    **CHANGES TO THE CREDITORS**

5.1    **Assignments by the Creditors**

(a)    Subject to this Clause 5, a Creditor (an "**Assigning Creditor**") may assign its participation in any Dividend Claim together with any related PIK Interest Tranche (in each case in whole but not in part) to another person (a "**New Creditor**").

DocuSign Envelope ID: DB818F8C-2EE5-4ED7-BDBE-15B374B9032E

(b) Any assignment of a Dividend Claim pursuant to paragraph (a) above shall only be effective:

    (i) prior to the Alternative Platform Implementation Date, on receipt by the Obligor of a notice of assignment substantially in the form as set out in Schedule 1 (*Notice of assignment*) duly executed by the Assigning Creditor and the New Creditor (in form and substance satisfactory to the Obligor); or

    (ii) after the Alternative Platform Implementation Date, the valid completion of a notice of assignment by such means specified on the applicable Alternative Platform,

    in each case whereupon in respect of such Dividend Claim and any related PIK Interest Tranche:

        (A) the Assigning Creditor shall cease to be the Creditor and the New Creditor shall become the Creditor; and

        (B) the Obligor shall procure that the Dividend Claim Schedule is duly updated to reflect the assignment of such Dividend Claim and any related PIK Interest Tranche.

## 5.2 Restrictions

With respect to any assignment of any Dividend Claim and any related PIK Interest Tranche pursuant to Clause 5.1 (*Assignments by the Creditors*) above, certain purchase or selling restrictions may apply to Creditors under applicable local laws and regulations from time to time. The Obligor shall not be responsible to ensure compliance with such laws and regulations and each Creditor is responsible for ensuring compliance with the relevant laws and regulations at its own cost and expense.

## 6. CONVERSION TERMS, OPT-OUT AND STRUCTURED SALE

## 6.1 Conversion Date and Conversion Price

(a) As provided in these Dividend Claim Terms, each Dividend Claim shall entitle the holder to convert such Dividend Claim into Shares ("**Conversion Shares**"), credited as fully paid (a "**Conversion Right**"), with such Conversion Shares being newly issued or existing Shares as the Obligor may determine in its discretion.

(b) The Conversion Right cannot be separated from the Dividend Claim.

(c) The number of Conversion Shares to be issued or transferred and delivered on exercise of a Conversion Right shall be equal to the Reference Shares in respect of such exercise.

(d) The initial conversion price shall be as follows (the "**Conversion Price**"):

$$CP = \frac{C}{S}$$

where:

    (i) **CP** is the initial Conversion Price;

DocuSign Envelope ID: D8818E8C 2EE5 4ED7 BDBE 15B374B9032D

(ii)  **C** is the aggregate nominal amount of Dividend Claims outstanding as of the Conversion Price Determination Date; and

(iii)  **S** is 233,548,229[1].

(e)  In case of any dispute between the Overseer and the Obligor regarding the Conversion Price, the decision of the Overseer shall be final.

(f)  Fractions of Shares shall not be issued or transferred and delivered on exercise of Conversion Rights and no cash payment or other adjustment will be made in lieu thereof.

(g)  The Obligor shall procure that Conversion Shares will be issued or transferred and delivered in accordance with the provisions of Clause 6.2 (*Procedure for exercise of Conversion Rights*). Such Conversion Shares shall be deemed to be issued or transferred and delivered as of the relevant Conversion Date.

(h)  Subject to paragraph (i) below, the so-called "Euro-market standard anti-dilution provisions" shall apply, *mutatis mutandis*, to the Conversion Price hereunder, from and including the Effective Time to and including the No-Sale Conversion Date.

(i)  Notwithstanding any provision of these Claim Terms to the contrary, no adjustment shall be made to the Conversion Price as a consequence of any event or circumstance expressly contemplated by the Schemes, including but not limited to any issuance of Shares, Securities or debt claims (whether for cash, consideration in kind or no consideration and regardless of whether their terms of issue carry (directly or indirectly) rights of conversion into, or exchange or subscription for, purchase of, or rights to otherwise acquire, Shares (or shall grant any such rights in respect of existing Securities so issued) or Securities which by their terms might be reclassified or redesignated as Shares) and any conversion of any of the foregoing into Shares or such Securities, in each case to the extent so contemplated.

## 6.2  Procedure for exercise of Conversion Rights

(a)  A Creditor may only exercise Conversion Rights by way of the Conversion Agent delivering to the Obligor a notice of exercise of such Conversion Right on behalf of such Creditor (a "**Conversion Notice**"), such Conversion Notice to be delivered:

(i)  in respect of any Structured Sale Dividend Claim, after the Opt-out Deadline and on or before the Structured Sale Conversion Date; or

(ii)  in respect of any No-Sale Dividend Claim, after the date falling five (5) Business Days prior to the No-Sale Conversion Date and on or before the No-Sale Conversion Date.

(b)  Conversion Rights shall be exercised subject in each case to any applicable fiscal or other laws or regulations.

---

[1] To be the number of Shares allocated to Unsecured Creditors as a whole (i.e. 25.4% of the share capital on a Fully Diluted Basis, under and as defined in the Irish Scheme).

(c)    Any determination as to whether any Conversion Notice has been duly completed and properly delivered shall be made by the Obligor and shall, save in the case of manifest error, be conclusive and binding on the Obligor and the relevant Creditors.

(d)    Conversion Rights may only be exercised in respect of the whole of a Dividend Claim.

(e)    A Conversion Notice, once delivered, shall be irrevocable.

(f)    The deemed date of exercise of the Conversion Right in respect of a Dividend Claim shall be the Conversion Date corresponding to such Dividend Claim.

(g)    The Obligor shall pay all capital, stamp, issue and registration and transfer taxes and duties payable in Norway, or in any other jurisdiction in which the Obligor may be domiciled or resident or to whose taxing jurisdiction it may be generally subject, in respect of the issue or transfer and delivery of any Shares in respect of such exercise (“**Specified Taxes**”). If the Obligor shall fail to pay any Specified Taxes, the relevant Creditor shall be entitled to tender and pay the same and the Obligor as a separate and independent stipulation, covenants to reimburse and indemnify each Creditor in respect of any payment thereof and any penalties payable in respect thereof.

(h)    A Creditor on whose behalf Conversion Rights are exercised must pay directly to the relevant authorities any capital, stamp, issue, registration and transfer taxes and duties arising on the exercise of Conversion Rights (other than any Specified Taxes). A Creditor must also pay all, if any, taxes imposed on it and arising by reference to any disposal or deemed disposal by it of its participation in the Dividend Claim or its interest therein in connection with the exercise of Conversion Rights by it.

(i)    The Obligor shall (if relevant via an account manager) as soon as reasonably practicable but in any case on or prior to the date falling five (5) Business Days after a Conversion Date:

(i)    carry the conversion into effect by, at its own discretion, issuing the relevant number of new Shares or transferring existing Shares to the benefit of the Converting Creditor as specified by the Conversion Agent in the Conversion Notice and in accordance with paragraph (ii) below; and

(ii)    ensure:

(A)    the due registration of such Shares in the CSD;

(B)    transfer to:

(1)    in the case of Structured Sale Conversion Shares, the Obligor VPS Account in accordance with Clause 6.4(a), or

(2)    in the case of No-Sale Conversion Shares, the designated Creditor VPS Account in accordance with Clause 6.5(b); and

(C)    subject to paragraph (j) below, listing of such Shares on the Stock Exchange(and shall deliver any such documents and do any acts necessary in relation thereto), but this obligation to list such Shares shall not be

considered as being breached as a result of a Change of Control Event (whether or not recommended or approved by the board of directors of the Obligor) that causes or gives rise to, whether following the operation of any applicable compulsory acquisition provision or otherwise including at the request of the person or persons controlling the Obligor as a result of the Change of Control Event, a de-listing of the Shares.

(j)     If on any Conversion Date there is a requirement for a new prospectus in order for the Shares to be listed on the Stock Exchange, the resulting Shares may be issued under a separate ISIN (such Shares referred to as the "**Temporary Shares**"). Upon the approval of the requisite prospectus, the Obligor shall ensure that the Temporary Shares are converted into the ISIN for the Shares. The Issuer shall use its best commercial endeavours to ensure that any Temporary Shares are listed on the Stock Exchange within 10 Business Days of the issue date for such Temporary Shares.

(k)     Upon the issuance or transfer of the Shares on conversion of any Dividend Claim in accordance with the terms of these Dividend Claim Terms, such Dividend Claim shall be deemed to be fully and finally written-down and settled, and the Obligor shall have no further liability in respect of such converted Dividend Claim.

## 6.3     Conversion Opt-out

(a)     Any Creditor may irrevocably elect, by written notice substantially in the form set out in Schedule 2 (*Conversion Opt-out Notice*) to the Obligor or its designated nominee (a "**Conversion Opt-out Notice**") no later than two (2) Business Days prior to the Structured Sale Conversion Date (the "**Opt-out Deadline**") for any Dividend Claim owned by it not to be converted into Shares, and such Dividend Claim shall with effect from the delivery of such Conversion Opt-out Notice cease to have a Conversion Right but otherwise shall continue on the terms of these Dividend Claim Terms.

(b)     If, in respect of any Dividend Claim, the Creditor owning such Dividend Claim has not delivered a Conversion Opt-out Notice on or before the Opt-out Deadline, the Obligor shall procure that the Conversion Agent shall deliver a valid Conversion Notice on behalf of such Creditor in respect of the entire Dividend Claim held by such Creditor in accordance with (and within the applicable time specified in) paragraph 6.2(a) above.

## 6.4     Structured Sale Process

(a)     If, in respect of any Dividend Claim, the Creditor owning such Dividend Claim has not delivered a Structured Sale Opt-out Notice, pursuant to Clause 6.5(a) below, on or before the Opt-out Deadline, any Shares resulting from the exercise of Conversion Rights attaching to such Dividend Claim (such Dividend Claim, a "**Structured Sale Dividend Claim**") in accordance with Clauses 6.2(a)(i) and 6.3(b) above ("**Structured Sale Conversion Shares**") shall be issued or transferred and delivered to a VPS investor escrow account held in the name of the Obligor and in respect of which the Broker is the account manager (the "**Obligor VPS Account**"), in each case on behalf of the Creditor that held the corresponding Structured Sale Dividend Claim immediately prior to the Structured Sale Conversion Date (each a "**Structured Sale Creditor**") and further in accordance with Clause 6.2(i) above.

DocuSign Envelope ID: DB818F8C-2EE5-4ED7-BDBE-15B374B3032D

(b) Promptly following the delivery of the Structured Sale Conversion Shares to the Obligor VPS Account, the Obligor shall irrevocably instruct the Broker to sell the Structured Sale Conversion Shares in accordance with the broker mandate letter attached at Schedule 4 (*Structured Sale Mandate Letter*) hereto (the "**Structured Sale Process**").

(c) The Net Cash Proceeds shall be placed into a blocked escrow account of the Obligor held with DNB Bank ASA (the "**Structured Sale Proceeds Account**"), and shall be distributed to each Structured Sale Creditor on a *pro rata* basis (based on Structured Sale Conversion Shares relating to each Structured Sale Creditor), as soon as reasonably practicable following the later of:

    (i) the completion of the Structured Sale Process; and

    (ii) the date on which such Structured Sale Creditor provides (to the extent not already provided) up-to-date payment details and, if applicable, necessary information in respect of "know your customer" or similar checks under applicable laws and regulations to the Obligor and/or its account bank for such distribution to be effected.

## 6.5 Structured Sale Opt-out

(a) Any Creditor may irrevocably elect, by written notice substantially in the form set out in Schedule 3 (*Structured Sale Opt-out Notice*) to the Obligor or its designated nominee (a "**Structured Sale Opt-out Notice**") no later than the Opt-out Deadline, that any Dividend Claim owned by it that would otherwise be converted to Structured Sale Conversion Shares to be sold pursuant to the Structured Sale Process (in accordance with Clauses 6.2(a)(i) and 6.4 (*Structured Sale Process*) above) shall not be so converted and sold but shall instead be converted to Shares on the No-Sale Conversion Date and delivered to the relevant Creditor as set out in this Clause 6.5 (such Shares "**No-Sale Conversion Shares**" and, together with the Structured Sale Conversion Shares, "**Conversion Shares**"), provided that any Creditor making such election (a "**No-Sale Creditor**") shall in the Structured Sale Opt-out Notice provide to the Obligor or its designated nominee details of a valid VPS account (either in its own name or in the name of its custodian) into which such No-Sale Conversion Shares are to be delivered in accordance with these Dividend Claim Terms (a "**Creditor VPS Account**").

(b) The Obligor shall procure that the No-Sale Conversion Shares shall, no later than five (5) Business Days after the No-Sale Conversion Date, be issued or transferred and delivered to the relevant Creditor VPS Account in accordance with Clause 6.2(i) above.

(c) Any Creditor shall be permitted to exercise its rights pursuant to Clauses 6.3 (*Conversion Opt-out*) or 6.5 (*Structured Sale Opt-out*) above (collectively, the "**Opt-out Election**") only upon representing in the applicable Conversion Opt-out Notice or Structured Sale Opt-out Notice that it is either (i) not located in the United States (as defined in Regulation S under the US Securities Act or (ii) it is either (A) a "qualified institutional buyer" (as defined in Rule 144A under the US Securities Act) or (B) an "institutional" accredited investor (within the meaning of Rule 501(a)(1), (3), (5) or (7) under the US Securities Act). For the avoidance of doubt, any Opt-Out Election of a Creditor shall not be effective unless the foregoing representation is provided by such Creditor.

6.6 **Ranking and entitlement in respect of Shares**

(a) Shares issued or transferred and delivered on exercise of Conversion Rights shall be fully paid and shall in all respects rank *pari passu* with the fully paid Shares in issue on the relevant Conversion Date and the relevant holder shall be entitled to all rights, distribution or payments the record date or other due date for the establishment of entitlement for which falls on or after the relevant Conversion Date, except in any such case for any right excluded by mandatory provisions of applicable law or as otherwise may be provided in these Dividend Claim Terms. Such Shares shall not rank for (or, as the case may be, the relevant holder shall not be entitled to receive) any rights, distributions or payments the record date or other due date for the establishment of entitlement for which falls prior to the relevant Conversion Date.

(b) For the purposes of this Clause 6.6, Shares held by or on behalf of the Obligor or any of its Subsidiaries shall not be considered as or treated as "in issue" or "issued" or entitled to receive the relevant right, distribution, or payment.

6.7 **Purchase or redemption of Shares**

The Obligor or any Subsidiary of the Obligor may exercise such rights as they may from time to time enjoy to purchase or redeem or buy back any shares of the Obligor (including Shares) or any depositary or other receipts or certificates representing the same without the consent of any Creditor.

6.8 **Independent reports**

(a) On the Conversion Price Determination Date, the Obligor shall, in conjunction with the Overseer, calculate and make available the Conversion Price at such time, together with supporting calculations and the Independent Verification Statement on its website and/or as a stock exchange notice.

(b) The Obligor shall make available the Post-Conversion Report as soon as reasonably practicable after completion of the Structured Sale Process and the distribution of No-Sale Conversion Shares on its website and/or as a stock exchange notice.

(c) For the purposes of paragraph (b) above, the Obligor shall procure and provide evidence to the Overseer promptly after the occurrence of each of the following events:

(i) that the Structured Sale Conversion Shares have been issued to the Obligor VPS Account;

(ii) that the Obligor has provided an instruction to the Broker to perform the Structured Sale Process in accordance with the terms set out in these Dividend Claim Terms;

(iii) from the Broker, of the average sale price that was obtained in respect of the Structured Sale Conversion Shares in the Structured Sale Process, and the calculation of the corresponding *pro rata* entitlement of each Structured Sale Creditor to the Net Cash Proceeds;

(iv) that the Net Cash Proceeds have been delivered to the Structured Sale Proceeds Account; and

(v)   that any No-Sale Conversion Shares to be issued to No-Sale Creditors have been delivered to such No-Sale Creditors no later than five (5) Business Days after the No-Sale Conversion Date or in accordance with Clause 6.5(d).

## 7.    MERGER

### 7.1   Conversion Rights under mergers

(a)   In the case of any consolidation, amalgamation or merger of the Obligor with any other corporation (other than a consolidation, amalgamation or merger in which the Obligor is the continuing corporation), the Obligor shall take such steps as shall be necessary (including the execution of an agreement supplemental to or amending these Dividend Claim Terms) to ensure that any Dividend Claims then outstanding will (during the period in which Conversion Rights may be exercised) be converted into the class and amount of shares and other securities and property receivable upon such consolidation, amalgamation or merger by a holder of the number of Shares that would have been issuable upon exercise of Conversion Rights immediately prior to such consolidation, amalgamation or merger.

(b)   The foregoing shall apply, *mutatis mutandis* to any subsequent consolidations, amalgamations or mergers.

## 8.    EVENTS OF DEFAULT AND ACCELERATION

### 8.1   No events of default

(a)   The Dividend Claims and any related PIK Interest Tranche shall not be subject to any event of default provisions. No Creditor may declare any event of default by the Obligor of any of its obligations under these Dividend Claim Terms (neither on a contractual basis nor on the basis of general principles of Norwegian law), or demand that any Dividend Claim and/or any related PIK Interest Tranche becomes due and payable prior to its stated maturity.

(b)   Notwithstanding paragraph (a) above:

(i)   all Dividend Claims and any related PIK Interest Tranche shall immediately become due and payable on:

(A)   the Maturity Date; or

(B)   the date on which any order is made or resolution is passed for the final and irrevocable liquidation, final and irrevocable winding-up or final and irrevocable dissolution (or analogous insolvency process in any jurisdiction) of the Obligor (otherwise than for the purposes of reconstruction, amalgamation or merger where the Obligor is still solvent),

and any Creditor may in such event exercise any or all of its rights, remedies, powers or discretions hereunder or take such further measures as are necessary to recover any unpaid amounts owing to it hereunder; and

(ii)   if the Obligor fails to pay to any Creditor any amount of interest which has become due and payable in respect of its Dividend Claim, such Creditor may demand payment of such amounts and take such steps to enforce such payment

(including initiating bankruptcy proceedings) as are available under law, provided that no principal amount outstanding under the Dividend Claims and any related PIK Interest Tranche may be declared due and payable by reason of such failure to pay (other than pursuant to paragraph (i)(B) above.

9. **AMENDMENTS AND WAIVERS**

This Clause 9 shall take effect on and from the Business Day immediately following the No-Sale Conversion Date.

9.1 **Creditors' Meeting**

(a) The Obligor may, at its own cost and expense, convene a meeting of the Creditors (a "**Creditors' Meeting**") for the purpose of making any amendment or waiver of these Dividend Claim Terms.

(b) All Creditors shall have the right to attend the Creditors' Meeting, and Creditors representing at least 10 % of the aggregate amount of the Dividend Claims shall be represented at a Creditors' Meeting for a quorum to be present.

(c) In the event that the necessary quorum set out in paragraph (b) above is not achieved, the Obligor may, within 10 Business Days of that first Creditors' Meeting, convene a repeated meeting with the same agenda as the first meeting. The provisions of this Clause 9 shall apply *mutatis mutandis* to such repeated Creditors' Meeting, save that the quorum requirements set out in paragraph (b) above shall not apply.

(d) Each Creditor (or person acting for a Creditor under a power of attorney) may cast one vote for each NOK 1 of Dividend Claim and any related PIK Interest Tranche owned.

(e) Any amendment or waiver of these Dividend Claim Terms shall be passed by a majority of at least two thirds of the aggregate amount of the Dividend Claims and any related PIK Interest Tranche represented at the Creditor's meeting.

(f) For the purposes of this Clause 9, quantum of Dividend Claims and any related PIK Interest Tranche and identity of Creditors there of shall be determined as of 5 pm CET on the date two Business Days prior to the Creditors' Meeting, for which purposes the Dividend Claims Schedule shall be conclusive.

(g) The Creditors' Meeting may not adopt resolutions which will give certain Creditors an unreasonable advantage at the expense of other Creditors or otherwise have a material adverse effect on the Dividend Claims and any related PIK Interest Tranche.

(h) The Obligor shall ensure that the Creditors are notified of resolutions passed at the Creditors' Meeting and that resolutions are published on the website of the Obligor (or alternatively by press release or other relevant information platform).

9.2 **Procedure for arranging a Creditors' Meeting**

(a) Summons to a Creditors' Meeting must be published no later than 10 Business Days prior to the proposed date of the Creditors' Meeting, on the website of the Obligor (or alternatively by press release or other relevant information platform), and must clearly state the agenda for the Creditors' Meeting and the matters to be resolved.

DocuSign Envelope ID: DB918F8C-2EE5-4ED7-BDBE-15B374B9032D

    (b)    A Creditors' Meeting shall be held on premises selected by the Obligor, however to be held in Oslo, Norway. The Obligor may in its discretion facilitate digital participation of Creditors in a Creditors' Meeting.

**9.3**    **Written Resolution**

    (a)    Anything that may be resolved by the Creditors in a Creditors' Meeting may also be resolved by way of a written resolution of the Creditors (a "**Written Resolution**"), and the provisions set out in this Clause 9 in respect of a Creditors' Meeting shall apply *mutatis mutandis* to a Written Resolution.

    (b)    Voting in respect of a Written Resolution shall take place during a period commencing on the date of the summons in respect thereof and ending at least 10 Business Days but not more than 15 Business Days thereafter (the "**Voting Period**").

    (c)    A Written Resolution shall be passed when the requisite majority set out in paragraph (e) of Clause 9.1 (*Creditors' Meeting*) above has been obtained, based on a quorum of the total Dividend Claims and any related PIK Interest Tranche, even if the Voting Period has not yet expired. If the Written Resolution is not passed prior to the expiry of the Voting Period, the number of votes shall be calculated at 5 pm CET on the last day of the Voting Period, and a decision made based on the quorum and majority requirements set out in paragraphs (b), (c) and (e) of Clause 9.1 (*Creditors' Meeting*) above.

**10.**    **MISCELLANEOUS**

**10.1**    **Limitation of claims**

All claims under these Dividend Claim Terms for payment, including interest and principal, shall be subject to the legislation regarding time-bar provisions of Norway.

**10.2**    **Access to information**

These Dividend Claim Terms shall be made available to the public and copies may be obtained from the Obligor.

**10.3**    **Notices, contact information**

    (a)    Unless otherwise specifically provided, all notices or other communications under or in connection with these Dividend Claim Terms between the Obligor and the Creditors will be given or made in writing, by e-mail or publication on a relevant information platform accessible to both the Obligor and the Creditors (including, but not limited to, the website of the Obligor and any Alternative Platform). Any such notice or communication will be deemed to be given or made as follows:

        (i)    if by e-mail, when received; and

        (ii)    if by publication or communication on a relevant information platform, when published or posted.

    (b)    The e-mail address for any notices or communication to the Obligor in connection with these Dividend Claim Terms is dividendclaims@norwegian.no.

    (c)    The Obligor and the Creditors shall each ensure that the other party is kept informed of changes in e-mail addresses and contact persons.

DocuSign Envelope ID: DB818F8C-2EE5-4ED7-BDBE-15B374B9032D

(d)   When determining deadlines set out in this these Dividend Claim Terms, the following shall apply (unless otherwise stated):

(i)   if the deadline is set out in days, the first day of the relevant period shall not be included and the last day of the relevant period shall be included;

(ii)   if the deadline is set out in weeks, months or years, the deadline shall end on the day in the last week or the last month which, according to its name or number, corresponds to the first day the deadline is in force. If such day is not a part of an actual month, the deadline shall be the last day of such month; and

(iii)   if a deadline ends on a day which is not a Business Day, the deadline shall be postponed to the next Business Day.

## 11.    GOVERNING LAW AND JURISDICTION

### 11.1    Governing law

These Dividend Claim Terms shall be governed by the laws of Norway, without regard to its conflict of law provisions.

### 11.2    Main jurisdiction

The City Court of Oslo (*Nw. Oslo tingrett*) shall have jurisdiction with respect to any dispute arising out of or in connection with these Dividend Claim Terms. The Obligor agrees for the benefit of the Creditors that any legal action or proceedings arising out of or in connection with these Dividend Claim Terms against the Obligor or any of its assets may be brought in such court.

*** 

These Dividend Claim Terms have been executed in one original which shall be retained by the Obligor, and a digital version shall be made available for viewing on the Obligor's website.

## SIGNATORIES:

**The Obligor:**

NORWEGIAN AIR SHUTTLE ASA

*Geir Karlsen*
——————————————————
Name: Geir Karlsen

Title:  CFO

**SCHEDULE 1**

**NOTICE OF ASSIGNMENT**

To:    Norwegian Air Shuttle ASA as Obligor

From:    [Assigning Creditor] (the "Assigning Creditor") and [New Creditor] (the "New Creditor")

Dated: [●]

**DIVIDEND CLAIM TERMS DATED 11 MARCH 2021 FOR NORWEGIAN AIR SHUTTLE ASA – NOTICE OF ASSIGNMENT**

1.    We refer to the above captioned dividend claim terms (the "**Dividend Claim Terms**"). This is a notice of assignment of the below stated Dividend Claim [and related PIK Interest Tranche] from the Assigning Creditor to the New Creditor. Terms defined in the Dividend Claim Terms shall have the same meaning in this notice unless given a different meaning herein.

2.    We refer to Clause 5 (*Changes to the Creditors*) of the Dividend Claim Terms. The Assigning Creditor has irrevocably assigned 100% of its Dividend Claim [and related PIK Interest Tranche] (in the amount of [●]) (the "**Assigned Claim**") to the New Creditor with effect from [date].

3.    The Obligor is irrevocably released from its obligation to pay any amount relating to the Assigned Claim to the Assigning Creditor.

4.    The New Creditor hereby irrevocably confirms the Dividend Claim Terms and that the Conversion Agent may exercise the Conversion Right on its behalf in accordance with Clause 6.2 (*Procedure for exercise of Conversion Rights*) of the Dividend Claim Terms, as if the New Creditor had been a recipient of such Claim under the Scheme of Arrangement).

5.    The contact details of the New Creditor are as follows:

[Entity name]

[Registered address]

[Registration number]

[Contact person]

[Email address]

6.    Each of the Assigning Creditor and the New Creditor represents and warrants that it has the power to enter into, perform and deliver, and has taken all necessary action to authorise its entry into, performance and delivery of, this notice of assignment and the transactions contemplated by this notice of assignment.

7.    Please procure that the Dividend Claim Schedule is duly updated to reflect the above assignment.

DocuSign Envelope ID: D8918F8C-2EE5-4ED7-BDBE-15B374B0325

8.      This notice of assignment may be executed in any number of counterparts and this has the same effect as if the signatures on the counterparts were on a single copy of this notice.

9.      This notice of assignment and any non-contractual obligations arising out of or in connection with it are governed by Norwegian law.


_____

**Assigning Creditor**

Name:

Title: [●] – Duly authorised signatory



_____

**New Creditor**

Name:

Title: [●] – Duly authorised signatory

DocuSign Envelope ID: DB818F8C-2EE5-4ED7-BDBE-15B374B0332D

## SCHEDULE 2
### CONVERSION OPT-OUT NOTICE

To:    Norwegian Air Shuttle ASA as Obligor

From:   [Creditor]

Dated: [●]

**DIVIDEND CLAIM TERMS DATED 11 MARCH 2021 FOR NORWEGIAN AIR SHUTTLE ASA – CONVERSION OPT-OUT NOTICE**

1.    The undersigned refers to the above captioned dividend claim terms (the "**Dividend Claim Terms**"). Terms defined in the Dividend Claim Terms shall have the same meaning in this Conversion Opt-out Notice unless given a different meaning herein. This is a Conversion Opt-out Notice.

2.    Further reference is made to Clause 6.3 (*Conversion Opt-out)* of the Dividend Claim Terms.

3.    The undersigned hereby irrevocably elects for 100% of its Dividend Claim in the amount of NOK [●] not to be converted into Shares, and agrees and acknowledges that such Dividend Claim shall with effect from the delivery of this Conversion Opt-out Notice cease to have a Conversion Right but shall otherwise continue on the terms of the Dividend Claim Terms.

4.    The undersigned represents and warrants that it is either (i) not located in the United States (as defined in Regulation S under the US Securities Act or (ii) it is either (A) a "qualified institutional buyer" (as defined in Rule 144A under the US Securities Act) or (B) an "institutional" accredited investor (within the meaning of Rule 501(a)(1), (3), (5) or (7) under the US Securities Act).

5.    The undersigned represents and warrants that it has the power to enter into, perform and deliver, and has taken all necessary action to authorise its entry into, performance and delivery of, this Conversion Opt-out Notice and the transactions contemplated herein.

6.    This Conversion Opt-out Notice and any non-contractual obligations arising out of or in connection with it are governed by Norwegian law.

_____

**Creditor**

Name:

Title: [●] – Duly authorised signatory

DocuSign Envelope ID: DB818F8C-2EE5-4ED7-BDBE-15B374B9032D

## SCHEDULE 3
### STRUCTURED SALE OPT-OUT NOTICE

To:      Norwegian Air Shuttle ASA as Obligor

From:    [Creditor]

Dated: [●]

**DIVIDEND CLAIM TERMS DATED 11 MARCH 2021 FOR NORWEGIAN AIR SHUTTLE ASA – STRUCTURED SALE OPT-OUT NOTICE**

1.      The undersigned refers to the above captioned dividend claim terms (the "**Dividend Claim Terms**"). Terms defined in the Dividend Claim Terms shall have the same meaning in this Structured Sale Opt-out Notice unless given a different meaning herein. This is a Structured Sale Opt-out Notice.

2.      Further reference is made to Clause 6.5 (*Structured Sale Opt-out*) of the Dividend Claim Terms.

3.      The undersigned hereby irrevocably elects for 100% of its Dividend Claim in the amount of NOK [•] that would otherwise be converted to Structured Sale Conversion Shares to be sold pursuant to the Structured Sale Process shall not be so converted and sold but shall instead be converted to No-Sale Conversion Shares on the No-Sale Conversion Date and delivered to the below stated Creditor VPS Account in accordance with Clause 6.5 (*Structured Sale Opt-out*) of the Dividend Claim Terms.

4.      Valid details of the Creditor VPS Account to which the resulting No-Sale Conversion Shares shall be delivered in accordance with Clause 6.5 (*Structured Sale Opt-out*) of the Dividend Claim Terms are set out below:

   [•][2]

5.      The undersigned represents and warrants that it is either (i) not located in the United States (as defined in Regulation S under the US Securities Act or (ii) it is either (A) a "qualified institutional buyer" (as defined in Rule 144A under the US Securities Act) or (B) an "institutional" accredited investor (within the meaning of Rule 501(a)(1), (3), (5) or (7) under the US Securities Act).

---

[2] To include VPS account number (always 12 digits, usually beginning with 0 or 1); name in which VPS account is held, and telephone and e-mail address details for the No-Sale Creditor. If a VPS account is held through a custodian arrangement, the VPS account name and number required is that of the custodian, and the following additional details are required: the name and number of the No-Sale Creditor's account held through the custodian, telephone and e-mail address of custodian contact.

DocuSign Envelope ID: DB818F8C-2EE5-4FD7-BDBE-15B374B0325

6.    The undersigned represents and warrants that it has the power to enter into, perform and deliver, and has taken all necessary action to authorise its entry into, performance and delivery of, this Structured Sale Opt-out Notice and the transactions contemplated herein.

7.    This Structured Sale Opt-out Notice and any non-contractual obligations arising out of or in connection with it are governed by Norwegian law.

_____

**Creditor**

Name:

Title: [●] – Duly authorised signatory

## SCHEDULE 4
### Structured Sale Mandate Letter

DocuSign Envelope ID: DB818F8C-2EE5-4ED7-BDBE-15B374B032D1



CONFIRMATION OF ASSIGNMENT

To: Norwegian Air Shuttle ASA
Att. Geir Karlsen, CFO

**Assignment confirmation regarding structured sale process**

Reference is made to the correspondence between Norwegian Air Shuttle ASA with organization number 965 920 358 (the "**Client**") and DNB Markets, a part of DNB Bank ASA with organisation number 984 851 006 (the "**Contractor**") regarding the structured sale process of shares issued by the Client.

We refer to the ongoing restructuring of the Client and certain of its subsidiaries by way of an Irish examinership and Norwegian reconstruction process, together with a parallel capital raise (the "**Restructuring**"). The proposed terms of the Restructuring provide that, as further set out in a proposal for a scheme of arrangement (the "**Scheme**") Clause 10, certain creditors are to receive a dividend in the form of claims which shall be convertible into shares amounting to up to 25.4% of the share capital of the Client (the "**Conversion Shares**"), based on the share capital as at the time immediately following the effectiveness of the Restructuring (and certain other assumptions detailed within the Scheme) subject to and in accordance with the terms of the Dividend Claims Terms at Schedule 8 to the Scheme (the "**Dividend Claims Terms**"). Subject to certain opt-out rights for creditors, the Conversion Shares will be issued within 5 business days of the date falling 60 days after the Effective Time, as defined in the Scheme, and shall be issued to a VPS investor escrow account (the "**VPS Escrow Account**") on behalf of the persons that held the corresponding dividend claims immediately prior to such conversion ("**Structured Sale Creditors**").

Furthermore, as set out in section 10 of the Scheme, the Conversion Shares are to be sold in the market by way of a structured sale process conducted by the Contractor (the "**Structured Sale Process**").

**1.    Assignment**

The Contractor confirms the following order for execution of the Structured Sale Process (the "**Assignment**"):

A.        The Contractor will lead-manage the Structured Sale Process, which structure shall be determined by the Contractor in its discretion (including with regards to timing and sale price), with an aim to maximizing the average sale price of the Conversion Shares within a commercially reasonable time period, based on liquidity and other market factors.

B.        The instruction from the Client to commence the Structured Sale Process, once given, shall be irrevocable, and the Client shall have no influence on and shall not be provided with any information about the duration, price or any other aspect of the Structured Sale Process, which shall be determined by the Contractor in its absolute discretion and acting independently, as set out in A. above. Notwithstanding the foregoing, the Contractor may during the Structured Sale Process report periodically to Helge A. Østvold of BHL DA (the "**Overseer**" as defined in the Dividend Claims Terms) with respect to the progress and average price obtained in the Structured Sale Process.

C.        The cash proceeds from the Structured Sale shall be placed into a blocked escrow account of the Client, held with DNB Bank ASA, and the proceeds shall be distributed *pro rata* to the Structured Sale Creditors as further set out in the Dividend Claims Terms.

D.        Subject to the above, the Contractor will use its commercially reasonable efforts to complete the Structured Sale during a period of 3 months, provided that it shall have discretion to extend such period where it considers in its professional judgement that it would be in the best interests of the Structured Sale Creditors to do so.

**2.    Regulatory compliance**

The Client shall, prior to the initiation of the Structured Sale, furnish the Contractor with a copy of all documentation necessary in order to lawfully initiate the Structured Sale.

The Client shall be solely responsible for its compliance with all legal requirements relating to the Assignment and the Structured Sale, including without limitation disclosure and reporting obligations, insider trading regulations,



**MARKETS**

CONFIRMATION OF ASSIGNMENT

market manipulation regulations, duties relating to equal treatment of shareholders and duties to ensure adequate disclosures to the public.

The Client shall indemnify and hold the Contractor harmless should the Contractor incur a loss (of any kind) as a result of the Client's failure to comply with any applicable legal requirements.

**3.      FEES**

The Contractor will conduct the Structured Sale for and on behalf of the Client on a provision basis at a rate of 0.35% of the gross proceeds of all Conversion Shares sold (the "**Provision Fee**"). The Provision Fee will be charged on a continuous basis and will be shown on the Client's respective contract notes.

Costs connected to repurchase transactions will be subject to continuous settlement in accordance with standard settlement terms and will be shown on the Client's respective contract notes.

**4.      APPROVAL OF THE STANDARD CONDITIONS**

By signature of the Engagement Letter the Client also accepts the standard conditions of DNB Markets Investment Banking Division (the "**Standard Conditions**") and the general business terms as they appear on https://www.dnb.no/en/agreements in the condition they exist upon the signing of this confirmation of assignment. The Standard Conditions constitute an integrated part of the confirmation of assignment, and is enclosed to the confirmation of assignment. In the case that the Client has not received a copy of the Standard Conditions, it may be obtained by sending a request to "markets.ibd@dnb.no".


******


Yours truly
p.p. DNB Bank ASA, DNB Markets


.......................................
Peter Behncke
Head of Investment Banking Division


Norwegian Air Shuttle ASA confirms its agreement to the terms set out in this confirmation of assignment.

10-mar-2021
...................................
Place and date


By authorisation

...........................
Geir Karlsen, CFO

DocuSign Envelope ID: DB818F8C-2EE5-4ED7-BDBE-15B374B0332D



CONFIRMATION OF ASSIGNMENT

**SCHEDULE 8**

Norwegian Restructuring Plan

**The Norwegian Restructuring Plan**

**in respect of**

**NORWEGIAN AIR SHUTTLE ASA**

**Dated 11 March 2021**

## 1    DEFINITIONS & INTERPRETATION

1.1    The following defined terms are applied herein:

| | |
|---|---|
| **2020 Convertible:Perpetual Bonds:** | has the same meaning as per the corresponding definition in the Scheme of Arrangement; |
| **Agreed Creditor:** | those Creditors whose Claims are accepted by the Company both in terms of liability and quantum and beside whose name in the Creditor Schedule there is the word "Yes"; |
| **Agreed Debt:** | a)  the amount due to a Creditor as appears beside its name and marked as agreed in the Creditor Schedule;<br><br>b)  the amount due to a Creditor which has otherwise been agreed by the Company and the Creditor prior to the Irish Confirmation Date, determined by the Irish High Court under section 537 (3) of the Irish Companies Act 2014 (as amended) or determined in accordance with the Expert Determination Process;<br><br>c)  in the case of any Contingent Litigation Creditor, the amount which is found to be due to it as determined by the courts of competent jurisdiction (subject to any appeal) or the amount settled or agreed by the Company; or<br><br>d)  in the case of any Customer Damages Claims, the amount which is found to be due to it by the Customer Claim Forum (subject to any appeal) or the amount settled or agreed by the Company; |
| **Board:** | the board of directors of the Company; |
| **Business Day:** | any day other than a Saturday, Sunday, or public holiday in either of Ireland or Norway; |
| **Cash Pot:** | is defined in section 4.13 below; |
| **Claim:** | any claim or right of action which a Creditor may have against the Company as at the Petition Date, including, but not limited to, any right to payment whether or not such right is reduced to judgement, liquidated, unliquidated, fixed, contingent, prospective, matured, unmatured, disputed, undisputed, ascertained, unascertained, legal, equitable, secured, unsecured (and including, for the avoidance of doubt and without limitation: (1) the right to payment of any Pre- |

|  | Repudiation Post-Petition Liabilities; and (2) any claim from a Contingent Unagreed Creditor that has not crystallised); |
|---|---|
| **Closing Date:** | is defined in section 4.23 below; |
| **Company:** | Norwegian Air Shuttle ASA, a company incorporated under the laws of Norway with company number 965920358 MVA, having its headquarters at Oksenøyveien 3, 1336 Lysaker, Norway (also referred to as "**NAS**"); |
| **Companies:** | the Company and the subsidiaries listed in section 3.1 (a) – (e); |
| **Company's Proposal:** | is defined in section 3.16 below; |
| **Contingent Litigation Creditor:** | has the same meaning as per the corresponding definition in the Scheme of Arrangement; |
| **Contingent Unagreed Creditors:** | has the same meaning as per the corresponding definition in the Scheme of Arrangement; |
| **Creditors:** | all creditors of the Company, known or unknown, whether or not the liabilities have been acknowledged or recognised, qualified or unqualified, actual or contingent, ascertained or unascertained, including (but not limited to) the creditors and classes of creditors listed in the Creditor Schedule attached to the Scheme of Arrangement, and each a "**Creditor**"; |
| **Creditors' Committee:** | the committee appointed on 8 December 2020 further to the Restructuring Proceedings, as set out in section 3.11 below; |
| **Creditor Schedule:** | the list of Creditors set out in Schedule 5 to the Scheme of Arrangement; |
| **Customer Creditors:** | the customers or other Creditors of the Company (including any travel agent, agent, claims handler or legal owner of such Claim) with Ticket Refund Claims and / or Customer Damages Claims including but not limited to the Customer Creditors identified in the Creditor Schedule maintained by the Company and the Examiner but not included with these Proposals further to the directions of the Irish High Court made on 19 February 2021; |
| **Customer Damages Claim:** | any Claim for losses, damages, penalties, standard compensation, interest or costs, whether arising under Regulation 261/2004/EC or |

|  | otherwise, in respect of flights which were cancelled or other matters which occurred prior to the Petition Date excluding, for the avoidance of doubt, any Ticket Refund Claims; |
|---|---|
| **Customer Claim Forum:** | the relevant decision making or judicial authority with jurisdiction over a Customer Damages Claim; |
| **Dividend Amount:** | is defined in section 4.13 below; |
| **Dividend Balance:** | is defined in section 4.13 below; |
| **Dividend Claims:** | the Claims of the Creditors set out in the Restructuring Plan reduced and converted on the Dividend Claims Terms; |
| **Dividend Claims Terms:** | the terms governing the Dividend Claims dated 11 March 2021, an executed copy of which is set forth in Schedule 7 in the Scheme of Arrangement; |
| **Effective Date:** | shall have the same meaning as per the corresponding definition in the Scheme of Arrangement; |
| **Effective Time:** | shall have the same meaning as per the corresponding definition in the Scheme of Arrangement; |
| **Examiner:** | the examiner of the Examinership, Mr. Kieran Wallace of KPMG, 1 Stokes Place, St; Stephen's Green, Dublin 2; |
| **Examinership:** | the examinership of the Companies in Ireland pursuant to the Irish Companies Act 2014; |
| **Existing Shares:** | all shares in the Company in issue immediately prior to the Effective Time; |
| **Expert Determination Process:** | the expert determination process set out in section 11 of Scheme of Arrangement; |
| **Explanatory Memorandum:** | the explanatory statement dated 11 March 2021 explaining the effect of the Scheme of Arrangement; |
| **FSAN:** | the Financial Supervisory Authority of Norway (Nor. *Finanstilsynet*); |
| **Fully Diluted Basis:** | the Company's issued share capital on a fully diluted basis at the Effective Time: (1) assuming that an amount exactly equal to the Minimum Gross Proceeds Threshold is raised under the Investment; (2) |

calculated as if all conversion rights under the New Capital Perpetual Bonds and the Dividend Claims were immediately exercised on issue on such date (notwithstanding that conversion on such date will not be permitted under either the New Capital Perpetual Bonds Instrument or the Dividend Claims Terms); (3) assuming all 2020 Convertible Perpetual Bonds are voluntarily converted by the holders thereof in accordance with their terms prior to the Effective Time (other than 2020 Convertible Perpetual Bonds beneficially owned by the Company as of the Petition Date); and (4) assuming that there are no changes to the Company's share capital other than as contemplated further to the Restructuring Plan and the Related Proposals;

| | |
|---|---|
| **GIEK Guaranteed Loan Facilities Creditor:** | has the same meaning as per the corresponding definition in the Scheme of Arrangement; |
| **Group:** | the group of companies of which the Companies form part; |
| **Investment:** | is defined in section 4.19 below; |
| **Investment Proceeds:** | the total proceeds raised by the Company in connection with the Investment; |
| **Irish Confirmation Date:** | the date on which the Irish High Court makes the Irish Confirmation Order; |
| **Irish Confirmation Order:** | the Irish Court order(s) confirming the Scheme of Arrangement pursuant to Section 541 of the Irish Companies Act 2014 (as amended); |
| **Irish Court:** | the Irish High Court, or where any decision of the Irish High Court is appealed, the Court of Appeal of Ireland and/or the Supreme Court of Ireland; |
| **Irish High Court:** | the High Court of Ireland; |
| **KYC:** | "Know Your Customer" anti-money laundering requirements under Norwegian law; |
| **Long Stop Date:** | 30 June 2021; |
| **Minimum Gross Proceeds Threshold:** | with respect to the Investment, gross proceeds (prior to the deduction of any costs or fees associated with the capital raising process) NOK 4,500,000,000 in aggregate; |

| | |
|---|---|
| **NAS07/08 Secured Bond Creditor:** | has the same meaning as per the corresponding definition in the Scheme of Arrangement; |
| **NAS09 Secured Bond Creditor:** | has the same meaning as per the corresponding definition in the Scheme of Arrangement; |
| **Net Agreed Debt:** | in respect of any Creditor, the amount of its Agreed Debt less: |

    (a)   the aggregate amount of Retained Claims Bonds (if any) issued or to be issued to such Creditor, provided that where a Creditor has more than one Agreed Debt, the aggregate amount of Retained Claims Bonds issued or to be issued to such Creditor shall be apportioned equally across each of its Agreed Debts; and

    (b)   in the case of the NAS07/08 Secured Bond Creditor and the NAS09 Secured Bond Creditor, that Creditor's relevant Secured Amount,

(such amount being an unsecured debt for the purposes of the Restructuring Act);

| | |
|---|---|
| **New Capital Perpetual Bonds:** | the bonds contemplated under the New Capital Perpetual Bond Instrument; |
| **New Capital Perpetual Bond Instrument:** | the instrument constituting the New Capital Perpetual Bonds, which shall reflect the terms of the near final term sheet set forth in schedule 6 in the Scheme of Arrangement, subject to such amendments as the Company may effect on the basis of discussions with potential investors in the New Capital Perpetual Bonds save that they shall not adversely impact the value or operation of the Dividend Claims; |
| **New Capital Perpetual Bonds Offering:** | the offering of New Capital Perpetual Bonds to Creditors, as more particularly described in sections 7.16 to 7.22 in the Scheme of Arrangement; |
| **Norwegian Confirmation Date:** | the date on which the Oslo City Registrar (Nor. *Oslo Byfogdembete*) makes the Norwegian Confirmation Order; |
| **Norwegian Confirmation Order:** | the Norwegian Court order sanctioning the Restructuring Plan; |
| **Norwegian Court:** | the Oslo City Registrar (Nor. *Oslo Byfogdembete*) or, where any decision of the Oslo City Registrar is appealed, the Court of Appeal of Norway and / or Supreme Court of Norway; |

| | |
|---|---|
| **Ordinary Creditors:** | the Company's unsecured creditors which, in the Scheme of Arrangement has been classed and defined as 2019 Convertible Bond Creditors, Unsecured Creditors, Retained Guaranteed Creditors, Non-Retained Guaranteed Creditors, Terminated Contract Creditors, Retained Sub-Lease Creditors, Terminated Guaranteed Sub-Lease Creditors, Retained Lease Creditors, Terminated Lease Creditors, Customer Creditors, 2020 Convertible Perpetual Bond Creditors, Connected and Intercompany Creditors and Contingent Unagreed Creditors; |
| **Oslo Stock Exchange:** | the Oslo Børs, a stock exchange operated by Oslo Børs ASA; |
| **Petition Date:** | 18 November 2020; |
| **Pre-Repudiation Post-Petition Liabilities:** | any liability of any kind of the Company, which has arisen under any contract which has been terminated or will be terminated upon the Restructuring Plan taking effect either: |
| | pursuant to a formal agreement with the Company entered into either on or before the date of these Proposals or before the Irish Confirmation Date; |
| | under the Repudiation Orders; or |
| | otherwise, |
| | during the period commencing on and including the Petition Date and ending on and including the date of termination of such contract; |
| **Private Placement:** | the private placing of new shares in the Company and the listing of such shares on the Oslo Stock Exchange as more particularly described in sections 7.11 to 7.15 of the Scheme of Arrangement; |
| **Prospectus:** | the prospectus to be prepared by the Company for the Rights Offering and the Private Placement, which shall be approved by FSAN; |
| **Reconstructor:** | the reconstructor appointed further to section 3-1 of the Restructuring Act, Mr. Håvard Wiker of Ro Sommernes advokatfirma DA; |
| **Related Proposals:** | shall have the same meaning as per the corresponding definition in the Scheme of Arrangement: |
| **Repudiation Orders:** | the Order(s) of the Irish High Court made under Section 537 of the Irish Companies Act 2014 (as amended) pursuant to any of: (i) the Notice of Motion dated 22 January 2021; (ii) the Notice of Motion dated 29 |

|  | January 2021; (iii) the Notice of Motion dated 1 February 2021; and (iv) the Notice of Motion dated 9 February 2021; |
|---|---|
| **Restructuring Act:** | the Norwegian Restructuring Act (Nor. *Rekonstruksjonsloven*); |
| **Restructuring Committee:** | the committee formed by the Reconstructor, the Creditors' Committee and the auditor appointed by the Oslo City Registrar, Helge Østvold of BHL DA, Elias Smiths vei 24, 1337 Sandvika, Norway; |
| **Restructuring Proceedings:** | is defined in section 3.5 below; |
| **Restructuring Plan:** | the Scheme of Arrangement, a copy of which is set out in Appendix 1 hereto; |

**Retained Claims Bonds:** the retained claims bonds which will be issued to each Creditor who participates in:

    a)    the New Capital Perpetual Bonds Offering; and/or

    b)    the Private Placement;

**Retained Claims Bonds Amount:**

    a)    with respect to any Creditor that participates in the New Capital Perpetual Bonds Offering, 200% of the aggregate nominal value of New Capital Perpetual Bonds subscribed for by such Creditor; and

    b)    with respect to any Creditor that participates in the Private Placement, 200% of the total amount paid by such Creditor in respect of its subscription for Shares under the Private Placement;

**Retained Claims Bonds Instrument:** the instrument constituting the Retained Claims Bonds, which shall reflect the terms of the near final term sheet set forth in Schedule 6 in the Scheme of Arrangement, subject to such amendments as the Company may effect on the basis of discussions with potential recipients of the Retained Claims Bonds, save that they shall not adversely impact the value or operation of the Dividend Claims and/or the Retained Claims Bonds;

**Rights Offering:** the rights offering more particularly described in sections 7.7 to 7.10 of the Scheme of Arrangement;

**Rights Offering Subscription Period:** the subscription period in respect of the Rights Offering, which will commence on a date to be determined by the Board, being no earlier

than the Business Day after the FSAN has approved the Prospectus, and expire no earlier than the Closing Date;

**Secured Amount:** the value of the Secured Assets, being;

a)    where any Creditor enforces its security over the Secured Assets on and from the Effective Date, the amount realised by that Creditor as a result of the enforcement of such security; or

b)    in any other case, the Secured Asset Valuation,

provided always that where the Company and the relevant Creditors have agreed an amount the value shall be the amount agreed in writing;

**Secured Assets:** with respect to any Creditor, the relevant asset(s) over which any of the Company or any other company within the Group has granted security to such Creditor including, in respect of any GIEK Guaranteed Loan Facilities Creditor, any cash balance of any company within the Group to which such GIEK Guaranteed Loan Facilities Creditor has recourse by way of any lawful set-off arrangement;

**Secured Asset Valuation:** the value of the relevant Secured Assets as determined by the Restructuring Committee, save that where the relevant Creditor disputes the value determined by the Restructuring Committee the value shall be conclusively determined by the Norwegian Court;

**Secured Creditors:** Creditors that hold security over assets belonging to the Company, which in the Scheme of Arrangement have been classed and defined as Secured Cash Deposit Creditors, NAS09 Secured Bond Creditors, NAS07/08 Secured Bond Creditors and GIEK Guaranteed Loan Facilities Creditors (provided such creditors hold lawful set-off arrangements) , and which are further specified in the Creditor Schedule;

**Scheme of Arrangement:** the scheme presented by the Examiner to the Irish High Court, a copy of which is set out in Appendix 1 hereto;

**Ticket Refund Claims:** shall have the same meaning as per the corresponding definition in the Scheme of Arrangement;

**Unagreed Creditor:** any Creditor:

(a)    which is not an Agreed Creditor;

(b)     whose Claim is not included in the Creditor Schedule; or

(c)     which disputes the amount of its Claim, whether or not designated as an Agreed Creditor by the Company, as it appears in the Creditor Schedule; and

**Unsecured Claim Amount:**   with respect to any of the Secured Creditors, the total amount by which such Creditor's Claim exceeds the relevant Secured Amount.

1.2     In the event that a defined term used herein has not been defined in section 1.1 above, the meaning of such term shall be determined by reference to the corresponding definition in the Scheme of Arrangement.

## 2     INTRODUCTORY REMARKS

2.1     Section 39 of the Restructuring Act specifies that a company in reconstruction has to present a restructuring plan to its creditors. The Reconstructor is satisfied that Company has complied with the requirements of section 39 of the Restructuring Act through the presentation of the Scheme of Arrangement.

2.2     Section 39 of the Restructuring Act also specifies that the Reconstructor has to present a report to the Creditors which, in accordance with section 25 thereof, has to include details of the Company's business, assets and liabilities. The report is enclosed as Schedule 9 to the Scheme of Arrangement.

2.3     The Company's Statement of Assets and Liabilities is enclosed as schedule 2 to the Scheme of Arrangement.

2.4     In short, the Restructuring Plan provides for the adoption and implementation of the Scheme of Arrangement under Norwegian law. Whilst a copy of the Restructuring Plan has been enclosed to the Scheme of Arrangement, it is important to note that the vote on the Restructuring Plan will take once the Scheme of Arrangement has been approved by the Irish High Court. Section 39 of the Restructuring Act stipulates a voting period in Norway of minimum 14 days.

2.5     Section 6 of the Scheme of Arrangement sets out that each Creditor appoints the Examiner as its attorney under a power of attorney, agent, nominee, proxy and representative with full power and authority, in such Creditor's name and on such Creditor's behalf, to exercise all rights in relation to the Creditor's entitlement to vote in favour of and to otherwise consent to the Restructuring Plan. The Examiner will therefore be provided with a copy of the Restructuring Plan ahead of the vote, in which the Examiner will vote on behalf of the Creditors. In order to comply with the Restructuring Act, the Reconstructor will also, for jurisdictional reasons, distribute copies of the Restructuring Plan to certain regional Creditors.

2.6     Section 46 of the Restructuring Act provides that the Norwegian Court will only determine any and all disputes/unclarities that have arisen in respect of one or more submitted Claims if such determination is necessary to determine the outcome of the vote on the Restructuring Plan.

2.7     The Restructuring Plan will, according to section 42 of the Restructuring Act , be approved by the Creditors when accepted by a majority thereof (calculated on the basis of their respective

Claims). The Examiner's vote will therefore secure the approval of the Restructuring Plan in Norway.

## 3    BACKGROUND

### (A)    Summary of proceedings in Ireland and Norway

3.1    On 18 November 2020, the Company's Irish subsidiaries petitioned for Examinership in Ireland. These were:

(a)    Arctic Aviation Assets DAC (AAA);

(b)    Norwegian Air International Limited (NAI);

(c)    Drammensfjorden Leasing Limited (DLL);

(d)    Torskefjorden Leasing Limited (TLL); and

(e)    Lysakerfjorden Leasing Limited (LLL).

3.2    As part of the petition, the subsidiaries applied to extend the protection of the High Court of Ireland to the Company as a related company. On 18 November 2020 Mr. Kieran Wallace of KPMG Ireland was appointed as interim examiner pending the hearing of the petition for Examinership.

3.3    The petition for Examinership was subsequently approved by the High Court of Ireland on 7 December 2020 following the hearing of the petition, further to which Mr. Wallace was appointed as examiner (the Examiner).

3.4    On the same day, the Board decided to file an application for the restructuring of the Company in Norway.

3.5    On 8 December 2020, the Oslo City Registrar (Nor. *Oslo Byfogdembete*) approved an application from the Company to be placed into restructuring(Nor. *Rekonstruksjonsforhandling*) further to section 2 (1) of the Restructuring Act (the *"***Restructuring Proceedings***"*).

3.6    The Restructuring Process is a court-monitored process conducted in accordance with the Restructuring Act the purpose of which is to seek a restructuring of a company's debt within the framework of Norwegian law.

3.7    Commencement of the Restructuring Process had the effect of putting in place a stay in relation to creditor actions against the Company as a matter of Norwegian law pending the presentation and potential approval of a restructuring plan.

3.8    The Restructuring Proceedings are facilitated by the court-appointment of (1) an administrator (in this case the Reconstructor) and (2) a creditor committee whose members represent the interests of the Company's creditors (the Creditor Committee). Collectively, the Reconstructor and the Creditor Committee form the Reconstruction Committee.

3.9    The responsibilities and tasks of the Reconstruction Committees' include (but are not limited to):

i.    the supervision of the management of the Company so as to ensure that no unlawful dispositions are made;

    ii.    the supervision of the financial results of the Company's operation during the Restructuring Process;

    iii.    assessing whether there are sufficient funds to cover all the obligations incurred during the Restructuring Process; and

    iv.    assisting in connection with the Company's preparation of the Restructuring Plan, including assessing whether the plan is in the overall interest of all of the Company's Creditors compared against the potential consequences to the creditors if the Company were to enter into insolvency.

3.10    The Oslo City Registrar appointed Håvard Wiker of Ro Sommernes advokatfirma DA as reconstructor (the Reconstructor) on 8 December 2020.

3.11    On 8 December 2020, the following were appointed to the Creditor Committee:

-    Attorney at law, Mr. Rolf Tjugum;

-    Attorney at law, Mr. Øyvind Dehli;

-    Attorney at law, Mr. Jørgen Andersen; and

-    Mr. Stig Patey (employee representative).

3.12    Helge Østvold was confirmed as the court appointed restructuring auditor (*Nor. Borevisor*) on 9 December 2020.

3.13    Since its appointment, the Restructuring Committee has held weekly meetings to discuss and assess the Restructuring Plan. Further, the Reconstructor has worked closely with the Examiner to ensure that the Restructuring Plan aligns with the Scheme of Arrangement and Norwegian law. Daily calls have been held between the Examiner, the Reconstructor, the court appointed auditor and their respective teams to discuss and coordinate the procedures in Ireland and Norway.

**(B)**    **The Company's Proposals**

3.14    The Board proposed a high-level restructuring plan to its shareholders on 3 December 2020 setting out its aim to adjust the size of its operations to a level of proven profitability. The plan proposed, inter alia, that the shareholders would give the Company's management wide authorisations for the implementation of the restructuring plan and expressed an intention that shareholders would retain a meaningful minority stake in the Company.

3.15    The extraordinary general meeting of the Company held on 17 December 2020 approved a number of resolutions that provided the Board with broad authorities to take steps that may ultimately facilitate the restructuring of NAS and the wider Group, including the Companies, in conjunction with and/or as part of the Examinership and the Restructuring Process. This included the ability, but not the obligation, of the Board to pursue a rights offering to raise new capital of up to NOK 4, 000,000,000, seek the conversion of certain liabilities of the Company and the wider Group, including the Companies into Shares, a reverse split of the Shares in the ratio 100:1, a subsequent reduction of nominal value of each of the Company's shares from NOK 10 to NOK 0.01 and general authorisations to the Board to issue shares and convertible loans.

3.16   The Board approved a business plan and proposed term sheet as a potential basis for the restructuring of the Company (and consequently the Companies) through the Examinership and the Restructuring Process (the "**Company's Proposal**") as announced by the notice submitted to the Oslo Stock Exchange on 14 January 2021.

3.17   The proposed term sheet contained details of the Company's Proposals in relation to the Rights Offering, the Private Placement, the New Capital Perpetual Bonds Offering and the possible terms of the Dividend Claims (then referred to as Old Capital Hybrid Loans) (each as explained further herein). In addition, the Company stated in the stock exchange announcement that, among other things, it intended to:

3.17.1   focus on its core Nordics business, operating a European short-haul network with narrow body aircraft (the Group expects to initially hold up to 50 Boeing 737 aircraft (owned and leased));

3.17.2   cease operating the Group's long-haul network; and

3.17.3   subject to the restructuring contemplated by the Restructuring Proceedings being successful:

(a)   reduce total debt to around NOK 20,000,000,000 and emerge from the restructuring with a free cash position of approximately NOK 4,000,000,000 to 5,000,000,000; and

(b)   achieve positive EBITDA following the restructuring in 2021 based on conservative assumptions as to the length of the COVID-19 pandemic and as to revenues, costs and load factors.

3.18   The Company's Proposal also envisages cost savings where possible, implemented by procuring the most competitive terms available from suppliers and, in some instances, replacing suppliers with in-house resources.

3.19   On 27 January 2021, the Company and the Reconstructor outlined the main terms proposed by the Company to the Creditors at a creditors' meeting.

3.20   The Examiner will present the Scheme of Arrangement to the Irish High Court after the Scheme of Arrangement has been voted on at a meeting of the shareholders and Creditors of the Companies.

## 4   The Restructuring Plan

**(A)   Introduction**

4.1   A summary of the Restructuring Plan is set out in part C below. A more detailed summary is set out in the Explanatory Memorandum.

4.2   In short, the Restructuring Plan provides for the adaptation and implementation of the Scheme of Arrangement.

4.3   The summary set out below is offered so as to highlight the main elements of the Scheme of Arrangement only. In the event of any inconsistencies between the summary and the Scheme of Arrangement, the terms of the Scheme of Arrangement shall take precedence.

**(B)**     **The relationship between Irish and Norwegian law**

4.4     It is important to emphasise that as the Scheme of Arrangement was passed pursuant to Irish law, there will be elements thereof that differ from Norwegian law.

4.5     First, Irish law allows for the organisation of creditors into different classes. Creditors can be classed and awarded voting rights in accordance with certain characteristics, such as but not limited to the type of debt involved, whether the creditor holds a monetary or non-monetary debt, whether the debt is secured etc. Such classing of creditors is not possible under Norwegian law, and it has not therefore been adopted in the Restructuring Plan. Classing of creditors is not in itself however, contrary to Norwegian law as long as the Scheme of Arrangement ensures equal treatment of the Creditors. The Reconstructor is satisfied that the Scheme of Arrangement provides for equal treatment of the Creditors, as the Company's Proposals apply equally to all Ordinary Creditors.

4.6     Second, with reference to section 11 of the Scheme of Arrangement, Creditors that (i) are unknown to the Company, and (ii) have not submitted a claim to the Company within a deadline stipulated by the Company in the Scheme of Arrangement, can, as a matter of Irish law, be precluded from submitting a claim against the Company once the said deadline has expired. Such preclusion of creditors is not possible under Norwegian law.

4.7     Ultimately the Scheme of Arrangement and consequently the Restructuring Plan, reflect the key principles and requirements of Irish examinership law and the Restructuring Act.

4.8     Given that there are jurisdictional differences, the Company and the Reconstructor have taken steps pursuant to Norwegian law to enhance the effectiveness of the Scheme of Arrangement (once approved by the Irish Court). This includes serving notices of termination on all of the Company's Creditors, further to section 7 of the Satisfaction of Claims Act (Nor. *dekningsloven*), that have been involved the repudiation proceedings in Ireland. Such notices have been served to reduce the risk of those Creditors trying to circumvent the Repudiation Orders.

4.9     Despite certain jurisdictional differences, the Reconstructor has worked closely with the Examiner so as to ensure that the Scheme of Arrangement, and the steps outlined therein, are in line with the requirements of the Restructuring Act, in addition to the overarching requirements of the Irish Companies Act 2014.

**(C)**     **The Restructuring Plan**

4.10     The Restructuring Plan involves compulsory composition (Nor. *tvangsakkord*) further to § 34 of the Restructuring Act.

4.11     Existing shareholders will have their holdings diluted as a result of (i) the issue of new shares in the Company pursuant to the Rights Offering and the Private Placement and (ii) the conversion of New Capital Perpetual Bonds and Dividend Claims into new shares in the Company. It is estimated that the Existing Shares will represent approximately 4.6% of the total issued share capital of the Company on a Fully Diluted Basis . Existing shareholders will however be entitled to participate in the Rights Offering, and such participation may reduce any dilution caused further to the Company's Proposals.

4.12     Secured Creditors shall, to the extent that the relevant Secured Amount is equal to or exceeds the related secured claim, be unaffected by the Restructuring Plan and the existing security held by such Secured Creditors shall remain in force. If, however, the relevant Secured Amount(s) is

less than the amount of a Secured Creditor(s) Claim, that Secured Creditor(s) Claim shall be written down to the value of the relevant Secured Amount. The relevant security held by the Secured Creditor shall then remain in force only in respect of the relevant Secured Amount and shall otherwise be released. Any Secured Creditor(s) whose claim is written down shall, in respect of the Unsecured Claim Amount, be treated as an Ordinary Creditor.

4.13    Certain Ordinary Creditors will receive a dividend of 5% of their respective Net Agreed Debts (the "**Dividend Amount**"), which shall be satisfied by (i) a cash payment (each such payment being a "**Cash Pot Entitlement**") from a fixed amount of NOK 500,000,000 in cash to be made available by the Company (the "**Cash Pot**") and which will be distributed in accordance with sections 10.5 – 10. 9 of the Scheme of Arrangement, and (ii) Dividend Claims equivalent to the balance between an Ordinary Creditor's Dividend Amount less its Cash Pot Entitlement (the "**Dividend Balance**"). These Ordinary Creditors will therefore be impaired by the Restructuring Plan.

4.14    Each Dividend Claim will constitute dematerialised/uncertificated unsecured debt obligations of the Company and shall be governed by the Dividend Claims Terms from and including the Effective Time. Each Dividend Claim shall be (i) convertible into shares in the Company further to the Dividend Claims Terms and (ii) assignable to another person (in each case, in respect of the whole of such Dividend Claim only) in accordance with, and subject to, the Dividend Claims Terms.

4.15    Any Dividend Claim that is not converted into shares in the Company further to the Dividend Claims Terms shall continue as an unsecured claim on the terms set out in the Dividend Claim Terms, however with no conversion rights. The maturity date for such continuing Dividend Claims shall be 7 years after the Effective Date and the continuing Dividend Claims shall accrue interest at a rate of 6-month NIBOR +1%, which shall be payable in kind until 1 June 2023 and in cash thereafter.

4.16    In the event of any inconsistencies between the Restructuring Plan and the Dividend Claims Terms, the Dividend Claims Terms shall take precedence.

4.17    The Company estimates that all of the Dividend Claims arising further to the Restructuring Plan would, in aggregate, convert into a number of shares that would represent 25.4% of the Company's issued share capital on a Fully Diluted Basis (or 233,548,229 shares). In the event that more than the Minimum Gross Proceeds are raised in the Investment, such 233,548,229 shares shall correspondingly represent less than 25.4% of the Company's issued share capital.

4.18    Unagreed Creditors shall have their Claims determined in accordance with the Expert Determination Process described in section 11 of the Scheme of Arrangement.

**(D)    The Investment**

4.19    The investment in the Company shall comprise the proceeds of the Rights Offering, the Private Placement and the New Capital Perpetual Bonds Offering (collectively, the "**Investment**").

4.20    The Restructuring Plan is conditional upon the Company raising Investment Proceeds of no less than the Minimum Gross Proceeds Threshold in connection with the Investment. In the event that Investment Proceeds of an amount exactly equal to the Minimum Gross Proceeds Threshold are raised, the investors participating in the Investment will be entitled to hold approximately 70% in aggregate of the Company's issued share capital on a Fully Diluted Basis.

4.21    If more Investment Proceeds than the Minimum Gross Proceeds Threshold are raised, the investors' aggregate entitlement will represent a larger proportion of the Company's issued share capital, and the shareholdings of existing shareholders and Ordinary Creditors shall correspondingly be diluted below 4.6% and 25.4% respectively.

4.22    In the event that the Investment Proceeds are less than the Minimum Gross Proceeds Threshold, the Restructuring Plan shall not become effective and the proceeds shall be returned to investors in accordance with the terms of the individual Norwegian law subscription process governing the Investment.

4.23    Completion of the Investment is conditional upon the occurrence of the Effective Time. Each element of the Investment will be launched on a date to be determined by the Board (and, in the case of the Rights Offering and the Private Placement, no earlier than the business day following the date on which the Prospectus has been approved by the FSAN), and will not close (the "**Closing Date**") until no earlier than the latest of:

(a)    the expiration of the time for any appeal of the Irish Confirmation Order and the Norwegian Confirmation Order; and

(b)    the final determination of any appeal of the Irish Confirmation Order and/or the Norwegian Confirmation Order, and

(c)    in the case of the Rights Offering, the date that falls two weeks after the opening of the Rights Offering Subscription Period,

provided that each relevant Closing Date, and consequently the Effective Time, shall occur by no later than the Long Stop Date.

4.24    The Investment Proceeds will be used to provide working capital for the Company and the wider Group for general corporate purposes and to ensure their ongoing survival as going concerns.

4.25    The dividends to be made pursuant to the Restructuring Plan shall be funded from cash available to the Company at the Effective Time.

4.26    Under the New Capital Perpetual Bonds Instrument and the Retained Claims Bonds Instrument, the Company will be subject to restrictions on, inter alia, the declaration or making of dividend payments until the Company has complied with certain of its repayment obligations thereunder. Shareholders and Creditors should therefore note this in the context of any application for shares under the Rights Offering and Private Placement or the exercise of conversion rights under the Dividend Claims Terms or the New Capital Perpetual Bonds Instrument.

4.27    Further information regarding the Investment will be published by the Company in accordance with the rules of the Oslo Stock Exchange. Participation in each element of the Investment will be subject to certain terms and conditions, including the provision of satisfactory KYC information to the Company.

**(E)    Rights Offering**

4.28    A summary of the Rights offering is set out in sections 7.7-7.10 of the Scheme of Arrangement.

**(F)      Private Placement**

4.29    A summary of the Private Placement is set out in sections 7.11-7.15 of the Scheme of Arrangement.

**(G)      New Capital Perpetual Bonds Offering**

4.30    A summary of the New Capital Perpetual Bonds Offering is set out in sections 7.16 – 7.22 of the Scheme of Arrangement.

**(H)      Retained Claims Bonds**

4.31    A summary of the issuance of Retained Claims Bonds is set out in sections 7.23 -7.25 in the Scheme of Arrangement.

**(I)      The Norwegian Government**

4.32    The Norwegian Government proposed (Prop. 79 S (2020-2021) [Post 91 and 92]), and the Parliament of Norway (Nor. *Stortinget*) has approved, the Norwegian Government's intention to participate in the New Capital Perpetual Bond Offering up to an amount not exceeding NOK 1,500,000,000.

**(J)      Effectiveness**

4.33    The Scheme of Arrangement and consequently this Restructuring Plan shall become effective at the Effective Time on the Effective Date, as set out in Section 5.1 of the Scheme of Arrangement.

**(K)      The Merits of the Restructuring Plan**

4.34    The Company has concluded that the Restructuring Plan will offer Creditors a higher dividend than what would be obtained if the Company was to be liquidated.

4.35    If the Company did enter into liquidation, it is estimated Creditors will receive a dividend of less than 2%. Before such dividend is paid however, the Company's remaining cash reserves will have to be used to pay for goods and services received and used during the restructuring period, the cost of the insolvency administration (Nor. *konkursbokostnader*) and preferential claims (such as a salary and tax claims). It is also reasonable to assume that each Creditor's claim is likely to increase as a result of the Company going into liquidation, which will further reduce the dividend.

4.36    Further to the Restructuring Plan, costs incurred by the Company in undertaking the restructuring have been financed through its operations. In addition, tax-claims will not be treated as preferential claims in the Restructuring Plan. Any such creditors will instead be treated as an Ordinary Creditor entitled to a Cash Pot Entitlement  and Dividend Claims only.

4.37    Another benefit of the Restructuring Plan as opposed to liquidation is that all Creditors will receive a dividend within a short period of time. In the event of an insolvency however, both the amount of dividend to be paid and the time by which such dividend will be paid are uncertain. Given the size of the Company and the character of its assets, it is not unreasonable to assume that it can take up to five years before the liquidation will be concluded.

**5      The Vote**

5.1    Whilst the Restructuring Plan will be put up for a vote by the Creditors, the outcome of the vote will already have been decided by the time the vote is held on the basis that Examiner will be authorised and compelled by the Scheme of Arrangement to approve the Restructuring Plan.

5.2    As the Restructuring Plan involves compulsory composition pursuant to section 34 of the Restructuring Act, the Restructuring Plan will be passed if 50% or more of the Creditors vote in favour of the plan, cf. section 42 of the Restructuring Act.

5.3    Section 6 of the Scheme of Arrangement sets out that each Creditor appoints the Examiner as its attorney under a power of attorney, agent, nominee, proxy and representative with full power and authority, in such Creditor's name and on such Creditor's behalf, to exercise all rights in relation to the Creditor's claim to vote in favour of and to otherwise consent to the Restructuring Plan. As this authority will have been granted by more than 50% of the Creditors, the Examiner's vote will in itself be sufficient to secure approval of the Restructuring Plan.

5.4    It has nevertheless and for good order, further to section 2 above, been decided to hold a vote in Norway so as to ensure compliance with Norwegian procedural law.

**APPENDIX 1**

SCHEME OF ARRANGEMENT

*THE SCHEME WILL BE ENCLOSED WHEN THE RESTRUCTURING PLAN IS SUBMITTED FOR
VOTING IN NORWAY*

**SCHEDULE 9**

Norwegian Restructuring Report



RO SOMMERNES
ADVOKATFIRMA DA
Fridtjof Nansens plass 7
Post Box 1983 Vika
N-0125 Oslo, Norway

Tel.  (+47) 23 00 34 40
E-mail    mail@rosom.no
Web      www.rosom.no

Our ref.  27970-501
Doc ID    #260150v1

Lawyer in Charge:
Håvard Wiker

Bank acct. 8101 05 28216
Client acct. 8101 11 86009
Org. NO 965 870 016 MVA

Oslo, 11 March 2021

## THE RECONSTRUCTOR'S AND COURT APPOINTED AUDITOR'S REPORT IN CASE NO. 20-177565KON-OBYF/1: NORWEGIAN AIR SHUTTLE ASA, UNDER RESTRUCTURING PROCEEDINGS

RO SOMMERNES ADVOKATFIRMA DA

# Table of Contents

1    GLOSSARY OF ABBREVIATIONS AND DEFINITIONS ........................................................ 3

2    RESTRUCTURING PROCEEDINGS IN IRELAND ........................................................... 6

3    RESTRUCTURING PROCEEDINGS IN NORWAY ................................................... 7

4    OVERVIEW OF NORWEGIAN AIR SHUTTLE ASA AND THE GROUP ........................... 8

5    FINANCIAL REPORTING AND ACCOUNTING ...................................................... 19

6    FINANCIAL DEVELOPMENT AND STANDING ................................................... 20

7    THE COMPANY'S ASSETS ............................................................................ 32

8    THE COMPANY'S DEBTS ............................................................................. 36

9    SOLVENCY .............................................................................................. 37

10   VOIDABLE TRANSACTIONS AND CRIMINAL LIABILITY ................................. 37

11   RESTRUCTURING PROCEEDINGS ............................................................... 37

12   LIST OF ANNEXES .................................................................................... 40

RO SOMMERNES ADVOKATFIRMA DA

# 1   GLOSSARY OF ABBREVIATIONS AND DEFINITIONS

**"2019 Convertible Bonds" –** USD 150 million Norwegian Air Shuttle ASA Senior Unsecured Convertible Bonds 2019/2024 with ISIN NO 001 0868284 issued in November 2019 pursuant to bond terms dated 13 November 2019 and as amended and restated on 19 May 2020

**"2020 Restructuring" –** The restructuring of the Group referenced in section 6.3

**"2020 Standard Convertible Perpetual Bonds" –** All outstanding bonds issued pursuant to the following zero coupon perpetual subordinated convertible bonds issued pursuant to bond terms dated 22 May 2020 (as amended and restated from time to time):

   a)   Norwegian Air Shuttle ASA perpetual 0% USD subordinated convertible bond loan with ISIN NO 0010883515

   b)   Norwegian Air Shuttle ASA perpetual 0% EUR subordinated convertible bond loan with ISIN NO 0010883416, and

   c)   Norwegian Air Shuttle ASA perpetual 0% SEK subordinated convertible bond loan with ISIN NO 0010883473

**"2020 VWAP Convertible Perpetual Bonds" –** All outstanding bonds issued pursuant to the Norwegian Air Shuttle ASA perpetual 0 % USD convertible bond loan with ISIN NO 0010884646 pursuant to bond terms dated 4 June 2020 (as amended and restated from time to time), being on substantially the same terms as the 2020 Standard Convertible Perpetual Bonds, save for amendments to the conversion price mechanism in respect of a two-week period from 4 June 2023 as described in the Company's stock exchange announcement to the Oslo Stock Exchange dated 30 September 2020

**"AAA" –** Arctic Aviation Assets DAC, a company incorporated on 9 August 2013 under the laws of Ireland with company registration no. 531191

**"ACOL" –** an Air Carrier Operating Licence

**"AOC" –** an Air Operator's Certificate

**"AOC Companies" –** NAS, NAN, NUK, NAI and NSE collectively

**"Boeing" –** The Boeing Company

**"Brand" –** Norwegian Brand Limited, a company incorporated on 9 December 2013 under the laws of Ireland with company registration no. 536457

**"Cargo" –** Norwegian Cargo AS, a company incorporated on 16 April 2013 under the laws of Norway with company registration no. 911 961 989

**"CCBLI" –** CCB Leasing (International) Corporation DAC

**"Creditors Committee" –** Collectively the four appointed members, ref. section 3.5

RO SOMMERNES ADVOKATFIRMA DA

**"Creditors Recovery Act" –** The Norwegian Creditors Recovery Act (Nw: Dekningsloven)

**"DLL" –** Drammensfjorden Leasing Limited, a company incorporated on 24 September 2013 under the laws of Ireland with company registration no. 533167

**"EUR" –** Euro - The lawful currency for the time being of Ireland and the EU

**"Examiner" –** Mr. Kieran Wallace of KPMG, 1 Stokes Place, St; Stephen's Green, Dublin 2

**"Examinership" –** Restructuring proceedings in Ireland

**"GoldCare Service Agreements" –** Full-fleet service support agreements with Boeing and Boeing Commercial Aviation Services Europe Limited

**"Group" –** NAS and all its direct and indirect subsidiaries

**"Hangar Property Lease" –** The Ground lease and Hangar at Gardermoen Airport in Norway

**"IFRS 16" –** International Financial Reporting Standards – Leases

**"Investment" –** comprise of the proceeds of the Rights Offering, the Private Placement and the New Capital Perpetual Bonds Offering as more particularly described in the Scheme of Arrangement

**"Irish Court" –** the Irish High Court, or where any decision of the Irish High Court is appealed, the Court of Appeal of Ireland and / or Supreme Court of Ireland

**"Irish High Court" –** the High Court of Ireland

**"LLL" –** Lysakerfjorden Leasing Limited, a company incorporated on 5 July 2015 under the laws of Ireland with company registration no. 585570

**"NAI" –** Norwegian Air International Limited, a company incorporated on 3 April 2013 under the laws of Ireland with company registration no. 525771

**"NAN" –** Norwegian Air Norway AS, a company incorporated on 17 June 2013 under the laws of Norway with company registration no. 912 084 949

**"NAR" –** Norwegian Air Resources Limited, a company incorporated on 20 September 2013 under the laws of Ireland, with company registration no. 533056

**"NAS" –** Norwegian Air Shuttle ASA, a company incorporated under the laws of Norway with company registration no. 965 920 358 (also referred to as the **"Company"**)

**"NAS07 Secured Bonds" –** All outstanding bonds constituted pursuant to the EUR 250,000,000 7.25 % Norwegian Air Shuttle ASA Senior Unsecured Bond Issue 2015/2019 with ISIN NO 001 0753437, originally entered into on 9 December 2015 and as amended and restated on 4 December 2019, and further amended on 26 May 2020

RO SOMMERNES ADVOKATFIRMA DA

**"NAS07/08 Secured Bonds" –** The NAS07 Secured Bonds and the NAS08 Secured Bonds

**"NAS08 Secured Bonds" –** All outstanding bonds constituted pursuant to the SEK 963,500,000 7.25% Norwegian Air Shuttle ASA Senior Unsecured Bond Issue 2017/2020 with ISIN NO 001 0783459, originally entered into on 7 February and as amended and restated on 4 December 2019, and further amended and restated on 26 May 2020

**"NAS09 Secured Bonds" –** All outstanding bonds constituted pursuant to the NOK 250,000,000 FRN Norwegian Air Shuttle ASA Senior Secured Bond Issue 2017/2020 with ISIN NO 001 0809940, originally entered into on 16 November 2017 and as amended and restated on 26 May 2020

**"New Capital Perpetual Bonds Offering" –** the offering to creditors to subscribe for New Capital Perpetual Bonds as more particularly described in the Scheme of Arrangement

**"NOK" –** Norwegian kroner - the lawful currency for the time being of Norway

**"Nordic Trustee AS" –** Security agent for all bonds issued by NAS, ref. section 6.7

**"NSE" –** Norwegian Air Sweden AB, a company incorporated on 10 May 2017 under the laws of Sweden, with company registration no. 559111-7907

**"NUK" –** Norwegian Air UK Limited, a company incorporated on 18 December 2014 under the laws of England with company registration no. 09360346

**"Oslo County Court" –** The Norwegian court that opened Restructuring Proceedings (Nw: Oslo byfogdembete), also referred to as the **"Norwegian Court"**

**"Private Placement" –** the private placing of new shares and the listing of such shares on the Oslo Stock Exchange as more particularly described in the Scheme of Arrangement

**"Reconstructor" –** Mr. Håvard Wiker of Ro Sommernes advokatfirma DA, Fridtjof Nansens pl. 7, 0160 Oslo, Norway

**"Resource Companies" –** Companies within the business area "People and services", ref. section 4.5

**"Restructuring Act" –** Norwegian act relating to restructuring of Norwegian companies in financial difficulties (Nw: Rekonstruksjonsloven)

**"Restructuring Committee" –** Jointly the Reconstructor, the court appointed Auditor and the Creditors Committee

**"Restructuring Proceedings" –** Proceedings in Norway commenced in accordance with the Restructuring Act section 2 (1)

RO SOMMERNES ADVOKATFIRMA DA

**"Restructuring Plan"** – The restructuring plan as presented by NAS in Norway (which in all material aspects is identical to the Irish Scheme of Arrangement)

**"Reward"** – Norwegian Reward AS, a company incorporated on 14 January 2008 under the laws of Norway, with company registration no. 992 197 552

**"Rights Offering"** – the rights offering more particularly described in the Scheme of Arrangement

**"Scheme of Arrangement"** – the scheme presented by the Examiner to the Irish Court

**"SPC"** – Special Purpose Companies (Subsidiaries of AAA)

**"State Aid Package"** – Norwegian government's guarantee scheme for the aviation industry

**"Structured Sale Process"** – as more particularly described in Schedule 8 to the Scheme of Arrangement, the "Dividend Claims Terms"

**"TLL"** – Torskefjorden Leasing Limited, a company incorporated on 23 April 2015 under the laws of Ireland with company registration no. 560938

**"USD"** – United States Dollars – the lawful currency for the time being of the United States of America

## 2    RESTRUCTURING PROCEEDINGS IN IRELAND

On 18 November 2020, five of the following Irish subsidiaries of Norwegian Air Shuttle ASA (in the following also referred to as NAS or the Company) petitioned for Examinership in Ireland:

- Arctic Aviation Assets DAC (AAA)

- Norwegian Air International Limited (NAI)

- Drammensfjorden Leasing Limited (DLL)

- Torskefjorden Leasing Limited (TLL)

- Lysakerfjorden Leasing Limited (LLL)

As part of the petition the subsidiaries applied to extend the protection of the High Court of Ireland to the Company as a related company. On 18 November 2020 Mr. Kieran Wallace of KPMG Ireland was appointed as interim examiner pending the hearing of the petition for Examinership. The Examinership was formally commenced by an Order of the Irish High Court dated 7 December 2020 appointing Mr. Kieran Wallace as Examiner.

Since the commencement of the Examinership TLL has been placed into liquidation, ref. section 4.4.4.

RO SOMMERNES ADVOKATFIRMA DA

The Restructuring Plan proposed under the Restructuring Proceedings in Norway, ref. Annex 1, is in all material aspects identical to the Scheme of Arrangement, attached as Annex 2.

## 3   RESTRUCTURING PROCEEDINGS IN NORWAY

### 3.1   COMMENCEMENT OF RESTRUCTURING PROCEEDINGS

NAS filed a motion to open Restructuring Proceedings in Norway on 8 December 2020. The decision to file such motion was decided upon at a board meeting on 7 December 2020. On 8 December 2020 Oslo County Court opened Restructuring Proceedings in respect of NAS, in accordance with the Restructuring Act section 2 (1).

### 3.2   THE RECONSTRUCTOR AND COURT APPOINTED AUDITOR'S REPORT

In accordance with the Restructuring Act section 25, the Reconstructor and the court appointed Auditor are obliged to compose a report in regards of the Company's state of affairs, hereby account for the circumstances which led to the Restructuring Proceedings, financial status, securities, contracts of guarantees, liabilities, funding, valuation of assets, invalid and/or voidable transactions, criminal offences and a recommendation to the Restructuring Plan presented by the Company. To meet this obligation, the Reconstructor and court appointed Auditor have jointly composed the present report.

The report is distributed to all known creditors, ref. the Restructuring Act section 25 (5).

### 3.3   COURT APPOINTED RECONSTRUCTOR

As Reconstructor (Nw.: "Rekonstruktør") was on 8 December 2020 appointed:

Attorney at law Håvard Wiker
Fridtjof Nansens plass 7, PO Box 1983 Vika, N-0125 Oslo
Tel.: +47 23 00 34 40
Email: hw@rosom.no

### 3.4   COURT APPOINTED AUDITOR

As Auditor (Nw.: "Borevisor") was on 9 December 2020 appointed:

State authorised auditor, Mr. Helge Østvold
Elias Smiths vei 24, 1337 Sandvika, Norway
Email: hao@bhl.no

### 3.5   COURT APPOINTED CREDITORS COMMITTEE

The following were, on 10 and 11 December 2020, appointed as members of the Creditors Committee, ref. the Restructuring Act section 8:

- Attorney at law, Mr. Rolf Tjugum – e-post: rolf.tjugum@giek.no

RO SOMMERNES ADVOKATFIRMA DA

- Attorney at law, Mr. Øyvind Dehli – e-post: ode@thommessen.no
- Attorney at law, Mr. Jørgen Andersen – e-post: andersen@nordictrustee.com
- Mr. Stig Patey (employee representative) – e-post: stig.patey@norwegian.no

## 3.6    THE RESTRUCTURING COMMITTEE'S TASKS

The Restructuring Committee's main tasks include, (but is not limited to):

- Supervise the Company and ensure that no unlawful dispositions are made,
- Supervise the financial result of the operation during the Restructuring Proceedings,
- Assess whether there are sufficient funds to cover all the obligations incurred during the proceedings, and
- Assist in connection with the Company's preparation of the Restructuring Plan, including assessing whether the plan is in the interest of the creditor community as a whole.

## 3.7    INSOLVENCY/RESTRUCTURING PROCEEDINGS IN GROUP COMPANIES

Since the commencement of Examinership in Ireland and Restructuring Proceedings in Norway the following companies have been taken under examinership/liquidation or restructuring proceedings:

- Torskefjorden Leasing Ltd.
- Norwegian Air Resources Ltd.
- Norwegian Air Resources US INC.
- Norwegian Air Resources UK Ltd.
- Norwegian Cabin Services Norway AS
- Norwegian Pilot Services Norway AS
- Norwegian Air Resources Spain S.L.
- Red Handling Spain S.L.
- Red Maintenance Spain S.L.
- Norwegian Air Resources Shared Service Center AS

## 4    OVERVIEW OF NORWEGIAN AIR SHUTTLE ASA AND THE GROUP

## 4.1    GENERAL INFORMATION

NAS was incorporated on 22 January 1993 under Norwegian company laws, with company registration no. 965 920 358. NAS is listed on Oslo Stock Exchange. The headquarter is located at Oksenøyveien 3, 1336 Lysaker, Norway.

Board of Directors are listed in Annex 3.

NAS is the parent company of the Group, which compromises 65 companies in total and several branches. NAS directly or indirectly holds subsidiaries in Denmark, Finland, Ireland, Norway, Spain, Sweden, the United Kingdom and the United States.

The subsidiaries can be sorted into four main categories/business areas:

- Companies holding one or several certificates required for operating commercial routes ("Aircraft Operations") – see section 4.3.
- Companies owning and/or leasing airplanes ("Assets/Financing") – see section 4.4.
- Companies leasing personnel to NAS' routes ("People & Services") – see section 4.5.
- Companies offering reward programs, credit cards etc. ("Other Business Areas") – see section 4.6.

NAS acts as an operational airline, and houses the Group management and corporate functions, in addition to serving other Group companies with shared services.

All income generated from ticket sales is collected and held by NAS. When required, funds are transferred by NAS to other Group companies.

At the time of the commencement of the Restructuring Proceedings NAS had a total of 24 facility leases in Norway (10), Denmark (2), Sweden (4), Spain (6), France (1) and Italy (1).

## 4.2    BRIEF ABOUT THE HISTORY

NAS was founded in 1993 and the Group is one of the largest low-cost airline carriers in Europe and among the ten largest in the world. Until recently the Group was the largest airline-company in Scandinavia and the ninth largest in Europe (measured in number of passengers).

In 2019 the Group had approximately 10 000 employees in eleven countries across four continents and transported over 36 million passengers on 500 different routes around the world. The Group have routes across Europe, North Africa, the Middle East, North America, South America and South-East Asia, and is one of the leaders in the European short-haul point-to-point market. The Group has a particularly strong market position in Scandinavia.

From its establishment in 1993 until 2001 the Company had a limited airline-fleet and operated only local routes in Norway on behalf of Braathens S.A.F.E with a fleet of Fokker F-50 aircraft. In 2002 Braathens was acquired by SAS and the contracts with NAS were terminated. After this NAS changed its business model and profile and started operating its own low-cost short- and medium range routes. At the same time the Company changed its fleet to consist almost exclusively of Boeing 737 aircraft.

In 2003 NAS became listed on Oslo Stock Exchange and established itself as one of the central low-cost airline companies in Europe.

RO SOMMERNES ADVOKATFIRMA DA

In 2004, the Group entered into a codeshare agreement with FlyNordic and Sterling. A codeshare is a business arrangement, common in the aviation industry, in which two or more airlines publish and market the same flight under their own airline designator and flight number as part of their published timetable or schedule. The flight is then operated by one airline while seats are sold or the flight by all co-operating airlines using their own designator and flight number.

Between 2004 and 2005, the Group continued to run low-fare operations. In April 2007, the Group announced the acquisition of the Swedish low-cost airline FlyNordic from Finnair plc, which resulted in it becoming the largest low-cost airline in Scandinavia.

In October 2007 the online bank, Bank Norwegian AS, was established, and the frequent flyer program Norwegian Reward was launched.

Between 2001 and 2013, the Group increased the size of its operations through the opening of several new bases across Europe including in Helsinki and at London Gatwick (with the latter intended to be the European base of its long-haul operations). During this time, the Group also grew its fleet through various contracts with aircraft lessors and aircraft manufacturers.

Since the Boeing 737 aircraft in the fleet were not able to operate long distance routes NAS decided to acquire and lease modern airplanes with wider range, to a lower cost to further the expansion. From 2008 to 2011 NAS entered into several agreements purchasing Boeing 737-800 aircraft. In 2012 NAS announced the purchase of 22 Boeing 787-800, 100 Boeing 737 MAX and 100 Airbus A320neo with a total cost of NOK 127 billion, and with options to acquire additional aircraft.

Between 2013 and 2019 NAS established itself as a global airline company with bases at Gatwick in London, new routes to USA, South America, the Middle East and Asia. In 2015, AAA (on behalf of the Group) contracted with Boeing to acquire an additional 19 Boeing 787-9 Dreamliner's.

In 2018 the Group launched Norwegian Air Argentina and was granted an AOC by the Argentine government. This was however subsequently sold in December 2019.

The long-distance routes never became profitable. This was partly due to engine- and software failures in the new Boeing aircrafts, which necessitated constant repairs. The most serious failure occurred in 2017 which led to all Boeing 737 MAX aircraft being subject to a no flight ban (which only recently was lifted).

The failures on the engines reduced NAS' operating profit in 2019. NAS cancelled the remaining ordered aircraft from Boeing and filed a significant claim against Boeing, ref. section 4.8 below.

To make operations profitable, several cost-reducing measures were implemented in 2019, including closing several bases and reducing the route offer.

The Group's financial results in 2019 were promising, with an increase of 8 % in total revenue compared to 2018. Significant actions were taken in 2019 to optimize the route network, cut costs and create financial headroom. In February 2020 (immediately prior to the Covid-19 pandemic hitting Europe) the Group was targeting a positive net profit for 2020.

In the middle of March 2020, Norway and several other countries introduced travel restrictions due to the Covid-19 pandemic. Within a few days NAS cancelled 85 % of its flights and furloughed about 7,300 employees, rising to approximately 8,000 by the end of June 2020 ref. section 4.7 below.

The situation led NAS into a serious economic crisis. In addition to the fact that no new journeys were being booked, the Group also did not have access to the customers' previous payments, as the Company's remuneration for already booked journeys is mostly locked with financial institutions until the relevant flights are completed. When NAS then grounded 140 aircraft, it also lost both revenue and access to cash.

Shortly after, the Group required additional external working capital in order to stave off a potential bankruptcy. It obtained this via urgent liquidity that was provided by the Norwegian government to airlines within Norway, including the Group. It was necessary, however, for the Group to restructure its debt before it would qualify for the Norwegian government's State Aid Package, ref. section 6.3.

NAS received state aid during the summer of 2020 to remedy the Group's financial problems arising from the Covid-19 pandemic. The Covid-19 pandemic continued, however, to have negative effect on the Company and Group throughout the fall of 2020. On 9 November 2020 the Norwegian government announced that NAS would not receive additional state aid, and shortly after NAS petitioned for Restructuring Proceedings in Ireland and Norway.

## 4.3    BUSINESS AREA - AIRCRAFT OPERATIONS

The Group has five airline operators in four different countries which each hold a unique AOC and ACOL. An AOC is an operational and technical approval issued by a country's civil aviation authority which grants the holder the right to conduct commercial flights. Air transport services cannot be provided within the EU for remuneration without an appropriate ACOL.

The co-existence of the five airline operators afforded the Group a broader market access than it would have with a single AOC, which was crucial to the Group's strategy of expanding the Group's route network. The Group's commercial airline activities were at the commencement of the Restructuring Proceedings operated through 20 bases globally, situated in Norway, Sweden, Denmark, Finland, United Kingdom, Spain, Thailand, the United States, Italy, and France.

The following five companies hold an AOC:

| "AOC" Holder | "AOC" Jurisdiction |
| --- | --- |
| Norwegian Air Shuttle ASA | Norway |
| Norwegian Air Norway AS | Norway |
| Norwegian Air UK Limited | United Kingdom |
| Norwegian Air International Limited | Ireland |
| Norwegian Air Sweden AB | Sweden |

Operationally, the AOC Companies take delivery of aircraft from the various AAA subsidiaries (SPCs), through sub-lease agreements. These sub-lease agreements take the form of standard operating leases and the respective aircraft are registered on the applicable airline's AOC and the respective civil aviation authority.

Each sublease agreement in place with the AOC Companies has been assigned to the head lessor or debt financier of the respective aircraft. NAS act as guarantor of the debt and lease finance obligations of the SPCs.

## 4.4    BUSINESS AREA - ASSETS/FINANCING

### 4.4.1 General

The Group's asset and financing companies are organised in a set of subsidiaries incorporated and existing in Ireland. The function of this business area is to handle aircraft financing, trading, leasing, and ownership.

Since the commencement of Examinership several of the lease agreements have been either terminated or renegotiated.

### 4.4.2 Arctic Aviation Assets DAC (AAA)

AAA is the holding company for NAS's Irish aircraft management, trading leasing and financing platform, through which NAS finances and leases its entire fleet of aircraft.

AAA has seven employees and actively manages the aircraft leasing and financing arrangements of the subsidiaries from its offices at Dublin Airport.

AAA has 36 subsidiaries incorporated in Ireland. The principal activity of these subsidiaries is acquisition, financing, sub-letting and disposal of aircraft, aircraft parts, aircraft engines and aircraft engine parts to support the airlines in the Group.

AAA is also a 30 % shareholder in SkyHawk Aviation Limited (SkyHawk), see section 4.4.7.

### 4.4.3 Drammensfjorden Leasing Limited (DLL)

DLL leased 20 Boeing 737-800 aircraft at the commencement of Examinership. All aircraft are sub-leased to AOC Companies. NAS has guaranteed the leasing obligations under all the agreements.

### 4.4.4 Torskefjorden Leasing Limited (TLL)

TLL leased 24 Boeing 787 aircraft at the time of the commencement of Examinership. All aircraft are subleased to AOC Companies. NAS has guaranteed the leasing obligations under all the agreements.

Since the commencement of Examinership the board of directors decided to cease offering long haul flights. Because of this the Examiner concluded that TLL no longer had a reasonable prospect of survival as a going concern and by order of the Irish Court dated 15 January 2021, the Examiner

RO SOMMERNES ADVOKATFIRMA DA

was discharged as examiner of TLL, and Mr. Kieran Wallace and Mr. Andrew O'Leary were appointed to act as joint liquidators of TLL.

### 4.4.5 Lysakerfjorden Leasing Limited (LLL)

TLL leased a total of 28 aircraft, 24 Boeing 737-800 aircraft and four Boeing 737 Max aircraft at the commencement of Examinership. All aircraft are sub-leased to AOC Companies. NAS has guaranteed the leasing obligations under all the agreements.

### 4.4.6 Other SPCs (not under Examinership)

For information purposes we have listed the remaining SPC's including number of aircraft and type of financing.

| Companies with owned aircraft | Number of Aircraft |
|---|---|
| DY3 Aviation Ireland Limited | 2 |
| DY5 Aviation Ireland Limited | 1 |
| DY6 Aviation Ireland Limited | 2 |
| DY7 Aviation Ireland Limited | 3 |
| DY9 Aviation Ireland Limited | 5 |
| Fedjefjorden Limited | 2 |
| Geirangerfjorden Limited | 1 |
| Hardangerfjorden Limited | 6 |
| Larviksfjorden II Limited | 3 |
| Larviksfjorden Limited | 3 |
| Nordfjord Limited | 1 |
| Ofotfjorden Limited | 1 |
| Oslofjorden Limited | 1 |
| Slidrefjorden Limited | 1 |
| Sognefjorden Limited | 3 |
| Stogofjorden Limited | 2 |
| Torefjorden DAC | 10 |
| Trollfjorden Limited | 2 |
| Tysfjorden Limited | 2 |
| Ullsfjorden Limited | 2 |
| Vindafjorden Limited | 2 |
| **Total** | **55** |

| Companies with leased aircraft | Number of aircraft |
|---|---|
| Tufjorden Limited | 2 |
| DY1 Aviation Ireland Limited | 7 |
| DY2 Aviation Ireland Limited | 4 |
| **Total** | **13** |

RO SOMMERNES ADVOKATFIRMA DA

| Companies without aircraft |
|---|
| Arctic Leasing No.1 Limited |
| Arctic Leasing No.2 Limited |
| Arctic Leasing No.4 Limited |
| Arctic Leasing No.5 Limited |
| DY4 Aviation Ireland Limited |
| Boknafjorden Limited |
| Fiskefjorden Limited |
| Lysefjorden Limited |
| Ifjorden Limited |

### 4.4.7 Joint venture with CCB Leasing (International) Corporation DAC (CCBLI)

NAS is, through AAA, part of the joint venture SkyHawk with CCBLI, a wholly owned subsidiary of China Construction Bank Corporation (CCB). CCBLI is the majority owner of SkyHawk with 70 %, while AAA hold the remaining 30 %.

The purpose of the joint venture is to finance, own and lease aircraft which are part of NAS' aircraft order book. Under the terms of the agreement, the joint venture will purchase a total of 27 Airbus A320neo aircraft from AAA that were/are to be delivered from 2020 to 2023. Three aircraft are currently delivered and on lease with a third-party operator. CCBLI has committed to provide senior debt financing to the joint venture for all 27 aircraft.

### 4.5    BUSINESS AREA - PEOPLE AND SERVICES

The Group's crew, airline- and crew support, and administrative functions are mainly organized within or through companies in the business area "People & Services" and provide services across the Group.

The Resource Companies include:

- Norwegian Air Resources Limited (NAR)

- Norwegian Air Resources Shared Service Center AS (NAR SSC)

- Norwegian Pilot Services Norway AS (PSN)

- Norwegian Cabin Services Norway AS (CSN)

- Norwegian Air Resources Sweden AB (NAR SE)

- Norwegian Air Resources Ireland Ltd (NAR IE)

- Norwegian Training Academy AS (NTA)

- Norwegian Air Resources 1 AS (NAR 1)

- Norwegian Air Resources Spain S.L. (NAR ES)

- Norwegian Air Resources Latvia SIA (NARL)

On 20 April 2020 four pilot and cabin crew companies in Sweden and Denmark filed for bankruptcy due to the drop in demand following the Covid-19 outbreak. The four companies,

RO SOMMERNES ADVOKATFIRMA DA

Norwegian Pilot Services Sweden AB, Norwegian Pilot Services Denmark ApS, Norwegian Cabin Services DK ApS, and Norwegian Air Resources DK LH ApS are currently under bankruptcy proceedings in Sweden and Denmark.

Due to the extraordinary situation, NAS also notified OSM Aviation that it cancelled crew provision agreements with several of its jointly owned OSM Aviation subsidiaries. These companies have crew based in Spain, U.K, Finland, Sweden and the US. On 17 July 2020, NAR and OSM Aviation Group Ltd. resolved to separate the business conducted through the joint venture. NAR ES, NAR UK and NAR US were transferred to NAR and the remaining entities left in the ownership of OSM.

NAR ES was taken under pre-insolvency protection proceedings on 18 December 2020, whilst NAR UK and NAR US was taken under bankruptcy proceedings on 5 and 12 February 2021, respectively.

A petition to wind up NAR was presented on 5 February 2021; joint provisional liquidators were appointed on 8 February 2021 and their appointment was confirmed on 1 March 2021.

On 23 February 2021 Restructuring Proceedings was commenced in PSN and CSN in Norway. On 3 March 2021 NAR SSC was taken under Restructuring Proceedings in Norway.

For further information about the employees of each company, see section 4.7.

## 4.6    OTHER BUSINESS AREAS

### 4.6.1  General

The Group's other business areas include among others the Norwegian brand, marketing, loyalty program, cargo and ground handling.

The companies with material activity within this business area are described in short below.

### 4.6.2  Norwegian Brand Limited (Brand)

Brand, with company registration no. 536457, was incorporated on 9 December 2013 and is an Irish subsidiary of NAS. Brand's business area is to protect, maintain and develop the Norwegian Group Brand, and marketing activities across all business areas.

### 4.6.3  Norwegian Reward AS (Reward)

Reward, with company registration no. 992 197 552, was incorporated on 14 January 2008 and is a Norwegian subsidiary of NAS. Reward operates the Groups loyalty program. Members can earn cashpoints which in turn can be used to pay for flights, upgrades, etc.

### 4.6.4  Norwegian Cargo AS (Cargo)

Cargo, with company registration no. 911 961 989, was incorporated on 16 April 2013 and is a Norwegian wholly owned subsidiary of NAS. Cargo's business area is to operate the Group's commercial cargo activities.

### 4.6.5  NAS Eire Invest AS (Eire Invest)

Eire Invest, with company registration no. 821 805 252, was incorporated on 10 October 2018 and is a Norwegian wholly owned subsidiary of NAS. Eire Invest is the holding company of NAN, ref. section 4.3.

### 4.6.6  Norwegian Ground Handling AS (NGH)

NGH, with company registration no. 997 923 812, was incorporated on 1 January 2012 and is a Norwegian wholly owned subsidiary of NAS. NGH own 100 % of the shares in Red Handling UK Ltd. and Red Handling Spain S.L.

Red Handling UK Ltd. and Red Handling Spain S.L. provides ground handling services at London Gatwick, Barcelona Airport, Alicante Airport, Palma de Mallorca Airport, Malaga Airport and Las Palmas Airport to the Group's airline companies. Ground handling services at all other airports are purchased by the Group from third-party providers.

Red Handling Spain S.L. was taken under pre-insolvency protection proceedings on 18 December 2020.

## 4.7    EMPLOYEES

The total number of full-time employees in the Group (administrative and crew personnel) amount to 6,688, including consultants. Of the 6,688 only approx. 1,050 are currently active, due to the impact the Covid-19 pandemic has had on the air transport sector.

In total the Group companies have 1,760 administrative full-time employees, of which 882 are currently furloughed and 918 are active. These numbers include consultants.

In total the Group companies have 4,928 crew personnel full time employees, of which 4,719 are currently furloughed and 209 are active. These numbers include consultants.

NAS has 472 employees, consisting of administrative personnel, located in in the following countries:

- Norway: 420 employees, of which 169 are currently furloughed.

- Denmark (Danish branch of NAS): 43 employees, of which 20 are currently furloughed.

- Sweden (Swedish branch of NAS: 9 employees, of which 4 are currently furloughed.

The other main employers of administrative personnel in the Group are:

- Norwegian Air Resources Shared Service Center AS (Norway): 255 full time employees (incl. consultants), of which 137 are currently furloughed.

- NAS Air Resources Shared Service Center - Branch (Spain): 259 full time employees (incl. consultants), of which 198 are currently furloughed.

- Red Handling Spain S.L. (Spain): 206 full time employees (incl. consultants), of which 203 are currently furloughed.

RO SOMMERNES ADVOKATFIRMA DA

The pilots and cabin crew (together referred to as "crew personnel") are employed in Group companies in various European countries and the USA. The main employers of crew personnel of the Group are:

- Norwegian Air Resources Spain S.L: 1,392 full time employees (incl. consultants), of which all 1,392 are currently furloughed,

- Norwegian Air Resources UK Ltd.: 1,104 full time employees (incl. consultants), of which all 1,104 are currently furloughed,

- Norwegian Cabin Services Norway AS: 856 full time employees (incl. consultants), of which 718 are currently furloughed,

- Norwegian Pilot Services Norway AS: 520 full time employees (incl. consultants), of which 450 are currently furloughed,

- Norwegian Air Resources US: 467 full time employees (incl. consultants), of which all 467 are currently furloughed,

- Norwegian Air Resources Limited Branch Italy: 322 full time employees (incl. consultants), of which all 322 are currently furloughed,

- Norwegian Air Resources Limited Branch France: 267 full time employees (incl. consultants), of which all 267 are currently furloughed.

## 4.8    AIRCRAFT FLEET

The Group's fleet consisted of 140 aircraft at the end of the third quarter 2020:

- 37 Boeing 787 Dreamliner

- 18 Boeing 737 MAX

- 85 Boeing 737-800

Of the fleet, 55 aircraft are funded by way of debt instruments with the remaining 85 aircraft financed through a range of operating lease agreements. Aircraft are predominately acquired from either Boeing or Airbus.

In 2012 NAS entered a purchase agreement with Boeing for 100 Boeing 737 MAX, of which 92 remain undelivered. The contract was novated to AAA in 2014 and NAS guarantees AAA's obligations under the contract. In 2012 NAS also entered a purchase agreement with Airbus. The agreement was novated to AAA in 2014, but the contract continues to carry a parent guarantee from NAS.

AAA entered a purchase agreement with Boeing for the purchase of 19 Boeing 787-9 aircraft (Dreamliner) in 2015, of which five remain undelivered.

NAS and AAA also entered into the GoldCare Service Agreements for the fleet of Boeing 737 MAX and Boeing 787 aircraft.

RO SOMMERNES ADVOKATFIRMA DA

The figure below shows the number of aircraft operated by the Group from 2012 to the end of the third quarter 2020:



*Source: Registration document listing prospectus perpetual bonds and shares, 14 January 2021 – www.norwegian.no

In March 2019, the Boeing 737 MAX aircraft were grounded by global aviation regulators due to two fatal accidents involving the aircraft type. Boeing was also, as a consequence of the grounding, unable to deliver the sixteen new aircraft expected to be delivered in 2019.

Since their entry into service, the 37 Boeing 787 aircraft have experienced severe operational problems causing the Group to ground the aircraft for heavy maintenance earlier than the expected intervals. The Group has been forced to lease substitute aircraft to replace the Boeing 787 aircraft.

In June 2020 NAS issued a notice to Boeing of termination of the purchase agreements for the remaining five Boeing 787 aircraft and the 92 Boeing 737 MAX aircraft on order and the GoldCare Service Agreements related to the Boeing 787 and Boeing MAX aircraft., ref. section 7.6.3.

The Group had 88 aircraft on order from Airbus at the end of the third quarter 2020, whereof 58 A320neo aircraft with expected delivery between 2024 and 2026, and 30 A321XLR aircraft with expected delivery between 2025 and 2027. 24 of the 88 aircraft are to be included in the joint venture with CCBLI, ref. section 4.4.7.

Since the commencement of the Restructuring Proceedings the fleet has been downsized. During this period the Group has operated approximately 10-15 aircraft.

According to the Restructuring Plan the Group aims to operate approximately 50 aircraft at the end of the Restructuring Proceedings, ref. section 11.2 and Annex 1 and 2. This will however be subject to market conditions and the effect of the Covid-19 pandemic.

RO SOMMERNES ADVOKATFIRMA DA

# 5    FINANCIAL REPORTING AND ACCOUNTING

## 5.1    ORGANIZATION

The Norwegian Group organization for finance and control is mainly organized within the parent company NAS and consist of: Accounting, Corporate Finance, Legal & Tax, Performance Management, and finally Investor Relations. In addition, there is a separate division for aircraft asset management within the subsidiary AAA.

## 5.2    CORPORATE GOVERNANCE

The Group is subject to Corporate Governance reporting requirements according to the Norwegian Accounting Act, section 3-3b, the Norwegian Code of Practice for Corporate Governance as revised on 17 October 2018 and the Continuing Obligations of Listed Companies as approved by Oslo Børs ASA.

The Group Corporate Governance policies are made public on www.norwegian.no.

## 5.3    FINANCIAL REPORTING

The management issues monthly performance reports to the Board of Directors for review. Quarterly financial reports have been prepared and made available to the capital market in accordance with the reporting requirements applicable to listed companies on Oslo Stock Exchange. The quarterly financial reports have been reviewed by the Audit Committee prior to Board approval and disclosure. Financial reports, risk reports and safety reports are drawn up, all of which have been subject to review at Board meetings. The Company's financial position and risks are described in the Board of Directors' Report.

The last annual report issued is for 2019 dated 9 June 2020. We have noted that in the 2019 Board Report, the Board of Directors addressed the uncertainty related to going concern after the impact of the Covid-19 outbreak.

As per the date of this report the Company has presented all quarterly financial reports for 2020. First quarter on 28 May 2020, second quarter on 27 August 2020, third quarter on 9 November 2020 and fourth quarter on 26 February 2021.

Annual and quarterly financial statements have been made public on www.norwegian.no.

## 5.4    AUDITOR

Group auditors are PricewaterhouseCoopers AS from July 2020 succeeding Deloitte AS. The auditor meets with the entire Board in connection with the presentation of the interim annual financial statements, and when otherwise required. The auditor also participates in Audit Committee meetings.

The auditor's report to the annual financial statements for 2019 addressed the material uncertainty related to going concern for NAS and the Group as a result of the impact of the Covid-19 outbreak.

RO SOMMERNES ADVOKATFIRMA DA

Further, on 9 June 2020 Deloitte AS issued a separate auditor's report to the Board of Directors with information about the implementation of the audit for 2019, findings and recommendations resulting from the audit.

Based on our review we have no further comments to the financial reports for 2020 or to the audit of the financial statements for 2019.

## 6    FINANCIAL DEVELOPMENT AND STANDING

## 6.1    CONSOLIDATED FINANCIAL KEY FIGURES

The tables below detail's the trading results recorded for the Group on a consolidated basis in the financial years ended from 2016 to 2020:

| NOK MILLION | 2020* | 2019 | 2018 | 2017 | 2016 |
|---|---|---|---|---|---|
| Revenue | 9,095.7 | 43,521.9 | 40,265.6 | 30,948.3 | 26,054.5 |
| Operating expenses | 32,864.1 | 42,665.9 | 44,116.2 | 32,950.4 | 24,234.1 |
| Operating profit (EBIT) | -23,768.4 | 856.0 | -3,850.6 | -2,002.1 | 1,820.4 |
| Net financial items | 1,643.2 | -2,530.0 | 1,232.0 | -852.0 | -524.9 |
| Profit (loss) from associated companies | -7.8 | -13.6 | 128.5 | 291.9 | 212.8 |
| Profit (loss) before tax (EBT) | -22,133.0 | -1,687.6 | -2,490.1 | -2,562.2 | 1,508.3 |
| Income tax expense (income) | 906.8 | -78.5 | 1,036.0 | -768.5 | -373.4 |
| Net profit (loss) | -23,039.8 | -1,609.1 | -1,454.1 | -1,793.7 | 1,135.0 |
| **Total comprehensive income for the period** | **-24,053.8** | **-1,585.0** | **-1,852.4** | **-1,967.7** | **1,057.5** |

| NOK MILLION | 2020* | 2019 | 2018 | 2017 | 2016 |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Intangible assets | 2,167.1 | 2,870.6 | 2,886.1 | 1,220.3 | 439.8 |
| Fixed assets | 9,553.3 | 61,432.0 | 31,545.0 | 26,231.9 | 22,943.4 |
| Financial assets | 146,7 | 6,431.7 | 9,777.5 | 6,875.7 | 8,586.2 |
| Inventory | 64.1 | 175.7 | 167.3 | 101.9 | 102.5 |
| Trade and other receivables | 4,578.8 | 10,132.9 | 6,752.6 | 4,357.6 | 3,014.0 |
| Other changes | 30,377.1 | 1,204.5 | 2,935.0 | 695.7 | 353.2 |
| Cash and cash equivalents | 2,666.9 | 3,095.6 | 1,921.7 | 4,039.8 | 2,323.6 |
| **TOTAL ASSETS** | **49,554.0** | **85,342.9** | **55,985.3** | **43,522.7** | **37,762.7** |
| | | | | | |
| **EQUITY AND LIABILITIES** | | | | | |
| Total equity | -6,623.9 | 4,124.9 | 1,704.4 | 2,098.4 | 4,049.0 |
| Borrowings non-current | 0.0 | 22,144.4 | 22,530.0 | 22,060.3 | 18,706.1 |
| Other non-current liabilities | 185.7 | 35,047.3 | 4,131.8 | 2,966.2 | 1,597.0 |
| Trade and other payables | ** | 9,129.5 | 8,011.8 | 5,568.3 | 3,881.7 |
| Borrowings current | 8,332.6 | 4,589.6 | 11,309.1 | 4,244.5 | 4,768.8 |
| Other current liabilities | 45,165.8 | 10,301.0 | 8,266.7 | 6,535.4 | 4,752.5 |
| Tax payable | ** | 6.1 | 31.4 | 49.6 | 7.7 |
| **TOTAL EQUITY AND LIABILITIES** | **49,554.0** | **85,342.9** | **55,985.3** | **43,522.7** | **37,762.7** |

RO SOMMERNES ADVOKATFIRMA DA

| NOK MILLION | 2020* | 2019 | 2018 | 2017 | 2016 |
|---|---|---|---|---|---|
| Net cash flow from operating activities | -1,390.9 | 3,037.8 | 462.7 | 2,901.3 | 3,046.5 |
| Net cash flow from investing activities | 2,662.1 | 8,332.4 | -8,563.2 | -3,428.1 | -6,512.4 |
| Net cash flow from financial activities | -1,627.5 | -10,193.0 | 5,984.1 | 2,291.1 | 3,302.8 |
| Foreign exchange effect on cash | -72.3 | -3.3 | -1.7 | -48.2 | 32.6 |
| Net change in cash and cash equivalents | -428.7 | 1,173.9 | -2,118.1 | 1,716.1 | -130.5 |
| Cash and cash equivalents at 1 January | 3,095.6 | 1,921.7 | 4,039.8 | 2,323.6 | 2,454.2 |
| **Cash and cash equivalents at 31 December** | 2,666.9 | 3,095.6 | 1,921.7 | 4,039.8 | 2,323.7 |

*Full year 2020 based on unaudited fourth quarter 2020 financial report.

**Not available in fourth quarter 2020 financial report, hence included in other current liabilities.

The total revenue for 2019 is a result of a number of factors, including ticket sales of approx. NOK 35.2 billion (up from NOK 32.5 billion in 2018), ancillary passenger revenue of approx. NOK 6.6 billion (up from NOK 6.2 billion in 2018), and freight, third party products and other revenue of approx. NOK 1.6 billion (up from approx. NOK 1.4 billion in 2018).

However, the negative financial impact of fleet disruptions caused by the grounding of Boeing 737 MAX aircraft and continued engine issues on the Boeing 787 Dreamliner's resulted in revenue reductions and cost increases impacting the operating profit of the Group negatively in 2019.

Operating results for 2020 were heavily affected by the Covid-19 pandemic. Traffic figures were severely affected, with travel restrictions and decreasing demand forcing the Group to significantly reduce operations, ref. section 4.2 and 6.3.

## 6.2   PARENT COMPANY FINANCIAL KEY FIGURES

The tables below detail's the trading results recorded for NAS in the financial years ended from 2015 to 2019:

| NOK MILLION | 2019 | 2018 | 2017 | 2016 | 2015 |
|---|---|---|---|---|---|
| Revenue | 26,351.9 | 25,006.0 | 19,930.5 | 14,839.5 | 18,849.1 |
| Operating expenses | 26,508.3 | 29,932.0 | 21,891.1 | 13,925.9 | 19,685.4 |
| Operating profit (EBIT) | -156.4 | -4,926.0 | -1,960.6 | 913.6 | -836.3 |
| Net financial items | 864.6 | 323.9 | 1,923.9 | 214.9 | -154.5 |
| Profit (loss) before tax (EBT) | 708.2 | -4,602.0 | -36.7 | 1,128.6 | -990.8 |
| Income tax expense (income) | -205.6 | -1,096.7 | 556.4 | 344.3 | -128.6 |
| Net profit (loss) | 913.7 | -3,505.3 | 519.6 | 784.2 | -862.2 |
| **Total comprehensive income for the period** | **906.0** | **-4,270.7** | **1,196.9** | **1,641.4** | **180.1** |

| NOK MILLION | 2019 | 2018 | 2017 | 2016 | 2015 |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Intangible assets | 3,339.5 | 3,140.4 | 914.7 | 389.2 | 717.4 |
| Fixed assets | 1,437.9 | 587.5 | 488.7 | 513.0 | 537.6 |
| Financial assets | 14,524.2 | 23,681.0 | 22,652.5 | 22,092.3 | 18,490.8 |
| Inventory | 174.6 | 164.9 | 73.3 | 83.8 | 86.0 |
| Trade and other receivables | 21,203.4 | 12,257.8 | 6,057.4 | 4,027.0 | 2,895.8 |
| Other changes | 0.0 | 2,084.4 | 3,977.8 | 353.2 | 0.0 |

RO SOMMERNES ADVOKATFIRMA DA

| | | | | | |
|---|---|---|---|---|---|
| Cash and cash equivalents | 2,799.0 | 1,429.3 | 3,239.3 | 2,149.3 | 1,629.7 |
| **TOTAL ASSETS** | **43,478.7** | **43,345.4** | **37,403.6** | **29,607.8** | **24,357.4** |
| | | | | | |
| **EQUITY AND LIABILITIES** | | | | | |
| Total equity | 11,198.9 | 6,287.4 | 9,096.9 | 7,882.9 | 6,225.2 |
| Borrowings non-current | 4,561.0 | 2,238.4 | 5,316.3 | 7,048.1 | 8,113.0 |
| Other non-current liabilities | 3,582.9 | 1,765.6 | 883.2 | 1,120.3 | 815.6 |
| Trade and other payables | 17,133.2 | 20,038.8 | 14,638.6 | 8,037.7 | 4,873.5 |
| Borrowings current | 776.7 | 4,757.3 | 2,322.7 | 2,248.5 | 721.1 |
| Other current liabilities | 6,226.1 | 8,257.8 | 5,145.9 | 3,270.3 | 3,608.9 |
| **TOTAL EQUITY AND LIABILITIES** | **43,478.7** | **43,345.4** | **37,403.6** | **29,607.8** | **24,357.4** |

For further information in regard to the Company's assets and liabilities see section 6.5 et seq.

## 6.3    THE 2020 RESTRUCTURING

The impact of the Covid-19 pandemic forced the Group into a significant financial restructuring process. The Norwegian government presented in March 2020 a State Aid Package to airlines, and NAS was required to restructure the debt to qualify for the scheme.

In April 2020, the Group outlined its plan to qualify for the State Aid Package. The 2020 Restructuring included the conversion of debt and leasing commitments to equity, the mark to market of certain aircraft lease rentals and a power-by-the-hour arrangement to support the Group's need to reduce its active fleet to seven Boeing 737-800 aircraft operating solely on domestic routes within Norway, and to postpone operations outside of Norway (including to the rest of Europe and intercontinental long-haul flights) until the Covid-19 pandemic eased.

The main financial restructuring was announced 20 May 2020 including significant conversion of bond debt, lease liabilities and accounts payable to equity, approximately NOK 12.7 billion, as well as a public offering of NOK 400 million in cash. Subsequently, through additional restructuring and conversion of debt, the total equity of the Group, improved by NOK 18.2 billion by end of third quarter.

The restructuring secured access to a NOK 3 billion loan guarantee from the Norwegian government, and the State Aid Package was made available to NAS for the purpose of financing short-term liquidity needs caused by the Covid-19 pandemic, to ensure the continued operation of the Group. However, it could not be used towards refinancing of other financial indebtedness of the Group or towards decreasing any negative balance on overdraft facilities or similar.

Further information on the restructuring related to the different financial liabilities is described below.

RO SOMMERNES ADVOKATFIRMA DA

## 6.4    GROUP AND NAS FINANCIAL FIGURES – THIRD QUARTER 2020

The Group and NAS showed the following financial positions on 30 September 2020:

| NOK MILLION | Group | | NAS | |
|---|---|---|---|---|
| | Q3 2020 | 2019 | Q3 2020 | 2019 |
| | | | | |
| Total Equity | 11,110.2 | 4,124.9 | *) | 11,198.8 |
| Equity % | 14.3 % | 4.8 % | | 25.8 % |
| | | | | |
| Pension obligation | 168.3 | 177.5 | | |
| Provision for periodic maintenance | 3,818.9 | 3,879.0 | 1,103.6 | 1,901.3 |
| Other non-current liabilities | 28.6 | 1.1 | 480.4 | 518.1 |
| Deferred tax | 498.0 | 540.7 | | |
| Borrowings | 22,858.8 | 22,144.4 | 5,237.7 | 4,561.0 |
| Lease liability | 23,383.5 | 30,079.8 | 694.3 | 794.3 |
| Derivative financial instruments | | 369.2 | | 369.2 |
| Total non-current liabilities | 50,756.1 | 57,191.7 | 7,516.0 | 8,143.9 |
| | | | | |
| Borrowings | 3,900.5 | 4,589.6 | 244.4 | 776.7 |
| Lease liability | 1,782.9 | 4,194.5 | -2,092.8 | 120.6 |
| Trade and other payables | 9,335.8 | 9,129.5 | 19,028.3 | 17,133.2 |
| Air traffic settlement liabilities | 826.1 | 6,106.5 | 825.7 | 6,106.3 |
| Derivative financial instruments | 241.0 | 0.0 | 241.0 | |
| Tax payable | -1.0 | 6.1 | -1.3 | -0.8 |
| | 16,085.3 | 24,026.2 | 18,245.3 | 24,136.0 |
| | | | | |
| **Total liabilities** | **66,841.4** | **81,217.9** | **25,761.3** | **32,279.9** |
| | | | | |
| **Total equity and liabilities** | **77,951.6** | **85,342.8** | | **43,478.7** |

*) NAS numbers as of Q3 2020 has not been approved/reported, equity is therefore not included

**) Q3 2020 numbers are based on unaudited interim financial information provided by the company, while 2019

is based on audited financial statements for the year.

The third quarter 2020 financial figures were the last publicly released financial information prior to the commencement of the Restructuring Proceedings. NAS' third quarter 2020 numbers are described in more detail in the following.

## 6.5    SHARE CAPITAL

NAS' registered share capital was NOK 397,493,660, divided into 39,749,366 shares with a nominal value of NOK 10 each, as of year-end 2020. On 17 December 2020, the Extraordinary General Meeting approved a reverse share split in the ratio of 100:1, and the nominal value was increased from NOK 0.10 to NOK 10. Proposed share issues, which has not yet been subscribed, was also approved at the Extraordinary General Meeting.

NAS has one class of shares and each share carry equal shareholder rights, including one voting right at the General Meeting. The Articles of Association do not provide for limitations on the transferability or ownership of shares.

RO SOMMERNES ADVOKATFIRMA DA

For information purposes we have listed all share capital changes in 2019 and 2020:

| Overview of Share Capital movements | Date | Share capital (MNOK) | Shares | Converted debt (MNOK) | Cash injection (MNOK) |
|---|---|---|---|---|---|
| 1 January 2019 | | 4.5 | 45,437,059 | - | - |
| Preferential rights issue | 15.03.2019 | 9.1 | 90,871,318 | - | 2,998.8 |
| Private placement | 03.12.2019 | 2.7 | 27,250,000 | - | 1,090.0 |
| 31 December 2019 | | 16.4 | 163,558,377 | - | 4,088.8 |
| | | | | | - |
| Financial restructuring | 20.05.2020 | 290.6 | 2,906,066,430 | 13,797.3 | 400.0 |
| Conversion USD convertible bonds | 10.06.2020 | 4.8 | 47,819,487 | 182.9 | - |
| Conv. of vendor debt and USD conv. bonds | 17.06.2020 | 10.9 | 108,938,080 | 458.3 | - |
| Conversion of lease debt | 26.06.2020 | 4.0 | 40,164,731 | 170.7 | - |
| Conversion USD convertible bonds | 02.07.2020 | 0.5 | 4,569,611 | 17.5 | - |
| Conversion USD convertible bonds | 20.07.2020 | 0.6 | 6,280,732 | 24.0 | - |
| Conversion of vendor debt | 21.07.2020 | 29.0 | 289,664,273 | 1,230.8 | - |
| Conversion USD convertible bonds | 03.08.2020 | 0.1 | 571,201 | 2.2 | - |
| Conversion of Lease debt | 06.08.2020 | 5.5 | 55,070,783 | 234.0 | - |
| Conversion of vendor debt | 07.08.2020 | 0.6 | 6,183,077 | 26.3 | - |
| Conversion of lease debt | 18.08.2020 | 0.5 | 4,775,564 | 20.3 | - |
| Conversion of Perpetual bonds *) | 03.09.2020 | 0.6 | 6,046,802 | - | - |
| Conversion of vendor debt | 23.10.2020 | 5.6 | 56,314,248 | 239.3 | - |
| Conversion of Perpetual bonds *) | 05.11.2020 | 0.5 | 4,555,868 | - | - |
| Conversion of vendor debt | 08.12.2020 | 1.9 | 18,778,583 | 79.8 | - |
| Conversion of Perpetual bonds *) | 11.12.2020 | 25.4 | 253,970,846 | 521.9 | - |
| Share issue to prepare for reverse split | 15.12.2020 | 0.0 | 7 | - | - |
| Reverse split of shares 100 to 1 **) | 17.12.2020 | - | 39,733,287 | - | - |
| Conversion of Perpetual bonds *) | 23.12.2020 | 0.2 | 16,079 | - | - |
| 31 December 2020 | | 397.5 | 39,749,366 | 17,005.2 | 400.0 |

*) Incl. Perpetual bonds not booked as liability. Share issue 11.12.2020 also incl. Future Maintenance bond (liability)

**) EGM decided transfer of NOK 393,518,723.40 to funds (notice period) and further share capital issues not yet subscribed

## 6.6    BORROWINGS

NAS borrowings consist by end of third quarter 2020 of the following liabilities:

| NOK MILLION | NAS | |
|---|---|---|
| | *) Q3 2020 | 2019 |
| Bond issue | 1,572.3 | 4,454.6 |
| Loan with state guarantee | 2,989.0 | |
| Other bank loans | 333.0 | |
| Aircraft financing | 587.8 | 910.1 |
| Total borrowings | 5,482.1 | 5,364.7 |
| of which current liabilities | 244.4 | 776.7 |

*) Q3 2020 numbers are based on unaudited interim financial information provided by the company, while 2019 is based on audited financial statements for the year.

For further information see section 6.7 to 6.9.

RO SOMMERNES ADVOKATFIRMA DA

## 6.7    BOND ISSUE

Bond issue per end of third quarter 2020:

| NOK MILLION | Nominal value | Unamortised | Book value |
|---|---|---|---|
| Senior Secured Bond Issue EUR (NAS07) | 1,406.2 | -744.6 | 661.6 |
| Senior Secured Bond Issue SEK (NAS08) | 522.1 | -273.6 | 248.5 |
| Senior Secured Bond Issue NOK (NAS09) | 252.3 | -13.6 | 238.7 |
| Senior Convertible bond issue USD | 62.7 | -10.4 | 52.3 |
| Total | 2,243.3 | -1,042.2 | 1,201.1 |
| | | | |
| Perpetual bonds with floor protection | | | 252.1 |
| Conversion rights EUR and SEK bonds related to slot values | | | 119.0 |
| Total derivative liabilities related to bonds | | | 371.1 |
| | | | |
| Total non-current bond issue | | | 1,572.2 |

Each bond is described in detail below.

### 6.7.1  NAS07/08 Secured Bonds

The Bonds were initially unsecured bonds issued in December 2015 and February 2017 with repayment date in December 2019 and August 2020, respectively. NAS07 Secured Bonds had a par value of EUR 250 million, while NAS08 Secured Bonds had a par value of SEK 963.5 million.

In December 2019 and May 2020, the terms of NAS07/08 Secured Bonds were amended, and the maturity was extended to November 2021 and February 2022, respectively. As a compensation, the redemption was amended to 105 % of par. In addition, a pledge was established of the shareholding by NAS Eire Invest AS in NAN. NAS07 Secured Bonds had a fixed coupon of 7.25 % while NAS08 Secured Bonds had a coupon of STIBOR + 5.03 %.

In November 2019 NAS sold the Gatwick slots to NAN for USD 384.8 million on a seller's credit. In the same process NAS assigned all its intercompany claims against NAN to the security agent, Nordic Trustee AS, on behalf of the bondholders.

In connection with the restructuring in May 2020 approximately 50 % of the bonds NAS07/08 Secured Bonds were converted to equity. Further an interest free period until 1 July 2021 was agreed related to the remaining bond debt and the maturity was postponed one year until November 2022 for NAS07 Secured Bonds and February 2023 for NAS08 Secured Bonds. Covenants were also changed for a period.

Bondholders were further agreed the right to receive additional bonds if the value of the London Gatwick slots, pledged as a new security for the bonds, increase above the principal value of the outstanding bonds at certain future dates (30 June 2021/2022 and 30 September 2022). The right to receive new bonds is for accounting purposes treated as an embedded derivative and recorded at its fair value (NOK 119 million by end of third quarter 2020). In accordance with IFRS, the remaining bond liability were accounted for as an extinguishment of the outstanding bond liability and recognition of the "new" bond liability at its fair value. As a result, the new bond liability has

RO SOMMERNES ADVOKATFIRMA DA

been recorded significantly lower than the nominal value, and the "Unamortized" amount as shown in the above table will be amortized to book value of the bonds over the residual time until maturity.

### 6.7.2 NAS09 Secured Bonds

In 2017 NAS issued a senior secured bond of NOK 250 million with maturity in November 2020. The coupon rate is 3M NIBOR + 3,95 %. The bond is secured by pledge in the Hangar Property Lease.

In connection with the restructuring in May 2020, an interest free period until 1 July 2021 was agreed. Further, the maturity was extended one year to November 2021, in addition to some amendments in the covenants for a period. These changes were settled by way of share issue.

The financial impact of the changes in bond terms have been recognized as an immediate financial income, and the "Unamortized" amount will be amortized to the book value of the bond over residual time until maturity.

### 6.7.3 2019 Convertible Bonds

In November 2019 NAS issued the 2019 Convertible Bonds of USD 150 million with maturity in November 2024. The fixed interest rate was 6.375 %. The bond is guaranteed by AAA. A conversion right was offered to the bondholders, at an initial conversion price of USD 5.4443 per share in NAS.

In connection with the restructuring process in May 2020, the bondholders agreed to convert approximately 77 % of the loan to equity, and the remaining principal amount of the loan was USD 34.5 million. The conversion subscription rate was reset to USD 0.40265 (before reverse split in December 20).

Further, an interest free period until 1 July 2021 and changes in the covenants for a period was agreed. Subsequent to the restructuring in May, further principal amounts of USD 28.2 million were converted to equity before end of third quarter 2020, with a principal amount of USD 6.3 million remaining at the end of the quarter.

### 6.7.4 2020 Standard Convertible Perpetual Bonds

As part of the 2020 Restructuring, NAS issued Multi-Currency Zero Coupon Perpetual Subordinated Convertible Bonds (EUR, SEK and USD) to certain holders of existing senior debt and certain counterparts such as lessors. The perpetual bonds are convertible to ordinary shares in NAS. The conversion price is fixed at NOK 4.24919 per share (before reverse split in December 2020), based on a fixed exchange rate, and there is no "floor" against potential decline in share price ("non-floor bonds").

No maturity or instalments are agreed to the bonds.  However, an "Acceleration Repayment Date" will occur on the date of a final liquidation, final winding-up or final dissolution of the issuer. As the bonds does not have any clause that gives the bondholder right to demand repayment of either instalments or interest, it will not meet the IFRS definition of a financial liability. Instead, the bonds are classified as other paid-in equity, and by end of third quarter 2020 the remaining perpetual bonds that have not been converted have a recorded equity value of NOK 1,771 million.

RO SOMMERNES ADVOKATFIRMA DA

### 6.7.5 2020 VWAP Convertible Perpetual Bonds

In addition to the 2020 Standard Convertible Perpetual Bonds, NAS also issued new Zero Coupon Perpetual Convertible Bonds with a floor protection (the "floor Bonds" or "Future Maintenance Bonds") to some lessors of leased aircrafts in June 2020. The "floor Bonds" is identical in terms as to the "non-floor Bonds", except for the option to convert into ordinary shares at the lower of market price and conversion price of NOK 4.24919 (before reverse split in December 2020) in June 2023.

As a result of an agreed variable conversion price, NAS has in accordance with IFRS classified the "floor-Bonds" as liability. Book value of the liability by end of third quarter 2020 represents NOK 252 million.

## 6.8    LOAN WITH STATE-GUARANTEE AND OTHER BANK LOANS

In March 2020, the Norwegian Government proposed a guarantee of NOK 3 billion to NAS based on certain conditions. The guarantee should be up to 90 % from Norwegian Government provided that financial institutions would contribute with the remaining 10 %.

The proposed financing was obtained through a tranche 1 in end of March and tranche 2 in mid May 2020, representing state-guarantee loans of NOK 2,989 million and other related loans from financial institutions of NOK 333 million. Total nominal and recorded value of the loans represents NOK 3,322 million.

The state guarantee has been issued by the Norwegian Export Credit Guarantee Agency ("GIEK"). All loans have maturity in 2022 and are based on floating interest rate of 3M NIBOR and margins depending on security.

## 6.9    AIRCRAFT FINANCING

By end of third quarter 2020, NAS had total aircraft financing with a book value of NOK 657 million, whereof NOK 244 million is classified as current liability.

See further description under section 6.17.

## 6.10    PERIODIC MAINTENANCE

An amount of NOK 1,104 million is accrued in the accounts by end of third quarter 2020. NAS pays a fee to a maintenance fund held by the lessor. The accrued provisions are estimated payments in excess of payments to the maintenance funds based on utilization and estimates of future maintenance costs.

## 6.11    LEASE LIABILITY

Book value of lease liability by end of third quarter 2020 represents NOK 875.9 million, of which NOK 181.6 million is classified as non-current. The leases accounted for in accordance with IFRS 16 (right-to-use assets, and lease liabilities) are mainly related to lease of buildings and aircraft spare parts/installations.

RO SOMMERNES ADVOKATFIRMA DA

At the end of 2019, NAS also had 50 aircraft on lease from Group entities. All internal aircraft lease agreements are classified as short-term leases as both parties have an option to terminate with a notice period of three months. NAS has elected not to recognize right-of-use assets and lease liabilities for short-term leases. See further description under section 6.17.

In connection with the refinancing in May 2020 approximately USD 860 million of lease liabilities were transferred from subsidiaries to NAS and converted to shares and perpetual bonds. The lease liability converted consist of overdue payments, contractual rent forgiven for a period and the net present value effect of agreed reduced lease rates from July 2020.

Further, the Group also agreed a "power by the hour" arrangement for the period 1 July 2020 until 31 March 2021. Under this arrangement, NAS settles the rent for operated aircraft in cash based on an agreed price per hour. These agreements effectively mean that no payments are made to respective lessors unless the aircraft is in use. However, overall lease obligation continues to accrue during the standstill period. The difference between the cash settlements and the contractually agreed revised monthly lease will be settled in a share issue in April 2021. The conversion price is fixed at NOK 4.24919 (before reverse share split in December 2020) and with a fixed exchange rate of USD to NOK.

The agreement to settle the liability in shares is treated as a derivate forward contract. By end of third quarter 2020 the derivate had a positive asset value of NOK 2,274.4 million which is classified against the non-current lease liabilities. The liability has as a result been adjusted down due to the fall in share price of NAS.

## 6.12   TRADE AND OTHER PAYABLES

Total trade and other payables by end of third quarter represents NOK 19,028 million. NOK 16,021 million is related to trade payables, while other payables of NOK 3,007 million is mainly related to accruals. NOK 14,190 million of trade payables is intercompany liabilities.

Vendor debt of NOK 1,694 million has as of end of third quarter 2020 been converted to equity due to the 2020 Restructuring, and further conversions have been agreed.

Although agreements have been reached with many creditors, the Group still has significant overdue payables.

## 6.13   DERIVATIVE FINANCIAL INSTRUMENTS LIABILITY

Non-current liability related to derivative financial instruments represent NOK 241 million by end of third quarter. These are mainly related to fuel-hedge contracts.

## 6.14   PARENT COMPANY GUARANTEES

NAS has provided parent company guarantees for certain Group companies, of which the majority is in favour of aircraft lessors and financiers. Total reported lease liabilities by end of third quarter 2020 represents NOK 25,166 million.

Further, NAS has provided guarantees in favour of financial institutions in connection with aircraft financing raised by Group companies related to financing of owned aircraft. Total reported aircraft financing, including aircraft prepayment, represents NOK 21,865 million by end of third quarter 2020.

NAS also guarantees any remaining obligations of AAA related to the assigned aircraft purchase contracts with Boeing and Airbus.

The total volume of guarantees is material, and as a result has a major influence on the financial position of NAS.

See further description under section 6.17.

## 6.15   INTERCOMPANY TRANSACTIONS

### 6.15.1 General

The Group has, since the end of 2013, continuously reorganized its operations. In 2013 and 2014, NAS transferred parts of its business to Irish group companies as part of an international reorganization process. In the following years, several new entities were established. From 2013 to the end of 2019 the number of companies in the Group increased from approximately 27 to 70.

A key consideration was to build a structure which maintained NAS's flexibility and adaptability when growing and entering new markets. The operations of the Group were divided into four main categories handling the separate business areas, providing necessary services across the Group. NAS is handling the cash pool arrangement within the Group and provide necessary financing. This generates large numbers of intercompany transactions and material balances.

### 6.15.2 Aircraft Operations

All AOC Companies bought management services and technical maintenance from NAS, whilst NAS wet leased aircraft from NSE and NAN.

In November 2019 NAS sold its Gatwick slots to NAN. The Gatwick slots were sold on a seller's credit at USD 384,8 million. The interest on the intercompany claim is NIBOR + 6 %. In the same process NAS assigned all its intercompany claims against NAN to the security agent, Nordic Trustee AS, on behalf of the bondholders in NAS07/NAS08 Secured Bonds. The assignment included all rights which derive from the claim including, but not limited to, interests. NAS is charged a monthly slot fee, which reduce the debt to NAN.

### 6.15.3 Assets and financing

AAA and the SPCs acquire management services from NAS, whilst NAS and the other AOC Companies sublease aircraft from the SPCs. The AOC Companies provide lease rental payments to the SPCs in return for the use of the aircraft and in turn the SPCs use the rental payments to meet the costs of their own debt and lease finance obligations. Lease rental payments under these sublease agreements are typically the rent due under the head leases plus a small margin in the region of 2 % which cover the asset management fees owed to AAA and other operating costs.

RO SOMMERNES ADVOKATFIRMA DA

During 2013 and 2014, NAS transferred several of its owned aircraft to AAA. NAS guaranteed the financial obligation towards the external financing institutions.

### 6.15.4 People and services

The Resource Companies provide operating personnel to the Group's airline activities (pilots, cabin crew, technical maintenance, and crew training services, etc.), as well as administrative support. The Resource Companies acquire management services from NAS.

The separation of joint ventures with OSM generated an intercompany balance of approx. NOK 1.1 billion between NAS and NAR, ref. section 4.5.

### 6.15.5 Other business areas

All companies in this business area acquire management services from NAS.

The intercompany transactions with Reward and Brand are the most significant within this business area. The reward program was transferred from NAS to Reward with effect from 1 January 2020 on a seller's credit at NOK 1,939 million. NAS pay a commission to Reward for all ticket and ancillary sales generated from Reward members, based on agreed terms.

In addition, NAS pay a license fee to Brand for the usage of the Norwegian trademark.

## 6.16  CASH POOL AND CASH MANAGEMENT

NAS operates, and is the owner, of two multi-currency cash pool arrangements within the Group, with DNB and Danske Bank respectively. In addition, NAS and some of the Group companies have stand-alone accounts.

Certain accounts, both within the cash pool and stand-alone accounts, are classified as restricted. Bank guarantees are granted for leasing liabilities for aircraft, suppliers of fuel and handling services, as well as airport charges from airports and governments. There is also a guarantee/deposit in place to secure a pension program.

NAS had the following cash balances by the end of November 2020 and by 26 February 2021:

| NOK MILLION | 30.11.2020 | 26.02.2021 | Change |
|---|---|---|---|
| Cash Pool DNB | 665 | 915 | 250 |
| Cash Pool Danske Bank | 16 | 34 | 18 |
| Stand alone accounts | 979 | 999 | 20 |
| Restricted cash | 998 | 711 | -287 |
| **Total cash Group** | **2,658** | **2,659** | **1** |
| -Restricted cash | 998 | 711 | -287 |
| -Stand alone accounts subsidiaries | 170 | 200 | 30 |
| **Total free cash NAS** | **1,490** | **1,748** | **258** |

Reward has a major part of the cash on stand-alone accounts within the Group, with approx. NOK 160 million in February 2021. The rest is divided on companies within the Group.

RO SOMMERNES ADVOKATFIRMA DA

Restricted cash outside of NAS is mainly withheld employment tax.

## 6.17   GROUP BORROWINGS

Group borrowings consist by end of third quarter 2020 of the following liabilities:

|  | Group | |
| --- | --- | --- |
| **NOK MILLION** | **Q3 2020** | **2019** |
| Bond issue | 1,572.3 | 4,178.4 |
| Loan with state guarantee | 2,989.0 | 0.0 |
| Other bank loans | 333.0 | 0.0 |
| Aircraft prepayment financing | 307.3 | 281.9 |
| Aircraft financing | 17,657.2 | 17,684.1 |
| Lease liabilities | 23,383.5 | 30,079.8 |
| Total non-current borrowings | 46,242.3 | 52,224.2 |
| | | |
| Bond issue | 0.0 | 249.2 |
| Aircraft prepayment financing | 416.0 | 578.6 |
| Aircraft financing | 3,484.4 | 3,761.8 |
| Lease liabilities | 1,782.9 | 4,194.5 |
| Total non-current borrowings | 5,683.3 | 8,784.1 |
| | | |
| **Total borrowings** | **51,925.6** | **61,008.3** |

### 6.17.1 Group Aircraft prepayment financing

The Group has entered into facility agreements to cover pre-delivery financing related to future aircraft delivery orders. By end of third quarter 2020 non-current liabilities represent NOK 307.3 million, while current liabilities represent NOK 416 million.

### 6.17.2 Group Aircraft financing

The Group has historically utilized financial institutions, such as ExIm, ECA and AFIC, as its primary funding source in relation to aircraft acquisitions in addition to the US Capital market by way of Private Placements, EETC and sale-leaseback arrangements. The liability is related to financing of the Group's 55 owned aircraft (per November 2020), established through the SPCs. The owned aircraft are pledged as collateral. Further, guarantees are provided by either NAS and/or ExIm Bank of the United States. The financing is based on both fixed and floating interest rate based on LIBOR and EUROBOR market rates and a risk premium equal to the spread at the reporting date. At year-end 2019 approximately 75 % of the financing was based on fixed interest rate. The aircraft financing is denominated in USD and in EUR.

By end of third quarter 2020 the book value of the non-current aircraft financing represents NOK 17,657 million, while book value of current liabilities represents NOK 3,484 million. The liability is accounted for based on the amortized cost method, and the nominal value of the debt is approximately NOK 950 million higher than the book value. The difference will be amortized to the loans over time until maturity.

RO SOMMERNES ADVOKATFIRMA DA

### 6.17.3 Lease liabilities

The Group lease, through the SPCs, 85 aircraft of its currently held 140 aircraft (per November 2020) through a range of lease agreements. Further, the Group lease aircraft spare parts, facilities, and other equipment.

From 1 January 2019 the Group has applied IFRS 16 related to lease agreements, requiring almost all such agreements to be reported in the balance sheet as right of use assets and lease liabilities. Lease liabilities are initially measured at the present value of the future lease payments, discounted using the Group's incremental borrowing rate. The corresponding right of use assets are measured at an amount equal to the lease liability at 1 January 2019, and subsequently depreciated using the straight-line method.

In accordance with IFRS16, the Group has elected not to recognize short term leases, except for aircraft leases, and leases of low-value assets. The abovementioned treatment of leases is for accounting purposes only, and the value of the right of use assets is not realizable as it will be required to be returned to the lessor in full, regardless of the underlying value of the aircraft.

Significant lease obligations were converted to equity in the 2020 Restructuring, ref. section 6.3. The Group has by end of third quarter reported a non-current lease liability of NOK 23,384 million and a current lease liability of NOK 1,783 million.

### 6.17.4 Group provision for periodic maintenance

For aircraft under lease agreements, the Group is contractually committed to either return the aircraft in a certain condition or to compensate the lessor depending on the actual condition. The Group is required to follow the maintenance program defined by the aircraft manufacturers, and estimated maintenance costs are accrued based on the use of the aircraft since last maintenance event. The non-current maintenance provision represented NOK 3,819 million by end of third quarter 2020.

### 6.17.5 Group trade and other payables

Total trade and other payables represent NOK 9,336 million by end of third quarter 2020, whereof other payables are NOK 5,948. Other current liabilities are among others related to loyalty customer accruals, accrued vacation pay and other accrued expenses.


## 7    THE COMPANY'S ASSETS

## 7.1    GENERAL

Based on NAS' unaudited accounts as of 31 December 2020, and information provided by the management, we will in the following give a brief description of NAS' assets, and our assessment on whether the assets are likely to have any value in a liquidation scenario. A summary of the assumed value of the assets in a liquidation scenario is outlined in Annex 5.

RO SOMMERNES ADVOKATFIRMA DA

## 7.2    CASH AND CASH EQUIVALENT

NAS had free cash and cash equivalent of approx. NOK 1,750 million as of 26 February 2021. The balance is expected to decrease during the remainder of the proceedings. If the Restructuring Plan is not accepted by the creditors, we assume the remaining free balance to be approx. NOK 965 in a liquidation scenario (end of March) based on current cash flow forecasts, costs accrued during the Restructuring Proceedings, and assumed set off positions.

## 7.3    INTANGIBLE ASSETS AND DEFERRED TAX ASSET

Intangible assets, which mainly consist of goodwill and deferred tax asset, had a book value of NOK 3,348 million as of 31 December 2020. These assets are not considered to have any material value in a liquidation scenario.

## 7.4    SHARES IN SUBSIDIARIES

NAS own shares in the following subsidiaries:

| Shares/investments |
|---|
| Norwegian Brand Ltd |
| Norwegian Reward AS |
| NAR 1 AS |
| NAS Eire Invest AS |
| Norwegian Ground Handling AS |
| Norwegian Cargo AS |
| Arctic Aviation Assets DAC |
| RED Maintenance S.L. |
| Norwegian Air International Ltd |
| Norwegian Air UK Ltd |
| Norwegian Air Resources Ltd |
| Norwegian Air Sweden AB |

Based on the current financial situation in these subsidiaries and the Group as a whole, we have not identified any material value in a liquidation scenario.

## 7.5    INTERCOMPANY RECEIVABLES

NAS had receivables towards Group companies in the net amount of NOK 10,304 million as of 31 December 2020. Intercompany receivables with book value that exceed NOK 200 million are listed below:

| Company | NOK Million |
|---|---|
| Arctic Aviation Assets DAC | 3 403 |
| Norwegian Air Norway AS | 2 945 |
| Norwegian Reward AS | 454 |
| Norwegian Air Resources Ltd. | 697 |
| Sognefjorden Ltd. | 433 |
| Nordfjord Ltd. | 354 |

RO SOMMERNES ADVOKATFIRMA DA

| | |
|---|---|
| Hardangerfjorden Ltd. | 305 |
| Slidrefjorden Ltd. | 229 |
| NAS Eire Invest AS | 225 |
| Tysfjorden Ltd. | 217 |

AAA and several of its subsidiaries entered into interim Examinership on 18 November 2020, with the Examinership being formally commenced on 7 December 2020 ref. section 2. In addition, NAR entered liquidation on 8 February 2021.

Based on the current financial situation in these companies and the Group as a whole, only the intercompany receivable towards Reward is considered to have any material value in a liquidation scenario.

There has been conducted an independent valuation of Reward as of January 2021. Based on the report we assume the receivable towards Reward to have a value of approx. NOK 100 million in a liquidation scenario.

## 7.6    OTHER RECEIVABLES

### 7.6.1  Holdbacks with financial institutions and credit card companies
NAS had a book balance related to holdbacks from financial institutions and credit card companies of approx. NOK 1,780 million, as of 31 December 2020.

Holdbacks are receivables towards certain financial institutions and credit cards companies, related to payments from customers through such companies. The financial institutions and credit card companies are entitled to withhold such payments for a period of time subject to agreed terms.

The majority of the abovementioned amount is related to flights cancelled due to the Covid-19 pandemic and future flights; hence the figure does not represent the actual amount available in a liquidation scenario. In addition, a portion of the amount has been paid out to the Company during the Restructuring Proceedings.

Based on anticipated refund claims due to cancellations, additional costs/fees, etc. we assume that net value of holdbacks will be approx. NOK 360 million in a liquidation scenario.

### 7.6.2  Account receivables
NAS had a book balance related to account receivables of approx. NOK 202 million, as of 31 December 2020.

We assume that the majority of relevant counterparties will assert claims against NAS in the event of a liquidation, and thus may be in a position to offset their claims against NAS' receivables. For precautionary reasons we have chosen to only recognize a minor recoverable value in a liquidation scenario.

RO SOMMERNES ADVOKATFIRMA DA

### 7.6.3 Claims against Boeing

NAS has acquired Boeing 737 MAX and Boeing 787 aircraft from Boeing of which 92 Boeing 737 MAX aircraft and five Boeing 787 aircraft remain undelivered, ref. section 4.8.

In June 2020 NAS issued a notice to Boeing of termination of the purchase agreements for the remaining aircraft on order and the GoldCare Service Agreements. In addition, NAS filed a legal claim seeking the return of predelivery payments related to the aircraft and for damages related to the grounding of the Boeing 737 MAX and engine issues on the Boeing 787. Boeing has contested the claims and asserted claims against the Group. Litigation proceedings are commenced in the US.

Information about the claims and counterclaims have been provided by the Company and based on a limited review there is material uncertainty regarding the outcome of the disputes. For precautionary reasons we have chosen not to recognize any recoverable value in a liquidation scenario.

### 7.6.4 VAT-refund

NAS is registered in the Norwegian VAT-register and has had a monthly VAT-refund claim towards the Norwegian tax office of approximately NOK 30-60 million through the restructuring period.

We assume that there will be a minor VAT-refund claim in a liquidation scenario.

### 7.6.5 Prepayments and deposits

NAS had a book balance related to pre-payments and deposits of approximately NOK 550 million, as of 31 December 2020. The majority relates to pre-payment of costs, including leasing.

We assume that the majority of relevant counterparties will assert claims against NAS in the event of a liquidation, and thus may be in a position to offset their claims against NAS' receivables. For precautionary reasons we have chosen to only recognize a minor recoverable value in a liquidation scenario.

## 7.7   PROPERTY AND BUILDINGS

At the commencement of the Restructuring Proceedings NAS had a ground lease at Gardermoen Airport on which a hangar is situated. In addition, NAS also owned two apartments, one in Florida and one in Seattle.

The apartment in Florida has been sold for approx. NOK 5,4 million and the amount has been settled. We assume the apartment in Seattle has a value of approx. NOK 5 million.

Nordic Trustee has a pledge on the Hangar Property Lease in favour of NAS09 Secured Bonds. There has been conducted an independent valuation as of January 2021 and based on current market conditions the value is estimated to be approx. NOK 192.3 million. We therefore assume that the value of the Hangar Property Lease is less than the liabilities related to NAS09 Secured Bonds, and thus do not represent a free value in a liquidation scenario.

RO SOMMERNES ADVOKATFIRMA DA

## 7.8    EQUIPMENT, SPAREPARTS AND INVENTORY

NAS had a book balance related to equipment, spareparts and inventory (including consumables) of approx. NOK 237 million, as of 31 December 2020. The majority of the abovementioned assets are situated at Gardermoen, other airports across Europe, and at the Company's headquarter.

It is expected that the balance will be reduced during the restructuring period, inter alia, due to consumption and general usage in ongoing operations. We assume the value of these assets to be approx. NOK 40 million in a liquidation scenario.

## 8    THE COMPANY'S DEBTS

## 8.1    REGISTERED CLAIMS DURING THE RESTRUCTURING PROCEEDINGS

All known creditors have been informed of the commencement of Examinership in Ireland and Restructuring Proceedings in Norway. The creditors were urged to submit their claims, and these have been registered. In the event a creditor has not submitted a formal claim, the Reconstructor and Examiner have registered the relevant debt recognized by the Company.

Unsecured claims in the Restructuring/Examinership Proceedings amounts to approx. NOK 62.8 billion.

The unsecured claims do, for various reasons, not necessarily correspond with debt recorded in the Company's accounts, ref. section 6.4.

For the sake of good order claims filed to the Reconstructor amounts to NOK 50.6 billion.

A complete list of creditors and claims is attached as Annex 4.

## 8.2    REGISTERED SECURED CLAIMS

The majority of the registered secured claims can be divided as follows:

-    Nordic Trustee on behalf of NAS07/08 Secured Bonds in the aggregate amount of NOK 1.86 billion. The claim is partly secured by pledge in the shares in NAN (owner of Gatwick Slots) and NAS receivable towards NAN, (approx. NOK 2.8 billion) and account pledge in NAN.

-    Nordic Trustee on behalf of NAS09 Secured Bonds in the amount of NOK 252.5 million. The claim is secured by pledge on the Hangar Property Lease.

-    DNB Bank ASA, related to payment guarantees counter guaranteed by NAS, in the amount of 211.7 million. The claim is secured by several cash deposits.

-    Danske Bank in the amount of NOK 80.9 million. The claim is connected to a trade finance facility, a counter indemnity guarantee and a bank guarantee facility. The claim is secured by collateral on a pledged account.

RO SOMMERNES ADVOKATFIRMA DA

The portion of the secured claims that exceed the value of the relevant pledge are reclassified as unsecured claims.

## 9    SOLVENCY

The Group had, prior the commencement of the Restructuring Proceedings, significant negative cash flow on a monthly basis. Given the Covid-19 effects on travel beyond 2020, management estimated that the Group as a whole would no longer have sufficient working capital to meet its current obligations by early 2021. This will in turn cause significant impairment to the balance sheet of NAS.

Based on current market and trading conditions, there is a significant risk that NAS will become insolvent if it is not able to reconstruct the business and resume normalised operations.

## 10    VOIDABLE TRANSACTIONS AND CRIMINAL LIABILITY

We have, during the Restructuring Proceedings, not identified any voidable transactions. Further, NAS, its management and its board of directors, have to our knowledge not committed criminal offences in connection with financial actions prior to commencement of the Restructuring Proceedings.

## 11    RESTRUCTURING PROCEEDINGS

## 11.1    CASH POSITION AND FUNDING THROUGH THE RESTRUCTURING PROCEEDINGS

The Group had a free cash balance of approx. NOK 1,600 million at the commencement of the Restructuring Proceedings. The balance was mainly held by NAS, ref. section 7.2.

A detailed cash forecast for the restructuring period was presented by management and has since been closely monitored at a weekly basis through the restructuring process to make sure NAS has sufficient funding to finalize and implement the Restructuring Plan.

In addition, NAS put in effect a new multi-authorization routine for payments carried out during the restructuring process to ensure payment for necessary services accrued in the restructuring period and to exclude pre-petition debt.

The actual cash balance from week-to-week has not deviated in any material sense from the presented cash forecast. In our view the Company will have sufficient funds to cover running expenses throughout the remaining restructuring period.

RO SOMMERNES ADVOKATFIRMA DA

## 11.2   NEW BUSINESS PLAN

The board of Directors approved a business plan and proposed term sheet as a potential basis for the restructuring of the Company (and consequently the companies under Examinership proceedings) through the Irish Examinership and the Norwegian Restructuring Proceedings as announced by stock exchange announcement made to the Oslo Stock Exchange on 14 January 2021.

The indicative term sheet contained details of the Company's proposals in relation to the Rights Offering, the Private Placement, the New Capital Perpetual Bonds Offering (the "Investment") and the possible terms of the dividend claims. In addition, the Company stated in the stock exchange announcement that, among other things, it intended to:

- focus on its core Nordics business, operating a European short-haul network with narrow body aircraft (the Company expects to initially hold up to 50 Boeing 737 aircraft (owned and leased));

- cease operating the Company's long-haul network; and

- subject to the restructuring contemplated by these proposals being successful:

    o reduce total debt to around NOK 20,000,000,000 and emerge from the restructuring with a free cash position of approximately NOK 4,000,000,000 to 5,000,000,000; and

    o achieve positive EBITDA following the restructuring in 2021 based on conservative assumptions as to the length of the Covid-19 pandemic and as to revenues, costs and load factors.

- The Company's proposal also envisages cost savings where possible, implemented by procuring the most competitive terms available from suppliers and, in some instances, replacing suppliers with in-house resources.

On 27 January 2021 the Company and the Reconstructor outlined the main terms proposed by the Company to the creditors at a creditor's meeting.

## 11.3   RESTRUCTURING PLAN

The Restructuring Plan is attached as Annex 1 and is in all material aspects identical to the Irish Scheme of Arrangement, attached as Annex 2.

The Restructuring Plan contains certain elements that may involve somewhat different treatment of creditors. This has been considered by the Restructuring Committee. Having regard to the complexity of the case and the feasibility of the Restructuring Plan, when compared to a liquidation scenario, the Restructuring Committee has concluded that the proposed solutions are within the framework set by the Restructuring Act, and therefore is acceptable.

The proposed dividend offered to unsecured creditors comprises a cash dividend and an established dividend claim that is convertible to shares in NAS. The combined value of the dividend

claim and the cash payment is assumed to give the unsecured creditors a total recovery of approx. 5 % of an unsecured creditor's debt.

For more detailed information please see section 10 of the Scheme of Arrangement (as summarized in section 4 (C) of the Restructuring Plan).

## 11.4   ESTIMATED COVERAGE IN A LIQUIDATION SCENARIO

Assumed asset values, claims and dividend in a liquidation scenario is calculated and summarized in Annex 5. The dividend to unsecured creditors is estimated to be less than 2 % in a liquidation scenario.

In a liquidation scenario we expect the claims to exceed NOK 80 billion due to breach of contract obligations and other accrued liabilities, ref. Annex 5.

In addition, NAS also owe accrued holiday pay for 2020 (with approx. NOK 35 million - in total for all NAS employees in Norway, Denmark and Sweden). Employee claims are, subject to the limitations in section 9-3 of the Creditor Recovery Act, considered to be first priority claims. The total amount of first priority claims from employees in a liquidation scenario is assumed to amount to a total of approx. NOK 115 million for the 472 NAS employees. The amount includes both the accrued holiday pay, and salary and holiday pay throughout the notice period as defined in the Norwegian Working Environment Act (Nw.: "Arbeidsmiljøloven") section 15-3.

## 11.5   RECOMMENDATION OF THE RESTRUCTURING PLAN

The Restructuring Committee is of the opinion that the Scheme of Arrangement, and thus the Restructuring Plan, will give the unsecured creditors better coverage than a liquidation scenario would entail, ref. Annex 5. Another benefit of the Restructuring Plan as opposed to liquidation is that all creditors may receive a dividend within a short period of time.

In the event of a liquidation however, both the amount of dividend and the time by which such dividend is paid, will be uncertain. Given the size of the Company and the character of its assets, it is not unreasonable to assume that it can take up to five years before a liquidation would be concluded.

Based on the above, the Restructuring Committee recommends that the Restructuring Plan is approved by the unsecured creditors.

RO SOMMERNES ADVOKATFIRMA DA

## 12    LIST OF ANNEXES

| | |
|---|---|
| Annex 1 | Restructuring Plan (attached as schedule 10 to the Scheme of Arrangement) |
| Annex 2 | Scheme of Arrangement |
| Annex 3 | Particulars of the Company (attached as schedule 1 to the Scheme of Arrangement) |
| Annex 4 | List of creditors (attached as schedule 5 to the Scheme of Arrangement) |
| Annex 5 | Summary and calculation of dividend in a liquidation scenario (attached as schedule 3 to the Scheme of Arrangement) |
| Annex 6 | Statement from the chairman of the board of directors |

Signature page to follow.



# SIGNATURE PAGE

Oslo, 11 March 2021

---
**Håvard Wiker**
Reconstructor

---
**Helge A. Østvold**
Court appointed Auditor

---
**Rolf Tjugum**
Restructuring Committee member

---
**Jørgen Andersen**
Restructuring Committee member

---
**Øyvind Dehli**
Restructuring Committee member

---
**Stig Patey**
Restructuring Committee member



## ANNEX 1 – THE RESTRUCTURING PLAN

THE RESTRUCTURING PLAN WILL BE ENCLOSED WHEN THE RESTRUCTURING PLAN IS SUBMITTED FOR VOTING IN NORWAY



## ANNEX 2 – SCHEME OF ARRANGEMENT

THE SCHEME OF ARRANGEMENT WILL BE ENCLOSED WHEN THE RESTRUCTURING PLAN IS SUBMITTED FOR VOTING IN NORWAY



## ANNEX 3 – PARTICULARS OF THE COMPANY

THE PARTICULARS OF THE COMPANY WILL BE ENCLOSED WHEN THE RESTRUCTURING PLAN IS SUBMITTED FOR VOTING IN NORWAY



## ANNEX 4 – LIST OF CREDITORS

THE LIST OF CREDITORS WILL BE ENCLOSED WHEN THE RESTRUCTURING PLAN
IS SUBMITTED FOR VOTING IN NORWAY



## ANNEX 5 – SUMMARY AND CALCULATION OF DIVIDEND IN A LIQUIDATION SCENARIO

A SUMMARY AND CALCULATION OF DIVIDEND IN A LIQUIDATION SCENARIO WILL BE ENCLOSED WHEN THE RESTRUCTURING PLAN IS SUBMITTED FOR VOTING IN NORWAY



## ANNEX 6 – STATEMENT FROM THE CHAIRMAN OF THE BOARD OF DIRECTORS

**STATEMENT**

Reference is made to the Restructuring Plan and the Reconstructor and court appointed auditor's report. On behalf of Norwegian Air Shuttle ASA (the "**Company**") I hereby confirm that all the Company's assets and liabilities are reported, ref. the Restructuring Act section 39 (1) no. 3.

I have taken note that the Company has been subject to the scrutiny of the Irish examinership process and the Norwegian restructuring process. My statement above should therefore be seen as being materially correct and provided based on the aforementioned and is based on my reasonable knowledge of the Company.

11 March 2021

Niels Smedegaard

Chairman of the board

# SCHEDULE 10

Liquidation Priorities under Norwegian law

| No. | Priority | Comment |
|---|---|---|
| 1. | Mass claims (*Nw: massefordringer*) | • The bankruptcy estate's necessary costs and certain other permitted costs. This includes accrued costs from new obligations entered into by the estate, e.g. trustee fees, rent/electricity/etc. after the opening of bankruptcy proceedings.<br>• Mass claims shall be covered by funds/assets in the estate.<br>• To the extent that the estate does not have sufficient funds to cover necessary expenses (*Nw: nødvendige boomkostninger*), the estate has, with certain limitations, a statutory lien over all of the debtor's pledged assets (including third party security for the debtor's debt). The statutory lien is limited to 5 % of the value or sales proceeds of the pledged asset, albeit limited to a maximum amount equal to 700 times the court fee in Norway (*Nw: rettsgebyr* - currently NOK 1,199, which corresponds to an aggregate amount of NOK 839 300) in respect of any asset that may be registered in an assets register (*Nw: realregister*). |
| 2. | Secured claims up to the amount being secured | Please note the following:<br>• The bankruptcy administrator may choose to transfer secured assets to the secured party (provided such party consents to the transfer) instead of liquidating the assets. The outstanding claim will be written off in an amount equivalent to the value of the transferred asset.<br>• If the value of the security is not sufficient to cover the outstanding claim in its entirety, the part of the claim not covered by the underlying security/collateral value, will be treated as unsecured claim. |
| 3. | First class preferential claims | • Salary (including holiday remuneration) to employees, pension claims and other remuneration claims.<br>• The employees' rights to salary are secured through the State-run Wage Guarantee Fund. Hence, if the company does not have the funds to provide salary for its employees, after bankruptcy, the fund will remunerate the employees, with some exceptions. The State-run Wage Guarantee Fund will subsequently have a first class preferential claim recourse claim towards the company. |
| 4. | Second class preferential claims | • Tax and VAT claims that have their ordinary maturity no earlier than six months prior to the date of the bankruptcy filing (*Nw: fristdagen*). Interest on these claims are not preferred claims. |
| 5. | Claims with no preference/unsecured claims | • All other claims not forming part of the above mentioned classes of claims. Unsecured claims such as loans and outstanding claims from service providers and suppliers will fall into this category. |

| 6. | Claims of last priority | • Claims for interest incurred after the commencement of the bankruptcy proceedings falls within this class of claims.<br>• Additional tax, penalties and disciplinary fines, etc.<br>• Claims with agreed subordination.<br>• Claims of last priority shall only be paid after all other claims are fully satisfied. |
|---|---|---|

**AAA Scheme**

## THE HIGH COURT

2020 No. 366 COS

IN THE MATTER OF

## ARCTIC AVIATION ASSETS DESIGNATED ACTIVITY COMPANY

AND IN THE MATTER OF

## NORWEGIAN AIR INTERNATIONAL LIMITED

AND IN THE MATTER OF

## DRAMMENSFJORDEN LEASING LIMITED

AND IN THE MATTER OF

## TORSKEFJORDEN LEASING LIMITED

AND IN THE MATTER OF

## LYSAKERFJORDEN LEASING LIMITED

AND IN THE MATTER OF

## PART 10 OF THE COMPANIES ACT 2014

AND IN THE MATTER OF

## NORWEGIAN AIR SHUTTLE ASA
## AS A RELATED COMPANY WITHIN THE MEANING OF SECTION 517 AND SECTION 2(10) OF THE COMPANIES ACT 2014

## PROPOSALS FOR A SCHEME OF ARRANGEMENT

## BETWEEN

## ARCTIC AVIATION ASSETS DESIGNATED ACTIVITY COMPANY
## (IN EXAMINATION UNDER PART 10 OF THE COMPANIES ACT 2014)

## AND

## ITS MEMBER AND CREDITORS

Kieran Wallace
Examiner
KPMG
1 Stokes Place
St Stephen's Green
Dublin 2
Ireland

# CONTENTS

| | | |
|---|---|---:|
| 1. | DEFINITIONS | 3 |
| 2. | INTERPRETATION | 15 |
| 3. | BACKGROUND AND RECITALS | 16 |
| 4. | THE REPORT AND FORMULATION OF PROPOSALS | 23 |
| 5. | NAS UNDERTAKING | 23 |
| 6. | EFFECTIVE DATE AND EFFECTIVE TIME | 23 |
| 7. | THE INVESTMENT | 25 |
| 8. | SUMMARY OF PROPOSALS | 30 |
| 9. | TREATMENT OF THE MEMBER | 31 |
| 10. | TREATMENT OF CREDITORS | 31 |
| 11. | DETERMINING THE CLAIMS OF UNAGREED CREDITORS | 36 |
| 12. | WAIVING OF CREDITOR RIGHTS | 39 |
| 13. | IMPLEMENTATION OF PROPOSALS | 40 |
| 14. | GENERAL DATA PROTECTION REGULATION | 41 |
| 15. | MISCELLANEOUS PROVISIONS | 41 |
| SCHEDULE 1 | | 43 |
| SCHEDULE 2 | | 44 |
| SCHEDULE 3 | | 45 |
| SCHEDULE 4 | | 47 |
| SCHEDULE 5 | | 54 |

1.    **Definitions**

In these Proposals, unless inconsistent with the subject or context, the following expressions bear the following meanings:

"**2020 Restructuring**", the restructuring of the Group referenced in Clause 3.14;

"**2020 Restructuring Plan**", the plan referenced in Clause 3.15;

"**Act**", the Irish Companies Act 2014 (as amended);

"**Affiliate**", with respect to a person:

(a)    any other person who, directly or indirectly is in control of, or controlled by, or is under common control with, such person; or

(b)    any other person who is a director, officer or employee:

  (i)    of such person;

  (ii)    of any subsidiary or parent company of such person; or

  (iii)    of any person described in paragraph (a) above,

and for the purposes of this definition, control of a person shall mean the power, direct or indirect, (A) to vote on more than 50% of the securities having ordinary voting power for the election of directors of such person, or (B) to direct or cause the direction of the management and policies of such person whether by contract or otherwise;

"**Agreed Creditor**", those Creditors whose Claims are accepted by the Company both in terms of liability and quantum and beside whose name in the Creditor Schedule there is the word "Yes";

"**Agreed Debt**":

(a)    the amount due to a Creditor as appears beside its name and marked as agreed in the Creditor Schedule; or

(b)    the amount due to a Creditor which has otherwise been agreed by the Company and the Creditor prior to the Irish Confirmation Date, determined by the Irish High Court under Section 537(3) of the Act or determined in accordance with the Expert Determination Process;

"**Aircraft Experts**":

(a)      Richard G. Spaulding of Spaulding Aviation Services LLC, 17971 Tobermory Place, Leesburg, VA 20175, United States of America; and

(b)      Robert Palmer, Malvern Consulting Limited of 17 Park Avenue, Solihull, West Midlands, B91 3EJ, United Kingdom,

(and each an "**Aircraft Expert**");

"**Allocation Factors**", has the meaning given to such term in Clause 7.13;

"**Allocation Principles**", has the meaning given to such term in Clause 7.13;

"**AOC**", an air operator's certificate;

"**Application**", has the meaning given to such term in the definition of Eligible New Capital Perpetual Bonds Creditor;

"**Auditor**", the Company's auditor, PricewaterhouseCoopers AS;

"**Business Day**", any day other than a Saturday, Sunday or public holiday in either of Ireland or Norway;

"**Capital Increase Registration**", has the meaning given to such term in Clause 6.1.4;

"**Claim**", any claim or right of action which a Creditor may have against the Company as at the Petition Date, including, but not limited to, any right to payment whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, prospective, matured, unmatured, disputed, undisputed, ascertained, unascertained, legal, equitable, secured, or unsecured (and including, for the avoidance of doubt and without limitation the right to payment of any Pre-Repudiation Post-Petition Liabilities);

"**Closing Date**", has the meaning given to such term in Clause 7.2;

"**Companies**", collectively:

(a)      the Company;

(b)      Norwegian Air Shuttle ASA, a company incorporated under the laws of Norway with company number 965920358 MVA, having its headquarters at Oksenøyveien 3, 1336 Lysaker, Norway ("**NAS**");

(c)      Norwegian Air International Limited, a private company limited by shares incorporated under the laws of Ireland with company number 525771, having its registered office at Ground Floor, Imbus House, Dublin Airport, Co Dublin ("**NAI**");

4

(d)     Drammensfjorden Leasing Limited, a private company limited by shares incorporated under the laws of Ireland with company number 533167, having its registered office at Ground Floor, Imbus House, Dublin Airport, Co Dublin ("**DLL**"); and

(e)     Lysakerfjorden Leasing Limited, a private company limited by shares incorporated under the laws of Ireland with company number 585570, having its registered office at Ground Floor, Imbus House, Dublin Airport, Co Dublin ("**LLL**");

"**Company**", Arctic Aviation Assets Designated Activity Company, a designated activity company incorporated under the laws of Ireland with company number 531191, having its registered office at Ground Floor, Imbus House, Dublin Airport, Co Dublin (also referred to as "**AAA**");

"**Connected and Intercompany Creditors**", any Creditor which is or was a member of the Group, including but not limited to those identified in the Creditor Schedule (and each a "**Connected and Intercompany Creditor**");

"**Connected Person**", a person who would be connected with another person for the purposes of Section 220 of the Act if that other person was a director of a company;

"**Constitution**", the Company's constitution as at the date of these Proposals;

"**Contingent Litigation Creditor**", any person with Claims against the Company which are contingent upon the outcome of litigation or any other binding dispute resolution procedure which is in being or has been intimated against the Company, including (but not limited to) those identified in the Creditor Schedule;

"**Conversion Shares**", the shares to be issued in NAS pursuant to the Dividend Claims;

"**Co-Obligor Liability Creditors**", any Creditor where the Company's liabilities or obligations owing to that Creditor are joint, equivalent or related to the liabilities or obligations of NAS owing to that Creditor whether as a primary obligor, guarantor, co-guarantor, co-obligor, counterparty or otherwise (excluding Secured Creditors and Contingent Litigation Creditors) including but not limited to Creditors identified in the Creditor Schedule (and each a "**Co-Obligor Liability Creditor**");

"**Counter-Indemnity Creditor**", any person which may be called upon to make payments to certain Creditors on foot of guarantees given by such persons in respect of the Company's obligations, including (but not limited to) those identified in the Creditor Schedule (and each a "**Counter-Indemnity Creditor**");

"**Creditor Schedule**", Schedule 4;

"**Creditors**", all creditors of the Company, known or unknown, whether or not the liabilities have been acknowledged or recognised, qualified or unqualified, actual or contingent, ascertained or unascertained, including (but not limited to) the creditors and classes of creditors listed in the Creditor Schedule and each a "**Creditor**";

"**Data Protection Laws**", has the meaning given to such term in Clause 14.1;

"**Determination Date**", the date of final agreement, settlement, crystallisation or determination of a Claim;

"**Directors**", the directors of the Company from time to time and each a "**Director**";

"**Dispute Notice**", a notice served by the Company on an Unagreed Creditor, under which the Company disputes the liability claimed to be owed by the Company to such Creditor;

"**Dividend Claims**", the convertible debt instrument to be provided to creditors of NAS under the NAS Proposals;

"**DNB**", DNB Bank ASA;

"**DOT Approval**", has the meaning given to such term in Clause 3.9;

"**Effective Date**", the date fixed by the Irish Court for the purposes of Section 542(3) of the Act or any alteration thereof on application by the Examiner pursuant to Clause 6.3 of these Proposals;

"**Effective Time**", the time on the Effective Date by which the last of the NRBE Registrations occurs;

"**Eligible Debt**", has the meaning given to such term in the definition of Initial Eligible New Capital Perpetual Bonds Creditor;

"**Eligible New Capital Perpetual Bonds Creditor**", an Initial New Capital Perpetual Bonds Creditor or a Subsequent Eligible New Capital Perpetual Bonds Creditor, provided that any such Examinership Companies Creditor, when aggregated with its Affiliates' and/or Connected Persons' Relevant Portions, has a Relevant Portion of more than NOK 2,500,000 (or an equivalent amount in another currency);

"**Eligible Private Placement Creditor**", any Examinership Companies Creditor that is permitted to participate in the Private Placement pursuant to applicable securities law and regulation that may apply to such Examinership Companies Creditor from time to time and that, when aggregated with its Affiliates' and/or Connected Persons' Relevant Portions, has a Relevant Portion not exceeding NOK 2,500,000 (or an equivalent amount in another currency);

"**Equivalent Expert Determination Process**", in respect of any of the Related Companies, the process set out in its Related Proposals which is substantially the same as the Expert Determination Process;

"**EU**", the European Union;

"**euro**" or "**€**", the lawful currency for the time being of Ireland;

"**Examiner**", Kieran Wallace of KPMG, 1 Stokes Place, St Stephen's Green, Dublin 2;

"**Examinership Companies Creditors**", the Creditors and the Related Company Creditors;

"**Existing NAS Shares**", all Shares in NAS in issue immediately prior to the Effective Time;

"**Existing Shares**", all Shares in issue immediately prior to the Effective Time;

"**Experts**", the Aircraft Expert and the General Expert (and each an "**Expert**");

"**Expert Determination End Date**", 60 days after the Irish Confirmation Date;

"**Expert Determination Process**", the expert determination process set out in Clause 11.1 of these Proposals;

"**Explanatory Memorandum**", the explanatory statement explaining the effect of these Proposals, as required by the Act;

"**FSAN**", Financial Supervisory Authority of Norway (*Finanstilsynet*);

"**Fully Diluted Basis**", NAS's issued share capital on a fully diluted basis at the Effective Time: (1) assuming that an amount exactly equal to the Minimum Gross Proceeds Threshold is raised under the Investment; (2) calculated as if all conversion rights under the New Capital Perpetual Bonds and the Dividend Claims were immediately exercised on issue on such date (notwithstanding that conversion on such date will not be permitted under either the New Capital Perpetual Bonds Instrument or the Dividend Claims Terms); (3) assuming all 2020 Convertible Perpetual Bonds (as defined in the NAS Proposals) are voluntarily converted by the holders thereof in accordance with their terms prior to the Effective Time (other than any 2020 Convertible Perpetual Bonds (as defined in the NAS Proposals) beneficially owned by NAS as of the Petition Date); and (4) assuming that there are no changes to NAS's share capital other than as contemplated in these Proposals and the Related Proposals;

"**General Expert**", Damien Murran of RSM Ireland, Trinity House, Charleston Road, Ranelagh, Dublin, D06 C8X4, Ireland;

"**General Payment Date**", the date which falls four weeks from the later of:

(a)      the Expert Determination End Date; and

(b)     the Effective Date;

"**Group**", the group of companies of which the Companies form part;

"**Guaranteed Creditors**", any persons to whom the Company and / or any Related Company has any obligation to make a payment on foot of a guarantee given by the Company and / or any Related Company in respect of the obligations of any of the Related Companies, any other entity within the Group or any other person whatsoever (and each a "**Guaranteed Creditor**");

"**Guaranteed Obligations**", all monies, obligations and liabilities owed, payable or otherwise, including any damages arising from a repudiation of any guarantee pursuant to the Repudiation Orders, due to any Guaranteed Creditor by any of the Related Companies, any other entity within the Group or any other person whatsoever which are subject to a guarantee, indemnity or other form of surety provided by the Company and / or any Related Company;

"**Independent Expert**", Ken Fennell of Deloitte LLP, 29 Earlsfort Terrace, Dublin 2;

"**Initial Eligible New Capital Perpetual Bonds Creditor**", any Examinership Companies Creditor that is permitted to participate in the New Capital Perpetual Bonds Offering pursuant to applicable securities law and regulation that may apply to such Examinership Companies Creditor from time to time, provided that:

(a)     with respect to any application for New Capital Perpetual Bonds (an "**Application**") by such Examinership Companies Creditor:

  (i)     the debt on which basis such Examinership Companies Creditor's Investment Allowance is calculated (the "**Eligible Debt**") was owned by such Examinership Companies Creditor as at the Petition Date; and

  (ii)    such Examinership Companies Creditor has not:

    (A)    entered into or permitted to be entered into any agreement to transfer all or part of its Eligible Debt to any person (or any arrangement of similar effect); and/or

    (B)    made or permitted to be made such Application in contemplation of any such agreement or arrangement;

  it being noted that the above provisos will be set out in the application form or similar documentation provided by NAS pursuant to which any such Application shall be made and will be represented by such Examinership Companies Creditor by its execution of the same; and

(b)     such Examinership Companies Creditor has delivered by email to NAS at nasperpetual@bahr.no, a non-binding expression of interest in participating in the

New Capital Perpetual Bond Offering on or before the business day following the Norwegian Confirmation Date.

"**Intercompany Payable**", has the meaning given to such term in Clause 10.5.3(b);

"**Investment**" has the meaning given to that term in Clause 7.1;

"**Investment Allowance**", with respect to a Creditor, 50% of such Creditor's Relevant Portion;

"**Investment Proceeds**", the total proceeds raised by NAS in connection with the Investment;

"**Ireland**", Ireland excluding Northern Ireland;

"**Irish Confirmation Date**", the date on which the Irish High Court makes an order confirming these Proposals and the Related Proposals pursuant to Section 541 of the Act;

"**Irish Confirmation Order**", the Irish Court's order(s) confirming these Proposals and the Related Proposals pursuant to Section 541 of the Act;

"**Irish Court**", the Irish High Court, or where any decision of the Irish High Court is appealed, the Court of Appeal of Ireland and/or Supreme Court of Ireland;

"**Irish High Court**", the High Court of Ireland;

"**KYC**", 'Know Your Customer' anti-money laundering requirements under Norwegian law;

"**Locked Accounts**", has the meaning given to such term in Clause 6.1.5;

"**Locked Bonds Proceeds Account**", has the meaning given to such term in Clause 6.1.5;

"**Locked Share Proceeds Account**", has the meaning given to such term in Clause 6.1.4;

"**Long Stop Date**", 30 June 2021;

"**Member**", the holder of the Existing Shares;

"**Minimum Gross Proceeds Threshold**", with respect to the Investment, gross proceeds (prior to the deduction of any costs or fees associated with the capital raising process) of NOK 4,500,000,000 in aggregate;

"**NAS Board**", the board of directors of NAS from time to time;

"**NAS Proposals**", the Related Proposals in respect of NAS;

"**NAS Shares**", the ordinary shares of NOK 0.10 in NAS (and each a "**NAS Share**");

"**Net Agreed Debt**", in respect of any Creditor, the amount of its Agreed Debt less:

9

(a)      the aggregate amount of Retained Claims Bonds (if any) issued or to be issued to such Creditor, provided that where a Creditor has more than one Agreed Debt, the aggregate amount of Retained Claims Bonds issued or to be issued to such Creditor shall be apportioned equally across each of its Agreed Debts; and

(b)      in the case of any Secured Creditor, that Secured Creditor's relevant Secured Amount;

"**New Capital Perpetual Bonds**", the bonds contemplated under the New Capital Perpetual Bond Instrument;

"**New Capital Perpetual Bond Instrument**", the instrument constituting the New Capital Perpetual Bonds, which shall reflect the terms of the near final term sheet set forth in Schedule 5, subject to such amendments as NAS may effect on the basis of discussions with potential investors in the New Capital Perpetual Bonds save that they shall not adversely impact the value or operation of the Dividend Claims;

"**New Capital Perpetual Bonds Offering**", the offering to Eligible New Capital Perpetual Bonds Creditors to subscribe for New Capital Perpetual Bonds as more particularly described in Clause 7.16 to 7.22;

"**New Capital Perpetual Bonds Subscription Period**", has the meaning given to such term in Clause 7.17;

"**NOK**", the lawful currency for the time being of Norway;

"**Norway**", the Kingdom of Norway;

"**Norwegian Administrator**", Håvard Wiker of Ro Sommernes advokatfirma DA, Fridtjof Nansens pl. 7, 0160 Oslo, Norway;

"**Norwegian Confirmation Order**", the Norwegian Court order sanctioning the Norwegian Restructuring Plan;

"**Norwegian Court**", the Oslo City Registrar (*nw. Oslo Byfogdembete*) or, where any decision of the Oslo City Registrar is appealed, the Court of Appeal of Norway and/or Supreme Court of Norway;

"**Norwegian Creditors Committee**", collectively:

(a)      Rolf Tjugum (attorney at law);

(b)      Øyvind Dehli (attorney at law);

(c)      Jørgen Andersen (attorney at law); and

(d)      Stig Patey (employee representative);

10

"**Norwegian's Proposal**", has the meaning given to such term in Clause 3.31;

"**Norwegian Public Limited Liability Companies Act**", *lov om aksjeselskaper (aksjeloven) 1997*;

"**Norwegian Restructuring Act**", *Rekonstruksjonsloven 2020*;

"**Norwegian Restructuring Committee**", collectively, the Norwegian Administrator, the Norwegian Creditors Committee and the auditor appointed by the Norwegian Court, Helge Østvold of BHL DA, Elias Smiths vei 24, 1337 Sandvika, Norway;

"**Norwegian Restructuring Plan**", the restructuring plan proposed under the Norwegian Restructuring Process,

"**Norwegian Restructuring Process**", the process in respect of NAS referenced in Clause 3.22 to 3.28;

"**Norwegian Restructuring Report**", the report prepared by the Norwegian Restructuring Committee and including, among other things, its recommendation to Creditors in respect of voting on the Norwegian Restructuring Plan;

"**Norwegian State Aid Package**", the Norwegian government's guarantee scheme for the aviation industry referenced in Clause 3.14;

"**NRBE**", Norwegian Register of Business Enterprises (*Nw. Foretaksregisteret*);

"**NRBE Registrations**", has the meaning given to such term in Clause 6.1.5;

"**Oslo Stock Exchange**", the Oslo Børs, a stock exchange operated by Oslo Børs ASA;

"**Perpetual Bond Issue Registration**", has the meaning given to such term in Clause 6.1.5;

"**Petition Date**", the date of the presentation of the petition, being 18 November 2020;

"**Pre-Repudiation Post-Petition Liabilities**", any liability of any kind of the Company which has arisen under any contract which has been terminated or will be terminated upon these Proposals taking effect either:

(a)     pursuant to a formal agreement with the Company entered into either on or before the date of these Proposals or before the Irish Confirmation Date;

(b)     under the Repudiation Orders; or

(c)     otherwise,

during the period commencing on and including the Petition Date and ending on and including the date of termination of such contract;

"**Private Placement**", the private placing of new NAS Shares and the listing of such NAS Shares on the Oslo Stock Exchange as more particularly described in Clause 7.11 to 7.15;

"**Private Placement Subscription Period**", has the meaning given to such term in Clause 7.12;

"**Pro Rata Proportion**", has the meaning given to such term in Clause 7.18;

"**Proposals**", these proposals and any modifications in respect of these proposals made pursuant to the Act;

"**Prospectus**", has the meaning given to such term in Clause 7.8;

"**Protection Period**", the period during which the Company is under the protection of the Irish Court in accordance with the Act;

"**Record Date**", has the meaning given to such term in Clause 7.7;

"**Related Companies**", the Companies, other than AAA (and each a "**Related Company**");

"**Related Company Creditors**", the creditors of any of the Related Companies, known or unknown, whether or not the liabilities have been acknowledged or recognised, qualified or unqualified, actual or contingent, ascertained or unascertained, including (but not limited to) the creditors and classes of creditors listed in the creditor schedule to each of the Related Proposals (and each a "**Related Company Creditor**");

"**Related Proposals**", in respect of any of the Related Companies, the Examiner's proposals for a scheme of arrangement in relation to such Related Company to be issued on or around the date of these Proposals;

"**Relevant Portion**", with respect to any Examinership Companies Creditor, such Examinership Companies Creditor's Agreed Debt (as such term is defined in these Proposals or the relevant Related Proposals (as applicable) and without double counting) or in the event that such Examinership Companies Creditor's Claim is an Unagreed Debt the amount as identified in the Creditor Schedule to these Proposals or to any of the relevant Related Proposals (as applicable and without double counting) less:

(a)    in the case of any Secured Examinership Companies Creditor, its relevant Secured Amount (as such term is defined in these Proposals or the relevant Related Proposals (as applicable)); and

(b)      in the case of any such debt against the Company or a Related Company that is subordinated to the unsecured liabilities of such Company or Related Company, the amount of such subordinated debt;

"**Report**", the report of the Independent Expert;

"**Repudiation Orders**", the order(s) of the Irish High Court made under Section 537 of the Act pursuant to any of: (i) the Notice of Motion dated 22 January 2021; (ii) the Notice of Motion dated 29 January 2021; (iii) the Notice of Motion dated 1 February 2021; and (iv) the Notice of Motion dated 9 February 2021;

"**Retained Claims Bonds Amount**":

(a)  with respect to any Eligible New Capital Perpetual Bonds Creditor that participates in the New Capital Perpetual Bonds Offering, 200% of the aggregate nominal value of New Capital Perpetual Bonds subscribed for by such Eligible New Capital Perpetual Bonds Creditor; and

(b)  with respect to any Eligible Private Placement Creditor that participates in the Private Placement, 200% of the total amount paid by such Eligible Private Placement Creditor in respect of its subscription for NAS Shares under the Private Placement;

"**Retained Claims Bonds**", the retained claims bonds contemplated under the Retained Claims Bond Instrument, which will be issued to each Creditor which participates in:

(a)  the New Capital Perpetual Bonds Offering; and/or

(b)  the Private Placement;

"**Retained Claims Bonds Instrument**", the instrument constituting the Retained Claims Bonds, which shall reflect the terms of the near final term sheet set forth in Schedule 5, subject to such amendments as NAS may effect on the basis of discussions with potential recipients of the Retained Claims Bonds save that they shall not adversely impact the value or operation of the Dividend Claims and/or Retained Claims Bonds;

"**Rights Offering**", the rights offering more particularly described in Clause 7.7 to 7.10;

"**Rights Offering Subscription Period**", has the meaning given to such term in Clause 7.8;

"**Secured Amount**", the value of the Secured Assets, being:

(a)      where any Creditor enforces its security over the Secured Assets on and from the Effective Date, the amount realised by that Creditor as a result of the enforcement of such security; or

(b)       in any other case, the Secured Asset Valuation,

provided always that where the Company and the relevant Creditor have agreed an amount, the value shall be the amount agreed in writing;

"**Secured Assets**" with respect to any Creditor, the relevant asset(s) over which any of the Companies or any other company within the Group has granted security to such Creditor;

"**Secured Asset Valuation**", the value of the relevant Secured Assets as determined by the Norwegian Restructuring Committee, save that where the relevant Creditor disputes the value determined by the Norwegian Restructuring Committee, the value shall be determined by the Norwegian Court;

"**Secured Creditors**", any Creditors to whom the Company has provided security whether on foot of a guarantee or otherwise as identified in the Creditor Schedule (and each a "**Secured Creditor**");

"**Secured Examinership Companies Creditors**", any Examinership Companies Creditors which are treated as being within a class of secured creditors under these Proposals or any of the Related Proposals (and each a "**Secured Examinership Companies Creditor**");

"**Shares**", the ordinary shares of USD $1.00 each in the capital of the Company;

"**Subscription Price**", the price determined for the subscription of NAS Shares in the Private Placement and Rights Offering and which shall be determined by NAS and its advisers based on, *inter alia*, the book-building process in respect thereof;

"**Subscription Rights**", has the meaning given to such term in Clause 7.9 (and each a "**Subscription Right**");

"**Subsequent Eligible New Capital Perpetual Bonds Creditor**", any Examinership Companies Creditor that is permitted to participate in the New Capital Perpetual Bonds Offering pursuant to applicable securities law and regulation that may apply to such Examinership Companies Creditor from time to time;

"**Terminated Contract Creditors**", Creditors identified in the Creditor Schedule with Claims arising from the termination of their contracts with the Company either:

(a)       pursuant to a formal agreement with the Company entered into either on or before the date of these Proposals or before the Irish Confirmation Date;

(b)       under the Repudiation Orders; or

(c)       otherwise;

14

(and each a "**Terminated Contract Creditor**");

"**TLL**", Torskefjorden Leasing Limited (In Liquidation), a private company limited by shares incorporated under the laws of Ireland with company number 560938, having its registered office at Ground Floor, Imbus House, Dublin Airport, Co Dublin;

"**Trading Period**", has the meaning given to such term in Clause 7.9;

"**Unagreed Creditor**", any Creditor:

(a)     which is not an Agreed Creditor;

(b)     whose Claim is not included in the Creditor Schedule; or

(c)     which disputes the amount of its Claim, whether or not designated as an Agreed Creditor by the Company, as it appears in the Creditor Schedule;

"**Unagreed Debt**", any Claim against the Company which is not an Agreed Debt;

"**Unsecured Creditors**", the unsecured creditors including (but not limited to) those persons identified in the Creditor Schedule (and each an "**Unsecured Creditor**");

"**US Dollar**" or "**$**", the lawful currency for the time being of the United States of America; and

"**VPS**", the Norwegian Central Securities Depository, being Euronext VPS, officially Verdipapirsentralen ASA.

2.     **Interpretation**

In these Proposals, unless the context otherwise requires or these Proposals expressly provide otherwise:

2.1     references to sections, Clauses, sub-paragraphs and Schedules are references to the sections, Clauses, sub-paragraphs and Schedules respectively of these Proposals;

2.2     references to a "person" include an individual, firm, partnership, company, corporation, unincorporated body of persons or any state or state agency;

2.3     references to a statute or a statutory provision or to a statutory instrument or provision of a statutory instrument include the same as subsequently modified, amended or re-enacted from time to time and all statutory instruments, regulations and orders from time to time made hereunder or deriving validity therefrom;

2.4     the singular includes the plural and vice versa and words importing one gender shall include all genders;

2.5    headings to sections, Clauses, sub-paragraphs and Schedules are for ease of reference only and shall not affect the interpretation of these Proposals;

2.6    words such as hereunder, hereto, hereof and herein and other words commencing with "here" shall, unless the context clearly indicates to the contrary, refer to the whole of these Proposals and not to any particular paragraph hereof;

2.7    in construing these Proposals, general words introduced by the word "other" shall not be given a restrictive meaning by reason of the fact that they are preceded by words indicating a particular class of acts, matters or things, and general words shall not be given a restrictive meaning by reason of the fact that they are followed by particular examples intended to be embraced by the general words, and any references to the word "include" or "including" is to be construed without limitation;

2.8    any reference to "these Proposals" or any other document, or to any specified provision of these Proposals or any other document, is to these Proposals, that document or that provision as in force for the time being and as amended from time to time in accordance with the terms of these Proposals or that document; and

2.9    any reference to a person includes his successors, personal representatives and permitted assigns.

**3.    Background and Recitals**

***A.  Overview in relation to the business of the Group***

   ***History of the Group***

3.1    The Group was founded in 1993 and was at the date of the Petition Date one of the largest low-cost airline carriers in Europe and among the ten largest in the world. In addition to being a global airline with a route network across Europe into North Africa, the Middle East, North America, South America, and South-East Asia, the Group is one of the leaders in the European short-haul point-to-point market and has a particularly strong market position in Scandinavia.

3.2    By 2019, the Group employed more than 9,388 staff at 20 operational bases in 11 countries across four continents. However, as outlined in further detail below, 2019 was a difficult year for the Group as it was faced with a number of significant challenges. In response to these challenges, the Group devised and implemented a number of cost reduction measures which included the closure of several crew bases. A re-evaluation of the Group's entire network was also undertaken as part of a strategy that was intended to return the Group to profitability.

3.3    In March 2020, the Group was severely impacted by the coronavirus pandemic. In early 2020, the Group's total employee headcount had been significantly reduced as part of the Group's response to the pandemic's effect on passenger demand.

16

### *The Companies in Examinership*

#### *(a) AAA*

3.4    AAA is the Irish holding company for NAS's Irish aircraft management, trading, leasing and financing platform, through which NAS finances and, at the Petition Date, continued to lease its entire fleet of aircraft.

3.5    AAA was incorporated to act as an asset management company for the Group and to centralise aircraft leases and financing arrangements in a dedicated corporate structure. It manages the Group's new aircraft orders, sources aircraft financing, manages aircraft leased from external lessors and markets and trades aircraft to third parties.

3.6    Further particulars of the Company are set out in Schedule 1.

#### *(b) NAS*

3.7    NAS is the holding company for the Group and the ultimate parent company of the Company. The Group management and corporate functions (which include an internal treasury function which NAS performs for the entire Group) are carried out within NAS. In addition, NAS provides other Group airlines, including the Company, and other business areas with shared services, including ticket sales. All income generated from ticket sales by the Group is collected and held by NAS which operates a cash pooling arrangement with the rest of the Group.

3.8    NAS (as a holder of an AOC) also leases its fleet of aircraft from certain of the Related Companies and other companies in the Group.

#### *(c) NAI*

3.9    NAI was established to serve intercontinental routes. However, due to delays obtaining United States Department of Transportation approval ("**DOT Approval**"), NAI started to operate routes within Europe, becoming the Group's first EU-licensed airline. After DOT Approval was obtained, NAI operated intercontinental routes as originally planned. At the end of 2019, NAI operated out of bases in Denmark, Finland, Spain, Ireland and the United Kingdom.

#### *(d) DLL*

3.10    DLL was incorporated to centralise all third-party Boeing 737-800 aircraft leased into the Group. DLL does not own any aircraft but was the head lessee in respect of 20 Boeing 737-800 aircraft on an operating lease basis as at the Petition Date. As at the Petition Date, each of these aircraft was in turn sub-leased by DLL to, and operated by, airlines within the Group.

### (e) LLL

3.11    LLL was also incorporated for the purpose of centralising certain Boeing 737-800 and Boeing 737-8 aircraft leases held by the Group. LLL does not own any aircraft but was the head lessee in respect of 24 Boeing 737-800 aircraft and four Boeing 737-8 Max aircraft on an operating lease basis as the Petition Date. As at the Petition Date, each of these aircraft was in turn sub-leased by LLL to, and operated by, airlines within the Group.

### Historical trading performance of the Group

3.12    The trading performance of NAS and the wider Group was under pressure before the onset of the coronavirus pandemic. The Group suffered significant losses during each of the 2017, 2018 and 2019 financial years. This was, in part, a result of fleet disruptions caused by the grounding of Boeing 737 MAX aircraft and continued engine issues on Boeing 787 Dreamliners which impacted negatively on the Group's operating profit in 2019.

3.13    However, the pandemic significantly and adversely affected the Group's operating results for 2020. Traffic figures were severely affected, with travel restrictions and decreasing demand forcing the Group to significantly reduce operations as outlined further below.

### 2020 Restructuring

3.14    With the sudden collapse of the Group's revenue due to the pandemic, the Group required additional external working capital in order to stave off a potential bankruptcy (the "**2020 Restructuring**"). It obtained this working capital through urgent liquidity that was provided by the Norwegian government to NAS. It was necessary, however, for the Group to restructure its debt before it would qualify for the Norwegian government's guarantee scheme for the aviation industry (the "**Norwegian State Aid Package**").

3.15    On 27 April 2020, the Group outlined its plan to qualify for the Norwegian State Aid Package (the "**2020 Restructuring Plan**"). The 2020 Restructuring Plan included the conversion of a certain proportion of the Group's debt and leasing commitments to equity, the mark to market of certain aircraft lease rentals and a 'power-by-the-hour' arrangement. The Group reduced its active fleet to seven Boeing 737-800 aircraft operating solely on domestic routes within Norway, and postponed operations outside Norway (including to the rest of Europe and intercontinental long-haul flights) until the pandemic eased.

3.16    On 20 May 2020, NAS announced that it had, as part of the 2020 Restructuring, successfully converted approximately NOK 12.7 billion (approximately €1.2 billion) of debt to equity (through agreement with certain of its creditors) and raised approximately NOK 400 million (approximately €37 million) in new cash and equity through a public offering. With the 2020 Restructuring completed, the Group fulfilled the conditions to enable it to access the Norwegian State Aid Package. The Norwegian State Aid Package consisted of a state loan guarantee package of NOK 3 billion (approximately €278 million) whereby loans would be

supported by guarantees issued by *Garantinstituttet for eksportkreditt*, the export credit agency of Norway.

### *Current insolvency of the Group*

3.17    The 2020 Restructuring generally, the power-by-the-hour agreements concluded with certain lessors and the access to the Norwegian State Aid Package provided the Group with sufficient liquidity to enable it to continue to trade until the end of the first quarter of 2021.

3.18    However, on 9 November 2020, the Norwegian government announced that it would not, at that point in time, be providing any further financial support to the Group. Following that announcement, the Group's management took the decision to furlough additional employees and reduce its already skeletal operations.

3.19    As it became clearer that the travel restrictions introduced in response to the pandemic would continue well into 2021, the Companies forecasted that without a further restructuring they would no longer have sufficient working capital after the first quarter of 2021. This resulted in the Companies petitioning for examinership.

## B.  *Appointment of the Examiner*

3.20    By Order of the Irish High Court dated 18 November 2020, the Examiner was appointed examiner of the Companies and TLL on an interim basis.

3.21    By further Order of the Irish High Court dated 7 December 2020, the Examiner was appointed as examiner of the Companies and TLL.

## C.  *Norwegian Restructuring Process*

3.22    The NAS Board applied to the Norwegian Court to have NAS placed into a Norwegian Restructuring Process, entitled *Rekonstruksjonsforhandling* under the Norwegian Restructuring Act. The application was approved on 8 December 2020 by the Norwegian Court and the Norwegian Restructuring Process has continued in parallel with the examinership process since that date, although the examinership process is the primary restructuring process.

3.23    The Norwegian Restructuring Process had the effect of putting in place a stay in relation to creditor actions against NAS as a matter of Norwegian law pending the presentation and potential approval of a Norwegian Restructuring Plan implementing restructuring proposals for NAS. The Norwegian Restructuring Process is a court-monitored process whose objective is to seek a restructuring of a company's debt within the framework of the relevant Norwegian law which is facilitated by the Norwegian Court's appointment of: (1) an administrator (in this case the Norwegian Administrator); and (2) a creditors' committee (in this case the Norwegian

Creditors Committee) consisting of four members that represent the different groups of creditors.

3.24    Under the Norwegian Restructuring Process, the NAS Board retained control and authority over NAS's affairs under the supervision of the Norwegian Administrator, alongside the Examiner. The Norwegian Administrator worked as part of the Norwegian Restructuring Committee, and separately with the Examiner, to develop the Norwegian Restructuring Plan which will adopt and implement the terms and substance of the NAS Proposals in full under Norwegian law.

3.25    The NAS Proposals, and consequently the Norwegian Restructuring Plan, reflect the key principles and requirements of Irish examinership law and the Norwegian Restructuring Process. The NAS Proposals are governed by Irish law and in the event of any inconsistencies between the NAS Proposals and the Norwegian Restructuring Plan, which will summarise and implement the NAS Proposals, the NAS Proposals shall take precedence.

3.26    Should the Irish High Court confirm the NAS Proposals, the Norwegian Restructuring Plan will be issued by the Norwegian Administrator immediately following the Irish Confirmation Date which will commence a two-week voting period on the Norwegian Restructuring Plan. In order to ensure the implementation of the NAS Proposals through the Norwegian Restructuring Plan, the creditors of NAS will authorise the Examiner pursuant to the NAS Proposals to vote in favour of the Norwegian Restructuring Plan on behalf of each NAS creditor.

3.27    Pursuant to the Norwegian Restructuring Process, the Norwegian Restructuring Committee is required to issue the Norwegian Restructuring Report. The Norwegian Restructuring Report includes the Norwegian Restructuring Committee's recommendation in respect of voting on the restructuring provided for in the NAS Proposals and the Norwegian Restructuring Plan.

3.28    The implementation of the NAS Proposals and consequently these Proposals are conditional on, among other things, the approval of the Norwegian Restructuring Plan by the Norwegian Court. The Norwegian Restructuring Plan shall, pursuant to its terms, take immediate effect as and from the Effective Time.

### D.  Liquidation of TLL

3.29    Following a decision of the NAS Board to cease offering long-haul flights, the Examiner concluded that TLL no longer had a reasonable prospect of survival as a going concern. By Order of the Irish High Court dated 15 January 2021, the Examiner was discharged as examiner of TLL and Kieran Wallace and Andrew O'Leary were appointed to act as joint liquidators of TLL.

### E.  Norwegian's Proposal

3.30    The NAS Board proposed a high-level restructuring plan to its shareholders on 3 December 2020 setting out its aim to adjust the size of operations to a level of proven profitability. The plan proposed, *inter alia*, that the shareholders would give NAS's management wide authorisations for the implementation of the restructuring plan and expressed an intention that shareholders would retain a meaningful minority stake in the Company. The extraordinary general meeting of NAS held on 17 December 2020 approved a number of resolutions that provided the NAS Board with broad authorities to take steps that may ultimately facilitate the restructuring of NAS and the wider Group, including the Companies, in conjunction with and/or as part of the examinerships and the Norwegian Restructuring Process. This included the ability, but not the obligation, of the NAS Board to pursue a rights offering to raise new capital of up to NOK 4 billion, seek the conversion of certain liabilities of NAS and the wider Group, including the Companies into NAS Shares, a reverse split of the NAS Shares in the ratio 100:1, a subsequent reduction of nominal value of each NAS Share from NOK 10 to NOK 0.01 and general authorisations to the NAS Board to issue NAS Shares and convertible loans.

3.31    Subsequently, the NAS Board approved a business plan and proposed term sheet as a potential basis for the restructuring of NAS (and consequently the Company and the other Related Companies) through the Irish examinership process and the Norwegian Restructuring Process ("**Norwegian's Proposal**") as announced by stock exchange announcement made to the Oslo Stock Exchange on 14 January 2021.

3.32    The proposed term sheet contained details of NAS's proposals in relation to the Rights Offering, the Private Placement, the New Capital Perpetual Bonds Offering and the possible terms of the Dividend Claims (then referred to as old capital hybrid loans) (each as explained further in these Proposals and in the NAS Proposals). In addition, NAS stated in the stock exchange announcement referred to in Clause 3.31 above that, among other things, it intended to:

    3.32.1    focus on its core Nordics business, operating a European short-haul network with narrow body aircraft (the Group expects to initially hold up to 50 Boeing 737 aircraft (owned and leased));

    3.32.2    cease operating the Group's long-haul network; and

    3.32.3    subject to the restructuring contemplated by the NAS Proposals (and consequently these Proposals and the other Related Proposals) being successful:

        (a)    reduce total debt to around NOK 20,000,000,000 and emerge from the restructuring with a free cash position of approximately NOK 4,000,000,000 to 5,000,000,000; and

(b)      achieve positive EBITDA following the restructuring in 2021 based on conservative assumptions as to the length of the pandemic and as to revenue, costs and load factors.

3.33    Norwegian's Proposal also envisages cost savings where possible, implemented by procuring the most competitive terms available from suppliers and, in some instances, replacing suppliers with in-house resources.

3.34    The Examiner considered and evaluated Norwegian's Proposal as a potential basis for the restructuring of NAS (and consequently the Company and the other Related Companies) and ultimately determined that Norwegian's Proposal was an appropriate basis upon which to prepare these Proposals in conjunction with the Company and the Norwegian Administrator.

### F.  Repudiation of Contracts and Termination of Guarantees

3.35    NAS's decision to pivot away from its long-haul operations necessitated a significant fleet, route and headcount reduction across the Group. In this regard, the Company and the Related Companies obtained the Repudiation Orders from the Irish High Court and consensually terminated certain contracts which were no longer required. For the most part, such contracts related to:

3.35.1    aircraft and aircraft engine leases which are surplus to the Group's future requirements in light of its scaled back operations;

3.35.2    ground handling and fuel line services provided to the Company and NAS at a number of US international airports; and

3.35.3    supply or service contracts where the Group will require, in order, to achieve the required economies, to enter into less expensive contracts or substitute third party contract counterparties with in-house resources.

3.36    The Repudiation Orders provide for the repudiation of the relevant contracts as and from the Effective Date of these Proposals and the Related Proposals as relevant (save for the Repudiation Order made in respect of the agreements with Airbus SAS which Repudiation Order provides for the repudiation of the said agreements with Airbus SAS as and from the date of the Repudiation Order).

3.37    The Repudiation Orders also give effect to the termination of any continuing non-monetary obligations under guarantees granted by NAS and the Related Companies (where relevant) in respect of the obligations of the Related Companies and other Group companies.

3.38    Save where the relevant Claims have been agreed between the relevant Companies and the respective Creditor under these Proposals or the Related Proposals (as applicable) or where the Irish High Court has made an Order pursuant to Section 537(3) of the Act determining the

amount of the relevant Claims, any Creditors' Claims arising from the repudiation or consensual termination of their contracts shall be determined under the Expert Determination Process as further described below.

**4.      The Report and Formulation of Proposals**

4.1      In the Report which accompanied the petition, the Independent Expert expressed the opinion that the Companies and TLL had a reasonable prospect of survival as a going concern, provided that, among other things, the creditors accepted and the Irish Court approved schemes of arrangement in respect of the Companies.

4.2      Having carefully analysed and evaluated Norwegian's Proposal and the projections underlying Norwegian's Proposal, the Examiner has formulated these Proposals in accordance with Section 534 of the Act.

4.3      Save for the liquidation of TLL as referred to in Clause 3.29 above (and which factors only apply to TLL), nothing has arisen since the appointment of the Examiner to cause the Examiner to disagree with the opinion of the Independent Expert set out above.

**5.      NAS Undertaking**

5.1      NAS has agreed to provide funding to the Company to fund cash dividends under these Proposals should it become effective and otherwise to submit and comply with the terms of these Proposals, including but not limited to, all obligations in relation to the issuance of the New Capital Perpetual Bonds, the Rights Offering, the Private Placement and the Retained Claims Bonds.

5.2      Furthermore NAS undertakes to the Irish Court to be bound by and to execute and do and procure to be executed and done all such documents, acts and things as may be necessary or desirable to be executed or done by it for the purpose of giving effect to these Proposals and NAS will appear by solicitor and/or counsel at the confirmation hearing in respect of these Proposals under Section 541 of the Act, to formally provide this undertaking to the Irish Court.

**6.      Effective Date and Effective Time**

6.1      Save for the provisions of Clause 11 (*Determining the Claims of Unagreed Creditors*), these Proposals will take effect as and from the Effective Time provided that all of the following conditions shall have been satisfied on or before the Effective Date:

6.1.1      these Proposals and the Related Proposals have been confirmed by the Irish Court;

6.1.2      the Norwegian Restructuring Plan, which shall implement the NAS Proposals without modification save for any modification to the NAS Proposals made in accordance

with the Act, has been sanctioned by the Norwegian Court in accordance with applicable law;

6.1.3    NAS has raised Investment Proceeds of no less than the Minimum Gross Proceeds Threshold in connection with the Rights Offering, the Private Placement and the New Capital Perpetual Bonds Offering;

6.1.4    with respect to the Rights Offering and the Private Placement, NAS has received the corresponding portion of the Investment Proceeds into a separate bank account in DNB specified for share contributions (*Nw. emisjonskonto*) (the "**Locked Share Proceeds Account**"), which shall, in accordance with the Norwegian Public Limited Liability Companies Act section 10-13, be blocked for NAS until (i) the share capital increase pertaining to the Rights Offering and the Private Placement has been registered with the NRBE (the "**Capital Increase Registration**") and (ii) the Examiner has given the instruction to DNB under Clause 6.1.7 below;

6.1.5    with respect to the New Capital Perpetual Bonds Offering, NAS has received the corresponding portion of the Investment Proceeds into a separate bank account in DNB pledged in favour of the Bond Trustee (as defined in the New Capital Perpetual Bond Instrument) on behalf of the subscribers for New Capital Perpetual Bonds (the "**Locked Bonds Proceeds Account**") (together with the Locked Share Proceeds Account, the "**Locked Accounts**") which shall, in accordance with the Norwegian Public Limited Liability Companies Act section 11-6(3), be blocked for NAS until (i) the issuance of convertible loans pertaining to the New Capital Perpetual Bonds Offering has been registered with the NRBE (the "**Perpetual Bond Issue Registration**") (together with the Capital Increase Registration, the "**NRBE Registrations**") and (ii) the Examiner has given the instruction to DNB under Clause 6.1.7 below;

6.1.6    the Auditor has confirmed in writing to the Examiner that the Investment Proceeds (which, for the avoidance of doubt, shall comprise no less than the Minimum Gross Proceeds Threshold) have been received in the Locked Accounts; and

6.1.7    subject to and conditional upon the satisfaction of the conditions set forth in Clause 6.1.1 to 6.1.6 (inclusive), the Examiner has confirmed to DNB in writing that the only remaining condition to the occurrence of the Effective Time under the NAS Proposals is the occurrence of the NRBE Registrations and has instructed that the Investment Proceeds (which, for the avoidance of doubt, shall comprise no less than the Minimum Gross Proceeds Threshold) shall be released to NAS at the Effective Time.

6.2    NAS shall take all actions required to be taken by it to procure that the NRBE Registrations occur (and consequently the Effective Time occurs) on the Effective Date, which registrations

shall, by operation of Norwegian law, result in NAS becoming entitled to the Investment Proceeds.

6.3    The Examiner shall be entitled at his absolute discretion to apply to the Irish Court (on one or more than one occasion) at any time and on such notice (if any) as may be required by the Irish Court to change or amend the Effective Date that has been fixed by the Irish Court, provided that the Effective Date shall not be changed or amended to a date after the Long Stop Date

6.4    In the event that the Effective Time does not occur on or before the Long Stop Date the NAS Proposals and consequently these Proposals (and the other Related Proposals) shall terminate (and shall be construed as if they had never become effective and the rights and obligations of the Member and Creditors shall not be affected by these Proposals and shall continue in full force and effect) and the terms of, and the rights and obligations of any person under or pursuant to, these Proposals shall lapse and all the compromises and arrangements provided by these Proposals and any releases granted pursuant to these Proposals shall be of no effect.

6.5    NAS shall, as soon as reasonably practicable, announce the occurrence of the Effective Time by stock exchange announcement to the Oslo Stock Exchange and in any event no later than one Business Day after the Effective Date.

**7.    The Investment**

7.1    The investment in NAS shall comprise the proceeds of the Rights Offering, the Private Placement and the New Capital Perpetual Bonds Offering (together, the "**Investment**"). Pursuant to Clause 6, the NAS Proposals (and consequently these Proposals and the other Related Proposals) are conditional upon NAS raising Investment Proceeds of no less than the Minimum Gross Proceeds Threshold in connection with the Investment. In the event that:

7.1.1    Investment Proceeds of an amount exactly equal to the Minimum Gross Proceeds Threshold are raised, the investors in the Investment will be entitled to hold approximately 70% in aggregate of NAS's issued share capital on a Fully Diluted Basis;

7.1.2    more Investment Proceeds than the Minimum Gross Proceeds Threshold are raised, the investors' aggregate entitlement will represent a larger proportion of NAS's issued share capital and the Existing NAS Shares and the Conversion Shares shall correspondingly be diluted below 4.6% and 25.4% respectively, as set out in more detail below; or

7.1.3    the Investment Proceeds are less than the Minimum Gross Proceeds Threshold, the NAS Proposals (and consequently these Proposals and the other Related Proposals) shall not become effective and the proceeds shall be returned to

investors in accordance with the terms of the individual Norwegian law subscription processes governing the Investment.

7.2     The completion of the Rights Offering, the Private Placement and the New Capital Perpetual Bonds Offering are conditional upon the occurrence of the Effective Time. Each element of the Investment will be launched on a date to be determined by the NAS Board (and, in the case of the Rights Offering and the Private Placement, no earlier than the Business Day following the date on which the Prospectus has been approved by the FSAN as further described below) and will close (the "**Closing Date**") no earlier than the latest of:

7.2.1     the expiration of the time for any appeal of the Irish Confirmation Order and the Norwegian Confirmation Order;

7.2.2     the final determination of any appeal of the Irish Confirmation Order and/or the Norwegian Confirmation Order, and

7.2.3     in the case of the Rights Offering, the date that falls two weeks after the opening of the Rights Offering Subscription Period,

provided that each relevant Closing Date, and consequently the Effective Time, shall occur by no later than the Long Stop Date in accordance with Clause 6.

7.3     The Investment Proceeds will be used to provide working capital for the Company, the Related Companies and the wider Group for general corporate purposes including to facilitate the ongoing survival of the Companies as going concerns.

7.4     The cash dividends to be made under these Proposals and/or the Related Proposals shall be funded from cash to be made available by NAS to the Company at the Effective Time.

7.5     Under the New Capital Perpetual Bonds Instrument and the Retained Claims Bonds Instrument, NAS will be subject to restrictions on, *inter alia*, the declaration or making of dividend payments until NAS has complied with certain of its repayment obligations thereunder.

7.6     Further information regarding each of the Rights Offering, the Private Placement and the New Capital Perpetual Bonds Offering (including the Record Date, Subscription Period and Trading Period prior to the occurrence or commencement of the same) will be published by NAS in accordance with the rules of the Oslo Stock Exchange. Participation in each element of the Investment will be subject to certain terms and conditions, including the provision of satisfactory KYC information to NAS.

**A.  Rights Offering**

7.7     Under the Rights Offering, each holder of Existing NAS Shares registered as such in the VPS on a date to be determined by the NAS Board (the "**Record Date**") will, subject to applicable law, be granted preferential rights to subscribe for and be allocated new NAS Shares at the Subscription Price in proportion to his/its shareholding in NAS. The Rights Offering will be limited to raising total gross proceeds for NAS in the amount of NOK 400,000,000.

7.8     NAS will prepare a prospectus for the Rights Offering and the Private Placement (the "**Prospectus**"), to be approved by the FSAN. The subscription period in respect of the Rights Offering will commence on a date to be determined by the NAS Board, being no earlier than the Business Day after the FSAN has approved the Prospectus, and expire no earlier than the Closing Date (the "**Rights Offering Subscription Period**").

7.9     Each holder of NAS Shares as of the Record Date will be granted tradeable subscription rights (the "**Subscription Rights**") for each NAS Share registered as held by such holder as of the Record Date. The aggregate amount of Subscription Rights received by such holders shall be an amount that ensures NOK 400,000,000 in aggregate gross proceeds at the Subscription Price. The Subscription Rights will be listed and tradeable on the Oslo Stock Exchange from the commencement of the Rights Offering Subscription Period until no earlier than 4.30 p.m. (Oslo time) two trading days prior to the end of the Rights Offering Subscription Period (the "**Trading Period**"). Over-subscription and subscription without Subscription Rights will be permitted. Each Subscription Right will, subject to applicable law and the conditions set out in Clause 7.2 above, give the right to subscribe for, and be allocated, one new NAS Share. Subscription Rights acquired during the Trading Period will carry the same right to subscription as the Subscription Rights granted to holders of NAS Shares as of the Record Date and all such Subscription Rights (whether received and retained by holders of Shares or acquired during the Trading Period) shall, for the avoidance of doubt, remain conditional until such time as the conditions of the Rights Offering are satisfied as set out in Clause 7.2 above.

7.10    Subscription Rights that are not used to subscribe for new NAS Shares before the expiry of the Rights Offering Subscription Period will have no value and will lapse without compensation to the holder.

**B.  Private Placement**

7.11    Under the Private Placement, certain investors and, as described in Clause 7.14 below, certain Examinership Companies Creditors, including Creditors of the Company, will be invited to apply for new NAS Shares at the Subscription Price. The new NAS Shares will be listed on the Oslo Stock Exchange.

7.12    The subscription period in the Private Placement will commence on a date to be determined by the NAS Board, being no earlier than on the Business Day after the FSAN has approved the Prospectus, and expire no earlier than the Closing Date (the "**Private Placement Subscription Period**").

27

7.13    NAS will, in consultation with DNB Markets (a part of DNB), as global coordinator, determine the allocation of NAS Shares. The allocation principles will, in accordance with customary practice for institutional placements, include factors such as perceived investor quality, investment horizon and history, sector knowledge, size and timeliness of the application, each of which NAS may in its discretion consider (the "**Allocation Factors**") and NAS will reserve the right to reduce or reject any application for shares in the Private Placement and also to set a maximum allocation per applicant, a maximum number of applicants or decide to make no allocation to any applicant (the "**Allocation Principles**"), provided that the Allocation Principles shall not be used to reduce or reject any application from an Eligible Private Placement Creditor in respect of its entitlement (whether in whole or in part) under Clause 7.14 below.

7.14    Each Eligible Private Placement Creditor shall be entitled to apply to participate in the Private Placement up to a maximum amount equal to such Eligible Private Placement Creditor's Investment Allowance during the Private Placement Subscription Period and such Eligible Private Placement Creditors shall be given a preferential allocation in the Private Placement up to the amount of their respective Investment Allowances.

7.15    Where an Eligible Private Placement Creditor participates in the Private Placement, it will also be issued Retained Claims Bonds by NAS in an amount equal to its Retained Claims Bonds Amount. Such Retained Claims Bonds will be issued by NAS in full and final satisfaction of the portion of each relevant Eligible Private Placement Creditor's total Claim that is equal to the aggregate face value of the Retained Claims Bonds issued to such Eligible Private Placement Creditor. The Retained Claims Bonds will be constituted pursuant to the Retained Claims Bonds Instrument.

### C.  New Capital Perpetual Bonds Offering

7.16    Under the New Capital Perpetual Bonds Offering, each Eligible New Capital Perpetual Bonds Creditor shall be entitled to apply for New Capital Perpetual Bonds up to a maximum amount equal to such Eligible New Capital Perpetual Bonds Creditor's Investment Allowance during the New Capital Perpetual Bonds Subscription Period. The New Capital Perpetual Bonds will be constituted pursuant to the New Capital Perpetual Bond Instrument.

7.17    The subscription period in the New Capital Perpetual Bonds Offering will commence on a date to be determined by the NAS Board and expire no earlier than the Closing Date (the "**New Capital Perpetual Bonds Subscription Period**").

7.18    The New Capital Perpetual Bonds will be allocated to each applying Initial Eligible New Capital Perpetual Bonds Creditor on a *pro rata* basis, based on the proportion that its Relevant Portion bears to the aggregate Relevant Portions of all applying Initial Eligible New Capital Perpetual Bonds Creditors (such proportion being, with respect to each such Initial Eligible New Capital Perpetual Bonds Creditor, its "**Pro Rata Proportion**"). To the extent that any Initial Eligible

New Capital Perpetual Bonds Creditor subscribes for less than its Pro Rata Proportion, resulting in unsubscribed New Capital Perpetual Bonds, such unsubscribed New Capital Perpetual Bonds shall be reallocated among Initial Eligible New Capital Perpetual Bonds Creditor which have not been allocated the full subscription applied for, in accordance with their respective Pro Rata Proportions, until each Initial Eligible New Capital Perpetual Bonds Creditor has been allocated the full subscription it applied for or, if earlier, the New Capital Perpetual Bonds Offering is fully subscribed. In the event that the New Capital Perpetual Bonds Offering is not fully subscribed following allocation to Initial Eligible New Capital Perpetual Bonds Creditors as aforesaid, NAS may allocate any remaining unallocated New Capital Perpetual Bonds to applying Subsequent Eligible New Capital Perpetual Bonds Creditors in its discretion, with regard to the Allocation Factors.

7.19    The maximum amount of the New Capital Perpetual Bonds Offering shall be determined by NAS in parallel with, determining the amount of the Rights Offering and the Private Placement and shall be no greater than NOK 1,875,000,000.

7.20    Each Eligible New Capital Perpetual Bonds Creditor that participates in the New Capital Perpetual Bonds Offering will also be issued Retained Claims Bonds by NAS in an amount equal to its Retained Claims Bonds Amount. Such Retained Claims Bonds will be issued by NAS in full and final satisfaction of the portion of each relevant Eligible New Capital Perpetual Bonds Creditor's Relevant Portion that is equal to the aggregate face value of the Retained Claims Bonds issued to such Eligible New Capital Perpetual Bonds Creditor. The Retained Claims Bonds will be constituted pursuant to the Retained Claims Bonds Instrument and are further detailed in Clause 7.23 to 7.25 below.

7.21    Participation in the New Capital Perpetual Bonds Offering shall be subject to certain terms and conditions set forth in the New Capital Perpetual Bond Instrument, including a minimum subscription of at least the NOK equivalent of EUR 100,000.

7.22    The New Capital Perpetual Bonds shall be convertible into NAS Shares at a price equal to 150% of the Subscription Price subject to and in accordance with the terms of the New Capital Perpetual Bond Instrument.

### D.  Retained Claims Bonds

7.23    Each Eligible New Capital Perpetual Bonds Creditor that participates in the New Capital Perpetual Bonds Offering and each Eligible Private Placement Creditor that participates in the Private Placement will be issued Retained Claims Bonds by NAS in an amount equal to its Retained Claims Bonds Amount. Such Retained Claims Bonds will be issued by NAS in full and final satisfaction of the portion of the Relevant Portion of each relevant Eligible New Capital Perpetual Bonds Creditor and/or Eligible Private Placement Creditor that is equal to the aggregate face value of the Retained Claims Bonds issued to such Eligible New Capital Perpetual Bonds Creditor and/or Eligible Private Placement Creditor.

7.24    To the extent a Creditor has more than one Agreed Debt, the aggregate amount of Retained Claims Bonds issued or to be issued to such Creditor shall be apportioned equally across each of its Agreed Debts when determining its Net Agreed Debt for the purposes of ascertaining the amount of its entitlement (if any) to a dividend under these Proposals. For the avoidance of doubt, no Creditor shall be paid any cash dividend in respect of such part of its Claim as shall be satisfied by the issuance of Retained Claims Bonds.

7.25    The Retained Claims Bonds will be constituted pursuant to the Retained Claims Bonds Instrument.

### E.  Norwegian Government

7.26    The Norwegian Government proposed (*Prop. 79 S (2020 – 2021*) [*Post 91 and 92*]), and the Parliament of Norway (*Nw. Stortinget*) has approved, the Norwegian Government's intention to participate in the New Capital Perpetual Bonds Offering up to an amount not exceeding NOK 1,500,000,000.

### 8.    Summary of Proposals

### A.  Member

8.1    There is only one Member of the Company.

8.2    For the purpose of these Proposals, the interests of the Member are impaired if:

8.2.1    the nominal value of its shareholding in the Company is reduced;

8.2.2    where it is entitled to a fixed dividend in respect of its shareholding in the Company, the amount of that dividend is reduced;

8.2.3    it is deprived of all or any part of the rights accruing to it by virtue of its shareholding in the Company; or

8.2.4    its percentage interest in the total issued share capital in the Company is reduced.

8.3    The interests of the Member are not being impaired pursuant to the terms of these Proposals.

### B.  Creditors

8.4    The classes of Creditors of the Company are specified at Clause 10 below.

8.5    For the purpose of these Proposals, a Creditor's Claim against the Company is impaired if it receives less in payment of its Claim than the full amount due in respect of its Claim at the Petition Date.

30

8.6     The interests or Claims of certain classes of Creditors are being impaired pursuant to the terms of these Proposals, as explained in detail at Clause 10 below.

**C.  General**

8.7     These Proposals will become binding on the Creditors, the Member, the Company and their respective successors and assigns as and from the Irish Confirmation Date and shall separately take effect in accordance with the terms of these Proposals as set out in Clause 6.

8.8     These Proposals provide in Clause 13 for implementation.

8.9     The Examiner does not propose any changes to the Constitution under these Proposals.

8.10    The Examiner does not propose any changes in relation to the management of the Company or the Directors to facilitate the survival of the Company, as a whole or any part of its undertaking, as a going concern.

8.11    A statement of assets and liabilities (including contingent and prospective liabilities) of the Company as at the date of these Proposals is attached at Schedule 2.

8.12    The estimated financial outcome of a winding-up of the Company for the Member and the classes of Creditors is also attached at Schedule 3.

8.13    The Irish High Court has not directed that any specific provisions be included in these Proposals.

8.14    The Examiner has ensured that these Proposals include all such other matters as he deems appropriate.

8.15    The following sets out in detail what these Proposals provide insofar as the Member and Creditors are concerned.

**9.    Treatment of the Member**

9.1     The Member is named in Schedule 1.

9.2     Where the Irish High Court confirms these Proposals (with or without modification), these Proposals shall notwithstanding any enactment, rule of law or otherwise be binding on the Member in accordance with the terms of these Proposals as set out in Clause 6.

9.3     These Proposals will not impact the position of the Member as a shareholder in the Company and accordingly the Member is not impaired as a shareholder by these Proposals.

**10.   Treatment of Creditors**

**A.  General**

10.1     The classes of Creditors are dealt with below.

10.2     The Creditor Schedule sets out the amount of each individual Creditor's Claims as set out in the Company's books and records as at the Petition Date (and includes any Pre-Repudiation Post-Petition Liabilities, on the basis that these were contingent or prospective liabilities of the Company as at the Petition Date).

10.3     The treatment proposed in these Proposals with respect to each class of Creditor is set out below. Where the Irish High Court confirms these Proposals (with or without modification), these Proposals shall notwithstanding any enactment, rule of law or otherwise be binding on all the Creditors in accordance with Clause 6 of these Proposals and the class or classes of Creditors affected by these Proposals.

10.4     The claims of Creditors can be categorised into the following classes:

        10.4.1     Secured Creditors;

        10.4.2     Unsecured Creditors;

        10.4.3     Connected and Intercompany Creditors;

        10.4.4     Co-Obligor Liability Creditors;

        10.4.5     Terminated Contract Creditors;

        10.4.6     Contingent Litigation Creditor; and

        10.4.7     Counter-Indemnity Creditor.

**B.**  *Specific Creditor Classes*

10.5     The specific classes of Creditors of the Company as at the Petition Date and the manner in which it is proposed that they will be treated under the terms of these Proposals with effect on and from the Effective Time are as follows:

        10.5.1     **Secured Creditors**

            (a)      The Secured Creditors' Claims shall be treated as follows:

                (i)      to the extent that the relevant Secured Amount is equal to or exceeds the amount of any Secured Creditor's Claim, each such Secured Creditor's Claim shall be unaffected by these Proposals and the existing security held by each such Secured Creditor shall remain in force notwithstanding Clause 12.2 and Clause 12.4.4; and

(ii)     to the extent that the relevant Secured Amount is less than the amount of any Secured Creditor's Claim:

(A)     each such Secured Creditor's Claim shall be written down to the value of the relevant Secured Amount. Notwithstanding Clause 12.4.4, the existing security held by each such Secured Creditor shall remain in force only in respect of the relevant Secured Amount and shall otherwise be released in accordance with these Proposals; and

(B)     each such Secured Creditor shall be paid a cash dividend of 1% of its Net Agreed Debt in full and final satisfaction of the Secured Creditor's Unsecured Claim Amount.

(b)     For the avoidance of doubt, these Proposals shall not prevent any Secured Creditor from enforcing its security over the Secured Assets on and from the Effective Time.

(c)     In the event that any Secured Creditor enforces its security over the Secured Assets and the Secured Amount is uncertain and/or unascertainable pending the realisation of the Secured Assets, such Secured Creditor shall not be entitled to any dividend under Clause 10.5.1(a)(ii)(B) above unless and until the Secured Assets have been realised, save where the Secured Amount is otherwise agreed in writing between the Company and the relevant Secured Creditor.

(d)     Each Secured Creditor shall be deemed to have absolutely, irrevocably and unconditionally released and discharged:

(i)     each relevant Related Company in respect of any liability related to or associated with the Secured Creditor's liability discharged under this Clause 10.5.1 and each such Related Company shall be treated as so released and discharged by operation of these Proposals without any further action on the part of the Related Companies under the Related Proposals or otherwise; and

(ii)     the obligations of the Company and / or any Related Company under the guarantees provided by the Company and / or any Related Company to the Secured Creditors in respect of any Related Companies' Guaranteed Obligations and such guarantees shall be terminated.

(e)     Consequently, the Secured Creditors are impaired by these Proposals to the extent their Claims are treated under Clause 10.5.1(a)(ii) above.

33

### 10.5.2    Unsecured Creditors

Each Unsecured Creditor shall be paid a cash dividend of 1% of its Net Agreed Debt in full and final satisfaction of the total amount of such Unsecured Creditor's Claim. Consequently, the Unsecured Creditors are impaired by these Proposals.

### 10.5.3    Connected and Intercompany Creditors

(a)    Each of the Connected and Intercompany Creditor's Claims is an unsecured claim which shall be off set against any mutual claim as between the Company and the Connected and Intercompany Creditor's as at the Petition Date.

(b)    In the event that any residual balance is due by the Company to a Connected and Intercompany Creditor following any set off under sub-paragraph (a) above (the "**Intercompany Payable**"), the Connected and Intercompany Creditor shall be paid a cash dividend of 0.5% of its Intercompany Payable in full and final satisfaction of the total amount of such Connected and Intercompany Creditor's Claim.

(c)    Consequently, the Connected and Intercompany Creditors are impaired by these Proposals.

### 10.5.4    Co-Obligor Liability Creditors

(a)    The Claims of the Co-Obligor Liability Creditors have been discharged and released in full pursuant to the terms of the NAS Proposals.

(b)    The Co-Obligor Liability Creditors shall not receive any dividend in respect of their Claims under these Proposals. To the extent necessary, the Claims of the Co-Obligor Liability Creditor shall be written down in full in these Proposals.

(c)    Consequently, the Co-Obligor Liability Creditors are impaired by these Proposals.

(d)    These Proposals are without prejudice to, and shall not prevent a Co-Obligor Liability Creditor from enforcing its security over the Secured Assets. The Co-Obligor Liability Creditor shall not be entitled to maintain any Claim against the Company that is otherwise discharged or released in these Proposals or the NAS Proposals save that the Co-Obligor Liability Creditor shall retain such Claim to the extent necessary to enforce any security over the Secured Assets, provided that recourse under any such Claim shall be limited to the Secured Assets.

10.5.5    **Terminated Contract Creditors**

(a)    Unless agreed prior to the Irish Confirmation Date, the Claims of Terminated Contract Creditors shall be treated as Unagreed Creditors and their Claims shall be determined under the Expert Determination Process.

(b)    All Terminated Contract Creditors' Claims are unsecured claims and shall be subject to the same treatment as Unsecured Creditors whether agreed or upon the determination of their claim in accordance with the Expert Determination Process. Consequently, the Terminated Contract Creditors are impaired by these Proposals.

10.5.6    **Contingent Litigation Creditor**

(a)    As at the date of these Proposals:

(i)    the liability, if any, of the Company to the Contingent Litigation Creditor; and

(ii)    the quantum, if any, due to the Contingent Litigation Creditor,

has not been determined.

(b)    Unless agreed and crystallised prior to the Effective Time, the Claims of the Contingent Litigation Creditor shall be determined by the courts of competent jurisdiction and, for the avoidance of doubt, the Expert Determination Process shall not apply.

(c)    Any actual, contingent or potential liability of the Company and NAS to the Contingent Litigation Creditor have been addressed in the NAS Proposals and the NAS Proposals provide for the absolute, irrevocable and unconditional release and discharge of the Company from any liability associated or related to the Contingent Litigation Creditor's Claim.

(d)    The Contingent Litigation Creditor shall not receive any dividend in respect of its Claims under these Proposals. To the extent necessary, the Claims of the Contingent Litigation Creditor shall be written down in full by these Proposals.

(e)    Consequently, the Contingent Litigation Creditor is impaired by these Proposals.

10.5.7    **Counter-Indemnity Creditor**

(a)     The Counter-Indemnity Creditor shall provide dividends to the Co-Obligor Liability Creditors and the Contingent Litigation Creditor (should any liability arise) pursuant to the NAS Proposals.

(b)     Any residual Counter-Indemnity Creditor's Claims following the set-off provided for the in the NAS Proposals shall be written down in full and the Counter-Indemnity Creditor shall not receive any dividend in respect of its Claims. Consequently, the Counter-Indemnity Creditor is impaired by these Proposals.

## 11.    Determining the Claims of Unagreed Creditors

11.1    In order to implement these Proposals and in the interests of the Company and its Creditors, taken as a whole, it is proposed to resolve the Claims of Unagreed Creditors (including, for the avoidance of doubt, any Pre-Repudiation Post-Petition Liabilities) as set out in this Clause 11.1, provided that: (i) no determination hereunder shall bind the Company and any Unagreed Creditor before the occurrence of the Effective Time whereupon any determination made or deemed made before such time shall become immediately effective and binding upon such parties; and (ii) the Expert Determination Process shall not be used to determine the claims of the Contingent Litigation Creditor.

11.1.1    An Unagreed Creditor shall forward to the Company, by email to creditorclaims@norwegian.com, within 14 days after the Irish Confirmation Date a proof of claim setting forth the amount which it believes should be included as its claim for the purposes of these Proposals and the basis for the claim including supporting documents as applicable.

11.1.2    In the event that an Unagreed Creditor listed in the Creditor Schedule does not notify the Company of its claim, in accordance with the provisions set out above, that Unagreed Creditor shall be deemed to have submitted a claim for the amount stated in the Company's records and as set out in the Creditor Schedule and the Effective Date shall be deemed to be the Determination Date for such claim.

11.1.3    In the event that an Unagreed Creditor is not listed in the Creditor Schedule and that Unagreed Creditor does not notify the Company of its claim in accordance with the provisions as set out above, such Unagreed Creditor shall have no valid claim whatsoever against the Company.

11.1.4    The Company shall notify the Unagreed Creditor, by return email, within 7 days after receipt of its claim whether the Company accepts the claim or not. In the event that the Company disputes the claim the Company's notice shall be deemed to be a Dispute Notice and it shall specify the quantum of the claim that the Company, acting in good faith, considers should be admitted. If the Company, acting in good faith,

considers that the Unagreed Creditor is not a Creditor of the Company the Dispute Notice will specify that this quantum is "zero".

11.1.5   An Unagreed Creditor may, within 14 days of the issue of a Dispute Notice, submit the said claim for determination to:

(a)      one of the Aircraft Experts, by email to either:

(i)       Mr Richard G. Spaulding at richard.spaulding@spauldingaviation.com; or

(ii)      Mr Robert Palmer at robert.palmer@malvernconsulting.net,

to the extent such Unagreed Creditor considers that its Claim arises from contracts relating to the leasing, financing, acquisition, manufacture or maintenance of aircraft (or any part thereof, including, without limitation, any engine(s)); or

(b)      the General Expert by email to NorwegianAirClaims@rsmireland.ie, in all other cases.

To the extent the Company believes that the claim whether submitted to an Aircraft Expert or the General Expert has not been submitted by the Unagreed Creditor to the correct Expert the dispute with regard to whether the claim has been submitted to the correct Expert shall be determined by reference to the criteria identified in this Clause 11.1 by the Expert to which the claim has been submitted.

11.1.6   In the event that an Unagreed Creditor does not submit its claim to either Expert within 14 days after the issue of the Dispute Notice, that Unagreed Creditor shall be deemed to have submitted a claim for the amount, if any, included in the Dispute Notice and will be admitted as a creditor in that amount (or no amount if no amount is included in the Dispute Notice), and the deemed Determination Date shall be 15 days after the issue of the Dispute Notice.

11.1.7   The Company and the Unagreed Creditor may negotiate a settlement of the claim at any time. In such case, the date of settlement shall be the Determination Date.

11.1.8   The relevant Expert shall, upon receipt of the Unagreed Creditor's claim, furnish the Company with a copy of the claim. The Company may submit a response to the relevant Expert within 14 days after receipt of such copy claim. The relevant Expert shall not deliver his determination before the expiry of that period of 14 days.

11.1.9   The relevant Expert shall be entitled, but shall not be obliged, to seek further information as he at his sole discretion deems necessary prior to making his

determination and the relevant Expert shall be entitled to stipulate the necessary time deadlines for the provision of such information.

11.1.10    The relevant Expert shall, not later than the Expert Determination End Date, notify both the Unagreed Creditor and the Company of his determination of the amount, if any, for which the Unagreed Creditor's claim shall be admitted. The date of the relevant Expert's determination shall be deemed to be the Determination Date.

11.1.11    When determining the Terminated Contract Creditors' Claims, Claims and/or any other Unagreed Debt arising from the termination or repudiation of an underlying contract, each Expert shall apply the same legal principles that would be applied by the Irish High Court in a hearing under Section 537(3) of the Act to determine the amount of any loss or damage. Without prejudice to the generality of the foregoing, each Expert shall have full regard to and take account of the value (including the value of future attributable income) of any assets (in any form) in respect of which the relevant Creditor has in connection with its Claim the benefit of any security (whether legal or otherwise), recourse to, and/or any right to (re)take possession. Any dispute regarding the value of such assets shall be determined by the relevant Expert.

11.1.12    The Aircraft Experts shall confer as they deem fit regarding the determination of claims submitted to them.

11.1.13    Where any Creditor with an Unagreed Debt also has a claim against any Related Company, and that claim against a Related Company has been referred for determination under any applicable Equivalent Expert Determination Process, the relevant Expert shall determine that Creditor's Unagreed Debt in parallel to the determination under the Equivalent Expert Determination Process and shall ensure that both determinations are consistent.

11.1.14    The relevant Expert's determination shall be final and binding on the parties.

11.1.15    Upon determination by the relevant Expert in respect of the quantum of a liability, payment in respect of the liability will be made in accordance with the provisions contained herein for payment to the class of Creditor to which the said Unagreed Creditor belongs.

11.1.16    The Company and the Unagreed Creditor shall each be liable for 50% of the costs and expenses of the relevant Expert in connection with his determination. For illustrative purposes only, the hourly rates of each Expert are set out below:

(a)    the Aircraft Experts: EUR 250.00 plus VAT; and

(b)    the General Expert: EUR 250.00 plus VAT.

11.1.17    Each Expert shall act as an expert and not as an arbitrator and his determination shall be final, binding and conclusive in all respects and no dispute in relation to the rights or claims of such Unagreed Creditors, submitted for decision to either Expert, shall be litigated or arbitrated, nor shall the provisions of the Arbitration Act 2010 be applicable.

11.2    The Examiner may seek an Order from the Irish High Court under Section 542(2) of the Act to ensure the effectiveness of Clause 11.1 as and from the Irish Confirmation Date.

**12.    Waiving of Creditor Rights**

12.1    These Proposals apply to all of the Company's liabilities, including contingent and prospective liabilities, as at the Petition Date (and including, for the avoidance of doubt, any Pre-Repudiation Post-Petition Liabilities) whether or not the liabilities have been acknowledged or recognised or are unknown including for the avoidance of doubt any liabilities arising from or in connection with guarantees or indemnities to any party.

12.2    With effect from the Effective Time, without prejudice to the right of the Company to perform and seek performance of a Creditor's contractual rights and entitlements existing at the Petition Date, no Creditor or any other party shall have any debt, right or claim of any description whatsoever (including, but not limited to, contingent or prospective claims arising out of any guarantee or indemnity granted in respect of any liability of the Company and claims of which the Company and/or the Examiner are unaware save as provided in Clause 10.5.1), against the Company howsoever arising whether out of or connected with any contract, engagement, circumstance, event, act or omission of the Company prior to the Petition Date, or arising as a consequence of the appointment of the Examiner, save as provided in these Proposals.

12.3    Without prejudice to the generality of Clause 12.2 above, no Creditor shall be permitted to set off a debt which it owes to the Company (where such debt has been incurred during the examinership period) against a debt which was owing to it by the Company on or before the Petition Date.

12.4    Save as otherwise expressly provided in these Proposals, the following shall apply:

12.4.1    Failure through inadvertence on the part of the Examiner or the Company to notify any Creditor of the class meeting of creditors to which the Creditor should have received notice will not prevent that Creditor from being bound by these Proposals, if and when these Proposals are confirmed by the Irish High Court.

12.4.2    Nothing in these Proposals shall prejudice or affect the rights of the Company to seek full payment or contribution from any person or to pursue or enforce any claim or liability of any person or to seek performance of any such person's contractual rights and entitlements existing at the Petition Date.

12.4.3    To the extent that any Creditor claim is insured, these Proposals shall not affect the liability of the insurer or any right of the Creditor under applicable law or related security to the proceeds of the Company's claim against the insurer.

12.4.4    Unless otherwise provided in these Proposals, where a Creditor's Claim is supported by security from the Company (whether legal or otherwise), that Creditor shall: (a) upon receipt of any dividend paid to it pursuant to these Proposals; or (b) where it is to receive no dividend pursuant to these Proposals as and from the Effective Time, be deemed to have irrevocably and unconditionally released the Company from all of its obligations and/or liabilities arising out of or in connection with or relating to the said security and furthermore, that Creditor shall within seven days of receipt of its dividend (or the Effective Time in the case of those Creditors that will receive no dividend under these Proposals), take all such acts and execute all such documents as may be reasonably necessary in order to remove the security from any public register. Every such Creditor hereby appoints Per Christoffer Kise, the Company's Head of Legal or such other person having such title as the case may be, as its lawfully appointed attorney or, failing that, its agent, nominee and representative for the limited purpose of doing all such acts and executing such documentation as is necessary in order to effect the release of its security.

12.4.5    Unless otherwise provided in these Proposals, with respect to the Company, no interest, damages, penalties, or costs (over and above the sum specified in the Creditor Schedule), notwithstanding whether such liabilities were prospective or contingent as at the Petition Date, shall be payable by the Company to any Creditor.

12.4.6    With respect to the Company, the payments provided for in these Proposals pursuant to an order of the Irish High Court confirming these Proposals shall be in full and final settlement of all claims and entitlements of each Creditor to which a payment is made as determined in accordance with these Proposals.

12.4.7    To the extent not otherwise provided in these Proposals, where the Company has joint or equivalent liability with any Related Company to any Creditor each such Creditor shall be deemed to have absolutely, irrevocably and unconditionally discharged and released the Related Company in respect of any obligations and/or liabilities, whether direct or indirect, whether secured or otherwise and whether monetary or non-monetary.

## 13.    Implementation of Proposals

13.1    In formulating these Proposals, the Examiner has treated each separate class of Creditors, on a fair and equitable basis having regard to the current trading position of the Company and the amounts which those Creditors might receive on a winding up. The Examiner is satisfied that

the acceptance and implementation of these Proposals is in the best interests of the Creditors of the Company.

13.2    At the confirmation hearing in respect of the Company under Section 541 of the Act, the Examiner proposes to seek an order approving these Proposals in respect of the Company and fixing the Effective Date in accordance with Clause 6 and these Proposals will otherwise become effective in accordance with Clause 6.

13.3    In addition the Examiner may seek one or more orders from the Irish High Court under Section 542(2) of the Act to ensure the effectiveness of Clause 11.1 as and from the Irish Confirmation Date.

13.4    Where required under these Proposals, the Company shall take all steps necessary to pay all cash dividends to the relevant Creditors on or before the General Payment Date.

## 14.    General Data Protection Regulation

14.1    The Examiner shall comply at all times with his obligations as a controller, as provided under Regulation (EU) 2016/679 of the European Parliament and the Council of 27 April 2016 on the protection of natural persons with regard to the processing of personal data and on the free movement of such data and the Data Protection Acts 1988 – 2018 (the "**Data Protection Laws**").

14.2    To the extent that the Examiner acts as a processor (as defined in the Data Protection Laws) on behalf of another party acting as controller, the relevant parties shall enter into a data processing agreement in respect of such processing activities, in accordance with the requirements of the Data Protection Laws.

## 15.    Miscellaneous Provisions

15.1    Priorities

15.1.1    The remuneration costs and expenses of the Examiner shall be afforded the priority given to them in Section 554 of the Act and shall be paid in priority to all other debts or payments under these Proposals.

15.1.2    Except as provided herein, all amounts due to Creditors by the Company in respect of goods or services used by the Company during the Protection Period shall be paid by the Company in full in the normal course of business. For the avoidance of doubt, any Pre-Repudiation Post-Petition Liabilities shall not be considered to be amounts due to Creditors by the Company in respect of goods or services used by the Company during the Protection Period.

41

15.1.3   No certificates pursuant to Section 529 of the Act have been issued by the Examiner at the date of these Proposals in relation to the Company during the Protection Period.

15.2   Foreign Currency Conversion

15.2.1   Creditors' claims denominated in currency other than US Dollar amounts as at the Petition Date will be converted at the daily exchange rates maintained by the European Central Bank as at the Petition Date.

15.2.2   All cash dividends shall be paid in the currency of the Creditor's underlying Claim as converted on the General Payment Date.

15.3   Non-Admission of Claims

Nothing contained in these Proposals shall constitute an admission or acknowledgement of liability in respect of any claim which has not otherwise been admitted by the Company.

15.4   Explanatory Memorandum

15.4.1   Accompanying these Proposals is an Explanatory Memorandum, which provides a summary of these Proposals and their effect. It should be read in conjunction with these Proposals.

15.4.2   Terms defined in these Proposals in respect of the Company shall have the same meaning in the Explanatory Memorandum. In the event of any inconsistency between the terms of the Explanatory Memorandum and these Proposals, the terms of these Proposals shall apply.

15.5   Governing Law and Jurisdiction

15.5.1   These Proposals and any dispute hereunder (contractual or otherwise) shall be governed by and construed in accordance with the laws of Ireland and the courts of Ireland shall have exclusive jurisdiction to hear and determine any suit, action or proceeding or to settle any dispute which may arise in relation to these Proposals.

WF-28989817-exv

**SCHEDULE 1**

Particulars of the Company

| Arctic Aviation Assets Designated Activity Company | Particulars |
|---|---|
| Registered Number | 531191 |
| Date of Incorporation | 9 August 2013 |
| Place of Incorporation | Dublin Ireland |
| Registered Office | Ground Floor, Imbus House, Dublin Airport Co. Dublin, Ireland. |
| Authorised Share Capital | USD $1,000,000,000 |
| Issued Share Capital | USD $479,603,658 |
| Members and respective shareholdings | Norwegian Air Shuttle ASA (100%) |
| Directors | Tore Jenssen (DOB 05/06/1978) Peter Lawless (DOB 19/06/1990) Geir Karlsen (DOB 10/01/1965) Tony Byrne (DOB 03/10/1946) |
| Secretary | Matsack Trust Limited |

**SCHEDULE 2**

Statement of Assets and Liabilities for the Company

| Arctic Aviation Assets DAC - Statement of Affairs @ 31 December 2020 | | |
|---|---|---|
| | USD'000 | USD'000 |
| **Fixed Assets** | | |
| Intangible Assets | 5 | |
| Investments | 1,237,269 | |
| Deferred Tax Asset | 1,141 | |
| Loan Receivable | 10,173 | **1,248,588** |
| | | |
| **Current Assets** | | |
| Intercompany Receivables | 347,262 | |
| Cash and Cash Equivalents | (300,667) | **347,262** |
| **Total Assets** | | **1,595,849** |
| | | |
| **Liabilities** | | |
| Creditors (Including Long Term Liabilities) | (1,853,476) | |
| **Total Liabilities** | | **(1,853,476)** |
| **Net Assets / (Liabilities) at 31 December 2020** | | **(257,627)** |

## SCHEDULE 3

Estimated Financial Outcome of a Winding-Up for the Company

| Arctic Aviation Assets DAC  - Liquidation Statement of Affairs at 28 February 2021 | | | |
|---|---|---|---|
| | **Notes** | **Net Book Value** | **Projected Realisable Value** |
| | | **$USD'000** | **$USD'000** |
| **Asset Realisations** | | | |
| Intangible Assets | | 5 | 0 |
| Investments | 1 | 1,237,269 | 573 |
| Deferred Tax Asset | | 1,141 | 0 |
| Loan Receivable | | 10,173 | 0 |
| Cash and cash equivalents | 2 | -300,667 | 0 |
| Intercompany receivables | | 146,583 | 0 |
| **Projected Total Liquidation Realisations for Assets** | | | **573** |
| | | | |
| **Examinership Costs** | | | |
| Examiner Fees | 3 | (204) | |
| Examinership Professional Fees / Outlay | 3 | (182) | **(387)** |
| | | | |
| **Projected Liquidation Costs** | | | |
| Projected Liquidation Fees, Costs and Outlay | 4 | | **(380)** |
| **Projected total funds available to the Preferential Creditors** | | | **-** |
| | | | |
| **Preferential Creditors** | | | |
| Total Preferential Creditors | 5 | | **(37)** |
| *Projected Dividend available for the Preferential Creditors* | | | *0%* |
| **Projected Total Funds Available to the Secured Creditors** | | | **-** |
| | | | |
| **Secured Creditors** | | | |
| Total Secured Creditors | 6 | | **(228)** |
| *Projected Dividend available for the Secured Creditors* | | | *0%* |
| **Projected Total Funds Available to the Unsecured Creditors** | | | **-** |
| | | | |
| **Unsecured Creditors** | | | |
| Total Unsecured Creditors | 7 | | **(1,853,476)** |
| *Projected Dividend available for the Unsecured Creditors* | | | *0%* |
| **Projected Overall Liquidation Deficit** | 8 | | **(1,853,935)** |

**NOTES**

**Note 1. Tangible Fixed Assets**
It is projected that in a liquidation scenario the realisable investments would be USD573k

**Note 2. Cash**
It is projected that in a liquidation scenario there would be no liquid cash funds available to the creditors of the Liquidation

**Note 3: Examiners Costs**
The Examiners Fees, Legal fees/costs and outlay for the Examinership period from 18 November 2020 is USD387k

**Note 4: Liquidation Costs**
The projected Liquidators fees and costs for dealing with the completion of the Liquidation of Arctic Aviation Assets DAC in projected at USD380k.

**Note 5: Preferential Creditors**
The projected Other Preferential Creditor claims in a Liquidation scenario are estimated at USD37k

**Note 6: Secured Creditors**
The projected Secured Creditor claims in a Liquidation scenario are estimated at USD228k

**Note 7: Unsecured Creditors**
The projected Unsecured Creditors in a Liquidation scenario is estimated at USD1,853,476k

**Note 8: Projected Liquidation Deficit**
The projected overall deficit for liquidation of Arctic Aviation Assets DAC is USD1,853,935k. It is projected that the Liquidation of the company would take 3-4 years to complete with the payment of the unsecured dividend being one of the final matters which would project to be in year 3/4 of the overall liquidation process

**SCHEDULE 4**

Creditor Schedule

| Secured Creditors | | | | | |
|---|---|---|---|---|---|
| No of Creditor | Creditor Name | Amount at 18 November 2020 | USD Amount at 18 November 2020 | Claim Received (Yes/No) | Claim Agreed in Quantum & Liability |
| 1 | DVB Bank SE, London Branch | $           228,117 | $           228,117 | No | No |
| 2 | Wells Fargo Bank, Northwest National Association | $      20,703,904 | $      20,703,904 | No | No |
| | Total | | $      20,932,021 | | |

| Unsecured Creditors | | | | | |
|---|---|---|---|---|---|
| No of Creditor | Creditor Name | Amount at 18 November 2020 | USD Amount at 18 November 2020 | Claim Received (Yes/No) | Claim Agreed in Quantum & Liability |
| 1 | Lufthansa Technik | $ 155,106 | $ 155,106 | Yes | Yes |
| 2 | Moody's Investors Service Ltd | € 75,000 | $ 89,010 | Yes | Yes |
| 3 | RPK Capital Management | $ 65,950 | $ 65,950 | No | No |
| 4 | Santos Dumont | $ 60,500 | $ 60,500 | Yes | Yes |
| 5 | Gram, Hambro & GarmanAdvokatfirma | NOK 479,824 | $ 53,163 | Yes | Yes |
| 6 | ALSAA (AerLingus Social & Athletic Association) | $ 742 | $ 742 | Yes | Yes |
|  | Total |  | $ 424,471 |  |  |

| Connected and Intercompany Creditors | | | | | |
|---|---|---|---|---|---|
| No of Creditor | Creditor Name | Amount at 18 November 2020 | USD Amount at 18 November 2020 | Claim Received (Yes/No) | Claim Agreed in Quantum & Liability |
| 1 | Arctic Leasing No.4 | $ 1,138,279 | $ 1,138,279 | No | No |
| 2 | Norwegian Air Shuttle ASA | $ 396,624,577 | $ 396,624,577 | No | No |
| 3 | DY1 | $ 2,839,248 | $ 2,839,248 | No | No |
| 4 | DY2 | $ 1,503,573 | $ 1,503,573 | No | No |
| 5 | DY3 | $ 95,720 | $ 95,720 | No | No |
| 6 | DY4 | $ 537,648 | $ 537,648 | No | No |
| 7 | DY5 | $ 379,461 | $ 379,461 | No | No |
| 8 | DY6 | $ 437,015 | $ 437,015 | No | No |
| 9 | Norwegian Brand Ltd. | $ 97,998 | $ 97,998 | No | No |
| 10 | Norwegian Air International | $ 59,949 | $ 59,949 | No | No |
| 11 | DY9 | $ 115,824 | $ 115,824 | No | No |
| 12 | Norwegian Air Resources SSC | $ 783,066 | $ 783,066 | No | No |
| 13 | Torskefjorden | $ 196,460 | $ 196,460 | No | No |
| 14 | Fedjefjorden | $ 23,513,575 | $ 23,513,575 | No | No |
| 15 | Lavriksfjorden II | $ 6,611,817 | $ 6,611,817 | No | No |
| 16 | Ofotfjorden | $ 10,797,095 | $ 10,797,095 | No | No |
| | Total | | $ 445,731,305 | | |

| Co-Obligor Liability Creditors | | | | | |
|---|---|---|---|---|---|
| No of Creditor | Creditor Name | Amount at 18 November 2020 | USD Amount at 18 November 2020 | Claim Received (Yes/No) | Claim Agreed in Quantum & Liability |
| 1 | Airbus | £ 600,000.00 | $ 796,751 | No | No |
| 2 | MUFG | NOK 2,058,871 | $ 192,211 | Yes | Yes |
| 3 | Nordic Trustee AS | $ 6,256,000 | $ 6,256,000 | Yes | Yes |
| 4 | International Aero Engines LLC | $ 79,000,000 | $ 79,000,000 | No | No |
| 5 | Wilmington Trust | $ 280,786,957 | $ 280,786,957 | No | No |
| 6 | Pratt & Whitney / UT Finance Corporation | $ - | $ - | No | No |
| 7 | Wells Fargo Bank, Northwest National Association | $ 143,716,356 | $ 143,716,356 | No | No |
| 8 | AFIC | $ 325,571,581 | $ 325,571,581 | No | No |
| 9 | CCB | $ 19,425,000 | $ 19,425,000 | No | No |
| 10 | EXIM | $ 130,000,000 | $ 130,000,000 | No | No |
|  | Total |  | $ 985,744,856 |  |  |

| Terminated Contract Creditors | | | | | |
|---|---|---|---|---|---|
| No of Creditor | Creditor Name | Amount at 18 November 2020 | USD Amount at 18 November 2020 | Claim Received (Yes/No) | Claim Agreed in Quantum & Liability |
| 1 | Aerdata | $    20,000 | $    20,000 | No | No |
| 2 | Recaro | $   4,675,308 | $   4,675,308 | Yes | Yes |
| | **Total** | | **$   4,695,308** | | |

| Contingent Litigation Creditors | | | | | |
|---|---|---|---|---|---|
| No of Creditor | Creditor Name | Amount at 18 November 2020 | USD Amount at 18 November 2020 | Claim Received (Yes/No) | Claim Agreed in Quantum & Liability |
| 1 | Boeing | $        - | $        - | No | No |
|  | **Total** |  | **$        -** |  |  |

| Counter-Indemnity Creditors | | | | | |
|---|---|---|---|---|---|
| No of Creditor | Creditor Name | Amount at 18 November 2020 | USD Amount at 18 November 2020 | Claim Received (Yes/No) | Claim Agreed in Quantum & Liability |
| 1 | Norwegian Air Shuttle ASA | $ 985,744,856 | $ 985,744,856 | No | No |
| | Total | | $ 985,744,856 | | |

**SCHEDULE 5**

New Capital Perpetual Bonds – Term Sheet

## TERM SHEET



**NORWEGIAN AIR SHUTTLE ASA FRN PERPETUAL SUBORDINATED CONVERTIBLE BONDS**
**ISIN [●]**

| | |
|---|---|
| **Issuer:** | Norwegian Air Shuttle ASA, incorporated under the laws of Norway with business registration number 965 920 358 and LEI-code 549300IEUH2FEM2Y6B51 |
| **Bond Trustee:** | Nordic Trustee AS, a company existing under the laws of Norway with registration number 963 342 624 and LEI-code 549300XAKTM2BMKIPT85 |
| **Currency:** | NOK |
| **Issue Amount:** | Up to NOK 1,875,000,000 (excluding any PIK Bonds) |
| **Issue Date:** | Expected to be [●][1] |
| **Maturity Date:** | The Bonds shall be perpetual with no scheduled maturity date. |
| **Interest Rate:** | The percentage rate per annum which is the aggregate of the Reference Rate plus the Margin. |

| **Margin:** | Year 1 | Years 2 - 3 | Years 4 - 5 | Years 6 - 7 | Year 8+ |
|---|---|---|---|---|---|
| | 250 bps | 350 bps | 500 bps | 700 bps | 950bps |

| | |
|---|---|
| **Reference Rate:** | 6-month NIBOR |
| **Interest:** | Interest to be settled in cash on each relevant Interest Payment Date, unless the Issuer elects to pay interest through issuance of additional Bonds (**PIK Bonds**). |
| **PIK Bonds:** | PIK Bonds shall have Conversion Rights and shall bear interest at a rate equal to the Interest Rate from time to time, however will be treated as a separate claim in the CSD and will be provided with a separate ISIN in accordance with the procedures of the CSD. Any ISIN for PIK Bonds shall not have any voting rights in |

---

[1] To be the Effective Date in respect of the schemes of arrangement under the Examinerships and/or the reconstruction plan under the Reconstruction

accordance with the Bond Terms and will be subject to Bondholders' decisions made in any Bondholders Meeting.

**Interest Payment Date:**

The last day of each Interest Period, the first Interest Payment Date being [●]

**Interest Periods:**

Subject to adjustment in accordance with the Business Day Convention, the period between [●] and [●] each year, and between the end of any such period and the commencement of the corresponding period in the following year.

**Business Day:**

A day on which both the relevant CSD settlement system is open and the relevant Bond currency settlement system is open.

**Business Day Convention:**

If the last day of any Interest Period originally falls on a day that is not a Business Day, the Interest Period will be extended to include the first following Business Day unless that day falls in the next calendar month, in which case the Interest Period will be shortened to the first preceding Business Day.

**Default Interest:**

Interest Rate plus 2 percentage points p.a.

**Conversion Rights:**

Each Bond (including any PIK Bonds) shall entitle the holder, at any time during the Conversion Period, to convert such Bond into ordinary shares of the Issuer (**Shares**), credited as fully paid, at the Conversion Price.

**Conversion Price:**

NOK [●][2], subject to adjustment as set out in *Anti-Dilution Protection* below

Upon conversion of Bonds to Shares, a consideration equal to the Conversion Price shall be paid for each Share. Payment shall be carried out by set-off against the Bonds. The number of new Shares to be issued upon conversion shall equal the aggregate nominal value of the Bonds that are to be converted, divided by the Conversion Price. If this does not result in a whole number of Shares, the number shall be rounded down to the nearest number of whole Shares.

**Conversion Period:**

The Conversion Period shall commence on the second anniversary of the Issue Date and shall end on (and include) the tenth Business Day prior to (i) the Conversion Right Expiry Date or (ii) any earlier date fixed for redemption of the Bonds.

Any Bondholder that is also a shareholder of the Issuer on the date on which an Extension Resolution is proposed at a General Meeting of the Issuer shall vote in favour of the Extension Resolution.

**Conversion Right Expiry Date** means the date that is (i) five years from the date on which the issue of the Bonds was approved by the Issuer or, if later (ii) the latest date on which the Conversion Rights may be exercised pursuant to an Extension Resolution.

---

[2] Conversion Price to be 150% of the share price in respect of the Rights Offering / Private Placement.

**Extension Resolution** means a valid resolution by the Issuer, to be made prior to the Conversion Right Expiry Date, to extend the conversion period for the Conversion Rights.[3]

**Conversion Notice Period**: 10 Business Days

| | |
|---|---|
| **Interest following Conversion Right Expiry Date** | If the Conversion Right Expiry Date occurs, the provisions with respect to Default Interest shall apply, save that the rate of such Default Interest shall be the Interest Rate plus 20 percentage points p.a., until such time as the Conversion Right Expiry Date is extended. |
| **Anti-Dilution Protection:** | Euro-market standard anti-dilution provisions dealing with, *inter alia*, share consolidations, share splits, spin-off events, rights issues and reorganisations (provided that no adjustment shall occur as a consequence of any event or circumstance provided for by any scheme of arrangement in relation to the Examinerships and/or Reconstruction (as defined below)). |
| **Subscription Price:** | 100% of the Initial Nominal Amount |
| **Initial Nominal Amount:** | NOK 1 |
| **Minimum Investment:** | The minimum permissible investment in the Bonds is the NOK equivalent of EUR 100,000. |
| **Use of proceeds:** | The Issuer will use the net proceeds from the Bond Issue for the general corporate purposes of the Issuer and its subsidiaries. |
| **Status of the Bonds:** | The Bonds, including any accrued interest any other amounts due in respect of the Bonds, shall constitute direct, unsecured obligations of the Issuer and shall rank: |
| | (a)   *pari passu* without any preference among themselves; |
| | (b)   senior in right and priority of payment to the ordinary share capital of the Issuer (**Junior Obligations**); and |
| | (c)   junior in right and priority of payment, and shall be postponed and subordinated to, all present and future claims of all (i) unsubordinated creditors of the Issuer, and (ii) subordinated creditors whose rights are expressed to rank senior to the Bonds. |
| **Dividend Restriction:** | No declaration or making of dividend, interest or other distributions or payments (including by way of repurchase) in respect of Junior Obligations at any time while any PIK Bonds remain outstanding. |
| **No set-off:** | Subject to applicable law, no Bondholder may exercise, claim or plead any right of set-off, compensation or retention in respect of any amount owed to it by the Issuer in respect of, or arising under or in connection with the Bonds and each |

---

[3] Pursuant to Norwegian law, conversion rights may not be granted in excess of five years without a subsequent resolution extending such period

Bondholder shall, by virtue of its holding of any Bond, be deemed to have waived all such rights of set-off, compensation or retention.

**Listing:** The Issuer shall use its reasonable endeavours to ensure that the Bonds are listed on the Exchange within 6 months after the Issue Date and thereafter remain listed on the Exchange until the Bonds have been redeemed in full.

**Exchange:** Oslo Børs

**Transaction Security:** Unsecured

**Finance Documents** The Bond Terms, the Bond Trustee Agreement, the Calculation Agency Agreement and any other document designated by the Issuer and the Bond Trustee as a Finance Document.

**Conditions Precedent:** Disbursement of proceeds from the Bonds to the Issuer shall be conditional upon the events set out in Schedule 1 to this Term Sheet being fulfilled.

**Issuer Call Option:** The Issuer shall at any time after the fourth anniversary of the Issue Date (the **First Call Date**) have the right to redeem all or part of the Outstanding Bonds (including, if any, PIK Bonds), together with accrued and unpaid interest, at a price equal to:

(a)    from the First Call Date to the fifth anniversary of the Issue Date, 103% of Nominal Amount; and

(b)    after the fifth anniversary of the Issue Date, 100% of the Nominal Amount,

such right to be exercised by prior written notice to the Bond Trustee not more than 60 nor less than 30 calendar days prior to the settlement date for redemption.

**Listing Failure Event:** means that:

(a)    the Bonds have not been admitted to listing on the Exchange on or before the date that is 6 months after the Issue Date, or

(b)    in the case of a successful admission to listing, that a period of 6 months has elapsed since the Bonds ceased to be admitted to listing on the Exchange.

Upon a Listing Failure Event and for so long as such Listing Failure Event is continuing, the interest on any principal amount outstanding under the Bonds Terms shall accrue at the Interest Rate plus 1 percentage point p.a.

**Sustainability:** The Issuer will aim within 2030 to reduce carbon emissions with 45% per passenger per kilometer compared to the levels in 2010 and seek to be one of the leaders within the European airline industry in respect of emissions and sustainability.

**Information Undertakings:** Customary information undertakings, to include making financial reports available on the website of the Issuer, and informing the Bond Trustee and the Bondholders of a Listing Failure Event or the occurrence of the Conversion Right Expiry Date

57

**No Events of Default:** The Bond Terms will not contain any event of default provisions. Neither the Bond Trustee nor the Bondholders may declare any event of default by the Issuer of any of its obligations under the Bond Terms or accelerate, demand or enforce payment of any such obligations (neither on a contractual basis nor on the basis of general principles of Norwegian law).

Notwithstanding the foregoing, the Bond Trustee may demand that the Bonds shall become due and payable, together with accrued and unpaid interest, on or after the date on which any order is made or resolution is passed for the final and irrevocable liquidation, final and irrevocable winding-up or final and irrevocable dissolution (or an analogous insolvency process in any jurisdiction) of the Issuer (other than for the purposes of reconstruction, amalgamation or merger where the Issuer is still solvent).

**Bond Terms:** The standard Nordic Bond Terms for corporate high yield bonds related to each Relevant Jurisdiction will regulate the rights and obligations with respect to the Bonds. In the event of any discrepancy between this term sheet and the Bond Terms, the provisions of the Bond Terms shall prevail.

By filing an application to subscribe for Bonds, each investor accepts to become a Bondholder (as defined in the Bond Terms) and to be bound by the provisions of the Bond Terms. Further, by filing such application, each investor accepts that certain adjustments to the structure and terms described in this term sheet may occur in the final Bond Terms.

The Bond Terms shall include provisions on the Bond Trustee's right to represent the Bondholders, including a "no action" clause, meaning that no individual Bondholder may take any legal action against the Issuer individually (as further described in the Bond Terms). The Bond Terms will further contain provisions regulating the duties of the Bond Trustee, procedures for Bondholders' Meetings/Written Resolutions and applicable quorum and majority requirements for Bondholders' consent, whereby a sufficient majority of Bondholders may materially amend the provisions of the Bond Terms or discharge the Bonds in part or in full without the consent of all Bondholders, as well as other provisions customary for a bond offering as described herein.

**Defined terms:** Capitalised terms used but not defined herein shall have the meaning ascribed to such terms in the standard Nordic Bond Terms for high yield bonds.

**Calculation Agent:** [•]

**Paying and Conversion Agent:** DNB Bank ASA

**Securities Depository:** The Bonds will be registered in book entry form in Verdipapirsentralen ASA, the Norwegian central securities depository (the **CSD**).

**Examinerships and Reconstruction:** References to the **Examinerships** and **Reconstruction** herein shall be references to (i) the examinerships of the Issuer and certain of its subsidiaries which commenced on an interim basis pursuant to an order of the High Court of Ireland made on 18 November 2020 and were subsequently confirmed by an order made

on 7 December 2020 and (ii) the reconstruction of the Issuer granted by the Oslo Probate Court on 8 December 2020, respectively.

| | |
|---|---|
| **Eligible Investors:** | Eligibility to be determined in accordance with the allocation principles as set out in Schedule 3 (*Principles for Allocation of New Capital Perpetual Bonds and Retained Claims Bonds*). |
| **Allocation:** | To be allocated in accordance with the allocation principles set out in Schedule 3 (*Principles for Allocation of New Capital Perpetual Bonds and Retained Claims Bonds*). |
| **Continuation of existing debt:** | An amount of each subscriber's Agreed Claim equal to 200% of the aggregate Nominal Amount of Bonds subscribed for will be converted into bonds substantially on the terms set out in Schedule 2 (*Retained Claims Bonds*) (the **Retained Claims Bonds**), subject to adjustments as may be permitted under the schemes of arrangement proposed under the Examinerships and the reconstruction plan proposed under the Reconstruction. |
| **Manager:** | DNB Bank ASA, DNB Markets |
| **Repurchase of Bonds:** | The Issuer may purchase and hold Bonds and such Bonds may be retained, sold or cancelled in the Issuer's sole discretion. |
| **Terms of subscription:** | Any subscriber of the Bonds specifically authorises the Bond Trustee to execute and deliver the Bond Terms on behalf of the prospective Bondholder, who will execute and deliver relevant application forms prior to receiving Bond allotments. On this basis, the Issuer and the Bond Trustee will execute and deliver the Bond Terms and the latter's execution and delivery shall be on behalf of all of the subscribers, such that they thereby become bound by the Bond Terms. The Bond Terms specify that by virtue of being registered as a Bondholder (directly or indirectly) with the CSD, the Bondholders are bound by the terms of the Bond Terms and any other Finance Document, without any further action required to be taken or formalities to be complied with. |
| | The Bond Terms shall be made available to the general public for inspection purposes and may, until redemption in full of the Bonds, be obtained on request to the Bond Trustee or the Issuer. |
| **Subscription Restrictions:** | The Bonds will only be offered or sold within the United States to Qualified Institutional Buyers ("QIBs") as defined in Rule 144A under the U.S. Securities Act. |
| | The Bonds have not and will not be registered under the U.S. Securities Act, or any state securities law except pursuant to an exemption from the registration requirements of the U.S. Securities Act and appropriate exemptions under the laws of any other jurisdiction. The Bonds may not be offered or sold within the United States to, or for the account or benefit of, any U.S. Person (as such terms are defined in regulations), except pursuant to an exemption from the registration requirements of the U.S. Securities Act. Failure to comply with these restrictions may constitute a violation of applicable securities legislation. |

**Transfer Restrictions:**    The Bonds will be freely transferable in accordance with the rules and regulations governing securities registered in the CSD, and may be pledged, subject to the following:

(a)    Bondholders may be subject to purchase or transfer restrictions with regard to the Bonds, as applicable from time to time under local laws to which a Bondholder may be subject (due e.g. to its nationality, its residency, its registered address or its place(s) for doing business). Each Bondholder must ensure compliance with local laws and regulations at its own cost and expense.

(b)    Notwithstanding the above, a Bondholder that has purchased the Bonds in contradiction to mandatory restrictions may nevertheless utilize its voting rights under the Bond Terms provided that the Issuer shall not incur any additional liability by complying with its obligations to such Bondholder.

**Governing Law:**    The Bond Terms will be governed by Norwegian law with Oslo District Court (*tingrett*) as agreed legal venue.

SCHEDULE 1
CONDITIONS PRECEDENT

1.    **Conditions precedent for disbursement to the Issuer**

   (a)    Payment of the net proceeds from the issuance of the Bonds to the Issuer shall be
          conditional on the Bond Trustee having received in due time (as determined by the
          Bond Trustee) prior to the Issue Date each of the following documents, in form and
          substance satisfactory to the Bond Trustee:

      (i)    these Bond Terms duly executed by all parties hereto;

      (ii)    certified copies of all necessary corporate resolutions of the Issuer to issue the
             Bonds and execute the Finance Documents to which it is a party;

      (iii)    a certified copy of a power of attorney (unless included in the corporate
              resolutions) from the Issuer to relevant individuals for their execution of the
              Finance Documents to which it is a party, or extracts from the relevant register
              or similar documentation evidencing such individuals' authorisation to execute
              such Finance Documents on behalf of the Issuer;

      (iv)    certified copies of the Issuer's articles of association and of a full extract from
             the relevant company register in respect of the Issuer evidencing that the Issuer
             is validly existing;

      (v)    copies of the Issuer's latest Financial Reports (if any);

      (vi)    confirmation that the applicable prospectus requirements (ref the EU prospectus
             directive (2003/71 EC)) concerning the issuance of the Bonds have been fulfilled;

      (vii)    confirmation that the Bonds are registered in the CSD;

      (viii)    copies of any written documentation used in marketing the Bonds or made public
              by the Issuer or any Manager in connection with the issuance of the Bonds;

      (ix)    the Bond Trustee Fee Agreement duly executed by the parties thereto;

      (x)    legal opinions or other statements as may be required by the Bond Trustee
             (including in respect of corporate matters relating to the Issuer and the legality,
             validity and enforceability of these Bond Terms and the Finance Documents);
             and

      (xi)    evidence that the Retained Claims Bonds shall be issued on or about the Issue
             Date.

The Bond Trustee, acting in its reasonable discretion, may, regarding this Clause (*Conditions
precedent for disbursement to the Issuer*), waive the requirements for documentation, or decide in
its discretion that delivery of certain documents shall be made subject to an agreed closing procedure
between the Bond Trustee and the Issuer.

## SCHEDULE 2
### RETAINED CLAIMS  BONDS

# TERM SHEET



## NORWEGIAN AIR SHUTTLE ASA RETAINED CLAIMS BONDS 2021/2026
### ISIN [●]

**Issuer:**    Norwegian Air Shuttle ASA, incorporated under the laws of Norway with business registration number 965 920 358 and LEI-code 549300IEUH2FEM2Y6B51

**Group:**    The Issuer with all its subsidiaries from time to time

**Bond Trustee:**    Nordic Trustee AS, a company existing under the laws of Norway with registration number 963 342 624 and LEI-code 549300XAKTM2BMKIPT85

**Examinerships and Reconstruction:**    References to the **Examinerships** and **Reconstruction** herein shall be references to (i) the examinerships of the Issuer and certain of its subsidiaries which commenced on an interim basis pursuant to an interim order of the High Court of Ireland made on 18 November 2020 and subsequently confirmed by an order made on 7 December 2020 and (ii) the reconstruction of the Issuer granted by the Oslo Probate Court on 8 December 2020, respectively.

**Eligibility and allocation:**    Eligibility and allocation to be determined in accordance with the allocation principles set out in Schedule 3 (*Principles for Allocation of New Capital Perpetual Bonds and Retained Claims Bonds*).

**Currency:**    NOK

**Issue Date:**    Expected to be [●][4]

**Maturity Date:**    [In respect of 50% of the Bonds issued to each Bondholder on the Issue Date, 30 September 2025, and in respect of the remaining 50% of the Bonds issued to each Bondholder on the Issue date, 30 September 2026.][5]

**Interest:**    [0]% p.a.[6]

**Subscription Price:**    100% of the Nominal Amount

**Status of the Bonds:**    The Bonds will constitute senior unsecured debt obligations of the Issuer. The Bonds will rank at least *pari passu* with each other and with all other obligations of the Issuer (save for such claims which are preferred by bankruptcy, insolvency, liquidation or other similar laws of general application).

---

[4] To be the Effective Date in respect of the schemes of arrangement under the Examinerships and/or the reconstruction plan under the Reconstruction
[5] TBC
[6] TBC

| | |
|---|---|
| **Listing:** | The Issuer shall use its reasonable endeavours to ensure that the Bonds are listed on the Exchange on or before the date falling 12 months after the Issue Date and thereafter remain listed on the Exchange until the Bonds have been redeemed in full. |
| **Exchange:** | Oslo Børs |
| **Transaction Security:** | Unsecured |
| **Finance Documents** | The Bond Terms, the Bond Trustee Agreement and any other document designated by the Issuer and the Bond Trustee as a Finance Document |
| **Information Undertakings:** | Standard information undertakings pursuant to the Bond Terms |
| **General Undertakings:** | Standard general undertakings pursuant to the Bond Terms, addressing authorisations, compliance with laws, continuation of business, corporate status, mergers and de-mergers, disposals and related party transactions |

**Negative Pledge:** The Issuer shall not, and shall procure that no other Group company will, create or allow to subsist, retain, provide, prolong or renew any security over any of its/their assets (whether present or future), other than any Permitted Security,

where **Permitted Security** means any security:

(a) granted by Arctic Aviation Assets Limited, a company existing under the laws of Ireland with business registration number 531191, or its subsidiaries;

(b) expressly contemplated in the schemes of arrangement proposed under the Examinerships and the reconstruction plan proposed under the Reconstruction to continue following the effectiveness of the Examinerships and the Reconstruction;

(c) securing any Financial Indebtedness incurred by the Group which is:

(i) wholly or partially guaranteed or provided by any government (including any governmental institution) to the Group or forms part of a financing arrangement involving any such Financial Indebtedness; or

(ii) incurred to enable the Group to cover corporate expenses during the restrictions on commercial air traffic as a result of the Covid-19 pandemic; or

(d) securing any trade instrument issued in respect of the obligations of any member of the Group arising in the ordinary course of trading of that member of the Group.

**Sustainability:** The Issuer will aim within 2030 to reduce carbon emissions with 45% per passenger per kilometer compared to the levels in 2010 and seek to be one of the leaders within the European airline industry in respect of emissions and sustainability.

**Events of Default:**   Standard Event of Default provisions applicable to the Issuer pursuant to the Bond Terms, with a cross acceleration threshold of NOK [•][7] (or equivalent thereof in any other currency) and an equal threshold amount for insolvency or insolvency proceedings, creditor's process and material litigation.

**Dividend Restriction:**   No declaration or making of dividend payments, repurchase of shares or other distributions or loans to shareholders of the Issuer at any time while the Bonds remain outstanding.

**Bond Terms:**   The standard Nordic Bond Terms for corporate high yield bonds related to each Relevant Jurisdiction will regulate the rights and obligations with respect to the Bonds. In the event of any discrepancy between this term sheet and the Bond Terms, the provisions of the Bond Terms shall prevail.

By filing an application to subscribe for Bonds, each investor accepts to become a Bondholder (as defined in the Bond Terms) and to be bound by the provisions of the Bond Terms. Further, by filing such application, each investor accepts that certain adjustments to the structure and terms described in this term sheet may occur in the final Bond Terms.

The Bond Terms shall include provisions on the Bond Trustee's right to represent the Bondholders, including a "no action" clause, meaning that no individual Bondholder may take any legal action against the Issuer individually (as further described in the Bond Terms). The Bond Terms will further contain provisions regulating the duties of the Bond Trustee, procedures for Bondholders' Meetings/Written Resolutions and applicable quorum and majority requirements for Bondholders' consent, whereby a sufficient majority of Bondholders may materially amend the provisions of the Bond Terms or discharge the Bonds in part or in full without the consent of all Bondholders, as well as other provisions customary for a bond offering as described herein.

**Defined terms:**   Capitalised terms used but not defined herein shall have the meaning ascribed to such terms in the Bond Terms.

**Securities Depository:**   The Bonds will be registered in book entry form in Verdipapirsentralen ASA, the Norwegian central securities depository (the **CSD**).

**Repurchase of Bonds:**   The Issuer may purchase and hold Bonds and such Bonds may be retained, sold or cancelled in the Issuer's sole discretion.

**Terms of subscription:**   Any subscriber of the Bonds specifically authorises the Bond Trustee to execute and deliver the Bond Terms on behalf of the prospective Bondholder, who will execute and deliver relevant application forms prior to receiving Bond allotments. On this basis, the Issuer and the Bond Trustee will execute and deliver the Bond Terms and the latter's execution and delivery shall be on behalf of all of the subscribers, such that they thereby become bound by the Bond Terms. The Bond Terms specify that by virtue of being registered as a Bondholder (directly or indirectly) with the CSD, the Bondholders are bound by the terms of the Bond Terms and any other Finance Document, without any further action required to be taken or formalities to be complied with.

---

[7] TBC

The Bond Terms shall be made available to the general public for inspection purposes and may, until redemption in full of the Bonds, be obtained on request to the Bond Trustee or the Issuer.

**Subscription Restrictions:**

The Bonds will only be offered or sold within the United States to Qualified Institutional Buyers ("QIBs") as defined in Rule 144A under the U.S. Securities Act.

The Bonds have not and will not be registered under the U.S. Securities Act, or any state securities law except pursuant to an exemption from the registration requirements of the U.S. Securities Act and appropriate exemptions under the laws of any other jurisdiction. The Bonds may not be offered or sold within the United States to, or for the account or benefit of, any U.S. Person (as such terms are defined in regulations), except pursuant to an exemption from the registration requirements of the U.S. Securities Act. Failure to comply with these restrictions may constitute a violation of applicable securities legislation.

**Paying Agent:**

DNB Bank ASA

**Transfer Restrictions:**

The Bonds will only become freely transferable from the date that is 12 months following the Issue Date (or such earlier date as determined by the Issuer in its discretion), in accordance with the rules and regulations governing securities registered in the CSD, and may be pledged, subject to the following:

(a) Bondholders may be subject to purchase or transfer restrictions with regard to the Bonds, as applicable from time to time under local laws to which a Bondholder may be subject (due e.g. to its nationality, its residency, its registered address or its place(s) for doing business). Each Bondholder must ensure compliance with local laws and regulations at its own cost and expense.

(b) Notwithstanding the above, a Bondholder that has purchased the Bonds in contradiction to mandatory restrictions may nevertheless utilize its voting rights under the Bond Terms provided that the Issuer shall not incur any additional liability by complying with its obligations to such Bondholder.

**Governing Law:**

The Bond Terms will be governed by Norwegian law with Oslo District Court (*tingrett*) as agreed legal venue.

## SCHEDULE 1
## CONDITIONS PRECEDENT

1.      **Conditions precedent for issuance of the Bonds**

(a)      Issuance of the Bonds shall be conditional on the Bond Trustee having received in due time (as determined by the Bond Trustee) prior to the Issue Date each of the following documents, in form and substance satisfactory to the Bond Trustee:

(i)      these Bond Terms duly executed by all parties hereto;

(ii)      certified copies of all necessary corporate resolutions of the Issuer to issue the Bonds and execute the Finance Documents to which it is a party;

(iii)      a certified copy of a power of attorney (unless included in the corporate resolutions) from the Issuer to relevant individuals for their execution of the Finance Documents to which it is a party, or extracts from the relevant register or similar documentation evidencing such individuals' authorisation to execute such Finance Documents on behalf of the Issuer;

(iv)      certified copies of the Issuer's articles of association and of a full extract from the relevant company register in respect of the Issuer evidencing that the Issuer is validly existing;

(v)      copies of the Issuer's latest Financial Reports (if any);

(vi)      confirmation that the applicable prospectus requirements (ref the EU prospectus directive (2003/71 EC)) concerning the issuance of the Bonds have been fulfilled;

(vii)      confirmation that the Bonds are registered in the CSD;

(viii)      copies of any written documentation used in marketing the Bonds or made public by the Issuer or any Manager in connection with the issuance of the Bonds;

(ix)      the Bond Trustee Fee Agreement duly executed by the parties thereto; and

(x)      legal opinions or other statements as may be required by the Bond Trustee (including in respect of corporate matters relating to the Issuer and the legality, validity and enforceability of these Bond Terms and the Finance Documents).

The Bond Trustee, acting in its reasonable discretion, may, regarding this Clause (*Conditions precedent for issuance of the Bonds*), waive the requirements for documentation, or decide in its discretion that delivery of certain documents shall be made subject to an agreed closing procedure between the Bond Trustee and the Issuer.

**SCHEDULE 3**

PRINCIPLES FOR ALLOCATION OF NEW CAPITAL PERPETUAL BONDS AND RETAINED CLAIMS BONDS

1.    **DEFINITIONS**

Capitalised terms used but not defined in this Schedule shall have the same meaning ascribed to them in the NAS Scheme unless the context otherwise requires.

"**Affiliates**" means with respect to a person:

(c)    any other person who, directly or indirectly is in control of, or controlled by, or is under common control with, such person; or

(d)    any other person who is a director, officer or employee:

(i)    of such person;

(ii)    of any subsidiary or parent company of such person; or

(iii)    of any person described in paragraph (a) above,

and for the purposes of this definition, control of a person shall mean the power, direct or indirect, (A) to vote on more than 50% of the securities having ordinary voting power for the election of directors of such person, or (B) to direct or cause the direction of the management and policies of such person whether by contract or otherwise.

"**Agreed Debt**" means:

(c)    the amount due to a Creditor as appears beside its name and marked as agreed in the Creditor Schedule;

(d)    the amount due to a Creditor which has otherwise been agreed by the Issuer and the Creditor prior to the Irish Confirmation Date, determined by the Irish High Court under Section 537(3) of the Act or determined in accordance with the Expert Determination Process;

(e)    in the case of any Contingent Litigation Creditor, the amount which is found to be due to it as determined by the courts of competent jurisdiction (subject to any appeal) or the amount settled or agreed by the Issuer; or

(f)    in the case of any Customer Damages Claims Creditor, the amount which is found to be due to it by the Customer Claim Forum (subject to any appeal) or the amount settled or agreed by the Issuer.

"**Allocation Factors**" includes factors such as perceived investor quality, investment horizon and history, sector knowledge, size and timeliness of the application, each of which the Issuer may in its discretion consider.

"**Connected Person**" means a person who would be connected with another person for the purposes of Section 220 of the Irish Companies Act 2014 (as amended) if that other person was a director of a company;

"**Creditors**" means all creditors of the Issuer, known or unknown, whether or not the liabilities have been acknowledged or recognised, qualified or unqualified, actual or contingent, ascertained or unascertained, including (but not limited to) the creditors and classes of creditors listed in the Creditor Schedule (under and as defined in the NAS Scheme) and each a "**Creditor**".

"**Eligible New Capital Perpetual Bonds Creditor**" means an Initial New Capital Perpetual Bonds Creditor or a Subsequent Eligible New Capital Perpetual Bonds Creditor, provided that any such Examinership Companies Creditor, when aggregated with its Affiliates' and/or Connected Persons' Relevant Portions, has a Relevant Portion of more than NOK 2,500,000 (or an equivalent amount in another currency).

"**Examiner**" means Kieran Wallace of KPMG, 1 Stokes Place, St; Stephen's Green, Dublin 2.

"**Examinership Companies Creditors**" means the Creditors and the Related Company Creditors.

"**Initial Eligible New Capital Perpetual Bonds Creditor**" means any Examinership Companies Creditor that is permitted to participate in the New Capital Perpetual Bonds Offering pursuant to applicable securities law and regulation that may apply to such Examinership Companies Creditor from time to time, provided that:

(c)     with respect to any application for New Capital Perpetual Bonds (an "**Application**") by such Examinership Companies Creditor:

(i)     the debt on which basis such Examinership Companies Creditor's Investment Allowance is calculated (the "**Eligible Debt**") was owned by such Examinership Companies Creditor as at the Petition Date; and

(ii)    such Examinership Companies Creditor has not:

    (A)    entered into or permitted to be entered into any agreement to transfer all or part of its Eligible Debt to any person (or any arrangement of similar effect); and/or

    (B)    made or permitted to be made such Application in contemplation of any such agreement or arrangement;

it being noted that the above provisos will be set out in the application form or similar documentation provided by the Issuer pursuant to which any such Application shall be made and will be represented by such Examinership Companies Creditor by its execution of the same; and

(d)    such Examinership Companies Creditor has delivered by email to the Issuer at nasperpetual@bahr.no, a non-binding expression of interest in participating in the New Capital Perpetual Bond Offering on or before the business day following the date on which the restructuring plan proposed under the Norwegian restructuring process under the Norwegian Restructuring Act is sanctioned by the Norwegian court.

"**Investment Allowance**" means, with respect to a Creditor, 50% of such Creditor's Relevant Portion.

"**NAS Scheme**" means the Scheme of Arrangement in relation to the Issuer.

"**New Capital Perpetual Bonds Offering**" means the offering to Eligible New Capital Perpetual Bonds Creditors to subscribe for New Capital Perpetual Bonds as more particularly described in the Schemes of Arrangement.

"**Petition Date**" means the date of the presentation of the petition, being 18 November 2020.

"**Private Placement**" means the private placing of new shares and the listing of such shares on the Oslo Stock Exchange as more particularly described in the Schemes of Arrangement.

"**Reconstruction**" means the reconstruction negotiations (Nw. rekonstruksjonsforhandling) in respect of the Issuer pursuant to section 23 of the Norwegian Temporary Reconstruction Act (Nw. rekonstruksjonsloven) commenced by service of a petition dated 8 December 2020.

"**Related Companies**" means:

(a)    Arctic Aviation Assets Designated Activity Company, a designated activity company incorporated under the laws of Ireland with company number 531191, having its registered office at Ground Floor, Imbus House, Dublin Airport, Co Dublin;

(b)    Norwegian Air International Limited, a private company limited by shares incorporated under the laws of Ireland with company number 525771, having its registered office at Ground Floor, Imbus House, Dublin Airport, Co Dublin;

(c)    Drammensfjorden Leasing Limited, a private company limited by shares incorporated under the laws of Ireland with company number 533167, having its registered office at Ground Floor, Imbus House, Dublin Airport, Co Dublin; and

(d)    Lysakerfjorden Leasing Limited, a private company limited by shares incorporated under the laws of Ireland with company number 585570, having its registered office at Ground Floor, Imbus House, Dublin Airport, Co Dublin.

"**Related Company Creditors**" means the creditors of any of the Related Companies, known or unknown, whether or not the liabilities have been acknowledged or recognised, qualified or unqualified, actual or contingent, ascertained or unascertained.

"**Relevant Portion**" means with respect to any Examinership Companies Creditor, such Examinership Companies Creditor's Agreed Debt (as such term is defined in the applicable Scheme of Arrangement) and without double counting) or in the event that such Examinership Companies Creditor's Claim is an Unagreed Debt the amount as identified in the Creditor Schedule to the applicable Scheme of Arrangement (and without double counting) less:

(c)    in the case of any Secured Examinership Companies Creditor, its relevant Secured Amount (as such term is defined in the applicable Scheme of Arrangement)); and

(d)    in the case of any such debt against the Issuer or a Related Company that is subordinated to the unsecured liabilities of such Issuer or Related Company, the amount of such subordinated debt (including for the avoidance of doubt, in respect of the 2020 Convertible Perpetual Bond Creditor, any debt in respect of the 2020 Convertible Perpetual Bonds).

"**Retained Claims Bonds**" means the retained claims bonds contemplated under the Retained Claims Bond Instrument, which will be issued to each Creditor that participates in:

(e) the New Capital Perpetual Bonds Offering; and/or

(f) the Private Placement.

"**Retained Claims Bonds Amount**" means,

(g) with respect to any Eligible New Capital Perpetual Bonds Creditor that participates in the New Capital Perpetual Bonds Offering, 200% of the aggregate nominal value of New Capital Perpetual Bonds subscribed for by such Eligible New Capital Perpetual Bonds Creditor; and

(h) with respect to any Eligible Private Placement Creditor that participates in the Private Placement, 200% of the total amount paid by such Eligible Private Placement Creditor in respect of its subscription for Shares under the Private Placement.

"**Rights Offering**" means the rights offering described in the Schemes of Arrangement.

"**Schemes of Arrangement**" means the schemes of arrangement relating to the Issuer and the Related Companies (together the "**Examinership Companies**") between, in each case, the relevant Examinership Company and its members and creditors as formulated by the examiner of such Examinership Company pursuant to section 534 of the Irish Companies Act 2014.

"**Schemes**" means the Schemes of Arrangement and the reconstruction plan under the Reconstruction.

"**Secured Examinership Companies Creditors**" means any Examinership Companies Creditors which are treated as being within a class of secured creditors under the Schemes or Arrangement (and including, but not limited to, the Secured Cash Deposit Creditors, the NAS07/08 Secured Bond Creditor or the NAS09 Secured Bond Creditor (each as defined in the NAS Scheme)) (and each a "**Secured Examinership Companies Creditor**").

"**Shares**" means the ordinary shares of the Issuer.

"**Subsequent Eligible New Capital Perpetual Bonds Creditor**" means any Examinership Companies Creditor that is permitted to participate in the New Capital Perpetual Bonds

Offering pursuant to applicable securities law and regulation that may apply to such Examinership Companies Creditor from time to time.

"**Unagreed Debt**" means any Claim against the Issuer which is not an Agreed Debt.

## 2.    PRINCIPLES FOR ALLOCATION

### 2.1    New Capital Perpetual Bonds Offering

(a)    Under the New Capital Perpetual Bonds Offering, each Eligible New Capital Perpetual Bonds Creditor shall be entitled to apply for New Capital Perpetual Bonds up to a maximum amount equal to such Eligible New Capital Perpetual Bonds Creditor's Investment Allowance.

(b)    The New Capital Perpetual Bonds will be allocated to each applying Initial Eligible New Capital Perpetual Bonds Creditor on a *pro rata* basis, based on the proportion that its Relevant Portion bears to the aggregate Relevant Portions of all applying Initial Eligible New Capital Perpetual Bonds Creditors (such proportion being, with respect to each such Initial Eligible New Capital Perpetual Bonds Creditor, its "**Pro Rata Proportion**"). To the extent that any Initial Eligible New Capital Perpetual Bonds Creditor subscribes for less than its Pro Rata Proportion, resulting in unsubscribed New Capital Perpetual Bonds, such unsubscribed New Capital Perpetual Bonds shall be reallocated among Initial Eligible New Capital Perpetual Bonds Creditors which have not been allocated the full subscription applied for, in accordance with their respective Pro Rata Proportions, until each Initial Eligible New Capital Perpetual Bonds Creditor has been allocated the full subscription it applied for or, if earlier, the New Capital Perpetual Bonds Offering is fully subscribed.  In the event that the New Capital Perpetual Bonds Offering is not fully subscribed following allocation to Initial Eligible New Capital Perpetual Bonds Creditors as aforesaid, the Issuer may allocate any remaining unallocated New Capital Perpetual Bonds to applying Subsequent Eligible New Capital Perpetual Bonds Creditors in its discretion, with regard to the Allocation Factors.

### 2.2    Retained Claims Bonds

(a)    Each Eligible New Capital Perpetual Bonds Creditor that participates in the New Capital Perpetual Bonds Offering and each Eligible Private Placement Creditor that participates in the Private Placement will be issued Retained Claims Bonds by the Issuer in an amount equal to its Retained Claims Bonds Amount.  Such Retained Claims Bonds will be issued by the Issuer in full and final satisfaction of the portion of the Relevant Portion of each relevant Eligible New Capital Perpetual Bonds Creditor and/or Eligible Private Placement Creditor that is equal to the aggregate face value of the Retained Claims Bonds issued to such Eligible New Capital Perpetual Bonds Creditor and/or Eligible Private Placement Creditor.

**<u>Exhibit C</u>**

**Oslo Stock Exchange Announcement**

# NewsWeb

| Norwegian Air Shuttle ASA | |
|---|---|
| Innsendt dato: | 11.03.2021 07:30 |
| UtstederID: | NAS |
| MeldingsID: | 527351 |
| Instrument: | NAS - Norwegian Air Shuttle |
| Marked: | XOSL |
| Kategori: | INNSIDEINFORMASJON |
| Informasjonspliktig: | Ja |
| Lagringspliktig: | Ja |
| Vedlegg: | NAS - New Capital Perpetual Bond - Term Sheet.pdf, Notice - NAS Customer Creditors' Meeting.pdf, Notice - NAS Unsecured Creditors Meeting.pdf, Notice for NAI Customer Creditors' Meeting.pdf, Notice for NAI Unsecured Creditors' Meeting.pdf, Notice for NAS Shareholder Meeting.pdf, Explanatory Memorandum to the Proposals - Norwegian Air Shuttle ASA (In Examinership) 11 March 2021.PDF, Proposals for a Scheme of Arrangement - Norwegian Air Shuttle ASA (In Examinership) 11 March 2021.PDF |
| Tittel: | Norwegian Air Shuttle ASA (NAS) launch of scheme for exit from the Irish examinership and Norwegian reconstruction processes |

NOT FOR RELEASE, PUBLICATION OR DISTRIBUTION, DIRECTLY OR INDIRECTLY, IN AUSTRALIA, CANADA, THE HONG KONG SPECIAL ADMINISTRATIVE REGION OF THE PEOPLE'S REPUBLIC OF CHINA, SOUTH AFRICA, NEW ZEALAND, JAPAN OR THE UNITED STATES, OR ANY OTHER JURISDICTION IN WHICH SUCH RELEASE, PUBLICATION OR DISTRIBUTION WOULD BE UNLAWFUL. THIS ANNOUNCEMENT DOES NOT CONSTITUTE AN OFFER OF ANY OF THE SECURITIES DESCRIBED HEREIN.

Reference is made to the stock exchange announcements of Norwegian Air Shuttle ASA (the "Company" or the "Group") dated 14 January 2021 and 19 February 2021 wherein the board of directors of the Company reported on indicative plans for the Company's emergence from its ongoing restructuring processes.

Following the Irish High Court's decision on Friday 5 March 2021 in respect of the repudiation of certain contracts, Mr Kieran Wallace of KPMG Ireland as Examiner of the Company and a number of Irish subsidiaries of the Group (the "Examinership Companies") has proposed schemes of arrangement for the financial restructuring the Company and the Examinership Companies, which in the case of the Company will be implemented through the Norwegian reconstruction processes (together the "Restructuring Proposal").

The Restructuring Proposal provides, among other matters, for each creditor with an unsecured claim to receive a dividend equal to 5.0% of such creditor's unsecured claim (excluding any amount the creditor may recover through participation in the proposed capital raise) comprising (i) a pro rata cash payment from a NOK 500 million "pool" to be distributed among unsecured creditors and customer creditors (ii) a convertible debt claim with 7 year maturity and NIBOR +1% interest ("Dividend Claims").

The Dividend Claims will on certain terms and conditions be convertible in aggregated into shares representing up to 25.4% of the Company's share capital following the Restructuring and the proposed capital raise.

The Restructuring Proposal is conditional on certain matters including the approval of requisite classes of creditors of the Examinership Companies, the confirmation by the Irish High Court and the Norwegian Court (in the case of the reconstruction) and ultimately the closing of the proposed rights offering, private placement and offering of perpetual hybrid instrument (the "New Capital Perpetual Bonds") (the "Capital Raise").

New investors in the Capital Raise, by investing in equity and/or the New Capital Perpetual Bonds, will receive approximately 70% of the post-Restructuring share capital with the shares held by existing shareholders diluted to approximately 4.6%. This equity allocation (including the allocation of the shares on the conversion of the Dividend Claims) assumes, for illustrative purposes, an overall Capital Raise of

NOK 4,500,000,000, comprised of up to NOK 3,000,000,000 in shares (including rights offering of NOK 400,000,000) and up to NOK 1,875,000,000 in New Capital Perpetual Bonds and will be subject to change in the event that the Capital Raise exceeds NOK 4,500,0000. Current creditors of Norwegian have already expressed an interest to participate in the Capital Raise with an amount of at least NOK 1,800,000,000.


Further details regarding the Restructuring Proposal and its terms are set out in the proposals for a scheme of arrangement (the "Proposals") and accompanying explanatory memorandum issued by the Examiner.

The Examiner is today convening meetings of the relevant classes of members and creditors of the Company and the Examinership Companies to take place over the course of 18 – 20 March 2021 and will as soon as possible thereafter seek the confirmation of the Proposals by the Irish High Court.

Notices for the meeting of the shareholders of the Company and certain classes of creditors of the Company and Norwegian Air International Limited are available here https://www.norwegian.com/uk/about/company/investor-relations/ together with a copy of the Proposals for the Company and an accompanying explanatory memorandum.

In the event the Restructuring is approved by the required authorities the Company plans to move forward with the Capital Raise commencing in April and target closing in May 2021.

For further details of the overall detailed plan supporting the future operations of the Company see the attached documents.

Details of the New Capital Perpetual Bonds, including retained claims bond terms, are attached.


For more information, please contact:
Geir Karlsen, CFO, phone +47 916 08 332

Press contact:
Esben Tuman, SVP External Communications, phone +47 905 08 400

Fornebu, 11 March 2021
Norwegian Air Shuttle ASA


This information is subject of the disclosure requirements according to the Market Abuse Regulation (MAR) Article 17 no. 1, and was prepared by Tore Østby, EVP Strategic Development at Norwegian Air Shuttle ASA, tel +47 99546400.


Important information
The release is not for publication or distribution, in whole or in part directly or indirectly, in or into Australia, Canada, the Hong Kong Special Administrative Region Of The People's Republic Of China, South Africa, New Zealand, Japan or the United States (including its territories and possessions, any state of the United States and the District of Columbia). This release is an announcement issued pursuant to legal information obligations, and is subject of the disclosure requirements pursuant to section 5-12 of the Norwegian Securities Trading Act. It is issued for information purposes only, and does not constitute or form part of any offer or solicitation to purchase or subscribe for securities, in the United States or in any other jurisdiction. The securities mentioned herein have not been, and will not be, registered under the United States Securities Act of 1933, as amended (the "US Securities Act"). The securities may not be offered or sold in the United States except pursuant to an exemption from the registration requirements of the US Securities Act.

This announcement is an advertisement and is not a prospectus for the purposes of Regulation (EU) 2017/1129 of the European Parliament and of the Council of 14 June 2017 on prospectuses to be published when securities are offered to the public or admitted to trading on a regulated market, and repealing Directive 2003/71/EC (as amended) as implemented in any Member State.

Forward-looking statements: This release and any materials distributed in connection with this release may contain certain forward-looking statements. By their nature, forward-looking statements involve risk and uncertainty because they reflect the Company's current expectations and assumptions as to future events and circumstances that may not prove accurate. A number of material factors could cause actual results and developments to differ materially from those expressed or implied by these forward-looking statements.

**<u>Exhibit D</u>**

**Norwegian Explanatory Memorandum**

## THE HIGH COURT

**2020 No. 366 COS**

IN THE MATTER OF

## ARCTIC AVIATION ASSETS DESIGNATED ACTIVITY COMPANY

AND IN THE MATTER OF

## NORWEGIAN AIR INTERNATIONAL LIMITED

AND IN THE MATTER OF

## DRAMMENSFJORDEN LEASING LIMITED

AND IN THE MATTER OF

## TORSKEFJORDEN LEASING LIMITED

AND IN THE MATTER OF

## LYSAKERFJORDEN LEASING LIMITED

AND IN THE MATTER OF

## PART 10 OF THE COMPANIES ACT 2014

AND IN THE MATTER OF

## NORWEGIAN AIR SHUTTLE ASA
## AS A RELATED COMPANY WITHIN THE MEANING OF SECTION 517 AND SECTION 2(10) OF THE COMPANIES ACT 2014

## EXPLANATORY MEMORANDUM FOR THE PROPOSALS FOR A SCHEME OF ARRANGEMENT

**BETWEEN**

**NORWEGIAN AIR SHUTTLE ASA (IN EXAMINATION UNDER PART 10 OF THE COMPANIES ACT 2014)**

**AND**

**ITS MEMBERS AND CREDITORS**

**11 MARCH 2021**

Kieran Wallace
Examiner
KPMG
1 Stokes Place
St Stephen's Green
Dublin 2
Ireland

**1      Irish Examinership Process**

1.1    Arctic Aviation Assets Designated Activity Company ("**AAA**"), Norwegian Air International Limited ("**NAI**"), Drammensfjorden Leasing Limited ("**DLL**"), Lysakerfjorden Leasing Limited ("**LLL**") and Torskefjorden Leasing Limited ("**TLL**") presented a Petition for the appointment of an examiner to those companies and to Norwegian Air Shuttle ASA as a related company (the "**Company**" or "**NAS**") on 18 November 2020 (the "**Petition Date**") pursuant to Part 10 of the Companies Act 2014 (as amended) (the "**Act**"). I was appointed as interim examiner of AAA, NAI, DLL, LLL and NAS (the "**Companies**") and TLL following the presentation of the Petition, and my appointment as examiner to the Companies and TLL was subsequently confirmed by further Order of the Irish High Court made on 7 December 2020.

1.2    As a consequence of filing the Petition, the Companies are under the protection of the Irish High Court pursuant to Part 10 of the Act.  Following a decision of the Company's board of Directors to cease offering long haul flights, I concluded that TLL no longer had a reasonable prospect of survival as a going concern and by order of the Irish High Court dated 15 January 2021, I was discharged as examiner of TLL and Mr Andrew O'Leary and I were appointed to act as joint liquidators of TLL.

1.3    As required by the Act, I have formulated proposals for a scheme of arrangement for the Company (the "**Proposals**") a copy of which has been provided in conjunction with this Explanatory Memorandum and notice of the relevant statutory meetings).  I am required by the Act to provide this Explanatory Memorandum to each Creditor and Member (or "**Shareholder**") of the Company.  This Explanatory Memorandum provides a summary of the Proposals and their effects on the Shareholders and classes of Creditors and should be read in conjunction with the Proposals.  In formulating the Proposals, I have attempted to treat the Shareholders and each class of Creditors on a fair and equitable basis having regard to the current trading position of the Company and the amounts which they would otherwise receive on a winding up.

1.4    Capitalised terms used but not defined in this Explanatory Memorandum shall have the same meaning ascribed to them as in the Proposals.  In the event of any ambiguity or difference between the terms of this Explanatory Memorandum and the terms of the Proposals, the terms of the Proposals shall apply.

**2      Norwegian Restructuring Process**

2.1    As a separate (but parallel) process, the Board applied to the Norwegian Court to have the Company placed into the Norwegian Restructuring Process.  The application was approved on 8 December 2020 by the Norwegian Court and Mr Håvard Wiker was appointed reconstructor ("**Norwegian Administrator**"). In addition, the Norwegian Court also appointed the Norwegian Creditors Committee, consisting of four members that represent the different groups of Creditors.

2.2    The Norwegian Restructuring Process had the effect of putting in place a stay in relation to Creditor actions against the Company as a matter of Norwegian law pending the presentation and potential approval of a Norwegian Restructuring Plan.   Under the Norwegian Restructuring Process, the Directors retained control and authority over the Company's affairs under the supervision of the Norwegian Administrator, alongside the Examiner. The Norwegian Administrator worked as part of the Norwegian Restructuring Committee, and separately with the Examiner, to develop the Norwegian Restructuring Plan, a copy of which is included at Schedule 8 to the Proposals, which will adopt and implement the terms and

2

substance of the Proposals in full under Norwegian law.

**3      Summary of the Proposals' Effect on Shareholders and Creditors**

*Shareholders*

3.1     The interests of the single class of Shareholders are impaired by the Proposals. This is because the Shareholders' shareholding will be diluted as a result of the issue of capital raise associated with the Proposals (detailed below) and the proposed conversion of liabilities of the Company into Shares.  The Company estimates that the Shareholders' Existing Shares will be diluted to 4.6% of the total issued share capital in the Company on a Fully Diluted Basis. Shareholders can potentially mitigate the impact of the dilution by subscribing for new Shares pursuant to the proposed Rights Offering.

*Creditors*

3.2     The unsecured claims of Creditors, including Customer Creditors, are impaired by the Proposals and will, in broad terms, be crammed down with certain classes of Creditors:

3.2.1     receiving a pro rata cash dividend from a fixed amount of NOK 500,000,000 in cash to be made available by the Company (the "**Cash Pot**"); and

3.2.2     having 5% of their Net Agreed Debt (after deducting the amount of the cash dividend) converted into a Dividend Claim,

in full and final satisfaction of the total amount of their unsecured claims.

3.3     In summary, the Dividend Claims are convertible debt obligations of the Company with a seven year maturity which, save where a Creditor opts out, will be deemed to convert into Shares in the Company 60 days after the Proposals become effective and will then be sold in the Structured Sale Process by DNB Markets, as broker, with the net proceeds shared proportionately amongst the participating Creditors.

3.4     Examples of how the Dividend Claims will operate for Creditors are set out in Schedule 1 of this Explanatory Memorandum.

3.5     Creditors can, subject to certain conditions, opt out and decide (a) not to convert their Dividend Claims at all and hold them as debt obligations (with interest accruing from a date after the completion of the Structured Sale Process)  or (b) to convert their Dividend Claims into Shares but not sell them as part of the Structured Sale Process (subject to certain restrictions, including having a valid VPS account, whether in the Creditor's own name or in the name of its custodian).

3.6     Separate to the cram down of Claims, certain eligible Creditors will have the ability to apply to subscribe in the Private Placement (a private placing of new Shares and the listing of such Shares on the Oslo Stock Exchange). Eligible Creditors are those with a Relevant Portion (an agreed or unagreed but identified debt) not exceeding NOK 2,500,000.  The Company will consider the application in accordance with the Allocation Factors set out in the Proposals and if accepted, the eligible Creditors will be entitled to subscribe for a set amount of Shares to be determined by the Company and will be given preferential allocation to investors.

3.7     Certain eligible Creditors shall be entitled to apply for New Capital Perpetual Bonds (an

offering to subscribe for a convertible bond). Eligible Creditors are those with a Relevant Portion of more than NOK 2,500,000. Eligible Creditors can subscribe for up to a maximum amount equal to the Creditor's Investment Allowance (defined in the Proposals) and subject to certain terms and conditions.

3.8    Eligible Creditors that participate in either the Private Placement or the New Capital Perpetual Bonds Offering will also be issued with Retained Claims Bonds equal to:

    3.8.1    200% of the total amount paid for the subscription for Shares in the Private Placement; or

    3.8.2    200% of the aggregate nominal value of New Capital Perpetual Bonds subscribed for.

3.9    Further detail on the treatment of Creditors is set out in paragraph 9 of this Explanatory Memorandum.

3.10    The implementation of the Proposals is subject to, amongst other matters as detailed in paragraph 4 below, the Company raising at least NOK 4.5 billion pursuant to the Rights Offering, Private Placement and the New Capital Perpetual Bonds Offering.

*Customer Creditors*

3.11    The treatment of Customer Creditors is summarised in paragraph 9D(15) below and detailed in Clause 10.27.15 of the Proposals.

3.12    As noted above, Customer Creditors' claims will be crammed down under the Scheme.

    3.12.1    where a Customer Creditor's Claim is agreed by the Company it will receive a dividend of 5% of the agreed amount of its claim (or Net Agreed Debt) as (i) a pro rata cash payment from the Cash Pot and (ii) conversion of the balance of such dividend into a Dividend Claim;

    3.12.2    if the Company does not agree a Customer Creditor's Claim then:

        (a)    Ticket Refund Claims will be addressed under the Expert Determination Process set out in Clause 11.1 of the Proposals; and

        (b)    Customer Damages Claims (ie claims other than for ticket refunds) will be determined by the relevant Customer Claim Forum,

    and in each case the outcome for such Customer Creditors will be the same as outlined under paragraph 1.10.1 above should their Claims be determined in the their favour (or where otherwise agreed by the Company);

    3.12.3    If a Customer Creditor does not agree with Company's assessment of its Claim then it may submit its Claim to General Expert for determination.

3.13    There ae costs associated with the Expert Determination Process for all Creditors as set out in Clause 11 of the Proposals.

**4        Implementation of the Proposals and Norwegian Restructuring Plan**

4.1      Under the Act, the Proposals may be approved by the Irish High Court (the "**Irish Confirmation Date**") where the Proposals have been approved by at least one impaired class of Creditors by a simple majority in number representing a majority in value of those Creditors voting in person or by proxy at a meeting. Further information on the Shareholders and Creditors meetings is at paragraph 7 below. The Proposals will become binding on the Creditors, the Shareholders and the Company and their respective successors and assigns as and from the Irish Confirmation Date.

4.2      The Norwegian Restructuring Plan will be issued by the Norwegian Administrator immediately following the Irish Confirmation Date which will commence a two-week voting period on the Norwegian Restructuring Plan.  In order to ensure the implementation of the Proposals through the Norwegian Restructuring Plan, the Proposals provide that the Creditors will irrevocably appoint me as their agent, nominee proxy and representative, with effect from Irish Confirmation Date, to vote in favour of the Norwegian Restructuring Plan on their behalf (the "**Norwegian Voting Authority**").

4.3      A copy of the Norwegian Administrator's Report, which includes the Norwegian Administrator's recommendation in respect of voting on the restructuring provided for in the Proposals and the Norwegian Restructuring Plan, is included at Schedule 9 to the Proposals.

4.4      The Proposals, if confirmed, will take effect at the Effective Time (as described below) on the Effective Date (being a date to be fixed by the Irish High Court), provided that the conditions summarised in the following sub-paragraph have been satisfied before such time.

4.5      In order for the Proposals to take effect, the Proposals and Related Proposals must first be confirmed by the Irish High Court and the Norwegian Restructuring Plan must be sanctioned by the Norwegian Court. The Company must also raise at least the Minimum Gross Proceeds Threshold (as described below), which will then be held by DNB in locked accounts in the Company's name. The Auditor must then verify to me that such Investment Proceeds have been received in the locked accounts.  Upon receipt of the confirmation from the Auditor (and the satisfaction of each of the other conditions), I will instruct DNB in writing that the Investment Proceeds shall be released to the Company at the Effective Time.

4.6      Immediately upon the satisfaction of the above conditions, the Company shall ensure that the NRBE Registrations occur.  The Effective Time will occur at the time at which the last of such registrations has occurred whereupon the Company will become entitled to the Investment Proceeds.

4.7      If the Effective Time does not occur on or before the Long Stop Date (30 June 2021), the Proposals shall terminate and lapse (save in respect of the Norwegian Voting Authority).

**5        Company's Proposal**

5.1      The board of Directors of the Company approved the Company's Proposal, which I have considered, evaluated and ultimately used as a basis upon which to prepare the Proposals in conjunction with the Company and the Norwegian Administrator.

5.2      Key to the Company's Proposal, and as announced to the Oslo Stock Exchange on 14 January 2021, is the Company's intention to:

5.2.1   focus on its core Nordics business, operating a European short-haul network with narrow body aircraft;

5.2.2   cease operating the Group's long-haul network; and

5.2.3   subject to the restructuring contemplated by the Proposals and the Related Proposals being successful:

(a)   reduce total debt to around NOK 20,000,000,000 and emerge from the restructuring with a free cash position of approximately NOK 4,000,000,000 to NOK 5,000,000,000; and

(b)   achieve positive EBITDA following the restructuring in 2021 based on conservative assumptions as to the length of the COVID-19 pandemic and as to revenues, costs and load factors.

5.3   The Company's Proposal also envisages cost savings where possible, implemented by procuring the most competitive terms available from suppliers and, in some instances, replacing suppliers with in-house resources.

5.4   In furtherance of that objective, the Companies obtained orders from the Irish High Court to repudiate and/or consensually terminate certain contracts which were no longer required and re-negotiated other contracts on a go forward basis. For the most part, the repudiated contracts relate to aircraft and aircraft engine leases, and supply or service agreements relevant to the long-haul part of the Companies' business. As the Company decided to pivot away from its long-haul operations to ensure the future survival of the business, the repudiation of certain contracts was required.

## 6   Investment

6.1   The Proposals and Related Proposals are conditional upon the Company receiving gross proceeds (prior to the deduction of any costs or fees associated with the capital raising process) of no less than NOK 4,500,000,000 in aggregate (otherwise known as the "**Minimum Gross Proceeds Threshold**") as a result of the Rights Offering, the Private Placement and the New Capital Perpetual Bonds Offering, as briefly summarised below.  If an amount exactly equal to the Minimum Gross Proceeds Threshold is raised, the investors in the Rights Offering, the Private Placement and the New Capital Perpetual Bonds Offering will be entitled to hold 70% in aggregate of the Company's issued share capital at the Effective Time on a Fully Diluted Basis. If an amount greater than the Minimum Gross Proceeds Threshold is raised, then the investors' aggregate entitlement will represent a larger proportion of the Company's issued share capital. These statements are based on a number of assumptions detailed within the Proposals, including that all conversion rights under the New Capital Perpetual Bonds and the Dividend Claims (as described below) will be immediately exercised on issue on such date.  In practice, this will not be the case as neither the New Capital Perpetual Bonds nor the Dividend Claims will be convertible into Shares on such date (the relevant timings are briefly summarised below).

6.2   The completion of the Rights Offering, the Private Placement and the New Capital Perpetual Bonds Offering are conditional upon the occurrence of the Effective Time.  Each element of the Investment will be launched on a date to be determined by the Board (and, in the case of the Rights Offering and the Private Placement, no earlier than the business day following the date on which the Prospectus has been approved by the FSAN) and will close (the "**Closing**

6

**Date**") no earlier than the latest of:

6.2.1   the expiration of the time for any appeal of the Irish Confirmation Order and the Norwegian Confirmation Order;

6.2.2   the final determination of any appeal of the Irish Confirmation Order and/or the Norwegian Confirmation Order; and

6.2.3   in the case of the Rights Offering, the date that falls two weeks after the opening of the Rights Offering Subscription Period,

provided that each relevant Closing Date, and consequently the Effective Time, shall occur by no later than the Long Stop Date.

6.3   The Company obtained the necessary shareholder authorities to give effect to the Rights Offering, the Private Placement and the New Capital Perpetual Bonds Offering at its extraordinary general meeting held on 17 December 2020.

6.4   The Investment Proceeds will be used to provide working capital for the Company, the Related Companies and the wider Group for general corporate purposes including to facilitate the ongoing survival of the Companies as going concerns.  The dividends to be made under the Proposals and/or the Related Proposals shall be funded from cash available to the Company and the Related Companies at the Effective Time.

6.5   Under the New Capital Perpetual Bonds Instrument and the Retained Claims Bonds Instrument, the Company will be subject to restrictions on, inter alia, the declaration or making of dividend payments until the Company has complied with certain of its repayment obligations thereunder. Shareholders and Creditors should therefore note this in the context of any application for Shares under the Rights Offering and Private Placement or the exercise of conversion rights under the Dividend Claims Terms or the New Capital Perpetual Bonds Instrument.

6.6   Further information regarding each of the Rights Offering, the Private Placement and the New Capital Perpetual Bonds Offering (including the Record Date, Subscription Period and Trading Period, as briefly described below, prior to the occurrence or commencement of the same) will be published by the Company in accordance with the rules of the Oslo Stock Exchange. Participation in each element of the Investment will be subject to certain terms and conditions, including the provision of satisfactory KYC information to the Company.

### A.   *Rights Offering*

6.7   Under the Rights Offering, each holder of Shares on the Record Date (to be determined by the Board) will, subject to applicable law, be granted preferential rights to subscribe for and be allocated new Shares at the Subscription Price (to be determined by the Company and its advisers) in proportion to his/its shareholding in the Company. The Rights Offering will be limited to raising total gross proceeds for the Company in the amount of NOK 400,000,000.

6.8   The Company will prepare the Prospectus to be approved by the FSAN.  The subscription period for the Rights Offering will commence on a date to be determined by the Board being no earlier than the business day after the FSAN has approved the Prospectus and expire no earlier than the Closing Date (the "**Rights Offering Subscription Period**").

6.9    Each holder of Shares as of the Record Date will be granted tradeable subscription rights (the "**Subscription Rights**") for each Share registered as held by such holder as of the Record Date. The aggregate amount of Subscription Rights received by such holders shall be an amount that ensures NOK 400,000,000 in aggregate gross proceeds at the Subscription Price. The Subscription Rights will be listed and tradeable on the Oslo Stock Exchange from the commencement of the Rights Offering Subscription Period until no earlier than 4.30 p.m. (Oslo time) two trading days prior to the end of the Rights Offering Subscription Period (the "**Trading Period**"). Over-subscription and subscription without Subscription Rights will be permitted. Each Subscription Right will, subject to applicable law and certain conditions set out in the Proposals, give the right to subscribe for, and be allocated, one new Share. Subscription Rights acquired during the Trading Period will carry the same right to subscription as the Subscription Rights granted to holders of Shares as of the Record Date and all such Subscription Rights (whether received and retained by holders of Shares or acquired during the Trading Period) shall, for the avoidance of doubt, remain conditional until such time as the conditions of the Rights Offering are satisfied.

6.10    Subscription Rights that are not used to subscribe for new Shares before the expiry of the Rights Offering Subscription Period will have no value and will lapse without compensation to the holder.

### B.    Private Placement

6.11    Under the Private Placement, certain investors, and certain Examinership Companies Creditors, will be invited to apply for new Shares at the Subscription Price.  The new Shares will be listed on the Oslo Stock Exchange.

6.12    The subscription period in the Private Placement will commence on a date to be determined by the Board, being no earlier than on the business day after the FSAN has approved the Prospectus, and expire no earlier than the Closing Date (the "**Private Placement Subscription Period**").

6.13    The Company will, in consultation with DNB Markets (a part of DNB), as global coordinator, determine the allocation of Shares. The allocation principles will, in accordance with customary practice for institutional placements, include factors such as perceived investor quality, investment horizon and history, sector knowledge, size and timeliness of the application, each of which the Company may in its discretion consider ("**Allocation Factors**") and the Company will reserve the right to reduce or reject any application for shares in the Private Placement and also to set a maximum allocation per applicant, a maximum number of applicants or decide to make no allocation to any applicant (the "**Allocation Principles**"), provided that the Allocation Principles shall not be used to reduce or reject any application from an Eligible Placement Creditor in respect of its entitlement (whether in whole or in part) summarised in the following sub-paragraph.

6.14    Each Eligible Private Placement Creditor shall be entitled to apply to participate in the Private Placement up to a maximum amount equal to such Eligible Private Placement Creditor's Investment Allowance during the Private Placement Subscription Period and such Eligible Private Placement Creditors shall be given a preferential allocation in the Private Placement up to the amount of their respective Investment Allowances.

6.15    Where an Eligible Private Placement Creditor participates in the Private Placement, it will also be issued Retained Claims Bonds by the Company in an amount equal to its Retained Claims

Bonds Amount. Such Retained Claims Bonds will be issued by the Company in full and final satisfaction of the portion of each relevant Eligible Private Placement Creditor's Relevant Portion that is equal to the aggregate face value of the Retained Claims Bonds issued to such Eligible Private Placement Creditor. The Retained Claims Bonds will be constituted pursuant to the Retained Claims Bonds Instrument, the near final term sheet in respect of which is at Schedule 6 to the Proposals.

### C.    New Capital Perpetual Bonds Offering

6.16    Under the New Capital Perpetual Bonds Offering, each Eligible New Capital Perpetual Bonds Creditor shall be entitled to apply for New Capital Perpetual Bonds up to a maximum amount equal to such Eligible New Capital Perpetual Bonds Creditor's Investment Allowance during the New Capital Perpetual Bonds Subscription Period.  The New Capital Perpetual Bonds will be constituted pursuant to the New Capital Perpetual Bond Instrument, the near final term sheet in respect of which is at Schedule 6 to the Proposals.

6.17    The subscription period in the New Capital Perpetual Bonds Offering will commence on a date to be determined by the Board and expire no earlier than the Closing Date (the "**New Capital Perpetual Bonds Subscription Period**").

6.18    The New Capital Perpetual Bonds will be allocated to each applying Initial Eligible New Capital Perpetual Bonds Creditor on a *pro rata* basis, based on the proportion that its Relevant Portion bears to the aggregate Relevant Portions of all applying Initial Eligible New Capital Perpetual Bonds Creditors (such proportion being, with respect to each such Initial Eligible New Capital Perpetual Bonds Creditor, its "**Pro Rata Proportion**").  To the extent that any Initial Eligible New Capital Perpetual Bonds Creditor subscribes for less than its Pro Rata Proportion, resulting in unsubscribed New Capital Perpetual Bonds, such unsubscribed New Capital Perpetual Bonds shall be reallocated among Initial Eligible New Capital Perpetual Bonds Creditors which have not been allocated the full subscription applied for, in accordance with their respective Pro Rata Proportions, until each Initial Eligible New Capital Perpetual Bonds Creditor has been allocated the full subscription it applied for or, if earlier, the New Capital Perpetual Bonds Offering is fully subscribed.  In the event that the New Capital Perpetual Bonds Offering is not fully subscribed following allocation to Initial Eligible New Capital Perpetual Bonds Creditors as aforesaid, the Company may allocate any remaining unallocated New Capital Perpetual Bonds to applying Subsequent Eligible New Capital Perpetual Bonds Creditors in its discretion, with regard to the Allocation Factors.

6.19    The maximum amount of the New Capital Perpetual Bonds Offering shall be determined by the Company in parallel with determining the amount of the Rights Offering and the Private Placement and shall be no greater than NOK 1,875,000,000.

6.20    Each Eligible New Capital Perpetual Bonds Creditor that participates in the New Capital Perpetual Bonds Offering will also be issued Retained Claims Bonds by the Company in an amount equal to its Retained Claims Bonds Amount. Such Retained Claims Bonds will be issued by the Company in full and final satisfaction of the portion of each relevant Eligible New Capital Perpetual Bond Creditor's Relevant Portion that is equal to the aggregate face value of the Retained Claims Bond issued to such Eligible New Capital Perpetual Bonds Creditor. The Retained Claims Bonds will be constituted pursuant to the Retained Claims Bond Instrument.

6.21    Participation in the New Capital Perpetual Bonds Offering shall be subject to certain terms

and conditions set forth in the New Capital Perpetual Bond Instrument, including a minimum subscription of at least the NOK equivalent of EUR 100,000.

6.22   The New Capital Perpetual Bonds shall become convertible into Shares at a price equal to 150% of the Subscription Price subject to and in accordance with the terms of the New Capital Perpetual Bond Instrument (including as to the duration of the conversion period).

6.23   The Norwegian Government proposed (*Prop. 79 S (2020 – 2021) [Post 91 and 92]*), and the Parliament of Norway (*Nw. Stortinget*) has approved, the Norwegian Government's intention to participate in the New Capital Perpetual Bonds Offering up to an amount not exceeding NOK 1,500,000,000.

### D.   Retained Claims Bonds

6.24   Each Eligible New Capital Perpetual Bonds Creditor that participates in the New Capital Perpetual Bonds Offering and each Eligible Private Placement Creditor that participates in the Private Placement will be issued Retained Claims Bonds by the Company in an amount equal to its Retained Claims Bonds Amount. Such Retained Claims Bonds will be issued by the Company in full and final satisfaction of the portion of the Relevant Portion of each relevant Eligible New Capital Perpetual Bonds Creditor and/or Eligible Private Placement Creditor that is equal to the aggregate face value of the Retained Claims Bonds issued to such Eligible New Capital Perpetual Bonds Creditor and/or Eligible Private Placement Creditor.

6.25   To the extent a Creditor has more than one Agreed Debt, the aggregate amount of Retained Claims Bonds issued or to be issued to such Creditor shall be apportioned equally across each of its Agreed Debts when determining its Net Agreed Debt for the purposes of ascertaining the amount of its entitlement (if any) to a dividend under the Proposals. For the avoidance of doubt, no Creditor shall have any part of its Net Agreed Debt converted into a Dividend Claim  or be paid any Cash Pot Entitlement in respect of such part of its Claim as shall be satisfied by the issuance of Retained Claims Bonds.

6.26   The Retained Claims Bonds will be constituted pursuant to the Retained Claims Bonds Instrument and are subject to certain terms and conditions contained therein.

## 7   Shareholders and Creditors Meetings

7.1   Full details for the relevant meetings for Shareholders or the class or classes of Creditor, which you are entitled to attend are provided separately and merely summarised below.

7.2   For all relevant meetings of Shareholders and Creditors of the Company, notice is given to participants at least seven days before the date of the relevant meetings.

Shareholders Meeting

7.3   There is only one class of Shareholder in the Company, therefore only one meeting will be held. For Shareholders, notice of the meeting and a form of proxy (containing a unique reference number and pin code for the purposes of submitting a proxy or attending the meeting) are sent to Shareholders either by post, by email or through the Shareholder's online Verdipapirsentralen ASA central security depositary account (**VPS Account**).

7.4   Additionally, the Proposals, this Explanatory Memorandum and the form of proxy are available to Shareholders on the Company's website www.norwegian.com, as required by Norwegian

law.   These documents, and Norwegian translations of same, are also available to Shareholders if they log on to their individual Shareholder's VPS Account. Notice of the meeting and the Proposals are also placed on the Company's website and announced via the Oslo Stock Exchange, the Oslo Børs.

7.5    The voting record date is 4pm two days before the date of the meeting. Shareholders must also return proxy forms by 4pm two days before the date of the meeting. Proxy forms can be submitted electronically via the Shareholder's individual VPS Account or through the Company's website, or alternatively can be submitted by email to DNB (Registrar for the Company).

7.6    The meeting of the Shareholders shall take place on 18 March 2021, via an online video conferencing platform operated by Lumi Global. Voting shall take place during the meeting through the Lumi Global live voting system by participants or their proxies in attendance. NAS Shareholders who appoint a proxy to attend and vote at the meeting on their behalf must provide their proxy with their individual log-on codes for the online portal operated by Lumi Glogal (the **Portal**) to enable proxies to vote on their behalf. Where an individual is appointed as a proxy for multiple Shareholders, the proxy must log in to the Portal with each Shareholder's log-on details and cast separate votes on behalf of each Shareholder. Shareholders can submit written questions or comments to the Examiner during the meeting through the Portal.

Creditors Meetings

7.7    There are 17 classes of Creditors, therefore 17 separate meetings will be held. Certain classes of Creditors have very large numbers; Unsecured Creditors comprise circa 1,600 Creditors and Customer Creditors comprise circa 34,000 Creditors. Having regard to the large numbers, the meetings for these Creditors will be managed differently to other classes of Creditors.

7.8    For identified Unsecured Creditors and Customer Creditors for which the Company has email contact details, notice of the meetings and individual log-on codes for the Portal are sent by email by my team.

7.9    For Unsecured Creditors and Customer Creditors for which the Company does not have email contact details, or where my team receives a delivery failure notice from the email, Creditor notification is effected by:

7.9.1    Public advertisement on the Company's website, www.norwegian.com;

7.9.2    Public announcement via the website of the Oslo Stock Exchange, the Oslo Børs; and

7.9.3    Where relevant, notification of intermediaries for customer bookings

7.10    For meetings of Customer Creditors, notice is only provided to customers who have either submitted claims or responded to the advertisement within the stated seven-day period.

7.11    Unsecured Creditors and Customer Creditors must return proxy forms by submitting them electronically through the online Portal by 4pm two days before the meeting. For all other classes of Creditors, proxies must be returned by email to my team to be received no later than 4pm the day before the relevant meeting.

7.12    Meetings of the Unsecured and Customer Creditors shall also be hosted online via the video conferencing platform operated by Lumi Global. Voting shall take place during the meeting through the Lumi Global live voting system by participants or their proxies in attendance. Lumi shall then reconcile the votes immediately and provide the results to me and my team. Unsecured Creditors and Customer Creditors who appoint a proxy to attend and vote at the meeting on their behalf must provide their proxy with their individual log-on codes for the Portal to enable proxies to vote on their behalf. Where an individual is appointed as a proxy for multiple Creditors, the proxy must log in to the Portal with each Creditor's log-on details and cast separate votes on behalf of each individual Creditor in order to vote. Unsecured Creditors and Customer Creditors can submit written questions or comments to me during the meeting through the Portal.

7.13    For all other classes of Creditors, they are notified of the meetings by email sent by my team containing, or providing a link to, soft copies of the Proposals, this Explanatory Memorandum, proxy forms, log-on details for the meeting to be held by video conference via Zoom, a statement of the value of each Creditor's claim and a dedicated email address to contact in the event that the Creditor wished to dispute the claim. Voting shall take place by each participant verbally voting for or against the proposals on the Zoom videoconference meeting. Voting in advance of the meetings is not permitted. Creditors can raise questions or comment orally during the meeting.

7.14    Meetings of all Creditors of the Company shall take place on  18 March 2021.

        <u>General</u>

7.15    Care should be taken to execute the forms of proxy in accordance with the notes on the face of the form of proxy.

7.16    I will act as Chairman of the meetings and you may, if you so wish, appoint me as your proxy. If so appointed, I will vote in favour of the Proposals unless otherwise instructed.

7.17    It is not necessary to submit a proof of debt with a form of proxy in order to vote at a meeting of Creditors.

7.18    If a Creditor has transferred its debt (or any part of it) before or after the issuance of the Proposals but prior to the meetings of the Creditors, the log-in details for the online Portal should be transmitted to the purchaser/transferee.  The purchaser/transferee may request the transferring Creditor to complete a form of proxy on its behalf for the purpose of voting at the relevant meeting of Creditors.

## 8        Shareholder and Creditor Claims

8.1    I would like to draw your attention to the amount at which your Claim is stated in the Creditor Schedule at Schedule 5 to the Proposals. In accordance with the Order of Mr Justice Quinn made on 19 February 2021, Customer Creditors are not listed in the Creditor Schedule. However, any Customer Creditor will be able see the amount of their individual Claim upon logging onto the Lumi Global meeting platform.

8.2    The Proposals contain a procedure for parties wishing to make a Claim which, at the time the Proposals were formulated, the Company did not accept or accept in full, whether or not such parties were listed in the Creditor Schedule.  If a party wishes to make such a Claim, they are required to follow the procedures set out in the Proposals and briefly described further below.

8.3    Additionally, in accordance with the Order of Mr Justice Quinn made on 19 February 2021, Schedule 4 to the Proposals only includes a list of the Company's top 20 largest shareholders in value as of 2 March 2021.

**9    Summary of Proposals**

9.1    The Proposals reflect, and the Norwegian Restructuring Plan will also reflect, the key principals and requirements of Irish examinership law and the Norwegian Restructuring Process. In the event of any inconsistencies between the Proposals and the Norwegian Restructuring Plan, the Proposals shall take precedence.

<u>Treatment of Shareholders</u>

9.2    There is only one class of Shareholder in the Company and the interests of the Shareholders **<u>are impaired</u>** by the Proposals.

9.3    On and from the Effective Time, the Existing Shares will be diluted on account of (i) the issue of new Shares pursuant to the Rights Offering and the Private Placement and (ii) the conversion of New Capital Perpetual Bonds and Dividend Claims into Shares. On a Fully Diluted Basis, the Company estimates that the Existing Shares will represent approximately 4.6% of the total issued share capital of the Company.

9.4    Shareholders are, however, entitled to participate in the Rights Offering which may, if they elect to subscribe for their allocated number of new Share(s), mitigate the extent to which their total interest in the Company's share capital will be diluted by virtue of the Proposals and Related Proposals.

<u>Treatment of Creditors</u>

***A.  Cash Pot Entitlement***

9.5    As described further below, certain classes of Creditors will receive a cash dividend under the Proposals (such creditors being, the "**Cash Creditors**") from the Cash Pot of NOK 500,000,000.

9.6    Each Cash Creditor will be entitled to be paid a cash dividend from the Cash Pot on a *pro rata* basis, based on the proportion that its Net Agreed Debt bears to the aggregate of (i) the Net Agreed Debts of all Cash Creditors as of the day immediately following the end of the Expert Determination Process and (ii) the Estimated Net Agreed Debts (defined below) as of such date (each Cash Creditor's proportionate entitlement to payment from the Cash Pot being its "**Cash Pot Entitlement**").

9.7    The Company will place an amount of the Cash Pot into escrow as a reserve from which to pay cash dividends to any Contingent Litigation Creditors and Customer Damages Claims Creditors whose Claims are agreed by the Company or determined in their favour after the end of the Expert Determination Process (the "**Litigation Reserve**").  The Litigation Reserve will be calculated based on the Company's best estimates of those Creditors' Net Agreed Debts, if any, subject to the non-binding assumption that the Claims are determined in the Creditors' favour ("**Estimated Net Agreed Debts**").

9.8    If the Litigation Reserve is insufficient to pay in full the Contingent Litigation Creditors and Customer Damages Claims Creditors their cash dividends (if any) then the Company shall be

required to make up the difference.  Further, if there is any excess Litigation Reserve after all Customer Damages Creditors' and Contingent Litigation Creditors' Claims have been determined, settled, agreed or withdrawn then the Company shall retain such cash.

### B.  Dividend Claims

9.9     As described further below, certain classes of Creditors will, in addition to receiving their Cash Pot Entitlement, have their respective Dividend Balance (ie 5% of their Net Agreed Debt less their Cash Pot Entitlement) converted into a Dividend Claim in full and final satisfaction of the total amount of the Creditors' Claims (the holders of such Dividend Claims from time to time being the "**Dividend Claims Creditors**").

9.10    Dividend Claims shall be dematerialised/uncertificated unsecured debt obligations of the Company and shall be governed by the Dividend Claims Terms from and including the Effective Time.  Each Dividend Claim shall be:

9.10.1   convertible into Shares in the Company; and

9.10.2   assignable to another person (in each case, in respect of the whole of such Dividend Claim only, together with any related PIK Interest Tranche (as defined in the Dividend Claims Terms) in accordance with, and subject to, the Dividend Claims Terms.

9.11    The full terms and conditions of the Dividend Claims are set out in the Dividend Claim Terms and the following is a summary of the key terms.  In the event of any inconsistencies between this Explanatory Memorandum, the corresponding section of the Proposals and the Dividend Claims Terms, the Dividend Claims Terms shall take precedence.

9.12    Neither this Explanatory Memorandum nor the Proposals constitute or contain taxation advice on any matter, including (without limitation) the taxation consequences for Creditors which participate in any element of the Investment or which are entitled to Dividend Claims or cash payments under the Proposals.  All Creditors should consult their own taxation advisers about the Irish and Norwegian taxation consequences (and the taxation consequences under the laws of other relevant jurisdictions) which may arise as a result of the Proposals and the matters contemplated hereby (including pursuant to the Dividend Claims Terms).

9.13    The Dividend Claims Terms provide for a number of steps to be taken in relation to the potential conversion of the Dividend Claims and the structured sale of the Conversion Shares as summarised below. The Company shall appoint the Overseer with effect from the Effective Time to perform the duties summarised below and specified in the Dividend Claims Terms.

9.14    Subject to the option of Dividend Claims Creditors to opt out of the conversion process and/or the Structured Sale Process as described below, the Dividend Claims shall be deemed converted into Shares on the date that falls 60 days after the Effective Date (the "**Structured Sale Conversion Date**") and the resulting Shares (excluding any No-Sale Conversion Shares, the "**Structured Sale Conversion Shares**") shall be issued within 5 business days after the Structured Sale Conversion Date to a VPS investor escrow account (the "**Obligor VPS Account**") in the name of the Company on behalf of the Dividend Claims Creditors that held the corresponding Dividend Claims immediately prior to such conversion (each a "**Structured Sale Creditor**").

9.15    On the date that falls 5 business days prior to the Structured Sale Conversion Date (the "**Conversion Price Determination Date**"), the Company shall, in conjunction with the

Overseer, fix the conversion price under the Dividend Claims (the "**Conversion Price**") such that all of the Dividend Claims arising under the Proposals would in aggregate convert into a number of Shares that would represent 25.4% of the Company's issued share capital on a Fully Diluted Basis (or 233,548,229 Shares).  In the event that the amount of Investment Proceeds raised exceeds the Minimum Gross Proceeds Threshold, such 233,548,229 Conversion Shares shall correspondingly represent less than 25.4% of the Company's issued share capital.    Should there be any dispute between the Overseer and the Company regarding the Conversion Price, the decision of the Overseer shall be final.

9.16    The Structured Sale Conversion Shares   shall subsequently be sold in the market by the Broker by way of a structured sale process, the structure of which (including timing and sale price) shall be determined by the Broker in its discretion, with the objective of maximising the average sale price of the Structured Sale Conversion Shares within a commercially reasonable time period, based on liquidity and other market factors (the "**Structured Sale Process**"). The instruction from the Company to the Broker to commence the Structured Sale Process, once given, shall be irrevocable. The Broker shall use all reasonable efforts to complete the Structured Sale Process within three months from the Structured Sale Conversion Date, provided that it shall have discretion to extend such period where it considers in its professional judgment that it would be in the best interests of the Structured Sale Creditors to do so.  The mandate letter of the Broker with respect to the Structured Sale Process is attached to the Dividend Claims Terms.

9.17    The cash proceeds from the Structured Sale Process, net of a 0.35% provision fee that shall be deducted from the Structured Sale Proceeds (and consequently shall be borne pro rata by each Structured Sale Creditor (the "**Structured Sale Proceeds**") shall be deposited in a blocked escrow account of the Company held with DNB (the "**Structured Sale Proceeds Account**")  and shall be distributed pro rata to the Structured Sale Creditors, in each case as soon as reasonably practicable following the later of:

9.17.1   the completion of the Structured Sale Process; and

9.17.2   the date on which such Structured Sale Creditor provides payment details (and, if applicable, satisfactory KYC information) to the Company and/or DNB.

9.18    Notwithstanding sub-paragraphs 9.10 to 9.14 above, a Dividend Claims Creditor may subject to the Dividend Claims Terms and securities laws applicable to that Dividend Claims Creditor, irrevocably elect no later than 2 business days prior to the Structured Sale Conversion Date (the "**Opt-Out Deadline**"), by delivery to the Company of a notice in the form set out in the Dividend Claims Terms (an "**Opt-Out Notice**") for either:

9.18.1   such Dividend Claim (in whole but not in part) not to be converted to Shares; such Dividend Claim shall in such event continue on the terms of the Dividend Claims Terms, with no conversion right thereafter; or

9.18.2   such Dividend Claim (in whole but not in part) to be converted to Shares but not be sold pursuant to the Structured Sale Process ("**No-Sale Conversion Shares**", and, together with the Structured Sale Conversion Shares, "**Conversion Shares**"), provided that such Dividend Claims Creditor (each a "**No-Sale Creditor**" and, together with the Structured Sale Creditors, the "**Converting Creditors**") shall provide to the Company details of a valid VPS account (either in its own name or in the name of its custodian) ("**Dividend Creditor VPS Account**") on or before the Opt-

15

Out Deadline; in such event the Dividend Claims in respect of which such notice is given shall, promptly following completion of the Structured Sale Process (and in any event no later than three months after commencement of the Structured Sale Process) (the "**No-Sale Conversion Date**"), be deemed converted into No-Sale Conversion Shares and delivered to the specified Dividend Creditor VPS Account within 5 business days after the No-Scale conversion Date;

(collectively, the "**Opt-Out Election**").

9.19    In accordance with the Dividend Claims Terms, a Dividend Claims Creditor shall only be permitted to exercise its Opt-Out Election where:

9.19.1   the Dividend Claims Creditor provides the Company with details of a valid Dividend Creditor VPS Account on or prior to the Opt-Out Deadline; and

9.19.2   it represents in the Opt-Out Notice that it is either:

(a)     not located in the United States (as defined in Regulation S under the US Securities Act); or

(b)     it is either (i) a "qualified institutional buyer" (as defined in Rule 144A under the US Securities Act) or (ii) an "institutional" accredited investor (within the meaning of Rule 501(a)(1), (3), (5) or (7) under the US Securities Act).

For the avoidance of doubt, the Opt-Out Election of a Dividend Claims Creditor shall not be effective unless the foregoing representation is provided by such Dividend Claims Creditor.

9.20    The Company may in its discretion implement an electronic platform for the purpose of the provision of information and the administration of transactions relating to the Dividend Claims, including:

9.20.1   the Obligor providing each Dividend Claims Creditor with the outstanding amount of its Dividend Claim;

9.20.2   a Dividend Claims Creditor notifying the Company of an assignment of its Dividend Claim;

9.20.3   the delivery by Dividend Claims Creditors of an Opt-out Notice as described in Clauses 9.15 and 9.16 above; and

9.20.4   the provision by Dividend Claims Creditors of payment details and KYC information for the purposes of disbursement of Structured Sale Proceeds and/or payment of principal and interest.

9.21    The Company shall obtain written confirmation from the Overseer that he considers that (the "**Independent Verification Statement**"):

9.21.1   the Conversion Price will in fact enable the Dividend Claims in aggregate to be convertible into a number of Conversion Shares that would represent 25.4% of the Company's issued share capital on a Fully Diluted Basis; and

16

9.21.2  the number of Conversion Shares to be issued to each Converting Creditor has been calculated in accordance with the Dividend Claims Terms.

9.22    The Company shall announce the Conversion Price, the fact that the Independent Verification Statement has been obtained in respect thereof and the supporting calculations behind the Conversion Price, by stock exchange announcement to the Oslo Stock Exchange and/or on its website on the Conversion Price Determination Date.

9.23    The Company shall procure and provide evidence to the Overseer, promptly after the occurrence of each of the following events:

9.23.1  that the Structured Sale Conversion Shares to be issued to each Structured Sale Creditor have been issued to the Obligor VPS Account;

9.23.2  that the Company has provided an instruction to the Broker to perform the Structured Sale Process in accordance with the Dividend Claims Terms;

9.23.3  from the Broker, of the average sale price that was obtained in respect of the Structured Sale Conversion Shares in the Structured Sale Process, and the calculation of the corresponding pro rata entitlement of each Structured Sale Creditor to the Structured Sale Proceeds;

9.23.4  that the Structured Sale Proceeds have been delivered to the Structured Sale Proceeds Account; and

9.23.5  that any No-Sale Conversion Shares to be issued to No-Sale Creditors have been issued to such No-Sale Creditors no later than 5 business days following the No-Sale Conversion Date,

9.24    and the Company shall procure from the Overseer, following the conclusion of the Structured Sale Process and the issuance of any No-Sale Conversion Shares, a report based on the aforementioned evidence (the "**Post-Conversion Report**").

9.25    The Company shall make the Post-Conversion Report available on its website as soon as practicable after receipt of the same.

9.26    Any Dividend Claim that is not converted to Shares on the Structured Sale Conversion Date or the No-Sale Conversion Date due to an opt-out as described in sub-paragraph 9.15.1 above (and any Dividend Claim in respect of which the Litigation Payment Date falls after the Conversion Price Determination Date) shall continue as an unsecured claim on the terms of the Dividend Claims Terms, with no conversion rights.  Such continuing Dividend Claims shall have a maturity date 7 years after the Effective Date, and shall accrue interest at a rate of six-month NIBOR +1% from the business day following the No-Sale Conversion Date, payable in kind until 1 June 2023 and in cash thereafter.

### C.  Dividend Claims Worked Example

9.27    The projected value, based on certain assumptions, of the Dividend Claims is set out in Schedule 1 of this Explanatory Memorandum.

### D.  Specific Creditor Classes

17

9.28   The Proposals include the following provisions in respect of the 17 classes of Creditors of the Company:

*(1)  Secured Cash Deposit Creditors*

9.29   The security held by the Secured Cash Deposit Creditors over certain bank accounts exceeds the amount of the Secured Cash Deposit Creditors' Claims.  Consequently, the Secured Cash Deposit Creditors **are not impaired** by the Proposals and the existing security shall remain in force.

*(2)  NAS09 Secured Bond Creditor*

9.30   If the relevant Secured Amount is equal to or exceeds the amount of the NAS09 Secured Bond Creditor's Claim, the Claim shall be unaffected by the Proposals and the existing security held by the Creditor shall remain in force.

9.31   If the relevant Secured Amount is less than the amount of the Claim:

9.31.1   the Claim shall be written down to the value of the relevant Secured Amount, and the existing security held by the Creditor shall remain in force (to the value of the relevant Secured Amount); and

9.31.2   the Creditor shall receive a dividend of the Dividend Amount which shall be satisfied by (i) the payment of its Cash Pot Entitlement and (ii) the conversion of its Dividend Balance into a Dividend Claim in full and final satisfaction of the total amount of the Creditor's Unsecured Claim Amount.

9.32   The Proposals shall not prevent the NAS09 Secured Bond Creditor from enforcing its security over the Secured Assets on and from the Effective Time.

9.33   In the event that either:

9.33.1   the Creditor applies to the Norwegian Court to determine its Secured Asset Valuation; or

9.33.2   the Creditor enforces its security over the Secured Assets;

and the Secured Amount is uncertain and/or unascertainable pending the determination of the Norwegian Court or realisation of the Secured Assets, the Creditor shall not be entitled to any dividend unless and until the date of the Norwegian Court's final decision in relation to the Secured Asset Valuation or the realisation of the Secured Assets (as applicable) in accordance with the applicable rules for such realisation, save where otherwise agreed in writing between the Company and the Creditor.

9.34   Consequently, the NAS09 Secured Bond Creditor **is impaired** by the Proposals **only if** the relevant Secured Amount is less than the amount of the Claim.

*(3)  NAS07/08 Secured Bond Creditors*

9.35   If the relevant Secured Amount is equal to or exceeds the amount of the NAS07/08 Secured Bond Creditor's Claim, the Claim shall be unaffected by the Proposals and the existing security shall remain in force.

9.36    If the relevant Secured Amount is less than the amount of the Claim:

9.36.1    the Claim shall be written down to the value of the relevant Secured Amount and the existing security shall remain in force (to the value of the relevant Secured Amount); and

9.36.2    the Creditor shall receive a dividend of the Dividend Amount which shall be satisfied by (i) the payment of its Cash Pot Entitlement and (ii) the conversion of its Dividend Balance into a Dividend Claim in full and final satisfaction of the total amount of the Creditor's Unsecured Claim Amount.

9.37    The Proposals shall not prevent the NAS07/08 Secured Bond Creditor from enforcing its security over the Secured Assets on and from the Effective Time.

9.38    In the event that either:

9.38.1    the Creditor applies to the Norwegian Court to determine its Secured Asset Valuation; or

9.38.2    the Creditor enforces its security over the Secured Assets;

and the Secured Amount is uncertain and/or unascertainable pending the determination of the Norwegian Court or realisation of the Secured Assets, the Creditor shall not be entitled to any dividend unless and until the date of the Norwegian Court's final decision in relation to the Secured Asset Valuation or the realisation of the Secured Assets (as applicable) in accordance with the applicable rules for such realisation, save where otherwise agreed in writing between the Company and the Creditor.

9.39    Consequently, the NAS07/08 Secured Bond Creditor **is impaired** by the Proposals **only if** the relevant Secured Amount is less than the amount of the Claim.

### (4)  2019 Convertible Bond Creditors

9.40    The amount of the 2019 Convertible Bond Creditors' Claim shall be the aggregate principal amount of the 2019 Convertible Bonds held by the Creditor at the Petition Date.

9.41    The Creditor shall receive a dividend of the Dividend Amount which shall be satisfied by (i) the payment of its Cash Pot Entitlement and (ii) the conversion of its Dividend Balance into a Dividend Claim in full and final satisfaction of the total amount of the Creditor's Claim. Consequently, the 2019 Convertible Bond Creditor **is impaired** by the Proposals.

9.42    Further, the 2019 Convertible Bond Creditors shall be deemed to have absolutely, irrevocably and unconditionally discharged and released AAA in respect of any liability in respect of the 2019 Convertible Bonds with no further action required.

### (5)  Unsecured Creditors

9.43    Each Unsecured Creditor shall receive a dividend of the Dividend Amount which shall be satisfied by (i) the payment of its Cash Pot Entitlement and (ii) the conversion of its Dividend Balance into a Dividend Claim in full and final satisfaction of the total amount of such Unsecured Creditor's Claim. Consequently, the Unsecured Creditors **are impaired** by the Proposals.

### *(6) GIEK Guaranteed Loan Facilities Creditors*

9.44    If the relevant Secured Amount (if any) is equal to the amount of such GIEK Guaranteed Loan Facilities Creditor's Claims, such Creditor's Claims shall be unaffected by these Proposals and any existing lawful set-off right held by such Creditor (if any) shall (for the avoidance of doubt) remain in force.

9.45    If the relevant Secured Amount (if any) is less than the amount of such Creditor's Claims:

    9.45.1    such Creditor's Claims shall be written down to the value of the relevant Secured Amount; and

    9.45.2    such Creditor shall receive a dividend of the Dividend Amount which shall be satisfied by (i) the payment of its Cash Pot Entitlement and (ii) the conversion of its Dividend Balance into a Dividend Claim in full and final satisfaction of such Creditor's Unsecured Claim Amount.

9.46    The Proposals shall not in themselves prevent any GIEK Guaranteed Loan Facilities Creditor from enforcing any lawful right of set-off it may have (if any) over the Secured Assets on and from the Effective Time.

9.47    In the event that either:

    9.47.1    the Creditor applies to the Norwegian Court to determine the existence of any lawful set-off right and/or its Secured Asset Valuation in respect thereof; or

    9.47.2    the Creditor enforces any lawful right of set-off in respect of the Secured Assets;

    and the Secured Amount is uncertain and/or unascertainable pending the determination of the Norwegian Court or realisation of the Secured Assets, such Creditor shall not be entitled to any dividend unless and until the date of the Norwegian Court's final decision in relation to the existence of such lawful set-off right, Secured Asset Valuation or the realisation of the Secured Assets (as applicable) in accordance with the applicable rules for such realisation, save where otherwise agreed in writing between the Company and such Creditor.

9.48    Consequently, each GIEK Guaranteed Loan Facilities Creditor **is impaired** by these Proposals only if the relevant Secured Amount is less than the amount of the Claim.

### *(7) Retained Guaranteed Creditors*

9.49    Unless agreed prior to the Irish Confirmation Date, the Claims of Retained Guaranteed Creditors shall be treated as Unagreed Creditors and their Claims shall be determined under the Expert Determination Process.

9.50    Each Creditor shall receive a dividend of the Dividend Amount which shall be satisfied by (i) the payment of its Cash Pot Entitlement and (ii) the conversion of its Dividend Balance into a Dividend Claim in full and final satisfaction of the total amount of such Creditor's Claim. Consequently, the Retained Guaranteed Creditors **are impaired** by the Proposals.

9.51    Each Creditor shall be deemed to have absolutely, irrevocably and unconditionally discharged and released the Company and/or any Related Company in respect of any monetary liabilities, associated or related to such Creditor's Claim, including (but not limited to) any

obligations under any Aircraft Sub-Lease which are secured in favour of any Creditor. Each such Related Company shall be treated as so discharged and released by operation of the Proposals without any further action required.

9.52    The Proposals do not affect the terms of any agreements with any Creditor (including any related security, related guarantee or liabilities arising from the Effective Time) to continue the primary agreement which is the subject of the guarantee or the said guarantee following the conclusion of the Irish examinership process.

### (8)  Non-Retained Guaranteed Creditors

9.53    Unless agreed prior to the Irish Confirmation Date, the Claims of Non-Retained Guaranteed Creditors shall be treated as Unagreed Creditors and their Claims (including, for the avoidance of doubt, any Pre-Repudiation Post-Petition Liabilities) shall be determined under the Expert Determination Process.

9.54    Each Creditor shall receive a dividend of the Dividend Amount which shall be satisfied by (i) the payment of its Cash Pot Entitlement and (ii) the conversion of its Dividend Balance into a Dividend Claim in full and final satisfaction of the total amount of such Creditor's Claim. Consequently, the Non-Retained Guaranteed Creditors **are impaired** by the Proposals.

9.55    Each Creditor shall be deemed to have absolutely, irrevocably and unconditionally discharged and released:

9.55.1    each relevant Related Company in respect of that Related Company's Guaranteed Obligations and each such Related Company shall be treated as so discharged and released by operation of these Proposals without any further action required;

9.55.2    the Company and/or any Related Company in respect of any obligations and/or liabilities, payable to such Creditor including (but not limited to) any obligations under any Aircraft Sub-Lease which are secured in favour of any Creditor; and

9.55.3    the obligations of the Company and/or any Related Company under the guarantees provided by the Company and/or any Related Company to the Creditor in respect of any Related Companies' Guaranteed Obligations and such guarantees shall be terminated.

### (9)  Terminated Contract Creditors

9.56    Unless agreed prior to the Irish Confirmation Date, the Claims of Terminated Contract Creditors shall be treated as Unagreed Creditors and their Claims (including, for the avoidance of doubt, any Pre-Repudiation Post-Petition Liabilities) shall be determined under the Expert Determination Process.

9.57    All Terminated Contract Creditors' Claims are unsecured claims and shall be subject to the same treatment as Unsecured Creditors whether agreed or upon the determination of their claim in accordance with the Expert Determination Process. Consequently, the Terminated Contract Creditors **are impaired** by the Proposals.

9.58    Each such Creditor shall be deemed to have absolutely, irrevocably and unconditionally discharged and released each relevant Related Company from any joint, equivalent or other liability associated or related to the Creditor's Claims with no further action required.

### (10) Retained Sub-Lease Creditors

9.59    The Claims of the Retained Sub-Lease Creditors shall be written down in full and they shall not receive any dividend in respect of these Claims.

9.60    Any obligations of the Company or Related Companies to Non-Retained Guaranteed Creditors under any Aircraft Sub-Lease, including any obligations which are secured in favour of any Retained Guaranteed Creditor, have been released under *(7) Retained Guarantee Creditors* above.

9.61    Consequently, the Retained Sub-Lease Creditors **are impaired** by the Proposals.

9.62    The Proposals do not affect the terms of any agreements with a Retained Sub-Lease Creditor (including any related security, related guarantee or liabilities arising from the Effective Time) to continue the underlying Aircraft Sub-Lease from the Retained Sub-Lease Creditor, as sub-lessor, to the Company, as sub-lessee, following the conclusion of the examinership process.

### (11) Terminated Guaranteed Sub-Lease Creditors

9.63    The Claims of the Terminated Guaranteed Sub-Lease Creditors are written down in full and the Creditors shall not receive any dividend in respect of these Claims under the Proposals.

9.64    Any obligations, direct or indirect, of the Company or Related Companies to Non-Retained Guaranteed Creditors, including any obligations to Terminated Guaranteed Sub-Lease Creditors under any Aircraft Sub-Lease which are secured in favour of any Non-Retained Guaranteed Creditor, have been discharged and released pursuant to the *(8) Non-Retained Guaranteed Creditors* class above.

9.65    Consequently, the Terminated Guaranteed Sub-Lease Creditors **are impaired** by the Proposals.

### (12) Retained Lease Creditors

9.66    Unless agreed prior to the Irish Confirmation Date, the Claims of Retained Lease Creditors shall be treated as Unagreed Creditors and their Claims shall be determined under the Expert Determination Process.

9.67    Each Creditor shall receive a dividend of the Dividend Amount which shall be satisfied by (i) the payment of its Cash Pot Entitlement and (ii) the conversion of its Dividend Balance into a Dividend Claim in full and final satisfaction of the total amount of such Creditor's Claim.

9.68    The Proposals do not affect the terms of any agreements with a Creditor (including any related security, related guarantee or liabilities arising from the Effective Time) to continue the underlying Aircraft Lease from the Creditor following the conclusion of the examinership process.

9.69    Consequently, the Retained Lease Creditors **are impaired** by the Proposals.

### (13) Terminated Lease Creditors

9.70    Unless agreed prior to the Irish Confirmation Date, the Claims of Terminated Lease Creditors shall be treated as Unagreed Creditors and their Claims (including, for the avoidance of

doubt, any Pre-Repudiation Post-Petition Liabilities) shall be determined under the Expert Determination Process.

9.71    Each Terminated Lease Creditor shall receive a dividend of the Dividend Amount which shall be satisfied by (i) the payment of its Cash Pot Entitlement and (ii) the conversion of its Dividend Balance into a Dividend Claim in full and final satisfaction of the total amount of such Terminated Lease Creditor's Claim

9.72    The Proposals are without prejudice to, and shall not prevent a Terminated Lease Creditor from enforcing its security over any Secured Assets, unless such security is otherwise released and/or discharged, save that the Creditor shall not be entitled to maintain any Claim against the Company or any Related Company that is otherwise discharged and/or released in these Proposals or the Related Proposals other than that the Creditor shall retain such Claim to the extent necessary to enforce such security which Claim shall be limited in terms of recourse to the Secured Assets

9.73    Consequently, the Terminated Lease Creditors **are impaired** by the Proposals.

### *(14) Customer Creditors*

9.74    Each Customer Creditor shall, upon agreement or determination of its Claim in accordance with sub-paragraphs below (as applicable), receive a dividend of the Dividend Amount which shall be satisfied by (i) the payment of its Cash Pot Entitlement and (ii) the conversion of its Dividend Balance into a Dividend Claim in full and final satisfaction of the total amount of such Creditor's Claim.

9.75    To the extent that the Company disputes a Customer Creditor's Ticket Refund Claim, or that Ticket Refund Claim has not been submitted by a Customer Creditor to the Company and agreed by the Company prior to the Irish Confirmation Date, it shall be subject to the Expert Determination Process.  Any Ticket Refund Claim submitted by a Customer Creditor and which has not been agreed by the Company prior to the Irish Confirmation Date shall be taken as submitted to the Company in accordance with Clause 11.1.1 of the Proposals for the purposes of the Expert Determination Process.

9.76    To the extent that the Company disputes a Customer Creditor's Customer Damages Claim that has been submitted by a Customer Creditor to the Company but not agreed by the Company prior to the Irish Confirmation Date (an "**Unagreed Submitted Customer Damages Claim**"), it shall be subject to the determination by the relevant decision making or judicial authority with jurisdiction over the dispute (a "**Customer Claim Forum**").

9.77    Any Customer Damages Claim that has not been submitted by a Customer Creditor to the Company and agreed by the Company prior to the Irish Confirmation Date ("**Unagreed Non-Submitted Customer Damages Claim**", such Claims being together with the Unagreed Submitted Customer Damages Claims, the "**Unagreed Customer Damages Claims**"), shall, unless otherwise agreed by the Company, be subject to the jurisdiction of the relevant Customer Claim Forum.

9.78    To the extent that any Customer Creditor disputes the Company's record of their **C**laim (an "**Unagreed Customer Creditor**"). The Unagreed Customer Creditor shall forward to the Company, by email to *creditorclaims@norwegian.com* within 14 days after the Irish Confirmation Date a proof of their Claim setting forth the amount which it believes should be

included as its Claim for the purposes Proposals and the basis for the Claim with supporting documents necessary to identify and assess the Claim including, but not limited to the Norwegian Air booking reference (6 characters), flight details and reason for the Claim.

9.79    For the avoidance of doubt the Expert Determination Process shall not apply to determine any Unagreed Customer Damages Claims above.

9.80    Each Customer Creditor shall be deemed to have absolutely, irrevocably and unconditionally discharged and released NAI in respect of any direct, joint or equivalent liability for the Customer Creditor's Claims and NAI shall be so discharged and released by the Proposals without any further action required.

9.81    Consequently, the Customer Creditors **are impaired** by the Proposals.

### (15) 2020 Convertible Perpetual Bond Creditors

9.82    The amount of the 2020 Convertible Perpetual Bond Creditors' Claim shall be the market value of the number of Shares that the 2020 Convertible Perpetual Bonds held by the Creditors at the Petition Date (save for any 2020 Convertible Perpetual Bonds converted to Shares after the Petition Date) would have converted into at the conversion price in effect on the Petition Date.

9.83    Each Creditor shall receive a dividend of the Dividend Amount which shall be satisfied by (i) the payment of its Cash Pot Entitlement and (ii) the conversion of its Dividend Balance into a Dividend Claim in full and final satisfaction of the total amount of its Claim. Consequently, the 2020 Convertible Perpetual Bond Creditors **are impaired** by the Proposals.

### (16) Connected and Intercompany Creditors

9.84    Each Connected and Intercompany Creditor's Claims are unsecured claims which shall be off set against any mutual claims as between the Company and the Creditor as at the Petition Date (excluding any Claims against the Company in respect of any Aircraft Sub-Leases) and, subject to sub-paragraph 9.88 and 9.89 below, shall be subject to the same treatment as Unsecured Creditors whether agreed or upon the determination of their claim in accordance with the Expert Determination Process.   Consequently, the Connected and Intercompany Creditors **are impaired** by the Proposals.

9.85    The amount of any Creditor's entitlement to a dividend (by way of cash and a Dividend Claim) under sub-paragraph 9.88 above shall be offset against:

9.85.1    any counterindemnity obligations owed by such Creditor to the Company on foot of the Company's discharge of that Creditor's Terminated Guaranteed Obligations under the Proposals ("**Counter Indemnity Obligations**"); and

9.85.2    in the case of a Related Company, the amount of funding provided in the form of cash by the Company to fund dividends payable by that Related Company under the Related Proposals.

9.86    Should any balance remain due by the Company to any Related Company following the set off under sub-paragraph 9.89 above, such balance shall be written down in full and the Related Company shall not receive any dividend in respect of its Claim.

9.87    Should any Connected and Intercompany Creditors dispute the amount of their Counter Indemnity Obligations under sub-paragraph 9.88 above, such Creditors shall be treated as Unagreed Creditors and their Claims shall be determined under the Expert Determination Process.

### (17) Contingent Unagreed Creditors

9.88    As at the date of the Proposals:

9.88.1    the liability, if any, of the Company to each of the Contingent Unagreed Creditors; and

9.88.2    the quantum, if any, due to these Creditors,

have not been determined, agreed and/or crystallised.

9.89    Unless agreed and crystallised prior to the Effective Time, the Claims of these Creditors shall, unless otherwise agreed by the Creditor and the Company, be determined:

9.89.1    to the extent proceedings have been issued by any such Creditor before the Irish Confirmation Date (each such Creditor being, a "**Contingent Litigation Creditor**"), by the courts of competent jurisdiction and, for the avoidance of doubt, the Expert Determination Process shall not apply; and

9.89.2    in all other cases, by the Expert Determination Process.

9.90    All Contingent Unagreed Creditors' Claims whether quantified by agreement or upon the determination of their Claim under the Expert Determination Process or, in the case of any Contingent Litigation Creditor, by a court of competent jurisdiction (which, for the avoidance of doubt, shall include any existing or future liability of the Company for any such Contingent Litigation Creditor's costs in connection with any litigation or binding dispute resolution procedure) are unsecured claims and any amounts due or found to be due to any Contingent Unagreed Creditor shall be subject to the same treatment as Unsecured Creditors. Consequently, the Contingent Unagreed Creditors **are impaired** by the Proposals.

9.91    Contingent Unagreed Creditors shall be deemed to have irrevocably released each relevant Related Company from any liability associated or related to the Creditor's Claim.

### E.   Determining the Claims of Unagreed Creditors

9.92    Unagreed Creditors' Claims (including, for the avoidance of doubt, any Pre-Repudiation Post-Petition Liabilities) will be determined in accordance with the Expert Determination Process set out in Clause 11.1 of the Proposals, provided that:

9.92.1    any determination under this process shall not be binding until the Effective Time; and

9.92.2    this process shall not apply to the Customer Damages Claims Creditors and Contingent Litigation Creditors whose Claims shall be determined by the relevant Customer Claims Forum and courts of competent jurisdiction, respectively.

9.93    In order for its Claim to be determined, each Unagreed Creditor must forward to the Company by email to creditorclaims@norwegian.com, by email within 14 days after the Irish Confirmation Date a proof of claim setting forth the amount which it believes should be

included as its claim for the purposes of the Proposals and the basis for the claim including supporting documents as applicable. If an Unagreed Creditor fails to do so it will be deemed to have a claim for the amount stated in the Creditor Schedule or, to the extent any Creditor is not listed in the Creditor Schedule, it will have no valid claim whatsoever against the Company.

9.94 To the extent a Creditor submits a claim within the period set out in the preceding sub-paragraph, the provisions of Clause 11.1 of the Proposals shall apply and which will, to the extent the Company disputes its claim, enable that Creditor to refer its claim for expert determination by either the Aircraft Expert of the General Expert (as applicable) within the time period specified in the said Clause 11.1.

9.95 The Company and the Unagreed Creditor shall each be liable for 50% of the costs and expenses of the relevant Expert in connection with his determination.

### F. Consequences of the Proposals

9.96 Where required under the Proposals, the Company shall take all steps necessary (including without limitation recording the relevant Dividend Claims Creditors and the amount of their Dividend Claims within the Dividend Claim Schedule to the Dividend Claims Terms) to document the conversion of Dividend Balances into Dividend Claims and pay all Cash Pot Entitlements to relevant Cash Creditors on or before the later of:

9.96.1 either:

(a) in the case of all Creditors (other than Contingent Litigation Creditors and Customer Damages Claims Creditors), the General Payment Date (being four weeks from the later of 60 days after the Irish Confirmation Date or the Effective Date); or

(b) in the case of Contingent Litigation Creditors and Customer Damages Claims Creditors, the Litigation Payment Date; and

9.96.2 10 Business Days following the date on which such Creditor provides its account payment details to the Company.

### G. Financial Position and Liquidation

9.97 A statement of assets and liabilities (including contingent and prospective liabilities) of the Company as at the date of the Proposals is attached as Schedule 2 to the Proposals. The estimated financial outcome of a winding-up of the Company for the Shareholders and the classes of Creditors, applying Norwegian law as it would apply to the liquidation of the Company, is attached at Schedule 3 to the Proposals.

9.98 The statement of affairs on a winding up basis shows clearly that the Proposals would be more beneficial to the Creditors as a whole than a winding-up.

### H. Material Interests of the Directors

9.99 In accordance with Section 540(11) of the Act, please note that the effect of the Proposals on any material interest of a Director, whether as Director, Creditor or Shareholder of any of the Companies, is not different from the effect on any other Creditor or Shareholder of the

26

Company.

### I.  Implementation

9.100   The Proposals contain specific terms for implementation.

### J.  Conclusion

9.101   Please note that this Explanatory Memorandum is intended to be a summary of the Proposals only, for the convenience of Shareholders and Creditors, and is not intended to be legally binding or to be relied upon by Shareholders and/or Creditors. Shareholders and Creditors are therefore strongly advised to read the Proposals in their entirety.

9.102   I am of the opinion that the Proposals are in the best interests of the Shareholders and the Creditors of the Company and I recommend them to you for your approval.

**KIERAN WALLACE**
**EXAMINER**

**Dated 11 March 2021**

WF-28637797-exv

**SCHEDULE 1**

**Projected Outcomes for Dividend Claims**

| Norwegian Air Shuttle AS - Worked Example of Dividend Claims | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Notes | | | Example 1 | | Example 2 | Example 3 | Example 4 | |
| **Creditor Agreed Debt NOK** | | | | 10,000 | | 100,000 | 1,000,000 | 10,000,000 | |
| *Dividend Amount (5%) NOK* | *1* | | | *500* | | *5,000* | *50,000* | *500,000* | |
| | | | | | | | | | |
| **Total assumed Claim amount (excluding contingent claims)** | *2* | NOK | 48,074,857,632 | | | | | | |
| **Total assumed Claim amount (including high estimated contingent claims)** | | NOK | 49,796,031,350 | | | | | | |
| **Dividend Amount Split** | | | | | | | | | |
| **Cash Pot Entitlement %** (NOK500m/Current Scenario plus the Contingencies) | *3* | | 1.00% | | | | | | |
| Projected Cash Dividend to be paid | *4* | | | 100 | | 1,004 | 10,041 | 100,410 | |
| Dividend Claim Amount | *4* | | | 400 | | 3,996 | 39,959 | 399,590 | |
| **Total Dividend Amount (NOK)** | | NOK | | **500** | NOK | **5,000** | NOK | **50,000** | NOK | **500,000** |
| | | | | | | | | | |
| **Dividend Claim if Converted** | | | | | | | | | |
| Total No of Shares to be distributed to creditors | *5* | | 233,548,229 | | | | | | |
| Total Dividend Claim Amount NOK | | NOK | 1,921,025,119 | | | | | | |
| Share Conversion Price | *6* | NOK | 8.23 | | | | | | |
| *No of Shares Available* | *7* | | | *49* | | *486* | *4,858* | *48,580* | |
| | | | | | | | | | |
| Effect on Dividend on Share Price Movement | | | | | | | | | |
| **Overall Dividend Value if Share Price is NOK10** | | NOK | | **586** | NOK | **5,862** | NOK | **58,621** | NOK | **586,211** |
| *Dividend Percentage* | *8* | | | *5.86%* | | *5.86%* | *5.86%* | *5.86%* | |
| | | | | | | | | | |
| **Overall Dividend Value if Share Price is NOK15** | | NOK | | **829** | NOK | **8,291** | NOK | **82,911** | NOK | **829,111** |
| *Dividend Percentage* | *8* | | | *8.29%* | | *8.29%* | *8.29%* | *8.29%* | |
| | | | | | | | | | |
| **Overall Dividend Value if Share Price is NOK20** | | NOK | | **1,072** | NOK | **10,720** | NOK | **107,201** | NOK | **1,072,012** |
| *Dividend Percentage* | *8* | | | *10.72%* | | *10.72%* | *10.72%* | *10.72%* | |
| | | | | | | | | | |
| **Overall Dividend Value if Share Price is NOK55** | | NOK | | **2,772** | NOK | **27,723** | NOK | **277,232** | NOK | **2,772,316** |
| *Dividend Percentage* | *8* | | | *27.72%* | | *27.72%* | *27.72%* | *27.72%* | |

**Notes**
1. Dividend Percentage that each creditor will receive for their total Agreed Debt claim
2. The projected total debt to rank for a dividend in cash and convertible note following the issue of any retained bonds
3. The projected cash dividend element based on the projected overall debt amount including an estimate for contingent liabilities
4. Projected split of the 5% dividend between cash and Convertible Note dividend
5. Total amount of shares to be distributed to creditors and corresponding to 25.4% of fully diluted share capital in the event of a NOK4.5B capital raise
6. The Conversion Price is calculated by dividing the aggregate nominal amount of Dividend Claims outstanding as of the Conversion Price Determination Date divided by the 233,548,229 shares
7. Projected no of shares available based on the pro rata split of the total shares available of 233,548,229 representing 25.4% of the Company
8. Projected potential return to creditors based on potential changes in the share price

**AAA Explanatory Memorandum**

## THE HIGH COURT

**2020 No. 366 COS**

IN THE MATTER OF

### ARCTIC AVIATION ASSETS DESIGNATED ACTIVITY COMPANY

AND IN THE MATTER OF

### NORWEGIAN AIR INTERNATIONAL LIMITED

AND IN THE MATTER OF

### DRAMMENSFJORDEN LEASING LIMITED

AND IN THE MATTER OF

### TORSKEFJORDEN LEASING LIMITED

AND IN THE MATTER OF

### LYSAKERFJORDEN LEASING LIMITED

AND IN THE MATTER OF

### PART 10 OF THE COMPANIES ACT 2014

AND IN THE MATTER OF

### NORWEGIAN AIR SHUTTLE ASA
### AS A RELATED COMPANY WITHIN THE MEANING OF SECTION 517 AND SECTION 2(10) OF THE COMPANIES ACT 2014

## EXPLANATORY MEMORANDUM FOR THE PROPOSALS FOR A SCHEME OF ARRANGEMENT

**BETWEEN**

**ARCTIC AVIATION ASSETS
DESIGNATED ACTIVITY COMPANY
(IN EXAMINATION UNDER PART 10 OF THE COMPANIES ACT 2014)**

**AND**

**ITS MEMBER AND CREDITORS**

**11  MARCH 2021**

Kieran Wallace
Examiner
KPMG
1 Stokes Place
St Stephen's Green
Dublin 2
Ireland

# 1    Irish Examinership Process

1.1    Arctic Aviation Assets Designated Activity Company (the "**Company**" or "**AAA**"), Norwegian Air International Limited ("**NAI**"), Drammensfjorden Leasing Limited ("**DLL**"), Lysakerfjorden Leasing Limited ("**LLL**") and Torskefjorden Leasing Limited ("**TLL**") presented a Petition for the appointment of an examiner to those companies and to Norwegian Air Shuttle ASA as a related company ("**NAS**") on 18 November 2020 (the "**Petition Date**") pursuant to Part 10 of the Companies Act 2014 (as amended) (the "**Act**"). I was appointed as interim examiner of the Company, NAI, LLL, DLL and NAS (the "**Companies**") and TLL following the presentation of the Petition and my appointment as examiner to the Companies and TLL was subsequently confirmed by further Order of the Irish High Court made on 7 December 2020.

1.2    As a consequence of filing the Petition, the Companies are under the protection of the Irish High Court pursuant to Part 10 of the Act. Following a decision of NAS's board of Directors to cease offering long haul flights, I concluded that TLL no longer had a reasonable prospect of survival as a going concern and by order of the Irish High Court dated 15 January 2021, I was discharged as examiner of TLL and Mr Andrew O'Leary and I were appointed to act as joint liquidators of TLL.

1.3    As required by the Act, I have formulated proposals for a scheme of arrangement for the Company (the "**Proposals**") a copy of which has been provided in conjunction with this Explanatory Memorandum and notice of the relevant statutory meetings. I am required by the Act to provide this Explanatory Memorandum to each Creditor and Member of the Company.  This Explanatory Memorandum provides a summary of the Proposals and their effects on the Member (being the shareholder in the Company) and classes of Creditors and should be read in conjunction with the Proposals. In formulating the Proposals, I have attempted to treat the Member and each class of Creditors on a fair and equitable basis having regard to the current trading position of the Company and the amounts which they would otherwise receive on a winding up.

1.4    Capitalised terms used but not defined in this Explanatory Memorandum shall have the same meaning ascribed to them as in the Proposals. In the event of any ambiguity or difference between the terms of this Explanatory Memorandum and the terms of the Proposals, the terms of the Proposals shall apply.

# 2    Norwegian Restructuring Process

2.1    As a separate (but parallel) process to the examinership of the Companies, the Board of NAS applied to the Norwegian Court to have NAS placed into the Norwegian Restructuring Process. The application was approved on 8 December 2020 by the Norwegian Court and Mr Håvard Wiker was appointed reconstructor ("**Norwegian Administrator**"). In addition, the Norwegian Court also appointed the Norwegian Creditors Committee, consisting of four members that represent the different groups of Creditors.

2.2    The Norwegian Restructuring Process had the effect of putting in place a stay in relation to Creditor actions against NAS as a matter of Norwegian law pending the presentation and potential approval of a Norwegian Restructuring Plan. Under the Norwegian Restructuring Process, the Directors retained control and authority over NAS's affairs under the supervision of the Norwegian Administrator, alongside the Examiner. The Norwegian Administrator worked as part of the Norwegian Restructuring Committee, and separately with the Examiner, to develop the Norwegian Restructuring Plan, a copy of which is included at Schedule 8 to the NAS Proposals, which will adopt and implement the terms and substance of the NAS Proposals in full under

Norwegian law.

**3    Implementation of the Proposals and Norwegian Restructuring Plan**

3.1    Under the Act, the Proposals may be approved by the Irish High Court (the "**Irish Confirmation Date**") where the Proposals have been approved by at least one impaired class of Creditors by a simple majority in number representing a majority in value of those Creditors voting in person or by proxy at a meeting. Further information on the Shareholder and Creditors meetings is at paragraph 6 below. The Proposals will become binding on the Creditors, the Shareholder and the Company and their respective successors and assigns as and from the Irish Confirmation Date. The coming into effect of the Proposals is conditional upon, among other matters, the confirmation of the NAS Proposals and the confirmation of the Norwegian Restructuring Plan.

3.2    The Norwegian Restructuring Plan will be issued by the Norwegian Administrator immediately following the Irish Confirmation Date which will commence a two-week voting period on the Norwegian Restructuring Plan.  In order to ensure the implementation of the NAS Proposals through the Norwegian Restructuring Plan, the NAS Proposals provide that the creditors of NAS will irrevocably appoint me as their attorney, agent, nominee, proxy and representative, with effect from Irish Confirmation Date, to vote in favour of the Norwegian Restructuring Plan on their behalf.

3.3    The Proposals, if confirmed, will take effect at the Effective Time (as described below) on the Effective Date (being a date to be fixed by the Irish High Court), provided that the conditions summarised in the following sub-paragraph have been satisfied before such time.

3.4    In order for the Proposals to take effect, the Proposals and Related Proposals must first be confirmed by the Irish High Court and the Norwegian Restructuring Plan must be sanctioned by the Norwegian Court. NAS must also raise at least the Minimum Gross Proceeds Threshold (as described below), which will then be held by DNB in locked accounts in NAS's name. The Auditor must then verify to me that such Investment Proceeds have been received in the locked accounts. Upon receipt of the confirmation from the Auditor (and the satisfaction of each of the other conditions), I will instruct DNB in writing that the Investment Proceeds shall be released to NAS at the Effective Time.

3.5    Immediately upon the satisfaction of the above conditions, NAS shall ensure that the NRBE Registrations occur. The Effective Time will occur at the time at which the last of such registrations has occurred whereupon NAS will become entitled to the Investment Proceeds.

3.6    If the Effective Time does not occur on or before the Long Stop Date (30 June 2021), the Proposals shall terminate and lapse.

**4    Norwegian's Proposal**

4.1    The Board of NAS approved Norwegian's Proposal, which I have considered, evaluated, and ultimately used as a basis upon which to prepare the Proposals and the Related Proposals in conjunction with NAS.

4.2    Key to Norwegian's Proposal, and as announced to the Oslo Stock Exchange on 14 January 2021, is NAS's intention to:

4.2.1    focus on its core Nordics business, operating a European short-haul network with narrow body aircraft;

4.2.2    cease operating the Group's long-haul network; and

4.2.3    subject to the restructuring contemplated by the Proposals and the Related Proposals being successful:

(a)    reduce total debt to around NOK 20,000,000,000 and emerge from the restructuring with a free cash position of approximately NOK 4,000,000,000 to NOK 5,000,000,000; and

(b)    achieve positive EBITDA following the restructuring in 2021 based on conservative assumptions as to the length of the COVID-19 pandemic and as to revenues, costs and load factors.

4.3    Norwegian's Proposal also envisages cost savings where possible, implemented by procuring the most competitive terms available from suppliers and, in some instances, replacing suppliers with in-house resources.

4.4    In furtherance of that objective, the Companies obtained orders from the Irish High Court to repudiate and/or consensually terminate certain contracts which were no longer required and re-negotiated other contracts on a go forward basis. For the most part, the repudiated contracts relate to aircraft and aircraft engine leases, and supply or service agreements relevant to the long-haul part of the Companies' business. As NAS decided to pivot away from its long-haul operations to ensure the future survival of the business, the repudiation of certain contracts was required.

**5**    **Investment**

5.1    These Proposals and Related Proposals are conditional upon NAS receiving gross proceeds (prior to the deduction of any costs or fees associated with the capital raising process) of no less than NOK 4,500,000,000 in aggregate (otherwise known as the "**Minimum Gross Proceeds Threshold**") as a result of the Rights Offering, the Private Placement and the New Capital Perpetual Bonds Offering, as briefly summarised below.  If an amount exactly equal to the Minimum Gross Proceeds Threshold is raised, the investors in the Rights Offering, the Private Placement and the New Capital Perpetual Bonds Offering will be entitled to hold 70% in aggregate of NAS's issued share capital at the Effective Time on a Fully Diluted Basis. If an amount greater than the Minimum Gross Proceeds Threshold is raised, then the investors' aggregate entitlement will represent a larger proportion of the NAS's issued share capital. These statements are based on a number of assumptions detailed within the Proposals, including that all conversion rights under the New Capital Perpetual Bonds (as described below) will be immediately exercised on issue on such date.  In practice, this will not be the case as the New Capital Perpetual Bonds will not be convertible into NAS Shares on such date (the relevant timings are briefly summarised below).

5.2    The completion of the Rights Offering, the Private Placement and the New Capital Perpetual Bonds Offering are conditional upon the occurrence of the Effective Time.  Each element of the Investment will be launched on a date to be determined by the Board of NAS (and, in the case of the Rights Offering and the Private Placement, no earlier than the business day following the date on which the Prospectus has been approved by the FSAN) and will close (the "**Closing Date**") no

earlier than the latest of:

5.2.1    the expiration of the time for any appeal of the Irish Confirmation Order and the Norwegian Confirmation Order;

5.2.2    the final determination of any appeal of the Irish Confirmation Order and/or the Norwegian Confirmation Order; and

5.2.3    in the case of the Rights Offering, the date that falls two weeks after the opening of the Rights Offering Subscription Period,

provided that each relevant Closing Date, and consequently the Effective Time, shall occur by no later than the Long Stop Date.

5.3    NAS obtained the necessary shareholder authorities to give effect to the Rights Offering, the Private Placement and the New Capital Perpetual Bonds Offering at its extraordinary general meeting held on 17 December 2020.

5.4    The Investment Proceeds will be used to provide working capital for NAS and the wider group (including the Company) for general corporate purposes including to facilitate the ongoing survival of the Companies as going concerns. The dividends to be made under the Proposals shall be funded from cash to be made available to the Company and the Related Companies at the Effective Time.

5.5    Further information regarding each of the Rights Offering, the Private Placement and the New Capital Perpetual Bonds Offering (including the Record Date, Subscription Period and Trading Period, as briefly described below, prior to the occurrence or commencement of the same) will be published by NAS in accordance with the rules of the Oslo Stock Exchange. Participation in each element of the Investment will be subject to certain terms and conditions, including the provision of satisfactory KYC information to NAS.

***A.  Rights Offering***

5.6    Under the Rights Offering, each holder of shares in NAS (or the Existing Shares) on the Record Date (to be determined by the Board of NAS) will, subject to applicable law, be granted preferential rights to subscribe for and be allocated new NAS Shares at the Subscription Price (to be determined by NAS and its advisers) in proportion to his/its shareholding in NAS.  The Rights Offering will be limited to raising total gross proceeds for NAS in the amount of NOK 400,000,000.

5.7    NAS will prepare the Prospectus to be approved by the FSAN. The subscription period for the Rights Offering will commence on a date to be determined by the Board of NAS, being no earlier than the business day after the FSAN has approved the Prospectus, and expire no earlier than the Closing Date (the "**Rights Offering Subscription Period**").

5.8    Each holder of Existing Shares as of the Record Date will be granted tradeable subscription rights (the "**Subscription Rights**") for each Existing NAS Share registered as held by such holder as of the Record Date. The aggregate amount of Subscription Rights received by such holders shall be an amount that ensures NOK 400,000,000 in aggregate gross proceeds at the Subscription Price. The Subscription Rights will be listed and tradeable on the Oslo Stock Exchange from the commencement of the Rights Offering Subscription Period until no earlier than 4.30 p.m. (Oslo time) two trading days prior to the end of the Rights Offering Subscription Period (the "**Trading**

Period"). Over-subscription and subscription without Subscription Rights will be permitted. Each Subscription Right will, subject to applicable law and certain conditions set out in the Proposals, give the right to subscribe for, and be allocated, one new Share. Subscription Rights acquired during the Trading Period will carry the same right to subscription as the Subscription Rights granted to holders of Existing Shares as of the Record Date and all such Subscription Rights (whether received and retained by holders of NAS Shares or acquired during the Trading Period) shall, for the avoidance of doubt, remain conditional until such time as the conditions of the Rights Offering are satisfied.

5.9    Subscription Rights that are not used to subscribe for new NAS Shares before the expiry of the Rights Offering Subscription Period will have no value and will lapse without compensation to the holder.

### B.    Private Placement

5.10    Under the Private Placement, certain investors, and certain Examinership Companies Creditors, will be invited to apply for new NAS Shares at the Subscription Price.  The new NAS Shares will be listed on the Oslo Stock Exchange.

5.11    The subscription period in the Private Placement will commence on a date to be determined by the Board of NAS, being no earlier than on the business day after the FSAN has approved the Prospectus, and expire no earlier than the Closing Date (the "**Private Placement Subscription Period**").

5.12    NAS will, in consultation with DNB Markets (a part of DNB), as global coordinator, determine the allocation of NAS Shares. The allocation principles will, in accordance with customary practice for institutional placements, include factors such as perceived investor quality, investment horizon and history, sector knowledge, size and timeliness of the application, each of which NAS may in its discretion consider ("**Allocation Factors**") and NAS will reserve the right to reduce or reject any application  for NAS Shares in the Private Placement and also to set a maximum allocation per applicant, a maximum number of applicants or decide to make no allocation to any applicant (the **"Allocation Principles"**), provided that the Allocation Principles shall not be used to reduce or reject any application from an Eligible Placement Creditor in respect of its entitlement (whether in whole or in part) summarised in the following sub-paragraph.

5.13    Each Eligible Private Placement Creditor, which includes certain creditors of the Company, shall be entitled to apply to participate in the Private Placement up to a maximum amount equal to such Eligible Private Placement Creditor's Investment Allowance during the Private Placement Subscription Period and such Eligible Private Placement Creditors shall be given a preferential allocation in the Private Placement up to the amount of their respective Investment Allowances.

5.14    Where an Eligible Private Placement Creditor participates in the Private Placement, it will also be issued Retained Claims Bonds by NAS in an amount equal to its Retained Claims Bonds Amount. Such Retained Claims Bonds will be issued by NAS in full and final satisfaction of the portion of each relevant Eligible Private Placement Creditor's Relevant Portion that is equal to the aggregate face value of the Retained Claims Bonds issued to such Eligible Private Placement Creditor. The Retained Claims Bonds will be constituted pursuant to the Retained Claims Bonds Instrument, the near final term sheet in respect of which is at Schedule 5 to the Proposals.

### C.   New Capital Perpetual Bonds Offering

5.15   Under the New Capital Perpetual Bonds Offering, each Eligible New Capital Perpetual Bonds Creditor shall be entitled to apply for New Capital Perpetual Bonds up to a maximum amount equal to such Eligible New Capital Perpetual Bonds Creditor's Investment Allowance during the New Capital Perpetual Bonds Subscription Period.   The New Capital Perpetual Bonds will be constituted pursuant to the New Capital Perpetual Bond Instrument, the near final term sheet in respect of which is at Schedule 5 to the Proposals.

5.16   The subscription period in the New Capital Perpetual Bonds Offering will commence on a date to be determined by the Board of NAS and expire no earlier than the Closing Date (the "**New Capital Perpetual Bonds Subscription Period**")

5.17   The New Capital Perpetual Bonds will be allocated to each applying Initial Eligible New Capital Perpetual Bonds Creditor, which includes certain creditors of the Company, on a *pro rata* basis, based on the proportion that its Relevant Portion bears to the aggregate Relevant Portions of all applying Initial Eligible New Capital Perpetual Bonds Creditors (such proportion being, with respect to each such Initial Eligible New Capital Perpetual Bonds Creditor, its "**Pro Rata Proportion**").   To the extent that any Initial Eligible New Capital Perpetual Bonds Creditor subscribes for less than its Pro Rata Proportion, resulting in unsubscribed New Capital Perpetual Bonds, such unsubscribed New Capital Perpetual Bonds shall be reallocated among Initial Eligible New Capital Perpetual Bonds Creditors which have not been allocated the full subscription applied for, in accordance with their respective Pro Rata Proportions, until each Initial Eligible New Capital Perpetual Bonds Creditor has been allocated the full subscription it applied for or, if earlier, the New Capital Perpetual Bonds Offering is fully subscribed. In the event that the New Capital Perpetual Bonds Offering is not fully subscribed following allocation to Initial Eligible New Capital Perpetual Bonds Creditors as aforesaid, NAS may allocate any remaining unallocated New Capital Perpetual Bonds to applying Subsequent Eligible New Capital Perpetual Bonds Creditors in its discretion, with regard to the Allocation Factors.

5.18   The maximum amount of the New Capital Perpetual Bonds Offering shall be determined by NAS in parallel with determining the amount of the Rights Offering and the Private Placement and shall be no greater than NOK 1,875,000,000.

5.19   Each Eligible New Capital Perpetual Bonds Creditor that participates in the New Capital Perpetual Bonds Offering will also be issued Retained Claims Bonds by NAS in an amount equal to its Retained Claims Bonds Amount. Such Retained Claims Bonds will be issued by NAS in full and final satisfaction of the portion of each relevant Eligible New Capital Perpetual Bond Creditor's Relevant Portion that is equal to the aggregate face value of the Retained Claims Bond issued to such Eligible New Capital Perpetual Bonds Creditor. The Retained Claims Bonds will be constituted pursuant to the Retained Claims Bond Instrument.

5.20   Participation in the New Capital Perpetual Bonds Offering shall be subject to certain terms and conditions set forth in the New Capital Perpetual Bond Instrument, including a minimum subscription of at least the NOK equivalent of EUR 100,000.

5.21   The New Capital Perpetual Bonds shall become convertible into NAS Shares at a price equal to 150% of the Subscription Price subject to and in accordance with the terms of the New Capital Perpetual Bond Instrument.

5.22   The Norwegian Government proposed (*Prop. 79 S (2020 – 2021) [Post 91 and 92]*), and the

Parliament of Norway (*Nw. Stortinget*) has approved, the Norwegian Government's intention to participate in the New Capital Perpetual Bonds Offering up to an amount not exceeding NOK 1,500,000,000.

### D.   Retained Claims Bonds

5.23    Each Eligible New Capital Perpetual Bonds Creditor that participates in the New Capital Perpetual Bonds Offering and each Eligible Private Placement Creditor that participates in the Private Placement will be issued Retained Claims Bonds by NAS in an amount equal to its Retained Claims Bonds Amount. Such Retained Claims Bonds will be issued by NAS in full and final satisfaction of the portion of the Relevant Portion of each relevant Eligible New Capital Perpetual Bonds Creditor and/or Eligible Private Placement Creditor that is equal to the aggregate face value of the Retained Claims Bonds issued to such Eligible New Capital Perpetual Bonds Creditor and/or Eligible Private Placement Creditor.

5.24    To the extent a Creditor has more than one Agreed Debt, the aggregate amount of Retained Claims Bonds issued or to be issued to such Creditor shall be apportioned equally across each of its Agreed Debts when determining its Net Agreed Debt for the purposes of ascertaining the amount of its entitlement (if any) to a dividend under the Proposals. For the avoidance of doubt, no Creditor shall be paid any Cash Pot Entitlement in respect of such part of its Claim as shall be satisfied by the issuance of Retained Claims Bonds.

5.25    The Retained Claims Bonds will be constituted pursuant to the Retained Claims Bonds Instrument and are subject to certain terms and conditions contained therein.

## 6    Member and Creditors' Meetings

6.1    Full details for the relevant meetings of the Member or the class or classes of Creditor, which you are entitled to attend are provided separately and merely summarised below.

6.2    For all relevant meetings of the Member and Creditors of the Company, notice is given to participants at least seven days before the date of the relevant meetings.

### Member Meeting

6.3    As there is only one Member of the Company, only one meeting will be held. Notice of the meeting, together with copies of the Proposals, this Explanatory Memorandum, a proxy form, and log-in details for the meeting to be held by videoconference via Zoom will be sent by email by my team to the Member.

6.4    The Member must return the proxy form to me and my team by email no later than 4pm the day before the Member's meeting.

6.5    Voting shall take place by the Member verbally voting for or against the proposals on the Zoom videoconference meeting. Voting in advance of the meeting is not permitted. The Member can raise questions or comment orally during the meeting.

6.6    The meeting of the Member of the Company shall take place on 20 March 2021.

### Creditors Meetings

6.7    There are 7 classes of Creditors, therefore 7 separate meetings will be held.

6.8     For all classes of Creditors, they are notified of the meetings by email sent by my team containing, or providing a link to, soft copies of the Proposals, this Explanatory Memorandum, proxy forms, log-on details for the meeting to be held by video conference via Zoom, a statement of the value of each Creditor's claim and a dedicated email address to contact in the event that the Creditor wished to dispute the claim. Voting shall take place by each participant verbally voting for or against the proposals on the Zoom videoconference meeting.  Voting in advance of the meetings is not permitted. Creditors can raise questions or comment orally during the meeting.

6.9     Creditors must return their proxy forms to me and my team by email no later than 4pm the day before the relevant class of Creditors' meeting.

6.10    Meetings of all Creditors of the Company shall take place on 19 and 20 March 2021.

        <u>General</u>

6.11    Care should be taken to execute the forms of proxy in accordance with the notes on the face of the form of proxy.

6.12    I will act as Chairman of the meetings and you may, if you so wish, appoint me as your proxy. If so appointed, I will vote in favour of the Proposals unless otherwise instructed.

6.13    It is not necessary to submit a proof of debt with a form of proxy in order to vote at a meeting of Creditors.

6.14    If a Creditor has transferred its debt (or any part of it) before or after the issuance of the Proposals but prior to the meetings of the Creditors, the log-in details for the Zoom videoconference should be transmitted to the purchaser/transferee.  The purchaser/transferee may request the transferring Creditor to complete a form of proxy on its behalf for the purpose of voting at the relevant meeting of Creditors.

**7       Creditor Claims**

7.1     I would like to draw your attention to the amount at which your Claim is stated in the Creditor Schedule at Schedule 4 to the Proposals.

7.2     The Proposals contain a procedure for parties wishing to make a Claim which, at the time the Proposals were formulated, the Company did not accept or accept in full, whether or not such parties were listed in the Creditor Schedule.  If a party wishes to make such a Claim, they are required to follow the procedures set out in the Proposals and briefly described further below.

**8       Summary of Proposals**

        <u>Treatment of Members</u>

8.1     There is only one Member in the Company and the interests of the Member **<u>are not impaired</u>** by the Proposals.

        <u>Treatment of Creditors</u>

                   ***A.   Specific Classes of Creditors***

8.2     The Proposals include the following provisions in respect of the 7 classes of Creditors of the Company:

*(1) Secured Creditors*

8.3     If the relevant Secured Amount is equal to or exceeds the amount of any Secured Creditor's Claim, each such Secured Creditor's Claim shall be unaffected by the Proposals and the existing security held by each such Secured Creditor shall remain in force.

8.4     If the relevant Secured Amount is less than the amount of any Secured Creditor's Claim:

8.4.1     each such Creditor's Claim shall be written down to the value of the relevant Secured Amount. The existing security held by each such Creditor shall remain in force only in respect of the relevant Secured Amount and shall otherwise be released in accordance with the Proposals; and

8.4.2     each such Creditor shall be paid a cash dividend of 1% of its Net Agreed Debt in full and final satisfaction of the Secured Creditor's Unsecured Claim Amount.

8.5     For the avoidance of doubt, the Proposals shall not prevent any Secured Creditor from enforcing its security over the Secured Assets on and from the Effective Date.

8.6     Each Secured Creditor shall be deemed to have absolutely, irrevocably and unconditionally released:

8.6.1     each relevant Related Company in respect of any liability related to or associated with the Secured Creditor's liability discharged under this paragraph and each such Related Company shall be treated as so released and discharged by operation of the Proposals without any further action on the part of the Related Companies under the Related Proposals or otherwise; and

8.6.2     the obligations of the Company and / or any Related Company under the guarantees provided by Company and / or any Related Company to the Secured Creditors in respect of any Related Companies' Guaranteed Obligations and such guarantees shall be terminated.

8.7     Consequently, the Secured Creditors **are impaired** by the Proposals **only if** the relevant Secured Amount is less than the amount of the Secured Creditor's Claim.

*(2) Unsecured Creditors*

8.8     Each Unsecured Creditor shall be paid a cash Dividend of 1% of its Net Agreed Debt in full and final satisfaction of the total amount of such Unsecured Creditor's Claim.

8.9     Consequently, the Unsecured Creditors **are impaired** by the Proposals.

*(3) Connected and Intercompany Creditors*

8.10    Each of the Connected and Intercompany Creditor's Claims are unsecured claims which shall be off set against any mutual claims as between the Company and the Connected and Intercompany Creditor's as at the Petition Date.

8.11    In the event that any residual balance is due by the Company to a Connected and Intercompany Creditor following any set off under the paragraph above (the "**Intercompany Payable**"), the Connected and Intercompany Creditor shall be paid a cash dividend of 0.5% of its Intercompany Payable in full and final satisfaction of the total amount of such Connected and Intercompany Creditor's Claim.

8.12    Consequently, the Connected and Intercompany Creditors **are impaired** by the Proposals.

### (4)  Co-Obligor Liability Creditors

8.13    The Claims of the Co-Obligor Liability Creditors have been discharged and released in full pursuant to the terms of the NAS Proposals.

8.14    The Co-Obligor Liability Creditors shall not receive any dividend in respect of their Claims under the Proposals. To the extent necessary, the Claims of the Co-Obligor Liability Creditor shall be written down in full in the Proposals.

8.15    Consequently, the Co-Obligor Liability Creditors **are impaired** by the Proposals.

### (5)  Terminated Contract Creditors

8.16    Unless agreed prior to the Irish Confirmation Date, the Claims of Terminated Contract Creditors shall be treated as Unagreed Creditors and their Claims shall be determined under the Expert Determination Process.

8.17    All Terminated Contract Creditors' Claims are unsecured claims and shall be subject to the same treatment as Unsecured Creditors whether agreed or upon the determination of their claim in accordance with the Expert Determination Process.

8.18    Consequently, the Terminated Contract Creditors **are impaired** by the Proposals.

### (6)  Contingent Litigation Creditor

8.19    As at the date of the Proposals:

8.19.1   the liability, if any, of the Company to the Contingent Litigation Creditor; and

8.19.2   the quantum, if any, due to the Contingent Litigation Creditor,

has not been determined.

8.20    Unless agreed and crystallised prior to the Effective Time, the Claims of the Contingent Litigation Creditor shall be determined by the courts of competent jurisdiction and, for the avoidance of doubt, the Expert Determination Process shall not apply.

8.21    Any actual, contingent or potential liability of the Company and NAS to the Contingent Litigation Creditor have been addressed in the NAS Proposals and the NAS Proposals provide for the absolute, irrevocable and unconditional release and discharge of the Company from any liability associated or related to the Contingent Litigation Creditor's Claim.

8.22    The Contingent Litigation Creditor shall not receive any dividend in respect of its Claims under the Proposals. To the extent necessary, the Claims of the Contingent Litigation Creditor shall be

written down in full in the Proposals.

8.23   Consequently, the Contingent Litigation Creditor **is impaired** by the Proposals.

### (7)  Counter-Indemnity Creditor

8.24   The Counter-Indemnity Creditor shall provide dividends to Co-Obligor Creditors and Contingent Litigation Creditors (should any liability arise) pursuant to the NAS Proposals.

8.25   Any residual Counter-Indemnity Creditor's Claims following the set-off provided for the in the NAS Proposals shall be written down in full and the Counter-Indemnity Creditor shall not receive any dividend in respect of its Claims.

8.26   Consequently, the Counter-Indemnity Creditor **is impaired** by the Proposals.

### B.   Determining the Claims of Unagreed Creditors

8.27   Unagreed Creditors' Claims (including, for the avoidance of doubt, any Pre-Repudiation Post-Petition Liabilities) will be determined in accordance with the Expert Determination Process set out in Clause 11.1 of the Proposals, provided that:

8.27.1   any determination under this process shall not be binding until the Effective Time; and

8.27.2   this process shall not apply to the Contingent Litigation Creditor whose Claims shall be determined by the relevant courts of competent jurisdiction.

8.28   In order for its Claim to be determined, each Unagreed Creditor must forward to the Company, by email to creditorclaims@norwegian.com, within 14 days after the Irish Confirmation Date a proof of claim setting forth the amount which it believes should be included as its claim for the purposes of the Proposals and the basis for the claim including supporting documents as applicable.  If an Unagreed Creditor fails to do so it will be deemed to have a claim for the amount stated in the Creditor Schedule or, to the extent any Creditor is not listed in the Creditor Schedule, it will have no valid claim whatsoever against the Company.

8.29   To the extent a Creditor submits a claim within the period set out in the preceding sub-paragraph, the provisions of Clause 11.1 of the Proposals shall apply and which will, to the extent the Company disputes its claim, enable that Creditor to refer its claim for expert determination by either the Aircraft Experts or the General Expert (as applicable) within the time period specified in the said Clause 11.1 .

8.30   The Company and the Unagreed Creditor shall each be liable for 50% of the costs and expenses of the relevant Expert in connection with his determination.

### C.  Consequences of the Proposals

8.31   Where required under the Proposals, the Company shall take all steps necessary to pay all cash dividends to the relevant Creditors on or before the General Payment Date (as defined in the Proposals).

### D.  Financial Position and Liquidation

8.32   A statement of assets and liabilities (including contingent and prospective liabilities) of the

Company as at the date of the Proposals is attached as Schedule 2 to the Proposals. The estimated financial outcome of a winding-up of the Company for the Members and the classes of Creditors is attached at Schedule 3 to the Proposals.

8.33    The statement of affairs on a winding up basis shows clearly that the Proposals would be more beneficial to the Creditors as a whole than a winding-up.

### E.   Material Interests of the Directors

8.34    In accordance with Section 540(11) of the Act, please note that the effect of the Proposals on any material interest of a Director, whether as Director, Creditor or Member of any of the Companies, is not different from the effect on any other Creditor or Member of the Company.

### F.   Implementation

8.35    The Proposals contain specific terms for implementation.

### G.   Conclusion

8.36    Please note that this Explanatory Memorandum is intended to be a summary of the Proposals only, for the convenience of the Member and Creditors, and is not intended to be legally binding or to be relied upon by the Member and/or Creditors. The Member and Creditors are therefore strongly advised to read the Proposals in their entirety.

8.37    I am of the opinion that the Proposals are in the best interests of the Member and the Creditors of the Company and I recommend them to you for your approval.


**KIERAN WALLACE**
**EXAMINER**

**Dated 11 March 2021**